# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

## No. 25-1257

---

### KAREN READ,
**Petitioner - Appellant**

*v.*

### NORFOLK COUNTY SUPERIOR COURT; ANDREA J. CAMPBELL, MASSACHUSETTS ATTORNEY GENERAL,
**Respondents - Appellees**

---

**On Appeal from an Order of the United States District Court
for the District of Massachusetts Denying Petition for Habeas Corpus**

---

**BRIEF OF APPELLANT KAREN READ**

---

Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
pabianlaw38@gmail.com

Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICITON….1

STATEMENT OF ISSUES PRESENTED……………………………………...1

INTRODUCTION……………………………………………………………….2

STATEMENT OF THE CASE……………………………………………….4

    Procedural Background……………………………………………………...4

    Jury Deliberations……………………………………………………...6

    Final Note and Declaration of Mistrial…………………………………....9

    Post-Trial Juror Statements…………………………………………...10

SUMMARY OF ARGUMENT……………………………………………...14

ARGUMENT……………………………………………………………...15

I.    RE-PROSECUTION ON COUNTS 1 AND 3 WILL VIOLATE READ'S DOUBLE JEOPARDY RIGHTS……………………………………..15

    A.    Standard of Review……………………………………………15

    B.    The Constitutional Protection Against Double Jeopardy……………16

    C.    Re-Prosecution Is Barred Because There Was No Manifest Necessity to Declare a Mistrial…………………………………………19

        1.    *The manifest necessity standard*……………………...19

        2.    *The record reflects no consideration of alternatives to a mistrial*……………………………………………..23

i

3.  *The trial court never consulted counsel regarding the possibility of a mistrial*……………………………………….30

4.  *The Commonwealth did not satisfy its burden of establishing manifest necessity*………………………………………….37

5.  *The declaration of mistrial here was a precipitous decision made with no evident consideration of Read's Double Jeopardy rights*……………………………………………………….39

6.  *No deference is due to the trial court because it failed to exercise sound discretion*………………………………….…..39

D.  The Jury's Unanimous Conclusion Following Trial that Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution…………………………………………………….…..40

E.  Alternatively, Petitioner Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Read………………………47

CONCLUSION………………………………………………………………...58

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*A Juvenile v. Commonwealth*, 392 Mass. 52 (1984).................................................26

*Allen v. Att'y Gen. of Me.*, 80 F.3d 569 (1st Cir. 1996)......................................6, 52

*Arizona v. Washington*, 434 U.S. 497 (1978) .................................................. *passim*

*Ball v. United States*, 163 U.S. 662 (1896)....................................................... 42, 45

*Blueford v. Arkansas*, 566 U.S. 599 (2012) ..................................................... *passim*

*Brady v. Samaha*, 667 F.2d 224 (1st Cir. 1981) .............................................. *passim*

*Christian v. Wellington*, 739 F.3d 294 (6th Cir. 2014)...........................................16

*Commonwealth v. Fidler*, 377 Mass. 192 (1979) ...................................................58

*Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337 (1996)..................................32

*Commonwealth v. Jenkins*, 416 Mass. 736 (1994) ................................................26

*Commonwealth v. Nicoll*, 452 Mass. 816 (2008)....................................................32

*Commonwealth v. Steward*, 396 Mass. 76 (1985) ........................................... 32, 40

*Commonwealth v. Taylor*, 486 Mass. 469 (2020)...................................................32

*Dennis v. United States*, 339 U.S. 162 (1950) .......................................................47

*Downum v. United States*, 372 U.S. 734 (1963) ....................................................38

*Erlinger v. United States*, 602 U.S. 821 (2024)............................................... 16, 17

*Gonzalez v. Justices of Mun. Court of Bos.*, 382 F.3d 1 (1st Cir. 2004) ...... 6, 15, 16

*Green v. United States*, 355 U.S. 185 (1957) .................................................. 18, 43

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ................................................51

*Harris v. Nelson*, 394 U.S. 286 (1969) .......................................................52

*Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021)...........................................15

*Hudson v. Louisiana*, 450 U.S. 40 (1981) ................................................42

*Justices of Bos. Mun. Court v. Lydon*, 466 U.S. 294 (1984) ..............................6, 53

*Martinez v. Illinois*, 572 U.S. 833 (2014) ................................................40

*McDonald v. Pless*, 238 U.S. 264 (1915) ................................................48

*McElrath v. Georgia*, 601 U.S. 87 (2024) ................................................ 40, 44, 57

*Montilla v. Fed. Nat'l Mortgage Assoc.*, 999 F.3d 751 (1st Cir. 2021) .................31

*Oregon v. Kennedy*, 456 U.S. 667 (1982)................................................19

*Picard v. Commonwealth*, 400 Mass. 115 (1987) ....................................32

*Porter v. Zook*, 898 F.3d 408 (4th Cir. 2018) .........................................50

*Price v. Georgia*, 398 U.S. 323 (1970)....................................................43

*Read v. Commonwealth*, 495 Mass. 312 (2025) ............................................ *passim*

*Remmer v. United States*, 347 U.S. 227 (1954) ........................................50

*Renico v. Lett*, 559 U.S. 766 (2010)................................................ *passim*

*Smith v. Phillips*, 455 U.S. 209 (1982) ................................................47

*Teti v. Bender*, 507 F.3d 50 (1st Cir. 2007) .........................................51

*Townsend v. Sain*, 372 U.S. 293 (1963)........................................ 51, 52

iv

*United States v. Armstead*, 116 F.4th 519 (D.C. 2024) ............................................25

*United States v. Barragan-Cepeda*, 29 F.3d 1378 (9th Cir. 1994)........................56

*United States v. Candelario-Santana*, 977 F.3d 146 (1st Cir. 2020).............. *passim*

*United States v. Dennison*, 73 F.4th 70 (1st Cir. 2023) .................................... 21, 29

*United States v. Dinitz*, 424 U.S. 600 (1976)............................................................20

*United States v. Dotson*, 817 F.2d 1127 (5th Cir. 1987) ................................... 43, 44

*United States v. Garske*, 939 F.3d 321 (1st Cir. 2019) ..................................... 20, 29

*United States v. Hernandez*, 146 F.3d 30 (1st Cir. 1998)........................................30

*United States v. Jorn*, 400 U.S. 470 (1971) (plurality opinion) ................ 19, 20, 21

*United States v. Kechego*, 91 F.4th 845 (6th Cir. 2024).........................................25

*United States v. Lara-Ramirez*, 519 F.3d 76 (1st Cir. 2008) ........................... 21, 57

*United States v. Mespoulede*, 597 F.2d 329 (2d Cir. 1979)....................................24

*United States v. Perez*, 22 U.S. 579 (1824) .............................................................22

*United States v. Pierce*, 593 F.2d 415 (1st Cir. 1979)............................................33

*United States v. Ramirez*, 884 F.2d 1524 (1st Cir. 1989) ............................... *passim*

*United States v. Stauffer*, 922 F.2d 508 (9th Cir. 1990) ..........................................44

*United States v. Tejeda*, 481 F.3d 44 (1st Cir. 2007)...............................................55

*United States v. Toribio-Lugo*, 376 F.3d 33 (1st Cir. 2004)........................... *passim*

*United States v. Tsarnaev*, 96 F.4th 441 (1st Cir. 2024) .................................. 48, 49

*United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020)...........................................58

*United States v. Villar*, 586 F.3d 76 (1st Cir. 2009) ................................... 48, 53, 56

*United States v. Zimny*, 846 F.3d 458 (1st Cir. 2017) .............................................47

*Wallace v. Havener*, 552 F.2d 721 (6th Cir. 1977)..............................................24

*Williams v. Taylor*, 529 U.S. 420 (2000) ..................................................51

*Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005)............................................. 51, 53

*Younger v. Harris*, 401 U.S. 37 (1971)..................................................52

## <u>Constitutional Provisions</u>

Fifth Amendment to U.S. Constitution .................................................. 2, 15, 17, 54

Sixth Amendment to U.S. Constitution ................................................ 15, 17, 47 54

Fourteenth Amendment to U.S. Constitution ...........................................................2

## <u>Statutes</u>

28 U.S.C. §2241 ...................................................................................... *passim*

28 U.S.C. §2246…………………………………………………………………..52

28 U.S.C. §2254 ................................................................................ 15, 16, 29, 51

Mass. Gen. Laws c. 234A, § 68C ......................................................................8, 25

## <u>Rules</u>

Mass. R. Crim. P. 27(b) .................................................................................2, 23

## Note on Citations to the Record

Material contained in the Addendum to the Brief is cited as "Add:____."

Material contained in the Appendix is cited in the Brief as "App:_____."

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This appeal arises from an order of the district court entered March 13, 2025 denying Read's petition for habeas corpus, Add:1-2; Read's notice of appeal was filed the same day.  App:653. The district court had jurisdiction under 28 U.S.C. §2241 and §1331.  This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

1.      Whether there was manifest necessity for the state trial judge to declare a mistrial, without considering any alternatives to a mistrial or providing counsel with an opportunity to be heard.

2.      Whether the jury's unanimous conclusion, reflected in post-trial affidavits of counsel, that Read is not guilty of two of the three charges against her (including second-degree murder) constitutes an acquittal and precludes re-prosecution.

3.      Whether Read is alternatively entitled to a post-verdict judicial inquiry to determine whether the evidence supports the juror representations as to having acquitted her.

1

## INTRODUCTION

Petitioner Karen Read is currently facing an April 1, 2025 retrial in Norfolk County Superior Court, after a prior mistrial in July 2024.  After unsuccessfully moving in state court to dismiss two of the three charges against her and petitioning the Supreme Judicial Court ("SJC") to review the denial of that motion, Read filed a petition for writ of habeas corpus in federal district court contending that retrial will violate her Fifth and Fourteenth Amendment protections against Double Jeopardy.  The petition relied upon post-trial statements of five jurors (four directly and one indirectly) that the jury in Read's first trial reached a final, unanimous decision to acquit her of second-degree murder and leaving the scene of a collision.  Despite massive media publicity regarding these declarations, none of the other seven jurors disputed the accuracy of the post-trial statements.

In the usual course, the jury's verdict would have been announced in open court, and re-prosecution for those charges would indisputably be constitutionally prohibited.  Here, however, the trial court, assuming but not verifying that juror notes indicating an impasse referred to all rather than just some of the outstanding charges, failed to inquire, pursuant to Mass. R. Crim. P. 27(b), regarding the existence of any partial verdicts (as well as failing to poll the jury) and, for that

reason, the jury acquittals were not announced and a mistrial was declared.

Contrary to longstanding federal as well as state caselaw, the trial court gave no

consideration to any of the existing viable alternatives to a mistrial, nor was

counsel consulted or given any opportunity to be heard in relation to the court's

declaration of a mistrial, and the record does not reflect that the trial court

considered the defendant's rights, reflected in the Double Jeopardy Clause, to

avoid the burdens and perils of a successive prosecution prior to declaring a

mistrial.  At no time prior to the trial court's final *sua sponte* decision to respond to

a jury note by declaring a mistrial had the trial court or the parties even mentioned

the word "mistrial."  In these circumstances, this Court's precedents, cited below,

compel the conclusion that the Commonwealth did not satisfy its heavy burden of

establishing manifest necessity, such that Read may not constitutionally be forced

to stand trial a second time.

Petitioner independently maintains that a jury's final, unanimous agreement

that Read is not guilty constitutes an acquittal for Double Jeopardy purposes, and

that the trustworthy and uncontradicted post-trial affidavits entitled her at

minimum to a judicial inquiry on this issue.  The district court's contrary ruling

takes the position that no post-trial showing, no matter how clear and convincing,

could ever warrant an inquiry to establish an unannounced acquittal.  In other words, even if all 12 jurors executed affidavits affirming, with no ambiguity, that they unanimously and finally found the defendant not guilty, *voir dire* of the jurors would be inappropriate.  Petitioner contends that no precedent or logic supports the erection of such an impenetrable procedural barrier to prevent Read from proving what is clearly true – that the jurors finally and unanimously agreed that she did not commit the murder for which she stands charged.  The district court's ruling is irreconcilable with the constitutional interest in having decisions by jurors respected and honored.  Public respect for the judiciary requires that agreements reached by a jury of the defendant's peers in a matter so consequential not be rendered irrelevant and that, at minimum, a post-trial *voir dire* be afforded when a defendant makes a showing as strong as Petitioner did in this case.

## STATEMENT OF THE CASE

### Procedural Background

On June 9, 2022, Read was charged in three separate indictments with second-degree murder in violation of Mass. Gen. Laws c. 265, §1 (Count 1); manslaughter while operating under the influence of alcohol in violation of Mass. Gen. Laws c. 265, §13½ (Count 2); and leaving the scene of a collision resulting in

death in violation of Mass. Gen. Laws c. 90, §24(2)(a½)(2) (Count 3).  App:186-91.  A jury trial began on April 16, 2024.  The trial court declared a mistrial on July 1, 2024.

After the mistrial, Read moved to dismiss Counts 1 and 3 on Double Jeopardy grounds.  On August 22, 2024, after hearing oral argument, the superior court issued an order denying Read's motion to dismiss.

On September 11, 2024, Read filed a petition for relief with the SJC pursuant to Mass. Gen. Laws c. 211, §3.  App:52.  On September 19, 2024, a single justice of the SJC (Dewar, J.) reserved and reported the case, without decision, to the full court.  App:470.  On February 11, 2025, the SJC issued an opinion affirming the denial of Read's motion to dismiss.  *See Read v. Commonwealth*, 495 Mass. 312 (2025).

Read filed her federal petition for habeas corpus on February 18, 2025.  App:5.  After oral argument, on March 13, 2025, the district court denied Read's petition.  Add:1-2.  Before denying the petition on the merits, the district court found that (1) Read, who is on pre-trial release pending her state court trial date, properly brought her petition under 28 U.S.C. §2241; (2) she satisfied the custody requirement to bring a habeas petition, *see Allen v. Att'y Gen. of Me.*, 80 F.3d 569,

5

572 (1st Cir. 1996); (3) she exhausted her state-court remedies; and (4) no abstention doctrine barred it from considering the petition, *see Allen*, 80 F.3d at 572; *Justices of Bos. Mun. Court v. Lydon*, 466 U.S. 294, 303 (1984). Add:9-11; *see also* App:598 (Respondents agreeing on all these points). The district court granted a certificate of appealability, finding that Read made a "substantial showing of the denial of a constitutional right as to all claims." Add:30 (citation omitted).[1]

## Jury Deliberations

On June 25, 2024, the jury in Read's first trial began deliberations after receiving instructions from the trial court. The court instructed the jurors, "You should continue deliberating until you have reached a final verdict on each charge." App:237. It also noted that Count 2 contained "lesser included charge[s]" of involuntary manslaughter and motor vehicle homicide, which the jury should consider "even if [the Commonwealth] fail[ed] to prove the greater charge of manslaughter while operating a motor vehicle under the influence of liquor." App:226, 229.

---

[1] While not required to appeal from the denial of this §2241 petition, *see Gonzalez v. Justices of Mun. Court of Bos.*, 382 F.3d 1, 6 (1st Cir. 2004), *vacated on other grounds and subsequently reinstated*, 420 F.3d 5, the district court *sua sponte* granted a certificate of appealability here.

6

The following day, on June 26, 2024, outside the presence of the jury, counsel for Read raised an issue regarding the verdict form. With respect to Count 2, the original verdict slip provided only one option to find Read not guilty before going on to ask whether Read was guilty of the offense charged, or guilty of one of the two lesser-included offenses. App:286. Counsel asked that the form be amended to provide "not guilty options for the subordinate charges under Count 2." App:259. The trial court initially indicated its disagreement with counsel's request. App:262. However, after considering the matter further, the court agreed to provide supplemental instructions and an amended verdict slip. App:263-68. Later that day, the court provided the supplemental instructions, telling jurors that "Count 2 encompasses three separate charges, the most serious of which is manslaughter while operating a vehicle under the influence of liquor." App:270. The jury should first focus on that "lead charge" and, "if the Commonwealth…failed to prove that crime beyond a reasonable doubt, then…consider the remaining lesser included offenses in descending order." App:270.

On June 28, 2024, the jury sent the following note to the court: "I am writing to inform you on behalf of the jury that despite our exhaustive review of the

evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict." App:297. The court asked counsel for their views "on whether there ha[d] been due and thorough deliberations" sufficient to support the giving of a so-called *Tuey-Rodriguez* charge. App:298; *see also* Mass. Gen. Laws c. 234A, §68C.[2] The Commonwealth responded that the charge should not be given because there "simply ha[d]n't been sufficient time yet." App:298. Counsel for Read disagreed, requesting that the court "read the *Tuey-Rodriguez* model instruction and go from there." App:299. The trial court sided with the Commonwealth ruling, "I am not prepared to find that there have been due and thorough deliberations at this point. So I am going to send them back out." App:300.

On July 1, 2024, the jury presented another note, stating:

> despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind. The divergence in our views are not rooted in a lack of understanding or effort but deeply held convictions that each of us carry, ultimately leading to a point where consensus is unattainable. We recognize the weight of this admission and the implications it holds.

---

[2] In the SJC's words, "[t]he *Tuey-Rodriguez* charge is a model instruction given when jurors report a deadlock after due and thorough deliberation that is designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view." *Read*, 495 Mass. at 315 n.4 (citation omitted).

App:311.  Upon being asked by the court, the parties reiterated their same previously expressed views, with the Commonwealth taking the position that due and thorough deliberations had not yet occurred and Read's counsel arguing that the court should give a *Tuey-Rodriguez* instruction.  App:308-10.  This time, the trial court decided to give the requested instruction.

### Final Note and Declaration of Mistrial

Later that day, the jury sent yet another note.  Thereafter, without reading the note to counsel, and without providing counsel with either an opportunity to be heard or an opportunity to consult with their client about the implication of a potential mistrial on one or more charges, the trial court simply stated, "The jury is at an impasse" and immediately called in the jurors.  App:314.  It then read the note on the record:

> despite our rigorous efforts, we continue to find ourselves at an impasse.  Our perspectives on the evidence are starkly divided.  Some members of the jury firmly believe that the evidence surpasses the burden of proof, establishing the elements of the charges beyond a reasonable doubt.  Conversely, others find the evidence fails to meet this standard and does not sufficiently establish the necessary elements of the charges.  The deep division is not due to a lack of effort or diligence but, rather, a sincere adherence to our individual principles and moral convictions.  To continue to

9

deliberate would be futile and only serve to force us to
compromise these deeply held beliefs.

App:315.

Immediately after reading the note, without soliciting the views of counsel in

any respect, and without inquiring of the jury whether the note reflected an

impasse on all or just some of the charges, the trial court stated, "I am not going to

do that to you, folks.  Your service is complete.  I am declaring a mistrial in this

case."  App:315.  The jury was then excused.  Counsel was not invited to speak

during this entire interaction.

### Post-Trial Juror Statements

The following day, on July 2, 2024, unsolicited by any party, one of the

jurors ("Juror A") contacted one of the attorneys for Read, Alan Jackson.  Juror A

stated that s/he "wish[ed] to inform [Attorney Jackson] of the true *results*" of the

jury's deliberations.  App:333.[3]  According to Juror A, "the jury unanimously

agreed that Karen Read is NOT GUILTY of Count 1 (second degree murder).

Juror A was emphatic that Count 1 (second degree murder) was 'off the table,' and

that all 12 of the jurors were in agreement that she was NOT GUILTY of such

---

[3] For purposes of adjudicating Read's Double Jeopardy claim, both the trial
court and the SJC "accepted" the juror statements reflected in the post-trial affidavits
"as true and accurate."  *Read*, 495 Mass. at 327 n.14.

10

crime." App:334. "[T]he jury also unanimously agreed that Karen Read is NOT GUILTY of Count 3 (leaving the scene with injury/death)." App:334.

One day later, on July 3, 2024, another attorney for Read, David Yannetti, was contacted by "two different individuals (hereinafter, 'Informant B' and 'Informant C') who had received information from two distinct jurors (hereinafter 'Juror B' and 'Juror C') both of whom were part of the deliberating jury in this case." App:330.

Informant B sent Attorney Yannetti "a screenshot he/she had received from someone (hereinafter, 'Intermediary B') of text messages that Intermediary B had received from Juror B. In that screenshot, Juror B texted the following to Intermediary B: 'It was not guilty on second degree. And split in half for the second charge…. I thought the prosecution didn't prove the case. No one thought she hit him on purpose or even thought she hit him on purpose [sic].'" App:330. Juror B later placed an unsolicited phone call to Attorney Yannetti, confirming that the information contained in the publicly filed Affidavit was accurate. App:377. "Juror B clarified, however, that he/she meant to write, 'No one thought she hit him on purpose or even knew that she had hit him.'" App:377-78. Juror B further told Attorney Yannetti s/he "believe[d] that every member of the jury, if asked,

11

w[ould] confirm that the jury reached Not-Guilty verdicts on indictments (1) and

(3)."  App:378.

Informant C had been in contact with another individual ("Intermediary C")

who is a co-worker and friend of Juror C and joined a Zoom meeting during which

Juror C discussed the trial.  Informant C sent Attorney Yannetti the below

screenshots of his/her text messages with Intermediary C regarding what Juror C

revealed in the Zoom meeting:

> Intermediary C:    "no consideration for murder 2.
> manslaughter started polling at 6/6
> then ended deadlock @ 4no8yes."
>
> ….
>
> Informant C:       "interesting.  if it was no consideration
> for murder two, shouldn't she have
> been acquitted on that count.    and
> hung on the remaining chargers [sic]
> goes back to the jury verdict slip that
> was all confusing"
>
> Intermediary C:    "she should've been acquitted I agree.
> Yes, the remaining charges were what
> they were hung on.    and that
> instruction paper was very confusing."

App:331-32.

After the filing of Read's initial motion to dismiss, but before the superior

court hearing on that motion, Attorney Jackson was contacted by two other

deliberating jurors. The first, "Juror D," stated "that the jury reached NOT GUILTY verdicts on Count 1 and Count 3, and that the disagreement was solely as to Count 2 and its lesser offenses." App:340. S/he recounted that, "after the jury was excused and aboard the bus, many of the jurors appeared uncomfortable with how things ended, wondering, *Is anyone going to know that we acquitted [Karen Read] on Count 1 and 3?*" App:340. Juror D unequivocally told counsel, "*Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3. Because that's what happened.*" App:340. "Juror E" similarly stated "that the jury was 'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges." App:370.

The Commonwealth filed a post-trial notice of disclosure informing the court that, "[o]n Sunday July 21, 2024, Assistant District Attorney Adam Lally received an unsolicited voicemail on his office's phoneline from an individual, who identified their self as a juror by full name and seat number." App:372. The message stated, "it is true what has come out recently about the jury being unanimous on charges 1 and 3." App:372. ADA Lally received a subsequent message from the same individual stating he could "confirm unanimous on charges one and three, as not guilty and as of last vote 9-3 guilty on the manslaughter

13

charges….." App:372. The Commonwealth additionally "received emails from three individuals who identified themselves as jurors" and "indicated they wished to speak anonymously." App:372. The Commonwealth declined to substantively respond to the voice messages or emails, instead claiming in responsive emails that it was ethically prohibited from discussing such matters. App:372.

## SUMMARY OF ARGUMENT

The district court's finding that the declaration of mistrial here was supported by manifest necessity was contrary to clear binding precedent. None of the factors that have guided this Court's manifest necessity analysis are satisfied. The record reflects no consideration by the trial court of any alternatives to a mistrial, including inquiring with the jury regarding the existence of any partial verdicts and/or whether the reported impasse applied to all, or just some, counts. The trial court never consulted counsel regarding its intent to declare a mistrial. The trial court acted precipitously, dismissing the jury just over two minutes after informing counsel that the jury's final note reflected an impasse. And there is no hint in the record that the trial court gave any consideration at all to Read's constitutional right not to be subjected to successive prosecutions.

Alternatively, given the central importance that acquittals have held in our

14

criminal justice system for hundreds of years, Petitioner respectfully submits that

the jury's unanimous agreement, reflected in the post-trial affidavits, that she is not

guilty precludes re-prosecution on Counts 1 and 3.  The affidavits, at the very least,

entitled Read to a post-trial judicial inquiry to substantiate the acquittals, just as

this Court has required where a defendant comes forward after trial with evidence

of juror bias or extraneous influence.  The Fifth Amendment guarantee against

Double Jeopardy is no less fundamental and deserving of protection than the Sixth

Amendment rights that have been held to require post-verdict inquiry.

## ARGUMENT

### I.    RE-PROSECUTION ON COUNTS 1 AND 3 WILL VIOLATE READ'S DOUBLE JEOPARDY RIGHTS

#### A.    Standard of Review

This Court reviews "a district court's…denial of habeas…de novo."

*Hernandez-Lara v. Lyons*, 10 F.4th 19, 26 (1st Cir. 2021) (citation omitted).

Because Read is "awaiting trial on state criminal charges," she "is not in

custody pursuant to the SJC's judgment."  *Gonzalez v. Justices of Mun. Court of

Bos.*, 382 F.3d 1, 6 (1st Cir. 2004).  Accordingly, her petition was brought under

28 U.S.C. §2241, not §2254.  *See id.*  Section 2254's restrictions on the scope of

habeas review, therefore, do not apply.  *See id.* at 7.  Instead, the Court "must defer

to the SJC's findings of fact, but must undertake plenary review of that court's resolution of issues of law." *Id.* (citation omitted); *see also Christian v. Wellington*, 739 F.3d 294, 298 (6th Cir. 2014) ("[H]abeas petitions governed by § 2241 are not subject to the heightened standards contained in § 2254(d)." (citation omitted)).

The district court did not identify any factual findings to which deference is due on habeas review. This Court has specifically held that "the inquiry into the [trial] judge's discretion and the existence vel non of manifest necessity" is "a question of law or, at most, a mixed question of law and fact," "***not*** a habeas corpus factual review." *Brady v. Samaha*, 667 F.2d 224, 229 n.6 (1st Cir. 1981) (emphasis added). Accordingly, the denial of Read's motion to dismiss is reviewed *de novo*. *See, e.g.*, *Gonzalez*, 382 F.3d at 7; App:598 (district court stating, and Respondents agreeing, that Read's petition presents "a legal question…to consider de novo").

## B.    The Constitutional Protection Against Double Jeopardy

The ancient right to a jury trial is no mere "procedural formalit[y] but [rather a] fundamental reservation[] of power to the American people." *Erlinger v. United States*, 602 U.S. 821, 832 (2024) (citation omitted). "By requiring the Executive

16

Branch to prove its charges to a unanimous jury beyond a reasonable doubt, the Fifth and Sixth Amendments seek to mitigate the risk of prosecutorial overreach and misconduct, including the pursuit of 'pretended offenses' and 'arbitrary convictions.'" *Id.* (citation omitted). "Prominent among the reasons colonists cited in the Declaration of Independence for their break with Great Britain was the fact Parliament and the Crown had 'depriv[ed] [them] in many cases, of the benefits of Trial by Jury.'" *Id.* at 829 (citation omitted). "After securing their independence, the founding generation sought to ensure what happened before would not happen again. As John Adams put it, the founders saw representative government and trial by jury as 'the heart and lungs' of liberty." *Id.* (citation omitted). It follows that a jury acquittal is entitled to the utmost respect in our criminal justice system. *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) ("Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that [a] verdict of acquittal…could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution." (citation omitted)).

"The Double Jeopardy Clause provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Blueford v.*

*Arkansas*, 566 U.S. 599, 605 (2012) (quoting U.S. Const., Amdt. 5).  "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." *Green v. United States*, 355 U.S. 185, 187 (1957).  "Even if the first trial is not completed, a second prosecution may be grossly unfair.  It increases the financial and emotional burden on the accused, prolongs the period in which [s]he is stigmatized by an unresolved accusation of wrongdoing, and ***may even enhance the risk that an innocent defendant may be convicted***."  *Arizona v. Washington*, 434 U.S. 497, 503-04 (1978) (internal footnotes omitted) (emphasis added); *see also Martin Linen*, 430 U.S. at 569 ("At the heart of this policy is the concern that permitting the sovereign freely to subject the citizen to a second trial for the same offense would arm Government with a potent instrument of oppression."); *Blueford*, 566 U.S. at 605 ("The Clause guarantees that the State shall not be permitted to make repeated attempts to convict the accused, thereby subjecting h[er] to embarrassment, expense and ordeal and compelling h[er] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent [s]he may be found guilty." (citation omitted)).

18

**C.    Re-Prosecution Is Barred Because There Was No Manifest Necessity to Declare a Mistrial**

1.    *The manifest necessity standard*

"[A]s a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Washington*, 434 U.S. at 505. This rule is rooted in "the importance to the defendant of being able, once and for all, to conclude h[er] confrontation with society through the verdict of a tribunal [s]he might believe to be favorably disposed to h[er] fate." *United States v. Jorn*, 400 U.S. 470, 486 (1971) (plurality opinion); *see also Oregon v. Kennedy*, 456 U.S. 667, 671-72 (1982) ("[T]he Double Jeopardy Clause affords a criminal defendant a valued right to have h[er] trial completed by a particular tribunal." (citation omitted)).  Thus, "after a mistrial has been declared without the defendant's request or consent,"[4] the permissibility of retrial "depends on whether there [wa]s a manifest necessity for the [mistrial]." *United States v. Dinitz*, 424

---

[4] Neither the district court nor the SJC found that Read or her counsel consented to the mistrial here.  Add:17 n.9; *Read*, 495 Mass. at 326 n.13.  And for good reason.  Neither Read nor her counsel requested or expressly consented to a mistrial.  While consent may, in some circumstances, be implied "from a failure to object," any such finding requires, "at a bare minimum, that the defendant…had an adequate opportunity to register an effective objection." *United States v. Toribio-Lugo*, 376 F.3d 33, 40 (1st Cir. 2004).  For reasons discussed *infra* pages 30-37, no such opportunity was provided here.

19

U.S. 600, 606-07 (1976) (citation omitted).

   ***Importantly, the "heavy" burden of establishing "manifest necessity" to justify a mistrial is exclusively on the Commonwealth***, *Washington*, 434 U.S. at 505 (emphasis added), a burden that the district court and state courts erroneously placed on Petitioner.

   While the manifest necessity standard cannot "be applied mechanically," this Court has repeatedly considered three factors as "useful" to the inquiry: "(1) whether the [trial] court consulted with counsel; (2) whether the court considered alternatives to a mistrial; and (3) whether the court adequately reflected on the circumstances before making a decision." *United States v. Garske*, 939 F.3d 321, 334 (1st Cir. 2019) (citations omitted). These factors are consistent with the Supreme Court's manifest necessity jurisprudence. *See Jorn*, 400 U.S. at 487 (finding no manifest necessity where "no consideration was given to the possibility of a trial continuance" and "had the prosecutor been disposed to suggest a continuance, or the defendant to object to the discharge of the jury, there would have been no opportunity to do so"). And they have time and again guided this Court's manifest necessity analysis, both before and after *Renico v. Lett*, 559 U.S. 766 (2010), a decision relied upon heavily by Respondents and the district court.

20

*See, e.g.*, *United States v. Dennison*, 73 F.4th 70, 78 (1st Cir. 2023); *United States v. Candelario-Santana*, 977 F.3d 146, 158 (1st Cir. 2020); *Garske*, 939 F.3d at 334; *United States v. Lara-Ramirez*, 519 F.3d 76, 85 (1st Cir. 2008); *United States v. Toribio-Lugo*, 376 F.3d 33, 39 (1st Cir. 2004); *United States v. Ramirez*, 884 F.2d 1524, 1529 (1st Cir. 1989); *Brady*, 667 F.2d at 229.

"Embracing both…consideration of alternatives and consultation with counsel[] is the amount of time devoted by the judge to the mistrial decision. A precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial…tend[s] to indicate insufficient concern for the defendant's constitutional protection." *Brady*, 667 F.2d at 229. Essential to an assessment of whether the trial court's *sua sponte* declaration of a mistrial was precipitous is whether that decision entailed "careful consideration of the valued right of the defendant[] to have [her] guilt or innocence determined" at a single trial. *Id.* at 230; *see also Jorn*, 400 U.S. at 486 ("the judge must always temper the decision whether or not to abort the trial by considering the importance" of defendant's Double Jeopardy rights); *Washington*, 434 U.S. at 515-16 ("evincing a concern for the possible double jeopardy consequences of an erroneous ruling, [court] gave both defense counsel and the prosecutor full opportunity to explain their positions

on the propriety of a mistrial," thus indicating "that the trial judge acted responsibly and deliberately, and accorded careful consideration to respondent's interest in having the trial concluded in a single proceeding").

For reasons set forth below, all three factors are clearly unsatisfied here under this Court's binding precedents. In these circumstances, a finding that there was no manifest necessity to support the mistrial does not require the application of any impermissible "mechanical" rule. *Renico*, 559 U.S. at 775 (citation omitted). Rather, it follows ineluctably from the Supreme Court's pronouncement more than 200 years ago that the "power" to discharge a jury without a verdict "ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious cases." *United States v. Perez*, 22 U.S. 579, 580 (1824). Petitioner is not second-guessing a trial court which considered viable options, gave both counsel an opportunity to be heard before making the pivotal mistrial decision, and carefully weighed the defendant's rights against being re-prosecuted in the decision. Here, the evidence reflects that the trial court satisfied ***none*** of the factors that this Court and the Supreme Court have relied upon as the criteria for whether a mistrial is ordered only "with the greatest caution, under urgent circumstances, and for very plain and obvious cases."

22

2.    *The record reflects no consideration of alternatives to a mistrial*

Turning to the relevant factors, the record reflects no judicial consideration of alternatives to a mistrial.  *See Ramirez*, 884 F.2d at 1529 ("[I]n determining whether there was a manifest necessity for a mistrial, our first inquiry must be whether the court gave adequate consideration to the existence of any less drastic alternative." (citation omitted)); *Candelario-Santana*, 977 F.3d at 162 ("At the very least, we require the district court to consider other options to ensure that the jury is genuinely deadlocked before discharging it."); *Brady*, 667 F.2d at 229 ("Whether or not the record indicates [court] has considered alternatives to a mistrial is significant.").  "Where there is a viable alternative to a mistrial and the [trial] court fails adequately to explore it, a finding of manifest necessity cannot stand."  *Toribio-Lugo*, 376 F.3d at 39.

Here, there was one obvious alternative: to simply ask the jury to specify the charge(s) on which it was deadlocked and/or to ask the jury whether or not its final note related to all or less than all of the charges.  This option is apparent from the face of Mass. R. Crim. P. 27(b) which states that "[t]he judge may declare a mistrial as to any charges upon which the jury cannot agree upon a verdict; **provided**, however, that the judge may first require the jury to return verdicts on

23

those charges upon which the jury can agree and direct that such verdicts be received and recorded." (Emphasis added). In fact, the reporter's notes expressly indicate that such reception of partial verdicts is **required** before a mistrial may be declared for manifest necessity. *See* Mass. R. Crim. P. 27, reporter's notes ("This rule also provides that the court may declare a mistrial in cases where the jury is unable to reach a verdict. However, it **must** first receive and record the verdicts which the jury can agree upon." (emphasis added)). Had the court inquired as to the existence of any partial verdicts, and the jury articulated its verdict consistent with the statements of Juror A, Juror B, Juror C, Juror D, and Juror E, the Double Jeopardy implications would have been clear and decisive. "[I]ndeed, with virtual unanimity, the cases have applied collateral estoppel to bar the Government from relitigating a question of fact that was determined in defendant's favor by a partial verdict." *United States v. Mespoulede*, 597 F.2d 329, 336 (2d Cir. 1979); *see also Wallace v. Havener*, 552 F.2d 721, 724 (6th Cir. 1977) ("When the jury hands down a partial verdict, a final judgment is rendered on the counts upon which the jury has reached agreement.").

The district court erroneously relied upon the trial judge's consideration of a separate legal issue, namely the propriety of a *Tuey-Rodriguez* instruction under

state law, in response to the first two jury notes.  *See infra* pages 33-34.  But that

says nothing about the requisite consideration of alternatives ***to a mistrial***.  The

state statutory prohibition on ordering the jury to continue deliberations without

consent upon reporting an impasse – but allowing deliberations upon consent –

following a *Tuey-Rodriguez* charge, *see* Mass. Gen. Laws c. 234A, §68C, was one

among many factors that the trial court should have considered in consultation with

the parties.  The statute would not have prohibited the trial court from simply

asking whether the jury had reached a verdict on any count(s) or asking the jury

whether its impasse related to all or less than all charges.

Contrary to the district court's suggestion, Add:16, there is simply nothing

coercive about asking a jury whether it has reached a verdict on some but not all

separately charged counts.  *See, e.g.*, *United States v. Armstead*, 116 F.4th 519, 526

(D.C. 2024) (affirming instruction that "simply asked the jury to report any partial

verdict it had already reached" as non-coercive); *United States v. Kechego*, 91

F.4th 845, 852 (6th Cir. 2024) ("[A] court does not err if it asks about a partial

verdict [even] when it is clear that the jury is at an impasse and further

deliberations would prove fruitless.").[5]  Moreover, the trial court could have

---

[5] *Blueford* held that, before declaring a mistrial, the trial court was not required

alternatively (a) informed the jury that it could not be required to continue deliberations without its consent and still (b) asked it to retire to consider whether it was prepared to return any partial verdict. *See Commonwealth v. Jenkins*, 416 Mass. 736, 739-40 (1994). This Massachusetts statute, on its face, by permitting the jury to be sent back to continue deliberating with its consent, contemplates that courts may non-coercively make a post *Tuey-Rodriguez* inquiry to the jury as to whether it consents to continuing deliberations. Whether the trial court would have ultimately adopted any of these alternatives is beside the point. The dispositive fact for present purposes is that the record provides no indication that the trial court even considered available alternatives.

This Court's decision in *United States v. Toribio-Lugo*, 376 F.3d 33 (1st Cir. 2004), provides a helpful analogue evidencing the importance in this circuit's manifest necessity jurisprudence of a showing that the trial court carefully considered viable legal alternatives to a *sua sponte* mistrial order. There, in the

---

to permit the jury to return a partial verdict on lesser-included offenses within a single charge. The Supreme Court explained that, "under Arkansas law, the jury's options…were limited to two: either convict on one of the offenses, or acquit on all." 566 U.S. at 610. By contrast, where, as here, unlike in *Blueford*, "a complaint or indictment, in multiple counts, charges multiple crimes," a partial verdict is an available alternative under Massachusetts law. *A Juvenile v. Commonwealth*, 392 Mass. 52, 55 n.1 (1984).

midst of trial, upon noticing "that only eleven jurors were present," the district

judge "consulted with both the prosecutor and the [defendant's] lawyers," outlining

"two options: either postpone the trial until the twelfth juror could be located or

proceed with a jury of eleven." *Id.* at 36.  Defense counsel "conferred with her

client and informed the judge that the [defendant] did not wish to proceed at that

moment with eleven jurors, but, rather, would like to wait for…a twelve-member

jury." *Id.* (internal quotation marks omitted).  Shortly thereafter, the judge learned

"that the missing juror had been absent during some or all of the earlier portions of

the trial.  The judge then announced that he was going to declare a mistrial because

only eleven jurors had heard the evidence and he did not believe that there was any

way to cure that defect." *Id.*  The trial judge denied a subsequent motion to

dismiss on the grounds "that a mistrial was required by manifest necessity because

only eleven jurors remained and the [defendant] had refused to proceed with fewer

than twelve." *Id.*

This Court reversed, finding that "there was a clear alternative to a mistrial:

proceeding with eleven jurors." *Id.* at 39.  While the district court had "tentatively

explored" that alternative, it "never exhausted" it. *Id.*  "The court never offered the

[defendant] a choice between proceeding with eleven jurors or accepting a

27

mistrial." *Id.* In fact, "during the pertinent time frame," as here, the court "made no effort to ascertain the [defendant's] attitude or wishes with regard to the possibility of a mistrial. In view of these omissions, the record compel[led] a conclusion that the 'jury of eleven' alternative was not adequately explored." *Id.*

The present case reflects even less consideration of alternatives to a mistrial. While the trial court discussed the two prior jury notes reporting an impasse with counsel, it did so only in the context of deciding whether to give a *Tuey-Rodriguez* charge, and the court did not even mention the prospect of a mistrial. "[T]here is nothing in the record to indicate that the judge was considering a mistrial at that time." *Brady*, 667 F.2d at 230. Instead, the trial judge was weighing the defendant's request for a *Tuey-Rodriguez* charge against the Commonwealth's desire to just allow the jurors to continue to deliberate. While the notes stated that the jury had reached an impasse on some charges, "[t]he test is not whether the judge considered that [s]he had a potential problem on h[er] hands but rather whether [s]he 'accorded careful consideration to [defendant's] interest in having the trial concluded in a single proceeding.'" *Id.* (quoting *Washington*, 434 U.S. at 516). "With the record barren of any hint whatsoever that the judge was aware of

the double jeopardy implications of h[er] decision," Petitioner respectfully submits

that this Court cannot find "that h[er] discretion was sound." *Id.* at 230-31.

The district court suggested that *Toribio-Lugo* was "superseded" by the

Supreme Court's subsequent opinion in *Renico*. Add:14 n.7.  But this Court has

continued to favorably cite *Toribio-Lugo*, and the three relevant factors set forth

*supra* page 20, with no hint of abrogation.  *See Dennison*, 73 F.4th at 78;

*Candelario-Santana*, 977 F.3d at 158;[6] *Garske*, 939 F.3d at 334.   And for good

reason: *Renico* depended heavily upon restrictions imposed on habeas petitions

under §2254, which Respondents conceded and the district court found are

inapplicable to Read's §2241 petition.  The sole question presented in *Renico* was

whether the state court's rejection of the Double Jeopardy claim represented "an

unreasonable application of…clearly established Federal law, ***as determined by the***

***Supreme Court of the United States***."  559 U.S. at 772 (quoting §2254(d)(1))

(emphasis added).  Because the *Renico* Court's inquiry was restricted to clearly

established Supreme Court precedent, it had no occasion to, and indeed could not

have, abrogated this Court's manifest necessity precedent.  Notably, because of the

---

[6] Indeed, in *Candelario-Santana*, this Court cited *Toribio-Lugo*, including its consideration of the three factors, and *Renico* in consecutive paragraphs.  *See* 977 F.3d at 158.

highly deferential standard of review not applicable here, *Renico* expressly declined to even determine whether the state court's conclusion regarding manifest necessity was correct.  *See id.* at 779 ("Whether or not the Michigan Supreme Court's opinion reinstating [petitioner's] conviction…was *correct,* it was clearly *not unreasonable*." (emphasis in original)).[7]

       3.     *The trial court never consulted counsel regarding the possibility of a mistrial*

The record is equally lacking on the second factor because "the [trial] judge did not give counsel an opportunity to object or discuss with them the advisability of a mistrial."  *Ramirez*, 884 F.2d at 1529.  Upon receiving the final jury note, the court declared a mistrial and excused the jury without consulting counsel.  This was directly contrary to the "preferred practice" for addressing jury notes outlined by this Court, which includes "sharing [the note] with counsel, and affording the lawyers an opportunity to suggest an appropriate rejoinder."  *United States v. Hernandez*, 146 F.3d 30, 35 (1st Cir. 1998).

---

[7] Moreover, the district court's reliance upon the lack of opportunity to be heard in *Toribio-Lugo*, Add:16 n.8, overlooks the fact that the Court separately concluded that the trial judge's lack of consideration of alternatives precluded a finding of manifest necessity.  Neither the district court nor Respondents made any effort to distinguish this aspect of *Toribio-Lugo*, and Petitioner respectfully submits it is materially indistinguishable.

Video footage[8] reinforces the suddenness of the court's action and
corresponding lack of any meaningful opportunity to be heard.  At the
approximately 5:47:25 mark of the video, the court took the bench and stated,
"[t]he jury is at an impasse."  In contrast to the procedure followed as to prior
notes, this note was not read to counsel, nor had the court advised counsel whether
the court would make further inquiries of the jury regarding its note.  Instead, the
court immediately called for the jury to be brought in.  The sound of a door
opening or closing can be heard and then, at approximately 5:47:55, a mere 30
seconds later, the jury arrived in the courtroom.  The court then read the note on
the record.  At 5:49:23, the court stated it was declaring a mistrial and immediately
discharged the jury at 5:49:30, a mere seven seconds later.  These circumstances
did not provide Read's counsel with a meaningful opportunity to be heard,
particularly given that they had no knowledge as to the contents of the note,

---

[8] *Available at*
https://www.youtube.com/watch?v=0An5qcRINe8&list=PLGE3I9evF9H_XqVRt8
WzVmdICluMirtCg&t=7s.  Petitioner respectfully submits that the Court may take
judicial notice of the contents of the video, which, despite Read's reliance upon it
in state and federal court, neither the Commonwealth nor Respondents have
questioned the accuracy of in any respect. *See, e.g.*, *Montilla v. Fed. Nat'l
Mortgage Assoc.*, 999 F.3d 751, 760 n.8 (1st Cir. 2021) (taking judicial notice of
facts reflected in undisputed news articles).

whether it related to all or just some counts, or whether the court intended to either question the jury foreperson or others or ask counsel to approach the bench to be heard before declaring a mistrial.

Legal and factual context renders the trial court's action even more unexpected. Legally, trial counsel was entitled to rely on decades of caselaw expressly requiring a "full opportunity to be heard" before the declaration of a mistrial. *Commonwealth v. Steward*, 396 Mass. 76, 79 (1985).[9] Factually, in response to multiple prior jury notes in this case, the trial court had always advised counsel of the contents and then afforded them time first to consider and then be heard regarding any issues raised. App: 297-98, 308-10. The trial court's deviation from that well-known and accepted practice with respect to the final note was a "precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial." *Brady*, 667 F.2d at 229. It also deprived defense counsel of any opportunity to raise issues or even discuss potential remedies with their client or even the court during the pivotal time period between their first hearing the contents of the note and the court's unexpected decision to *sua sponte*

---

[9] *See also Commonwealth v. Taylor*, 486 Mass. 469, 484 (2020); *Commonwealth v. Nicoll*, 452 Mass. 816, 818 (2008); *Picard v. Commonwealth*, 400 Mass. 115, 118 (1987); *Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337, 340 (1996).

declare a mistrial without asking for the input of either the prosecution or defense.

Petitioner respectfully submits that, given the importance of Double Jeopardy protections and the profound implications of a retrial for a criminal defendant, an opportunity to be heard must, in order to be meaningful, occur after a reasonable opportunity for counsel to consult with their client. *See, e.g.*, *United States v. Pierce*, 593 F.2d 415, 417 n.1 (1st Cir. 1979) (noting in finding lack of manifest necessity that counsel had no opportunity to discuss the prospect of a mistrial with his client). Counsel for Read had no such opportunity here.

The district court erred in multiple respects in ruling that counsel had a sufficient opportunity to be heard. First, the court relied upon the trial judge's "solicit[ation of] counsel's views after the first and second notes," when "it should have been obvious to all parties that a mistrial was highly likely." Add:15. But those discussions related solely to the propriety of giving a *Tuey-Rodriguez* charge, which again "is designed to urge the jury to reach a verdict," *Read*, 495 Mass. at 315 n.4 (citation omitted). Defense counsel's request for a *Tuey-Rodriguez* charge implied that their desire was not to have a mistrial but instead to have the trial court urge this jury to reach a verdict. No party sought or even discussed a mistrial in this case, and the defense request for a *Tuey-Rodriguez* instruction was the

antithesis of a motion for mistrial.  Counsel could not have known prior to the

giving of a *Tuey-Rodriguez* charge whether it would succeed in prompting a

verdict.  Even assuming *arguendo* that the possibility of a mistrial was "obvious,"

Add:15, despite the fact that it had not yet been mentioned a single time, it was far

from obvious that, directly contrary to decades of caselaw and past practice in this

case, the trial judge would declare a mistrial without first consulting counsel.

Second, with respect to the final jury note, the district court found that while

"the span of time was relatively brief [just over two minutes] between the point

that the trial judge advised counsel that the jury was at an impasse and the point

she declared a mistrial," "it was not so brief that counsel could not have objected

or asked to be heard."  Add:15-16.  This reasoning ignores the reality of counsel's

situation.  For one thing, the district court failed to acknowledge that, at this point,

the trial court had not stated its intent to declare a mistrial, disclosed the content of

the note to counsel, or made clear that after reading the note there would be no

opportunity for counsel to be heard.  Even assuming *arguendo* counsel was on

notice that a mistrial ***may*** be declared, they cannot reasonably be expected to have

decided upon and interjected to express a position on such a weighty matter

without having had any opportunity to consult with their client whose rights were

at stake, without any notice as to what the jury said to the court including whether the impasse was expressly on all not just a subset of charges, and without any idea as to precisely when the jury (who had already been called to the courtroom) would arrive.

The district court's analysis of this issue is, moreover, irreconcilable with two binding precedents. In *Ramirez*, after taking witness testimony regarding a possible defect in the jury venire, the trial court declared a mistrial "without consulting defense counsel or the prosecutor." 884 F.2d at 1527. "The jury was then brought in, thanked for their services and discharged." *Id.* This Court held that this did not constitute a sufficient opportunity to object for Double Jeopardy purposes, even though counsel (no less than in the present case) could have lodged an objection or asked to be heard. In fact, in *Ramirez*, unlike in the present case, the court had, prior to taking the witness testimony, already asked counsel for their position regarding a mistrial, putting them on notice of the issue. *See id.* at 1526. Similarly, in *Brady*, the trial court, shortly after appointing standby counsel, "heard the defendants…outside the presence of the jury" regarding an order it had issued "to govern the conduct of…the trial." 667 F.2d at 227. When the defendants became argumentative, the court "order[ed] a mistrial." *Id.* Given that the jury

was not present, defendants or standby counsel could theoretically have objected. But this Court nonetheless found the trial judge's failure to confer with the parties "before making the decision" "improper." *Id.* at 229. These two precedents, which the district court did not distinguish despite Read's repeated citation, are dispositive here. In fact, unlike in the present case, the trial court in *Ramirez* and *Brady* stated its intent to declare a mistrial **before** calling in the jury, providing more of an opportunity to object than that afforded to Read.

The district court also erred by relying in part upon counsel's failure to have sought "reconsideration…before the jury was formally discharged." Add:16. That opportunity appears to have been no less available in *Ramirez* and *Brady*. Moreover, this Court has specifically held such an after-the-fact opportunity insufficient. *See Candelario-Santana*, 977 F.3d at 162 (noting in finding insufficient opportunity to object that district court "only addressed counsel after reading and confirming the verdict in open court to ask if there was '[a]nything else' before discharging the jury");[10] *Renico*, 559 U.S. at 794 n.17 (Stevens, J., dissenting) ("[W]e have never suggested that defendants must object to [mistrial] orders to preserve a claim, much less object to an order issued *sua sponte* and

---

[10] While the district court cited *Candelario-Santana* on other points, it did not address this language.

without any advance notice."); *Ramirez*, 884 F.2d at 1529 ("stress[ing] the importance of giving counsel an opportunity to be heard ***before*** declaring a mistrial" (emphasis added)).[11]

4. *The Commonwealth did not satisfy its burden of establishing manifest necessity*

While the law is clear that a jury deadlock may constitute manifest necessity, "[t]he key to this principle, of course, is that the jury must be *genuinely* deadlocked." *Candelario-Santana*, 977 F.3d at 158. "[T]he prosecution has a heavy burden to show that the mistrial was justified by manifest necessity." *Brady*, 667 F.2d at 228 (quoting *Washington*, 434 U.S. at 505).

Here, it is "possible" to read the jury notes, in the context of the trial court's instructions, as reflecting an impasse on one count but not others. *Candelario-Santana*, 977 F.3d at 159. The jury's reference to "charges" is easily reconciled with the post-trial affidavits affirming that the only deadlock related to the lesser-included offenses of Count 2. Indeed, the trial court repeatedly referred to those lesser-included offenses as distinct and multiple "charge[s]," both in its initial and supplemental instructions to the jury. App:226, 229, 270. In this context, the

---

[11] Defense counsel would risk the displeasure of the jury and court if in the one or two seconds after they first heard the content of the note they interrupted the court as it *sua sponte* declared a mistrial.

jury's final note was facially susceptible to two alternative interpretations: (1) that the jury had reached an impasse as to all charges, or (2) that the deadlock applied to only some of those charges (*e.g.*, multiple lesser-included allegations within Count 2). The information received from jurors post-trial proves the latter interpretation was correct. The jury's failure to expressly mention its agreement on Counts 1 and 3 is understandable in light of the court's instruction that it "should continue deliberating until" it had "reached a final verdict on **each** charge." App:237 (emphasis added).

The trial court "took no steps to clarify the jury's" notes. *Candelario-Santana*, 977 F.3d at 160. In the Double Jeopardy context, where the Commonwealth alone bears the burden of establishing manifest necessity, this ambiguity must be read in the defendant's favor. *See id.* at 161 ("[A]mbiguous verdicts…must be construed in favor of the defendant."); *Downum v. United States*, 372 U.S. 734, 738 (1963) ("We resolve any doubt in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion." (citation omitted)). The district court therefore erred in adopting the state courts' characterization of the jury notes as an unambiguous declaration of an impasse on all counts. Add:14-15. Despite Read repeatedly

38

raising this issue at all stages of the litigation, neither the trial court, the SJC, nor the district court so much as mentioned the caselaw's clear allocation of the burden on the Commonwealth to justify retrial.

5. *The declaration of mistrial here was a precipitous decision made with no evident consideration of Read's Double Jeopardy rights*

"In sum, a decision…made so precipitately," in the span of just over two minutes, "could not have been the product of any careful consideration of the valued right of the defendant[] to have [her] guilt or innocence determined" in a single trial. *Brady*, 667 F.2d at 230. Indeed, the record reflects no hint of the trial court's "deliberation and concern for [Read's] protected interest in completing the trial." *Id.* at 229. "Where a constitutional right of the magnitude of the protection against double jeopardy is involved," the Court "cannot defer to the judgment of the trial judge where the circumstances make that judgment so manifestly suspect." *Id.* at 231.

6. *No deference is due to the trial court because it failed to exercise sound discretion*

Although, in other circumstances, "a reviewing court may defer to the trial court's discretion to make a mistrial decision, '[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to h[er], the reason for

39

such deference…disappears." *Brady*, 667 F.2d at 229 (quoting *Washington*, 434

U.S. at 510 n.28); *see also Steward*, 396 Mass. at 79 (stating that deferential review

is appropriate "only if it is clear from the record that the judge has given careful

consideration to the available alternatives and to the defendant's interest in having

the trial concluded in a single proceeding." (citation omitted)).  Here, the district

court (like the SJC before it) committed legal error by relying heavily upon the

trial court's discretion, notwithstanding that the record reflects no exercise of

sound discretion.  Add:12-17.

### D. The Jury's Unanimous Conclusion Following Trial that Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution

"[W]hat constitutes an 'acquittal' is not to be controlled by the form" of the

action in question.  *Martinez v. Illinois*, 572 U.S. 833, 841-42 (2014) (citation

omitted).  "Rather, [the Court] must determine whether" the action "actually

represents a resolution, correct or not, of some or all of the factual elements of the

offense charged."  *Martin Linen*, 430 U.S. at 571.  "[L]abels—including those

provided by state law—do not control [the] analysis…."  *McElrath v. Georgia*, 601

U.S. 87, 96 (2024) (citation omitted).  This is because "***whether an acquittal has***

40

***occurred for purposes of the Double Jeopardy Clause is a question of federal,
not state, law*.**" *Id.* (emphasis added).

Here, the affidavits by Attorneys Jackson and Yannetti reflect statements by
four deliberating jurors that the jury had reached a final, unanimous conclusion that
Read is not guilty of Counts 1 and 3 (and an indirect statement by a fifth juror that
they had agreed with respect to Count 1). Both the trial court and the SJC, for
purposes of ruling on the Double Jeopardy issue, "proceed[ed] from the
assumption that the affidavits [we]re accurate." *Read*, 495 Mass. at 327 n.14.
There was nothing tentative about the jurors' statements. To the contrary, they
were definitive in describing the result of the jury's deliberations. App:334 ("Juror
A was emphatic that Count 1 (second degree murder) was 'off the table,' and that
all 12 of the jurors were in agreement that she was NOT GUILTY of such crime."),
330 (reflecting text message from Juror B, "It was not guilty on second degree….
No one thought she hit him on purpose or even [knew that she had hit him]"), 331
(reflecting Juror C's statement, relayed by Intermediary C, that there was "no
consideration for murder 2"), 340 ("Juror D, without hesitation, said in substance,
*Every one of us will agree and acknowledge that we found [Karen Read] NOT
GUILTY of Counts 1 and 3. Because that's what happened.*"), 370 ("Juror E

41

explained that the jury was 'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges.").  Despite significant publicity that accompanied the filing of the defense motion relying on jury declarations, none of the remaining jurors ever communicated to the court, the court's staff, the District Attorney's office, defense counsel, or the media that they disputed the accuracy of the five jurors' representations.

In rejecting Read's claim of acquittal, the SJC relied solely upon the lack of a formal verdict "returned, received, and recorded in open court."  *Read*, 495 Mass. at 328.  This reasoning is rooted in a formalism that has been consistently rejected by the Supreme Court in a string of precedents spanning more than one hundred years.  *See supra* pages 40-41 (citing cases); *Ball v. United States*, 163 U.S. 662, 671 (1896) ("However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense."); *Hudson v. Louisiana*, 450 U.S. 40, 41 & n.1 (1981) (holding that judicial grant of new trial prohibited retrial on Double Jeopardy grounds, notwithstanding that the state "Code of Criminal Procedure d[id] not authorize trial judges to enter judgments of acquittal in jury trials").  This emphasis of substance over form applies in the context of both jury acquittals and judicial acquittals.  The

42

Supreme Court has, for example, "consistently refused to rule that jeopardy for an offense continues after an acquittal, ***whether that acquittal is express or implied*** by a conviction on a lesser included offense…." *Price v. Georgia*, 398 U.S. 323, 329 (1970) (emphasis added); *see also Green*, 355 U.S. at 191 ("[W]e believe this case," where defendant was charged with first and second-degree murder and the jury returned a verdict finding him guilty of the lesser offense, "can be treated no differently, for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: 'We find the defendant not guilty of murder in the first degree but guilty of murder in the second degree.'").

The "ruling" here was the jury's unanimous and final decision, reflected in the post-trial affidavits, that Read is not guilty. It is not unprecedented for a jury's unanimous and final decision to supersede even verdict slips that fail to accurately reflect such collective juror decisions. Read cited two cases in which a jury's "unrecorded vote" for acquittal was given effect, notwithstanding the jury's failure to formally announce such verdict. Add:19; *United States v. Dotson*, 817 F.2d 1127, 1129 (5th Cir. 1987) (affirming correction of verdict on one count after "receiv[ing] a telephone call from two of the jurors…stat[ing] that, contrary to the

verdict read in court, the jury had unanimously voted to acquit"),[12] *vacated in part*

*on other grounds*; *United States v. Stauffer*, 922 F.2d 508, 511 (9th Cir. 1990)

(affirming changing verdict on count where "[p]ost-verdict interviews of several

jurors…determined that the jury had…intended to acquit"); App:40.  This follows

from the Supreme Court's instruction that "it is not dispositive whether a factfinder

incanted the word acquit; instead, an acquittal has occurred if the factfinder acted

on its view that the prosecution had failed to prove its case."  *McElrath*, 601 U.S.

at 96 (citation omitted).  The juror statements quoted above amply satisfy that

standard.

　　　*Blueford* is not to the contrary.  There, the foreperson had reported during

deliberations that the jury "was unanimous against" the charges of capital murder

and first-degree murder but split on manslaughter.  566 U.S. at 603-04.  The court

sent the jury back to continue deliberations and, when the jury remained unable to

reach a verdict, declared a mistrial.  *See id.* at 604.  The Supreme Court rejected

the defendant's argument that the Double Jeopardy Clause prohibited re-

prosecution for capital and first-degree murder.  In doing so, the Court relied

---

[12] The trial court then "telephoned the foreman of the jury," accepted the foreman's affidavit, and "corrected the verdict to acquit" defendant on the relevant count.  *Id.* at 1129.

heavily upon the lack of finality of the juror's report.  "[T]he jury's deliberations had not yet concluded," and it "went back to the jury room to deliberate further." *Id.* at 606.  "The foreperson's report was not a final resolution of anything," and there was no indication at the conclusion of deliberations that "it was still the case that all 12 jurors believed [defendant] was not guilty of capital or first-degree murder." *Id.*  Accordingly, the foreperson's mid-deliberation report "lacked the finality necessary to amount to an acquittal…, quite apart from any requirement that a formal verdict be returned or judgment entered."[13]  Thus, the district court was incorrect in reading *Blueford* to "reject[]" the defendant's argument that an acquittal did not require a formal verdict.  Add:20.  The Court simply did not rule on that issue.

Justice Sotomayor, in dissent, reaffirmed that, "[i]n ascertaining whether an acquittal has occurred, form is not to be exalted over substance.  Rather, [the Court] ask[s] whether the factfinder has made a substantive determination that the prosecution has failed to carry its burden.  ***Jurisdictions have different procedures respecting the announcement of verdicts…, but that diversity has no***

---

[13] It has been clear for more than 100 years that the formal entry of judgment is not required for a jury decision to acquit to preclude retrial.  *See Ball*, 163 U.S. at 671.

***constitutional significance***.  Jeopardy terminates upon a determination, ***however***

***characterized***, that the evidence is insufficient to prove a defendant's factual

guilt."  *Id.* at 611-12 (citations omitted) (emphasis added).

Here, unlike the foreperson's statement in *Blueford*, the juror affidavits were

all executed post-trial.  The fact that, in this context, the affidavits do not so much

as hint that the decision to acquit was non-final or revisited at any time is a

powerful indicator of finality.  The district court was also wrong in observing that

the juror statements "do not foreclose the possibility that the relevant votes were

based on a preliminary discussion or straw poll."  Add:21.  The jurors' references

to the "result" of deliberations and not guilty "verdicts" are inconsistent with that

characterization.   App:334, 340, 370, 378.  This language is strongly indicative of

"a final, conclusive verdict of acquittal," Add:21, at least sufficient to warrant the

further judicial inquiry requested where the district court (or even the state trial

court) could address any of the speculative doubts raised by the district court

regarding the finality and certitude of the not guilty verdicts.

**E.    Alternatively, Petitioner Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Read**

The district court, in denying Read's request for further inquiry, held that "[e]ven assuming that a post-trial *voir dire* elicited evidence strongly favorable to petitioner—such as an attestation from each juror that the jury voted unanimously to acquit petitioner on Counts One and Three before being discharged—her claim would still fail." Add:27.  Under this reasoning, sworn and credible statements by all 12 jurors attesting to a final, unanimous decision to acquit would not be sufficient to mount a successful Double Jeopardy challenge.  Surely, that cannot be the law.  Indeed, it ***must*** not be the law.

In the analogous context of juror bias, the law is clear that the defendant's Sixth Amendment right to an impartial jury also guarantees "the opportunity to prove" a claim of bias.  *Dennis v. United States*, 339 U.S. 162, 171-72 (1950); *see also Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.").  Thus, "a nonfrivolous claim of jury taint" triggers the trial court's "unflagging duty to adequately probe" the allegation.  *United States v. Zimny*, 846 F.3d 458, 464 (1st Cir. 2017) (citation omitted).  The

47

required inquiry may include the taking of jury testimony because a categorical bar of such testimony on the issue of bias would "violat[e] the plainest principles of justice." *United States v. Villar*, 586 F.3d 76, 84 (1st Cir. 2009) (quoting *McDonald v. Pless*, 238 U.S. 264, 268-69 (1915)).

There is no legal or constitutional basis to afford less rights to a defendant seeking the ultimate benefit of her right to a jury trial – an acquittal as found by a unanimous jury – than rights regularly granted to defendants challenging the process, *i.e.*, contending that their jury was not impartial. Recently, in *United States v. Tsarnaev*, 96 F.4th 441, 449 (1st Cir. 2024), this Court remanded for further proceedings in the Boston Marathon bombing case due to two jurors' postings on social media "regarding the bombings and the district court proceedings," which came to light after the jurors had been provisionally selected to serve. The comments reflected possible bias and were also inconsistent with the jurors' assurances that they had not discussed the case online. *See id.* at 454-55, 461. This Court held that the district court erred by failing to inquire about these issues with the jurors. *See id.* at 458, 462. Given that "[t]he right to an impartial jury is a constitutional bedrock[,]…when there is a plausible claim that a prospective juror lied in a manner that may reveal bias, a court need conduct some

inquiry reasonably calculated to determine whether the prospective juror did lie and, if so, why." *Id.* at 458 (citation omitted).  Although the district court has broad discretion to determine the type of investigation into juror bias warranted by particular facts, "[n]otwithstanding this broad discretion,…a district judge does not have discretion to refuse to conduct any inquiry at all regarding the magnitude of the taint-producing event and the extent of the resulting prejudice if confronted with a colorable claim of juror misconduct." *Id.* at 457 (citation omitted).

Crucially for present purposes, in a case like the one *sub judice* that included substantial media publicity both before and after the trial, this Court ordered the district court to *voir dire* the jurors, ***nine years after the trial***.  In doing so, the court acknowledged, "[n]o doubt any juror would have strong incentives to avoid admitting having committed perjury during voir dire.  We also expect that most jurors, having taken time out of their daily lives to receive evidence at trial, deliberate with other jurors, and reach a verdict that they believe is just, would prefer not to have that verdict disturbed – especially as a result of their own actions….  [W]e have no doubt that the able district court judge can do what judges regularly do – form a considered opinion about the sufficiency of the jurors' explanations once those explanations are given and explored." *Id.* at 464.

49

Post-verdict inquiry is similarly required to investigate claims of external influence. In *Remmer v. United States*, 347 U.S. 227, 228 (1954), "[a]fter the jury had returned its verdict, the petitioner learned for the first time that during the trial a person unnamed had communicated with a certain juror, who afterwards became the jury foreman, and remarked to him that he could profit by bringing in a verdict favorable to the petitioner." The court, without the defense's knowledge, then enlisted the FBI to investigate. The Supreme Court held that the defendant was entitled to post-verdict inquiry regarding the FBI's unauthorized contact with jurors.

Neither the district court nor Respondents cited any authority for the suggestion that a federal habeas court may not conduct fact-finding required to determine whether Petitioner's federal constitutional rights would be violated by a retrial on Counts 1 and 3. Notably, in the contexts of juror bias and extraneous influence, federal habeas courts have ordered further fact-finding, including testimony from state-court jurors. *See Porter v. Zook*, 898 F.3d 408, 429 (4th Cir. 2018) ("[A]fter discovery, should Juror…be called to testify in an evidentiary hearing, Appellant ought to be able to ask questions regarding external prejudicial information or whether any outside influence was improperly brought to bear."

50

(citation omitted)); *Wisehart v. Davis*, 408 F.3d 321, 328 (7th Cir. 2005) (vacating judgment "with directions that the state release [petitioner], retry him, or conduct a further postconviction hearing addressed to the issue of jury bias").

While these cases involved §2254 petitions, Petitioner's ability to present evidence in support of a §2241 petition must, at the very least, be no less than the rights of a petitioner under §2254, a statute that was amended in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") with the specific intent "to avoid unneeded evidentiary hearings in federal habeas corpus." *Williams v. Taylor*, 529 U.S. 420, 436 (2000). "Before AEDPA, judge-made law" provided district courts "discretion to grant [evidentiary] hearings when they deemed it appropriate." *Teti v. Bender*, 507 F.3d 50, 60 (1st Cir. 2007). This authority remains intact in the context of §2241, which was not amended by AEDPA. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 526 (2004) ("The simple outline of § 2241 makes clear…that Congress envisioned that habeas petitioners would have some opportunity to present and rebut facts…."). The Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963), explicitly held that "a federal [habeas] court ***must*** grant an evidentiary hearing" where, as here, "the merits of the factual dispute were not resolved in the state hearing." (Emphasis added).

This is a necessary corollary of the straightforward proposition that "where specific allegations before the [habeas] court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that [s]he is [in custody] illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Harris v. Nelson*, 394 U.S. 286, 300 (1969); *see also Townsend*, 372 U.S. at 312 ("It is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues. Thus a narrow view of the hearing power would totally subvert Congress's specific aim…of affording state prisoners a forum in the federal trial courts for the determination of claims of detention in violation of the Constitution."); 28 U.S.C. §2246 ("On application for a writ of habeas corpus, evidence may be taken orally or by deposition….").

The district court's hesitation, based on under *Younger v. Harris*, 401 U.S. 37 (1971), to require a *voir dire* conducted by the state-court judge, stands in significant tension with its finding that Read's "colorable double-jeopardy claim" removes her case from the abstention doctrine. Add:11; *Allen*, 80 F.3d at 572 ("To realize the solemn promise of this constitutional guaranty, federal habeas courts will in appropriate circumstances entertain a claim that permitting a nascent (but as

52

yet incomplete) state court prosecution to go forward would violate the Double Jeopardy Clause."); *Lydon*, 466 U.S. at 303 ("Because the [Double Jeopardy] Clause protects interests wholly unrelated to the propriety of any subsequent conviction, a requirement that a defendant run the entire gamut of state procedures, including retrial, prior to consideration of h[er] claim in federal court, would require h[er] to sacrifice one of the protections of the Double Jeopardy Clause." (citation omitted)). Having reached that conclusion, the district court was obligated to rule on the federal constitutional issue, including whether a post-trial *voir dire* is required whether by the federal district court itself or by the state trial court. Among other things, the court had the option of conditionally granting the writ, ordering Respondents to release Read from custody "or conduct a further post[-trial] hearing." *Wisehart*, 408 F.3d at 328.

Petitioner respectfully submits that, no less than the risk of a conviction rendered by a biased jury or impermissibly tainted by external influence requires a *voir dire* when the defendant has met her burden of production, forcing a defendant to stand trial for murder after a unanimous jury found her not guilty of that same offense without a jury *voir dire* would violate "the plainest principles of justice." *Villar*, 586 F.3d at 84 (citation omitted). Indeed, the district court did not suggest

otherwise.  Instead, it erected an artificial dividing line between the Fifth

Amendment protection against Double Jeopardy and the Sixth Amendment right to

an impartial jury.  The defense respectfully submits that this result is not supported

by precedent or logic.  While the foregoing authorities arose in different contexts,

they stand for the proposition that a defendant who comes forward with credible

evidence of a serious constitutional violation post-trial must be entitled to an

opportunity to prove those claims.  There is no apparent reason to artificially limit

the availability of such constitutional inquiry to bias and extraneous influence. The

defense acknowledges that there is little precedent involving situations factually

similar to that at issue here.  This case is unique.  It is not often that after trial one

juror, much less four jurors, directly contact defense counsel stating in no uncertain

terms that the jury had acquitted the defendant.  But the unique strength of the

evidence underlying Read's motion to dismiss clearly demonstrates that she has

met her burden of production and fully supports rather than undermines her claim

for relief.

To create an impenetrable procedural wall to this new evidence just because

a jury failed to volunteer to the court that its impasse was not as to all counts or

because the state trial court failed to inquire into the existence or non-existence of

partial verdicts, is no more consistent with the reviewing court's role in assuring

that trials below – state or federal – do not violate core constitutional principles

than to create a similar wall against new evidence of untruthfulness by a juror as in

*Tsarnaev*, of racial bias as in *Villar*, or of contact with an outsider as in *Remmer*.

As in *Tsarnaev*, the law trusts trial courts to determine whether any of the jurors'

answers to *voir dire* have been affected by media exposure.[14]

This Court has entrusted post-trial jury inquiries to the skill and experience

of trial courts in matters ranging from extraneous influence to the intrusion of

racial or ethnic bias during deliberations.  Petitioner submits that the values at the

core of the Double Jeopardy Clause – the primacy of a jury's decision-making as a

protection for accused citizens against the perils of being prosecuted twice for the

same offense for which a prior jury acquitted – is as central to the values of our

criminal justice system as is the right to a trial before an impartial and unbiased

jury.  Petitioner has met her burden of production.  Far lesser showings –

statements by one juror for instance, have resulted in repeated holdings that jury

inquiries are mandated.  *See, e.g.*, *United States v. Tejeda*, 481 F.3d 44, 48 (1st Cir.

2007).

---

[14] There cannot be one set of rules for trials with publicity and another for
trials without it.

The district court was also in error in concluding that the requested *voir dire* "would inevitably require a detailed inquiry into the jury's deliberations." Add:24. To the contrary, the requested inquiry was directed solely to the ***result*** of such deliberations, namely a unanimous and final decision that Read is not guilty of murder in the second degree. The results of a jury's deliberations are not secret. They are, in fact, routinely announced in open court.[15] Here, the defense learned post-trial that the jury reached a verdict that was not so announced. It was at least entitled to the opportunity to substantiate that fact in order to ensure Read is not unconstitutionally forced to stand trial for criminal offenses of which she has already been acquitted. Such inquiry in no way intrudes on the deliberative process of the jury. Such an inquiry instead honors the jury service which the trial court described as "extraordinary" rather than disregarding the efforts of five jurors to disclose that there was not an "impasse" on all three as contrasted to only one count.

---

[15] Juror testimony on this subject is not prohibited. *See United States v. Barragan-Cepeda*, 29 F.3d 1378, 1380 (9th Cir. 1994) ("Rule 606(b) bars the admission of juror testimony only upon an inquiry into 'the validity of a verdict.' It does not limit the admissibility of juror affidavits to determine what issues were decided in a prior proceeding."); Add:26 (district court acknowledging that "Rule 606 does not literally apply"). In any event, evidentiary rules cannot extinguish a criminal defendant's fundamental constitutional rights. *See Villar*, 586 F.3d at 87.

The inquiry requested by Petitioner here could be accomplished by a single, or at most a small number of, "yes" or "no" questions posed to jurors: *did you unanimously acquit Karen Read of the charges in Counts 1 and 3?*, *was your decision (or did you believe your decision to be) final as to each count?*, or similar questions that do not intrude into the heart of jury deliberations.  If all 12 jurors answer those questions affirmatively, the other hypothetical questions posed by the district court would be entirely irrelevant.  For example, assuming all 12 jurors reached a final, unanimous decision that Read is not guilty, nothing about "what each juror said and thought at the time of the vote" or whether "the votes reflect[ed] any compromises" could possibly alter the clear and decisive constitutional implications of the jury's decision.  Add:24; *see also McElrath*, 601 U.S. at 97 ("We simply cannot know why the jury in [this] case acted as it did, and the Double Jeopardy Clause forbids us to guess.").  Ultimately, as this Court stated in a case of alleged external influence, "concern for the sanctity of jury deliberations may not be elevated above the defendant's right to have h[er] fate decided by the first jury empaneled in h[er] case."  *Lara-Ramirez*, 519 F.3d at 87.[16]

---

[16] The district court's allusion to a few purported inconsistences among the juror statements, Add:24 n.12, overlooks the overarching consistency: that the jury unanimously acquitted Read of two of the three counts pending against her,

Petitioner, who absent intervention of this Court will stand trial for murder beginning April 1, self-evidently has a powerful interest in determining whether she was, in fact, acquitted of that offense by a jury of her peers.  But that is not the only interest at stake here.  As the SJC observed in a case cited by the district court, "an inflexible rule," like that imposed here, "excluding all juror testimony…achieves stability at the expense of doing justice between the parties a result not consistent with the ideal of trial by an impartial jury."  *Commonwealth v. Fidler*, 377 Mass. 192, 197 (1979).  In a case that has generated enormous media attention,[17] at a time when confidence in the judiciary is of the utmost importance, the public has a strong interest in a full and fair hearing of this matter.

## CONCLUSION

For the foregoing reasons, the district court's denial of Read's petition should be reversed.

---

including the count alleging second-degree murder.  The inconsistencies cited simply pale in comparison and are irrelevant to the Double Jeopardy issue.  App:532 n.12 (Respondents noting one juror reported the final vote on Count 2 as 8-4, whereas another reported it was 9-3).

[17] Much like the *Tsarnaev* case.  *See United States v. Tsarnaev*, 968 F.3d 24, 42 (1st Cir. 2020) ("It is no exaggeration to say that the reporting of the events here — in the traditional press and on different social-media platforms — stands unrivaled in American legal history (at least as of today)."), *reversed on other grounds*.

Respectfully submitted,
Karen Read
By her Attorneys,

**/s/ Michael Pabian**
Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
pabianlaw38@gmail.co

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1.      This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 12,979 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14-point font.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

Dated:  March 18, 2025

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this 18th day of March 2025, this Brief was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

Dated:  March 18, 2025

# ADDENDUM

**TABLE OF CONTENTS**

**Caption**                                                                                          **Page**

Memorandum and Order on Petition for Writ of Habeas Corpus,

Document 27……………………………………….…………………...1

Memorandum and Order on Motion for Certificate of Appealability,

Document 28……………………………………………………………29

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KAREN READ, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. |
| v. | ) | 25-cv-10399-FDS |
| | ) | |
| NORFOLK COUNTY SUPERIOR COURT | ) | |
| and MASSACHUSETTS ATTORNEY | ) | |
| GENERAL, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM AND ORDER ON
## PETITION FOR WRIT OF HABEAS CORPUS

**SAYLOR, C.J.**

This is a petition for writ of habeas corpus under 28 U.S.C. § 2241. Petitioner Karen Read is under indictment in the Massachusetts Superior Court for second-degree murder and two other charges. She was tried on those charges beginning on April 16, 2024. On July 1, 2024, after the jury reported that it was deadlocked, the trial judge declared a mistrial.

Petitioner moved in the Superior Court to dismiss two of the three charges on the ground that the Double Jeopardy Clause barred a retrial of those charges. The Superior Court denied that motion, and petitioner appealed that ruling to the Massachusetts Supreme Judicial Court. The SJC affirmed the Superior Court by a unanimous vote. Petitioner then filed this habeas petition. The retrial is scheduled to commence in the Superior Court on April 1, 2025.

The issues presented by the petition are limited to those arising under the federal Constitution—specifically, whether a retrial would constitute double jeopardy in violation of petitioner's rights under the Fifth and Fourteenth Amendments. For the reasons set forth below,

the petition will be denied.

## I.    **Background**

### A.    **2024 Trial**

On June 9, 2022, the Commonwealth of Massachusetts charged petitioner Karen Read with second-degree murder, in violation of Mass. Gen. Laws ch. 265, § 1 (Count One); manslaughter while operating under the influence of alcohol, in violation of Mass. Gen. Laws ch. 265, § 13½ (Count Two); and leaving the scene of a collision resulting in death, in violation of Mass. Gen. Laws ch. 90, § 24(2)(a½)(2) (Count Three).  *See Read v. Commonwealth*, 495 Mass. 312, 314 (2025).

A jury trial began in Norfolk County Superior Court on April 16, 2024, and lasted more than two months.  *See id*.  At the close of evidence, the jury received instructions concerning the three charged offenses, as well as two lesser-included offenses in Count Two:  involuntary manslaughter and motor vehicle homicide.  *See id*.

As part of its instructions, the trial judge indicated that the jury would receive separate verdict slips for each of the three charges.  *See id*.  The foreperson was directed to check the appropriate boxes as to each charge and to notify the court once the jury had reached a unanimous verdict.  *See id*.  The trial judge further instructed the jurors to "continue deliberating until [they] ha[d] reached a final verdict on each charge" and not to disclose their progress or standing as to any charge until they had reached a unanimous verdict.  *See id*.

On the jury's third day of deliberations, the foreperson delivered a note to the court.  *See id*.  At that point, the jury had been deliberating for approximately 19 hours.  In its entirety, the note said:

> I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict.

*See id.*

The court read the note into the record, and then invited argument from the parties as to whether it should issue a *Tuey-Rodriguez* charge (which is the Massachusetts equivalent of the federal *Allen* charge). *See id.* at 315; *see also Commonwealth v. Rodriguez*, 364 Mass. 87, 101-02 (1973); *Commonwealth v. Tuey*, 8 Cush. 1, 2-3 (1851); *Allen v. United States*, 164 U.S. 492 (1896). Such an instruction is designed to "urge the jury to reach a verdict by giving more serious consideration to opposing points of view" when the jury is deadlocked after "due and thorough deliberations." *Commonwealth v. Carnes*, 457 Mass. 812, 827 (2010); Mass. Gen. Laws ch. 234A, § 68C.

The Commonwealth opposed issuing the instruction. Counsel for petitioner, however, asserted that the jury's use of the terms "impasse" and "exhaustive" indicated that the jury's deliberations had been sufficiently "due and thorough," and thus warranted the instruction. *See Read*, 495 Mass. at 315. Given the length of the trial, the volume of evidence presented, and the complexity of the issues, the trial judge determined that "due and thorough" deliberations had not yet been completed, and thus the instruction was not appropriate at that time. *See id.*

At around 10:45 a.m. on the following Monday, July 1, 2024, the foreperson submitted a second note to the court. *See id.* By that point, the jury had deliberated for approximately 25 hours. The second note stated:

> Despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind.
>
> The divergence in our views are not rooted in a lack of understanding or effort, but deeply held convictions that each of us carry ultimately leading to a point where consensus is unattainable.
>
> We recognize the weight of this admission and the implications it holds.

*See id.* After soliciting further argument from the parties, the trial judge determined that a *Tuey-*

*Rodriguez* instruction was appropriate at that point. The court noted that it had "never seen a note like this [from a jury] reporting to be at an impasse." *Id*. at 316. The instruction was given to the jurors, who then returned to the jury room for further deliberations. *See id*.

Later that day, at around 2:30 p.m., the foreperson delivered a third note to the court. *See id*. By that point, the jury had deliberated for nearly 30 hours in total. The third note stated:

> Despite our rigorous efforts, we continue to find ourselves at an impasse.
>
> Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyond a reasonable doubt. Conversely, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of the charges.
>
> The deep division is not due to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions.
>
> To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs.

*See id*.

The court read the note into the record before the parties, directed that the jury be brought back into the courtroom, and declared a mistrial. *See id*. The court then discharged the jury and discussed setting a future status conference with the parties. *See id*. Petitioner's counsel did not object to the court's declaration of a mistrial at any time during that discussion or ask to be heard on that topic. *See id*.

**B.    Post-Trial Events**

On July 2, 2024, one day after the trial concluded, "Juror A" contacted one of petitioner's counsel to inform him that the jury had agreed the defendant was not guilty of either Count One or Three. *See id*. The following day, July 3, a person who was not a member of the jury sent petitioner's counsel screenshots of text messages from "Juror B" saying, among other things, "It

was not guilty on second degree.  And split in half for the second charge." *Id*. at 317.[1]  Another

person, not a member of the jury, sent petitioner's counsel screenshots of text messages

summarizing a conversation "Juror C" had with friends about deliberations.  *See id*.  According

to this intermediary, "manslaughter started polling at 6/6 then ended deadlock @4no8yes." *Id*.[2]

Several days later, "Juror D" contacted petitioner's counsel to explain that the jury's deadlock

related only to Count Two and its lesser included offenses.  *See id*.  "Juror E," similarly,

contacted petitioner's counsel to explain that the jury had been deadlocked only on the "lower

charges on count 2." *Id*.

Based on a subset of those statements, petitioner filed a motion to dismiss Counts One

and Three on July 8, 2024, one week after the declaration of a mistrial.  *See id*.  In substance,

petitioner argued that the jurors' post-trial statements demonstrated that the jury had effectively

acquitted her as to those counts, rendering a potential retrial unconstitutional.  *See id*.  She

further contended that the declaration of a mistrial was improper as to those two counts and that

the court, at a minimum, should conduct a post-verdict inquiry to verify the subsequent accounts

of the deliberations.  *See id*.

After petitioner's counsel attested to the juror communications as a part of petitioner's

motion to dismiss, the Commonwealth also received communications from several jurors.  *See

id*. at 318.  One juror left the prosecutor two voicemails stating that the jury had voted not guilty

---

[1] According to the affidavit of petitioner's counsel, the text read, "It was not guilty on second degree.  And split in half for the second charge.  When the judge sent us back with that Hernandez thing to look at the other side it turned into a bully match.  I thought the prosecution didn't prove the case.  No one thought she hit him on purpose or even thought she hit him on purpose [sic]." (Pet. Ex. A at 283).  Juror B later affirmed the content of these messages directly to petitioner's counsel.  (*Id.* at 330).

[2] According to the affidavit of petitioner's counsel, the summary also stated, "no consideration for murder 2."  Upon questioning, the intermediary further stated, "the remaining charges were what they were hung on."  (Pet. Ex. A at 285).

on Counts One and Three and had voted "9-3 guilty on the lower manslaughter charges." *Id.*[3]

Three other jurors e-mailed the prosecutor asking to speak about deliberations anonymously, but declined to do so after they were informed that the Commonwealth might have to disclose what they said to petitioner's counsel or the court. *See id.*

After hearing argument, the trial court denied the motion to dismiss Counts One and Three. The court stated that there had been "no open and public verdict affirmed in the open court" acquitting petitioner of any of the charges. *Id.* The court also rejected petitioner's contention that declaration of a mistrial was inappropriate, noting that petitioner had herself twice requested a *Tuey-Rodriguez* instruction—which is typically the last step before a mistrial— and at no point objected to or sought to opine on the court's mistrial declaration. *See id.* In light of the jury's multiple notes indicating a deadlock, the court concluded that a mistrial was necessary and appropriate. *See id.*

**C.      SJC Appeal**

On September 11, 2024, petitioner filed a petition to the Supreme Judicial Court of Massachusetts ("SJC"). On February 11, 2025, the SJC affirmed the trial court's denial of the motion to dismiss. *See id.* at 314.

The SJC first held that the trial court properly acted within its discretion to determine that the jury was at an impasse and that a mistrial was "manifestly necessary." *Id.* at 320. It based that conclusion primarily on the jury's "increasingly emphatic notes," some of which "echo[ed] language from other cases where [the SJC] ha[s] characterized a jury's report of deadlock as 'unambiguous.'" *Id.* It went on to reject petitioner's contention that no "manifest necessity" had been established because the trial judge failed to adequately consider alternatives to mistrial. *See*

---

[3] According to the Commonwealth, those messages came on August 1, one month after the jury was discharged. (Pet. Ex. A at 325).

*id.* at 321.  According to the SJC, the judge "did consider and pursue such alternatives" by taking a measured and iterated approach to breaking the deadlock.  *Id.*

The SJC specifically rejected petitioner's other proposed alternatives, including inquiring about a partial verdict or polling the jury.  *See id.* at 321-25.  It found that while Mass. R. Crim. P. 27(d) allows a trial judge to inquire about a partial verdict, "a judge is not required to accept a partial verdict before declaring a mistrial, . . . and is prohibited from doing so on a single indictment that contains lesser included offenses," such as Count Two here.  *Id.* at 321.  The court gave great weight to the fact that "the record before the trial judge suggested complete deadlock" where "[t]he first and second notes provided no indication of a partial consensus, and the third note plainly implied the opposite."  *Id.* at 322.  It also emphasized that "these notes indicated that additional inquiry into the jury's deliberations risked producing a coerced verdict." *Id.* at 322-25.

The SJC also rejected petitioner's claim that the trial judge abused her discretion by declaring a mistrial without notifying defense counsel of the third note's contents and without allowing them to express their views.  *See id.* at 325-26.  It found that "there [was] no indication that inviting defense counsel to participate in a third round of consultation would have produced any fruitful alternatives" to mistrial.  *Id.* at 325.

The SJC then held that "because the jury did not publicly affirm that [petitioner] was not guilty of [Counts 1 and 3], there was no acquittal barring retrial under the double jeopardy clause."  *Id.* at 329-30.  It relied on the fact that, under Mass. R. Crim. P. 27(a), the jury had not returned a valid verdict; only "the actual return, receipt, and recording of a verdict . . . constitutes a final verdict[.]"  *Id.* at 327-28.  The court reasoned that absent these conditions, it "cannot conclude that the jury acted on their view that the prosecution had failed to prove its case," as required to establish acquittal under *McElrath v. Georgia*, 601 U.S. 87 (2024).  *Id.* at 328.  It

rejected petitioner's contention that the formalities of valid verdicts should not prevent the acquittal votes from taking effect. *See id.* at 329-30. According to the court, "requiring a jury to publicly affirm their verdict in open court . . . serves a vital purpose—it ensures that the verdict agreed upon in private truly reflects the unanimous and deliberate judgment of each juror." *Id.* at 329.

The SJC then went on to hold that the trial judge did not abuse her discretion in denying the petitioner's request for post-trial inquiry. *See id.* at 332. It found that because no verdict was announced as required, a post-trial *voir dire* "would not change the outcome of defendant's first trial." *Id.*. The court reasoned that petitioner was not entitled to this inquiry because the jurors' affidavits "do not indicate exposure to extraneous matters or juror bias," and because "there [was] no suggestion that jury's failure to return a verdict was the result of a clerical error." *Id.* at 330-31. The inquiry would therefore inappropriately require "probing the content of juror deliberations" and would do so "well after they became susceptible to outside influences." *Id.* at 331-32.

In the meantime, the trial judge set the matter for a retrial beginning on April 1, 2025. *See id.* at 332.

### D.    Procedural History

On February 18, 2025, petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 in this Court. That same day, the Court issued an expedited briefing and hearing schedule in light of the imminent retrial date. Defendants submitted an opposition brief on February 26, 2025, and the Court heard oral arguments on March 5, 2025.

For the following reasons, the petition will be denied.

## II.    Analysis

There are two threshold questions that the Court must address before turning to the merits

of the claim:  whether it has jurisdiction to consider the habeas petition and, if so, whether it

must abstain from doing so.

### A.      <u>Jurisdiction and Ripeness</u>

A United States District Court may issue a writ of habeas corpus for a person "in custody

in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(a),

(c)(3).  A person on pretrial release is considered to be "in custody" and may petition for habeas

relief if that custody violates federal law.  *See Justs. of Bos. Mun. Ct. v. Lydon*, 466 U.S. 294,

300 (1984).  Ordinarily, a person "in custody" is "in custody pursuant to the judgment of a State

court" or "in custody under sentence of a court established by Act of Congress."  28 U.S.C.

§§ 2254(a), 2255(a).  Because a person on pretrial release falls in neither category, any habeas

petition filed by such a person must be brought under 28 U.S.C. § 2241.  The petition here is

therefore filed under the correct statute.

A state defendant who is released pending trial "must still contend with the requirements

of the exhaustion doctrine if [she] seeks habeas corpus relief in the federal courts."  *Lydon*, 466

U.S. at 301.  Nonetheless, a petitioner claiming a violation of the Double Jeopardy Clause need

not stand trial a second time to exhaust her state remedies.  *See id.* at 302.  Instead, she must

"take[ ] h[er] claim that [s]he should not be tried again as far as [s]he can in the state courts."  *Id.*

Here, petitioner moved to dismiss Counts One and Three of the indictment based on her

double-jeopardy claim, and appealed the denial of that motion to the Massachusetts Supreme

Judicial Court, which denied her claim.  Thus, she has exhausted her state-court remedies for the

alleged constitutional violation, and the matter is ripe for review.

Accordingly, the Court may properly exercise jurisdiction over the habeas petition.  *See*

*Lydon*, 466 U.S. at 302.

### B.   <u>Abstention</u>

The primary relief petitioner seeks is release from state custody and a declaration that a retrial on Counts One and Three would violate the Double Jeopardy Clause.  (Pet. at 7).  In effect, she seeks a permanent stay of her state prosecution.  That request for relief potentially conflicts with the policy that, "except under extraordinary circumstances, where the danger of irreparable loss is both great and immediate," federal courts should abstain from enjoining state criminal prosecutions or issuing declaratory or other relief to similar practical effect.  *Younger v. Harris*, 401 U.S. 37, 45 (1971); *see Samuels v. Mackell*, 401 U.S. 66, 73 (1971).

By statute, a court considering a habeas petition may, "before final judgment or after final judgment of discharge . . . stay any proceeding against the person detained . . . by or under the authority of any State for any matter involved in the habeas corpus proceeding."  28 U.S.C. § 2251.[4]  Nevertheless, the power to enjoin state prosecutions must be exercised sparingly, even when it is permitted.  *See Younger*, 401 U.S. at 54 (requiring abstention based on "the absence of the factors necessary under equitable principles to justify federal intervention," assuming such intervention was permitted).

A federal court generally must abstain from acting if "the requested relief would interfere . . . with (1) an ongoing state judicial proceeding; (2) that implicates an important state interest; and (3) that provides an adequate opportunity for the federal plaintiff to advance his federal constitutional challenge," such as a state criminal prosecution.  *Verizon New England, Inc. v. Rhode Island Dep't of Lab. & Training*, 723 F.3d 113, 116 (1st Cir. 2013).  But if there is a showing of "bad faith, harassment, or some other extraordinary circumstance that would make

---

[4] The Anti-Injunction Act, 28 U.S.C. § 2283, accordingly does not bar petitioner's requested relief.  *See id.* ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress.").

abstention inappropriate," a federal court may enjoin (or effectively enjoin) an ongoing state proceeding. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982).

A party can establish that extraordinary circumstances justify such an injunction by showing that she will suffer "great and immediate irreparable injury" if the state proceeding goes forward. *Doe v. Donovan*, 747 F.2d 42, 44 (1st Cir. 1984). In a typical case, a colorable double-jeopardy claim satisfies the irreparable-injury standard, because "a requirement that a defendant run the entire gamut of state procedures, including retrial, prior to consideration of his claim in federal court, would require him to sacrifice one of the protections of the Double Jeopardy Clause." *Lydon*, 466 U.S. at 303.[5]

Here, petitioner makes a colorable double-jeopardy claim. Even if she is ultimately acquitted of Counts One and Three, or if a conviction on those counts is ultimately overturned on double jeopardy grounds, she will have suffered irreparable injury from standing trial again for those charges. The Court therefore will not abstain, and will consider the merits of petitioner's claim.

## C.   <u>Double Jeopardy</u>

Under the Fifth and Fourteenth Amendments, no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see* U.S. Const.

---

[5] It is true that in one instance the First Circuit applied the abstention doctrine in a habeas petition alleging a double-jeopardy violation. *See Donovan*, 747 F.2d at 44. There, the alleged violation did not establish irreparable injury arising from a retrial because of "the unique jurisdictional posture" of that case. *Id.* at 45. The petitioner there was a minor less than a year shy of her eighteenth birthday, who was to stand trial for manslaughter even if the murder charge against her were dropped on double-jeopardy grounds, and who could not remain in state custody after she turned 18. *Id.* at 44-45. The Court of Appeals concluded that she "will suffer no significantly greater harm from a retrial on the murder count even if manslaughter is subsequently found to be the only permissible charge." *Id.* at 45. However, the court also affirmed the principle that, in ordinary circumstances, "the mere possibility of retrial prior to a determination of the federal constitutional claim would constitute irreparable harm justifying federal court intervention." *Id.* at 44.

amend. XIV, *Benton v. Maryland*, 395 U.S. 784, 794 (1969). The right "protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense." *See Lydon*, 466 U.S. at 306–07.

Here, petitioner contends that the Double Jeopardy Clause prevents her retrial on Counts One and Three for two reasons: because the trial judge improperly declared a mistrial and because she was actually acquitted as to both counts. Alternatively, she seeks an order providing for *voir dire* of the jurors in order to ascertain whether they did, in fact, vote to acquit her on both counts prior to the declaration of a mistrial.

### 1.   Whether the Trial Judge Improperly Declared a Mistrial

A trial judge may declare a mistrial in a criminal case without implicating the protections of the Double Jeopardy Clause whenever, "taking all the circumstances into consideration," there is a "manifest necessity" for doing so. *United States v. Perez*, 9 Wheat. 579, 580 (1824); *Renico v. Lett*, 559 U.S. 766, 773 (2010).[6] A "mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict [has been] long considered the classic basis for a proper mistrial." *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *accord Renico*, 559 U.S. at 774; *Blueford v. Arkansas*, 566 U.S. 599, 609 (2012); *see also Downum v. United States*, 372 U.S. 734, 736 (1963) (a deadlocked jury is the "classic example" of when a state may try the same defendant twice).

The decision whether to grant a mistrial is reserved to the "broad discretion" of the trial judge. *Illinois v. Somerville*, 410 U.S. 458, 462 (1973); *see also Perez*, 9 Wheat. at 580 (stating

---

[6] Subsequent to *Perez*, the Supreme Court clarified that the "manifest necessity" standard "cannot be interpreted literally," and that a mistrial is appropriate when there is a "'high degree'" of necessity. *Washington*, 434 U.S. at 506.

that the decision to declare a mistrial is left to the "sound discretion" of the judge, but "the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes"). "The reasons for 'allowing the trial judge to exercise broad discretion' are 'especially compelling' in cases involving a potentially deadlocked jury." *Renico*, 559 U.S. at 775 (quoting *Washington*, 434 U.S. at 509).

Furthermore, "[t]he trial judge's decision to declare a mistrial when he considers the jury deadlocked is . . . accorded great deference by a reviewing court." *Washington*, 434 U.S. at 510. The justification for deference is that "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Renico*, 559 U.S. at 775. In the absence of such deference, trial judges might otherwise "employ coercive means to break the apparent deadlock," thereby creating a "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Id.* at 509-10.

The Supreme Court has "expressly declined to require the 'mechanical application' of any 'rigid formula' when trial judges decide whether jury deadlock warrants a mistrial." *Renico*, 559 U.S. at 775 (quoting *Wade v. Hunter*, 336 U.S. 684, 691, 690 (1949)).

> We have also explicitly held that a trial judge declaring a mistrial is not required to make explicit findings of "'manifest necessity'" nor to "articulate on the record all the factors which informed the deliberate exercise of his discretion." And we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse.

*Id.* (quoting *Washington*, 434 U.S. at 517); *see Blueford*, 566 U.S. at 609 (stating that "[w]e have never required a trial court, before declaring a mistrial because of a hung jury,

to consider any particular means of breaking the impasse—let alone to consider giving

the jury new options for a verdict").

Similarly, the First Circuit has held that trial judges are not required "to take

specific steps or make specific findings before concluding that a jury is deadlocked and

unlikely to reach a verdict." *United States v. Candelario-Santana*, 977 F.3d 146, 158 (1st

Cir. 2020). Rather, a judge exercises sound discretion to declare a mistrial based on

deadlock as long as she "take[s] *some* step to ensure that the jury truly is unable to reach

a verdict before discharging it." *Id.* [7]

Here, there was a "manifest necessity" for the declaration of a mistrial based on jury

deadlock, and the trial court did not abuse its broad discretion in reaching that conclusion.

In her memorandum of decision, the trial judge stated that she "had no doubt based on the

jury's notes to the Court that [the jury] was unable to reach a unanimous verdict." (Pet. Ex. A at

402-403). Nothing in the jury's three notes, she found, "indicated agreement on any of the

charges," or even an "inkling of an indication of agreement," notwithstanding the "care that went

into writing the notes and how articulately they expressed the jurors' disagreement." (Pet. Ex. A

at 403). Once the jury reported a deadlock for the third time, Massachusetts law prohibited the

judge from ordering the jury to continue deliberations without their consent. *See* Mass. Gen.

Laws ch. 234A, § 68C; *Read*, 495 Mass. at 321, 323. She concluded that it was "clear" that the

---

[7] In an opinion issued before *Renico*, the First Circuit held that although there is "no mechanical rule" that determines whether there is manifest necessity for a mistrial, three factors "inform[ ]" the inquiry: "(i) whether alternatives to a mistrial were explored and exhausted; (ii) whether counsel had an opportunity to be heard; and (iii) whether the judge's decision was made after sufficient reflection." *United States v. Toribio-Lugo*, 376 F.3d 33, 39 (1st Cir. 2004). To the extent, if any, that decision can be read to hold that a failure to consider any of those three factors is somehow dispositive, it has been superseded by subsequent Supreme Court decisions. *See Renico*, 559 U.S. at 779. In any event, the *Toribio-Lugo* court held that the inquiry "inevitably reduces to whether the district judge's declaration of a mistrial was reasonably necessary under all the circumstances." *Toribio-Lugo*, 376 F.3d at 39.

jurors "would not consent to continuing their deliberations" after it sent the third note.  (Pet. Ex. A at 400).

The SJC similarly concluded that "[t]he jury clearly stated during deliberations that they had not reached a unanimous verdict on any of the charges and could not do so."  *Read*, 495 Mass. at 313.  "The first and second notes provided no indication of a partial consensus, and the third note plainly implied the opposite."  *Id*. at 322.  "In short, the record before the trial judge suggested complete deadlock."  *Id*.

This Court sees no basis to conclude that the trial judge's decision to declare a mistrial was incorrect or improper.  To begin, the relevant inquiry is not confined to the brief interval of time between the receipt of the third note and the trial judge's declaration of a mistrial.  By that point, the jury had deliberated for nearly 30 hours, and had sent three notes to the court indicating that they were deadlocked—the latter two making that point with considerable emphasis.  The trial judge had held two conferences with counsel to discuss how to respond to the reported deadlock (during both of which counsel for defendant had argued that the jury was at an impasse).  After the second conference, the judge gave the *Tuey-Rodriguez* instruction.  In short, the decision to declare a mistrial was the product of a multi-day discussion between counsel and the court.  Under the circumstances, the judge cannot be said to have acted precipitately and without adequate time for reflection.

Nor did the trial judge fail to provide defense counsel an opportunity to be heard.  *See Read*, 495 Mass. at 325-26.  The judge solicited counsel's views after the first and second notes; by the time of the second note, if not earlier, it should have been obvious to all parties that a mistrial was highly likely.  As for counsel's opportunity to respond to the third note, it is true that the span of time was relatively brief between the point that the trial judge advised counsel that the jury was at an impasse and the point she declared a mistrial.  But it was not so brief that

counsel could not have objected or asked to be heard.  Furthermore, after the trial judge declared

a mistrial, there is no obvious reason why counsel could not have immediately asked to be heard

at sidebar in order to seek reconsideration of her decision before the jury was formally

discharged.[8]

Petitioner also contends that the trial judge improperly failed to consider alternatives

before declaring a mistrial.  The trial judge did, in fact, consider such alternatives in response to

the first and second note, and concluded after the second note to give a *Tuey-Rodriguez*

instruction.  After the third note—which, again, emphatically indicated that the jury was at a

deadlock—Massachusetts law required her to discharge the jury unless it consented to continue

deliberations.  *See* Mass. Gen. Laws ch. 234A § 68C.  The judge reasonably determined under

the circumstances that the jury would not consent to do so.  (Pet. Ex. A at 402-403).

Nothing more was required, as a matter of federal constitutional law, before the trial

judge could fairly conclude that the jury was genuinely deadlocked and should be discharged.  In

particular, the trial judge was not required to inquire about a possible partial verdict or poll the

jury before discharging it.  As the SJC noted, to make further inquiry would create a substantial

possibility of coercing a verdict.  *See Read*, 495 Mass. at 321-24, 26.

In summary, the trial judge took appropriate steps before determining that the jury was

"*genuinely* deadlocked."  *Candelario-Santana*, 977 F.3d at 158 (emphasis in original).  The

evidence that the jury was at an unresolvable impasse was substantial, and the trial judge, in the

exercise of her "broad discretion," made a well-grounded decision to declare a mistrial—a

---

[8] In *Toribio-Lugo*, 376 F.3d at 40-42, the trial judge ruled that defense counsel had consented to the declaration of a mistrial because she failed to make an objection.  The First Circuit reversed, noting that counsel had made "either two or three attempts to be heard during the district court's sua sponte consideration of whether or not to declare a mistrial," but that the judge "stopped counsel in her tracks, cutting her off" on each occasion, and it was "only after these three attempts to state her position had been firmly rebuffed that [she] lapsed into silence."  *Id.* at 41.  That is very far from the situation here, where defense counsel made no attempt to make an objection or ask to be heard.

decision that is entitled to "great deference" by this Court. *Somerville*, 410 U.S. at 462; *see Washington*, 434 U.S. at 510. Accordingly, because there was "manifest necessity" for the mistrial, petitioner may be tried again on the same charges without violating her rights under the Double Jeopardy Clause. *See Washington*, 434 U.S. at 509.[9]

### 2. <u>Whether the Jury Acquitted Petitioner</u>

Petitioner further contends that she was actually acquitted by the jury as to Counts One and Three, and therefore cannot be tried again on those counts.

"[I]t has long been settled under the Fifth Amendment that a verdict of acquittal is final, ending a defendant's jeopardy, and . . . is a bar to a subsequent prosecution for the same offence." *McElrath*, 601 U.S. at 94 (quoting *Green v. United States*, 355 U.S. 184, 188 (1957)) (internal quotation marks omitted). "The Double Jeopardy Clause recognizes an event as an acquittal" when "there has been any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." *Id.* at 96.

It is also well-established that "whether an acquittal has occurred for purposes of the Double Jeopardy Clause is a question of federal, not state, law." *Id.* The analysis does not depend on state-law "labels," and a state's "characterization, as a matter of double jeopardy law, of [a ruling] is not binding." *Id.* (quoting *Smalis v. Pennsylvania*, 476 U.S. 140, 144, n.5 (1986)). Nonetheless, state law remains relevant.

> [T]he ultimate question is whether the Double Jeopardy Clause recognizes an event as an acquittal. In making that determination, we ask whether—given the operation of state law—there has been "any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense."

*Id.* (quoting *Evans v. Michigan*, 568 U.S. 313, 318 (2013)); *see also Smith v. Massachusetts*, 543

---

[9] The trial judge concluded that counsel's lack of objection to the declaration of a mistrial constituted implied consent. (Pet. Ex. A at 399-402). The SJC concluded that it did not need to reach the issue. *Read*, 495 Mass. at 326 n.13. This Court likewise concludes it need not do so.

U.S. 462, 474 (2005) (suggesting that a double-jeopardy ruling might be different if the state had adopted different procedural rules).

A "ruling" of insufficient proof does not require a jury verdict; a judge may direct a verdict of acquittal or overturn a conviction based on insufficient evidence.  *See, e.g.*, *Burks v. United States*, 437 U.S. 1, 17–18 (1978).  The critical question is whether there was such a "ruling."  *McElrath*, 601 U.S. at 96.

Here, the SJC summarized what constitutes a valid jury verdict under "the operation of" Massachusetts law:

> [T]he fundamental requirements for a jury's issuance of a verdict in a criminal case are set forth in Mass. R. Crim. P. 27(a).  Pursuant to that rule, a valid jury verdict must be unanimous and returned by the jury to the judge in open court.  Our case law confirms that a criminal verdict is effective only when affirmed by jurors in open court.  In other words, the distinction between informal agreement on a verdict and the actual return, receipt, and recording of a verdict in open court is central—only the latter constitutes a final verdict of the jury on a criminal charge.  We have consistently reaffirmed this longstanding distinction throughout our jurisprudence.

*Read*, 495 Mass. at 327-328 (quotations and citations omitted); *see also A Juvenile v. Commonwealth*, 392 Mass. 52, 56-57 (1984) (quoting *Lawrence v. Stearns*, 11 Pick. 501, 502 (1831)) ("The only verdict which can be received and regarded, as a complete and valid verdict of a jury, upon which a judgment can be rendered, is an open and public verdict, given in and assented to, in open court, as the unanimous act of the jury, and affirmed and entered of record, in the presence and under the sanction of the court.").

The SJC concluded that the jury here did not render a valid verdict under Massachusetts law.  *See Read*, 495 Mass. at 328 ("Far from an affirmation in open court of unanimous agreement on counts one and three, these notes clearly reflected a lack of consensus on 'the charges.'  Even if the jury's deadlock pertained specifically to count two, their notes made no such distinction, nor did they indicate any verdict would be returned to the judge in open court,

as required by Mass. R. Crim. P. 27(a)."). Petitioner appears to concede as much. (Pet. Reply at 13-16). Thus, in the absence of a valid verdict under state law, she must point to some other "*ruling* that the prosecution's proof is insufficient to establish criminal liability" to show that the jury acquitted her as a matter of federal constitutional law. *McElrath*, 601 U.S. at 96 (emphasis added).

Petitioner has not done so. Counsel have pointed to no case, from any jurisdiction, in which a private, unreported, and unrecorded vote of a jury was deemed to be a "ruling" capable of terminating jeopardy. In fact, the Supreme Court has held that it is not sufficient for the foreperson of a jury to report—in open court, in the presence of the other jurors—that the jury had voted to acquit as to certain counts. *See Blueford*, 566 U.S. at 608.

In *Blueford*, the defendant was tried in Arkansas state court for capital murder, which included the lesser included offenses of first-degree murder, manslaughter, and negligent homicide. *Id.* at 602. After a period of deliberation, the foreperson reported that the jury was "hopelessly deadlocked." *Id.* at 603. The court then "asked the foreperson to disclose the jury's votes on each offense." *Id.* The foreperson reported that the jury had voted unanimously against capital murder, had voted unanimously against first-degree murder, was deadlocked on manslaughter, and had not voted on negligent homicide. *Id.* at 603-604. The court gave the jury an *Allen* charge (its second) and instructed the jury to resume deliberations. *Id.* at 604. When the jury returned a half an hour later and reported that they were still deadlocked, the court declared a mistrial. *Id*

The state then sought to retry the defendant on all charges. *Id.* He moved to dismiss the capital murder and first-degree murder charges on double-jeopardy grounds. *Id.* The trial court denied the motion, and the Arkansas Supreme Court affirmed. *Id.*

The Supreme Court concluded that the defendant had not been acquitted, and that

therefore double jeopardy did not bar a new trial as to all charges.

> Blueford's primary submission is that he cannot be retried for capital and first-degree murder because the jury actually acquitted him of those offenses. The Arkansas Supreme Court noted—and Blueford acknowledges—that no formal judgment of acquittal was entered in his case. But none was necessary, Blueford maintains, because an acquittal is a matter of substance, not form. Blueford contends that despite the absence of a formal verdict, a jury's announcement constitutes an acquittal if it "'actually represents a resolution . . . of some or all of the factual elements of the offense charged.'" Here, according to Blueford, the foreperson's announcement of the jury's unanimous votes on capital and first-degree murder represented just that: a resolution of some or all of the elements of those offenses in Blueford's favor.

*Id.* at 605-06 (citations omitted). The court rejected that contention, concluding that "[t]he

foreperson's report was not a final resolution of anything." *Id.* at 606.

> When the foreperson told the court how the jury had voted on each offense, the jury's deliberations had not yet concluded. The jurors in fact went back to the jury room to deliberate further, even after the foreperson had delivered her report. When they emerged a half hour later, the foreperson stated only that they were unable to reach a verdict. She gave no indication whether it was still the case that all 12 jurors believed Blueford was not guilty of capital or first-degree murder, that 9 of them believed he was guilty of manslaughter, or that a vote had not been taken on negligent homicide. The fact that deliberations continued after the report deprives that report of the finality necessary to constitute an acquittal on the murder offenses.

*Id.* The court concluded that it "was therefore possible for Blueford's jury to revisit the offenses

of capital and first-degree murder, notwithstanding its earlier votes." *Id.* at 608. "And because

of that possibility, the foreperson's report prior to the end of deliberations lacked the finality

necessary to amount to an acquittal on those offenses, quite apart from any requirement that a

formal verdict be returned or judgment entered." *Id.*[10]

Here, even assuming that the jury did take a vote to acquit petitioner on Counts One and

---

[10] In a later portion of the opinion, where the Supreme Court concluded that the trial judge did not improperly declare a mistrial, it "reject[ed] the suggestion" that "the court . . . should have taken some action . . . to give effect to [the jury's] votes." *Id*. at 609.

Three, there is no basis to conclude that any such agreement was "final[ ]."  *Id.*  And unlike *Blueford*, any such agreement was not reported in open court in the presence of the other jurors, casting further doubt on the finality of any vote.

Petitioner seeks to distinguish *Blueford* on the ground that the post-trial juror statements here reflect the jury's position at "the end of deliberations," and that therefore there was no real possibility that a juror might change his or her mind.  (Pet. Mem. at 27-28).  But those post-trial statements do not actually indicate when the relevant votes were taken, or whether they actually reflect a final, conclusive verdict of acquittal by all twelve jurors.  (Pet. Ex. A at 283-88, 292-94, 323-26, 330-31).  And they certainly do not foreclose the possibility that the relevant votes were based on a preliminary discussion or a straw poll.  *See Blueford*, 566 U.S. at 608 ("A single juror's change of mind is all it takes to require the jury to reconsider"); *see also Commonwealth v. Roth*, 437 Mass. 777, 793 (2002) (stating that even the "most recent 'vote' immediately prior to reporting deadlock may well be tentative, a failed experiment in compromise, and not a true expression of each juror's assessment of the case").

In short, any jury vote here was not final, as required by *Blueford*.  It was not an "actual return, receipt, and recording of a verdict in open court," as required under Massachusetts law. *Read*, 495 Mass. at 327.  And there is no other basis, in fact or law, to conclude that it is a "ruling" capable of terminating jeopardy.  Accordingly, and as a matter of federal constitutional law, petitioner was not actually acquitted of any of the relevant offenses.  *See McElrath*, 601 U.S. at 96.

### D.    <u>Whether a Post-Trial *Voir Dire* of Jurors Is Appropriate</u>

Finally, and alternatively, petitioner requests post-trial *voir dire* of the individual jurors in order to ascertain whether they voted to acquit her on any of the charges before the trial judge declared a mistrial.  The SJC rejected that request, concluding that an inquiry would contravene

the Massachusetts "prohibition on probing the content of juror deliberations." *Read*, 495 Mass. at 330.

There is a threshold question as to whether this Court has the legal authority to conduct such a *voir dire*. As a general matter, the statutory framework for habeas proceedings contemplates the taking of evidence. Specifically, Section 2243 provides that a court "shall summarily hear and determine the facts" underlying a petition for habeas corpus. 28 U.S.C. § 2243. Section 2246 further provides that "[o]n application for a writ of habeas corpus, evidence may be taken orally or by deposition, or, in the discretion of the judge, by affidavit." 28 U.S.C. § 2246. And when a federal prisoner files a habeas petition under Section 2255 challenging his or her federal confinement, the statute explicitly authorizes the court to "make findings of fact" to determine whether the claim has merit. 28 U.S.C. § 2255(b).

However, in a petition filed by a state prisoner under Section 2254 challenging his or her state confinement, a federal court has more limited authority. *See* 28 U.S.C. § 2254(e). In such a proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct," subject to rebuttal. 28 U.S.C. § 2254(e)(1). If there have been no state-court factual findings supporting the claim, the petitioner is entitled to an evidentiary hearing only if the claim relies on a retroactive rule of constitutional law or a factual predicate not discoverable through due diligence, and if the facts petitioner seeks to adduce would show that "no reasonable factfinder would have found the applicant guilty." 28 U.S.C. § 2254(e)(2).

Petitioner here is not challenging a federal sentence, nor a state court judgment, so her petition is not brought under either Section 2255 or Section 2254. Instead, she is challenging her state custody under Section 2241. In one respect, the ability of a federal court to conduct a factfinding inquiry in connection with a petition under Section 2241 is clearly limited; the federal court must give deference to any findings of fact made by the state courts. *See Marshall v.*

*Bristol Superior Ct.*, 753 F.3d 10, 16 (1st Cir. 2014).  But the extent of the authority of a federal court to take *additional* evidence concerning the underlying state-court proceeding is not clear.

The general grant of factfinding authority under Sections 2243 and 2246 would seem to permit the federal court to conduct an evidentiary hearing concerning a state-court proceeding under at least some circumstances.  Indeed, at least two federal courts appear to have held evidentiary hearings in matters involving state-prisoner petitions under Section 2241, although neither opinion cited any authority for doing so nor provided any relevant legal analysis.  *See Johnson v. Patton*, 580 F. App'x 646, 649 (10th Cir. 2014) (unpublished) (noting in passing that the federal court conducted an evidentiary hearing concerning "jail-time and street-time credits" for which a state prisoner would be eligible); *Hiratsuka v. Houser*, 2022 WL 348460, at *1 (D. Alaska Jan. 5, 2022) (noting in passing that the federal court held an evidentiary hearing concerning delays in pre-trial proceedings), report and recommendation adopted, 2022 WL 343772 (D. Alaska Feb. 4, 2022), aff'd, 2023 WL 5695995 (9th Cir. Sept. 5, 2023).

Counsel for petitioner has not, however, pointed to any case, from any court, where a federal court considering a Section 2241 petition has either undertaken its own *voir dire* of a state-court jury or ordered a state court to do the same.  Either approach is fraught with potential problems.

To begin, an injunction directing the state trial court to conduct a *voir dire* of the former jurors would implicate substantial concerns of federalism and comity.  *Cf. Younger*, 401 U.S. at 43-44.  While those concerns may be somewhat mitigated if this Court itself conducts the *voir dire*, such a process would nonetheless represent a substantial intrusion by a federal court into the functions and role of the state judiciary.  For example, and at a minimum, this Court would have to issue an order directing the state court to produce the impounded juror list.  Such a *voir dire* should be undertaken, if at all, only in extraordinary circumstances and even then with great

circumspection and care.

Furthermore, the *voir dire* petitioner proposes would inevitably require a detailed inquiry into the jury's deliberations. Petitioner contends that the inquiry could be limited to a simple yes-or-no question as to any votes the jury may have taken before the declaration of the mistrial. But surely more than that would be required. A *voir dire* would serve little or no purpose unless it established that the jury took a unanimous and conclusive vote of acquittal on one or more counts. To make such a finding, it would be necessary to ascertain when any votes were taken, and what each juror said and thought at the time of the vote. How many votes were taken? Were they straw votes, or otherwise preliminary or tentative? What was the timing of those votes in connection with the various notes to the trial judge? What, if anything, did jurors say to each other about the votes? Did the votes reflect any compromises? Was the possibility of compromise discussed? What were the mental processes of each juror? Did any jurors have private reservations about the vote they cast? How can any such votes be reconciled with the jury's public statements that they were deadlocked on the "charges"?[11] Why are the juror affidavits inconsistent?[12]

Nor would the inquiries be limited to the deliberations and votes inside the jury room. Because the events in question happened more than eight months ago, it would also be necessary to inquire into matters such as the potential pressures on jurors since the conclusion of the trial and the effect, if any, of such pressures on their testimony. *See Read*, 495 Mass. at 332 (noting

---

[11] The trial judge found that the post-trial statements by jurors "directly contradict[ed]" the jury's notes, particularly the third note, which stated they were "starkly divided" as to whether the elements of "the charges" had been proved. (Pet. Ex. A at 396 n.4). The SJC likewise concluded that the statements were "inconsistent with" and "contradict[ed]" their prior notes." *Read*, 495 Mass. at 313-14.

[12] The post-trial juror statements are inconsistent as to what charge (or charges) resulted in a unanimous verdict; what the vote count was as to the deadlocked charge; and whether the deliberations were respectful or had become a "bully match." (Pet. Ex. A at 283-85, 325-31).

that any inquiry of the jurors would necessarily "occur well after they became susceptible to outside influences"). Those are hardly hypothetical concerns, given the intense public focus on the jurors and their expressly voiced concerns for their privacy and even physical safety. (Pet. Ex. A at, 293, 324, 325-26).

Any *voir dire* of that nature would, at a minimum, involve considerable complexities and lead to extended delays. But even assuming that the many practical issues with a *voir dire* could be resolved—and even putting the federalism and comity issues to one side—there is a more substantial problem with petitioner's proposal: it runs directly contrary to long-established principles that generally prohibit any examination of the content of juror deliberations. *See Tanner v. United States*, 483 U.S. 107, 127 (1987).

The starting point for the analysis is Rule 606(b)(1) of the Federal Rules of Evidence. That rule provides as follows:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1).[13] That rule codified long-standing common-law principles designed to protect the freedom of juror deliberations, the protection of jurors against harassment, and the finality of verdicts. *See Tanner*, 483 U.S. at 119-21 (noting that "full and frank discussion in the jury room, juror's willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post-verdict scrutiny of juror conduct"); *Warger v. Shauers*, 574 U.S. 40, 47–48 (2014). The

---

[13] Rule 606(b)(2) provides three narrow exceptions to the rule, none of which are applicable here: inquiry is allowed only into extraneous prejudicial information, outside influence, or clerical errors made when entering the verdict on the verdict form. *See* Fed. R. Evid. 606(b)(2).

Supreme Court in *Tanner* observed that the prohibitions set out in Rule 606(b)(1) derived from a long-standing common-law rule supported by "[s]ubstantial policy considerations":

> Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

*Id.*, 483 U.S. at 120 (quoting *McDonald v. Pless*, 238 U.S. 264, 267-68 (1915)); *see also Commonwealth v. Fidler*, 377 Mass. 192, 196 (1979) ("[I]t is essential to the freedom and independence of [jury] deliberations that their discussions in the jury room should be kept secret and inviolable; and to admit the testimony of jurors to what took place there would create distrust, embarrassment and uncertainty[.]") (quoting *Woodward v. Leavitt*, 107 Mass. 453, 460 (1871)).[14]

It is true that Rule 606 does not literally apply here, because the jury did not actually render a "verdict." Fed. R. Evid. 606(b)(1). Nonetheless, the same policy considerations concerning the freedom of juror deliberations and the protection of jurors against harassment are unquestionably implicated in the circumstances of this case. In fact, they apply with unusual force. This is a highly sensationalized prosecution that has been the subject of exceptional public scrutiny, not only locally but nationally. For a number of reasons, it has also proved to be unusually divisive. There is a strong likelihood that jurors would be subject to harassment, public pressure, and social coercion were the Court to order a post-trial *voir dire* that explores

---

[14] As noted, the SJC concluded that the *voir dire* requested by petitioner would contravene Massachusetts law and its "prohibition on probing the content of juror deliberations." *Read*, 495 Mass. at 330. It stated that "[m]aintaining the secrecy of those deliberations is a bedrock of our judicial system," which "not only prevents jury tampering but also upholds the finality of jury verdicts and fosters confidence in the judicial process." *Id.* at 330-31 (quotation omitted). "Probing secret deliberations to determine whether the jurors may have privately agreed on a verdict they never returned would undermine these fundamental principles." *Id.* at 331.

their viewpoints and votes at some length.[15]  More than eight months after the conclusion of the

trial, the jurors' willingness to speak honestly about their deliberations would surely be

compromised.[16]

Even the policy underlying Rule 606(b)(1) that favors finality is implicated, if only by

analogy.  The jury notes reporting a deadlock—culminating in the note stating that the jury was

"starkly divided" as to whether the Commonwealth had proved "the necessary elements of the

charges"—led ineluctably to a substantial, if not final, legal consequence:  the declaration of a

mistrial and the termination of the first trial.  (Pet. Ex. A at 268).

For all of those reasons, the Court concludes that a federal-court *voir dire* of the state-

court jurors—a *voir dire* that would necessarily subject their private deliberations to intense

public scrutiny—is probably unlawful and certainly ill-advised.  But in any event, under the

circumstances presented here, the Court concludes that it is not necessary to reach the issue.

Even assuming that a post-trial *voir dire* elicited evidence strongly favorable to petitioner—such

as an attestation from each juror that the jury voted unanimously to acquit petitioner on Counts

One and Three before being discharged—her claim would still fail.

As noted, an acquittal requires a "*ruling* that the prosecution's proof is insufficient to

establish criminal liability for an offense."  *McElrath*, 601 U.S. at 96 (emphasis added).  A

private, unreported, unrecorded jury vote is not a "ruling," and therefore not an acquittal.  *Id.*  At

---

[15] While the Court could of course order that the juror names be kept confidential, it is at least somewhat doubtful that their anonymity could be entirely and permanently protected.  More importantly, the jurors themselves would likely doubt the efficacy of any such order, and their willingness to speak freely concerning their deliberations would likely be inhibited.

[16] According to petitioner, "in the context of this highly publicized case, it strains credulity to suggest" that if the post-trial juror statements did not "represent the unanimous view of all 12, the remaining jurors would allow the inaccuracy to go uncorrected."  (Pet. Mem. at 27).  It is at least as likely that the remaining seven jurors are inhibited from coming forward in order to avoid continued media and social pressure, whether they agree with the post-trial statements or not.  (Pet. Ex. A at 331) (Juror B stating that he believes "other jurors have been reluctant to come forward because there is so much public and media attention focused on this case").  In any event, the actual views of those jurors could only be ascertained by a detailed *voir dire*.

the very least, such a "ruling" requires finality, and the public affirmation of a verdict is part of what makes it final, rather than provisional. The opportunity for "a single juror's change of mind" is enough to undermine its finality. *Blueford*, 566 U.S. at 608. And such a vote, in any event, does not constitute an acquittal under Massachusetts law. *Read*, 495 Mass. at 326-30. Therefore, there was no "ruling" that acquitted petitioner as to Counts One and Three. *McElrath*, 601 U.S. at 96.

Accordingly, the Court declines to order post-trial *voir dire* of the individual jurors in the initial trial of this matter.

## III.  <u>Conclusion</u>

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**


/s/  F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  March 13, 2025                    Chief Judge, United States District Court

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN READ,            ) <br>                ) <br>        **Petitioner,**    ) <br>                ) <br>     **v.**             ) <br>                ) <br> **NORFOLK COUNTY SUPERIOR COURT** ) <br> **and MASSACHUSETTS ATTORNEY** ) <br> **GENERAL,**          ) <br>                ) <br>      **Respondents.**   ) | **Civil Action No.** <br> **25-cv-10399-FDS** |

## MEMORANDUM AND ORDER ON MOTION
## FOR A CERTIFICATE OF APPEALABILITY

**SAYLOR, C.J.**

This is a petition for writ of habeas corpus under 28 U.S.C. § 2241. Petitioner Karen

Read challenges her continued prosecution in Massachusetts state court, after the declaration of a

mistrial, on the ground that it violates her right under the Double Jeopardy Clause. She is under

indictment for second-degree murder and two other charges; her first trial on those charges ended

in a mistrial after the jury reported that they were deadlocked.

Her petition presented four questions: (1) "whether the jury's unanimous conclusion

following trial that Ms. Read is not guilty on Counts 1 and 3 constitutes an acquittal and

precludes re-prosecution;" (2) "whether, alternatively, the defense is entitled to a post-verdict

judicial inquiry to determine whether the evidence supports the juror representations as to having

acquitted Ms. Read;" (3) whether re-prosecution is independently barred because there was no

manifest necessity to declare a mistrial on counts for which the jury was not deadlocked;" and

(4) "assuming arguendo the court found that counsel consented to a mistrial, whether the defendant's personal consent was required."

On March 13, 2025, the Court denied the habeas petition in its entirety, ruling against petitioner on the first three grounds and determining that it need not reach the fourth ground.

To appeal a final order in a habeas proceeding that contests the validity of state custody, a petitioner must first obtain a certificate of appealability from a circuit justice or a district court. *See* 28 U.S.C. § 2253(c). A COA will issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard is satisfied by "demonstrating that jurists of reason could disagree with the district court's resolution of [petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Petitioner has made the necessary "substantial showing of the denial of a constitutional right" as to all claims. 28 U.S.C. § 2253(c)(2). Accordingly, a certificate of appealability is GRANTED as to all claims.

**So Ordered.**


/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: March 13, 2025                    Chief Judge, United States District Court

2

Add0030