# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————

## No. 25-1257

———————————

**KAREN READ,**
**Petitioner - Appellant**

*v.*

**NORFOLK COUNTY SUPERIOR COURT; ANDREA J. CAMPBELL,**
**MASSACHUSETTS ATTORNEY GENERAL,**
**Respondents - Appellees**

———————————

**On Appeal from an Order of the United States District Court**
**for the District of Massachusetts Denying Petition for Habeas Corpus**

———————————

**JOINT APPENDIX**
**VOLUME II**
**(Pages 472 – 654)**

———————————

Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
pabianlaw38@gmail.com

Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

**Counsel for Karen Read**

Thomas E. Bocian
MA Attorney General's Office

Caleb J. Schillinger
Norfolk District Attorney's Office

**1 Ashburton Pl., 20th Fl.**
**Boston, Massachusetts 02108**
**(617) 727-2200 (Telephone)**

**Counsel for Norfolk County Superior**
**Court and Massachusetts Attorney**
**General**

**45 Shawmut Rd.**
**Canton, Massachusetts 02021**
**(781) 830-4800 (Telephone)**

**Counsel for Norfolk County**
**Superior Court**

## TABLE OF CONTENTS

**<u>Caption</u>**                                                                                                    **<u>Page</u>**

**VOLUME I**

Docket Entries…………………………………………………………...1

Petition for Writ of Habeas Corpus, Document 1…………………… ....5

Memorandum in Support of Petition for Writ of Habeas Corpus, Document 2………………………………………………………………13

SJC Record Appendix, Document 2-1…………………………………48

**VOLUME II**

SJC Opinion, Document 2-2………………………………………………472

Respondent's Opposition to Petition for Writ of Habeas Corpus, Document 18 ……………………………………...............................507

SJC Supplemental Record Appendix, Document 18-1………………536

Reply to Respondent's Opposition, Document 22……………………575

Hearing Transcript, 3/5/25………………………………………………595

Notice of Appeal, Document 29………………………………………653

NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13663

KAREN READ  vs.  COMMONWEALTH.


Suffolk.     November 6, 2024. - February 11, 2025.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
Dewar, & Wolohojian, JJ.


Supreme Judicial Court, Superintendence of inferior courts.
    Homicide.  Motor Vehicle, Homicide, Operating under the
    influence, Leaving scene of accident.  Practice, Criminal,
    Mistrial, Double jeopardy, Deliberation of jury,
    Investigation of jurors, Verdict, Affidavit.
    Constitutional Law, Double jeopardy.  Jury and Jurors.


    Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on September 11, 2024.

    The case was reported by Dewar, J.


    Martin G. Weinberg (Alan J. Jackson, of California, Michael
Pabian & David R. Yannetti also present) for the petitioner.
    Caleb J. Schillinger, Assistant District Attorney (Laura A.
McLaughlin, Assistant District Attorney, also present) for the
Commonwealth.
    Jessie Rossman, Daniel McFadden, & Michael T. Packard, for
American Civil Liberties Union of Massachusetts, Inc., amicus
curiae, submitted a brief.

GEORGES, J.  The defendant challenges the denial of her
motion to dismiss after her first trial ended in a mistrial.[1]
That trial was lengthy, spanning eight weeks of evidence,
involving seventy-four witnesses and 657 exhibits.  The
defendant does not contend that this evidence was legally
insufficient to support a conviction on any of the charges,
which would preclude retrial.[2]  Instead, her argument focuses on
whether the trial judge properly declared a mistrial and the
relevance, if any, of posttrial accounts of jury deliberations.

The jury deliberated for five days, sending progressively
insistent notes to the judge about their inability to reach a
unanimous verdict.  In their third and final note, the jury
stated that "[s]ome members . . . firmly believe[d] that the
evidence surpasses the burden of proof establishing the elements
of the charges," while others did not.  They described their
views as rooted in "sincere adherence to [their] individual
principles and moral convictions," and stated that further
deliberation would be "futile" and would "force [them] to

---

[1] Although Karen Read commenced this action by filing a
petition in the county court, for convenience, we refer to her
as the defendant.

[2] The record submitted to the single justice, and now before
this court, does not contain transcripts of the testimony or the
exhibits from the defendant's first trial.

compromise these deeply held beliefs."  Based on this final note, the judge declared a mistrial.

The defendant's motion to dismiss and this petition rely on posttrial accounts from several jurors.  These accounts suggest that, during deliberations, the jury unanimously agreed the defendant was not guilty on two of the three charges and were deadlocked only on the remaining charge.  The defendant argues that a mistrial was thus not manifestly necessary because the judge could have requested a partial verdict from the jury before discharging them.  The defendant further asserts that these posttrial accounts show she was, in effect, acquitted of two charges, and that double jeopardy bars retrial on those counts.

This petition thus raises the question:  Can posttrial accounts of jurors' private deliberations that are inconsistent with their public communications in court render the declaration of a mistrial improper, or constitute an acquittal, where the jury did not announce or record a verdict in open court?  We conclude that they cannot.  The jury clearly stated during deliberations that they had not reached a unanimous verdict on any of the charges and could not do so.  Only after being discharged did some individual jurors communicate a different supposed outcome, contradicting their prior notes.  Such posttrial disclosures cannot retroactively alter the trial's

outcome -- either to acquit or to convict.  Accordingly, we affirm the trial judge's denial of the motion to dismiss and the defendant's request for a posttrial juror inquiry.[3]

    _Background_.  1.  _Trial and deliberations_.  In 2022, a grand jury returned three indictments against the defendant:  murder in the second degree, G. L. c. 265, § 1 (count one); manslaughter while operating a motor vehicle under the influence of alcohol, G. L. c. 265, § 13 1/2 (count two); and leaving the scene of personal injury resulting in death, G. L. c. 90, § 24 (2) (_a_ 1/2) (2) (count three).  Trial began in April 2024 and lasted over two months.  On the thirty-seventh day, the jury received instructions regarding the three indictments, and two lesser included offenses for count two:  involuntary manslaughter and motor vehicle homicide.

    Before deliberations began, the judge indicated that the foreperson of the jury would be given separate verdict slips for each of the three indictments.  The judge then explained the procedure for delivering the verdicts:

> "After the final vote of the jury, the foreperson should check the appropriate boxes as to each charge, then sign and date the verdict slips and notify the court officer that you have reached a unanimous verdict.  You will then be brought back into the courtroom, where the foreperson will deliver the verdicts to the Court."

---

[3] The motion filed by the American Civil Liberties Union of Massachusetts, Inc., seeking leave to file an amicus curiae brief, is hereby allowed.

The judge also instructed the jury to "continue deliberating until you have reached a final verdict on each charge," and to not disclose their numerical standing or progress to anyone, including the judge, "before such time as you have reached a unanimous verdict."  The jury then began deliberations.

Three days later, after approximately nineteen hours of deliberations, the foreperson submitted a note to the judge (first note) that stated:

> "I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict."

After reading the note into the record, the judge requested argument from the parties on whether the jury had conducted "due and thorough" deliberations, warranting a so-called Tuey-Rodriquez charge.[4]  The Commonwealth argued that the jury had not deliberated long enough, while the defense disagreed, requesting the instruction and asserting that the foreperson's use of the word "exhaustive" suggested "an impasse."  The judge determined

---

[4] See Commonwealth v. Rodriquez, 364 Mass. 87, 101-102 (1973) (Appendix A); Commonwealth v. Tuey, 8 Cush. 1, 2-3 (1851).  The Tuey-Rodriquez charge is a model instruction "given when jurors report deadlock after 'due and thorough deliberation'" that is "designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view."  Commonwealth v. Carnes, 457 Mass. 812, 827 (2010).  Once a deadlocked jury receives the Tuey-Rodriquez charge and resumes their deliberations, "they shall not be sent out again without their own consent."  G. L. c. 234A, § 68C.

that further deliberation was appropriate and instructed the
jury to continue.

Deliberations extended through the afternoon and resumed
the following Monday morning.  At 10:45 $\underline{A}$.$\underline{M}$., the jury
foreperson submitted another note to the judge (second note),
which stated:

> "Despite our commitment to the duty entrusted to us, we
> find ourselves deeply divided by fundamental differences in
> our opinions and state of mind.

> "The divergence in our views are [sic] not rooted in a lack
> of understanding or effort, but deeply held convictions
> that each of us carry ultimately leading to a point where
> consensus is unattainable.

> "We recognize the weight of this admission and the
> implications it holds."

Upon receiving this note, the judge again invited argument from
both parties.  The Commonwealth acknowledged that the jury had
already deliberated "in the vicinity of 22 or 23 hours,"[5] but
nonetheless argued it was premature to conclude their
deliberations had been due and thorough.  Defense counsel,
however, maintained that the jury were "hopelessly deadlocked,"
and again requested the Tuey-Rodriquez instruction.  The judge
agreed with defense counsel, noting that the jury had been
"extraordinary" and that she had "never seen a note like this

---

[5] Although the transcript does not state the precise time
that deliberations resumed on Monday morning, based on prior
proceedings it appears the jury had deliberated closer to
twenty-four or twenty-five hours by this point.

reporting to be at an impasse."  The judge then delivered the Tuey-Rodriquez instruction to the jury and sent them back to deliberate further.

At approximately 2:30 P.M., the foreperson submitted yet another note to the judge (third note), which stated:

"Despite our rigorous efforts, we continue to find ourselves at an impasse.

"Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyound [sic] a reasonable doubt. Convers[e]ly, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of the charges[.]

"The deep division is not due to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions.

"To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs."

After receiving the third note, the judge informed counsel that "[t]he jury is at an impasse."  The jury were called back into the court room, and the third note was read aloud into the record.  Upon reaching the final line -- stating that further deliberation would "force [the jury] to compromise these deeply held beliefs" -- the judge addressed the jury, saying, "I am not going to do that to you . . . folks," and declared a mistrial.

The judge then discharged the jury back to the deliberation room, explaining that she would meet them there privately to thank them for their service.  The judge and the parties

remained in the court room to discuss their availability for scheduling a status conference on the matter. At no point during this discussion did defense counsel object to the judge's declaration of a mistrial or express disagreement with that outcome.

2. _Posttrial events_. According to affidavits submitted by defense counsel, a member of the deliberating jury (juror A) contacted defense counsel on July 2, 2024, after noticing "inaccurate reports" about the jury's alleged "split" that caused the mistrial the day before. Juror A stated that the jury had unanimously agreed that the defendant was not guilty of count one (murder in the second degree) and count three (leaving the scene of personal injury resulting in death).

Two days after the mistrial, defense counsel also received screenshots[6] of text message exchanges with jurors or their acquaintances describing the deliberations. In one exchange, another member of the jury (juror B) wrote, "It was not guilty on second degree. And split in half for the second charge."[7] In another exchange, an individual (referred to as an "[i]nformant"

---

[6] "A screenshot is a copy of the image displayed by a computer screen" (quotation and citation omitted). _Commonwealth_ v. _Cronin_, 495 Mass. 170, 171 n.2 (2025).

[7] One month later, juror B contacted defense counsel to confirm the content of this exchange, and further asserted that the jury had unanimously agreed the defendant was not guilty of count three as well.

by defense counsel) was advised that another juror (juror C) had told friends there was "no consideration" of murder in the second degree and that the jury deadlocked on "the remaining charges."  The exchange contained no mention of count three, but it stated that "manslaughter started polling at 6/6 then ended deadlock [sic] @ 4no8yes."  Juror C had also reportedly stated that the jurors had "a group text going."  Upon receiving this information, the informant commented, "[I]f they all agreed on no for murder two[,] they should make that clear to the DA[] and the court.  [I]t's basically a case of double jeopardy if she is retried on that charge."

On July 8, 2024, one week after the mistrial, the defendant filed a motion to dismiss based on these posttrial accounts. The defendant argued that the accounts showed the jury had effectively acquitted her of counts one (murder in the second degree) and three (leaving the scene of personal injury resulting in death).  She further contended that the judge's mistrial declaration was improper for these two counts and requested, at minimum, a postverdict inquiry to confirm whether the jury had agreed she was not guilty of those charges.

Defense counsel later supplemented the motion with accounts from two additional jurors.  One juror (juror E) stated that the jury had been deadlocked only on the "lower charges on count 2." The other juror (juror D) stated that the jury's disagreement

solely concerned "Count 2 and its lesser offenses."  Juror D
indicated that the jury had debated whether to inform the judge
of their decision on counts one and three, but they were
uncertain "if they were allowed" to do so.  Juror D claimed
that, after discussing the matter, the jury ultimately "decided
to inform the court that they were deadlocked, and they expected
they would get further instruction about the remaining (decided)
counts thereafter."

The Commonwealth also submitted a posttrial filing
notifying the court that, after the submission of defense
counsel's affidavits, it had received two voicemail messages
from a member of the jury.  The juror specified that the jury
had voted not guilty on counts one and three, "and as of last
vote[,] 9-3 guilty . . . on the lower-level manslaughter
charges."  The Commonwealth also received e-mail messages from
three individuals who identified themselves as jurors and asked
to speak anonymously.  Once the Commonwealth informed them that
it may be required to disclose the substance of their
communications to defense counsel or the court, however, the
jurors declined to communicate further.

The trial judge denied the defendant's motion to dismiss
after a nonevidentiary hearing.  The judge reasoned that,
"[b]ecause there was no open and public verdict affirmed in the
open court rendered in this case, the defendant was not

acquitted of any of the charges," and that any posttrial voir dire of jurors would involve an impermissible inquiry into the substance of the jury's deliberations.

Additionally, the judge rejected the defendant's argument that declaring a mistrial was improper.  She noted that defense counsel had twice requested the Tuey-Rodriquez instruction -- "the final step" preceding a mistrial -- and raised no objections nor made any request to be heard when the mistrial was declared.  The judge remarked that "defense counsel were no shrinking violets" during the trial, making it unlikely that, "when counsel heard that the jury was at an impasse for a third time and a mistrial was inevitable, at perhaps the most crucial point in the trial, counsel would sit silently if they did not consent to a mistrial."  She also concluded that, in any event, the mistrial was manifestly necessary given the jury's repeated statements of deadlock.

On September 11, 2024, the defendant filed a petition for relief under G. L. c. 211, § 3, in the county court.[8]  A single

---

[8] Although a defendant ordinarily is not entitled to interlocutory review of the denial of a motion to dismiss, we have recognized a narrow exception to this general rule in the context of double jeopardy claims.  See Neverson v. Commonwealth, 406 Mass. 174, 175 (1989).  The Commonwealth does not contest that interlocutory review is appropriate in the circumstances of the instant case.

justice of this court reserved and reported the matter, without decision, to the full court.[9]

Discussion. 1. Propriety of declaring a mistrial. The double jeopardy clause of the Fifth Amendment to the United States Constitution "generally preclude[s] the Commonwealth from trying a defendant more than once for the same offense." Commonwealth v. Phim, 462 Mass. 470, 473 (2012). See Benton v. Maryland, 395 U.S. 784, 787, 795-796 (1969) (Federal double jeopardy clause applicable to States by Fourteenth Amendment). However, an exception to this general rule applies when a mistrial is declared due to "manifest necessity" (citation omitted). Ray v. Commonwealth, 463 Mass. 1, 3 (2012). In such instances, the double jeopardy clause does not bar the State from retrying the defendant. See id.

To determine whether the declaration of a mistrial is manifestly necessary, a trial judge balances "the defendant's valued right to have his or her trial completed by a particular tribunal against the interest of the public in fair trials designed to end in just judgments" (quotations and citation omitted). Commonwealth v. Edwards, 491 Mass. 1, 17 (2022). A hung jury has long been recognized as "a traditional example" of

---

[9] At the time this matter was reserved and reported, the defendant's retrial was scheduled to begin on January 27, 2025. The retrial has since been continued until April 2025.

manifest necessity, allowing retrial without offending the defendant's double jeopardy rights. Commonwealth v. Troila, 410 Mass. 203, 206 (1991). See Richardson v. United States, 468 U.S. 317, 326 (1984) ("jeopardy does not terminate when the jury is discharged because it is unable to agree").

The decision to declare a mistrial is entrusted to the "sound discretion" of the trial judge. Commonwealth v. Bryan, 476 Mass. 351, 352 (2017). Trial judges receive such discretion to avoid the possibility of coercive measures being used to force jury agreement, thereby protecting the fairness of the proceedings. See A Juvenile v. Commonwealth, 392 Mass. 52, 55 (1984). See also Renico v. Lett, 559 U.S. 766, 774 (2010). In evaluating whether a trial judge abused his or her discretion in declaring a mistrial, a reviewing court considers whether the judge carefully explored "alternatives to a mistrial," and whether counsel were "given full opportunity to be heard" (citation omitted). Commonwealth v. Taylor, 486 Mass. 469, 484–485 (2020). If these principles were followed, and there is no claim of insufficient evidence to support a conviction, "double jeopardy will not prevent [the defendant's] retrial" (citation omitted).[10] Ray, 463 Mass. at 4.

---

[10] The defendant has not argued that the evidence presented at her first trial was legally insufficient to sustain a conviction, and we thus do not address the issue.

Here, we discern no abuse of discretion in the trial judge's decision that the jury were at an impasse and that a mistrial was manifestly necessary.  After extensive, multiday deliberations, the jury submitted several increasingly emphatic notes about their inability to reach a unanimous verdict.  By the time the jury sent their first note, they had deliberated for approximately nineteen hours, over four days.  That note stated that they had conducted an "exhaustive review of the evidence," and given "diligent consideration of all disputed evidence."  Following the judge's instruction to continue their deliberations, the jury deliberated for another five to six hours -- spanning a Friday afternoon and the following Monday morning -- before sending a second note that was noticeably more definitive.  That note stated jurors were "deeply divided by fundamental differences" and that "consensus [was] unattainable," echoing language from other cases where we have characterized a jury's report of deadlock as "unambiguous." See, e.g., Ray, 463 Mass. at 5 (concluding that jury note stating jurors were "hopelessly deadlocked" was "unambiguous" about their inability to agree); Fuentes v. Commonwealth, 448 Mass. 1017, 1018 (2007) (final note stating that jurors were "unable to come to a unanimous decision" unequivocally reflected that they were deadlocked).

The second note further emphasized that the deadlock arose not from "a lack of understanding or effort," but from "deeply held convictions that each of [the jurors] carr[ied]."  By this point, the jury had already deliberated approximately twenty-four hours, see note 5, supra, and defense counsel described them as "hopelessly deadlocked."  But the trial judge did not immediately conclude that all hope of attaining a verdict was lost.  Instead, she issued the Tuey-Rodriquez charge, a standard instruction that encourages deadlocked juries to "reach a verdict by giving more serious consideration to opposing points of view" (citation omitted).  Commonwealth v. Chalue, 486 Mass. 847, 860 (2021).

After nearly four hours of additional deliberation —-bringing the total to approximately twenty-eight hours -- the jury submitted a third note that was even more emphatic.  It stated that further deliberations "would be futile and only serve to force us to compromise [our] deeply held beliefs." While there is no "mechanical formula" for determining whether a jury is genuinely deadlocked, see Ray, 463 Mass. at 4-5, quoting Illinois v. Somerville, 410 U.S. 458, 462 (1973), the trial judge acted well within her discretion in concluding the jury were at an impasse and a mistrial was manifestly necessary.

The defendant contends that, despite the jury's deadlock, the trial judge failed to adequately consider alternatives to

declaring a mistrial.  Yet, as discussed, the trial judge did consider and pursue such alternatives.  After the first note reporting deadlock, the judge instructed jurors to continue their deliberations.  After the second note, the judge issued the Tuey-Rodriquez charge.  It was only when the jury submitted their third report of deadlock, at which point the judge was statutorily precluded from ordering them to continue deliberations without their consent, see G. L. c. 234A, § 68C, that the judge declared a mistrial.  Nonetheless, the defendant argues that the judge should have inquired whether the jury had reached agreement on any of the charges.  Had the judge done so, the defendant asserts, she would have discovered that the jury had agreed on counts one and three, allowing for a partial verdict.  We disagree.

Rule 27 (b) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 897 (1979), "gives a trial judge discretion to require a jury to return a verdict" for charges on which they have unanimously agreed before declaring a mistrial (quotation and citation omitted).  Commonwealth v. Floyd P., 415 Mass. 826, 830 (1993).  See Mass. R. Crim. P. 27 (b) ("judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded" [emphasis added]).  Rule 27 (d) also permits a judge to poll the jury "[w]hen a verdict is returned and before the

verdict is recorded." Mass. R. Crim. P. 27 (d). However, "a judge is not required to accept" a partial verdict before declaring a mistrial, <u>Daniels</u> v. <u>Commonwealth</u>, 441 Mass. 1017, 1018 n.3 (2004), and is prohibited from doing so on a single indictment that contains lesser included offenses, see <u>Commonwealth</u> v. <u>Roth</u>, 437 Mass. 777, 787 (2002).

Here, the jury were instructed on three separate indictments, along with two lesser included offenses on count two, but the trial record offers no indication that a partial verdict was imminent or possible. The jury's first note simply stated they were "unable to reach a unanimous verdict," without reference to any specific charge. The second note reiterated that consensus was unattainable and acknowledged "the implications" of the jury's deadlock. Neither note suggested the jury had reached, or could reach, consensus on any subset of the charges,[11] and we have cautioned against assuming a final verdict exists from general reports of deadlock. See <u>Roth</u>, 437 Mass. at 793-794.

---

[11] As the trial judge observed in her memorandum of decision denying the defendant's motion to dismiss, it is particularly striking that the jury notes provided "no inkling" of agreement on any of the charges. Additionally, the notes did not request clarification on whether a partial verdict could be returned. This absence is particularly significant given the evident "care that went into writing the notes and how articulately they expressed the jurors' disagreement."

In fact, the jury's third note implied they were deadlocked on <u>all</u> charges. That note stated, in part:

> "Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of <u>the charges</u> [beyond] a reasonable doubt. Convers[e]ly, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of <u>the charges</u>" (emphases added).

Although the defendant relies on posttrial affidavits to suggest "the charges" referred only to count two and its lesser included offenses, we assess the trial judge's decision based on what was known at the time of her decision. See <u>Commonwealth</u> v. <u>Torres</u>, 453 Mass. 722, 736 (2009). As one court has observed, allowing posttrial juror accounts to affect the analysis "would create endless confusion and controversy" in cases where a mistrial has already been declared due to deadlock. <u>Fitzgerald</u> v. <u>Lile</u>, 732 F. Supp. 784, 789 (N.D. Ohio), aff'd, 918 F.2d 178 (6th Cir. 1990).

In short, the record before the trial judge suggested complete deadlock. The first and second notes provided no indication of a partial consensus, and the third note plainly implied the opposite. See <u>State</u> v. <u>Fennell</u>, 431 Md. 500, 522 (2013), and cases cited ("the mere theoretical availability of partial verdicts" does not obligate trial judge to conduct further inquiry where "no party has requested a partial verdict be taken or the jury does not indicate that it has reached

one").  Further still, these notes indicated that additional
inquiry into the jury's deliberations risked producing a coerced
verdict.

Judges must carefully avoid actions that might pressure
jurors into compromising their genuine views of the evidence.
See Commonwealth v. Foster, 411 Mass. 762, 765 (1992).  And we
have long recognized that "deadlocked juries are particularly
susceptible to coercion."  Roth, 437 Mass. at 791.  See
Commonwealth v. O'Brien, 65 Mass. App. Ct. 291, 295 (2005), and
cases cited.  It is precisely for this reason that judges are
statutorily prohibited from ordering further deliberations by a
deadlocked jury that has twice reported being at an impasse
after due and thorough deliberation, unless they explicitly
consent or seek clarification on the law.  See Commonwealth v.
Tiscione, 482 Mass. 485, 492 (2019), quoting G. L. c. 234A,
§ 68C ("If, after 'due and thorough deliberation,' the jury
report to the judge twice that they are deadlocked, 'they shall
not be sent out again without their own consent, unless they ask
from the court some further explanation of the law'").  The risk
of coercion is also heightened when a judge inquires about the
possibility of a partial verdict following a deadlock.  As we
have explained:

> "Where the jurors have twice reported themselves
> deadlocked, and have already heard the Tuey-Rodriquez
> charge, a judge's inquiry concerning partial verdicts

cannot avoid communicating to the jury the judge's desire to salvage <u>something</u> from the trial. However the inquiry is articulated or explained, the import of the inquiry is unmistakable: 'Can't you at least decide a part of this case?' The inquiry, by its nature, plays on the deadlocked jurors' natural sense of frustration, disappointment, and failure. The jurors are confronted with the request, and asked to absorb its inherent complexity, at the worst possible time, when they are tired, anxious to be discharged, and perhaps angry at fellow jurors whom they blame for failing to reach agreement."

<u>Roth</u>, <u>supra</u> at 792.

In this case, the risks of coercion were evident. After receiving the third note, the judge was statutorily barred from ordering further deliberation without the jury's consent. See G. L. c. 234A, § 68C. Far from suggesting that consent might be obtained, the third note made clear that further deliberation would "only serve to force [the jurors] to compromise . . . deeply held beliefs" rooted in "sincere adherence to [their] individual principles and moral convictions." See <u>Commonwealth</u> v. <u>Winbush</u>, 14 Mass. App. Ct. 680, 682 (1982) (statutory prohibition on ordering further deliberation was designed to prevent jurors "from being coerced into reaching a verdict in the face of views conscientiously reached and held"). Asking jurors whether they would nonetheless consent to further deliberation would have implicitly pressured them to compromise those beliefs in order to "salvage" some part of the trial. <u>Roth</u>, 437 Mass. at 792. In these circumstances, "[t]here is simply too great a risk" that any resulting verdict "would

merely be the product of one hasty, final attempt to satisfy the judge's apparent desire for some form of decision on the case." Id. at 793. And if the judge were to inquire about the possibility of a partial verdict, "by definition, any further discussion amongst the jurors regarding their response to the judge's partial verdict inquiry would itself be further deliberation" in violation of the statute. Id. at 792.

Indeed, if the judge had inquired about a partial verdict on her own initiative, and the jury returned a verdict of guilty on any of the counts, "there is no question that this defendant would be making a strenuous -- and potentially meritorious -- argument that that guilty verdict was the product of coercive intrusion into the function of the jury." Roth, 437 Mass. at 792. Thus, given the entire course of jury deliberations, and the emphatic language of the third note that jurors were deadlocked on "the charges" and that further deliberation would be coercive, the judge acted within her discretion in declaring a mistrial without inquiring sua sponte about a partial verdict. See Fuentes, 448 Mass. at 1018-1019 (judge was not required to ask jury if they would consent to further deliberations before declaring mistrial because jury had already received Tuey-Rodriquez instruction and final note unequivocally stated they were deadlocked); Daniels, 441 Mass. at 1018 n.3.

For much the same reason, the trial judge's decision not to poll the jury sua sponte to confirm the deadlock before declaring a mistrial did not constitute an abuse of discretion. As we explained in Ray, 463 Mass. at 5 n.5, polling jurors about "whether further instructions or deliberation would be likely to resolve the deadlock" is discouraged due to the "risk of coercion inherent in questioning jurors, particularly in individual colloquies." A trial judge is not "required to consider every conceivable alternative before declaring a mistrial," and we discern no abuse of discretion in the judge not pursuing alternatives suggested, after the fact, by defense counsel based on information obtained after the mistrial was declared. Commonwealth v. Cassidy, 410 Mass. 174, 179 (1991) ("If an alternative which was neither suggested by counsel nor considered by the judge is later developed, we will not fault the judge, so long as an honest inquiry into alternatives is made"). See generally Blueford v. Arkansas, 566 U.S. 599, 609–610 (2012) ("We have never required a trial court, before declaring a mistrial because of a hung jury, to consider any particular means of breaking the impasse -- let alone to consider giving the jury new options for a verdict").

The defendant further contends, separately from the availability of alternatives, that it was an abuse of discretion to declare a mistrial without first notifying defense counsel of

the content of the third note and allowing an opportunity to be heard.  First, it is worth noting that the trial judge discredited defense counsel's claim that he lacked such an opportunity.  See generally Commonwealth v. Garner, 490 Mass. 90, 94 (2022) (appellate courts defer to credibility determinations of trial judge).  The judge explained that she had previously sought defense counsel's views after receiving each of the first two jury notes, when counsel had argued that the jury were at an impasse.  The only alternative proposed by defense counsel during these exchanges was the issuance of a Tuey-Rodriquez charge, which the judge granted.  When the third note prompted the mistrial, defense counsel neither objected nor expressed any dissatisfaction, even when the parties remained in the court room to schedule a subsequent status conference.

In any event, there is no indication that inviting defense counsel to participate in a third round of "consultation would have produced any fruitful alternatives."  Fuentes, 448 Mass. at 1019.  As discussed, the receipt of the third note barred the judge from "requiring further deliberation without the jury's consent" because they had already engaged in due and thorough deliberations and twice reported being deadlocked.  Commonwealth v. Carnes, 457 Mass. 812, 829 (2010).  Furthermore, nothing suggested that defense counsel would have requested an inquiry into the possibility of a partial verdict based on the content

of the jury notes.[12]  See <u>Oliver</u> v. <u>Justices of the N.Y. Supreme Court of N.Y. County</u>, 36 N.Y.2d 53, 58 (1974) ("Having displayed no enthusiasm for the rendering of a partial verdict while the jury was still impaneled, and a guilty verdict still possible, the defense may not seek to overturn the court's order of mistrial after discharge of the jury . . .").  While the more prudent course might have been to read the third note to counsel and provide yet another opportunity to be heard before declaring a mistrial, the trial judge did not abuse her discretion in failing to do so.  See <u>Fuentes</u>, <u>supra</u>.

In sum, we conclude that the trial judge acted within her discretion in declaring a mistrial without first inquiring about a partial verdict or offering defense counsel an additional opportunity to be heard.  Considering the length of jury deliberations, the judge's prior efforts to encourage consensus, and the increasingly emphatic tone of the jury notes indicating deadlock, it was clear the jury had reached an impasse.

---

[12] It is difficult to imagine that a competent defense attorney, upon learning that some members of the jury "firmly believe[d]" the evidence proved "the elements of the charges" beyond a reasonable doubt, would request that the jury be instructed to return verdicts on any charges where agreement had been reached.  As other courts have recognized, "[a] defendant may have a tactical reason for not requesting the trial court to question the jury about a partial verdict," and trial judges should not be required to inquire about partial verdicts on their own initiative.  <u>State</u> v. <u>Tate</u>, 256 Conn. 262, 286 n.16 (2001).

Furthermore, nothing suggested that the deadlock was limited to a specific charge; on the contrary, the notes contained no inkling of agreement, and the third note implied the jury were deadlocked on <u>all</u> charges.  Under these circumstances, given the content of the notes and the fact that defense counsel did not request further inquiry, engaging in one sua sponte risked coercing a verdict.  Thus, the judge appropriately exercised her discretion in declaring a mistrial based on manifest necessity. See <u>Daniels</u>, 441 Mass. at 1017, and cases cited (judge did not abuse discretion in declaring mistrial after four days of deliberation where jury had reported impasse and received <u>Tuey</u>-<u>Rodriquez</u> charge but remained unable to reach verdict and stated, in response to judicial inquiry, that additional deliberation would not result in verdict).  See also <u>Fuentes</u>, 448 Mass. at 1018-1019 (no abuse of discretion in declaring mistrial without first asking whether jury would consent to deliberate further where jury had already been given <u>Tuey</u>-<u>Rodriquez</u> instruction and final jury note "unequivocally stated that the jury were 'unable to come to a unanimous decision'").[13]

---

[13] Because we conclude that the trial judge acted within her discretion in determining that declaring a mistrial was manifestly necessary, we do not need to address the defendant's alternative argument that defense counsel did not consent to the mistrial.  Similarly, we do not address the defendant's ancillary argument, raised here for the first time, that the court should have conducted a colloquy with the defendant before finding such consent.  But see <u>Daniels</u>, 441 Mass. at 1018 n.2

2. <u>Defendant's claims of acquittal</u>. The defendant separately argues that she cannot be retried on count one or count three, regardless of whether the mistrial declaration was proper. She contends that posttrial information from five deliberating jurors[14] -- indicating the jury were deadlocked only on count two and had unanimously found her not guilty on counts one and three[15] -- effectively amounts to an acquittal of those counts. Alternatively, she asserts that the trial judge abused her discretion in denying a posttrial inquiry to verify these accounts of juror deliberations. We examine each contention below.

a. <u>Claim of acquittal based on juror disclosures</u>. The double jeopardy clause of the United States Constitution prohibits retrial for the same offense after an acquittal. See <u>McElrath</u> v. <u>Georgia</u>, 601 U.S. 87, 93-94 (2024). See also G. L.

---

("That [the defendant] did not personally assent to the mistrial makes no difference"). Cf. <u>Poretta</u> v. <u>Commonwealth</u>, 409 Mass. 763, 766 (1991) ("there can be no doubt that the Federal Constitution does not condition the permissibility of retrial on the defendant's personal, explicit assent to a mistrial motion brought by his attorney").

[14] For purposes of adjudicating the motion to dismiss, the trial judge accepted the purported juror statements as true and accurate. For purposes of this discussion, we similarly proceed from the assumption that the affidavits are accurate.

[15] Juror C did not disclose information indicating whether the jury had unanimously agreed that the defendant was not guilty on count three.

c. 263, § 7.  To determine whether an acquittal has occurred, we look to whether, "given the operation of state law," the jury "acted on [their] view that the prosecution had failed to prove its case" (citation omitted).  McElrath, supra at 96.  Because this presents a legal question, our review of the trial judge's decision is de novo.  Commonwealth v. Hebb, 477 Mass. 409, 411 (2017).

Relevant here, "the fundamental requirements" for a jury's issuance of a verdict in a criminal case are set forth in Mass. R. Crim. P. 27 (a).  Roth, 437 Mass. at 786.  Pursuant to that rule, a valid jury verdict must be unanimous and "returned by the jury to the judge in open court."  Mass. R. Crim. P. 27 (a). Our case law confirms that a criminal verdict is effective only when affirmed by jurors in open court.  See A Juvenile, 392 Mass. at 56-57, quoting Lawrence v. Stearns, 11 Pick. 501, 502 (1831) ("The only verdict which can be received and regarded, as a complete and valid verdict of a jury, upon which a judgment can be rendered, is an open and public verdict, given in and assented to, in open court, as the unanimous act of the jury, and affirmed and entered of record, in the presence and under the sanction of the court").  In other words, the distinction between informal "agreement on a verdict" and the actual "return, receipt, and recording of a verdict" in open court is central -- only the latter constitutes a final verdict of the

jury on a criminal charge.  A Juvenile, supra, quoting
Commonwealth v. Kalinowski, 12 Mass. App. Ct. 827, 830 (1981).
We have consistently reaffirmed this long-standing distinction
throughout our jurisprudence.[16]

In this case, it is undisputed that the jury did not
announce a final verdict on any charge.  Although the defendant
has submitted affidavits claiming the jurors reached an
agreement on counts one and three during deliberations, the only
statements made in open court reflected the jury's inability to
reach a unanimous verdict.  As discussed, the jury submitted
three separate notes to the judge indicating deadlock --
culminating in a final note indicating that "[s]ome members of
the jury firmly believe[d] that the evidence surpasse[d] the
burden of proof establishing the elements of the charges," while
others did not.

---

[16] See Commonwealth v. Tennison, 440 Mass. 553, 561 (2003)
(initial verdict "was sealed but not yet valid because it was
not given and affirmed orally by the jurors in open court");
Gelmette v. Commonwealth, 426 Mass. 1003, 1003 (1997) (polling
of jurors, after declaration of mistrial in murder case, showing
that eleven had voted to convict defendant of lesser included
offense of manslaughter, and one had voted to acquit, "was of no
effect and . . . did not constitute an acquittal on so much of
the indictment as charged murder in the first and second
degree").  See also Rich v. Finley, 325 Mass. 99, 105 (1949) (no
final verdict where one juror died after jury had unanimously
agreed to verdict, but before jury announced that verdict in
open court); Lawrence, 11 Pick. at 502 (no final verdict where
jury had come to unanimous agreement, but where one juror
changed his mind following morning when jury met to return final
verdict); Kalinowski, 12 Mass. App. Ct. at 830.

Far from an "affirmation in open court" of unanimous agreement on counts one and three, see A Juvenile, 392 Mass. at 57, these notes clearly reflected a lack of consensus on "the charges." Even if the jury's deadlock pertained specifically to count two, their notes made no such distinction, nor did they indicate any verdict would be returned "to the judge in open court," as required by Mass. R. Crim. P. 27 (a). In the absence of a verdict returned, received, and recorded in open court, we cannot conclude that the jury "acted on [their] view that the prosecution had failed to prove its case" (citation omitted). McElrath, 601 U.S. at 96. See Clark v. State, 170 Tenn. 494, 502 (1936) ("however fully it may be made to appear that the jury arrived among themselves at the decision that [the defendant] was not guilty, there is no claim that they agreed to so report or return, or that they agreed to report any agreement whatever, except that they could not agree").[17]

---

[17] The circumstances of Clark, 170 Tenn. 494, are very similar to those at issue here. There, a defendant argued that he had been acquitted at his first trial, after learning that the jury had agreed he was not guilty and had deadlocked only as to his codefendant. See id. at 497. Rejecting this argument, the Supreme Court of Tennessee explained:

"Agreement on the issue of guilt or innocence is of the very essence of a verdict. . . .

"We have here no 'verdict' reported, and none 'agreed on and intended to be expressed.' It is conceded here that the report of disagreement was that intended to be

The defendant nonetheless argues that "any lack of
formality" in the jurors' intended dispositions of counts one
and three should not prevent those dispositions from taking
legal effect.  However, the requirement that a verdict be
returned and affirmed in open court is far from a mere
formality.  Rather, "[t]hese principles recognize that, as a
practical matter, jurors may agree in the course of
deliberations to a tentative compromise on the facts of a case
or on the disposition of related charges as they attempt to
reach unanimous agreement."  Floyd P., 415 Mass. at 831.  See
Blueford, 566 U.S. at 608.  Since "[a] jury should not be
precluded from reconsidering a previous vote on any issue"
(citation omitted), A Juvenile, 392 Mass. at 56, tentative or
conditional agreements reached amid deliberations "cannot have
the force of a final verdict," Floyd P., supra.  See A Juvenile,
supra ("A jury should not be precluded from reconsidering a
previous vote on any issue, and the weight of final adjudication
should not be given to any jury action that is not returned in a
final verdict" [citation omitted]).

Requiring a jury to publicly affirm their verdict in open
court thus serves a vital purpose -- it ensures that the verdict

reported.  This determinative distinction runs through all
the cases we have examined."  (Citation omitted.)

Id. at 501, 503.

agreed upon in private truly reflects the unanimous and
deliberate judgment of each juror under public scrutiny, rather
than a tentative compromise.  See Commonwealth v. Lawson, 425
Mass. 528, 530 (1997).  See also People v. Thornton, 155 Cal.
App. 3d 845, 859 (1984).  Maintaining this distinction between
private deliberations and public verdicts is essential to
preserving both the confidentiality of jury discussions and the
integrity of the judicial system.  Thus, because the jury did
not publicly affirm that the defendant was not guilty of the
charges, there was no acquittal barring retrial under the double
jeopardy clause.  See A Juvenile, 392 Mass. at 56-57 (signed
verdict slips reflecting votes of not guilty, found in
deliberation room after mistrial had been declared due to
deadlock, did not constitute acquittals).  See also Commonwealth
v. Mayfield, 398 Mass. 615, 630 (1986) (information indicating
that "jury were deadlocked, eleven to one, for conviction of
murder but only in the second degree," and had purportedly
agreed that defendant was not guilty of murder in first degree,
did not bar retrial because "[t]here was no open and public
verdict of not guilty").

    b.  Request for posttrial juror inquiry.  Finally, we
consider the denial of the defendant's request for a posttrial
juror inquiry.  Generally, a judge is not obligated to
investigate jury deliberations unless there is evidence that

jurors were exposed to extraneous information or demonstrated racial or ethnic bias.  See Commonwealth v. Pytou Heang, 458 Mass. 827, 858 (2011).  Even in cases of alleged bias, however, judicial inquiry cannot delve into jurors' subjective reasoning or deliberative content.  See Matter of the Enforcement of a Subpoena, 463 Mass. 162, 168 (2012).  Because the trial judge is afforded "broad discretion" in assessing whether a posttrial juror inquiry is appropriate, Commonwealth v. Guisti, 434 Mass. 245, 251 (2001), S.C., 449 Mass. 1018 (2007), we review that determination only for an abuse of discretion, see Pytou Heang, supra.

Here, the defendant concedes that the affidavits do not indicate exposure to extraneous matters or juror bias that would suggest her right to an impartial jury was compromised.  Contrast Commonwealth v. McCalop, 485 Mass. 790, 799 (2020).  Instead, she argues that the affidavits suggest an "unannounced verdict" warranting further inquiry.  Yet, as discussed, a verdict, as a matter of law, requires a public announcement in open court.  No verdict exists if none was announced, or even intended to be announced, by the jury before they were discharged.  See Commonwealth v. Brown, 367 Mass. 24, 28 (1975), S.C., 378 Mass. 165 (1979) and 470 Mass. 595 (2015) ("once the jury have been discharged, they have no further power to deliberate or to agree to a verdict").

Allowing inquiry into a private agreement reached in the secrecy of the deliberation room would also contravene our prohibition on probing the content of juror deliberations. Maintaining the secrecy of those deliberations is a "bedrock of our judicial system" (citation omitted). Commonwealth v. Moore, 474 Mass. 541, 548 (2016), S.C., 489 Mass. 735 (2022). See Woodward v. Leavitt, 107 Mass. 453, 460 (1871). It not only prevents jury tampering but also upholds the finality of jury verdicts and fosters confidence in the judicial process. See Commonwealth v. Fidler, 377 Mass. 192, 195 (1979). Probing secret deliberations to determine whether the jurors may have privately agreed on a verdict they never returned would undermine these fundamental principles. See Woodward, supra at 471 (juror testimony as to "part which he [or she] took in the discussions and votes of the jury" is not permissible "because it relate[s] to the private deliberations of the jury"); Brown v. State, 661 So. 2d 309, 311 (Fla. Dist. Ct. App. 1995) (even though postdischarge inquiry asked jurors to "disavow the nonexistence of a verdict rather than to impeach a verdict already in existence," it still constituted improper inquiry as to jurors' mental processes). Were it otherwise, "[j]urors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts" that might be used to set aside a final verdict (citation omitted). Fidler, supra.

Nor is the defendant merely seeking juror testimony as to a "mistake" entered on a final verdict slip.  See Mass. G. Evid. § 606(c) (2024) (permitting juror testimony about mistakes "made in entering the verdict on the verdict form").  Here, there is no suggestion that the jury's failure to return a verdict was the result of a clerical error.  The posttrial accounts do not dispute that the jurors had reached an impasse, as they reported, and had decided not to return a verdict slip on any charge, as occurred.  Contrast Brown, 367 Mass. at 27-28, and cases cited (permitting testimony to correct clerical mistakes in verdict where jury, without outside influence, "immediately indicated" error in announced verdict).  No juror expressed surprise or disagreement in court when the judge declared a mistrial based on the jury's report that they could not reach a unanimous verdict on "the charges."  Contrast Latino v. Crane Rental Co., 417 Mass. 426, 431 (1994) (juror inquiry permissible where jurors audibly answered "no" during polling of jury).

Additionally, the limited exception for juror testimony concerning mistaken verdicts only results in alteration of a verdict where there has been no "opportunity for outside influence."  Brown, 367 Mass. at 29, and cases cited.  Cf. Commonwealth v. DiBenedetto, 94 Mass. App. Ct. 682, 684-685 (2019).  Here, all the defendant's affidavits concern jurors' accounts to others after leaving "the control of the court."

Brown, supra at 28.  See Dietz v. Bouldin, 579 U.S. 40, 49
(2016); State v. Edwards, 15 Wash. App. 848, 850-852 (1976)
(when jury leave "the sterility of the court's control . . .
contamination is presumed").  A posttrial inquiry of these
jurors would similarly occur well after they became susceptible
to outside influences and would not provide a recognized basis
for altering the result of the first trial.  See Commonwealth v.
Johnson, 359 Pa. 287, 293-294 (1948) (court could not alter
verdict of acquittal upon learning that jury had intended to
convict defendant of lesser offense, where jury "had ample
opportunity" to clarify or express disagreement with original
verdict when it was announced in open court prior day).  Thus,
the trial judge did not err or abuse her discretion in denying
the defendant's request for such an inquiry where it would not
change the outcome of the defendant's first trial.  The jury
chose to report a deadlock, not a verdict, and no basis exists
for further investigation into private discussions or subjective
beliefs they declined to announce publicly in open court.

   Conclusion.  For the reasons stated above, the trial judge
correctly denied the defendant's motion to dismiss and request
for a posttrial juror inquiry.  The case is remanded to the
county court for entry of a judgment denying the defendant's
petition for relief.

So ordered.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

KAREN READ, )
)
Petitioner, )
)        Civil Action No.
v. )        25-cv-10399-FDS
)
NORFOLK COUNTY SUPERIOR COURT and )
MASSACHUSETTS ATTORNEY GENERAL, )
)
Respondents. )
)

## RESPONDENT NORFOLK COUNTY SUPERIOR COURT'S OPPOSITION TO THE PETITION FOR A WRIT OF HABEAS CORPUS

In July 2024, the petitioner's criminal trial in a Massachusetts state court ended when the judge declared a mistrial based on jury deadlock. The petitioner claims that the Double Jeopardy Clause of the United States Constitution bars retrial on two of the three charges she faces because, as to those two charges, there was no manifest necessity for the mistrial and statements purportedly made by some jurors after the mistrial show that the jury unanimously agreed she was not guilty. In the alternative, she seeks a posttrial inquiry of the jurors.

These claims having been rejected on the merits by the Massachusetts Supreme Judicial Court ("SJC"), the petitioner filed this habeas corpus petition pursuant to 28 U.S.C. § 2241. None of the petitioner's contentions is a valid basis for habeas relief, particularly given the factual findings in the proceedings below and the SJC's construction of Massachusetts law, both of which are binding in this action. The trial judge exercised sound discretion in declaring a mistrial, and the petitioner was not acquitted of any charges. The petition should be denied.

## I.    Procedural Posture

In 2022, a grand jury returned three indictments against the petitioner, charging her with murder in the second degree, Mass. Gen. Laws ch. 265, § 1 ("count one"); manslaughter while operating a motor vehicle under the influence of alcohol, Mass. Gen. Laws ch. 265, § 13½ ("count two"); and leaving the scene of personal injury resulting in death, Mass. Gen. Laws ch. 90, § 24(2)(a½)(2) ("count three").  (R.139-144).[1]  A jury trial on the three indictments began in April 2024 and lasted over two months.  (R.100-101).  On July 1, 2024, the fifth day of deliberations, the trial judge declared a mistrial based on jury deadlock.  (R.268).

Following the mistrial, the petitioner filed a motion to dismiss counts one and three on double jeopardy grounds, or in the alternative, to conduct a posttrial juror inquiry.  (R.137, 272). The motion was accompanied by two affidavits from her attorneys.  (R.137, 283-288).  The Commonwealth filed a written opposition to the motion (R.137, 295), and the petitioner filed a reply (R.137, 310).  The petitioner also filed three supplemental memoranda, each accompanied by an affidavit of counsel.  (R.137-138, 289, 320, 327).  On August 9, 2024, the trial judge heard argument on the motion.  (R.138, 332).  In a memorandum of decision and order entered on August 23, 2024, the judge denied the motion.  (R.138, 388).

On September 11, 2024, the petitioner filed a petition for extraordinary relief pursuant to Mass. Gen. Laws ch. 211, § 3, seeking review of the order denying her motion to dismiss.  (R.5,

---

[1] The docket entries in this case are cited as Doc. No. __ at __.  The record appendix for the petitioner's appeal to the SJC was filed at Doc. No. 2-1.  In her memorandum in support of the petition, the petitioner cited to the record appendix as R.__, corresponding to the page numbers in the lower lefthand corner of each page.  The respondent will adopt the same citation format for consistency.  The supplemental record appendix submitted by the Commonwealth in the SJC appeal is attached as Exhibit A to this Opposition and is cited as S.R.__, also consistent with that document's pagination.

418).[2]  A single justice of the SJC reserved and reported the case without decision for determination by the full court.  (R.423).

On February 11, 2025, the full SJC issued an opinion affirming the trial judge's denial of the petitioner's motion and remanding the case to the single justice for entry of a judgment denying the petition for relief.  Read v. Commonwealth, 495 Mass. 312 (2025).[3]  The petitioner then filed this federal habeas corpus petition pursuant to 28 U.S.C. § 2241 on February 18, 2025.  (Doc. No. 1).

## II.    Facts

### A.    Jury Deadlock and Mistrial

On Tuesday, June 25, 2024, the thirty-seventh day of trial, the judge charged the jury.  (R.145, 147).  She instructed the jury on the three indictments, as well as two lesser-included offenses of count two:  involuntary manslaughter and motor vehicle homicide.  (R.168-187).  Before deliberations began, the judge indicated that the jury would be given separate verdict slips for each of the three indictments.  (R.189).  She explained to the jury the procedure for delivering the verdicts:

> "After the final vote of the jury, the foreperson should check the appropriate boxes as to each charge, then sign and date the verdict slips and notify the court officer that you have reached a unanimous verdict.  You will then be brought back into the courtroom, where the foreperson will deliver the verdicts to the Court."

(R.195).  She also instructed the jury to "continue deliberating until you have reached a final verdict on each charge," and not to disclose to anyone, including the judge, their numerical

---

[2] Mass. Gen. Laws ch. 211, § 3 confers upon the SJC a power of "general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided . . . ."

[3] The petitioner filed a copy of the slip opinion at Doc. No. 2-2.  References herein to the opinion are made to the official version published in the Massachusetts Reports.

standing or progress "before such time as you have reached a unanimous verdict." (R.194). The jury then began deliberations that same afternoon. (R.197).

Deliberations continued over the next three days. (R.210-211, 228-229, 242-245, 247-250). On Friday, June 28, after approximately 19 hours of deliberations, the foreperson submitted a note to the judge ("first note") that stated:

> "I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict."

(S.R.3; R.250; Read, 495 Mass. at 314). After reading the note into the record, the judge requested argument from the parties on whether the jury had engaged in "due and thorough" deliberation.[4] (R.251). The Commonwealth argued that the jury had not had sufficient time to deliberate, and that it was therefore too soon to give a Tuey-Rodriguez instruction.[5] (R.251). The defense disagreed and argued that the jury were "communicating to the Court that they've exhausted all manner of compromise, all manner of persuasion and they are at an impasse." (R.252). Defense counsel asked the judge to give the Tuey-Rodriguez instruction. (R.252).

---

[4] Mass. Gen. Laws ch. 234A, § 68C, formerly codified at Mass. Gen. Laws ch. 234, § 34 (see Mass. St. 2016, ch. 36, §§ 1, 5, effective May 10, 2016), provides:

> "If a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

[5] See Commonwealth v. Rodriguez, 364 Mass. 87, 98-103 (1973) (approving modified version of charge set out in Commonwealth v. Tuey, 8 Cush. 1, 2-3 [1851], for prospective use with deadlocked juries). "The Tuey-Rodriguez charge is a model instruction given when jurors report deadlock after due and thorough deliberation that is designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view. Once a deadlocked jury receives the Tuey-Rodriguez charge and resumes their deliberations, 'they shall not be sent out again without their own consent.'" Read, 495 Mass. at 315 n.4, quoting Mass. Gen. Laws ch. 234A, § 68C (other internal quotations and citation omitted).

The judge determined that there had not yet been due and thorough deliberation, given the length of the trial, the amount of evidence presented through 74 witnesses and 657 exhibits, the complexity of the issues, and the fact that each of the prior days of deliberations had been shortened. (R.253). She instructed the jury to continue deliberating. (R.254).

Deliberations extended through that Friday afternoon and resumed the following Monday morning. (R.255-256, 260-261). At around 10:45 a.m. on Monday, the jury foreperson submitted another note to the judge ("second note"), which stated:

> "Despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind.
>
> The divergence in our views are [sic] not rooted in a lack of understanding or effort, but deeply held convictions that each of us carry ultimately leading to a point where consensus is unattainable.
>
> We recognize the weight of this admission and the implications it holds."

(S.R.4; R.261, 264, 390). Upon receiving this note, the judge again invited argument on whether there had been due and thorough deliberation. (R.261-262). Although by this point the jury had already deliberated for approximately 24 to 25 hours, the Commonwealth argued it was still premature to conclude their deliberations had been due and thorough. (R.261-262; Read, 495 Mass. at 315 n.5). Defense counsel, however, maintained that the jury had "come back now twice, indicating essentially that they are hopelessly deadlocked," and that it was "time for a Tuey-Rodriguez." (R.262). The defense again requested the Tuey-Rodriguez instruction. (R.263). The judge determined that the jury had engaged in due and thorough deliberation, noting that this jury had been "extraordinary" and that she had "never seen a note like this reporting to be at an impasse." (R.263). The judge gave the jury the Tuey-Rodriguez instruction and sent them back to deliberate further. (R.264-267).

At about 2:30 p.m. that same day, the foreperson submitted yet another note to the judge ("third note"), which stated:

> "Despite our rigorous efforts, we continue to find ourselves at an impasse.
>
> Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyound [sic] a reasonable doubt. Convers[e]ly, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of the charges[.]
>
> The deep division is not due to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions.
>
> To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs."

(S.R.5; R.267-268, 391). After the judge received the third note, the parties returned to the courtroom, the case was called, and the judge informed counsel that "[t]he jury is at an impasse." (R.267). The jury were called back into the courtroom, and the third note was read aloud into the record. (R.267-268). Upon reaching the final line of the note—stating that further deliberation would "force [the jury] to compromise these deeply held beliefs"—the judge addressed the jury, saying, "I am not going to do that to you, folks," and she declared a mistrial. (R.268).

The judge discharged the jury back to the deliberation room, explaining that she would meet them there privately to thank them for their service. (R.268). The judge and the parties remained in the courtroom and scheduled a date to return for a status conference. (R.269-270). At no point during this discussion did defense counsel object to the declaration of a mistrial or express disagreement with that outcome. (R.269-270; Read, 495 Mass. at 316).

## B.    Purported Posttrial Juror Statements

One week later, on July 8, the petitioner filed her motion to dismiss along with affidavits from her counsel, Attorneys Alan Jackson and David Yannetti. (R.137, 283, 286). Attorney Jackson's affidavit stated that on July 2 a purported juror ("Juror A") contacted him. (R.286).

6

JA0512

He said he was able to identify which juror they were from his conversation with them. (R.286). According to Attorney Jackson's description of the conversation, Juror A said the jury had unanimously agreed that the petitioner was not guilty of count one (murder in the second degree), and "shortly following that determination," they also had unanimously agreed that she was not guilty of count three (leaving the scene of personal injury resulting in death). (R.287).

Attorney Yannetti's affidavit stated that he had received communications from two "informants," both on July 3. (R.283). He said one of these informants ("Informant B") sent him a screenshot that Informant B had received from some other person ("Intermediary B") of text messages that Intermediary B allegedly had received from a purported juror ("Juror B"). (R.283). Attorney Yannetti believed he could confirm Juror B had been a deliberating juror based on a first name for Juror B given to him by Informant B. (R.283). According to Attorney Yannetti's description of the screenshot, Juror B allegedly texted Intermediary B: "It was not guilty on second degree. And split in half for the second charge. When the judge sent us back with that Hernandez [sic] thing to look at the other side it turned into a bully match. I thought the prosecution didn't prove the case. No one thought she hit him on purpose or even thought she hit him on purpose [sic]." (R.283).

Attorney Yannetti stated that the other informant ("Informant C") had contacted him to say that they personally knew a purported juror ("Juror C"), as they and Juror C used to work together and had a mutual friend ("Intermediary C") who was a current co-worker and friend of Juror C. (R.284). Informant C also knew from Intermediary C that Juror C would be participating in a Zoom meeting with friends to discuss the trial. (R.284). Three days later, Informant C sent Attorney Yannetti screenshots of text messages exchanged between

Informant C and Intermediary C, in which Intermediary C purportedly reported what Juror C had allegedly said during the Zoom meeting. (R.284).

According to Attorney Yannetti's representation of that exchange, Intermediary C texted, "no consideration for murder 2. manslaughter started polling at 6/6 then ended deadlocked @ 4no8yes"; Informant C texted back, "if it was no consideration for murder two, shouldn't she have been acquitted on that count. and hung on the remaining chargers [sic]," and Intermediary C responded, "she should've been acquitted I agree. Yes, the remaining charges were what they were hung on." (R.284-285). Based on the descriptions of Juror C by Informant C and Intermediary C, Attorney Yannetti said he could positively identify Juror C as a deliberating juror. (R.285).

On July 10, Attorney Jackson submitted a supplemental affidavit stating that on July 8 he was contacted by a purported juror ("Juror D"). (R.137, 292). He said he was able to identify which juror they were from his conversation with them. (R.292). According to Attorney Jackson's description of the conversation, Juror D said the jury had unanimously agreed that the petitioner was not guilty of counts one and three, and that the jury's disagreement was solely as to count two and its lesser-included offenses. (R.293).

Attorney Jackson submitted a second supplemental affidavit on July 18. (R.137, 323). He stated that he had been contacted the day before, July 17, by a purported juror ("Juror E"). (R.323). He again said he could identify the individual as a deliberating juror. (R.323). According to Attorney Jackson, Juror E said the jury was "unanimous on 1 and 3," the petitioner was not guilty, and the jurors deadlocked only on the "lower charges" on count two. (R.323).

On August 1, 2024, the Commonwealth filed in the trial court a notice disclosing that, on July 21, an unsolicited voicemail was left on the office phoneline of one of the trial prosecutors.

8

(R.325).  The caller, who identified themself as a juror by full name and seat number, stated, "it is true what has come out recently about the jury being unanimous on charges 1 and 3."  (R.325). That same individual left another unsolicited voicemail for the prosecutor on July 26, stating that they "can confirm unanimous on charges one and three, as not guilty[,] and as of last vote 9-3 guilty on the manslaughter charges . . . on the lower-level manslaughter charges."  (R.325).

The Commonwealth's notice further disclosed that it also had received emails from three individuals who identified themselves as jurors and wished to speak anonymously.  (R.325). The Commonwealth had responded to the emails by stating that, although it would welcome the opportunity to discuss the evidence or its case, it was ethically prohibited from inquiring into the substance of the jury's deliberations and could not promise confidentiality, as it might be required to disclose any such communications to the defense or the court.  (R.325-326). All three individuals declined to communicate further with the Commonwealth and provided no information about the jury's purported votes.  (R.326).

On August 5, Attorney Yannetti submitted a supplemental affidavit stating that he had received an unsolicited phone call on July 31.  (R.138, 330).  The caller said they had been a juror in the case, and based on what they represented to Attorney Yannetti to be their full name, Attorney Yannetti stated that he was able to confirm that the caller was the person identified as Juror B in his prior affidavit.  (R.330).  According to him, the caller said the jury had reached unanimous not-guilty verdicts on "indictments (1) and (3)" and had been deadlocked only on "indictment (2)."  (R.330).  The caller also said they were familiar with Attorney Yannetti's prior affidavit and the text message exchange referenced in paragraph four of the affidavit (quoted above) was accurate, except that they had meant to write, "No one thought she hit him on purpose or even knew that she had hit him."  (R.330-331).  The caller "believe[d] that other

jurors ha[d] been reluctant to come forward because there is so much public and media attention focused on this case."  (R.331).

## III.   Argument

### A.   Jurisdiction and Ripeness

This pretrial challenge is governed by the general habeas provision, 28 U.S.C. § 2241 ("section 2241").  The First Circuit's section 2241 precedent instructs that, to the extent this petitioner may presently be "in custody" for purposes of federal habeas relief, it is not pursuant to the SJC's ruling, but, rather, it is because of any state-imposed restrictions on her liberty while she is awaiting retrial on the existing indictments.  See Gonzalez v. Justices of Mun. Court of Bos., 382 F.3d 1, 5-6 (1st Cir. 2004), judgment vacated on other grounds, 544 U.S. 918 (2005), and reinstated, 420 F.3d 5 (1st Cir. 2005) (petitioner in custody due to personal recognizance order pending retrial, not SJC's judgment vacating required finding of not guilty in first trial and reinstating case for further proceedings before trial court).  The petitioner is subject to such restrictions.  She remains admitted to bail and must comply with certain pretrial conditions of release inapplicable to the public generally.  (R.102, 105).  That suffices to meet the "in custody" requirement of section 2241.  See Justices of BMC v. Lydon, 466 U.S. 294, 300-301 (1984) (petitioner's release on personal recognizance pending retrial, by itself, was sufficient to deem him "in custody" under section 2241 given penalties prescribed under Massachusetts law if he failed to appear in court); Gonzalez, 382 F.3d at 5 (same).  Having obtained review on the merits of her claim by the SJC, she has exhausted her available state interlocutory remedies, and as her claim is one of double jeopardy based on alleged successive prosecutions, her resort to federal habeas corpus relief need not await retrial and conviction on the two challenged indictments. See Allen v. Att'y Gen. of Me., 80 F.3d 569, 572-573 (1st Cir. 1996).

10

### B.    Standard of Review

On review under section 2241, this Court "must defer to the SJC's findings of facts but must undertake plenary review of that court's resolution of issues of law."  Marshall v. Bristol Superior Ct., 753 F.3d 10, 16 (1st Cir. 2014), quoting Gonzalez, 382 F.3d at 7 (citation omitted). In conducting its "plenary" review, however, this Court also is bound by and must accept the SJC's interpretations of Massachusetts law.  See Marshall, 753 F.3d at 12, 19 ("We are similarly bound by the state court's construction of its state statutes and other issues of state law.").

### C.    As a matter of federal constitutional law, the trial judge exercised sound discretion in declaring a mistrial based on the jury's deadlock.

"A mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict has been long considered the classic basis for a proper mistrial" and poses no double jeopardy bar to retrial.  Renico v. Lett, 559 U.S. 766, 774 (2010) (quotation omitted).[6]  The decision to declare a mistrial because of a deadlocked jury is entrusted to the trial judge's "broad discretion" and "accorded great deference" on review.  Id. at 774, quoting Arizona v. Washington, 434 U.S. 497, 509, 510 (1978).  In Renico, the Court reiterated that "[t]he reasons for 'allowing the trial judge to exercise broad discretion' are 'especially compelling' in cases involving a potentially deadlocked jury" because "'the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate,'" and absent "such deference, trial judges might otherwise 'employ coercive means to break the apparent deadlock,' thereby creating a 'significant risk that a verdict may result from pressures inherent in the situation rather than the

---

[6] As noted by the SJC, the petitioner presented no claim below that the evidence adduced at her first trial "was legally insufficient to support a conviction on any of the charges, which would preclude retrial."  Read, 495 Mass. at 313.  Nor was the record she submitted on appeal adequate in any event to establish such a claim.  See id. at n.2.  She does not raise a sufficiency claim in this petition.

considered judgment of all the jurors.'"  Renico, 559 U.S. at 774, quoting Washington, 434 U.S. at 509-510 & n.28.  See also Read, 495 Mass. at 319 ("Trial judges receive such discretion to avoid the possibility of coercive measures being used to force jury agreement, thereby protecting the fairness of the proceedings.").

In addition, and notably for purposes of this case, the Court went on to reaffirm what is _not_ required as a matter of federal constitutional law in exercising that broad discretion:

> "We have expressly declined to require the mechanical application of any rigid formula when trial judges decide whether jury deadlock warrants a mistrial.  We have also explicitly held that a trial judge declaring a mistrial is not required to make explicit findings of manifest necessity nor to articulate on the record all the factors which informed the deliberate exercise of [their] discretion.  And we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse.  In 1981, then-Justice Rehnquist noted that this Court had never overturned a trial court's declaration of a mistrial after a jury was unable to reach a verdict on the ground that the manifest necessity standard had not been met.  The same remains true today, nearly 30 years later."

Renico, 559 U.S. at 775 (quotations and citations omitted).  Accord Blueford v. Arkansas, 566 U.S. 599, 609 (2012).  Following Renico and Blueford, the First Circuit similarly has held that trial judges are not required "to take specific steps or make specific findings before concluding that a jury is deadlocked and unlikely to reach a verdict."  United States v. Candelario-Santana, 977 F.3d 146, 158 (1st Cir. 2020).  Rather, a judge exercises sound discretion to declare a mistrial based on deadlock so long as she "take[s] some step to ensure that the jury truly is unable to reach a verdict before discharging it."  Id. (emphasis in original).

Here, the trial judge more than satisfied this requirement.  The jury's first note was delivered to the judge after approximately 19 hours of deliberations over four days.  In it, they stated that "despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict."  The judge did not rush

to declare a mistrial. Instead, she heard from the parties. And even though defense counsel argued that the jury already had "exhausted all manner of compromise, all manner of persuasion," and were "at an impasse," the judge still did not immediately declare a mistrial. She took the measured approach of considering the extent of the jury's deliberations in view of the trial length, the amount of evidence presented, and the complexity of the issues to be decided; she concluded the deliberations had not yet been due and thorough; and she instructed the jury to continue deliberating.

The jury then "deliberated for another five to six hours -- spanning a Friday afternoon and the following Monday morning -- before sending a second note that was noticeably more definitive." Read, 495 Mass. at 320. The second note stated, "we find ourselves deeply divided by fundamental differences in our opinions and state of mind," the "divergence in our views are [sic] not rooted in a lack of understanding or efforts, but deeply held convictions," and "consensus is unattainable." Again, the judge did not race to declare a mistrial. She once more gave the parties an opportunity to be heard. Defense counsel argued the jury were "hopelessly deadlocked." Still, the judge did not declare a mistrial. See id. (noting that, despite second note's definitive language and counsel's argument, judge still "did not immediately conclude that all hope of attaining a verdict was lost"). Instead, she gave the Tuey-Rodriguez charge.

"After nearly four hours of additional deliberation -[- ] bringing the total to approximately twenty-eight hours -- the jury submitted a third note that was even more emphatic." Read, 495 Mass. at 320. The third note stated, "we continue to find ourselves at an impasse," "[o]ur perspectives on the evidence are starkly divided" stemming from "a sincere adherence to our individual principles and moral convictions," and further deliberations "would be futile and only serve to force us to compromise these deeply held beliefs." It was only then,

after all of the steps described above, and in light of the tone and content of the jury's final note, that the judge declared a mistrial.

In her memorandum of decision denying the petitioner's motion to dismiss, the trial judge explained that she "had no doubt based on the jury's notes to the Court that [the jury] was unable to reach a unanimous verdict." (R.402-403). Nothing in the jury's three notes, she found, "indicated agreement on any of the charges," or even an "inkling of an indication of agreement," despite the evident "care that went into writing the notes and how articulately they expressed the jurors' disagreement." (R.403). It was also "clear" to the judge from the third note that the jurors "would not consent to continuing their deliberations." (R.400). And at that point the judge was precluded by Massachusetts law from ordering the jury to continue deliberations without their consent. See Mass. Gen. Laws ch. 234A, § 68; Read, 495 Mass. at 321, 323.

The SJC likewise found that "[t]he jury clearly stated during deliberations that they had not reached a unanimous verdict on any of the charges and could not do so." Read, 495 Mass. at 313. "The first and second notes provided no indication of a partial consensus, and the third note"—with its repeated references to "the charges"—"plainly implied the opposite." Id. at 322. "In short, the record before the trial judge suggested complete deadlock." Id.

The trial judge took not just "some step," but multiple steps, to determine that the jury was "genuinely deadlocked" before declaring a mistrial. Candelario-Santana, 977 F.3d at 158 (emphases in original). Both the trial judge and the SJC found that the jury truly was unable to reach a verdict. See Marshall, 753 F.3d at 16 (federal habeas court must defer to state courts' factual findings). The judge acted well within her broad discretion in declaring a mistrial. See Renico, 559 U.S. at 775, quoting Washington, 434 U.S. at 510 n.28, 514 (exercise of

14

discretion is sound where judge does not act "irrationally or irresponsibly" or "for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling").

The petitioner's argument to the contrary proceeds from a flawed premise. Pointing to the language in Washington that the burden of justifying a mistrial rests on the prosecution, she claims the SJC improperly shifted that burden to her. See Pet. Mem. (Doc. No. 2) at 15, quoting Washington, 434 U.S. at 505. The Court went on to explain in Washington, however, that a deadlocked jury is the type of manifest necessity sufficient to meet that burden—indeed, it is the "classic basis for a proper mistrial." Washington, 434 U.S. at 509. The question then becomes whether the judge abused her "broad discretion" in declaring a mistrial for that reason, id., which is exactly the question that the SJC addressed. There was no burden shifting.

The petitioner maintains that the trial judge abused her discretion by failing to consider alternatives to a mistrial and to afford defense counsel an opportunity to be heard concerning the declaration of a mistrial. See Pet. Mem. at 16-24. To begin with, the Court in Renico expressly rejected the proposition that a judge's exercise of sound discretion hinges on "whether the judge (1) heard the opinions of the parties' counsel about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly." Renico, 559 U.S. at 778-779 (quotation omitted). The Court cautioned that Washington "nowhere established these three factors as a constitutional test that determines whether a trial judge has exercised sound discretion in declaring a mistrial," nor could such factors properly be understood as merely an "illuminat[ion]" of Washington. Id. at 779 (quotations and citations omitted). The Court further noted that although the trial judge in that case "could have asked the foreperson additional followup questions, granted additional time for further deliberations, or consulted with the prosecutor and defense counsel before acting," and that "[a]ny of these steps would have been

appropriate under the circumstances," none of these steps "was required" under the Court's "double jeopardy precedents." Renico, 559 U.S. at 779.[7]  The trial judge's purported failure here to do that which was not required by the federal constitution is not a basis for granting habeas relief.

Even assuming federal law, like Massachusetts law, mandates that a judge consider alternatives to a mistrial and afford counsel an opportunity to be heard, the petitioner still would not be entitled to relief.  See Read, 485 Mass. at 319, quoting Commonwealth v. Taylor, 486 Mass. 469, 484-485 (under state law, reviewing court "considers whether the judge carefully explored 'alternatives to a mistrial,' and whether counsel were 'given full opportunity to be heard'" [citation omitted]).  As described above, and as the SJC found, the judge "did consider and pursue such alternatives." Id. at 321.  After the jury's first note reporting a deadlock, the judge instructed the jury to continue deliberating.  Following the second note, reporting a deadlock in even stronger terms, she issued the Tuey-Rodriguez instruction.  "It was only when the jury submitted their third report of deadlock, at which point the judge was statutorily precluded from ordering them to continue deliberations without their consent, see [Mass. Gen. Laws ch.] 234A, § 68C, that the judge declared a mistrial."  Id.

The petitioner glosses over these alternatives that the judge employed in response to the first and second notes.  She focuses in isolation on the third note and contends that the judge, in response to that note, should have inquired pursuant to Mass. R. Crim. P. 27 as to the existence

---

[7] Although the habeas petition in Renico was brought pursuant to 28 U.S.C. § 2254, the case is not distinguishable on that basis.  The Court's discussion of what trial judges are not obligated to do before declaring a mistrial when the jury is at an impasse, and its rejection of a multi-factor test for determining whether a judge has exercised sound discretion in declaring a mistrial, was based on the Court's double jeopardy jurisprudence, separate and apart from the additional deference required under section 2254 and the federal habeas statute.  See Renico, 559 U.S. at 778-779.

of any partial verdicts.  See Pet. Mem. at 2, 19-22.  But the SJC, construing Massachusetts law—Rule 27; ch. 234A, § 68C; and that court's prior precedents—held that the judge was not required to make additional inquiry into the jury's deliberations, including the possibility of a partial verdict, or to poll the jurors to confirm their deadlock, and that had she done so, it would have improperly "risked coercing a verdict."  See Read, 495 Mass. at 321-324, 326.  As there was no federal constitutional imperative that the trial judge make these inquiries, see Renico, 559 U.S. at 775, the SJC's determination that further inquiry was not a viable alternative to a mistrial as a matter of state law is dispositive.  See Marshall, 753 F.3d at 12, 19 (federal habeas court "bound by the state court's construction of its state statutes and other issues of state law").[8]

Nor did the trial judge fail to provide defense counsel an opportunity to be heard.  See Read, 495 Mass. at 325-326.  In addition to soliciting counsel's views after the first and second notes, the judge found that counsel had multiple opportunities to object to the declaration of a mistrial if they in fact wanted to do so at the time.  (R.401).  Counsel could have objected, or at least have asked to be heard on the matter—whether it was a request to be heard at that moment or at some point before any final decision was made on a mistrial—while waiting for the jurors to enter the courtroom, especially since the judge had announced to counsel that the jury remained at an impasse.  The defense also could have voiced an objection or asked to be heard during the subsequent discussion with the judge about scheduling a status hearing, or even while

---

[8] Even if there had been an error under state law in the application of Mass. R. Crim. P. 27, such a state-law error alone would not be a basis for relief.  As relevant here, section 2241 does not permit relief unless a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  Cf. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (affirming, in section 2254 context, that "'federal habeas corpus relief does not lie for errors of state law'" and "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States").

the jurors were still at the courthouse and waiting in the deliberation room for the judge to speak to them. The judge further found that, had counsel objected or raised an issue, she would have heard from counsel. She also made a point to note that "defense counsel were no shrinking violets"—they had never needed the judge to inquire whether they had an objection in order to be heard, and she had never refused them an opportunity to be heard in open court or at sidebar —making it difficult for the judge "to believe that when counsel heard that the jury was at an impasse for a third time and a mistrial was inevitable, at perhaps the most crucial point in the trial, counsel would sit silently if they did not consent to a mistrial." (R.401-402). See Read, 495 Mass. at 318.

Despite several opportunities to do so, defense counsel neither objected to nor expressed any dissatisfaction with the declaration of a mistrial. See id. at 325. For these reasons, the trial judge found not credible the assertions in the petitioner's motion to dismiss that the declaration of the mistrial was "sudden" and "unexpected," or defense counsel's assertion in his affidavit in support of the motion that he lacked an opportunity to be heard. See id.; R.287, 401-402. These findings and credibility determinations, which are binding, belie the petitioner's claim that counsel was not afforded "any meaningful opportunity to be heard." (Pet. Mem. at 16).

### D. Alternatively, the petitioner may be retried on counts one and three because she consented to the mistrial.

For much the same reason, the trial judge also concluded that counsel's lack of objection constituted consent to the mistrial. (R.399-402). Having determined that the mistrial was manifestly necessary, the SJC did not need to reach that issue of consent, and it declined to do so. See Read, 495 Mass. at 326 n.13.[9] The petitioner addresses the issue in a footnote in her

---

[9] The SJC also declined to reach the petitioner's "ancillary argument, raised [on appeal] for the first time, that the court should have conducted a colloquy with the [petitioner] before finding such consent." Read, 495 Mass. at 326 n.13. The petitioner does not attempt to develop this

memorandum in support of her petition, asserting that this Court should find that she did not consent because she did not affirmatively do so and she did not impliedly consent because she had no opportunity to object. See Pet. Mem. at 15 n.5. As detailed above, counsel had ample opportunity to object but neither did so nor even asked to be heard concerning the mistrial declaration. Counsel instead proceeded to schedule a status conference in preparation for the retrial. That is sufficient to permit a finding of implied consent, which independently removes any bar to retrying the petitioner, irrespective of whether there was a manifest necessity for the mistrial. See United States v. DiPietro, 936 F.2d 6, 8-10 (1st Cir. 1991) (implying consent where, following judge's sua sponte announcement of mistrial, defense counsel sat in courtroom for several minutes without objecting and participated in setting new trial date). Contrast United States v. Toribio-Lugo, 376 F.3d 33, 40-41 (1st Cir. 2004) (counsel had no fair opportunity to object where she made attempts to be heard but judge repeatedly cut her off).

**E.    The petitioner was not acquitted of any charge because no verdicts of acquittal were returned, announced, and affirmed by the jurors in open court.**

In determining "whether the Double Jeopardy Clause recognizes an event as an acquittal," the question is whether, "given the operation of state law," the jury "acted on [their] view that the prosecution had failed to prove its case." McElrath v. Georgia, 601 U.S. 87, 96

---

ancillary argument in her memorandum or list it in her petition. It is, therefore, waived for at least two different reasons. See Logan v. Gelb, 790 F.3d 65, 70 (1st Cir. 2015) (per curiam) (noting, in section 2254 case, that an argument not included in a federal habeas petition is "waived"); Woods v. Medeiros, 465 F. Supp. 3d 1, 8 (D. Mass. 2020), aff'd on other grounds, 993 F.3d 39 (1st Cir. 2021) (noting, in section 2254 case, that argument not developed in supporting memorandum is deemed waived). And, in any event, the Supreme Court and the First Circuit have rejected the argument. See United States v. Dinitz, 424 U.S. 600, 609 n.11 (1976) (permissibility of retrial following mistrial does not depend on defendant's knowing, intelligent, and voluntary waiver of double jeopardy rights); United States v. DiPietro, 936 F.2d 6, 11 (1st Cir. 1991) (noting Dinitz's rejection in double jeopardy context of "a waiver theory analogous to the requirement that waiver of the Sixth Amendment right to counsel must be knowing, voluntary and intelligent").

19

JA0525

(2024) (quotation omitted).  See Read, 495 Mass. at 327 (acknowledging same).  The SJC's

instruction on what constitutes a valid jury verdict under "the operation of state law" is definitive

and binding in this habeas action:

> "[T]he fundamental requirements for a jury's issuance of a verdict in a criminal case are
> set forth in Mass. R. Crim. P. 27(a).  Pursuant to that rule, a valid jury verdict must be
> unanimous and returned by the jury to the judge in open court.  Our case law confirms
> that a criminal verdict is effective only when affirmed by jurors in open court.  In other
> words, the distinction between informal agreement on a verdict and the actual return,
> receipt, and recording of a verdict in open court is central -- only the latter constitutes a
> final verdict of the jury on a criminal charge.  We have consistently reaffirmed this long-
> standing distinction throughout our jurisprudence."

Read, 495 Mass. at 327-328 (quotations and citations omitted).  See also A Juvenile v.

Commonwealth, 392 Mass. 52, 56-57 (1984), quoting Lawrence v. Stearns, 11 Pick. 501, 502

(1831) ("The only verdict which can be received and regarded, as a complete and valid verdict of

a jury, upon which a judgment can be rendered, is an open and public verdict, given in and

assented to, in open court, as the unanimous act of the jury, and affirmed and entered of record,

in the presence and under the sanction of the court").

Here, the jury did not return, announce, and affirm a final verdict on any charge.  Their

only open and public, unanimous acts were their statements to the judge that they were unable to

reach a unanimous verdict or to attain consensus, remained at an impasse, and were starkly

divided on whether the evidence was sufficient to establish the elements of "the charges."

See Read, 495 Mass. at 328 ("Far from an affirmation in open court of unanimous agreement on

counts one and three, these notes clearly reflected a lack of consensus on 'the charges.'  Even if

the jury's deadlock pertained specifically to count two, their notes made no such distinction, nor

did they indicate any verdict would be returned to the judge in open court, as required by Mass.

R. Crim. P. 27(a)" [quotations and citations omitted]).  As such, the trial judge and the SJC

correctly ruled that the petitioner was not acquitted of any charge.  See id., quoting McElrath,

601 U.S. at 96 ("In the absence of a verdict returned, received, and recorded in open court, we cannot conclude that the jury 'acted on [their] view that the prosecution had failed to prove its case.'").

The requirement of an open and public verdict announced and affirmed in court "is far from a mere formality," id. at 329, though the petitioner argues otherwise (Pet. Mem. at 26). "Public affirmation in open court provides safeguards against mistakes." A Juvenile, 392 Mass. at 57. See also Commonwealth v. Zekirias, 443 Mass. 27, 33 (2004) (verdict must be "affirmed in open court, as the unanimous act of the jury, and in presence of the whole panel," so that each juror may express dissent if their decision has been mistaken, misrepresented, or coerced by other jurors [quotation omitted]). It also protects each juror's right to re-evaluate their position, and to change their mind on any issue or their vote on any charge, during deliberations. See Read, 495 Mass. at 329 ("these principles recognize that, as a practical matter, jurors may agree in the course of deliberations to a tentative compromise on the facts of a case or on the disposition of related charges as they attempt to reach unanimous agreement," and "[s]ince a jury should not be precluded from reconsidering a previous vote on any issue, tentative or conditional agreements reached amid deliberations cannot have the force of a final verdict" [quotations and citations omitted]).[10] Indeed, under state law, even after jurors agree upon a verdict, fill out a

_____

[10] State law confirms that the possibility of a juror changing their mind is not merely hypothetical. See, e.g., Daniels v. Commonwealth, 441 Mass. 1017, 1017 (2004) (on first full day of deliberations, jury told judge they had reached unanimous verdict on one charge but not others; judge ordered jury to resume deliberations; next day, jury reported they had not reached unanimous decision on any charge); Commonwealth v. Floyd P., 415 Mass. 826, 829 (1993) (in delinquency proceeding on charges of armed robbery, aggravated rape, and murder in the first degree, jury note requested instruction on how to proceed where jury had unanimously voted guilty on charges of armed robbery and aggravated rape, but where two jurors stated they would change their votes "if the conviction on rape has to result in first degree murder"); A Juvenile, 392 Mass. at 53 (jury initially reported they could reach verdict on murder charge, but next day they sent judge note indicating they were deadlocked on that charge).

verdict slip, and walk into the courtroom, any juror still remains free to change their mind before the verdict is affirmed and recorded. See Commonwealth v. Nettis, 418 Mass. 715, 718-719 (1994). "Requiring a jury to publicly affirm their verdict in open court thus serves a vital purpose -- it ensures that the verdict agreed upon in private truly reflects the unanimous and deliberate judgment of each juror under public scrutiny, rather than a tentative compromise." Read, 495 Mass. at 329.

Federal precedent does not command a different result here, as Blueford makes clear.[11] There, the foreperson disclosed to the judge that the jury had voted unanimously against guilt on two of the offenses, were deadlocked on a third, and had not voted on a fourth. See Blueford, 566 U.S. at 603-604. The jury continued to deliberate, later reported to the judge that they had not reached a verdict, and the judge declared a mistrial. See id. at 604.

The defendant in that case similarly argued "acquittal is a matter of substance, not form," and that he had been "actually acquitted" of the two offenses based on the foreperson's earlier report of the jury's unanimous votes. Id. at 605-606. The Supreme Court expressed no endorsement of his premise of substance-not-form and instead rejected the argument on its own

---

[11] In the other cases relied on by the petitioner, the jury did return a verdict or the proceedings were terminated by judicial action. See Pet. Mem. at 24, 26. As to the latter category, the passages quoted in the petitioner's memorandum omit important context, namely the express references to judicial action contained in those decisions. Compare Pet. Mem. at 24 with Martinez v. Illinois, 572 U.S. 833, 841-842 (2014), quoting United States v. Martin Linen Supply Co., 430 U.S. 564, 571 (1977) ("'We have emphasized that what constitutes an "acquittal" is not to be controlled by the form of the *judge's action*'; it turns on 'whether the *ruling of the judge*, whatever its label, actually represents a resolution of some or all of the factual elements of the offense charged'" [emphases added]). In the context of decisions involving the termination of a case by judicial action, double jeopardy principles distinguish between a ruling on the merits and a ruling on procedural grounds; the substance of the ruling, regardless of its form (or how it is styled), makes a difference. There is no such distinction with a jury determination at least because juries do not make procedural rulings, and judicial action does not require the same safeguards that are served by the verdict-in-open-court requirement to confirm that actual and final outcome of deliberations by twelve individuals.

terms. See id. at 606, 608 (reported votes "lacked the finality necessary to amount to an acquittal on those offenses, *quite apart from any requirement that a formal verdict be returned or judgment entered*" [emphasis added]). "The foreperson's report was not a final resolution of anything," the Court held, because the jurors continued to deliberate after that report and were therefore free to revisit their prior votes and to change their minds. Id. at 606-608. The Court further noted that it would be "unjustified" to assume the reported votes did not later change given the possibility that even a single juror could have rethought their position on those offenses. Id. at 608.

The petitioner argues that Blueford is "factually distinguishable from the instant case" based on a flawed assumption that the purported juror statements at issue here reflect the jury's position at "the end of deliberations." (Pet. Mem. at 27-28). For one thing, a closer reading of the statements reveals that they do not identify at what point during the five days of deliberations the jury allegedly reached unanimous agreements on two of the charges. See R.283-287, 292-293, 323-326, 330-331. They therefore do not foreclose the possibility that the supposed unanimity perceived by some jurors was based on a preliminary discussion or straw poll conducted early on in, or at the start of, the deliberations—the very scenario cited by the Supreme Court as a cautionary example. See Blueford, 566 U.S. at 607-608 ("A single juror's change of mind is all it takes to require the jury to reconsider"). See also Commonwealth v. Roth, 437 Mass. 777, 793 (2002) (even "most recent 'vote' immediately prior to reporting deadlock may well be tentative, a failed experiment in compromise, and not a true expression of each juror's assessment of the case"). For another thing, the purported statements also do not— and cannot—establish that none of the twelve jurors would have changed their mind had the jury gone through the process of returning and affirming a verdict in open court, and the solemnity

23

that attends such an occasion.  It is the rendering of a verdict that communicates the *true* finality

and unanimity of the deliberations.  And "[b]ecause the jury did not publicly affirm that the

[petitioner] was not guilty of the charges, there was no acquittal barring retrial under the double

jeopardy clause."  Read, 495 Mass. at 329-330.

### F.   The petitioner's requested posttrial inquiry would require delving into the jury's deliberations, an impermissible subject.

The petitioner contends, in the alternative, that she is entitled to a posttrial inquiry of the

jurors.  See Pet. Mem. at 28.  The SJC rightly rejected that contention, concluding that the

requested inquiry would contravene Massachusetts law and its "prohibition on probing the

content of juror deliberations."  Read, 495 Mass. at 330.  The court emphasized that

"[m]aintaining the secrecy of those deliberations is a bedrock of our judicial system," which "not

only prevents jury tampering but also upholds the finality of jury verdicts and fosters confidence

in the judicial process."  Id. at 330-331 (quotation omitted).  "Probing secret deliberations to

determine whether the jurors may have privately agreed on a verdict they never returned would

undermine these fundamental principles."  Id. at 331.

Federal law is not to the contrary and does not compel such an inquiry be made

notwithstanding state law.  Compare Fed. R. Evid. 606(b) (during inquiry into validity of verdict,

"a juror may not testify about any statement made or incident that occurred during the jury's

deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental

processes concerning the verdict," and "[t]he court may not receive a juror's affidavit or

evidence of a juror's statement on these matters") with Mass. G. Evid. § 606(b) (prescribing

same limitations).  The Supreme Court has repeatedly affirmed the common law anti-

impeachment principle, which embodied in Federal Rule of Evidence 606(b)(1).  As noted, it

provides that jurors may not be asked to impeach a verdict by testifying about matters internal to

their deliberations. See, e.g., <u>Warger</u> v. <u>Shauers</u>, 574 U.S. 40, 47 (2014) (juror may not testify to remarks made by another juror during deliberations which showed that the juror at issue lied during voir dire); <u>Tanner</u> v. <u>United States</u>, 483 U.S. 107, 127 (1987) (anti-impeachment rule bars juror testimony about the consumption of drugs and alcohol by members of the jury during trial).

The requested inquiry would necessarily entail delving into the jury's subjective reasoning and deliberative content. Although the trial judge accepted the purported juror statements (which contain two, three, or even four levels of hearsay) as true and accurate for purposes of deciding the motion to dismiss, as did the SJC for purposes of the appeal, the judge explicitly disagreed with the petitioner's characterization of those statements as being "strong and uncontradicted." (R.396). The judge found that the statements "directly contradict[ed]" the jury's notes during their deliberations, including their final note expressing their stark divide as to the elements of "the charges." (R.396). The SJC also found that the statements were "inconsistent with" and "contradict[ed] their prior notes." <u>Read</u>, 495 Mass. at 313-314.

The petitioner argues, as she did in state court, that the jury's reference to "the charges" can readily be understood to mean count two and its lesser-included offenses. See Pet. Mem. at 23. That is not the more natural and straightforward reading, it is not what the trial judge and the SJC found it to mean (findings that are entitled to deference here), nor is it consistent with the petitioner's position at trial. See R.403 (trial judge noting, "[f]or the defense to now claim that the notes were susceptible to different interpretations such that the Court should have inquired further rings hollow, particularly where [defense counsel] had twice argued that the jury had engaged in due and thorough deliberations and could not agree"). But more importantly, it does not matter what the petitioner now, in hindsight, claims the reference to "the charges" might

mean; it matters what the jury meant at the time, and why they said it. That cannot be determined without inquiring into their thinking and deliberations.

Further undermining the petitioner's assertions of some form of finality is the inconsistency even among the jurors who are said to have made statements after the trial. For example, according to Juror C, the jury were unanimous only as to second-degree murder and "the remaining charges were what they were hung on." (R.284-285).[12] Such a statement does not reflect unanimity on counts one and three. Apparently even the five purported jurors, to say nothing of the seven other jurors, were not of one mind. These and other discrepancies would need to be reconciled to establish with any confidence whether in fact, or to what extent, any unanimity may have been reached. That would require an impermissible inquiry into the jurors' deliberative process.

The petitioner claims that her inquiry is directed solely to the "result" of the jury's deliberations and can be accomplished with a single "yes" or "no" question posed to each juror. See Pet. Mem. at 32. But a juror's stated agreement in the jury room to find the petitioner not guilty on a particular charge may have been only a tentative compromise. That juror cannot disclose where they truly stood—that their agreement was merely tentative and may not have been their final position depending on the resolution of the other charges, the jury's further discussion of evidence, or some other reason—without "intrud[ing] into the heart of jury deliberations." (Pet. Mem. at 32).

---

[12] There are additional contradictions. Juror B said that following Tuey-Rodriguez, the deliberations "turned into a bully match." (R.283, 330). Juror C, however, said the jurors "all got along and never heated. They agreed to disagree and respected each other." (R.285). Juror B also said the jury's vote on count two was "split in half" (R.283, 330); Juror C said the vote "started polling at 6/6," but "ended deadlock[ed] @ 4no8yes" (R.284); and the purported juror who left a voicemail for the prosecutor said the final vote was "9-3 guilty" (R.325).

Additional considerations militate against the requested inquiry. Jurors questioned at this point, more than seven months after they were discharged, may feel pressured to provide responses that they believe will minimize their risk of being harmed or harassed. See <u>Read</u>, 495 Mass. at 332 (noting an inquiry of the jurors, now, would "occur well after they became susceptible to outside influences"). People associated with this case have been charged criminally with witness intimidation. (S.R.6). Individuals have also expressed outrage at the jurors and sought to identify them and release their personal information. (S.R. 13-15). One of the jurors has said they fear for their personal safety and that of their family, and they worry that they will be subject to harassment or even physical harm because of what they did or did not do on the jury and the outcome of the jury's deliberations. (S.R.16). Several of the purported jurors wish to remain anonymous. (R.293, 324-325).[13] In view of these circumstances, a "yes"/"no" question may not capture a juror's nuanced views or concerns, or lead to a reliable and accurate understanding.[14]

Allowing such an inquiry raises forward-looking concerns as well:

> "The proper evidence of the decision of the jury is the verdict returned by them upon oath and affirmed in open court; it is essential to the freedom and independence of their deliberations that their discussions in the jury room should be kept secret and inviolable; and to admit the testimony of jurors to what took place there would create distrust, embarrassment and uncertainty."

---

[13] The petitioner remarks, "in the context of this highly publicized case, it strains credulity to suggest" that if the purported juror statements did not "represent the unanimous view of all 12, the remaining jurors would allow the inaccuracy to go uncorrected." (Pet. Mem. at 27). Clearly, there is another reasonable explanation for why other jurors have not drawn further attention to themselves. See also R.331 (Juror B stating they believe "other jurors have been reluctant to come forward because there is so much public and media attention focused on this case").

[14] The extraneous-influence cases cited in the petitioner's memorandum (e.g., Pet. Mem. at 30) are readily distinguishable. Those cases involve inquiry, in certain circumstances, into external or outside-the-courtroom matters that may impermissibly have intruded into deliberations. They rest largely on the principle that a verdict should be based on the evidence heard in court. The inquiry proposed here goes directly to the deliberations themselves.

27

Commonwealth v. Fidler, 377 Mass. 192, 196 (1979), quoting Woodward v. Leavitt, 107 Mass. 453, 460 (1871).  If jurors' deliberations are allowed to become the subject of a posttrial inquiry because of purported statements like those here, future jurors may be hesitant to express their views fully and honestly during deliberations.  It also may be more difficult to find jurors willing to serve, both in the retrial here and in other cases, when jurors know their service may not end when the trial ends but could instead subject them to further inconvenience, embarrassment, or harassment well into the future.[15]

## IV.    Conclusion

For the foregoing reasons, the Court should deny the petition for a writ of habeas corpus.

Respectfully submitted,

NORFOLK COUNTY SUPERIOR COURT

By its attorney:

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

By:  */s/ Caleb J. Schillinger*
Caleb J. Schillinger
Special Assistant Attorney General
(BBO# 676592)
Assistant Norfolk District Attorney
45 Shawmut Road
Canton, MA 02021
(781) 830-4800

Dated:  February 26, 2025

---

[15] If this Court concludes that the state courts erred by refusing to conduct a posttrial inquiry, it should, in the interest of comity, remand this matter to the state courts to undertake that task.

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system on February 26, 2025, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including Martin G. Weinberg, Esq., and Michael Pabian, Esq., counsel for the petitioner in this matter.  There are no non-registered participants involved in this case.

*/s/ Caleb J. Schillinger*

Caleb J. Schillinger
Special Assistant Attorney General

COMMONWEALTH OF MASSACHUSETTS

SUPREME JUDICIAL COURT

NO. SJC-13663

_____

COMMONWEALTH,
Appellee

V.

KAREN READ,
Appellant

_____

ON A RESERVATION AND REPORT BY THE SINGLE JUSTICE
OF A PETITION FOR EXTRAORDINARY RELIEF
PURSUANT TO G.L. c. 211, § 3
_____

**COMMONWEALTH'S SUPPLEMENTAL RECORD APPENDIX**
_____

For the Commonwealth:

Michael W. Morrissey
District Attorney
For the Norfolk District

Caleb J. Schillinger
Adam C. Lally
Laura A. McLaughlin
Assistant District Attorneys
BBO#s 676592, 664079, 684295
45 Shawmut Road
Canton, Massachusetts 02021
(781) 830-4800

October 16, 2024

## TABLE OF CONTENTS

Trial exhibit VVV for identification,
  first jury note regarding deadlock .......................................... 3

Trial exhibit YYY for identification,
  second jury note regarding deadlock ....................................... 4

Trial exhibit AAAA for identification,
  third jury note regarding deadlock ......................................... 5

Order of Impoundment,
  dated July 8, 2024 (Cannone, J.) ............................................. 6

Juror Doe's Emergency Motion to Extend
  Impoundment Order, filed July 18, 2024 ................................ 8

Juror Doe's Affidavit in Support of
  Emergency Motion, filed July 18, 2024 ................................ 11

Findings and Order on Juror Doe's Emergency Motion,
  dated July 18, 2024 (Cannone, J.) ......................................... 38

## Note on Redactions

In the three jury notes referenced above, the signatures have been redacted to protect the juror's identity in accordance with Mass. R. A. P. 21, Supreme Judicial Court Rule 1:24, and the trial judge's Order of Impoundment.  The redactions appear on pages S.R.3, 4, and 5.



Dear Judge Cannone,

    I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict

6/28/24



Judge Cannone

Despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind.

The divergence in our views are not rooted in a lack of understanding or effort, but deeply held convictions that each of us carry ultimately leading to a point where consensus is unattainable. We recognize the weight of this admission and the implications it holds.



7/1/24



EXHIBIT

AAAA ident.
7-1-24

Judge Cannone,

   Despite our rigorous efforts. We continue to find ourselves at an impasse.

   Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyond a reasonable doubt. Conversly, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of the charges

   The deep division is not to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions.

   To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs.

7/1/24

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPERIOR COURT
                                          DOCKET NO. 2282-CR-00117

**COMMONWEALTH OF
MASSACHUSETTS,**
        **Plaintiff**

v.

**KAREN READ,**
        **Defendant.**

<u>**ORDER OF IMPOUNDMENT**</u>

The Supreme Judicial Court has recognized that the safety of jurors is crucial to the fair

functioning of the judicial system, and that "the justice system owes them the highest degree of

vigilance for their personal safety." *Commonwealth v. Silva*, 448 Mass. 701, 708 (2007).

This case has garnered significant and divisive attention in Massachusetts and across the

nation. The trial was livestreamed on local and national broadcasting channels. The proceedings

continue to be the daily subject of commentary on various social media platforms. People

associated with the case have been charged with intimidation.

This Court acknowledges that the names of empanelled jurors who rendered a verdict in a

criminal case must be retained in the court file and made available to the public. *Commonwealth*

*v. Fujita*, 470 Mass. 484, 486 (2015). The jury in this case did not render a verdict, however, the

Court concludes that there is a real and present "risk of [personal] harm to the jurors [and] to the

integrity of their service." *Id*. Consequently, the Court finds that good cause exists to impound

the list identifying the names of empanelled jurors in the trial of this case. The Court further

1

concludes that there is a risk of immediate and irreparable injury should the list be made available to the public at this time. *See* Uniform Rules of Impoundment Procedure Rule 3(a).

This Order shall expire ten days from the date of issuance, unless otherwise ordered by the Court, for good cause shown, pursuant to Rule 3(b) of the Uniform Rules of Impoundment Procedure.

Dated: July 8, 2024

*/s/ Beverly J. Cannone*
Beverly J. Cannone
Associate Justice
Superior Court

2



COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

NORFOLK, SS                                    DOCKET NO. 2282-CR-00117

COMMONWEALTH OF
MASSACHUSETTS
    Plaintiff

v.

KAREN READ
    Defendant

### EMERGENCY MOTION OF INTERESTED NON-PARTY JUROR DOE TO EXTEND ORDER OF IMPOUNDMENT OF JURY LIST

Juror Doe,[1] an interested non-party, moves pursuant to Rules 6 and 10 of Trial Court

Rule VIII: Uniform Rules on Impoundment Procedure, for an indefinite extension of the Order

of Impoundment, entered sua sponte by the Court (Cannone, J.) on July 8, 2024, impounding the

list of jurors in this action. Juror Doe was a juror in this action and wishes to maintain their

privacy.

In support of their motion, Juror Doe submits that the "real and present 'risk of [personal]

harm to the jurors [and] to the integrity of their service'" is ongoing. See Order of Impoundment,

p. 1, quoting Commonwealth v. Fujita, 470 Mass. 484, 486 (2015). Therefore, there continues to

be a risk of immediate and irreparable injury should the juror list be made public, and good cause

exists for an indefinite extension of the Order of Impoundment.

In further support of their motion, Juror Doe relies on their Affidavit and Memorandum

of Law, filed herewith. Also filed herewith are a Proposed Findings and Order, and an Affidavit

of Service reflecting compliance with Rule 4 of the Uniform Rules on Impoundment.

---

[1] Juror Doe requests to use a pseudonym for purposes of this motion.

WHEREFORE, Juror Doe, an interested non-party, respectfully requests that the Court grant their motion and enter the following relief:

1. Permit Juror Doe to proceed using a pseudonym for purposes of this motion;

2. Find that good cause exists for an extension of the Order of Impoundment of the jury list in Commonwealth v. Read, Norfolk Superior Court No. 2282-CR-00117;

3. Extend the Order of Impoundment of the jury list in Commonwealth v. Read, Norfolk Superior Court No. 2282-CR-00117 indefinitely, but no earlier than July 16, 2025.

Respectfully submitted,

JUROR DOE,

By their attorneys,

/s/ Andrew P. DiCenzo
Donald C. Keavany, Jr., BBO# 631216
Andrew P. DiCenzo, BBO# 689291
Christopher Hays, Wojcik & Mavricos, LLP
370 Main Street, Suite 970
Worcester, MA 01608
Tel. 508-792-2800
Fax 508-792-6224
dkeavany@chwmlaw.com
adicenzo@chwmlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document eFiled on July 17, 2024 will be sent by separate email to all counsel of record and the Office of the Attorney General of the Commonwealth of Massachusetts at the following addresses:

David R. Yannetti, Esq.
44 School Street
Suite 1000A
Boston, MA 02108
law@davidyannetti.com

Alan J. Jackson, Esq.
Elizabeth S. Little, Esq.
Werksman Jackson & Quinn, LLP
888 West Sixth Street, 4th Floor
Los Angeles, CA 90017
ajackson@werksmanjackson.com
elittle@werksmanjackson.com

Martin G. Weinberg, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116
owlmgw@att.net

Adam Lally, Esq.
Assistant District Attorney
Norfolk County District Attorney's Office
45 Shawmut Road
Canton, MA 02021
Adam.lally@mass.gov

Andrea Campbell, Esq.
Attorney General
Commonwealth of Massachusetts
One Ashburton Place, 21st Floor
Boston, MA 02108
Andrea.campbell@mass.gov

/s/ Andrew P. DiCenzo



COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

NORFOLK, SS                                     DOCKET NO. 2282-CR-00117

COMMONWEALTH OF
MASSACHUSETTS
          Plaintiff

v.

KAREN READ
          Defendant

## AFFIDAVIT OF JUROR DOE

Now comes Juror Doe, a pseudonym, who on oath deposes and says as follows:

1.       I am of legal age and have personal knowledge of the facts set forth herein.

2.       I was a member of the jury that was seated in the recently concluded trial in the above-captioned case.

3.       I just retained counsel to represent me.

4.       I have read the Impoundment Order entered by Superior Court Associate Justice Beverly J. Cannone on July 8, 2024, which found that "good cause exists to impound the list identifying the names of empaneled jurors in the trial of this case."

5.       As I read the Court's Order, it is scheduled to expire on July 18 unless it is extended by the Court.

6.       I submit this Affidavit in support of my request to extend the Impoundment Order entered on July 8.

7.     I am asking that the Impoundment Order be extended indefinitely because I am in fear of my personal safety and the personal safety of my family if the names of the jury are made public.

8.     I have read the Impoundment Order and noted on the very first page that individuals associated with this case have been charged criminally with intimidation.  I am frightened for my personal safety as a result of learning that someone associated with this case has been criminally charged with intimidation.

9.     I also recall testimony from at least one witness who described being harassed by individuals and her family being harassed because of their involvement in this case.  I do not know any of the specifics of any such harassment, but I fear that my family and I will not only be harassed if the names of the jurors are made public, but that our personal safety will be seriously compromised.

10.     During jury deliberations we could hear protesters outside screaming and yelling.

11.     During our jury service, the members of the jury would meet at what was supposed to be a secret location to be transported to and from the courthouse by bus.  After being discharged from jury service on July 1, 2024, we were taken by bus back to what was supposed to have been a secret location where we observed what appeared to be members of the media including photographers.  I was so much in fear on my way home that I pulled over to the side of the road to see if I was being followed.  Thankfully, I was not being followed, but that was (and remains) my mindset.  If juror names are made public, we will be constantly threatened and harassed and there will likely be a physical confrontation at some point.

12.     Since being discharged from jury service on July 1, 2024 I have read multiple news articles about the case and the attention that this case garnered across Massachusetts, New England and the country.

13.     There are clearly people who have very strong opinions about the case and about the jurors who deliberated over many days. I have seen articles, comments to articles and postings about the verdict saying some very nasty and dangerous things.  Some individuals have expressed outrage and anger that the jury did not acquit the defendant.  Some individuals have expressed outrage and anger that the jury did not find the defendant guilty.

14.     Just yesterday, I read an article in *The Boston Globe*, with the headline, "Karen Read case ended in a mistrial.  But the diehards haven't given up."  See, Exhibit 1.   In approximately the 12th paragraph of this article, an administrator of a Karen Read-focused Facebook group was quoted as saying: 'The people who were on the fringe of being interested in it are now engulfed…The anger level was at a nine before and now it's at an 11.5." The article characterized this increase as "a rising rage".

15.     Later in this July 15 *Boston Globe* article another individual interviewed by the reporter stated "people are insane about this case.  If they don't agree with you, they'll try to dox you."  I understand the term "dox" to mean that individuals will publicize someone's personal information, including someone's residential address, occupation, business address etc.  Publicizing my personal information in this context exposes me and my family to unwanted, and likely surprise, encounters with strangers who likely have an axe to grind with any juror.

16.     I have seen social media posts that were very demeaning of and attacking the integrity of the trial judge.  If someone is going to attack a sitting judge, I see no reason why they would not demean and attack, verbally and physically, a juror who sat on this jury.

17.     I understand that there are individuals who are upset that an Impoundment Order was entered and that they are actively seeking the identity of all of the jurors.

18.     For example, my attorneys have made me aware of a video posted by a blogger / journalist, whom I understand to be a person who has been charged with witness intimidation related to this case, speaking about the trial and the jury's inability to reach a unanimous verdict on all counts after trial. In the video, the blogger initially states that he has identified the jury foreperson in the case.  Not only does the blogger state that he has identified the jury foreperson, but also where this person lives and what the person does for a living.  A link to this video can be found here:  https://x.com/JulieCar94/status/1808495920511607087

19.     In this same video, the blogger demands to know the identity of the "[expletive] idiot on this jury" who did not vote in his preferred manner and further that:

> "Whoever did that subverted justice...Like, they helped cover up for a murder, as far as I'm concerned, fuck 'em, that's what I think."

https://x.com/JulieCar94/status/1808495920511607087

The blogger states in another video posted to "X",

> ""Who outed the Chesna juror, remember that? The one woman who hung the Michael Chesna trial,[1] in July? The jury lists are public, so I got the jury list and I went down the list and I found the juror who hung the jury, and I shamed her, as I should, cause it's shameful...." (emphases added).

A link to this post can be found here: https://x.com/Heels_In_TheAir/status/1779344132235997463.

20.     I understand that the above-mentioned blogger has been accused of harassing witnesses to the case, including by organizing crowds of people to harass them outside their homes, and I am aware that he has made statements in a blog from 2023 to the effect of,

---

[1] Commonwealth v. Lopes, Norfolk County Superior Court Docket No. 1882CV00309.

"murderers, <u>and those who cover for them</u>, do not deserve to live a comfortable life while Karen Read suffers and fights for justice for John O'Keefe." See Exhibit 2.

21.     If, as he has stated, this blogger believes that members of the jury on which I served "helped cover up for a murder," and he further believes that "those who cover for [murderers]" are legitimate targets of harassment, I fully expect that members of the jury will be subjected to efforts to harass and shame them with the very real probability that some physical confrontation will inevitably occur.

22.     My concerns are not limited to a particular blogger or to a particular "side" of this case. I am aware that there are other outspoken bloggers, commentators, and groups of people who wished for a guilty verdict on some or all charges against the defendant. I am aware that there have been physical confrontations between the two sides of supporters.

23.     An example of this is from two recent postings by an individual who appears to be a reporter from New Bedford. In today's post, she stated that she was in court today defending against a harassment charge against her and her pursuit of a counter-harassment charge. See, Exhibit 3.

24.     Yesterday, this reporter posted about "getting protection" from another blogger. See, Exhibit 4. While I do not know the facts concerning these court appearances, it is very evident that individuals on all sides in this case have acted irrationally and aggressively over the past few years, which has caused multiple court appearances by parties seeking protection of the courts from other individuals.

25.     In light of the mistrial – there is no end in sight to this irrational behavior, which clearly continues today. Jurors will undoubtedly be subjected to harassment and likely physical confrontations if their names are made public.

26.     My affidavit and motion should not be interpreted as indicating how I or any other juror voted on this case, or how I or any other juror feel about this case. Every member of the jury, regardless of how they voted, is likely to face backlash from a segment of the large portion of the public who intensely followed this case. I wish to remain anonymous, and I bring this motion on behalf of myself and any other juror who does not wish to be identified, regardless of whether or not we agreed during our deliberations.

27.     It was an honor to serve on the jury. It also was a significant sacrifice of time, which I understood and anticipated when I was selected. What I did not anticipate, however, was the likelihood that I and other members of the jury would become targets of intense public scrutiny and likely harassment campaigns strictly due to the outcome of our private deliberations.

28.     If jury names are made public, I will be subject to nonstop requests for comment about jury deliberations.  I would prefer to not have to respond to these inquiries.  However, what I fear is not only will I be subject to requests for interviews, but that I will be targeted and harassed because of what I did, or did not do on that jury.  I fear that verbal harassment will likely lead to physical confrontation and physical harm.  I am not prepared or equipped to anticipate and prepare for any surprise personal attack.  More importantly, I fear that I will not be able to protect myself and my family.

Signed under the penalties of perjury this 16th day of July 2024

/s/ Juror Doe_____

## CERTIFICATE OF SERVICE

I hereby certify that this document eFiled on July 17, 2024 will be sent by separate email to all counsel of record and the Office of the Attorney General of the Commonwealth of Massachusetts at the following addresses:

David R. Yannetti, Esq.
44 School Street
Suite 1000A
Boston, MA 02108
law@davidyannetti.com

Alan J. Jackson, Esq.
Elizabeth S. Little, Esq.
Werksman Jackson & Quinn, LLP
888 West Sixth Street, 4th Floor
Los Angeles, CA 90017
ajackson@werksmanjackson.com
elittle@werksmanjackson.com

Martin G. Weinberg, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116
owlmgw@att.net

Adam Lally, Esq.
Assistant District Attorney
Norfolk County District Attorney's Office
45 Shawmut Road
Canton, MA 02021
Adam.lally@mass.gov

Andrea Campbell, Esq.
Attorney General
Commonwealth of Massachusetts
One Ashburton Place, 21st Floor
Boston, MA 02108
Andrea.campbell@mass.gov


/s/ Andrew P. DiCenzo

# EXHIBIT 1

# Karen Read case ended in a mistrial. But the diehards haven't given up.

The judge in the Karen Read trial declared a mistrial. It triggered a cliffhanger — and in some, an even deeper obsession.

**By Beth Teitell** Globe Staff, Updated July 15, 2024, 6:04 a.m.



Jack Carney, right, of Canton, with other Karen Read supporters continuing their dedication to her, on a sidewalk along Providence Highway in Dedham on July 14. PAT GREENHOUSE/GLOBE STAFF

DEDHAM —The TV cameras have moved on. The man wearing the blonde Judge Beverly Cannone wig is gone. The street is no longer lined with people bedecked in pink holding "Free Karen Read" signs.

It's a weekday afternoon outside the Norfolk Superior Court, and where Read's supporters once reigned, with their righteous outrage and their beach chairs, there is instead a farmer's market. A band plays

Sonny Rollins. A child climbs into a fire truck brought just for that reason. A woman carries an armful of sunflowers.

But the pastoral scene is deceiving. The July 1 end of the trial wasn't the end at all. It was a <u>mistrial</u>, a cliffhanger, an invitation for yet more obsession over a real-life situation that's as sad as it gets, but for many has turned into a binge-worthy true-crime drama. And they get to be part of the story!

Those in the trial's grip are still out protesting, still fighting on Twitter and Facebook, still buying Karen Read merch (the "Jackson Yannetti 2024" baseball caps, named for the defense attorneys, make a nice keepsake).

Indeed, just six miles away from the Dedham courthouse where they got so chummy, the old "Karen Read was framed" gang reconvened last Wednesday. Once strangers, they have become people who hug hello and ask after each other's family members.

ADVERTISING

.

.

They have gathered in Canton, protesting in front of the offices of Norfolk District Attorney Michael Morrissey — one of their many nemeses.



(From left) Jack Carney, Cathy Carney, and Gail White hold up signs supporting Karen Read outside DA Morrisseys office in Canton. KAYLA BARTKOWSKI FOR THE BOSTON

"Morrissey Gotta Go!" reads one sign. "Justice is coming," promises another.

The weather app shows 88 degrees, but the air is thick, and it feels hotter. The group is huddled on a small patch of grass between the road and their enemy's parking lot. Shade is scarce, but crusaders aren't stopped by humidity.

"This is a busy week," says Scott McGuinness as he describes the demanding schedule of a Karen Read diehard. Today he is at a protest, and he went to one on Monday, too, in South Boston, outside of the Massachusetts State Police barracks. He spent Tuesday night at a meeting of the Canton Select Board. And tomorrow, Thursday, he'd be heading to Dedham, to support the blogger known as Turtleboy in court appearances related to his coverage of the case.

McGuinness lives in Shirley, and sometimes the commute to his Karen Read job takes an hour, or more if the traffic's bad. "But I feel like I'm letting people down if I don't go," he says.

It's been two weeks since Judge Cannone declared a mistrial, leaving unanswered, for now (for some), the question of whether Read drunkenly backed her Lexus into her boyfriend and left him for dead in

S.R. 21

JA0556

the snow on a lawn in Canton on a January night in 2022, as the Commonwealth alleges, or whether she was framed for his murder by the people inside the house, as her attorneys argued.

If you indulged in a brief coma on mistrial day, such is the ongoing intensity that you could be forgiven for thinking the trial was still in session. And not just because it's still spinning out actual news — leaks about the jurors' thoughts; the motion by Read's lawyers to dismiss two charges; the suspension without pay of state Trooper Michael Proctor, lead investigator in the case; the suspension with pay of Canton Police Detective Kevin Albert, whose brother owned the home where John O'Keefe's body was found.

An administrator of an enormous Karen Read-focused Facebook group says he is spending three or four hours a day on his responsibilities — approving new posts, writing his own, welcoming new members, who are coming in in droves, as Read's fame continues to grow.

"The people who were on the fringe of being interested in it are now engulfed," said the administrator, a middle school teacher, who asked to be identified by his Facebook name, Dooh Greg. "The anger level was at a nine before and now it's at an 11.5" — a rising rage he attributes to the assertion by Read's lawyers that the jury reportedly unanimously agreed to acquit her on two of the three counts.

"I've got a fire lit in me that I didn't know needed to be lit," Paul Cristoforo, a restaurant owner and one of the informal organizers of the resistance. It was early in the week, and already plans were being formulated for weekend protests in spots from Auburn to the South Shore, some at rotaries, others on overpasses.

"I'm just as active as I was during the trial," he said.

People's rage takes different forms. At least one Read supporter who is unhappy with Judge Cannone's handling of Read's trial has taken to Facebook to post a link to the Massachusetts Commission on Judicial Conduct so that others can easily file complaints against her.

Many Read obsessive spend their time on X, reading endless posts that dissect, once again, and possibly forever, what Karen Read did or didn't say after she discovered John O'Keefe's body buried in the snow, and who did or who did not hear her say it, whatever it is.

Then there are the trial highlight reels to binge for those who miss the good old days. One, "A goodbye to our new friends," is a nostalgia-tinged montage of the now-familiar courtroom characters (the court

reporter, the clerk, the cult-favorite ceiling fan) with Sara McLachlan's emotional "I Will Remember You" for a soundtrack.

Jay, its creator, asked that his last name not be used because "people are insane about this case. If they don't agree with you, they'll try to dox you."

He's a former insurance adjuster who became so fascinated with true crime that he cashed in his 401(k) to start a trial-focused YouTube channel. His Read montage was a hit — it got 1.7k likes — but even so, he found dealing with both sides of the case so unpleasant, he said, that he vowed not to cover a second Karen Read retrial.

Could it be? A person with the strength not to tune in for season two?

Beth Teitell can be reached at beth.teitell@globe.com. Follow her @bethteitell.

**Show 195 comments**

©2024 Boston Globe Media Partners, LLC

# EXHIBIT 2

# Canton Cover-Up Part 76: Chris Albert Confronts "Loser" Woman In "Free Karen Read" Shirt In Waterfall Parking Lot For Taking His Picture

Aidan Kearney    July 17, 2023



**– Framed – Video for Full Background on Canton Cover-Up Story**
**– Donate to the Karen Read Legal Defense Fund**
**– See all parts of the Canton Cover-Up Series**
**– Watch the Live Shows and Videos**

On Saturday a pair of turtle riders wandered over to the Waterfront Bar

& Grille in Canton, which was the last place John O'Keefe was seen alive. They wore the new Free Karen Read shirts that everyone's been raving about.



However, when they stepped foot inside they saw a familiar face.



Chicken Parm Charlie. The last time we saw him he was kicking an award winning journalist out of his pizza shop, and thus denying access to Chris Albert's world famous mediocre chicken parm. He then called police, claiming that he was some sort of victim, while periodically opening the door to call me a "looooosssaah" who was "going to get it."

Clearly this man is on tilt because he knows he can no longer go out in public and live a normal life like he used to. That tends to happen when your family is involved in the murder of a police officer, followed by the subsequent cover up and framing of an innocent woman.



It appears as if Chicken Parm Charlie, who is an elected member of the Board of Selectman, realized he was being photographed. However, instead of quietly accepting that people have the right to take pictures in public, and that he is both an elected official and the brother and father of men who have been accused in open court of murder, Chicken Parm Charlie decided to confront and berate these two women in the parking lot. He accused the woman of giving this award winning

journalist a handjob, which is factually untrue, but it would probably be more satisfying than his pizza. After that she began filming. Watch:

This dude cannot go five second without calling someone a "loooosssahhh," despite having a worse record in court than the New York Jets. Mr. Chicken Parm Charlie, you had to move into a small apartment because you couldn't afford to live in your house, you get by on your family name, and you make mediocre chicken parm that the Little League coaches buy out of pity. I assure you that the loser here is now who you think it is. As Marlo Stanfield once said, "You want it to be one way, but it's the other way."

Chris Albert wants to live in the world he used to live in, where the Alberts owned the town of Canton and nobody crossed them. He's not used to being unliked, despite the fact that he once killed a man and has countless court judgments and liens against him, which really says a lot about the town of Canton. This is a man who is a well known conservative in a town that Joe Biden won by 30 points, who managed to beat a Yale educated liberal attorney, simply because he comes from the cool jock family. He doesn't know how to react to negativity because he's never been in this position before, which is why he hired an attorney to send out more than a dozen demand letters threatening

defamation lawsuits against people who speculated about his family's involvement in a murder on Facebook.

But unfortunately for Chicken Parm Charlie we began reporting on this case, and the Albert family name no longer carries the swagger in town that it did three months ago. As Slim Charle once wisely said, "the thing about the old day, they the OLD days."

There is a Wire quote for everything.

The best part about the Alberts and McCabes is that they think they can talk their way out of everything. Matt McCabe told me when I confronted him previously that it was "proven in court" that his wife never Googled "how long to die in cold." When you're accustomed to

getting away with everything your entire life you don't know how to behave when you're finally held accountable. You're used to people blindly eating up your bullshit, which is why people like Chris think they can talk their way out of anything.

*"You don't know anything about me and my family."*

Here's some things we know about your family:

- Your brother Brian never came outside after being alerted that there was a dead cop on his front lawn
- Your son Colin frequently posts videos of himself threatening to kill people
- Your son was born innocent but became a depraved psychopath who believes that violence solves problems, which is a direct result of your failures as a father to impart morals into him, despite going through the motions and pretending to be practicing Catholics
- Your son had a black eye and cut up knuckles two weeks after John O'Keefe was killed
- You yourself once killed a man and left the scene of the crime
- You are close personal family friends with the Proctor family and have been for well over a decade
- Your family never left Canton because they control everything and can bang any woman they want so long as they graduated from Canton High School between 1989 and 1996

*"Why are you taking pictures of me?"*

Because she's a free person living in a free country and she can take pictures of whatever she wants without having to explain herself to you. But if you really wanna know why, it's because you're so brazen that

you still go to bars like the Waterfall, knowing full well what everyone in town is thinking about you.

*"Because you were being all weird to me."*

Sir, you're yelling at women in a parking lot and accusing them of giving an award winning journalist a handjob. I assure you that it is not them who is being weird. Also, your assumption that two women wouldn't drive a pickup truck reeks of toxic masculinity.

This interaction was the best:

Turtle rider: "You're framing an innocent woman."

Chicken Parm Charlie: "Am I really? Because Karen f***ing ran John over. You have no f***ing clue."

Turtle rider: "That's why Colin has bruises all over his body."

Chicken Parm Charlie: "You have zero clue."

Turtle rider: "The whole state believes that you are guilty."

Chicken Parm Charlie: "You're a f***ing looosah."

Turtle rider: "I'm a loser? You're arguing with a woman in a parking lot."

His response was basically the same response Matt McCabe gave me about his wife's Google search. It defies logic and reason, and ignores all the facts. But if they shout it loud enough then no one will challenge them. Karen Read did not run John over, and I will buy a $500 gift card to D&E Pizza (which I assume will be him writing something on a napkin) if he can explain to me the physics of how that happened,

which align with all witness statements and the autopsy photos.

The best thing she said was that the whole state believes they are guilty. Chris needed to hear that because the Alberts and McCabes have insulated themselves in a bubble of people that is growing smaller by the day, who reassure them that they believe Karen Read killed John O'Keefe. And for a while, so did most people. Outside of Canton no one believes that, and inside of Canton more and more people are seeing the truth. The one place that was their sanctuary of acceptance is no longer that.

Anyway, let's keep this up. I was so proud to see turtle riders unafraid, confronting evil like this in the flesh. The fact that he's still going to places like the Waterfall is because he feels comfortable doing so. But murderers, and those who cover for them, do not deserve to live a comfortable life while Karen Read suffers and fights for justice for John O'Keefe.

*Hello Turtle Riders. As you know if you follow Turtleboy we are constantly getting censored and banned by Facebook for what are **clearly not violations of their terms of service**. Twitter has done the same, and trolls mass reported our blog to Google AdSense thousands of times, leading to demonetization. We can get by and survive, but we could really use your help. Please consider donating by hitting the Donation button above if you'd like support free speech and what we do in the face of Silicon Valley censorship. Or just buy our award winning book about the dangers of censorship and rise of Turtleboy:*

# EXHIBIT 3

.

← **Post**

**Jessica Machado** ✔
@jessmachadoshow                                    Follow    •••

This morning, the individual who is accusing me of harassing her at Norfolk Superior Court during the Karen Read trial had an opportunity to be heard in front of a judge but chose not to be. Instead, she claimed that she now needs an attorney, as I counter filed against her this morning.

When the judge asked if she realized that there was no order in place and that she would not get one today if she requested a new date, she said she understood and asked for it to be continued. We now have a new date of July 26th. There is no order.

I was extremely prepared to not only defend myself against these ridiculous accusations, but I was equally as prepared to prove that I am the one in need of protection. However, at this time, I will be hiring an attorney to do the heavy lifting.

Many friends and followers have offered to help fund my legal representation and I will take you all up on that offer. Later today I will post a link to a fundraising option that you can use if you would like to contribute.

This is distracting from my work and as you can imagine, very stressful. The seemingly habitual exploiting of court ordered protection orders by women in our court system is a real problem and the only way to stop it is to fight back. I intend to do that.

Last edited 11:30 AM · Jul 16, 2024 · **44.8K** Views

💬 63          ⇄ 37          ♡ 515          🔖 10                    ↑

**Post your reply**                                              ˙˙˙˙˙

**Rich Vetstein** @richardvetstein · 2h                          •••
The newspaper you work for should really be paying your legal fees, since this is all happening as a result of your employment related activities. Just saying again.

💬 7          ⇄ 4          ♡ 180          ᐧ�823 4.8K          🔖 ↑

**Jessica Machado** ✔ @jessmachadoshow · 1h                      •••
We have a meeting at 130 today to discuss.

# EXHIBIT 4

← Post    🔍 Search

**Home**
**Explore**
**Notifications**
**Messages**
Grok
**Bookmarks**
**Communities**
**Premium**
**Verified Orgs**
**Profile**
**More**

Post

**Relevant people**

Jessica Machado ✓
@jessmachadoshow          Follow

Correspondent @FallRiverReport and @NewBedfordGuide. Former host of the Jessica Machado Show and SouthCoast Tonight @WBSM. Former columnist at @HowieCarrShow

Meredith O
@meredithoneil            Follow

Grant Smith Ellis
@msgrant_smith            Follow

Artist formerly known as Grande. Lindsey's simp. Wendy's disabled adult child. Human parody. All source and opinions from my Mom. Protected witness so FAFO.

Meredith O @meredithoneil · Jul 15    ···
Happy Monday! I figured everyone could use a good laugh after this weekend.

TBT to the dark days before @jessmachadoshow got @msgrant_smith banned from court. I didn't take this video, but it was went to me on a Sunday afternoon in May after I'd set up @DoctorTurtleboy's chair
Show more

Watch again

**What's happening**

**The Jim Rome Show**
Sports · 45 minutes ago

Politics · Trending
**FIRED**
333K posts

News · Trending
**#Maine**

Trending in United States
**Blake Lively**
Trending with Lady Deadpool

Entertainment industry · Trending
**California to Texas**
16.5K posts

Show more

0:00

○ 55      ⟲ 9      ♡ 205      �ili 37K      🔖  ↑

Jessica Machado ✓    ···
@jessmachadoshow

This video was entered into evidence and instrumental in me getting protection from Grant.

Have to admit, I hate watching this but it's a good reminder that you have to fight to stop people like Grant from attacking you because if you don't, they will.

12:45 PM · Jul 15, 2024 · **3,915** Views

○ 7      ⟲ 2      ♡ 174      🔖 1      ↑

Terms of Service   Privacy Policy   Cookie Policy   Accessibility   Ads info   More···   © 2024 X Corp.

Post your reply          · : ·

Butt Dial McCabe @McAlbuht · Jul 15    ···
We (i) love you

○ 1      ⟲      ♡ 9      ili 245      🔖  ↑

Mimi @j9sween1 · Jul 15
I love that he can't go to courthouse anymore. He treats everyone that way.. good job Jessica!

○      ⟲      ♡ 9      ili 193      🔖  ↑

Laila Mickelwait ✓ @LailaMickelwait          Ad ···
*TAKEDOWN* reveals the never-before-told inside story of how P*rnhub was exposed for enabling and profiting from countless videos of child rape and trafficking. But the fight isn't over yet! Victims deserve justice.

Watch & share this video, then learn more at the link below.

Don Keavany          ···
@DKeavany

💬 Messages

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CRIMINAL ACTION
N0. 2282CR00117

### COMMONWEALTH

### vs.

### KAREN READ

## FINDINGS AND ORDER ON JUROR DOE'S EMERGENCY MOTION TO EXTEND JULY 8, 2024 IMPOUNDMENT ORDER

This matter came before the Court on the emergency motion of Juror Doe, to extend the July 8, 2024 Impoundment Order entered by this court. Upon review of the motion and supporting documents, including the Affidavit of Juror Doe, the Court makes the following findings and Order:

1. This case has garnered significant and divisive attention in Massachusetts and across the nation.

2. Individuals associated with this case have been charged with intimidation, which charges remain pending.

3. Juror Doe has submitted a detailed affidavit which I find to be credible.

4. Juror Doe is in reasonable fear for their safety and the safety of their family if the list of jurors is made available to the public.

5. Through their affidavit, Juror Doe has established that publication of the list identifying the names of the empaneled jurors will present a real and present risk of personal harm to jurors and to the integrity of their service.

6. Through their affidavit, Juror Doe has established that there is a continuing risk of immediate and irreparable injury should the jury list be made available to the public at this time.

7. Through their affidavit, Juror Doe has established good cause to extend the Impoundment Order, dated July 8, 2024, until and unless otherwise ordered by the Court.

8. This Order shall not preclude any juror from identifying himself or herself and/or from speaking to the public about his/her jury service.

**SO ORDERED,**

/s/ Beverly J. Cannone

Beverly J. Cannone
Justice of the Superior Court

Date: July 18, 2024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____     )
                                    )
KAREN READ,                         )
              Petitioner            )
                                    )
v.                                  )        No. 25-CV-10399-FDS
                                    )
NORFOLK COUNTY SUPERIOR             )
COURT, MASSACHUSETTS                )
ATTORNEY GENERAL,                   )
              Respondents           )
                                    )
_____     )
```

## REPLY TO RESPONDENT NORFOLK COUNTY SUPERIOR COURT'S OPPOSITION TO PETITION FOR A WRIT OF HABEAS CORPUS

I.    **Introduction**

On the first issue raised by Ms. Read's petition, namely the existence of manifest necessity to support a mistrial, the question pending before this Court is whether, as a matter of federal constitutional law, a criminal defendant may be retried where (a) the record reflects no consideration by the court of any alternatives to the declaration of a mistrial, (b) the trial court never consulted with counsel regarding its intention to declare a mistrial or even mentioned the possibility before declaring a mistrial in open court, and (c) the court precipitously declared a mistrial and discharged the jury without evidencing any consideration of the defendant's "valued right . . . to have [her] guilt or innocence determined at" a single trial. *Brady v. Samaha*, 667 F.2d 224, 230 (1st Cir. 1981). Under the binding First Circuit precedents cited below and in her initial Memorandum, Ms. Read respectfully submits that the answer is clearly no.

1

In an effort to avoid this result, Respondent largely relies upon procedural arguments that are directly contradicted by binding precedent. Whether there was manifest necessity to support a mistrial is a question of law, not a "factual finding" for which deference to the state court is due. The First Circuit expressly so held in *Brady*. *See* 667 F.2d at 229 n.6. Similarly, in the context of this petition under 28 U.S.C. § 2241, § 2254's restrictions on the scope of this Court's habeas review, central to the Supreme Court's decision in *Renico v. Lett*, 559 U.S. 766 (2010) that is so heavily relied upon by Respondent, are clearly inapplicable. Respondent concedes as much while, at the same time, relying upon caselaw heavily dependent on those very restrictions.

Finally, Respondent (like the SJC) takes the position that no possible showing, no matter how compelling, that the jury unanimously, unconditionally, and with finality agreed to acquit a defendant but failed to announce such acquittal in open court could ever entitle the defendant to a post-trial judicial inquiry – whether by the federal or state court – to substantiate the fact of an acquittal when that acquittal was reached but not announced. Post-verdict juror *voir dires* are required when a defendant like Ms. Read has met her burden of production showing the high probability that the jury reached a final unanimous verdict of not guilty and no precedent cited by Respondent prohibits either this Court or the state court judge from conducting such an inquiry.

## II.     Standard of Review

As noted in Ms. Read's opening Memorandum, "[o]rdinarily, a motion to dismiss on double jeopardy grounds rests on a pure question of law that [the Court] review[s] de novo." Dkt. 2 at 13 (quoting *United States v. Candelario-Santana*, 977 F.3d 146, 154 (1st Cir. 2020)). But Respondent seeks to avoid the merits of the legal issue, repeatedly citing purported "factual findings" by the state courts on the issue of manifest necessity. Dkt. 18 at 1, 14, 18. But this

underpinning of the Opposition is contrary to binding First Circuit law holding that "the inquiry

into the [trial] judge's discretion and the existence vel non of manifest necessity" is "a question

of law or, at most, a mixed question of law and fact," "***not*** a habeas corpus factual review."

*Brady*, 667 F.2d at 229 n.6 (emphasis added).

Along similar lines, while nominally acknowledging that this § 2241 petition is not

subject to the strictures of § 2254, enacted in the Antiterrorism and Effective Death Penalty Act

("AEDPA"), Dkt. 18 at 11 & 16 n.7, Respondent's argument proceeds as if this were a § 2254

case. Its leading authority, *Renico v. Lett*, arose in that context. Respondent's contention that

*Renico* "is not distinguishable on that basis" because its "rejection of a multi-factor test for

determining whether a judge has exercised sound discretion in declaring a mistrial[] was based

on the Court's double jeopardy jurisprudence, separate and apart from the additional deference

required under section 2254," simply cannot be squared with the *Renico* opinion itself.

The very first words of the *Renico* Court's legal analysis were:

> It is important at the outset to define the question before us. That
> question is not whether the trial judge should have declared a
> mistrial. It is not even whether it was an abuse of discretion for
> her to have done so—the applicable standard on direct review.
> The question under AEDPA is instead whether the determination
> of the Michigan Supreme Court that there was no abuse of
> discretion was "an unreasonable application of . . . clearly
> established Federal law." § 2254(d)(1).

559 U.S. at 772-73. Notably, the Court characterized this as "a substantially higher threshold for

obtaining relief than [the] *de novo*" standard applicable here. *Id.* at 773 (citation omitted).

*Renico* repeated in its closing words, "[w]hether or not the Michigan Supreme Court's opinion

reinstating [the petitioner's] conviction in this case was *correct,* it was clearly *not*

*unreasonable*." *Id.* at 779 (emphasis in original).

3

In addition to imposing an onerous standard of review on petitioners, § 2254 also severely restricts the scope of authority on which they may rely. It requires "an unreasonable application of . . . clearly established Federal law, ***as determined by the Supreme Court of the United States***." *Id.* at 772 (quoting § 2254(d)(1)) (emphasis added). It was based on this statutory provision, which it bears repeating Respondent concedes is inapplicable here, that *Renico* "expressly rejected," Dkt. 18 at 15, the petitioner's reliance on Sixth Circuit precedent analyzing "whether the judge (1) heard the opinions of the parties' counsel about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly." *Renico*, 559 U.S. at 778-79 (citation omitted). The Sixth Circuit caselaw did "not constitute 'clearly established Federal law, as determined by the Supreme Court,' so any failure to apply that decision [could not] independently authorize habeas relief under AEDPA." *Id.* at 779 (citation omitted).

As the authorities cited in Ms. Read's opening Memorandum make clear, the First Circuit, like the Sixth Circuit, has adopted this three-factor inquiry regarding whether the declaration of a mistrial was supported by manifest necessity. *See* Dkt. 2 at 15-21 (citing *United States v. Garske*, 939 F.3d 321, 334 (1st Cir. 2019); *Brady*, 667 F.2d at 229; *United States v. Ramirez*, 884 F.2d 1524, 1529-30 (1st Cir. 1989); *United States v. Toribio-Lugo*, 376 F.3d 33, 39 (1st Cir. 2004)). Respondent appears to incorrectly take *Renico* as license to ignore the foregoing authority, which it does not cite at all on the issue of manifest necessity. In the context of this § 2241 petition, however, the First Circuit's construction of federal Double Jeopardy protections is binding on this Court.

4

III.    **Re-Prosecution Is Barred Because There Was No Manifest Necessity to Declare a Mistrial on Counts on which the Jury Was Not Deadlocked**

The question facing this Court is whether, applying the foregoing First Circuit precedent, the Commonwealth has satisfied its burden of establishing manifest necessity for a mistrial. The answer is clearly no.

A.    The Record Indisputably Establishes That the Trial Court Did Not Consult Counsel Regarding the Declaration of a Mistrial

First, the record makes clear that the trial court "did not give counsel an opportunity to object or discuss with them the advisability of a mistrial." *Ramirez*, 884 F.2d at 1529. Neither the court nor either party even mentioned the possibility of a mistrial until the trial judge *sua sponte* declared one in the presence of the jury. Respondent argues that, "assuming federal law" requires consultation with counsel, Dkt. 18 at 16, counsel for Ms. Read "could have objected, or at least have asked to be heard on the matter . . . while waiting for the jurors to enter the courtroom." *Id.* at 17.[1] It bears repeating that this was a mere 30-second interval, during which counsel could not possibly have known precisely when the jury would arrive, or, once they did, what the court intended to say to the jury, whether the court intended to question the jury, and when the court would consult with counsel before deciding on how to respond to the jury note. *See* Dkt. 2 at 17.

In any event, Respondent's claim that the mere theoretical possibility of an uninvited objection during this interval was sufficient is foreclosed by First Circuit precedent. In *Ramirez*,

---

[1] Respondent's suggestion that counsel had a sufficient opportunity to be heard in response to the first two jury notes overlooks the fact that, at that point, the issue was whether a *Tuey-Rodriguez* instruction, sought by the defense alone, should be given to break any impasse whether on one or more charges. *See infra* pages 7-8.

5

after taking witness testimony regarding a possible defect in the jury venire, the trial court

declared a mistrial "without consulting defense counsel or the prosecutor." 884 F.2d at 1527.

"The jury was then brought in, thanked for their services and discharged." *Id.* The First Circuit

held that this did not constitute a sufficient opportunity to object for Double Jeopardy purposes,

even though counsel (no less than in the present case) could have lodged an objection or asked to

be heard after the court stated its intention to declare a mistrial. In fact, in *Ramirez*, unlike in the

present case, the court had, prior to taking the witness testimony, already asked counsel for their

position regarding a mistrial, putting them on notice of the issue. *See id.* at 1526. Similarly, in

*Brady*, the trial court, shortly after appointing standby counsel, "heard the defendants . . . outside

the presence of the jury" regarding an order it had issued "to govern the conduct of . . . the trial."

667 F.2d at 227. When the defendants became argumentative, the court "order[ed] a mistrial."

*Id.* Given that the jury was not present, defendants or standby counsel could theoretically have

objected. But the First Circuit nonetheless found insufficient consultation with counsel. *See id.*

at 229. These precedents are dispositive here. In fact, unlike in the present case, the trial court

in *Ramirez* and *Brady* stated its intent to declare a mistrial ***before*** calling in the jury, providing

more of an opportunity to object than that afforded to Ms. Read.

      Contrary to Respondent's suggestion, whether counsel had an adequate opportunity to

object is a question for this Court to decide applying the foregoing First Circuit caselaw to the

transcripts and video footage of the proceedings (which Respondent does not in any respect

question the accuracy of). In doing so, the Court is not bound by any purported "credibility

determination[]," Dkt. 18 at 18, by the trial court. *See United States v. Donald*, 84 F.4th 59, 68

(1st Cir. 2023) (rejecting district court finding as to officer's statement during recorded

6

interrogation as clear error because Court's "review of the recording" led it "to conclude that it [wa]s clear that" the officer made the disputed statement); *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (granting summary judgment on grounds that "[r]espondent's version of events [wa]s so utterly discredited by the [videotape recording of the car chase at issue] that no reasonable jury could have believed him" and commenting that the "Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape").

B.     The Record Reflects No Consideration by the Trial Court of Any Alternatives to a Mistrial

The record is equally insufficient regarding the requirement that the trial court consider alternatives to a mistrial.  First Circuit law could hardly be clearer that, "[w]here there is a viable alternative to a mistrial and the [trial] court fails adequately to explore it, a finding of manifest necessity cannot stand."  Dkt. 2 at 21 (quoting *Toribio-Lugo*, 376 F.3d at 39).[2]  The key here is that the alternatives considered must relate to the prospect of a mistrial.  "[T]he test is not whether the judge considered that [s]he had a potential problem on h[er] hands but rather whether [s]he accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding."  Dkt. 2 at 21 (quoting *Brady*, 667 F.2d at 230).  Accordingly, Respondent's reliance upon the trial court's consideration, in response to the first and second jury notes, of a *Tuey-Rodriguez* instruction is insufficient as a matter of law.  On both occasions, the trial court asked for counsels' views on a single legal issue: "whether there ha[d] been due and thorough deliberations" sufficient to support the giving of a *Tuey-Rodriguez* charge under

---

[2] Again, Respondent, despite this clear binding precedent, merely "assum[es]" that federal law requires consideration of alternatives to a mistrial.  Dkt. 18 at 16.

7

state law.  (R. 251; *see also* R. 261).  "But there is nothing in the record to indicate that the judge

was considering a mistrial at that time."  *Brady*, 667 F.2d at 230.

 Under binding First Circuit caselaw, the trial court's consideration of a distinct legal

issue, *i.e.*, whether state law permitted a *Tuey-Rodriguez* instruction, did not constitute the

required consideration of alternatives **to a mistrial**.  *See id.* at 230 (rejecting state court's

conclusion that trial judge's "instruction to the defendants to read a case on contempt," in

response to conduct similar to that which ultimately resulted in the mistrial declaration, was

sufficient); *Toribio-Lugo*, 376 F.3d at 39 (holding that district court "never exhausted" the

alternative of proceeding with 11 jurors, even though it had "presented the lawyers with" the

options of "postpon[ing] the proceedings until the vanished juror could be located or . . .

proceed[ing] with a jury of eleven," because "[t]he court never offered the [defendant] a choice

between proceeding with eleven jurors or accepting a mistrial").

 As the foregoing authorities make clear, the sufficiency of the trial court's consideration

of alternatives is a question of federal, not state, law.  In a habeas case, state law, of course,

informs the alternatives available to the court, but neither the trial court nor the SJC held that

state law ***precluded*** inquiry (setting aside whether such inquiry is required as a matter of state

law) into the existence of any partial verdicts on separately charged counts.  *See Read v.

Commonwealth*, 495 Mass. 312, 321 (2025) ("Rule 27(b) . . . gives a trial judge discretion to

require a jury to return a verdict for charges on which they have unanimously agreed before

declaring a mistrial." (citation omitted)).  Indeed, they could not have reached any such

conclusion because it would be contrary to both the applicable rule and binding SJC precedent.

*See* Mass. R. Crim. P. 27(b) ("The judge may declare a mistrial as to any charges upon which the

8

jury cannot agree upon a verdict; provided, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded."); *A Juvenile v. Commonwealth*, 392 Mass. 52, 55 n.1 (1984) ("Where a complaint or indictment, in multiple counts, charges multiple crimes . . . a general verdict could be returned as to one of the counts, despite deadlock on the other counts."). Accordingly, inquiry regarding partial verdicts was an available alternative. *See Dunkerly v. Hogan*, 579 F.2d 141, 147 (2d Cir. 1978) (observing in finding lack of manifest necessity that the trial judge did not "suggest that the alternative of a short continuance would be . . . violative of any state law"). Importantly, the Court need not hold that the trial judge was required to pursue that alternative. Rather, it is the trial court's failure to even consider available alternatives that precludes a finding of manifest necessity.

C.   The Commonwealth Has Not Satisfied Its Heavy Burden of Establishing Manifest Necessity based on the Existence of a "Genuine" Deadlock

Ms. Read maintains that the foregoing failure to consult counsel or consider alternatives alone precludes a finding of manifest necessity and that, in these circumstances, no deference is due to the trial court's declaration of a mistrial. As the Supreme Court has made clear, "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to h[er], the reason for such deference . . . disappears." *Washington*, 434 U.S. at 510 n.28. Here, "[w]ith the record barren of any hint whatsoever that the judge was aware of the double jeopardy implications of h[er] decision," the Court cannot find that "h[er] discretion was sound." *Brady*, 667 F.2d at 230-31; *see also id.* at 229 (distinguishing *Washington*, where the "trial judge listened to counsel, deliberated, and expressed his concern for the double jeopardy implications of his ruling, thus persuading the Supreme Court that he had acted responsibly in light of the

9

importance of the defendant's constitutional right").  At the very least, the trial court's discretion (assuming *arguendo* any deference is due) cannot be as standardless as Respondent suggests. Rather, as the First Circuit has repeatedly held, the court's exercise of discretion must be cabined by factors designed to ensure "careful consideration of the valued right of the defendants to have their guilt or innocence determined at" a single trial.  *Id.* at 230.

As Respondent now acknowledges for the first time, the Commonwealth, as the party seeking a second trial, unequivocally bears the "heavy" burden to establish that the requisite careful consideration occurred.  *Washington*, 434 U.S. at 505; Dkt. 18 at 15.  Notwithstanding the clear binding precedent on this issue and Ms. Read's raising it repeatedly, neither the trial court, the SJC, nor the Commonwealth even mentioned the appropriate allocation of this burden in the state court proceedings.  Instead, the SJC repeatedly read ambiguous aspects of the record in favor of the Commonwealth and against Ms. Read.  *See, e.g.*, *Read*, 495 Mass. at 321 (observing that neither of first two jury notes "suggested the jury had reached, or could reach, consensus on any subset of the charges"); *id.* at 325 ("[T]here is no indication that inviting defense counsel to participate in" consultation regarding third note "would have produced any fruitful alternatives." (citation omitted)).  Respondent's contention that a "deadlocked jury is the type of manifest necessity sufficient to meet" the Commonwealth's "burden," of course, simply begs the question as to whether such deadlock has been established.  Dkt. 18 at 15; *see Candelario-Santana*, 977 F.3d at 158 ("The key to this principle . . . is that the jury must be *genuinely* deadlocked." (emphasis in original)).  The SJC's reversal of the burden on this issue constitutes a clear error of law that, in itself, violated Ms. Read's constitutional rights.  *See, e.g.*, *United States v. McIntosh*, 380 F.3d 548, 554 (1st Cir. 2004) ("An error of law, of course, is

tantamount to an abuse of discretion."); *Candelario-Santana*, 977 F.3d at 161 ("[A]mbiguous

verdicts . . . must be construed in favor of the defendant.").

Notwithstanding its provision of a *Tuey-Rodriguez* charge earlier in the day, at the crucial

point after the jury sent its final note, the "trial court took no steps to clarify" the scope of the

jury's impasse. *Candelario-Santana*, 977 F.3d at 160. In fact, while the prior instruction

encouraged the jury to reach a verdict, at no time did the trial judge do anything at all to confirm

whether the jury had reached an impasse on all counts, as opposed to merely some subset of the

counts (as the post-trial affidavits powerfully indicate is the case) and, post-trial, both the trial

judge and Respondent have been unwavering in their opposition to a *voir dire* of the jurors so

that there can be certitude as to whether the jury reached a final, unambiguous, collective, and

unanimous decision that acquitted Ms. Read of second-degree murder and leaving the scene of a

collision.

D.    The Court Should Reject Respondent's Alternative Argument that Ms. Read
      Consented to the Mistrial

The Court should reject Respondent's alternative contention, which the SJC did not rule

upon, that Ms. Read's counsel consented to the mistrial. The sole authority relied upon in

support of that argument, *United States v. DiPietro*, 936 F.2d 6 (1st Cir. 1991), is readily

distinguishable. *DiPietro* did not involve a jury deadlock. Instead, the court declared a mistrial

after "the government asserted that the guilty pleas and convictions of" other alleged participants

in the defendant's criminal conduct "constituted evidence that all the elements of the accusations

against [the defendant] had been proved, thus using their convictions for purposes other than

credibility." *Id.* at 7. After a recess for lunch, the court "summoned counsel and the court

reporter, and took notes while the reporter read back the government's rebuttal argument," after

11

which the attorneys withdrew "with no further comment." *Id.* at 8.  Upon reconvening, "the court declared a mistrial and excused the jury." *Id.*

*DiPietro* is inapposite here for a number of reasons.  First, "the error occurred several hours before the declaration of a mistrial" and "[d]efense counsel was arguably on inquiry notice when the court summoned the attorneys for conference and reviewed the erroneous government argument to the jury." *Id.* at 11.  Here, by contrast, the trial court called in the jury immediately after informing counsel that the jury was at an impasse and before it even disclosed the contents of the note to counsel.  The jury arrived a mere 30 seconds later.  Counsel cannot reasonably be expected to have anticipated the *sua sponte* mistrial declaration given (a) the court's established practice of reviewing jury notes with them and providing an opportunity to respond – a continuing, predictable prior practice that counsel had every reason to believe would not be varied from at this pivotal moment of the trial and (b) 40 years of SJC precedent guaranteeing them a "full opportunity to be heard" before a mistrial was declared.  Dkt. 2 at 17 (citing cases).  Second, while the *DiPietro* Court found "ample opportunity to object when the mistrial decision was declared," such an opportunity to object in the presence of the jury is not sufficient where, as here, a mistrial is declared for a jury deadlock.  As one authority heavily relied upon by *DiPietro* observed, "[w]hen defense counsel objects in the jury's presence after a mistrial declaration due to jury deadlock, he endures the risk that the jury will hold him responsible for compelling them to continue deliberations contrary to the opinion of both judge and jury." *Camden v. Cir. Ct. of Second Jud. Cir.*, 892 F.2d 610, 615 n.6 (7th Cir. 1989).  Finally, while the *DiPietro* Court noted counsel's failure to object after the jury was dismissed in combination with the other prior opportunities to object, such an after-the-fact opportunity, standing alone, does not rise to the

12

level of consent.  *Cf. Candelario-Santana*, 977 F.3d at 162 (noting that district court "only addressed counsel after reading and confirming the verdict in open court to ask if there was '[a]nything else' before discharging the jury").  Moreover, the *post hoc* discussion in *DiPietro*, unlike that at issue here, specifically related to the "explanation of the reason for a mistrial," substantially increasing the likelihood that counsel would have raised any objection they had regarding that issue.

Finally, Respondent's characterization of *DiPietro* is contrary to the string of First Circuit precedents relied on above.  If counsel's mere failure to object to a *sua sponte* declaration of mistrial upon which counsel was not asked to comment amounted to consent, then the defendants in *Brady*, *Ramirez*, and *Candelario-Santana* would have been found to have consented to the mistrials, obviating the need for any manifest necessity analysis.  Clearly, that is not the law in the First Circuit.

## IV. The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution

As noted in Ms. Read's opening Memorandum, "***whether an acquittal has occurred for purposes of the Double Jeopardy Clause is a question of federal, not state, law***."  Dkt. 2 at 25 (quoting *McElrath v. Georgia*, 601 U.S. 87, 96 (2024)).  This, in itself, is sufficient to reject Respondent's argument that "[t]he SJC's instruction on what constitutes a valid jury verdict . . . is definitive and binding in this habeas action."  Dkt. 18 at 20.  The operative question, under federal law, is whether "there has been any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense."  *McElrath*, 601 U.S. at 96 (citation omitted).  While "operation of state law" may inform whether the jury reached such a conclusion, *id.*, *i.e.*, by

13

defining what the jury was required to find, this Court may not defer to state procedural requirements regarding the form that any such finding must take.

In *McElrath*, for example, the Supreme Court of Georgia had vacated a verdict finding the defendant not guilty by reason of insanity under a state law "repugnancy" doctrine which, the state court held, rendered the not guilty verdict a "nullity" that "should not have been accepted by the trial court." *Id.* at 95-96 (citation omitted). The Supreme Court reversed, reaffirming that, "[b]ecause of" the Double Jeopardy caselaw's "focus on substance over labels, a State's characterization . . . of [a ruling] is not binding." *Id.* at 96 (citation omitted). In other words, "it is not dispositive whether a factfinder incanted the word acquit; instead, an acquittal has occurred if the factfinder acted on its view that the prosecution had failed to prove its case." *Id.* at 96 (citation omitted).

Respondent maintains that form must control over substance in the context of a jury acquittal, though it concededly does not for judicial acquittals. *See* Dkt. 18 at 22 n.11. This contention is inconsistent with *McElrath* itself (which refused to elevate form over substance in the context of a jury acquittal), as well as the Supreme Court's clear instruction that "[t]he Double Jeopardy clause . . . prohibits reexamination of a court-decreed acquittal to the same extent it prohibits reexamination of an acquittal by jury verdict." Dkt. 2 at 26 (quoting *Smith v. Massachusetts*, 543 U.S. 462, 467 (2005)); *see also Ball v. United States*, 163 U.S. 662, 671 (1896) ("However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense."). Respondent also ignores the Supreme Court caselaw finding jury acquittals "***implied*** by a conviction on a lesser included offense." Dkt. 2 at 26 (quoting *Price v. Georgia*, 398 U.S. 323,

14

329 (1970)); *see also Green v. United States*, 355 U.S. 184, 191 (1957) ("[W]e believe this case can be treated no differently, for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: 'We find the defendant not guilty of murder in the first degree but guilty of murder in the second degree.'"). In one such implied acquittal case, the Sixth Circuit relied upon the very same language from the Supreme Court's *Martin Linen* opinion that Respondent criticizes the Petitioner for citing here: "we must determine whether the ruling of the judge *(or jury)*, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charges." *Terry v. Peers*, 786 F.2d 1166, at *3 (6th Cir. 1986) (unpublished) (emphasis added). As Ms. Read's initial Memorandum noted, and Respondent fails to address, in the rare situation presented here, where the jury reached a final decision that the defendant is not guilty but failed to accurately announce that verdict, federal courts have acknowledged the substantive acquittal, notwithstanding the lack of form. *See* Dkt. 2 at 28 (citing *United States v. Dotson*, 817 F.2d 1127, 1129 (5th Cir. 1987); *United States v. Stauffer*, 922 F.2d 508, 511 (9th Cir. 1990)).

*Blueford v. Arkansas*, 566 U.S. 599 (2012), as previously explained, was decided based on a lack of finality, not form. *See* Dkt. 2 at 27-28; *Blueford*, 566 U.S. at 608 (finding that foreperson's report before jury was sent back to continue deliberations "lacked the finality necessary to amount to an acquittal . . . , quite apart from any requirement that a formal verdict be returned or judgment entered").[3] Respondent admits as much, but faults the Petitioner for making "a flawed assumption that the purported juror statements at issue here reflect the jury's

---

[3] It has been clear for more than 100 years that the formal entry of judgment is not required for a jury acquittal to prevent retrial under the Double Jeopardy Clause. *See Ball*, 163 U.S. at 671.

position 'at the end of deliberations.'" Dkt. 18 at 23. As an initial matter, the affidavits at issue were all executed post-trial, and none suggests that the agreement to acquit Ms. Read was tentative or changed at any point. In fact, one juror specifically recounted that, "after the jury was excused and aboard the bus, many of the jurors appeared uncomfortable with how things ended, wondering, *Is anyone going [to] know that we acquitted [Karen Read] on Count 1 and 3?* (R. 293). More fundamentally, to the extent there is any doubt regarding the finality of the jurors' agreement, the remedy is to conduct a *voir dire* as discussed *infra*.

## V.     Alternatively, the Defense Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Ms. Read

Ms. Read has clearly satisfied her burden of production to establish an entitlement to further inquiry regarding her acquittal. Contrary to Respondent's characterization, there is no indication in the affidavits submitted by Ms. Read that the jury's determination was "preliminary" or the result of a mere "straw poll." Dkt. 18 at 23; *see, e.g.*, (R. 287) ("Juror A told [counsel] that the **result** of the deliberations was that the jury unanimously agreed that Karen Read is NOT GUILTY of Count 1 (second degree murder)." (emphasis added)); (R. 293) ("Juror D explained that the jury reached NOT GUILTY **verdicts** on Count 1 and Count 3 . . . . Juror D, without hesitation, said in substance, *Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3. Because that's what happened*." (emphasis added)). While Respondent now suggests doubt regarding the veracity of the juror statements, referring no fewer than 16 times to "purported" jurors or juror statements, the fact remains that it has presented no contrary evidence since the July 8, 2024 filing of Ms. Read's motion to dismiss. In fact, to the contrary, the Commonwealth was contacted by an individual who identified

16

JA0590

him/herself "as a juror by full name and seat number," saying s/he could "confirm unanimous on charges one and three, as not guilty." (R. 325). In any event, both state courts assumed the truth of the juror statements, *see Read*, 495 Mass. at 327 n.14, which, on their face, entitle Ms. Read to further inquiry.

Ultimately, there is only one way to determine whether the jury in this case was, in fact, "unable to reach a verdict," Dkt. 18 at 11 (quoting *Renico*, 559 U.S. at 774), or by contrast had reached a partial verdict: through a *voir dire* conducted by this Court or the trial court.[4] Respondent, notably, does nothing to dispute the stunning implications of the SJC decision: "no defendant claiming that the jury acquitted her but failed to announce that verdict would be entitled to further inquiry, no matter how clear or well-supported her claim. . . . [E]ven if all 12 jurors submitted affidavits saying they unanimously and finally agreed to acquit the defendant, their failure to announce that verdict (and the trial court's failure to inquire) would take precedence over the defendant's fundamental constitutional protection against Double Jeopardy." Dkt. 2 at 28-29. Respondent cites no precedent or rationale convincingly supporting such a stark result.

Calling the jurors into Court and asking whether they had reached a final, unanimous verdict to acquit Ms. Read would be accompanied by the same "solemnity," if not more, that generally attends public announcement of verdicts. Dkt. 18 at 23. The answer to that question would, of necessity, dispel Respondent's concern that any such decision was merely preliminary,

---

[4] While Respondent suggests this Court should defer to the state court "in the interest of comity," Dkt. 18 at 28 n.15, it cites nothing that prohibits this Court from conducting a hearing to determine whether retrial would violate Ms. Read's rights under the United States Constitution.

as opposed to final.[5] It would also confirm what the defense affidavits already expressly state: that all jurors, not just some, agreed Ms. Read is not guilty. Those statements were widely publicized more than seven months ago and have not been contradicted in any respect by any of the seven other jurors. Respondent's suggestion that the remaining jurors may have let the five juror statements go uncorrected for fear of drawing "further attention to themselves," Dkt. 18 at 27 n.13, might explain why any one or two jurors failed to come forward, but the defense respectfully submits it cannot convincingly explain the silence of all seven. In any event, it is a matter readily discernable form the requested *voir dire*, which could be conducted anonymously. Respondent's focus on a few purported inconsistences among the juror statements overlooks the overarching consistency: that the jury unanimously acquitted Ms. Read of two of the three counts pending against her, including the count alleging second-degree murder. The inconsistencies cited by Respondent simply pale in comparison and are irrelevant to the Double Jeopardy issue. *See* Dkt. 18 at 26 n.12 (noting one juror reported the final vote on Count 2 as 8-4, whereas another reported it was 9-3).

Asking the jury whether it reached a verdict does not infringe upon deliberations. Rather, it is Respondent that seeks to inject issues regarding deliberations into the inquiry by raising peripheral, and constitutionally irrelevant, matters regarding the juror statements. But Respondent fails to articulate how any such peripheral issues could change the inevitable constitutional effect of a statement by all 12 jurors that they reached a final, unanimous

---

[5] At present, Respondent's suggestion that one or more jurors may have changed their mind *is* "merely hypothetical." Dkt. 18 at 21 n.10. The juror statements reflected in the defense affidavits indicate no such change, nor has the Commonwealth presented any evidence of one in the last seven-plus months.

conclusion that Ms. Read is not guilty of murder. *See McElrath*, 601 U.S. at 97 ("We simply cannot know why the jury in [this] case acted as it did, and the Double Jeopardy Clause forbids us to guess."). Even assuming *arguendo* and contrary to the Petitioner's contention that the requested *voir dire* would violate Fed. R. Evid. 606, Respondent does not dispute that such "evidentiary rules cannot extinguish a criminal defendant's fundamental constitutional rights." Dkt. 2 at 32 (citing *United States v. Villar*, 586 F.3d 76, 87 (1st Cir. 2009)).

Ms. Read, who absent intervention of this Court will stand trial for murder beginning April 1, self-evidently has a powerful interest in determining whether she was, in fact, acquitted of that offense by a jury of her peers. But that is not the only interest at stake here. "Democracies die behind closed doors." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002). As the SJC observed in a case cited by Respondent, "an inflexible rule," like that imposed here, "excluding all juror testimony . . . achieves stability at the expense of doing justice between the parties a result not consistent with the ideal of trial by an impartial jury." *Commonwealth v. Fidler*, 377 Mass. 192, 197 (1979). In a case that has generated enormous media attention, at a time when confidence in the judiciary is of the utmost importance, the public has a strong interest in a full and fair hearing of this matter, as well as in giving effect to any unanimous decisions reached by 12 of Ms. Read's fellow citizens.

Respectfully Submitted,
KAREN READ
By Her Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO #519480

19

20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Michael Pabian**
Michael Pabian, Esq.
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq.
Admitted *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

Dated: February 28, 2025

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, February 28, 2025, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.

20

JA0594

<pre>
 1                     UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3

 4    KAREN READ,                       )
                          Plaintiff,    )
 5                                      )  Civil Action
                                        )
 6    vs.                               )  No. 25-10399-FDS
                                        )
 7                                      )
      NORFOLK COUNTY SUPERIOR COURT     )
 8    and                               )
      MASSACHUSETTS ATTORNEY GENERAL,   )
 9                          Defendant.  )

10

11    BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR

12

13                          MOTION HEARING

14

15

16           John Joseph Moakley United States Courthouse
                        Courtroom No. 10
17                       1 Courthouse Way
                         Boston, MA 02210
18

19

20                        March 5, 2025
                          9:30 a.m.

21

22

23                      Valerie A. O'Hara
                       Official Court Reporter
24        John Joseph Moakley United States Courthouse
                        1 Courthouse Way
25                      Boston, MA 02210
                   E-mail: vaohara@gmail.com
</pre>

1    APPEARANCES:

2    For the Petitioner:

3        Martin G. Weinberg, PC, by MARTIN G. WEINBERG,
     ESQ., 20 Park Plaza, Suite 1000, Boston, Massachusetts
4    02116;

5        Michael Pabian Law Office, LLC, by MICHAEL PABIAN,
     ESQ., 20 Park Plaza, Suite 1000, Boston, Massachusetts
6    02116;

7        Werksman Jackson & Quinn LLP, by ALAN J. JACKSON,
     ESQ., 888 West Sixth Street, Fourth Floor
8    Los Angeles, California 90017;

9        DAVID R. YANNETTI, ESQ., 44 School St., Suite 1000A
     Boston, Massachusetts 02108;

10

11   For the Respondent:

12       Norfolk District Attorney's Office, by CALEB J.
     SCHILLINGER, ESQ., 45 Shawmut Road, Canton,
13   Massachusetts 02021;

14       Office of the Attorney General, by THOMAS E.
     BOCIAN, ESQ., One Ashburton Place, Boston, Massachusetts
     02108.

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2      THE CLERK:  All rise.  Court is now in session in

3  the matter of Karen Read vs. Norfolk County Superior Court,

4  et al, Civil Action Number 25-10399.

5      Would counsel please identify themselves for the

6  record, starting with the petitioner.

7      MR. WEINBERG:  Good morning, your Honor,

8  Martin Weinberg on behalf of the petitioner Karen Read, who

9  sits two seats to my left, along with co-counsel,

09:30AM 10  Michael Pabian, David Yannetti, and Alan Jackson.

11      THE COURT:  Good morning, all.

12      MR. SCHILLINGER:  Good morning, your Honor,

13  Caleb Schillinger for respondent Norfolk County Superior

14  Court.

15      MR. BOCIAN:  Good morning, your Honor,

16  Thomas Bocian for the Massachusetts Attorney General and

17  the Norfolk Superior Court.

18      THE COURT:  Good morning, all.  All right.  This

19  is a hearing on a petition for habeas corpus.  I read the

09:31AM 20  filings.  I want to make sure that we're in agreement on

21  the basic framework, which I think we are.

22      This is a petition under Section 2241.  The

23  petitioner has been released on her own recognizance by the

24  state court, which is a form of custody.  She's not in

25  custody pursuant to a judgment of a state court, so the

1    2254 doesn't apply, we're under 2241.  The Court has

2    subject matter jurisdiction.  The petitioner has exhausted

3    her state court remedies, and none of the extension

4    doctrines, such as *Younger v. Harris* apply, so it presents

5    basically the federal constitutional question of whether

6    her retrial would violate The Fifth Amendment right to

7    avoid double jeopardy as incorporated in the Fourteen

8    Amendment that apply to the states.

9           That is a legal question that I am to consider

09:32AM 10   de novo, all that by way of again trying to make sure we

11   are in agreement on those points.

12          Mr. Weinberg, are you taking the lead here?

13          MR. WEINBERG:  Yes, I am, your Honor.

14          THE COURT:  Do you disagree with the way I've

15   framed the question?

16          MR. WEINBERG:  I agree with the entirety of the

17   way you framed the question, your Honor.

18          MR. SCHILLINGER:  Respondent also agrees, your

19   Honor.

09:32AM 20          THE COURT:  With that, Mr. Weinberg, I'll hear

21   from you.

22          MR. WEINBERG:  Thank you, may I address you from

23   the podium?

24          THE COURT:  Yes.

25          MR. WEINBERG:  Thank you.  This petition presents

1    to your Honor two legal challenges to the state court

2    decisions by both the trial court and later by the Supreme

3    Judicial Court.

4         The first legal challenge is whether or not there

5    was manifest necessity for the trial court's sui sponte

6    declaration of a mistrial, and we contend, and I'll argue

7    that second, with your Honor's permission, that that

8    decision conflicts with clear-cut First Circuit

9    jurisprudence, which requires a consideration of viable

09:33AM 10   alternatives and requires a trial court to consult and give

11   the opportunity to all counsel to be heard before any

12   mistrial order occurs and requires some evidence that the

13   constitutional right of a defendant before the trial court

14   to have a first jury decide whether or not there was or

15   there was not sufficient evidence to convict or acquit

16   needs to be demonstrated on the record, and the record of

17   that case demonstrates no consideration of Ms. Read's

18   double jeopardy interests, but I want to start with the

19   second argument where there is little precedent, but I

09:34AM 20   believe strongly that the Court should establish precedent

21   that a right to a post-trial voir dire is an essential part

22   of the double jeopardy clause protections that center on

23   the right of a defendant, or, in this case, the petitioner,

24   not to be subjected by the same sovereign to prosecute for

25   the same offense for which a prior jury has unanimously

1    determined that the state failed to prove their case, that

2    in this case, that right dates back, and I'm not going to

3    burden the Court with the history, but

4    *Arizona v. Washington* has a footnote talking about how the

5    history of double jeopardy centers on people's right to

6    avoid multiple prosecutions, that that's more at the core

7    of double jeopardy than even the right to avoid multiple

8    punishments, that it dates back to an era in British

9    history where the *Steward* case would have a practice of

09:35AM 10   starting trials, and if the evidence wasn't good enough,

11   they would abort the trial and reserve it for future times,

12   and the British responded to that, and that the colonists

13   and later the framework of the Fifth Amendment double

14   jeopardy clause built up that foundation and that history,

15   and that's been repeated by the Supreme Court several times

16   and most recently in footnote 23 in *Arizona V. Washington*.

17        What is indisputable here is that the petitioner

18   has carried her burden of production.  It's virtually

19   unprecedented.  We've not found any federal precedent where

09:36AM 20   four jurors have directly represented to defense counsel

21   and the state court has accepted defense counsel's

22   representations as being reliable in terms of providing a

23   factual predicate for the decision-making.

24        Four jurors have directly informed trial counsel,

25   my co-counsel in this case, that there was a mistake made,

1    that they unanimously had come to a decision to find

2    Ms. Read not guilty on two of the three counts against her

3    and that the impasse that was documented in the final,

4    actually in the several notes but the final note that

5    Judge Cannone relied on related not to all three counts but

6    instead to the multiple charges that included lesser

7    included offenses within the manslaughter count, Count Two.

8            There were two reasons advanced by the

9    Commonwealth as to why a voir dire should not be ordered,

09:37AM 10    and the voir dire could establish whether the voir dire was

11    conducted by your Honor.  I think your Honor has the power

12    as part of this habeas corpus proceeding to order a

13    voir dire.

14            THE COURT:  Let me pause you there.  Is that

15    correct?  In other words, if I find that there was no

16    manifest necessity for the declaration of a mistrial or I

17    find that she was acquitted, I order her released from

18    custody, whatever that means in this context --

19            MR. WEINBERG:  Yes.

09:37AM 20            THE COURT:  -- but that standard habeas relief.

21    But the voir dire, do I have the power to do that, and if

22    so, from what source does it derive because that's not

23    habeas relief, that's not releasing her from custody,

24    that's conducting an investigation?

25            MR. WEINBERG:  Yes, it would be the power to

1    conduct an evidentiary hearing would be the power to make

2    fact findings as to whether or not the jury unanimously

3    Ms. Read.  It would be part of the Court's powers ancillary

4    to the constitutional decision of was there an acquittal,

5    what constitutes an acquittal, and how do I know whether

6    there was an acquittal?

7         And I'm not asking the Court to simply take the

8    four declarations and the fifth one who directly

9    communicated to Mr. Yannetti but to use that as a basis to

09:38AM 10    find that the petitioner satisfied her burden of

11    production.

12         I mean, we have many examples, you know, where the

13    burden of production that results in voir dires, both

14    federal and state, occur from a single juror's declaration

15    that there was ethnic bias, bias against Hispanics, a

16    racial bias, so when there's an allegation of external

17    contact, an allegation that extrinsic information somehow

18    permeated the jury's decision-making.

19         Here we have five, four direct, one indirect

09:39AM 20    declarations.  I think it's indisputable that Ms. Read has

21    met a burden of production, and the real issue is should

22    she have the opportunity to convert that burden of

23    production into proof that the jury unanimously and finally

24    and unconditionally acquitted her of charges, including the

25    most serious charge that she's facing on re-prosecution,

1    that being murder.

2         And the Commonwealth, I think their position when

3    you penetrate the arguments, comes down to two points, and

4    I want to address each of them.

5         Point one is that they believe, they argue that

6    even if 12 jurors came into whether this court or

7    Judge Cannone's court, and your Honor would have the

8    option, I contend, to order a voir dire, you know, with

9    Judge Cannone as part of a fact-finding to determine if

09:40AM 10   there was an acquittal.

11        If 12 jurors each, reliably credibly answered

12   questions that are not inconsistent with questions that a

13   Trial Judge like yourself might use to poll a jury, you

14   know, did you find, did you reach a decision on Count Two?

15   Was it unanimous?  Was it final?  What was your decision?

16        If 12 jurors credibly say we did make that

17   decision, it was final, it wasn't reconsidered, it was to

18   vote not guilty, then the state's position is we should

19   somehow create a procedural wall that prevents those facts

09:41AM 20   from being heard and those facts to crystallize the

21   decision about what constitutes an acquittal.

22        And we, of course --

23        THE COURT:  I'm sorry.

24        MR. WEINBERG:  We, of course, contend that that

25   kind of finding by a jury, which we believe was made by the

1    jury but not disclosed by the jury in the notes, you know,

2    is an acquittal, that the acquittal is not the

3    announcement, it's not the formality of a verdict, it's a

4    decision by a jury that's unanimous.  It's the heart of a

5    jury trial right.

6         I mean, the Sixth Amendment right to an unbiased

7    jury is really in part predicated on a defendant's right to

8    an acquittal from an unbiased jury, and here we have

9    powerful evidence, compelling evidence that jury reached a

09:42AM 10   final decision to acquit Ms. Read, and the state's position

11   is so what?  We have a right to re-prosecute, who cares?

12        They didn't come out.  A mistake was made.  The

13   jury didn't announce the verdict.  They didn't write a

14   footnote to their impasse note.  A mistake might have been

15   made by the trial court, which I'll contest when we discuss

16   manifest necessity not to ask the jury whether or not the

17   note reflected an impasse on all rather than just a subset

18   of charges, but the request for a voir dire is to make sure

19   that there is hard proof, reliable proof.

09:42AM 20        If it's not there, then there wasn't an unanimous

21   acquittal, but if it was there, if there was an unanimous

22   finding by the jury, it's entitled to respect.

23        THE COURT:  So let me ask you this.  Let's assume

24   that you are correct, how do you reconcile that with the

25   Supreme Court's decision in *Blueford v. Arkansas*, which is

1    a 2012 decision?  The foreperson of the jury comes back and

2    says we have unanimously voted to acquit, not just murder,

3    capital murder, and to acquit on first-degree murder, but

4    we are deadlocked on manslaughter, and the Supreme Court

5    said for double jeopardy purposes, that's not an acquittal.

6    How do you reconcile your argument with that case?

7        MR. WEINBERG:  Yes.  The majority opinion was

8    relying on two factors that are different than the factors

9    before the Court.  First was the idiosyncrasies of Arkansas

09:43AM 10    law that required either an acquittal on everything or a

11    conviction, but it doesn't allow for the kind of partial

12    verdicts that are part of federal law and are part of

13    Massachusetts law, but even more important, the Trial Judge

14    right or wrong in the Arkansas case sent the jury back to

15    deliberate, and the majority was very clear that they were

16    predicating their decision that there was not an acquittal

17    on the charges that the jury foreperson, you know, informed

18    the Court based on the lack of finality of those decisions,

19    based on the fact that jurors have a right to reconsider,

09:44AM 20    based on the fact that there was known to be deliberation

21    that continued after that announcement.

22        In this case, we don't have that record.  There is

23    no factual basis.  None of the other seven jurors, despite

24    the media in this case, despite the length of their jury

25    service, despite the notes that said we have a principal

1    disagreement with other jurors.  None of the seven have

2    said to anyone, not to the prosecution, not to the court

3    officers, not to Judge Cannone, not to the media, not

4    unanimously that we disagree with what the five jurors, who

5    are saying we unanimously reached a decision to acquit

6    Ms. Read of murder.

7         After two months, I think you can infer or expect

8    the likelihood that at least one of those jurors

9    anonymously, at least, would Tweet, would reach a media,

09:45AM 10    would reach the Court, would reach the State Police, would

11    reach the court's officers and say, wait a second, that's a

12    misrepresentation of what happened in that jury room, that

13    wasn't a final vote, that wasn't a vote to acquit, that was

14    just preliminary, but there's absolutely nothing in this

15    record, despite the large publicity that featured the

16    filing of the original motion to dismiss and the affidavits

17    of counsel and the declarations of the jurors that

18    conflicts with it.

19         There's a likelihood here, Judge, that if you

09:46AM 20    ordered a voir dire, we would end up with proof that would

21    essentially extinguish all of the state's concerns that,

22    like *Blueford,* this wasn't just a final vote, this was just

23    a preliminary vote, that we can infer that the jury has a

24    right to reconsider, yes, the jury a right to reconsider,

25    but there's no evidence in this record that they did

1    reconsider, that that wasn't the final vote, that they ever

2    thought of it as anything other than a final,

3    unconditional, unambiguous acquittal.

4          And, again, a mistake was made perhaps because the

5    trial instruction said that you need to reach a verdict on

6    each of the counts, the jury notes reflect, or at least we

7    contend they reflect an impasse on Count Two but not

8    Counts One and Three.

9          THE COURT:  I'm sorry to interject.  If I hear you

09:47AM 10  correctly, my power to conduct such a voir dire or to order

11   that it be conducted is ancillary to the habeas

12   jurisdiction?

13         MR. WEINBERG:  Yes, it would be as if the Court

14   was, you know, doing a habeas on an incompetence of

15   counsel.  Your Honor would be empowered to take evidence

16   and to decide did counsel have a conflict, were they asleep

17   at the table, were they drinking during a trial.

18         You know, federal courts on habeas can take

19   evidence, and there's nothing in the habeas rules that

09:47AM 20  would prevent you if you believed that you needed the voir

21   dire to make a final determination whether there was a

22   unanimous and final acquittal to take evidence, and,

23   therefore, there's nothing to prevent the Court from

24   determining that the jurors should be called, they should

25   be seated anonymously.  It's better in this courtroom where

1    there's no cameras in terms of protecting the privacy

2    rights and getting credible evidence.

3        You know, we know from the First Circuit's

4    decision in *Tsarnaev* where nine years later, the

5    First Circuit ordered Judge O'Toole to have a voir dire.

6        Voir dires are not extraordinary.  In fact, the

7    First Circuit has said in the *Zindi* case, which was adopted

8    *by the Tsarnaev* case, that we can't have a dogmatic rule

9    against voir dires.  We have duties when there's credible

09:48AM 10    evidence.

11        THE COURT:  But what *Tsarnaev* is the federal court

12    examining its own jury.  You're essentially asking the

13    federal court here to examine what happened in state court.

14    It may be no different.  I'm not expressing an opinion, but

15    it feels different to me.  Maybe that matters, maybe it

16    doesn't.  Is there precedent for a federal court to require

17    a voir dire of a state court jury?

18        MR. WEINBERG:  There's no precedent that I know of

19    where any court judge, any federal court, has dealt with

09:49AM 20    the voir dire for an acquittal issue.  This comes to you on

21    a pretrial basis, which is what is unique about double

22    jeopardy.

23        The other cases where the state court has

24    voir dires on a regular basis, and the federal court has

25    voir dires on a regular basis when any juror declares there

1    was external contact, there was bias in the jury room,

2    there was prejudice against a Hispanic defendant, and, you

3    know, what we're arguing is that those are Sixth

4    Amendment-based voir dires, but the values that are

5    represented by the double jeopardy clause are just as

6    important as the value of an impartial jury.

7         And it's only that there's no precedent.  What

8    jurors haven't said, wait, you know, we acquitted the

9    defendant, and the Judge didn't listen.  You know, we

09:50AM 10    provided the Court with two circuit court opinions, the

11    *Dotson* case, and out of the Fifth Circuit, the *Stauffer*

12    case.

13         In *Dotson*, two of the jurors hearing the verdict

14    read in court said, wait a second, that misrepresents our

15    unanimous decision to acquit the defendant on one count.  I

16    think it was an extortion case, Count Ten.

17         The Judge called the foreperson, the foreperson

18    executed an affidavit, and the Judge reversed that part of

19    the verdict slip.

09:50AM 20    In *Stauffer*, it was cause to defense counsel.

21    That's as close as the precedence give us to what's

22    occurred in this case, and it's why I wanted to start the

23    argument here because the manifest necessity has been the

24    subject of an enormous amount of opinions and some pretty

25    clear First Circuit guidance and Supreme Court guidance,

1    but we're here in a bit of a legal wilderness where your

2    Honor has less bench post, less precedential bench post,

3    and more needs to make a decision about right or wrong,

4    whether or not given the level of proof that there was a

5    unanimous finding of not guilty, whether we should just

6    insulate it, and, to me, not honor the services of those

7    jurors who spent two months sitting and listening to

8    evidence and we contend came to the conclusion that the

9    evidence didn't prove Ms. Read was a murderer, didn't prove

09:51AM 10    she left the scene to avoid, but they were hung on whether

11    or not there was some level of manslaughter, one of the

12    lesser includes regarding alcohol, there's a number of

13    different state court alternatives that Judge Cannone

14    instructed the jury on.

15    The state's argument, I think, says you can't have

16    an acquittal without announcing it, and the state's other

17    argument is under 606(b), how do you conduct a voir dire

18    without, you know, intruding into the deliberative process,

19    and let me take both of those on.

09:52AM 20    The most recent Supreme Court case that has dealt

21    with just what constitutes an acquittal is *McElrath v.*

22    *Georgia*.  In Georgia, they had a state court law that says

23    if there were inconsistent verdicts, that the state court

24    was empowered to invalidate an acquittal, and the

25    Supreme Court said it is well established that whether an

1    acquittal has occurred for purposes of the double jeopardy

2    clause is a question of federal, not state law.  An

3    acquittal occurs when there has been a ruling relating to

4    the ultimate question of guilt or innocence.  Labels,

5    including those provided by state law, do not control our

6    analysis.

7        Thus, it is not dispositive whether a fact-finder

8    recanted the word "acquit."  Instead, an acquittal has

9    occurred if the fact-finder, meaning the jury, acted on its

09:53AM 10    own view that the prosecution failed to prove its case.

11        The ultimate question is whether the double

12    jeopardy clause recognizes an event as an acquittal.  In

13    making that determination, we ask whether or not given the

14    operation of state law, there's any ruling that the

15    prosecution's proof is insufficient to establish criminal

16    liability.  The double jeopardy clause prohibits second

17    guessing of an acquittal for any reason.

18        The *Candelario* is a case that looks beneath the

19    label, beneath the procedure to determine whether or not

09:54AM 20    the substance, the finding, the event, in this case, the

21    jury decision, was an acquittal.

22        In *Blueford vs. Arkansas,* the dissenting opinion

23    from Justice Sotomayor, but this was just a prelude to it,

24    the context of her disagreement about whether or not they

25    should honor what the jury foreperson said.  It says,

1    "In ascertaining whether an acquittal has occurred, form is

2    not to be exalted over substance, rather we ask whether the

3    fact-finder has made a substantive determination that the

4    prosecution has failed to carry its burden."

5         "Jurisdictions have different procedures

6    respecting the announcement of verdicts and the entry of

7    judgments, but that diversity has no constitutional

8    significance.  Jeopardy terminates upon a determination

9    however characterized that the evidence is insufficient to

09:55AM 10    prove a defendant's factual guilt."

11         *U.S. vs. Martin Linen Supply Company*, the

12    Supreme Court again said, "The development of the double

13    jeopardy clause from its common law origin suggests it was

14    directed as a threat to the threat of multiple

15    prosecutions."

16         At the heart of the policy is the concern that

17    permitting the sovereign, in this case, the Norfolk D.A.,

18    freely to subject the citizen, Ms. Read, to a second trial

19    for the same offense would arm the government with a potent

09:56AM 20    instrument of oppression.

21         The following comes from *Green vs. United States*,

22    a historic opinion on double jeopardy.  The clause

23    therefore guarantees that the state shall not be permitted

24    to make repeated attempts to convict the accused, therefore

25    subjecting him or her to embarrassment, expense, ordeal,

1    compelling them to live in a constant state of anxiety and

2    insecurity, and, most important, as well as enhancing the

3    possibility that even though innocent, he or she may be

4    found guilty.

5         So the contention, Judge, here is that there was

6    an acquittal, it wasn't announced, but that Ms. Read is

7    entitled to prove that.  In fact, the four or five jurors

8    that have come forward with no contradiction are accurately

9    representing what occurred in that jury room and that there

09:57AM 10    was a finding of insufficient evidence, a finding to acquit

11    her, and that she should not, therefore, be subjected to a

12    second trial for murder when a first jury has unanimously

13    made a finding that she was not guilty.

14         And the vehicle, if you will, the evidentiary

15    vehicle to prove that to your Honor would be to bring the

16    12 jurors in anonymously outside the public, outside the

17    media, and to ask them the questions that you would

18    similarly ask to a jury if you had decided to determine was

19    there a partial verdict, should I poll the jury?

09:57AM 20         We don't have to intrude into the juror's mental

21    process, why they reached a verdict, what was the

22    conversation that led to a verdict.  Questions can be asked

23    that would be outside the boundaries of Rule 606(b), but

24    even if we were at the boundary, even if we were at the

25    boundary, Judge Saris sitting on the First Circuit in

1    *United States vs. Villar* in 2009 where there was an issue,

2    and this is 15 years ago, regarding whether or not there

3    was bias against a Hispanic defendant said the appellant's

4    more powerful argument is the application of Rule 606(b) to

5    prevent juror testimony about racial or ethnic statements

6    made in jury deliberations is unconstitutional as applied,

7    yet it violates a defendant's right to due process to a

8    trial by an impartial jury.

9         And so, yes, we're dealing with a different

09:58AM 10    constitutional clause, but the reasoning is the same that

11    you can't use an evidentiary rule to prevent proof of a

12    constitutional violation.

13         There's nothing more important in the double

14    jeopardy clause than the bar on multiple prosecution.  And

15    in this case, it cries out for some decision-making, your

16    Honor, in an area that hasn't had a great deal of

17    decisions, which is that there is no rule to prevent your

18    Honor from hearing from the jurors and making a

19    determination whether or not the burden of proof has been

09:59AM 20    met, whether the burden is on the prosecution, as the

21    double jeopardy cases say, whether the burden is on us in

22    this area of trying to prove that the jury, in fact,

23    acquitted that the appropriate procedural vehicle should be

24    a voir dire post-trial, a reliable voir dire.

25         We asked Judge Cannone to conduct one within days

           1    of the end of the first jury trial, and that led to her

           2    decision against it and the Court of Appeals, but with all

           3    due respect to the courts that have correctly required

           4    voir dires when there's evidence of racial conversation in

           5    a jury, and I submit a conversation and a Hispanic

           6    conversation, the double jeopardy right is just as

           7    important and gets vindicated through the same procedure,

           8    which is we determine, we don't ignore, we determine what

           9    happened in that jury room, and that's where I go back to

10:00AM   10    *Dzhokhar Tsarnaev*, which had that language about when

          11    there's credible abrogation of a constitutional violation,

          12    we don't -- we have a duty to investigate, and I think

          13    consistent with that duty is to investigate by voir diring

          14    the jurors.

          15            Alternatively, your Honor could find, as the

          16    Attorney General has recommended, that if you're going to

          17    order a voir dire, it could be done by Judge Cannone, but I

          18    think it's perfectly appropriate to do it in this courtroom

          19    in this habeas case before a Judge as experienced as your

10:01AM   20    Honor, and then your Honor would make credibility findings,

          21    your Honor would determine whether or not there's any

          22    reason to be skeptical of the declarations of the four or

          23    five jurors, and if there was no reason to be skeptical,

          24    then your Honor would then have the legal issue of

          25    determining whether or not a finding by a jury, a final

1   decision by a unanimous jury, is entitled to stop the

2   re-prosecution of Ms. Read for the very same offense that

3   the first jury acquitted her on.

4        THE COURT:  Let me ask you a question about the

5   factual record as it now exists, putting to one side the

6   voir dire question.  There are certain facts that I think

7   are not in dispute, the transcript of what happened in the

8   court, the three jury notes, I think at this stage the

9   affidavits are not controverted.

10:02AM 10        Was there fact-finding by the Superior Court or

11   for that matter the SJC to which I am required to give

12   deference?  I guess two questions, am I required to give

13   deference, but even before we get to that point, are there

14   additional facts in the record or fact-finding that would

15   even raise the question of deference, again, putting the

16   voir dire to one side?

17        MR. WEINBERG:  No, I believe, Judge, that when we

18   go to manifest necessity and the issues connected thereto,

19   those are rulings of law, those are conclusions of law that

10:03AM 20   there were no viable alternatives that the defense had an

21   opportunity to object or to find that rulings of law --

22   that are to find the factual record is the notes, the

23   factual record is perhaps the, you know, the sequence of

24   events that occurred, where you have note 1 and defense

25   counsel and the prosecutor, you know, were provided an

1    opportunity to read note 1, they made an argument that the

2    defense wanted a *Tuey* charge, the government did not.  The

3    second note, the same practice.

4         The proper practice, reading the note to counsel

5    in the absence of the jury, hearing from counsel, and in

6    that case, the Court decided to make a *Tuey*.  I think those

7    are all facts.  You know, I infer from those facts,

8    recommend or contend that the Court should as well.  The

9    result of those two discussions is a demonstration the

10:04AM 10    defense wanted a verdict from this jury.

11         My guess is that I know in my experience, my guess

12    is in the courts that when jurors say they're at an impasse

13    after days of deliberation, many times defense lawyers ask

14    for a mistrial, they object to an *Allen* charge.  Here, we

15    have the reverse.  We have the government not wanting an

16    *Allen* Charge, we have the defense asking for a Tuey charge,

17    the state analog to the *Allen* charge because they wanted

18    this case to conclude before this jury.  They wanted a

19    verdict.

10:04AM 20         And then when you go to the third note, the

21    practice of Judge Cannone somehow was varied, abandoned.

22    She didn't read the note to defense and the government.

23         THE COURT:  All right.  I think we're basically

24    talking about manifest necessity.

25         MR. WEINBERG:  Yes.

24

1          THE COURT:  Go ahead.

2          MR. WEINBERG:  The respondent correctly says that

3     the Supreme Court has no mechanical test and that any

4     single factor does not dictate a decision, but what's true

5     in this case, Judge, is that every factor the Supreme Court

6     looks to for determining whether they manifest necessity,

7     every factor weighs in favor of finding no manifest

8     necessity.

9          Was the decision by the trial court made in haste?

10:05AM 10     Was it precipitous?  Well, yes, between the time of the

11     reading of the note, it was 30 seconds until the jury came

12     in and then about a minute reading the note to the jury and

13     then an immediate decision to sui sponte to declare a

14     mistrial.  That's precipitous.

15          Second factor, did the Judge query defense counsel

16     before making the decision about their thoughts and

17     opinions, and there was no opportunity given to the defense

18     counsel to read the note, to follow past practice, to

19     follow state law, which requires, quote, "a full

10:06AM 20     opportunity of the defense to be heard."

21          Third, did the Judge give the prosecutor, who

22     bears the burden of proof, *Arizona v. Washington* and the

23     First Circuit says it's a heavy burden of proof.

24          Judge Cannone did not ask the prosecutor what

25     their judgments were, what their views were, what their

25

1    opinions were as to whether or not there were alternatives

2    to a declaration of mistrial.

3         Fourth, is there evidence that the Judge

4    considered viable alternatives?  And here there's no

5    evidence in the record of the case to demonstrate

6    Judge Cannone's consideration of viable alternates before

7    declaring a mistrial in the record of the trial.

8         THE COURT:  And at this stage, what were those

9    alternatives?  Again, we have the state statute about what

10:07AM 10   happens when the jury reports for the third time that

11   they're deadlocked effectively, what were her alternatives

12   at that point?

13        MR. WEINBERG:  I think she had two or three

14   alternatives, Judge.  The first alternate is to ask the

15   jury whether or not there was a unanimous decision, a

16   verdict, a finding on any of the three counts.  It was to

17   read the note, not as conclusive that there was no finding,

18   which we now know is inconsistent with the beliefs of at

19   least four and maybe five jurors, but that was a viable

10:08AM 20   alternative.

21        The advisory notes to state Rule 27B, which is not

22   dissimilar from Federal Rule 31(b) say it's mandatory when

23   you're going to order a mistrial, you have to ask the jury

24   whether or not there was any partial verdict, but intrinsic

25   in having a rule that allows partial verdicts is that a

1    court has to at least consider, if not in fact seek, some

2    guidance from the jury whether or not the impasse relates

3    on all or rather just a subset of the charges before her.

4    That was a viable alternative.

5         The *Tuey* statute in the state, 234, contains an

6    alternative, which is there could be no further

7    deliberations unless the jury consents to deliberations,

8    and so intrinsic in that is a court has an alternative to

9    ask the jury whether they want to limit their continuing

10:09AM 10   deliberations to one or another of the counts or whether

11   the note reflects an impasse on all counts.

12        The Judge had a right to poll the jury and ask

13   them the questions that I request of this court ask on a

14   post-trial voir dire.  They were all alternatives.  None

15   appeared to have been considered by Judge Cannone, who

16   immediately read the note and told the jury I'm going to

17   grant your wish, and I'll be seeing you in a few minutes.

18        THE COURT:  Does that argument require that I

19   effectively ignore what happened with the first and second

10:09AM 20   note, in other words, is all we're examining is what

21   happened in isolation on the third note?

22        MR. WEINBERG:  Well, you know, I don't want to lob

23   off, I think the Court can consider the history, but I

24   believe that cuts in favor of several things.  One is that

25   the defense wanted the verdict.  Two is that the issue

1    being discussed in the first and second note was not

2    whether or not to issue, to order a mistrial, and,

3    therefore, extinguish or at least appear to extinguish

4    Ms. Read's double jeopardy rights, but whether or not to

5    issue a supplemental instruction.  The defense never asked

6    for a mistrial.

7         The word "mistrial" was never mentioned during the

8    discussions of notes 1 and 2, and so everything that the

9    dialogue regarding notes 1 and 2 showed the defense wanted

10:10AM 10   the verdict, and, moreover, it demonstrated to the defense

11   what the practice that Judge Cannone was using, which is

12   the proper practice, the practice advocated in the state

13   court, which is that when a jury has a note, you read it to

14   defense counsel before making decisions, you read it to

15   defense counsel before calling the jury.

16        So, yes, I think your Honor can consider that, but

17   I don't think that interactions provides a bases for a

18   determination of manifest necessity or a bases of inferring

19   that the defense would not object to a mistrial or that

10:11AM 20   they wanted a mistrial, I think it infers just the

21   opposite.

22        So the Supreme Court also talks about

23   precipitousness and whether or not each party was given an

24   opportunity to register their views and whether the Court

25   considered viable alternatives, whether the Judge made

1    findings.  Again, not one of these are absolutely

2    mechanically required as a precondition to either a

3    mistrial order or to the reversal of a mistrial order.

4        Also, whether the Judge gave consideration in

5    weighing the central values in the defendant having the

6    right to avoid a successive prosecution is another factor

7    that the Supreme Court weighs, and here there was no

8    consideration evidenced in the record given to Ms. Read's

9    fundamental constitutional rights not to have to go through

10:12AM 10    this ordeal a second time, and as *Green* said, not to face

11    the risk that an innocent person being re-prosecuted could

12    well face a second jury.  Having to win twice is very

13    different than proving a not guilty once.

14        But the First Circuit jurisprudence I contend is

15    even clearer regarding what's required as a condition

16    precedent to a declaration of a mistrial.  It starts

17    U.S. v. *Ramirez -- and all of these cases are cited in our*

18    *petition, Judge.  It says, quote, "In U.S. vs. Pierce,"*

19    which is a 1979 First Circuit decision, "we held --" that's

10:12AM 20    a holding -- "that in determining whether there was a

21    manifest necessity for a mistrial, our first inquiry must

22    be whether the Court gave adequate consideration to the

23    existence of any less drastic alternative."  We stress the

24    importance of giving counsel an opportunity to be heard

25    before declaring a mistrial.

1          Years later, in *U.S. vs. Toribio-Lugo*, the Court

2     said, "Where there's a viable alternative to a mistrial,

3     the District Court fails adequately to explore it, a

4     finding of manifest necessity, quote, 'cannot stand.'"

5     That's a 2004 First Circuit case that we've written about.

6          *U.S. vs. Candelario-Santana*, another 2020 case,

7     it's the same. "At the very least," quote, "we require the

8     District Court to consider other options to ensure that a

9     jury is genuinely deadlocked before discharging it."

10:14AM 10     And then my fourth case, which is a panel from

11     1981 that was shared by Judge Wyzanski, I'm old enough to

12     remember Judge Wyzanski's tenure on the District Court and

13     Judge Breyer, Justice Breyer sitting First Circuit 1981,

14     "whether or not the record indicates the trial court has

15     considered alternatives to a mistrial is significant."

16          Also, of major importance is affording counsel an

17     opportunity to be heard.  A precipitous decision reflected

18     by a rapid sequence of events culminating in a declaration

19     of a mistrial would tend to indicate insufficient concerns

10:14AM 20     for the defendant's constitutional rights.

21          And that panel properly said that a trial court

22     must temper a decision whether or not to abort the trial by

23     considering the importance to the defendant of being able

24     once and for all to conclude his confrontation with society

25     through the verdict of a tribunal he might believe to be

1    favorably disposed to his fate.

2        The *Brady* case, and that was a habeas case, *Brady*

3    *vs. Samaha*, S-a-m-a-h-a.  It included two other procedural

4    points.  One is that the burden is on the Commonwealth, not

5    on the defense to justify re-prosecution.  Neither of the

6    state courts put that burden on the state when making the

7    trial court's opinion and the SJC opinion.  And, second,

8    that although there's some deference to trial courts, you

9    know, discretions, that deference is extinguished when the

10:15AM 10    record of the case does not demonstrate a sound and careful

11    exercise of discretion, such as we contend did not occur in

12    this case.

13        THE COURT:  To the extent that those First Circuit

14    cases, like *Toribio-Lugo*, were written before the

15    Supreme Court's decision in *Renico* and *Blueford*, if they

16    cannot be harmonized with *Renico and Blueford*, do you agree

17    that they are superseded by *Renico and Blueford*?

18        So, in other words, to the extent that they

19    suggest there is a checklist, you must do one or two or

10:16AM 20    three things, there is no checklist, and I think *Renico* at

21    some length says that considerable deference is to be given

22    to the trial judge.

23        MR. WEINBERG:  And, you know, two answers to that.

24    *Renico, of course,* was a 2254 case, not a 2241 case.

25        THE COURT:  Let me pause you there, but for

1    2254 cases, there's this two-part inquiry, was there

2    clearly established federal law, paraphrasing the

3    statute --

4              MR. WEINBERG:  Yes.

5              THE COURT:  -- clearly established federal law as

6    established by the Supreme Court, and then was the state

7    court decision unreasonable in light of that, so it's a

8    very deferential standard, which is not applicable here?

9              MR. WEINBERG:  Yes.

10:17AM 10              THE COURT:  But on the first part inquiry, what is

11    clearly established federal law, that does apply here,

12    right?

13              MR. WEINBERG:  Yes, your Honor.

14              THE COURT:  This is federal law?

15              MR. WEINBERG:  Yes, that's why I said the

16    Supreme Court, and including *Renico*, did not have a

17    mechanical test, but it doesn't conflict with the

18    First Circuit.

19              I'm not arguing that there's a mechanical test in

10:17AM 20    the First Circuit, I'm arguing that when each of the

21    principal four factors looked to by the series of

22    First Circuit decisions:

23              Were there viable alternatives that were carefully

24    considered?  No.

25              Was counsel, either counsel, given an opportunity

1    to be heard?  No.

2           Was the decision precipitous and made in haste?

3    Yes.

4           And, most important, was there any evidence in the

5    record of a careful consideration of the defendant's

6    constitutional right as protected by the double jeopardy

7    clause not to be subjected to re-prosecution?  Not a word

8    in the record of the state court.

9           So that's -- the Supreme Court, they look to multi

10:18AM 10    factors, but *Arizona v. Washington* says you only give

11    deference, you only apply an abusive discretion standard

12    when there's a demonstration of an exercise of careful

13    discretion.  That all goes back to a case called Perry --

14    *Perez*, I'm sorry, which is an ancient Supreme Court case,

15    which talks about urgency and talks about, you know, how

16    important the double jeopardy right is and how it only gets

17    extinguished when there's essentially no other

18    alternatives, and here I recommended that there's just no

19    demonstration that Judge Cannone believed that there were

10:19AM 20    alternatives to consider.

21           She made a mistake.  She misunderstood the jury

22    note if those four or five jurors and the first one

23    reported the mistake the very next day are correct, and,

24    therefore, there was no manifest necessity for the

25    declaration of a mistrial as to two or three counts.

1          The state says, Well, it would be coercive to, you

2     know, for Judge Cannone to ask the jury any questions once

3     they delivered the note, but there's nothing coercive about

4     asking the jury whether or not the note relates to all

5     counts, whether or not their decision, you know, they're at

6     an impasse includes all counts, whether or not they've

7     reached a decision on any one of the counts.

8          The cases relied on, including the state court

9     case, were all single count charges, not multiple count

10:20AM 10   charges.  When you have Rule 27B or in this court 31(b),

11     it's inherent that if we're going to determine whether

12     there's a partial verdict, a court has the power to ask the

13     jury in a noncoercive fashion whether or not they've

14     reached a consensus, a unanimous verdict on any one count.

15          Had she done that, it is predictable and probable

16     that the jury would have said we're at an impasse on

17     Count Two, and it's a failure of the Judge to ask that to

18     the jury, respectfully to Judge Cannone, who is an

19     experienced State Court Judge.  She made a mistake.  She

10:21AM 20   should have consulted counsel.  She didn't consult counsel.

21          There's no evidence here counsel consented to a

22     mistrial by asking for a *Tuey* instruction, which is what

23     she found in her opinion, but the SJC did not adopt or rely

24     on any allegation of consent.

25          We have here is whether under the Supreme Court

1    factors, which admittedly are not a mechanical test, and,

2    again, *Blueford* is distinguishable, and the dissent that I

3    read to the Court did not dissent with the holding that

4    *Blueford* is a case that demonstrated the importance of

5    finality, and they even talked about, if I can find it in

6    this blizzard of paper, if your Honor would give me one

7    second.

8         They talked about in the *Blueford* case that

9    they're relying on the lack of finality to the judgment

10:22AM 10    rather than, you know, whether or not the judgment had to

11    be announced in any particular formal way.

12         So there is -- it says, The foreperson's report

13    prior to the end of deliberations lacked the finality

14    necessary to amount to an acquittal on those offenses,

15    quite apart from any requirement that a formal verdict be

16    reached.

17         I contend that there's nothing inconsistent in

18    *Blueford* and nothing inconsistent in the 2010, 2254 case,

19    the *Renico vs. Lett* that is inconsistent with the

10:23AM 20    First Circuit jurisprudence, if the First Circuit's

21    continuous jurisprudence as read as a multi-factor test.

22         Here, none of the factors weigh in favor of the

23    mistrial order.  I don't have to rely on just the lack of

24    consideration, a viable alternatives, just a lack of

25    opportunity for the defense to be heard, just the absence

1    of any evidence in the record that double jeopardy was

2    considered.

3          Here, all of the factors weigh in favor of a

4    federal court reversing the state court decision and

5    finding that the jurisprudence of this circuit, which

6    includes jurisprudence in *Brady* in a 2241 case compels a

7    judicial determination that there is no manifest necessity.

8    Manifest necessity are important words.  It wasn't

9    necessary, it certainty wasn't manifest necessity for that

10:24AM 10   trial court to sui sponte declare a mistrial without

11   hearing from counsel, without considering alternatives, and

12   without weighing Ms. Read's double jeopardy rights.  Thank

13   you, sir.

14         THE COURT:  Thank you, Mr. Weinberg.  Let's take a

15   just a moment, stretch our legs, and then I'll hear from

16   the Commonwealth.

17         (Pause)

18         MR. SCHILLINGER:  I'd like to start by addressing

19   your Honor's question.  There were factual findings made

10:25AM 20   here, your Honor, both by the trial judge and the SJC that

21   are significant.

22         I will try to address those in the context of the

23   specific issues that we're talking about.  Those factual

24   findings are owed deference in this habeas action, as set

25   forth in the *Marshall* case that we cite in our brief and

1    also reaffirmed later by the First Circuit in *Powell vs.*

2    *Tompkins.*

3           Importantly, your Honor, there were also

4    determinations of state law made by the SJC in the opinion

5    below.  Those are also binding in this federal habeas

6    action.

7           THE COURT:  I agree that they're binding.  I'm

8    struggling with how they intersect with federal habeas

9    constitutional law.

10:25AM 10           MR. SCHILLINGER:  Yes, your Honor, and I'll try to

11    weave that in the context of the mistrial or the acquittal

12    or the post-trial inquiry.

13           I do have one example just to preview on the

14    mistrial issue.  Petitioner continues to argue based on the

15    reporters's notes to Rule 27, Massachusetts Rule of

16    Criminal Procedure 27 that some sort of inquiry of a

17    partial verdict was required or mandatory of the Judge.

18           The SJC flatly rejected that argument, noted that

19    it's discretionary, went on to determine as a matter of

10:26AM 20    state law making such an inquiry would be improperly

21    coercive.  Those determinations cannot be relitigated here

22    in this federal habeas action, and I think that's what's

23    significant, your Honor.

24           So, turning to first the mistrial issue and

25    manifest necessity, as your Honor noted, we have clear

1    Supreme Court precedent here, and there is no required

2    checklist that the Judge must go through before declaring a

3    mistrial.  She's not required to inquire individually of

4    the jurors, she's not even required to confer with counsel

5    before doing so, as set forth in *Renico* and *Blueford*.

6           As your Honor also noted, you know, the discussion

7    of what federal double jeopardy jurisprudence does or does

8    not require in *Renico* was based on federal precedent,

9    separate and apart from application of that precedent under

10   the deferential standard of a Section 2254 habeas action.

11          To the extent there is any lingering uncertainty

12   about that, I would point the Court to footnote 2 in

13   *Blueford* also referred by Chief Justice Roberts where he

14   noted that the dissent similarly tried to distinguish

15   *Renico* on the grounds that it was a habeas action, and,

16   quote, "has little to say about a trial judge's

17   responsibilities," but went on to note that Renico's

18   discussion of the applicable legal principles concerns just

19   that.

20          So that discussion is on point, your Honor, it is

21   binding, and it makes clear that there's no set checklist

22   here.

23          Massachusetts law, in comparison, arguably imposes

24   a more exacting standard as it does require a trial judge

25   to explore alternatives to a mistrial and give counsel a

38

1    full opportunity to be heard.

2         THE COURT:  I'm sorry to interrupt.  Can I get you

3    to move the microphone a little bit closer?

4         MR. SCHILLINGER:  Certainly.  Just on the last

5    point to repeat it, your Honor, Massachusetts law does

6    arguably impose a more exacting standard.  It does require

7    judges to give consideration to alternatives and to give

8    counsel a full opportunity to be heard, but the SJC found

9    as a matter of Massachusetts law that the Trial Judge here

10:28AM 10   did that, she did consider alternatives, namely in response

11   to the first note, she did not simply declare a mistrial or

12   rush to declare a mistrial, she rather encouraged consensus

13   and tried to encourage the jury to reach a verdict by

14   instructing them to continue their deliberations.

15         In response to the second note, which as the SJC

16   emphasized, had even more emphatic or definitive language,

17   and even though defense counsel at that point was telling

18   the Judge the jury is hopelessly deadlocked, they've

19   exhausted all matter of compromise and persuasion, the

10:29AM 20   Judge still did not rush to declare a mistrial, instead she

21   gave the *Tuey-Rodriguez* charge again and to get the jury to

22   reach a verdict if they're able to do so.

23         It was only when the third note arrived containing

24   even more emphatic language yet and made clear, your Honor,

25   that the jury was deadlocked on all of the charges, would

1    not consent to further deliberate, and that if they were

2    forced to continue to deliberate, any verdict that they

3    might reach would not be a just judgment but rather would

4    be the product of compromising their deeply-held beliefs,

5    which is exactly what *Tuey-Rodriguez* tells the jurors we

6    don't want you to do, it was at that point that she

7    declared a mistrial, and I think it's significant the trial

8    judge found she had no doubt based on the jury's three

9    notes that they were unable to reach a unanimous verdict

10:29AM 10    and that there was no, quote, "inkling" of an agreement as

11    to any of the charges anywhere in the notes.

12         And the SJC similarly found, your Honor, that

13    based on the record presented, nothing suggests that the

14    deadlock was limited to a specific charge, on the contrary,

15    the notes contained no inkling of agreement, and the third

16    note implied that the jury was deadlocked on all charges.

17         So looking to the circumstances that would inform

18    the Judge's exercise of her discretion in declaring a

19    mistrial, on one side of the scale, there was no need or

10:30AM 20    reason for her to go farther and inquire of the jurors.

21         In her mind, and as the SJC found, there was no

22    indication here that there might be a partial agreement as

23    to some of the charges.  At the same time, your Honor, the

24    jury had made it clear, and the Judge found that it was

25    clear to her, they wouldn't consent to continue

1  deliberating, so under the Massachusetts statute, 234A,

2  68C, they were precluded from being ordered to further

3  deliberate.

4         On the other side of the scale, there were strong

5  reasons that militated against making any sort of further

6  inquiry, including the alternatives that the petitioner

7  continues to suggest, which was the very real and evident

8  prospect of improper coercion, as the SJC found.

9         There was also defense and strategic

10:31AM 10  considerations, your Honor, which is something the trial

11  judge explicitly noted in her order denying the motion to

12  dismiss and that the SJC also noted in footnote 12 of its

13  opinion, which is for a trial judge of their own accord to

14  start making this sort of inquiry runs the risk of

15  extracting a guilty verdict as opposed to a mistrial across

16  the board, and competent defense counsel would not want the

17  Judge to make such an inquiry and run that risk.

18         I suggest that that consideration was all but

19  stronger here in this case given the nature of the

10:32AM 20  petitioner's defense, your Honor.  This wasn't a case where

21  the petitioner had different discrete defenses to different

22  charges, her defense across the board was that she did not

23  cause the victim's death but supposedly had been framed.

24  If the jury were to come back with a guilty verdict on any

25  of the three charges or the two lesser included offenses,

1    they would have necessarily had to have found that she did

2    cause the victim's death, and it would be a rejection of

3    that defense and public narrative.

4         Taking into consideration those circumstances, on

5    the one hand, your Honor, there was no need, no reason to

6    make further inquiry.  There were very strong reasons not

7    to do so, namely, the prospect of improper coercion,

8    defense's strategic considerations.  It wasn't an abuse of

9    discretion here, and federal constitutional law does not

10:32AM 10    require or mandate that a judge plow forward with such an

11    inquiry in the face of the SJC's determination that doing

12    so would be improperly coercive.

13         THE COURT:  Well, that's one of the complicated

14    questions here, that is, what is -- I'm required to accept

15    the SJC's determination of Massachusetts law.  That's

16    final.  I can't revisit that.

17         To the extent there were factual findings, I'm

18    required to give deference to them, but I can revisit them

19    under appropriate circumstances, and federal law, I address

10:33AM 20    de novo.

21         How those three things intersect and how the SJC

22    findings affect my decision is somewhat fuzzy to me.  The

23    SJC said that this is all appropriate under state law,

24    whether the statute or Rule 27, whatever, perhaps the

25    Massachusetts Declaration of Rights, I can't remember

1    whether there was an issue or not, but, regardless, it

2    didn't violate Massachusetts law.  To what extent does that

3    inform or not inform my decision?

4         MR. SCHILLINGER:  The way I view it, your Honor, I

5    think about it is there be a typical custom or practice in

6    federal court to make the sort of inquiry or take these

7    additional steps.

8         THE COURT:  Forget about the voir dire, the

9    additional factual finding.

10:34AM 10    MR. SCHILLINGER:  I'm sorry, your Honor, correct,

11   exactly, where a jury comes back and says we're deadlocked.

12   There may be a custom and practice in federal court to that

13   inquiry individually of the jurors, are you truly

14   deadlocked or can you reach agreement on any of the

15   charges, something along those lines, which is what the

16   petitioner is suggesting should have been done here.

17        But where a state court has looked at under state

18   law and said to do so would improperly coerce a verdict,

19   and it's significant because this is something that

10:35AM 20    protects defendants as well, your Honor, right, if the

21   Judge were to do this and the jury came back with a guilty

22   verdict, just as the SJC noted, the petitioner would be

23   making a very strenuous and potentially meritorious

24   argument that it was improper for the Judge to have done

25   that.

1          Where you have that determination, state law by

2     the SJC, there would need to be a clear constitutional

3     command that notwithstanding that, the Judge needed to have

4     done that here, and there is no such mandate, there is no

5     such command.

6          Federal practice might be different.  It might be

7     a different custom, what is typically done, but in the

8     absence of a clear constitutional command, the double

9     jeopardy clause requires before declaring a mistrial based

10:35AM 10   on jury deadlock for manifest necessity, you must take

11    these following steps.

12         I think that the SJC's determination under state

13    law that it would be improper to do that controls.  That's

14    how I think of it or view it, your Honor.  I think with all

15    of these issues, it is a question of what does the Federal

16    Constitution require or mandate under these circumstances,

17    and certainly as to that, your Honor's review is de novo or

18    plenary.

19         State law obviously cannot impose a requirement

10:36AM 20   that runs afoul of the Federal Constitution.  We're not

21    suggesting that, but we are suggesting that the SJC's

22    determinations of state law should be controlling here

23    absent a clear command that the Federal Constitution

24    mandates more.

25         THE COURT:  Okay.  Continue.

1           MR. SCHILLINGER:  Unless your Honor has any other

2      questions concerning the issue of the mistrial or manifest

3      necessity, I'll switch to the alleged acquittals, and here

4      there are three Supreme Court precedence I want to point

5      out.  Two have already been mentioned by counsel.  One is

6      *McElrath*, which I think is significant because it

7      acknowledges that in deciding or determining whether a jury

8      has acted on their view that the prosecution failed to

9      prove its case, that determination is informed by the

10:37AM 10      operation of state law.

11           Certainly where a jury has returned a verdict of

12      acquittal and it's been accepted by the trial judge, and I

13      say accepted, your Honor, because there's Justice Alito's

14      concurrence where he notes there may be situations where

15      trial judges refuse to accept inconsistent verdicts and

16      send the jury back to further deliberate, and the court

17      hasn't spoken about whether that runs afoul of double

18      jeopardy or not, but where this verdict was returned and

19      accepted of acquittal, it's inviolate, it is an acquittal,

10:37AM 20      and it can't be thrown out or set aside on the grounds that

21      it may have been inconsistent with other verdicts, which

22      was the issue with the repugnancy doctrine under Georgia

23      law.  We don't dispute that.

24           Similarly, there's no question that labels are not

25      dispositive, so in the case of a judicial action or ruling,

1    it doesn't matter that state law might characterize a

2    particular ruling as procedural if, in fact, it is a

3    determination on the merits that the prosecution failed to

4    prove its case, that is an acquittal.

5         But neither of those go so far as to suggest that

6    in the first instance, a state cannot prescribe what

7    constitutes a final ruling or determination by a jury, and

8    that's the crux here, your Honor.

9         And the third case, which I'll skip to because

10:38AM 10    it's important, it wasn't mentioned by counsel is *Smith vs.*

11    *Massachusetts*.  This is at 543 U.S. 462.  I direct your

12    Honor specifically to the discussion on pages 470 to 474.

13         This is a case the petitioner cites.  The Court

14    specifically noted that a state can impose a rule of

15    nonfinality, that a judgment of acquittal or directed

16    verdict is only tentative and can be reconsidered up until,

17    for example, it's signed and entered on the docket or a

18    formal order has issued.

19         So the particular issue in that case, your Honor,

10:39AM 20    was a judge granted a motion for a required finding of not

21    guilty because the prosecution had failed to prove or

22    introduce evidence that a fire wall had a barrel less than

23    16 inches.

24         Upon being given further, you know, case law

25    authority by the prosecutor, the Judge wanted to reconsider

 1    that ruling and reverse it, and the Supreme Court said the

 2    Judge couldn't do so.  At that point, it constituted an

 3    acquittal because the state hadn't imposed any rules,

 4    whether by Rules of Criminal Procedure, statute, or case

 5    authority that would allow a judge to do that, but it

 6    recognizes state law has the ability to prescribe when

 7    something is truly final, as opposed to tentative, and

 8    that's the issue here, your Honor, is that Massachusetts

 9    state law does have such a requirement for jury verdicts,

10:39AM 10    and it's a requirement that the verdict be returned,

11    announced, and confirmed in open court, and it provides

12    essential safeguards for the reasons that the SJC explained

13    in its opinion, it ensures unanimity, it ensures that no

14    juror's vote or position has been coerced or

15    misrepresented.

16         The double jeopardy clause does not go so far as

17    to say that the state cannot impose that requirement, and

18    here, given that requirement, there were no acquittals.

19    It's undisputed that no verdicts were returned by the jury.

10:40AM 20         Even separate and apart from that, if you accept

21    the petitioner's premise that there's such a thing as an

22    acquittal in substance, not form, which is the argument

23    advanced in *Blueford*, it still lacks the finality here,

24    your Honor, to be an acquittal for the reasons that were

25    set forth in *Blueford.*

1          And I think counsel mentioned two grounds that

2      they contend it's distinguishable:  First, by virtue of

3      Arkansas law.  In fact, I think it was the dissent that

4      tried to argue that because Arkansas was a hard transition

5      state where you could not proceed to consider any lesser

6      included offense until there was a finding of not guilty as

7      to the greater offense, the foreperson's report should be

8      treated as an acquittal, and the majority rejected that and

9      said no, it doesn't matter that it's a hard transition

10:41AM 10      state, juries are still free to go back and reconsider a

11      prior vote because that's what they do.

12          And it's the same issue here, your Honor, as to

13      why there's no lack of finality.  These juror statements

14      don't indicate anywhere at what point during the

15      deliberations the jury supposedly reached this unanimous

16      agreement.  They can't rule out the possibility that it may

17      have been a very initial straw vote or poll and that the

18      jury continued to deliberate subsequent to that, and a

19      juror might have changed their mind.

10:42AM 20          I know the petitioner says it's purely

21      hypothetical that a juror did change their mind.  That's

22      exactly what the Court in *Blueford* said, it's unjustified

23      to assume no juror might have changed their mind.  In other

24      words, that hypothetical is significant and should be taken

25      into account.

1          On top of that, even if at the end of their

2     deliberations when the mistrial was declared, the jurors

3     might have been unanimous on those two counts, the jurors

4     still had the ability to change their mind right up until

5     the point that the verdict is affirmed, announced, and

6     recorded in court, and it has happened under Massachusetts

7     law.

8          They could have voted not guilty or guilty in the

9     jury room, filled out the verdict slip, walked into court,

10:42AM 10   and at that point a juror was still free to change her mind

11    and say you know what, I think the petitioner actually is

12    guilty, it's important that we continue to deliberate.

13    They can't rule out that possibility, your Honor, and

14    that's what deprives these statements of the finality that

15    would be required even if you accept their premise that

16    there can be an acquittal in substance, not form.

17          Then just lastly, your Honor, on the issue of the

18    post-trial inquiry, I'm not aware of authority in either

19    direction to suggest that the Court has the ability to

10:43AM 20   conduct this type of voir dire and whether it might be

21    ancillary to the Court's powers.

22          THE COURT:  I don't think it's -- as Mr. Weinberg

23    has pointed out, I don't think there's any question that I

24    would have that ancillary power in a 2255 in a federal

25    case.  Ineffective assistance of counsel sometimes we do

 1    conduct these inquiries.

 2         MR. SCHILLINGER:  Right.

 3         THE COURT:  What is at least facially troublesome

 4    to me is the notion that I'm either stepping into the shoes

 5    of the state court or telling them to do something, and

 6    maybe I have that authority, maybe I don't, but I feel more

 7    comfortable with some precedent one way or the other, and

 8    you agree, I think, with Mr. Weinberg, there is no

 9    precedent, at least none you've found on that subject?

10:44AM 10    MR. SCHILLINGER:  None that we found, your Honor,

11    exactly, and we do argue that in the interest of comity, if

12    there were to be such a post-trial inquiry in the first

13    instance, it would be appropriate to have the state court

14    do that, but we contend, obviously, that conducting such an

15    inquiry would be inappropriate and is not required here.

16         I mean, in one sense, you know, counsel speaks to

17    their having satisfied their burden of production.  I mean,

18    the acknowledgement that more is needed to actually

19    establish that there was an acquittal and that the record

10:44AM 20    as it currently stands doesn't do so I think is an

21    acknowledgement there was in fact no acquittal and there

22    shouldn't be further inquiry, but the real crux of the

23    issue is what that inquiry goes to.

24         Certainly the Fifth Amendment right with respect

25    to double jeopardy is a bedrock principle.  It's

1    significant, as is the Sixth Amendment right to counsel and

2    other constitutional rights.  That's not the issue.

3        The distinction is the inquiry that they want to

4    conduct here goes to the deliberations themselves.  It is

5    internal.  It goes right to what the jurors said, what they

6    did, how they voted, why they voted the way that they did.

7    It's not simply limited on an external issue that has been

8    held to be appropriate in other circumstances.

9        THE COURT:  External issue, like racial bias, that

10:45AM 10   sort of thing?

11       MR. SCHILLINGER:  Exactly, your Honor extraneous

12   influence or racial bias.  It goes to the very heart of the

13   deliberations, and they cannot get around it, no matter how

14   they try to portray the question.  You can't ask a yes or

15   no question to get to where they want to get to.

16       For one thing, this is not how we ask jurors to

17   make decisions.  We don't ask them to hold up placards that

18   say yes or no or to submit an affidavit that suggests how

19   they voted on an issue.  We ask jurors to reach a verdict

10:46AM 20   through collaborative discussion, consideration of the

21   evidence.

22       For another thing, you know, as we point out in

23   our brief, this type of yes, no inquiry doesn't give any

24   juror the ability to explain the nuance that might have

25   been part of their position.  They may have tentatively

1   agreed in favor of not guilty on a particular charge, but

2   it was subject to further deliberation on the other

3   charges, how the jury came out on those charges, maybe

4   further discussion of particular pieces of evidence.

5          You simply call the jurors back in and say I don't

6   want to hear anything about your deliberations, I don't

7   want to hear anything about your thought process, just tell

8   me yes or no, did you vote this way.  It doesn't give that

9   juror any opportunity to explain that their position was

10:46AM 10  far more nuanced than simply yes or no, and that's the

11  issue here, your Honor.

12         Also, too, the petitioner wants to focus simply on

13  the end result, but you can't ignore the jury's notes and

14  what they publicly reported.  You couldn't have any

15  confidence that this alleged unanimous agreement was, in

16  fact, reached without reconciling, well, why is it that you

17  send a note saying that you were at an impasse on the

18  charges?

19         In addition, why is it that one of these five

10:47AM 20  purported jurors said it was not guilty on Count One but

21  doesn't say it was not guilty on Count Three when the other

22  four say it was as to both charges?  In addition, why do

23  three different purported jurors have different

24  recollections of the vote count as to Count Two, all of

25  which goes to, your Honor, jurors may have different

1    memories, different understandings of what occurred during

2    the deliberations, and that's why it's critical rather than

3    guessing, rather than calling jurors in and interrogating

4    them to try and construct a verdict that is never returned,

5    we insist upon the return and affirmance of a verdict in

6    open court because that ensures the unanimity of the jury

7    and the finality of the deliberations, and it's an

8    important rule that protects criminal defendants.

9         Change the hypothetical here.  Imagine a mistrial

10:48AM 10   is declared, and after the fact, a juror comes forward and

11   says, hold on a second, we all took a vote, and we agreed

12   that the defendant was guilty of murder.

13        If the Commonwealth were to come forward and say

14   they found her guilty, that should be given legal effect.

15   There can't be any serious doubt she would argue

16   strenuously, that is not a valid verdict, shouldn't be

17   given any legal effect, and she would be correct because

18   it's not, so the same rule should pertain here, your Honor.

19        If I could have one moment, your Honor, just to

10:48AM 20   confer?

21        THE COURT:  Yes.

22        MR. SCHILLINGER:  Your Honor, unless you have any

23   questions or if there's anything that I could address that

24   would be helpful to the Court, we'll rest on the remaining

25   arguments in our brief.

1          THE COURT:  All right.  Mr. Weinberg, quick

2     response.

3          MR. WEINBERG:  Thank you, Judge.  First I want to

4     address the state's position that state findings somehow

5     diminish the decision-making that's before your Honor.  It

6     may be that the SJC's interpretation of 27B is correct, but

7     it doesn't --

8          THE COURT:  Whether it's correct or not correct,

9     it's binding on me as a matter of state law, yes.

10:49AM 10          MR. WEINBERG:  And I'm not asking your Honor to

11     reverse a state law decision by the SJC, but it doesn't

12     preclude your Honor from determining that the values that

13     are represented by 27B constitute a viable alternative that

14     the Judge didn't carefully consider.

15          When the state talks about defense counsel would

16     want a mistrial, I mean, that's speculative, and, yes,

17     there was some speculation in Justice Georgia's decision,

18     but that doesn't bind the Court from looking at this record

19     and determining that the record of how defense responded to

10:50AM 20     notes 1 and 2 was the antithesis of that speculation that

21     the defense wanted a verdict for this jury and never asked

22     for a mistrial and urged the *Tuey* instruction, which

23     oftentimes defense lawyers don't seek because they don't

24     want a verdict.

25          When the state court talks about it would have

1    been improperly coercive, there's simply no basis.  It

2    misunderstands how a judge can frame questions without

3    being coercive, and that's, again, a federal decision

4    whether or not this jury could on a post-trial voir dire be

5    asked questions that would not trigger or not catalyze some

6    disclosure of their mental processes is something that your

7    Honor has the experience to determine.

8        There can be many questions to the jury that would

9    answer many of the state's concerns about, you know, did

10:51AM 10    the jury reconsider, was this a tentative vote?

11        Your Honor can ask a juror whether you ever

12    discussed Count Two again, whether you ever reconsidered

13    your decision on Count Two, whether you considered it a

14    final vote.  Those are all questions that are either at or

15    outside the boundaries of 606(b), which itself literally

16    applies to asking the jury to impeach a verdict but does

17    not literally apply to this unique circumstance where

18    jurors have disclosed an acquittal that remained

19    undisclosed because the jurors didn't announce it and the

10:52AM 20    Judge didn't seek it.

21        And then, of course, we have the constitutional

22    issue that I referenced from the *Villar* that Judge Saris

23    wrote about while sitting on the First Circuit, which is

24    whether or not the Constitution trumps Rule 606(b), whether

25    or not the values and interests at the heart of there, the

1    right to a jury trial before an unbiased jury, and here we

2    argue the right to the benefit of a jury trial, which then

3    flows into double jeopardy historic and valued protection

4    against the right not to be put to trial a second time

5    would require some fact-finding, would require an

6    opportunity to prove it.

7         The state argues, well, if four people aren't

8    enough, but the burden's on the state, and they should be

9    supporting a voir dire because your Honor could find an

10:53AM 10    acquittal based on the four jurors could find that the

11    state has not met their quote, "heavy burden," to prove

12    that a re-prosecution is viable with the state opposing a

13    procedure that could illuminate for the Court whether or

14    not those four jurors, you know, who are not contradicted

15    or the five jurors that were not contradicted were

16    representing that there was a final unanimous

17    unconditional, unreconsidered verdict to acquit.

18         The language from *Smith* is dicta, it's not a

19    holding, and the final point I wanted to make unless the

10:53AM 20    Court has questions is that the *Renico* case relied on by

21    the state where the Supreme Court made very clear in its

22    introduction and then in its holding that it could well

23    have reached a different decision to invalidate the state

24    mistrial order if it was a 2241, where 2254 only allows for

25    a reversal if it's clearly a misapplication of known

1    Supreme Court precedent, not First Circuit precedent, or in

2    that case, I believe it was Sixth Circuit precedent is a

3    very different case, but within the case, they talk about

4    the decision to declare a mistrial is left to the quote,

5    "sound discretion of the Judge," but the power, this is the

6    from the majority opinion.

7         THE COURT:  Is that *Renico?*

8         MR. WEINBERG:  Yes, ought to be used with the

9    greatest caution under urgent circumstances and for very

10:54AM 10  plain and obvious causes.

11        *Renico likely would have reversed Judge Cannone's*

12   *decision under the Perez* case, under the Supreme Court's

13   multi-factor test had it been a 2241.  Over and over, they

14   talk about the AEDPA prevents defendants from using federal

15   habeas as a vehicle to second guess reasonable decisions of

16   state courts whether or not the Michigan Supreme Court

17   opinion reinstating Lett's conviction in this case was

18   correct, it was clearly not unreasonable.

19        And the language in *Renico* is consistent with your

10:55AM 20  Honor's decision that we urge and which we, of course,

21   contend should be to reverse the state court decision

22   because of the absence of manifest necessity.

23        Lastly, *McElrath*, which is the most recent 2024,

24   there again, there was a Georgia law, a Georgia ruling, a

25   Georgia procedure invalidating jury findings based on the

         1    idiosyncrasies of state law that said the acquittal needed

         2    to be consistent with other counts.

         3         And I think that's a clear example of the fact

         4    that state law doesn't govern when state law conflicts with

         5    the federal constitutionals double jeopardy clause.  In

         6    this case, we strongly contend it does for two reasons,

         7    first, that there was a unanimous verdict to acquit to find

         8    the state's case insufficient to vote not guilty; second,

         9    that there was no manifest necessity under any of the

10:56AM 10    factors that either the Supreme Court or First Circuit look

        11    at to justify the precipitous sui sponte ruling by

        12    Judge Cannone.  Thank you very much.

        13         THE COURT:  Mr. Schillinger, last word.

        14         MR. SCHILLINGER:  Nothing further, your Honor,

        15    unless you have any questions.  Thank you.

        16         THE COURT:  Thank you.  It was well briefed and

        17    well argued on both sides.  I am quite conscious of what I

        18    understand is an April 1st retrial date, and I want to try

        19    to issue an opinion to give whichever side is or both sides

10:57AM 20    if they're both unhappy with my decision an opportunity to

        21    do an expedited appeal, so I'm going to put this opinion

        22    out as quickly as I can under the circumstances.

        23         There's quite a lot to consider here.

        24    Mr. Weinberg says it was a wilderness, it's a thick forest

        25    anyway, if not an actual jungle, but I'm going to pick my

58

1  way through it the best I can, render my decision as

2  quickly as I can under the circumstances, which, you know,

3  if I had a year to write this opinion might be more

4  scholarly, but I'm going to make the best decision I can,

5  so, again, there's an opportunity to appeal before the

6  retrial commences.  Thank you, and we'll stand in recess.

7           THE CLERK:  All rise.

8           (Whereupon, the hearing was adjourned at

9  10:57 a.m.)

10              C E R T I F I C A T E

11  UNITED STATES DISTRICT COURT )

12  DISTRICT OF MASSACHUSETTS ) ss.

13  CITY OF BOSTON )

14           I do hereby certify that the foregoing

15  transcript, Pages 1 through 58 inclusive, was recorded

16  by me stenographically at the time and place aforesaid

17  in Civil Action No. 25-10399-FDS, KAREN READ vs. NORFOLK

18  COUNTY SUPERIOR COURT and MASSACHUSETTS ATTORNEY

19  GENERAL, and thereafter by me reduced to typewriting and

20  is a true and accurate record of the proceedings.

21           Dated March 6, 2025.

22                      s/s Valerie A. O'Hara

23            _____

24              VALERIE A. O'HARA

25              OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____     )
                                    )
                                    )
KAREN READ,                         )
              Petitioner            )
                                    )
v.                                  )          No. 25-CV-10399-FDS
                                    )
NORFOLK COUNTY SUPERIOR             )
COURT, MASSACHUSETTS                )
ATTORNEY GENERAL,                   )
              Respondents           )
                                    )
_____     )

## PETITIONER'S NOTICE OF APPEAL

Now comes the Petitioner Karen Read, by and through undersigned counsel, and hereby

notices her appeal to the United States Court of Appeals for the First Circuit from the March 13,

2025 Order denying her petition for writ of habeas corpus in the above-captioned case.[1]

Respectfully Submitted,
KAREN READ
By Her Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

_____

[1] While not clearly required to appeal from the denial of this petition under 28 U.S.C. § 2241, *see Gonzalez v. Justices of Mun. Court of Bos.*, 382 F.3d 1, 6 (1st Cir. 2004), *vacated on other grounds and subsequently reinstated*, 420 F.3d 5, the District Court *sua sponte* granted a certificate of appealability finding that Petitioner made a "substantial showing of the denial of a constitutional right as to all claims." Dkt. 28 at 2 (citation omitted).

1

/s/ **Michael Pabian**
Michael Pabian, Esq.
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

/s/ **Alan J. Jackson**
Alan J. Jackson, Esq.
Admitted *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

/s/ **David R. Yannetti**
David R. Yannetti, Esq.
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

Dated: March 13, 2025

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, March 13, 2025, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

/s/ **Martin G. Weinberg**
Martin G. Weinberg, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

Dated: March 18, 2025