# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————

## No. 25-1257

———————————

## KAREN READ,
Petitioner - Appellant

*v.*

## NORFOLK COUNTY SUPERIOR COURT; ANDREA J. CAMPBELL, MASSACHUSETTS ATTORNEY GENERAL,
Respondents - Appellees

———————————

On Appeal from an Order of the United States District Court
for the District of Massachusetts Denying Petition for Habeas Corpus

———————————

## JOINT APPENDIX
## VOLUME I
## (Pages 1 – 471)

———————————

Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
pabianlaw38@gmail.com

Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

**Counsel for Karen Read**

Thomas E. Bocian
MA Attorney General's Office

Caleb J. Schillinger
Norfolk District Attorney's Office

1 Ashburton Pl., 20th Fl.
Boston, Massachusetts 02108
(617) 727-2200 (Telephone)

**Counsel for Norfolk County Superior Court and Massachusetts Attorney General**

45 Shawmut Rd.
Canton, Massachusetts 02021
(781) 830-4800 (Telephone)

**Counsel for Norfolk County Superior Court**

# TABLE OF CONTENTS

**Caption**                                                                          **Page**

**VOLUME I**

Docket Entries…………………………………………………………...1

Petition for Writ of Habeas Corpus, Document 1…………………… ....5

Memorandum in Support of Petition for Writ of Habeas Corpus,
Document 2………………………………………………………….13

SJC Record Appendix, Document 2-1…………………………….48

**VOLUME II**

SJC Opinion, Document 2-2………………………………………….472

Respondent's Opposition to Petition for Writ of Habeas Corpus,
Document 18 …………………………………….....................507

SJC Supplemental Record Appendix, Document 18-1……………….536

Reply to Respondent's Opposition, Document 22………………….575

Hearing Transcript, 3/5/25…………………………………………595

Notice of Appeal, Document 29…………………………………….653

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25-cv-10399-FDS

Read v. Norfolk County Superior Court et al
Assigned to: Chief Judge F. Dennis Saylor, IV
Case in other court:  USCA - First Circuit, 25-01257
Cause: 28:2241 Petition for Writ of Habeas Corpus (federa

Date Filed: 02/18/2025
Jury Demand: None
Nature of Suit: 530 Habeas Corpus
(General)
Jurisdiction: Federal Question

**Petitioner**

**Karen Read**

represented by **Martin G. Weinberg**
Martin G. Weinberg, PC
20 Park Plaza
Suite 1000
Boston, MA 02116
617-227-3700
Fax: 617-338-9538
Email: owlmgw@att.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Pabian**
Michael Pabian Law Office, LLC
20 Park Plaza, Suite 1000
Boston, MA 02116
339-227-0642
Email: pabianlaw38@gmail.com
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Norfolk County Superior Court**

represented by **Caleb J. Schillinger**
Norfolk District Attorney's Office
45 Shawmut Road
Canton, MA 02021
781-830-4800
Email: caleb.j.schillinger@mass.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas E. Bocian**
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-727-2200
Email: thomas.bocian@state.ma.us
*ATTORNEY TO BE NOTICED*

**Respondent**

**Massachusetts Attorney General**　　　　represented by　**Thomas E. Bocian**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/18/2025 | 1 | PETITION for Writ of Habeas Corpus (2241) Filing fee: $ 5, receipt number AMADC-10844523 Fee status: Filing Fee paid., filed by Karen Read. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Weinberg, Martin) (Entered: 02/18/2025) |
| 02/18/2025 | 2 | MEMORANDUM OF LAW by Karen Read in Support re 1 Petition for Writ of Habeas Corpus (2241). (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Weinberg, Martin) (Entered: 02/18/2025) |
| 02/18/2025 | 3 | ELECTRONIC NOTICE of Case Assignment. Chief Judge F. Dennis Saylor, IV assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Paul G. Levenson. (NMC) (Entered: 02/18/2025) |
| 02/18/2025 | 4 | Chief Judge F. Dennis Saylor, IV: ORDER entered. SERVICE ORDER re 2241 Petition. Order entered pursuant to 28 U.S.C. 2243 governing Section 2241 cases for service on respondents. The answer or responsive pleading is due no later than 21 days from receipt of this order. (NMC) (Entered: 02/18/2025) |
| 02/18/2025 | 5 | NOTICE of Appearance by Martin G. Weinberg on behalf of Karen Read (Weinberg, Martin) (Entered: 02/18/2025) |
| 02/18/2025 | 6 | NOTICE of Appearance by Michael Pabian on behalf of Karen Read (Pabian, Michael) (Entered: 02/18/2025) |
| 02/18/2025 | 7 | Copy re 4 Service Order - 2241 Petition mailed to Norfolk County Superior Court and Massachusetts Attorney General on 2/18/2025. (NMC) (Entered: 02/18/2025) |
| 02/18/2025 | 8 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER VACATING SERVICE ORDER 4 - The Service Order is hereby VACATED, a new Order to be entered. (BIB) (Entered: 02/18/2025) |
| 02/18/2025 | 9 | Chief Judge F. Dennis Saylor, IV: **SCHEDULING ORDER** entered. (MAC) (Entered: 02/18/2025) |
| 02/18/2025 | 10 | Copy re 9 Scheduling Order mailed to Massachusetts Office of the Attorney General, and Norfolk County Superior Court on 2/18/25. (MAC) (Entered: 02/18/2025) |
| 02/18/2025 | | Chief Judge F. Dennis Saylor, IV: ORDER entered. Hearing set for 3/5/2025 09:30 AM in Courtroom 10 (In person only) before Chief Judge F. Dennis Saylor IV. (MAC) (Entered: 02/18/2025) |
| 02/19/2025 | 11 | Chief Judge F. Dennis Saylor, IV: SERVICE ORDER...In light of the Court's order directing an expedited response, and the strong likelihood that respondents have actual notice of the petition, the Court will instead direct counsel for petitioner to file a statement by the close of business on February 20, 2025, stating or affirming that counsel has served a copy of the petition, in electronic form or by hand, on counsel for respondents, or that counsel has communicated with counsel for respondents and agreed that no further service is necessary... (BIB) (Entered: 02/19/2025) |

| 02/19/2025 | 12 | **Duplicate entry filed in error.** (Entered: 02/19/2025) |
|---|---|---|
| 02/20/2025 | 13 | RESPONSE TO COURT ORDER by Karen Read re 11 Service Order - 2254 Petition,, . (Weinberg, Martin) (Entered: 02/20/2025) |
| 02/24/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Alan Jackson Filing fee: $ 125, receipt number AMADC-10854863 by Karen Read. (Attachments: # 1 Exhibit 1) (Weinberg, Martin) Modified on 2/24/2025 (MAC). (Entered: 02/24/2025) |
| 02/24/2025 | 15 | **Duplicate entry filed in error** (Entered: 02/24/2025) |
| 02/24/2025 | 16 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 14 Motion for Leave to Appear Pro Hac Vice Added Alan Jackson. <br><br> **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> (MAC) (Entered: 02/24/2025) |
| 02/26/2025 | 17 | NOTICE of Appearance by Caleb J. Schillinger on behalf of Norfolk County Superior Court (Schillinger, Caleb) (Entered: 02/26/2025) |
| 02/26/2025 | 18 | MEMORANDUM OF LAW by Norfolk County Superior Court. (Attachments: # 1 Exhibit A - Supplemental Record Appendix in SJC Appeal)(Schillinger, Caleb) (Entered: 02/26/2025) |
| 02/26/2025 | 19 | STATEMENT OF COUNSEL of Respondent Norfolk County Superior Court Regarding Existence of Victim by Norfolk County Superior Court. (Schillinger, Caleb) (Entered: 02/26/2025) |
| 02/26/2025 | 20 | NOTICE of Appearance by Thomas E. Bocian on behalf of Norfolk County Superior Court (Bocian, Thomas) (Entered: 02/26/2025) |
| 02/26/2025 | 21 | NOTICE of Appearance by Thomas E. Bocian on behalf of Massachusetts Attorney General (Bocian, Thomas) (Entered: 02/26/2025) |
| 02/28/2025 | 22 | MEMORANDUM OF LAW by Karen Read in Reply to Opposition re 18 Memorandum of Law. (Weinberg, Martin) (Entered: 02/28/2025) |
| 03/05/2025 | 23 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Hearing held on 3/5/2025. Case called; Arguments heard; Court takes matter under advisement. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: Weinreb, Pabian, Jackson and Yanetti for the petitioner. Schillinger and Bocian for the respondents.) (MMM) (Entered: 03/05/2025) |
| 03/05/2025 | 24 | NOTICE by Karen Read re 1 Petition for Writ of Habeas Corpus (2241) *of Supplemental Authority* (Weinberg, Martin) (Entered: 03/05/2025) |
| 03/06/2025 | 25 | Transcript of Motion Hearing held on March 5, 2025, before Chief Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact |

| | | Information: Valerie OHara at vaohara@gmail.com. Redaction Request due 3/27/2025. Redacted Transcript Deadline set for 4/7/2025. Release of Transcript Restriction set for 6/4/2025. (DRK) (Entered: 03/06/2025) |
|---|---|---|
| 03/06/2025 | 26 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 03/06/2025) |
| 03/13/2025 | 27 | Chief Judge F. Dennis Saylor, IV: ORDER entered. MEMORANDUM AND ORDER ON PETITION FOR HABEAS CORPUS. The Petition for a Writ of Habeas Corpus is DENIED.(MMM) (Entered: 03/13/2025) |
| 03/13/2025 | 28 | Chief Judge F. Dennis Saylor, IV: ORDER entered. MEMORANDUM AND ORDER ON MOTION FOR CERTIFICATE OF APPEALABILITY. A Certificate of Appealability is GRANTED as to all claims.(MMM) (Entered: 03/13/2025) |
| 03/13/2025 | 29 | NOTICE OF APPEAL as to 27 Memorandum & ORDER by Karen Read. Filing fee: $ 605, receipt number AMADC-10891203 Fee Status: Not Exempt.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 4/2/2025. (Weinberg, Martin) (Entered: 03/13/2025)** |
| 03/13/2025 | 30 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 29 Notice of Appeal. (MAP) (Entered: 03/13/2025) |
| 03/14/2025 | 31 | USCA Case Number 25-1257 for 29 Notice of Appeal filed by Karen Read. (MAP) (Entered: 03/14/2025) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/17/2025 09:57:49 | | | |
| **PACER Login:** | mgwpc3700 | **Client Code:** | Read |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-10399-FDS |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

AO 242 (Rev. 09/17) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

# UNITED STATES DISTRICT COURT

for the
District of Massachusetts ▾

| | |
|---|---|
| Karen Read | ) |
| | ) |
| | ) |
| _____ | ) |
| *Petitioner* | ) |
| | ) |
| v. | ) |
| | ) Case No. _____ |
| Norfolk County Superior Court, Massachusetts Attorney | ) *(Supplied by Clerk of Court)* |
| General | ) |
| _____ | ) |
| *Respondent* | |
| *(name of warden or authorized person having custody of petitioner)* | |

## PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241
### Personal Information

1.  (a)  Your full name:  Karen Read
    (b)  Other names you have used:  N/A

2.  Place of confinement:
    (a)  Name of institution:  N/A
    (b)  Address:  N/A

    (c)  Your identification number:  N/A

3.  Are you currently being held on orders by:
    ❏ Federal authorities       ☑ State authorities       ❏ Other - explain:

4.  Are you currently:
    ❏ A pretrial detainee (waiting for trial on criminal charges)
    ❏ Serving a sentence (incarceration, parole, probation, etc.) after having been convicted of a crime
        If you are currently serving a sentence, provide:
        (a)  Name and location of court that sentenced you:  N/A

        (b)  Docket number of criminal case:  N/A
        (c)  Date of sentencing:
    ❏ Being held on an immigration charge
    ☑ Other *(explain)*:  Released on bail pending trial on criminal charges

### Decision or Action You Are Challenging

5.  What are you challenging in this petition:
    ❏ How your sentence is being carried out, calculated, or credited by prison or parole authorities (for example, revocation or calculation of good time credits)

AO 242 (Rev. 09/17) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

❏ Pretrial detention

❏ Immigration detention

❏ Detainer

❏ The validity of your conviction or sentence as imposed (for example, sentence beyond the statutory maximum or improperly calculated under the sentencing guidelines)

❏ Disciplinary proceedings

☑ Other *(explain)*:  I am claiming that my April 2025 retrial violates my federal Double Jeopardy rights.

6.  Provide more information about the decision or action you are challenging:

(a)  Name and location of the agency or court:  Norfolk County Superior Court

(b)  Docket number, case number, or opinion number:  Criminal Action 22-00117

(c)  Decision or action you are challenging *(for disciplinary proceedings, specify the penalties imposed)*:
Order denying motion to dismiss

(d)  Date of the decision or action:  08/22/2024

### Your Earlier Challenges of the Decision or Action

7.  **First appeal**

Did you appeal the decision, file a grievance, or seek an administrative remedy?

☑ Yes            ❏ No

(a)  If "Yes," provide:

(1)  Name of the authority, agency, or court:  Supreme Judicial Court

(2)  Date of filing:  09/19/2024

(3)  Docket number, case number, or opinion number:  SJC-13663

(4)  Result:  Affirmed

(5)  Date of result:  02/11/2025

(6)  Issues raised:  (1) whether the jury's unanimous conclusion following trial that Ms. Read is not guilty on Counts 1 and 3 constitutes an acquittal and precludes re-prosecution; (2) whether, alternatively, the defense is entitled to a post-verdict judicial inquiry to determine whether the evidence supports the juror representations as to having acquitted Ms. Read; (3) whether re-prosecution is independently barred because there was no manifest necessity to declare a mistrial on counts for which the jury was not deadlocked; and (4) assuming arguendo the court found that counsel consented to a mistrial, whether the defendant's personal consent was required

(b)  If you answered "No," explain why you did not appeal:  N/A

8.  **Second appeal**

After the first appeal, did you file a second appeal to a higher authority, agency, or court?

❏ Yes            ☑ No

AO 242 (Rev. 09/17) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

(a) If "Yes," provide:

    (1) Name of the authority, agency, or court: N/A

    (2) Date of filing:

    (3) Docket number, case number, or opinion number: N/A

    (4) Result: N/A

    (5) Date of result:

    (6) Issues raised: N/A

(b) If you answered "No," explain why you did not file a second appeal: There was no additional state remedy available to prevent the impending violation of my Double Jeopardy rights.

9. **Third appeal**

After the second appeal, did you file a third appeal to a higher authority, agency, or court?

☐ Yes    ☑ No

(a) If "Yes," provide:

    (1) Name of the authority, agency, or court: N/A

    (2) Date of filing:

    (3) Docket number, case number, or opinion number: N/A

    (4) Result: N/A

    (5) Date of result:

    (6) Issues raised: N/A

(b) If you answered "No," explain why you did not file a third appeal: There was no additional state remedy available to prevent the impending violation of my Double Jeopardy rights.

10. **Motion under 28 U.S.C. § 2255**

In this petition, are you challenging the validity of your conviction or sentence as imposed?

☐ Yes    ☑ No

If "Yes," answer the following:

(a)    Have you already filed a motion under 28 U.S.C. § 2255 that challenged this conviction or sentence?

    ☐ Yes    ☐ No

If "Yes," provide:

(1) Name of court: N/A

(2) Case number: N/A

(3) Date of filing:

(4) Result: N/A

(5) Date of result:

(6) Issues raised: N/A

(b)     Have you ever filed a motion in a United States Court of Appeals under 28 U.S.C. § 2244(b)(3)(A), seeking permission to file a second or successive Section 2255 motion to challenge this conviction or sentence?

☐ Yes          ☐ No

If "Yes," provide:

(1) Name of court: N/A

(2) Case number: N/A

(3) Date of filing:

(4) Result: N/A

(5) Date of result:

(6) Issues raised: N/A

(c)     Explain why the remedy under 28 U.S.C. § 2255 is inadequate or ineffective to challenge your conviction or sentence:     N/A

11.  **Appeals of immigration proceedings**

Does this case concern immigration proceedings?

☐ Yes          ☑ No

If "Yes," provide:

(a)     Date you were taken into immigration custody:

(b)     Date of the removal or reinstatement order:

(c)     Did you file an appeal with the Board of Immigration Appeals?

☐ Yes          ☐ No

AO 242 (Rev. 09/17) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

If "Yes," provide:

(1) Date of filing: _____

(2) Case number: N/A _____

(3) Result: N/A _____

(4) Date of result: _____

(5) Issues raised: N/A _____

_____

_____

_____

_____

(d)    Did you appeal the decision to the United States Court of Appeals?

❑ Yes            ❑ No

If "Yes," provide:

(1) Name of court: N/A _____

(2) Date of filing: _____

(3) Case number: N/A _____

(4) Result: N/A _____

(5) Date of result: _____

(6) Issues raised: N/A _____

_____

_____

_____

_____

12.    **Other appeals**

Other than the appeals you listed above, have you filed any other petition, application, or motion about the issues raised in this petition?

❑ Yes            ☑ No

If "Yes," provide:

(a) Kind of petition, motion, or application: N/A _____

(b) Name of the authority, agency, or court: N/A _____

(c) Date of filing: _____

(d) Docket number, case number, or opinion number: N/A _____

(e) Result: N/A _____

(f) Date of result: _____

(g) Issues raised: N/A _____

_____

_____

_____

AO 242 (Rev. 09/17)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

## Grounds for Your Challenge in This Petition

13.    State every ground (reason) that supports your claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.  Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE**:    Re-Prosecution Is Barred Because There Was No Manifest Necessity to Declare a Mistrial on Counts on which the Jury Was Not Deadlocked

(a)  Supporting facts *(Be brief.  Do not cite cases or law.)*:
See Memorandum in Support of Petition

(b)  Did you present Ground One in all appeals that were available to you?
☑Yes                    ☐No

**GROUND TWO**:    The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution

(a)  Supporting facts *(Be brief.  Do not cite cases or law.)*:
See Memorandum in Support of Petition

(b)  Did you present Ground Two in all appeals that were available to you?
☑Yes                    ☐No

**GROUND THREE**:    Alternatively, the Defense Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Ms. Read

(a)  Supporting facts *(Be brief.  Do not cite cases or law.)*:
See Memorandum in Support of Petition

(b)  Did you present Ground Three in all appeals that were available to you?
☑Yes                    ☐No

AO 242 (Rev. 09/17)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

**GROUND FOUR**:  N/A

(a)  Supporting facts *(Be brief.  Do not cite cases or law.)*:

N/A

(b)  Did you present Ground Four in all appeals that were available to you?

❏ Yes                    ❏ No

14.    If there are any grounds that you did not present in all appeals that were available to you, explain why you did
        not:    N/A

**Request for Relief**

15.  State exactly what you want the court to do:  Issue a writ of habeas corpus and rule that Ms. Read's re-prosecution
on Counts 1 and 3 would violate her Double Jeopardy rights

AO 242 (Rev. 09/17)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

## Declaration Under Penalty Of Perjury

If you are incarcerated, on what date did you place this petition in the prison mail system:

N/A

I declare under penalty of perjury that I am the petitioner, I have read this petition or had it read to me, and the information in this petition is true and correct.  I understand that a false statement of a material fact may serve as the basis for prosecution for perjury.

Date:      02/18/2025

_Signature of Petitioner_

Martin G. Weinberg

_Signature of Attorney or other authorized person, if any_

| Print | Save As... | | Reset |

Page 9 of  9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                              )
                                                              )
KAREN READ,                                           )
                    Petitioner                             )
                                                              )
v.                                                             )                    No. 25-CV-10399
                                                              )
NORFOLK COUNTY SUPERIOR           )
COURT, MASSACHUSETTS                   )
ATTORNEY GENERAL,                        )
                    Respondents                         )
                                                              )
_____ )

### MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

Now comes the petitioner Karen Read, by and through undersigned counsel, and hereby respectfully submits this Memorandum in Support of her Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241.

Ms. Read is currently facing an April 1, 2025 retrial in Norfolk County Superior Court, after a prior mistrial in July 2024. This Petition contends that such retrial will violate Ms. Read's Fifth and Fourteenth Amendment protections against Double Jeopardy. The Petition relies upon post-trial statements of five jurors (four directly and one indirectly) that the jury in Ms. Read's first trial reached a final, unanimous decision to acquit her of second-degree murder. Despite massive media publicity regarding these declarations, none of the other seven jurors disputed the accuracy of these post-trial statements. In the usual course, the jury's verdict would have been announced in open court, and re-prosecution for that charge would indisputably be constitutionally prohibited. Here, however, the trial court, assuming but not verifying that juror

1

notes indicating an impasse referred to all rather than just several of the outstanding charges, failed to inquire, pursuant to Mass. R. Crim. P. 27(b), regarding the existence of any partial verdicts (as well as failing to poll the jury) and, for that reason, the jury acquittals were not announced and a mistrial was declared without the defendant's consent. Contrary to longstanding federal as well as state caselaw, the trial court gave no consideration to any of the existing viable alternatives to a mistrial, nor was defense counsel consulted or given any opportunity to be heard prior to and in relation to the court's declaration of a mistrial. At no time prior to the trial court's final *sua sponte* decision to respond to a jury note by declaring a mistrial had the trial court even mentioned the word "mistrial." In these circumstances, the Commonwealth did not satisfy its heavy well-established burden of establishing manifest necessity as a condition precedent for the mistrial which was declared in violation of petitioner's Double Jeopardy rights.

The defense independently maintains that a jury's final, unanimous agreement that Ms. Read is not guilty constitutes an acquittal for Double Jeopardy purposes, and that the trustworthy and uncontradicted post-trial affidavits entitled her at minimum to a judicial inquiry on this issue. The prosecution wants this Court to in essence ignore the declarations of the jurors, ignore the possibility if not probability that the jury unconditionally, finally, and without any ambiguity unanimously found Ms. Read innocent, and avoid any post-trial inquiry that could demonstrate that all 12 jurors unanimously rejected the sufficiency of the prosecution as to two of the three indictments. The defense has more than met is burden of production regarding the jury's decision to acquit Ms. Read. Neither the trial court nor the SJC held otherwise. Instead, the state courts erected an impenetrable procedural barrier to prevent Ms. Read from proving what is

2

clearly true – that the jurors finally and unanimously agreed that Ms. Read did not commit the murder (nor a second charge of leaving the scene) for which she stands charged. This ruling is irreconcilable with the constitutional interest in having decisions by jurors respected and honored. Public respect for the judiciary requires that agreements reached by a jury of the defendant's peers in a matter so consequential not be rendered irrelevant. For these reasons, federal courts favor post-trial *voir dires*, and the denial of such inquiry here violated Ms. Read's Fifth, Sixth, and Fourteenth Amendment federal constitutional rights.

## I.    Procedural Background

On June 9, 2022, Ms. Read was charged in three separate indictments with second-degree murder in violation of Mass. Gen. Laws c. 265, § 1 (Count 1); manslaughter while operating under the influence of alcohol in violation of Mass. Gen. Laws c. 265, § 13½ (Count 2); and leaving the scene of a collision resulting in death in violation of Mass. Gen. Laws c. 90, § 24(2)(a½)(2) (Count 3). (R. 139-44).[1] A jury trial began in Norfolk County Superior Court on April 16, 2024. The trial court declared a mistrial on July 1, 2024.

After the mistrial, Ms. Read moved to dismiss Counts 1 and 3 on Double Jeopardy grounds, contending (1) that the jury reached a final, unanimous decision to acquit her on those charges; and (2) that there was no manifest necessity supporting the mistrial. As set forth in more detail *infra*, the motion was predicated, in part, upon affidavits by counsel reflecting statements of four deliberating jurors that the jury had agreed Ms. Read is not guilty of the

---

[1] The Record Appendix for Ms. Read's appeal to the Supreme Judicial Court is attached as Exhibit A to this Memorandum. The citations to that Record Appendix ("R. _____") correspond to the page numbers in the lower lefthand corner of each page.

relevant counts (and a second-hand statement attributed to a fifth juror stating that the jury had agreed Ms. Read is not guilty of murder).  On August 22, 2024, after hearing oral argument, the Superior Court issued an order denying Ms. Read's motion to dismiss.

On September 11, 2024, Ms. Read filed a petition for relief to the Supreme Judicial Court ("SJC") pursuant to Mass. Gen. Laws c. 211, § 3.  (R. 5).  On September 19, 2024, a single justice of the SJC (Dewar, J.) reserved and reported the case, without decision, to the full Court. (R. 423).

On February 11, 2025, the SJC issued an opinion (hereinafter "Opinion"), attached as Exhibit B to this Memorandum,[2] affirming the denial of Ms. Read's motion to dismiss.  The SJC held that (1) the trial court acted within its discretion in deciding that the jury was at an impasse and that a mistrial was therefore supported by manifest necessity, notwithstanding that the jury never clearly stated that the impasse extended to *all* counts (and the post-trial affidavits make clear that it did not); (2) the trial court adequately considered alternatives to a mistrial, notwithstanding that the court's intention of declaring a mistrial was not so much as mentioned until the trial court *sua sponte* declared one; (3) the trial court was not required to consult with counsel or give counsel an opportunity to be heard regarding the prospect of a mistrial because it had previously solicited counsel's views on whether to give a *Tuey-Rodriguez* charge designed to prevent a mistrial in response to prior jury notes (albeit without mentioning the possibility of a mistrial); (4) the lack of a formal verdict announced in open court precluded any later claim that the jury in fact had unanimously and finally decided to acquit Ms. Read of two of the three

---

[2] The parties' briefs filed with the SJC are attached as Exhibits C, D, and E.

charges against her; and (5) the defense was not entitled to a post-verdict inquiry to substantiate its claim of acquittal because the availability of such inquiry is limited to claims of extraneous influence or juror bias.

## II.    Ms. Read Is Entitled to Federal Review of Her Double Jeopardy Claim Prior to Retrial

Because Ms. Read is currently released on bail, she is in the Commonwealth's custody, as required to file a 28 U.S.C. § 2241 petition. *See Allen v. Att'y Gen. of Me.*, 80 F.3d 569, 572 (1st Cir. 1996).

The First Circuit has made clear that "[a] petition for habeas relief that raises a colorable claim of former jeopardy need not invariably await trial and conviction in the state court. Such claims are distinctive because the Constitution insists that 'courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial.'" *Id.* (quoting *Witte v. United States*, 515 U.S. 389, 397 (1995)). As the Supreme Court has observed, "the rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence. To be sure, the Double Jeopardy Clause protects an individual against being twice convicted for the same crime, and that aspect of the right can be fully vindicated on an appeal following final judgment . . . . However, this Court has long recognized that the Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense." *Abney v. United States*, 431 U.S. 651, 660 (1977). "Obviously, these aspects of the guarantee's protections would be lost if the accused were forced to 'run the gauntlet' a second time before an appeal could be taken; even if the accused is

5

acquitted, or, if convicted, has h[er] conviction ultimately reversed on double jeopardy grounds, [s]he has still been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit." *Id.* at 662.

"To realize the solemn promise of this constitutional guaranty, federal habeas courts will in appropriate circumstances entertain a claim that permitting a nascent (but as yet incomplete) state court prosecution to go forward would violate the Double Jeopardy Clause." *Allen*, 80 F.3d at 572. For reasons set forth *infra* Section IV, the defense contends that Ms. Read's retrial on Counts 1 and 3 would violate her federal constitutional protection against Double Jeopardy. Accordingly, Ms. Read "may seek federal habeas corpus relief without first undergoing trial on the challenged indictment[s]." *Id.*; *see also, e.g.*, *Justices of Bos. Mun. Court v. Lydon*, 466 U.S. 294, 303 (1984) ("Because the [Double Jeopardy] Clause protects interests wholly unrelated to the propriety of any subsequent conviction, a requirement that a defendant run the entire gamut of state procedures, including retrial, prior to consideration of h[er] claim in federal court, would require h[er] to sacrifice one of the protections of the Double Jeopardy Clause." (citation omitted)).

## III.    Facts

On June 25, 2024, the jury in Ms. Read's first trial began deliberations after receiving instructions from the trial court. The court instructed the jurors, "You should continue deliberating until you have reached a final verdict on each charge." June 25, 2024 Tr. at 46 (R. 190). It also noted that Count 2 contained "lesser include[d] charge[s]" of involuntary manslaughter and motor vehicle homicide, which the jury should consider "even if [the

Commonwealth] fail[ed] to prove the greater charge of manslaughter while operating a motor vehicle under the influence of liquor." *Id.* at 35, 38 (R. 179, 182).

The following day, on June 26, 2024, outside the presence of the jury, counsel for Ms. Read raised an issue regarding the verdict form. With respect to Count 2, the original verdict slip provided only one option to find Ms. Read not guilty before going on to ask whether Ms. Read was guilty of the offense charged, or guilty of one of the two lesser included offenses. *See* Exhibit B to Affidavit in Support of Motion to Amend Jury Verdict Slip (R. 239). Counsel asked that the form be amended to provide "not guilty options for the subordinate charges under Count 2." June 26, 2024 Tr. at 5 (R. 212). The trial court initially indicated its disagreement with counsel's request. *See id.* at 8 (R. 215). However, after considering the matter further, the court agreed to provide supplemental instructions and an amended verdict slip. *See id.* at 9-14 (R. 216-21). Later that day, the court provided the supplemental instructions, telling jurors that "Count 2 encompasses three separate charges, the most serious of which is manslaughter while operating a vehicle under the influence of liquor." *Id.* at 16 (R. 223). The jury should first focus on that "lead charge" and, "if the Commonwealth . . . failed to prove that crime beyond a reasonable doubt, then . . . consider the remaining lesser included offenses in descending order." *Id.* (R. 223).

On June 28, 2024, the jury sent the following note to the court: "I am writing to inform you on behalf of the jury that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict." June 28, 2024 Tr. at 4 (R. 250). The court asked counsel for their views "on whether there ha[d] been due and thorough deliberations" sufficient to support the giving of a so-called *Tuey-Rodriguez*

7

charge. *Id.* at 5 (R. 251); *see also* Mass. Gen. Laws c. 234A, § 68C.[3]  The Commonwealth

responded that the charge should not be given because there "simply ha[d]n't been sufficient

time yet."  June 28, 2024 Tr. at 5 (R. 251).  Counsel for Ms. Read disagreed, requesting that the

court "read the *Tuey-Rodriguez* model instruction and go from there."  *Id.* at 6 (R. 252).  The trial

court sided with the Commonwealth ruling, "I am not prepared to find that there have been due

and thorough deliberations at this point.  So I am going to send them back out."  *Id.* at 7 (R. 253).

On July 1, 2024, the jury presented another note, stating:

> despite our commitment to the duty entrusted to us, we find
> ourselves deeply divided by fundamental differences in our
> opinions and state of mind.  The divergence in our views are not
> rooted in a lack of understanding or effort but deeply held
> convictions that each of us carry, ultimately leading to a point
> where consensus is unattainable.  We recognize the weight of this
> admission and the implications it holds.

July 1, 2024 Tr. at 7 (R. 264).  Upon being asked by the court, the parties reiterated their same

previously expressed views, with the Commonwealth taking the position that due and thorough

deliberations had not yet occurred and Ms. Read's counsel arguing that the court should give a

*Tuey-Rodriguez* instruction.  *See id.* at 4-6 (R. 261-63).  This time, the trial court decided to give

the requested instruction.

Later that day, the jury sent yet another note.  Thereafter, without reading the note to

counsel, and without providing counsel with either an opportunity to be heard or an opportunity

to consult with their client about the implication of a potential mistrial on one or more charges,

---

[3] In the SJC's words, "[t]he *Tuey-Rodriguez* charge is a model instruction given when jurors
report a deadlock after due and thorough deliberation that is designed to urge the jury to reach a
verdict by giving more serious consideration to opposing points of view."  Opinion at 5 n.4
(citation omitted).

the trial court simply stated, "The jury is at an impasse" and immediately called in the jurors.  *Id.* at 10 (R. 267).  It then read the note on the record:

> despite our rigorous efforts, we continue to find ourselves at an impasse.  Our perspectives on the evidence are starkly divided.  Some members of the jury firmly believe that the evidence surpasses the burden of proof, establishing the elements of the charges beyond a reasonable doubt.  Conversely, others find the evidence fails to meet this standard and does not sufficiently establish the necessary elements of the charges.  The deep division is not due to a lack of effort or diligence but, rather, a sincere adherence to our individual principles and moral convictions.  To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs.

*Id.* at 11 (R. 268).

After reading the note, and without soliciting the views of counsel in any respect, the trial court stated, "I am not going to do that to you, folks.  Your service is complete.  I am declaring a mistrial in this case." *Id.* (R. 268).  The jury was then excused and ordered to leave the courtroom.  Counsel was not invited to speak during this entire interaction.  *See id.* (R. 268).

The following day, on July 2, 2024, unsolicited by any party, one of the jurors ("Juror A") contacted one of the attorneys for Ms. Read, Alan Jackson.  Juror A stated that s/he "wish[ed] to inform [Attorney Jackson] of the true *results*" of the jury's deliberations.  Affidavit of Alan J. Jackson ¶ 4 (R. 286).[4]  According to Juror A, "the jury unanimously agreed that Karen Read is NOT GUILTY of Count 1 (second degree murder).  Juror A was emphatic that Count 1 (second degree murder) was 'off the table,' and that all 12 of the jurors were in agreement that she was NOT GUILTY of such crime." *Id.* ¶ 5 (R. 287).  "[T]he jury also unanimously agreed

---

[4] For purposes of adjudicating Ms. Read's Double Jeopardy claim, both the trial court and the SJC "accepted" the juror statements reflected in the post-trial affidavits "as true and accurate." Opinion at 26 n.14.

9

that Karen Read is NOT GUILTY of Count 3 (leaving the scene with injury/death)." *Id.* ¶ 6 (R. 287).

One day later, on July 3, 2024, another attorney for Ms. Read, David Yannetti, was contacted by "two different individuals (hereinafter, 'Informant B' and 'Informant C') who had received information from two distinct jurors (hereinafter 'Juror B' and 'Juror C') both of whom were part of the deliberating jury in this case." Affidavit of David R. Yannetti ¶ 2 (R. 283).

Informant B sent Attorney Yannetti "a screenshot he/she had received from someone (hereinafter, 'Intermediary B') of text messages that Intermediary B had received from Juror B. In that screenshot, Juror B texted the following to Intermediary B: 'It was not guilty on second degree. And split in half for the second charge. . . . I thought the prosecution didn't prove the case. No one thought she hit him on purpose or even thought she hit him on purpose [sic].'" *Id.* ¶ 4 (R. 283). Juror B later placed an unsolicited phone call to Attorney Yannetti, confirming that the information contained in the publicly filed Affidavit was accurate. *See* Supplemental Affidavit of David R. Yannetti ¶ 4 (R. 330). "Juror B clarified, however, that he/she meant to write, 'No one thought she hit him on purpose or even knew that she had hit him.'" *Id.* (R. 330-31). Juror B further told Attorney Yannetti s/he "believe[d] that every member of the jury, if asked, w[ould] confirm that the jury reached Not-Guilty verdicts on indictments (1) and (3)." *Id.* ¶ 5 (R. 331).

Informant C had been in contact with another individual ("Intermediary C") who is a co-worker and friend of Juror C and joined a Zoom meeting during which Juror C discussed the trial. Informant C sent Attorney Yannetti the below screenshots of his/her text messages with Intermediary C regarding what Juror C revealed in the Zoom meeting:

10

| Intermediary C: | "no consideration for murder 2. manslaughter started polling at 6/6 then ended deadlock @ 4no8yes." |
| | |
| . . . . | |
| Informant C: | "interesting.  if it was no consideration for murder two, shouldn't she have been acquitted on that count.   and hung on the remaining chargers [sic] goes back to the jury verdict slip that was all confusing" |
| Intermediary C: | "she should've been acquitted I agree.  Yes, the remaining charges were what they were hung on.  and that instruction paper was very confusing." |

Affidavit of David R. Yannetti ¶ 10 (R. 284-85).

After the filing of Ms. Read's initial motion to dismiss, but before the Superior Court hearing on that motion, Attorney Jackson was contacted by two other deliberating jurors.  The first, "Juror D," stated "that the jury reached NOT GUILTY verdicts on Count 1 and Count 3, and that the disagreement was solely as to Count 2 and its lesser offenses."  Supplemental Affidavit of Alan J. Jackson ¶ 5 (R. 293).  S/he recounted that, "after the jury was excused and aboard the bus, many of the jurors appeared uncomfortable with how things ended, wondering, *Is anyone going to know that we acquitted [Karen Read] on Count 1 and 3?*"  *Id.* ¶ 8 (R. 293).  Juror D unequivocally told counsel, "*Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3.  Because that's what happened.*"  *Id.* ¶ 10 (R. 293).  "Juror E" similarly stated "that the jury was 'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges."  Second Supplemental Affidavit of Alan J. Jackson ¶ 4 (R. 323).

11

The Commonwealth filed a post-trial notice of disclosure informing the court that, "[o]n Sunday July 21, 2024, Assistant District Attorney Adam Lally received an unsolicited voicemail on his office's phoneline from an individual, who identified their self as a juror by full name and seat number."  Commonwealth Notice at 1 (R. 325).  The message stated, "it is true what has come out recently about the jury being unanimous on charges 1 and 3." *Id.* (R. 325).  ADA Lally received a subsequent message from the same individual stating he could "confirm unanimous on charges one and three, as not guilty and as of last vote 9-3 guilty on the manslaughter charges . . . ." *Id.* (R. 325).  The Commonwealth additionally "received emails from three individuals who identified themselves as jurors" and "indicated they wished to speak anonymously." *Id.* (R. 325).  The Commonwealth declined to substantively respond to the voice messages or emails, instead claiming in responsive emails that it was ethically prohibited from discussing such matters. *See id.* (R. 325).

## IV.    Re-Prosecution on Counts 1 and 3 Will Violate Ms. Read's Double Jeopardy Rights

### A.    Standard of Review

Because Ms. Read is "awaiting trial on state criminal charges," she "is not in custody pursuant to the SJC's judgment." *Gonzalez v. Justices of Mun. Court of Bos.*, 382 F.3d 1, 6 (1st Cir. 2004), *vacated on other grounds and subsequently reinstated*, 420 F.3d 5.  Accordingly, this Petition is brought under 28 U.S.C. § 2241, not § 2254. *See id.*  Section 2254's restrictions on the scope of habeas review, therefore, do not apply. *See id.* at 7.  Instead, the Court "must defer to the SJC's findings of fact, but must undertake plenary review of that court's resolution of issues of law." *Id.* (citation omitted); *see also Christian v. Wellington*, 739 F.3d 294, 298 (6th Cir. 2014) ("[H]abeas petitions governed by § 2241 are not subject to the heightened standards

12

contained in § 2254(d)." (citation omitted)).  "Ordinarily, a motion to dismiss on double jeopardy grounds rests on a pure question of law that [the Court] review[s] de novo."  *United States v. Candelario-Santana*, 977 F.3d 146, 154 (1st Cir. 2020).

B.    The Constitutional Protection Against Double Jeopardy

The ancient right to a jury trial is no mere "procedural formalit[y] but [rather a] fundamental reservation[] of power to the American people."  *Erlinger v. United States*, 602 U.S. 821, 832 (2024) (citation omitted).  "By requiring the Executive Branch to prove its charges to a unanimous jury beyond a reasonable doubt, the Fifth and Sixth Amendments seek to mitigate the risk of prosecutorial overreach and misconduct, including the pursuit of 'pretended offenses' and 'arbitrary convictions.'"  *Id.* (citation omitted).  "Prominent among the reasons colonists cited in the Declaration of Independence for their break with Great Britain was the fact Parliament and the Crown had 'depriv[ed] [them] in many cases, of the benefits of Trial by Jury.'"  *Id.* at 829 (citation omitted).  "After securing their independence, the founding generation sought to ensure what happened before would not happen again.  As John Adams put it, the founders saw representative government and trial by jury as 'the heart and lungs' of liberty."  *Id.* (citation omitted).  It follows that a jury acquittal is entitled to the utmost respect in our criminal justice system.  *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) ("Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that [a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution." (citation omitted)).

"The Double Jeopardy Clause provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'"  *Blueford v. Arkansas*, 566 U.S. 599, 605

13

(2012) (quoting U.S. Const., Amdt. 5). "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." *Green v. United States*, 355 U.S. 185, 187 (1957). "Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which [s]he is stigmatized by an unresolved accusation of wrongdoing, and ***may even enhance the risk that an innocent defendant may be convicted***." *Arizona v. Washington*, 434 U.S. 497, 503-04 (1978) (internal footnotes omitted) (emphasis added); *see also Martin Linen*, 430 U.S. at 569 ("At the heart of this policy is the concern that permitting the sovereign freely to subject the citizen to a second trial for the same offense would arm Government with a potent instrument of oppression."); *Blueford*, 566 U.S. at 605 ("The Clause guarantees that the State shall not be permitted to make repeated attempts to convict the accused, thereby subjecting h[er] to embarrassment, expense and ordeal and compelling h[er] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent [s]he may be found guilty." (citation omitted)).

  C. <u>Re-Prosecution Is Barred Because There Was No Manifest Necessity to Declare a Mistrial on Counts on which the Jury Was Not Deadlocked</u>

  "[A]s a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Washington*, 434 U.S. at 505. This rule is rooted in "the importance to the defendant of being able, once and for all, to conclude h[er] confrontation with society through the verdict of a tribunal [s]he might believe to be favorably disposed to h[er] fate." *United States v. Jorn*, 400 U.S. 470, 486 (1971) (plurality opinion); *see also Oregon v. Kennedy*, 456 U.S. 667, 671-72 (1982) ("[T]he Double Jeopardy Clause affords a criminal defendant a

14

valued right to have h[er] trial completed by a particular tribunal." (citation omitted)).  Thus,

"after a mistrial has been declared without the defendant's request or consent,"[5] the

permissibility of retrial "depends on whether there [wa]s a manifest necessity for the [mistrial]."

*United States v. Dinitz*, 424 U.S. 600, 606-07 (1976) (citation omitted).  The "power" to

discharge a jury without a verdict "ought to be used with the greatest caution, under urgent

circumstances, and for very plain and obvious cases."  *United States v. Ramirez*, 884 F.2d 1524,

1528 (1st Cir. 1989) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)).

   ***Importantly, the "heavy" burden of establishing "manifest necessity" to justify a***

***mistrial is exclusively on the Commonwealth***, *Washington*, 434 U.S. at 505 (emphasis added), a

burden that the state courts erroneously placed on the defendant.  In assessing whether the

prosecution satisfied its burden on this point, the First Circuit has stated it is "useful to consider"

the following three factors: "(1) whether the [trial] court consulted with counsel; (2) whether the

court considered alternatives to a mistrial; and (3) whether the court adequately reflected on the

circumstances before making a decision."  *United States v. Garske*, 939 F.3d 321, 334 (1st Cir.

2019) (citation omitted).  "Embracing both . . . consideration of alternatives and consultation

with counsel[] is the amount of time devoted by the judge to the mistrial decision.  A precipitate

decision, reflected by a rapid sequence of events culminating in a declaration of mistrial . . .

tend[s] to indicate insufficient concern for the defendant's constitutional protection."  *Brady v.*

---

[5] The SJC did not find that Ms. Read or her counsel consented to the mistrial here.  *See* Opinion
at 25 n.13.  And for good reason.  Neither Ms. Read nor her counsel requested or expressly
consented to a mistrial.  While consent may, in some circumstances, be implied "from a failure
to object," any such finding requires, "at a bare minimum, that the defendant . . . had an adequate
opportunity to register an effective objection."  *United States v. Toribio-Lugo*, 376 F.3d 33, 40
(1st Cir. 2004).  For reasons discussed *infra* pages 16-18, no such opportunity was provided here.

15

*Samaha*, 667 F.2d 224, 229 (1st Cir. 1981).

Although, in other circumstances, "a reviewing court may defer to the trial court's discretion to make a mistrial decision, '[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to h[er], the reason for such deference . . . disappears." *Id.* (quoting *Washington*, 434 U.S. at 510 n.28); *see also Commonwealth v. Steward*, 396 Mass. 76, 79 (1985) (stating that deferential review of a trial court's exercise of discretion as to when to declare a mistrial is appropriate "only if it is clear from the record that the judge has given careful consideration to the available alternatives and to the defendant's interest in having the trial concluded in a single proceeding." (citation omitted)).  Here, the SJC, at the outset, committed legal error by relying heavily upon the trial court's discretion, notwithstanding that the record reflected no consideration of any alternatives to a mistrial, *i.e.*, no exercise of such discretion.  *See* Opinion at 13-15, 21-22, 24-25.

Turning to the relevant factors, "[t]he first thing to be noted is that the [trial] judge did not give counsel an opportunity to object or discuss with them the advisability of a mistrial." *Ramirez*, 884 F.2d at 1529.  Upon receiving the final jury note, the court declared a mistrial and excused the jury without consulting counsel.

Video footage[6] reinforces the suddenness of the court's action and corresponding lack of any meaningful opportunity to be heard.  At the approximately 5:47:25 mark of the video, the court took the bench and stated, "[t]he jury is at an impasse."  In contrast to the procedure followed as to prior notes, this note was not read to counsel.  Instead, the court immediately

---

[6]https://www.youtube.com/watch?v=0An5qcRINe8&list=PLGE3I9evF9H_XqVRt8WzVmdIClu MirtCg&t=7s

called for the jury to be brought in. The sound of a door opening or closing can be heard and then, at approximately 5:47:55, a mere 30 seconds later, the jury arrived in the courtroom. The court then read the note, which had not previously been provided or read to counsel, on the record. At 5:49:23, the court stated it was declaring a mistrial and immediately discharged the jury at 5:49:30, a mere seven seconds later. These circumstances did not provide Ms. Read's counsel with a meaningful opportunity to be heard. *See Ramirez*, 884 F.2d at 1527 (finding lack of sufficient opportunity where, after hearing testimony regarding potential defect in jury venire, district court stated its intent to declare mistrial, then called for the jury to be brought in and discharged them); *Candelario-Santana*, 977 F.3d at 162 (finding lack of sufficient opportunity to object where "[t]he district court only addressed counsel after reading and confirming the verdict in open court to ask if there was '[a]nything else' before discharging the jury").

Legal and factual context renders the trial court's action even more unexpected. Legally, trial counsel was entitled to rely on decades of caselaw expressly requiring a "full opportunity to be heard" before the declaration of a mistrial. *Steward*, 396 Mass. at 79.[7] Factually, in response to multiple prior jury notes in this case, the trial court had advised counsel of the contents and afforded them time first to consider and then be heard regarding any issues raised. (R.250-51, 261-62). The trial court's deviation from that well-known and accepted practice with respect to the final note was a "precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial." *Brady*, 667 F.2d at 229. It also deprived defense counsel of any opportunity to raise issues or even discuss potential remedies with their client.

---

[7] *See also Commonwealth v Taylor*, 486 Mass. 469, 484 (2020); *Commonwealth v. Nicoll*, 452 Mass. 816, 818 (2008); *Picard v. Commonwealth*, 400 Mass. 115, 118 (1987); *Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337, 340 (1996).

17

Moreover, the defense respectfully submits that, given the importance of Double Jeopardy protections and the profound implications of a retrial for a criminal defendant, an opportunity to be heard must, in order to be meaningful, occur after a reasonable opportunity for counsel to consult with their client. *See United States v. Pierce*, 593 F.2d 415, 417 n.1 (1st Cir. 1979) (noting in finding lack of manifest necessity that counsel had no opportunity to discuss the prospect of a mistrial with his client). Counsel for Ms. Read clearly had no such opportunity here.

The SJC erred in multiple respects in ruling that the trial court's prior consultation with counsel was sufficient to excuse the absence of such consultation at the pivotal moment prior to any declaration of a mistrial. First, the SJC erred in relying upon the trial court's solicitation of counsel's views in response to the first two jury notes. Those discussions related solely to the propriety of giving a *Tuey-Rodriguez* charge, which again "is designed to urge the jury to reach a verdict," Opinion at 5 n.4 (citation omitted), and presents a distinct legal issue from the declaration of a mistrial. Defense counsel's request for a *Tuey-Rodriguez* charge implies that their desire was not to have a mistrial but instead to have the trial court urge this jury to reach a verdict. Second, the SJC was wrong in simply assuming that consultation regarding the third note would not "have produced any fruitful alternatives." Opinion at 23 (citation omitted). This reading of the silent record against the defense is contrary to the clear Supreme Court caselaw placing the burden of establishing manifest necessity on the prosecution. *See supra* page 15. Indeed, the SJC's Opinion does not so much as mention the appropriate allocation of the burden to the Commonwealth. Moreover, as set forth *infra* pages 19-22, there were alternatives to the declaration of a mistrial here, so it is far from clear that consultation would not have proved

18

fruitful.

The record is independently lacking on the second prong, as it reflects no judicial consideration of alternatives to a mistrial.  Here, there was one obvious alternative: to simply ask the jury to specify the charge(s) on which it was deadlocked and/or to ask the jury whether or not its final note related to all or less than all of the charges.  This option is apparent from the face of Mass. R. Crim. P. 27(b) which states that "[t]he judge may declare a mistrial as to any charges upon which the jury cannot agree upon a verdict; **provided**, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded."  (Emphasis added).  In fact, the reporter's notes expressly indicate that such reception of partial verdicts is **required** before a mistrial may be declared for manifest necessity.  *See* Mass. R. Crim. P. 27, reporter's notes ("This rule also provides that the court may declare a mistrial in cases where the jury is unable to reach a verdict.  However, it **must** first receive and record the verdicts which the jury can agree upon." (emphasis added)).  Had the court inquired as to the existence of any partial verdicts, and the jury articulated its verdict consistent with the statements of Juror A, Juror B, Juror C, Juror D, and Juror E, the Double Jeopardy implications would have been clear and decisive.  "[I]ndeed, with virtual unanimity, the cases have applied collateral estoppel to bar the Government from relitigating a question of fact that was determined in defendant's favor by a partial verdict." *United States v. Mespoulede*, 597 F.2d 329, 336 (2d Cir. 1979); *see also Wallace v. Havener*, 552 F.2d 721, 724 (6th Cir. 1977) ("When the jury hands down a partial verdict, a final judgment is rendered on the counts upon which the jury has reached agreement.").

The First Circuit's decision in *United States v. Toribio-Lugo*, 376 F.3d 33 (1st Cir. 2004), provides a helpful analogue. There, in the midst of trial, upon noticing "that only eleven jurors were present," the district judge "consulted with both the prosecutor and the [defendant's] lawyers," outlining "two options: either postpone the trial until the twelfth juror could be located or proceed with a jury of eleven." *Id.* at 36. Defense counsel "conferred with her client and informed the judge that the [defendant] did not wish to proceed at that moment with eleven jurors, but, rather, would like to wait for . . . a twelve-member jury." *Id.* (internal quotation marks omitted). Shortly thereafter, the judge learned for the first time "that the missing juror had been absent during some or all of the earlier portions of the trial. The judge then announced that he was going to declare a mistrial because only eleven jurors had heard the evidence and he did not believe that there was any way to cure that defect." *Id.* The trial judge denied a subsequent motion to dismiss on the grounds "that a mistrial was required by manifest necessity because only eleven jurors remained and the [defendant] had refused to proceed with fewer than twelve." *Id.*

The First Circuit reversed, finding that "there was a clear alternative to a mistrial: proceeding with eleven jurors." *Id.* at 39. While the district court had "tentatively explored" that alternative, it "never exhausted" it. *Id.* "The court never offered the [defendant] a choice between proceeding with eleven jurors or accepting a mistrial." *Id.* In fact, "during the pertinent time frame," the court "made no effort to ascertain the [defendant's] attitude or wishes with regard to the possibility of a mistrial. In view of these omissions, the record compel[led] a conclusion that the 'jury of eleven' alternative was not adequately explored." *Id.* This

conclusion was "dispositive" because, "[w]here there is a viable alternative to a mistrial and the [trial] court fails adequately to explore it, a finding of manifest necessity cannot stand." *Id.*

The present case reflects even less consideration of alternatives to a mistrial. While the trial court discussed the two prior jury notes reporting an impasse with counsel, it did so only in the context of deciding whether to give a *Tuey-Rodriguez* charge, and the court did not even mention the prospect of a mistrial. The SJC, therefore, legally erred in finding that the trial court's response to the first two jury notes reflected adequate consideration of alternatives to a mistrial. *See* Opinion at 16. "[T]here is nothing in the record to indicate that the judge was considering a mistrial at that time." *Brady*, 667 F.2d at 230. While the notes stated that the jury had reached an impasse on some "charges," "[t]he test is not whether the judge considered that [s]he had a potential problem on h[er] hands but rather whether [s]he 'accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding.'" *Id.* (quoting *Washington*, 434 U.S. at 516). "With the record barren of any hint whatsoever that the judge was aware of the double jeopardy implications of h[er] decision," the defense respectfully submits that this Court cannot find "that h[er] discretion was sound." *Id.* at 230-31.

The statutory prohibition on ordering the jury to continue deliberations without consent, *see* Mass. Gen. Laws c. 234A, § 68C, was one among many factors that the trial court should have considered in consultation with the parties. The statute would not have prohibited the trial court from simply asking whether the jury had reached a verdict on any count(s) or asking the jury whether its impasse related to all or less than all charges. Contrary to the SJC's suggestion, *see* Opinion at 19-20, there is simply nothing coercive about asking a jury whether it has reached a verdict on some but not all separately charged counts. *See, e.g.*, *United States v. Armstead*, 116

21

F.4th 519, 526 (D.C. 2024) (affirming instruction that "simply asked the jury to report any partial verdict it had already reached" as non-coercive); *United States v. Kechego*, 91 F.4th 845, 852 (6th Cir. 2024) ("[A] court does not err if it asks about a partial verdict [even] when it is clear that the jury is at an impasse and further deliberations would prove fruitless.").[8]  Moreover, the trial court could have alternatively (a) informed the jury that it could not be required to continue deliberations without its consent and still (b) asked it to retire to consider whether it was prepared to return any partial verdict.  *See Commonwealth v. Jenkins*, 416 Mass. 736, 739-40 (1994).  This Massachusetts statute, on its face, by permitting the jury to be sent back to continue deliberating with its consent, contemplates that courts may non-coercively make a post *Tuey-Rodriguez* inquiry to the jury as to whether it consents to continuing deliberations on all or less than all charges.  Whether the trial court would have ultimately adopted any of these alternatives is beside the point.  The dispositive fact for present purposes is that the record provides no indication that the trial court even considered available alternatives.[9]

---

[8] *Blueford* held that, before declaring a mistrial, the trial court was not required to permit the jury to return a partial verdict on lesser-included offenses within a single charge.  The Supreme Court explained that, "under Arkansas law, the jury's options . . . were limited to two: either convict on one of the offenses, or acquit on all."  566 U.S. at 610.  *Commonwealth v. Roth*, 437 Mass. 777 (2002), a case relied upon by the SJC, also involved lesser-included offenses within a single count.  By contrast, where, as here, "a complaint or indictment, in multiple counts, charges multiple crimes," a partial verdict is an available alternative under Massachusetts law.  *A Juvenile v. Commonwealth*, 392 Mass. 52, 55 n.1 (1984); *see also Roth*, 437 Mass. at 793 n.13 (distinguishing situation "where a defendant has been charged in separate indictments or complaints, each with a separate verdict slip").

[9] As stated *supra* page 15, the federal constitutional burden to justify a mistrial is clearly on the Commonwealth, yet the state court not only failed to identify that burden but improperly placed the burden on the defendant on subjects such as the consideration of alternatives.

22

While the law is clear that a jury deadlock may constitute manifest necessity, "[t]he key to this principle, of course, is that the jury must be *genuinely* deadlocked." *Candelario-Santana*, 977 F.3d at 158. Here, it is "possible" to read the jury notes, in the context of the trial court's instructions, as reflecting an impasse on one count but not others. *Id.* at 159. The jury's reference to "charges" is easily reconciled with the post-trial affidavits affirming that the only deadlock related to the lesser-included offenses of Count 2. Indeed, the trial court repeatedly referred to those lesser-included offenses as distinct and multiple "charge[s]," both in its initial and supplemental instructions to the jury. *See* June 25, 2024 Tr. at 35, 38 (R. 179, 182); June 26, 2024 Tr. at 16 (R. 223). In this context, the jury's final note was facially susceptible to two alternative interpretations: (1) that the jury had reached an impasse as to all charges, or (2) that the deadlock applied to only some of those charges (*e.g.*, multiple lesser-included allegations within a single count such as Count 2). It was not an unambiguous note affirmatively declaring an impasse on all charges as assumed by the SJC. The information received from jurors post-trial proves the latter interpretation was correct. The jury's failure to expressly mention its agreement on Counts 1 and 3 is understandable in light of the court's instruction that it "should continue deliberating until" it had "reached a final verdict on *each* charge." June 25, 2024 Tr. 46 (R. 190) (emphasis added). For these reasons, the SJC was wrong to characterize the juror affidavits underlying the defense motion as "inconsistent" with the jury notes. Opinion at 3. The jury simply never stated that it was unable to "reach[] a unanimous verdict on *any* of the charges." Opinion at 3 (emphasis added). The SJC did not mention, much less analyze, the reading of the notes set forth by the defense above.

23

The trial court "took no steps to clarify the jury's" notes. *Candelario-Santana*, 977 F.3d at 160. In the Double Jeopardy context, where the Commonwealth alone bears the burden of establishing manifest necessity, this ambiguity must be read in the defendant's favor. *See id.* at 161 ("[A]mbiguous verdicts . . . must be construed in favor of the defendant."); *Downum v. United States*, 372 U.S. 734, 738 (1963) ("We resolve any doubt in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion." (citation omitted)). The SJC therefore erred in construing the jury notes as an unambiguous declaration of an impasse on all counts.[10]

"In sum, a decision . . . made so precipitately could not have been the product of any careful consideration of the valued right of the defendant[] to have [her] guilt or innocence determined" in a single trial. *Brady*, 667 F.2d at 230. This, in itself, precludes the Commonwealth from retrying Ms. Read on Counts 1 and 3.

D.    The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution

"[W]hat constitutes an 'acquittal' is not to be controlled by the form" of the action in question. *Martinez v. Illinois*, 572 U.S. 833, 841-42 (2014) (citation omitted). "Rather, [the Court] must determine whether" the action "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *Martin Linen*, 430 U.S. at 571. "[L]abels—including those provided by state law—do not control [the] analysis . . . ." *McElrath*

---

[10] In *Commonwealth v. Daniels*, 441 Mass. 1017, 1017 (2004), the jury responded by a *Tuey-Rodriguez* charge by saying it had not reached a unanimous decision on ***any*** of the charges. The trial judge then asked counsel for his position, and counsel said he did not object to a mistrial. *Daniels* does not, therefore, support the SJC's finding that the trial court appropriately exercised its discretion here. In any event, *Daniels* does not bind this Court in its analysis of the federal constitutional issue.

24

*v. Georgia*, 601 U.S. 87, 96 (2024) (citation omitted). This is because "***whether an acquittal has occurred for purposes of the Double Jeopardy Clause is a question of federal, not state, law***." *Id.* (emphasis added).

Here, the affidavits by Attorneys Jackson and Yannetti reflect statements by four deliberating jurors that the jury had reached a final, unanimous conclusion that Ms. Read is not guilty of Counts 1 and 3 (and an indirect statement by a fifth juror that they had agreed with respect to Count 1). Both the trial court and the SJC, for purposes of ruling on the Double Jeopardy issue, "proceed[ed] from the assumption that the affidavits [we]re accurate." Opinion at 26 n.14. There was nothing tentative about the jurors' statements. To the contrary, they were definitive in describing the result of the jury's deliberations. *See* Affidavit of Alan J. Jackson ¶ 5 (R. 287) ("Juror A was emphatic that Count 1 (second degree murder) was 'off the table,' and that all 12 of the jurors were in agreement that she was NOT GUILTY of such crime."); Affidavit of David R. Yannetti ¶ 4 (R. 283) (reflecting text message from Juror B, "It was not guilty on second degree. . . . No one thought she hit him on purpose or even [knew that she had hit him]"); *Id.* ¶ 10 (R. 284-85) (reflecting Juror C's statement, relayed by Intermediary C, that there was "no consideration for murder 2" and Ms. Read "should've been acquitted" on that count); Supplemental Affidavit of Alan J. Jackson ¶ 10 (R. 293) ("Juror D, without hesitation, said in substance, *Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3. Because that's what happened.*"); Second Supplemental Affidavit of Alan J. Jackson ¶ 4 (R. 323) ("Juror E explained that the jury was 'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges."). Despite significant publicity that accompanied the filing of the defense motion relying on jury declarations, none of the remaining

jurors ever communicated to the court, the court's staff, the District Attorney's office, defense counsel, or the media that they disputed the accuracy of the five jurors' representations.

In rejecting Ms. Read's claim of acquittal, the SJC relied solely upon the lack of a formal verdict "returned, received, and recorded in open court."  Opinion at 29.  This reasoning is rooted in a formalism that has been consistently rejected by the Supreme Court in a string of precedents spanning more than one hundred years.  *See supra* page 24 (citing cases); *Ball v. United States*, 163 U.S. 662, 671 (1896) ("However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense."); *Hudson v. Louisiana*, 450 U.S. 40, 41 & n.1 (1981) (holding that judicial grant of new trial prohibited retrial on Double Jeopardy grounds, notwithstanding that the state "Code of Criminal Procedure d[id] not authorize trial judges to enter judgments of acquittal in jury trials"). "[T]he Double Jeopardy clause . . . prohibits reexamination of a court-decreed acquittal to the same extent it prohibits reexamination of an acquittal by jury verdict."  *Smith v. Massachusetts*, 543 U.S. 462, 467 (2005).  The Supreme Court has, for example, "consistently refused to rule that jeopardy for an offense continues after an acquittal, ***whether that acquittal is express or implied*** by a conviction on a lesser included offense . . . ."  *Price v. Georgia*, 398 U.S. 323, 329 (1970) (emphasis added); *see also Green*, 355 U.S. at 190 (similar).[11]

---

[11] The SJC's reliance upon an almost 90-year-old Supreme Court of Tennessee opinion, which has never been cited in any published federal court decision, is unpersuasive in light of the foregoing authorities.  *See* Opinion at 29 (citing *Clark v. State*, 170 Tenn. 494, 502 (1936)). Additionally, *Clark* did not foreclose the success of the Double Jeopardy claim at issue.  In fact, it expressly "reserved" such claim observing, "should the petitioner be again arraigned, the learned trial judge, if convinced that in truth and in fact all twelve of the jurors on this trial did agree, and continued to the end of their deliberations to agree, that petitioner was innocent, and that they failed to so report only because of a mistaken conception of their authority in the matter, may well conceive it his duty to exercise the right vested in him, of advising the entry of

26

Under the SJC's reasoning, affidavits executed by all 12 jurors attesting to a final, unanimous decision to acquit would not be sufficient to mount a successful Double Jeopardy challenge. Surely, that cannot be the law. Indeed, it **must** not be the law. And, in the context of this highly publicized case, it strains credulity to suggest that, if the unequivocal statements of five jurors quoted above did not, in fact, represent the unanimous view of all 12, the remaining jurors would allow the inaccuracy to go uncorrected. Instead, they would predictably have notified the Commonwealth or the trial court of their own recollection. Here, to the contrary, the Commonwealth has received the exact same information as the defense regarding the jury's unanimous agreement to acquit Ms. Read on Counts 1 and 3.

The Supreme Court's decision in *Blueford* is not to the contrary, as it is factually distinguishable from the instant case. There, the foreperson had reported during deliberations that the jury "was unanimous against" the charges of capital murder and first-degree murder but split on manslaughter. 566 U.S. at 603-04. The court sent the jury back to continue deliberations and, when the jury remained unable to reach a verdict, declared a mistrial. *See id.* at 604. The Supreme Court rejected the defendant's argument that the Double Jeopardy Clause prohibited re-prosecution for capital and first-degree murder. In doing so, the Court relied heavily upon the lack of finality of the juror's report. "[T]he jury's deliberations had not yet concluded," and it "went back to the jury room to deliberate further." *Id.* at 606. "The foreperson's report was not a final resolution of anything," and there was no indication at the conclusion of deliberations that "it was still the case that all 12 jurors believed [the defendant]

---

a nolle prosequi." *Clark*, 170 Tenn. at 648.

was not guilty of capital or first-degree murder." *Id.* Here, by contrast, the jurors' statements reflect a final and indelible determination that persisted through the end of deliberations and following.

The defense respectfully submits that this Court should hold that Ms. Read may not be forced to stand trial a second time for an offense a previous jury found her not guilty of simply because such final, unanimous agreement was not announced in open court. Any lack of formality does not supersede the defendant's fundamental constitutional protections. *See United States v. Dotson*, 817 F.2d 1127, 1129 (5th Cir. 1987) (affirming correction of verdict on one count after "receiv[ing] a telephone call from two of the jurors . . . stat[ing] that, contrary to the verdict read in court, the jury had unanimously voted to acquit"), *vacated in part on other grounds*; *United States v. Stauffer*, 922 F.2d 508, 511 (9th Cir. 1990) (affirming changing verdict on count where "[p]ost-verdict interviews of several jurors . . . determined that the jury had . . . intended to acquit"). This issue is one of existential importance—not merely to Ms. Read, but to the very foundation of the constitutional safeguards that protect her.

E.  <u>Alternatively, the Defense Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Ms. Read</u>

The SJC narrowly construed the right to a post-trial judicial inquiry to substantiate a constitutional violation as limited to claims "that jurors were exposed to extraneous information or demonstrated racial or ethnic bias." Opinion at 31-32. Under this logic, no defendant claiming that the jury acquitted her but failed to announce that verdict would be entitled to further inquiry, no matter how clear and well-supported her claim. In other words, even if all 12 jurors submitted affidavits saying they unanimously and finally agreed to acquit the defendant,

their failure to announce that verdict (and the trial court's failure to inquire) would take precedence over the defendant's fundamental constitutional protection against Double Jeopardy. The defense respectfully submits that this ruling violates Ms. Read's constitutional rights.

In the analogous context of juror bias, the law is clear that the defendant's Sixth Amendment right to an impartial jury also guarantees "the opportunity to prove" a claim of bias. *Dennis v. United States*, 339 U.S. 162, 171-72 (1950); *see also Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). Thus, "a nonfrivolous claim of jury taint" triggers the trial court's "unflagging duty to adequately probe" the allegation. *United States v. Zimny*, 846 F.3d 458, 464 (1st Cir. 2017) (citation omitted). Crucially, the trial court "does not have discretion to refuse to conduct any inquiry at all" when "confronted with a colorable claim of juror misconduct." *Id.* at 465 (citation omitted). The required inquiry may include the taking of jury testimony because a categorical bar of such testimony on the issue of bias would "violat[e] the plainest principles of justice." *United States v. Villar*, 586 F.3d 76, 84 (1st Cir. 2009) (quoting *McDonald v. Pless*, 238 U.S. 264, 268-69 (1915)).

Recently, in *United States v. Tsarnaev*, 96 F.4th 441, 449 (1st Cir. 2024), the First Circuit remanded the matter for further proceedings in the Boston Marathon bombing case due to two jurors' postings on social media "regarding the bombings and the district court proceedings," which came to light after the jurors had been provisionally selected to serve. The comments did not reflect racial bias in any way, but rather possible bias specific to the defendant. *See id.* at 454, 461. The comments were also inconsistent with the jurors' assurances that they had not discussed the case online. *See id.* at 455, 461. The First Circuit held that the district court erred

by failing to inquire about these issues with the jurors.  *See id.* at 458, 462.  Given that "[t]he right to an impartial jury is a constitutional bedrock[,] . . . when there is a plausible claim that a prospective juror lied in a manner that may reveal bias, a court need conduct some inquiry reasonably calculated to determine whether the prospective juror did lie and, if so, why."  *Id.* at 458 (citation omitted).  Although the district court has broad discretion to determine the type of investigation into juror bias warranted by particular facts, "[n]otwithstanding this broad discretion, . . . a district judge does not have discretion to refuse to conduct any inquiry at all regarding the magnitude of the taint-producing event and the extent of the resulting prejudice if confronted with a colorable claim of juror misconduct."  *Id.* at 457 (citation omitted).

Crucially for present purposes, the First Circuit ordered the district court to *voir dire* the jurors, ***nine years after the trial***.  In doing so, the court acknowledged, "[n]o doubt any juror would have strong incentives to avoid admitting having committed perjury during voir dire.  We also expect that most jurors, having taken time out of their daily lives to receive evidence at trial, deliberate with other jurors, and reach a verdict that they believe is just, would prefer not to have that verdict disturbed – especially as a result of their own actions. . . .  [W]e have no doubt that the able district court judge can do what judges regularly do – form a considered opinion about the sufficiency of the jurors' explanations once those explanations are given and explored."  *Id.* at 464.

Post-verdict inquiry is similarly required to investigate claims of external influence.  In *Remmer v. United States*, 347 U.S. 227, 228 (1954), "[a]fter the jury had returned its verdict, the petitioner learned for the first time that during the trial a person unnamed had communicated with a certain juror, who afterwards became the jury foreman, and remarked to him that he could

30

JA0042

profit by bringing in a verdict favorable to the petitioner."  The court, without the defense's

knowledge, then enlisted the FBI to investigate.  The Supreme Court held that the defendant was

entitled to post-verdict inquiry regarding the FBI's unauthorized contact with jurors.

The defense respectfully submits that, no less than a conviction rendered by a biased jury

or impermissibly tainted by external influence, requiring a defendant to stand trial for murder

after a unanimous jury found her not guilty of that same offense would violate "the plainest

principles of justice."  *Villar*, 586 F.3d at 84 (citation omitted).[12]  Indeed, the SJC did not suggest

otherwise.  Instead, it erected an artificial dividing line between the Fifth Amendment protection

against Double Jeopardy and the Sixth Amendment right to an impartial jury.  The defense

respectfully submits that this result is not supported by precedent or logic.  While the foregoing

authorities arose in different contexts, they stand for the proposition that a defendant who comes

forward with credible evidence of a serious constitutional violation post-trial must be entitled to

an opportunity to prove those claims.  There is no apparent reason to artificially limit the

availability of such constitutional inquiry, as the SJC did, to racial bias and extraneous influence.

The defense acknowledges that there is little precedent involving situations factually similar to

that at issue here.  This case is unique.  It is not often the case that, after trial, four jurors directly

contact defense counsel stating in no uncertain terms that the jury had acquitted the defendant.

But the unique strength of the evidence underlying the defense motion to dismiss supports rather

than undermines the claim for relief.

---

[12] The decades-old Florida and Pennsylvania state court opinions cited by the SJC involved post-trial rendering of guilty verdicts (not acquittals), and are therefore inapposite.  *See Brown v. State*, 661 So. 2d 309, 311 (Fla. Dist. Ct. App. 1995); *Commonwealth v. Johnson*, 359 Pa. 287, 290-91 (1948).

Contrary to the SJC's characterization, the defense request did not seek to "prob[e] the content of juror deliberations."  Opinion at 33.  To the contrary, the requested inquiry was directed solely to the ***result*** of such deliberations, namely a unanimous decision that Ms. Read is not guilty of murder in the second degree.  Juror testimony on that subject is not prohibited.  *See United States v. Barragan-Cepeda*, 29 F.3d 1378, 1380 (9th Cir. 1994) ("Rule 606(b) bars the admission of juror testimony only upon an inquiry into 'the validity of a verdict.'  It does not limit the admissibility of juror affidavits to determine what issues were decided in a prior proceeding.").  In any event, evidentiary rules cannot extinguish a criminal defendant's fundamental constitutional rights.  *See Villar*, 586 F.3d at 87.  The inquiry requested by the defense here could be accomplished by a single "yes" or "no" question posed to jurors: *did you unanimously acquit Karen Read of the charges in Counts 1 and 3*?, or similar questions that do not intrude into the heart of jury deliberations.

Of course, the results of a jury's deliberations are not secret.  They are, in fact, routinely announced in open court.  Here, the defense learned post-trial that the jury reached a verdict that was not so announced.  It was at least entitled to the opportunity to substantiate that fact in order to ensure Ms. Read is not unconstitutionally forced to stand trial for criminal offenses of which she has already been acquitted.  Such inquiry in no way intrudes on the deliberative process of the jury.  Such an inquiry instead honors the jury service which the trial court described as "extraordinary" rather than disregarding the efforts of five jurors to disclose that there was not an "impasse" on all three as contrasted to only one count.

The trial court rejected the defense's repeated requests to order a post-trial *voir dire* of the jury where the court could make inquiries that matched what would have occurred if the jury

was polled, count-by-count, which Mass. R. Crim. P. 27 permits if not prescribes – a *voir dire* that could be structured by this Court or the experienced trial court to steer clear of overstepping the boundaries set by Mass. Guide Evid. 606(b), that could ask about the results of a jury's deliberations without asking about how the jury internally and secretly reached that result. The First Circuit has entrusted post-trial jury inquiries to the skill and experience of the trial court in matters ranging from extraneous influence to the intrusion of racial or ethnic bias during deliberations. The defense submits that the values at the core of the Double Jeopardy Clause – the primacy of a jury's decision-making as a protection for accused citizens against the perils of being prosecuted twice for the same offense for which a prior jury acquitted – is as central to the values of our criminal justice system as is the right to a trial before an impartial and unbiased jury. The defendant has met her burden of production. Far lesser showings – statements by one juror for instance, have resulted in repeated holdings that jury inquiries are mandated. *See, e.g.*, *United States v. Tejeda*, 481 F.3d 44, 48 (1st Cir. 2007).

To create an impenetrable procedural wall to this new evidence just because a jury failed to volunteer to the court that its impasse was not as to all counts, just because it was never asked, is no more principled than to create a similar wall against new evidence of untruthfulness by a juror as in *Tsarnaev*, of racial bias as in *Villar*, of contact with an outsider as in *Remmer*: in each case the jury could have been polled about outside influence or violating the court's rules by accessing the internet, but that clearly does not result in an absolute prohibition against further fact finding on a showing far less compelling than that at issue here. As in *Tsarnaev*, the law trusts trial courts to determine whether any of the jurors' answers to *voir dire* have been affected

33

by media exposure.  There cannot be one set of rules for trials with publicity and another for trials without it.

The defense respectfully submits that confidence in the courts is eroded by the creation of such an impenetrable wall preventing jurors from informing the judge whether they voted, as a final matter, to acquit a defendant of murder.  At a time that public confidence in the judiciary is pivotal, not allowing the jurors to be heard on a matter of such significance, and allowing the trial court to decide (without taking any action to ascertain the truth of the matter) if there was in fact a final, unanimous, un-reconsidered decision to acquit, is inconsistent with the elevated role that jurors have long held in our democracy.

## V.    Conclusion

For all the foregoing reasons, the defense respectfully requests that this Court issue a writ of habeas corpus and hold that Ms. Read's retrial on Counts 1 and 3 would violate her Double Jeopardy rights.

Respectfully Submitted,
KAREN READ
By Her Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Michael Pabian**
Michael Pabian, Esq.
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116

34

(617) 227-3700
pabianlaw38@gmail.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq.
*Pro Hac Vice* application forthcoming
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

Dated: February 18, 2025

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, February 18, 2025, a copy of the foregoing document, the Petition, and all exhibits, has been served via hand-delivery on the Massachusetts Office of the Attorney General and via email on Assistant District Attorney Caleb Schillinger.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.

35

JA0047

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

Suffolk, ss.                                                    No. SJC-13663

COMMONWEALTH,
Appellee

v.

KAREN READ,
Defendant-Appellant.

─────────────────────────────────

On Appeal from Reservation and Report of G.L. c. 211, § 3 Petition

─────────────────────────────────

**RECORD APPENDIX OF APPELLANT KAREN READ**

MARTIN G. WEINBERG
Attorney for Appellant
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

MICHAEL PABIAN
Attorney for Appellant
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

ALAN J. JACKSON
Attorney for Appellant, *Pro Hac Vice*

Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

DAVID R. YANNETTI
Attorney for Appellant
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

September 24, 2024

Table of Contents:

1. Petition for relief pursuant to G.L. c. 211, § 3………………………………...5

2. Exhibits A and B to petition……………………………………………..42

3. Record appendix of Petitioner Karen Read………………………………..93

   a. Norfolk Superior Court docket report……………………………95

   b. Norfolk Superior Court Indictments…………………………….139

   c. Transcript of the charge to the jury, June 25, 2024…………………145

   d. Transcript of jury trial, June 26, 2024…………………………208

   e. Defendant's motion to amend the jury verdict slip associated with Count 2 and supporting affidavit, filed June 26, 2024………………………..231

   f. Transcript of jury trial, June 27, 2024…………………………240

   g. Transcript of jury trial, June 28, 2024…………………………247

   h. Transcript of jury trial, July 1, 2024…………………………..258

   i. Defendant's motion to dismiss and supporting affidavits, filed July 8, 2024……………………………………………………………272

   j. Defendant's supplemental memorandum in support of her motion to dismiss and supporting affidavit, filed July 10, 2024…………………289

   k. Commonwealth's opposition to defendant's post-trial motion to dismiss, filed July 12, 2024…………………………………………………295

   l. Defendant's reply to the Commonwealth's opposition to her motion to dismiss, filed July 15, 2024…………………………………………310

   m. Defendant's second supplemental memorandum in support of her motion to dismiss, filed July 18, 2024……………………………………320

n.  Commonwealth's post-trial notice of disclosure, filed August 1, 2024…………………………………………………………………..325

o.  Defendant's third supplemental memorandum in support of her motion to dismiss and supporting affidavit, filed August 5, 2024………………327

p.  Transcript of non-evidentiary hearing on motion to dismiss, August 9, 2024………………………………………………………………332

q.  Memorandum of decision and order on defendant's motion to dismiss, issued August 23, 2024……………………………………………..388

4.  Motion for leave to file transcript of May 24, 2024 sealed sidebar under seal…………………………………………………………………..409

5.  Motion for *pro hac vice* admission of Alan Jackson in the Supreme Judicial Court…………………………………………………………………411

6.  Proposed briefing schedule…………………………………………………416

7.  Docket sheet for SJ-2024-0332…………………………………………..418

8.  Parties' statement of agreed facts………………………………………420

9.  Reservation and report…………………………………………………....423

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

Suffolk, ss.                                                    No. SJ-2024-

KAREN READ,
Petitioner

v.

COMMONWEALTH OF MASSACHUSETTS,
Respondent.

_____

PETITION FOR RELIEF PURSUANT TO G.L. c. 211, § 3
_____

MARTIN G. WEINBERG
Attorney for Petitioner
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

MICHAEL PABIAN
Attorney for Petitioner
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

ALAN J. JACKSON
Attorney for Petitioner, *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460

DAVID R. YANNETTI
Attorney for Petitioner
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006

September 11, 2024

# <u>TABLE OF CONTENTS</u>

REQUEST FOR ORAL ARGUMENT……………………………………………………...3

INTRODUCTION……………………………………………………………………………...3

PROCEDURAL HISTORY……………………………………………………………………6

MEMORANDUM OF LAW…………………………………………………………………13

I.      The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution………………...13

II.     Alternatively, the Defense Is at Least Entitled to Conduct Post-Verdict Inquiry………..16

III.    Re-Prosecution Is Independently Barred Because There Was No Manifest Necessity to Declare a Mistrial on Counts on which the Jury Was Not Deadlocked…………………..20

CONCLUSION………………………………………………………………………………..31

# TABLE OF AUTHORITIES

**Cases**

*A Juvenile v. Commonwealth*, 392 Mass. 52 (1984) ........................................................ 15, 19, 29

*Abney v. United States*, 431 U.S. 651 (1977) ................................................................................. 3

*Arizona v. Washington*, 434 U.S. 497 (1978) ......................................................... 4, 20, 24, 31

*Ball v. United States*, 163 U.S. 662 (1896) ............................................................................... 14

*Blueford v. Arkansas*, 566 U.S. 599 (2012) .......................................................................... 4, 15, 29

*Commonwealth v. Babb*, 389 Mass. 275 (1983) ..................................................................... 13

*Commonwealth v. DiBenedetto*, 94 Mass. App. Ct. 682 (2019) ............................................... 20

*Commonwealth v. Edwards*, 491 Mass. 1 (2022) ...................................................................... 25

*Commonwealth v. Floyd P.*, 415 Mass. 826 (1993) .................................................................. 16

*Commonwealth v. Foster*, 411 Mass. 762 (1992) ...................................................................... 30

*Commonwealth v. Garteh*, 98 Mass. App. Ct. 1103 (2020) (unpublished) ................................ 30

*Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337 (1996) .......................................... 21, 27, 28

*Commonwealth v. Jenkins*, 416 Mass. 736 (1994) .................................................................... 26

*Commonwealth v. LaFontaine*, 32 Mass. App. Ct. 529 (1992) ................................................. 30

*Commonwealth v. McCalop*, 485 Mass. 790 (2020) .................................................................. 16

*Commonwealth v. Nicoll*, 452 Mass. 816 (2008) ....................................................... 20, 21, 23, 24

*Commonwealth v. Phetsaya*, 40 Mass. App. Ct. 293 (1996) ..................................................... 25

*Commonwealth v. Roth*, 437 Mass. 777 (2002) ................................................................... 29, 30

*Commonwealth v. Semedo*, 456 Mass. 1 (2010) ....................................................................... 25

*Commonwealth v. Steward*, 396 Mass. 76 (1985) ............................................................... 20, 21

*Commonwealth v. Taylor*, 486 Mass. 469 (2020) ............................................................... *passim*

*Commonwealth v. Zekirias*, 443 Mass. 27 (2004)……………………………………………16

*Cruz v. Commonwealth*, 461 Mass. 664 (2012)................................................... 20, 31

*Daniels v. Commonwealth*, 441 Mass. 1017 (2004) ................................................ 22

*Erlinger v. United States*, 144 S. Ct. 1840 (2024) .................................................. 3

*Flood v. Commonwealth*, 465 Mass. 1015 (2013) ................................................... 3

*Fuentes v. Commonwealth*, 448 Mass. 1017 (2007) ........................................... 19, 28

*Gonzalez v. United States*, 553 U.S. 242 (2008)..................................................... 21

*Green v. United States*, 355 U.S. 185 (1957)......................................................... 4

*Hudson v. Louisiana*, 450 U.S. 40 (1981).............................................................. 14

*Oregon v. Kennedy*, 456 U.S. 667 (1982).............................................................. 20

*Papp v. Commonwealth*, 491 Mass. 1019 (2023) .................................................... 2

*Pellegrine v. Commonwealth*, 446 Mass. 1004 (2006).................................... 24, 25, 27

*Picard v. Commonwealth*, 400 Mass. 115 (1987).................................................... 21

*Ray v. Commonwealth*, 463 Mass. 1 (2012) ...................................................... 20, 25, 28

*State v. Murdaugh*, No. 2023-000392 (Aug. 13, 2024) ........................................... 18

*United States v. Dinitz*, 424 U.S. 600 (1976)........................................................ 20

*United States v. Goldstein*, 479 F.2d 1061 (2d Cir. 1973)........................................ 27

*United States v. Jorn*, 400 U.S. 470 (1971) (plurality opinion)............................ 20, 31

*United States v. Martin Linen Supply Co.*, 430 U.S. 564 (1977)........................ 4, 13, 31

*United States v. McIntosh*, 380 F.3d 548 (1st Cir. 2004)......................................... 27

*United States v. Mespoulede*, 597 F.2d 329 (2d Cir. 1979) ..................................... 23

*United States v. Tsarnaev*, 96 F.4th 441 (1st Cir. 2024)......................................... 17

*United States v. You*, 382 F.3d 958 (9th Cir. 2004) ............................................... 27

iv

*Wallace v. Havener*, 552 F.2d 721 (6th Cir. 1977) .......................................................................... 23

## **Constitutional Provisions**

Fifth Amendment to U.S. Constitution .............................................................................. 3, 4

Sixth Amendment to U.S. Constitution ............................................................................... 3

## **Statutes**

G.L. c. 211, § 3 ................................................................................................................ 1, 2

G.L. c. 234A, § 68C ........................................................................................................ 7, 26

## **Rules**

Mass. R. Crim. P. 27(b) ........................................................................................... *passim*

## **Other Authorities**

The Federalist No. 83, p. 499 (C. Rossiter ed. 1961) ...................................................... 3

Now comes the Defendant Karen Read, who was aggrieved by an August 23, 2024, Memorandum of Decision and Order ("Order") denying her motion to dismiss on Double Jeopardy grounds in *Commonwealth v. Karen Read*, No. 22-00117 (Norfolk County Superior Court, Hon. Beverly J. Cannone). The Order, as it currently stands, will result in Ms. Read being retried on January 27, 2025, for the same two alleged crimes, including second-degree murder, that a jury of her peers has already unanimously agreed the Commonwealth failed to prove beyond a reasonable doubt following trial. Because the jury reached a final, unanimous decision to acquit Ms. Read on those charges, and because there was no manifest necessity supporting the declaration of a mistrial with respect to charges on which the jury unanimously agreed, retrial on such counts would violate the Double Jeopardy protections of both the federal and state constitutions and the common law decisions of this Court enforcing the protections of Double Jeopardy.

Ms. Read seeks relief from this Court through its discretionary superintendence powers under G.L. c. 211, § 3. In support of this petition, the defense has submitted a Memorandum of Law incorporated herein and has attached a record including the following documents:

    a.  Full docket report (R. 1-44);

    b.  Norfolk County Superior Court Indictment numbers 2282CR00117-001, 002, and 003 (R. 45-50);

    c.  Transcript of the charge to the jury, June 25, 2024 (R. 51-113);

    d.  Transcript of jury trial, June 26, 2024 (R. 114-36);

    e.  Defendant's motion to amend the jury verdict slip associated with Count 2 and supporting affidavit, filed June 26, 2024 (R. 137-45);

    f.  Transcript of jury trial, June 27, 2024 (R. 146-52);

    g.  Transcript of jury trial, June 28, 2024 (R. 153-63);

1

h.  Transcript of jury trial, July 1, 2024 (R. 164-77);

i.  Defendant's motion to dismiss and supporting affidavits, filed July 8, 2024 (R. 178-94);

j.  Defendant's supplemental memorandum in support of her motion to dismiss and supporting affidavit, filed July 10, 2024 (R. 195-200);

k.  Commonwealth's opposition to defendant's post-trial motion to dismiss, filed July 12, 2024 (R. 201-15);

l.  Defendant's reply to the Commonwealth's opposition to her motion to dismiss, filed July 15, 2024 (R. 216-25);

m.  Defendant's second supplemental memorandum in support of her motion to dismiss and supporting affidavit, filed July 18, 2024 (R. 226-30);

n.  Commonwealth's post-trial notice of disclosure, filed August 1, 2024 (R. 231-32);

o.  Defendant's third supplemental memorandum in support of her motion to dismiss and supporting affidavit, filed August 5, 2024 (R. 233-37);

p.  Transcript of non-evidentiary hearing on motion to dismiss, August 9, 2024 (R. 238-93); and

q.  Memorandum of decision and order on defendant's motion to dismiss, issued August 23, 2024 (R. 294-314).

Under G.L. c. 211, § 3, the Supreme Judicial Court has

> general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided; and it may issue all writs and processes to such courts . . . which may be necessary to the furtherance of justice and to the regular execution of the laws.

"[A] criminal defendant who raises a double jeopardy claim of substantial merit is entitled to review of the claim before [s]he is retried," and "G.L. c. 211, § 3, is the appropriate route for obtaining that review." *Papp v. Commonwealth*, 491 Mass. 1019, 1019 (2023) (citation omitted). "[B]ecause the double jeopardy right is a *right not to be tried*," this Court has "held that appellate review of [the denial of a motion to dismiss on that basis] after trial and conviction

2

would not provide adequate relief if the defendant were to prevail . . . ." *Flood v. Commonwealth*, 465 Mass. 1015, 1016 (2013) (citation omitted); *see also Abney v. United States*, 431 U.S. 651, 660-61 (1977) ("[T]he rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence. . . . [T]his Court has long recognized that the Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense.").

## REQUEST FOR ORAL ARGUMENT

Ms. Read respectfully requests that the Court hold oral argument on this petition.

## INTRODUCTION

The ancient right to a jury trial is no mere "procedural formalit[y] but [rather a] fundamental reservation[] of power to the American people." *Erlinger v. United States*, 144 S. Ct. 1840, 1850 (2024) (citation omitted). "By requiring the Executive Branch to prove its charges to a unanimous jury beyond a reasonable doubt, the Fifth and Sixth Amendments seek to mitigate the risk of prosecutorial overreach and misconduct, including the pursuit of 'pretended offenses' and 'arbitrary convictions.'" *Id.* (quoting The Federalist No. 83, p. 499 (C. Rossiter ed. 1961)). "Prominent among the reasons colonists cited in the Declaration of Independence for their break with Great Britain was the fact Parliament and the Crown had 'depriv[ed] [them] in many cases, of the benefits of Trial by Jury.'" *Id.* at 1848 (citation omitted). "After securing their independence, the founding generation sought to ensure what happened before would not happen again. As John Adams put it, the founders saw representative government and trial by jury as 'the heart and lungs' of liberty." *Id.* (citation omitted). It follows that a jury acquittal is

3

entitled to the utmost respect in our criminal justice system.  *See Commonwealth v. Taylor*, 486 Mass. 469, 481 (2020) ("Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that [a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution." (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977)).

"The Double Jeopardy Clause provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'"  *Blueford v. Arkansas*, 566 U.S. 599, 605 (2012) (quoting U.S. Const., Amdt. 5).  "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense."  *Green v. United States*, 355 U.S. 185, 187 (1957).  "Even if the first trial is not completed, a second prosecution may be grossly unfair.  It increases the financial and emotional burden on the accused, prolongs the period in which [s]he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. . . .  Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial."  *Arizona v. Washington*, 434 U.S. 497, 504-05 (1978) (internal footnotes omitted); *see also Martin Linen*, 430 U.S. at 569 ("At the heart of this policy is the concern that permitting the sovereign freely to subject the citizen to a second trial for the same offense would arm Government with a potent instrument of oppression."); *Blueford*, 566 U.S. at 605 ("The Clause guarantees that the State shall not be permitted to make repeated attempts to convict the accused, thereby subjecting h[er] to embarrassment, expense and ordeal and compelling h[er] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent [s]he may be found guilty." (citation omitted)).

4

Here, the very day after the trial court declared a mistrial, counsel for Ms. Read began receiving unsolicited communications from five of the twelve deliberating jurors (in four instances, directly from the jurors themselves) indicating in no uncertain terms that the jury had a firm and unwavering 12-0 agreement that Ms. Read is ***not guilty*** of two of the three charges against her, including the charge of murder in the second degree.  Crucially, neither the Commonwealth, which frankly acknowledged receiving communications from one juror to the same effect, nor the Superior Court judge, who expressly credited the veracity of juror statements relayed in affidavits by counsel, disputed the factual basis for the defense motion in any meaningful respect.  Given the central importance that acquittals have held in our criminal justice system for hundreds of years, the defense respectfully submits that the jury's unanimous agreement precludes re-prosecution of Ms. Read on Counts 1 and 3 and mandates dismissal of those charges.  This presents an issue of first impression for this Court, as does the defense's alternative contention that Ms. Read was entitled to a post-verdict inquiry to substantiate her claim and that this Court's precedents permitting such inquiry regarding claims of racial bias should be extended to the present context.

Independently, while a jury deadlock constitutes manifest necessity to support a mistrial, there is no authority for the proposition that disagreement as to ***some counts*** constitutes manifest necessity for the declaration of a mistrial with respect to ***all counts***.  Put another way, there was no deadlock as to two of the counts on which the trial court declared a mistrial.  The trial court's finding that Ms. Read's counsel consented to the mistrial is contrary to both the factual record and the clear binding caselaw placing the burden of establishing manifest necessity solely and exclusively on the prosecution.  The trial court also failed to address the two guiding principles set forth by this Court in *Taylor* – that before a mistrial is declared "(1) counsel must [have been]

5

given full opportunity to be heard and (2) the trial judge must [have given] careful consideration to alternatives to a mistrial." 486 Mass. at 484 (citation omitted). Thus, whether the jury acquitted Ms. Read or, alternatively, was merely not deadlocked on the relevant counts, the Constitution requires the same result: dismissal. The Commonwealth's response on this issue, arguing that inquiry regarding partial verdicts should be prohibited under case law involving lesser included offenses within a single count (unlike the present case), raises an important issue regarding the interaction between that lesser included offense case law and Mass. R. Crim. P. 27(b), which plainly permits, and in fact requires, the court, before declaring a mistrial, to inquire of a jury whether there exist partial verdicts where multiple offenses are charged in separate counts.

## PROCEDURAL HISTORY

On June 9, 2022, Ms. Read was charged in three separate indictments with second-degree murder in violation of G.L. c. 265, § 1 (Count 1); manslaughter while operating under the influence of alcohol in violation of G.L. c. 265, § 13½ (Count 2); and leaving the scene of a collision resulting in death in violation of G.L. c. 90, § 24(2)(a½)(2). (R. 45-50). A jury trial began on April 16, 2024.

On June 25, 2024, the jury began deliberations after receiving instructions from the trial court. The court instructed the jurors, "You should continue deliberating until you have reached a final verdict on each charge." June 25, 2024 Tr. at 46 (R. 96). It also noted that Count 2 contained "lesser include[d] charge[s]" of involuntary manslaughter and motor vehicle homicide, which the jury should consider "even if [the Commonwealth] fail[ed] to prove the greater charge of manslaughter while operating a motor vehicle under the influence of liquor." *Id.* at 35, 38 (R. 85, 88).

6

The following day, on June 26, 2024, outside the presence of the jury, counsel for Ms. Read raised an issue regarding the verdict form.  With respect to Count 2, the original verdict slip provided only one option to find Ms. Read not guilty before going on to ask whether Ms. Read was guilty of the offense charged, or guilty of one of the two lesser included offenses.  *See* Exhibit B to Affidavit in Support of Motion to Amend Jury Verdict Slip (R. 145).  Counsel asked that the form be amended to provide "not guilty options for the subordinate charges under Count 2."  June 26, 2024 Tr. at 5 (R. 118).  The trial court initially indicated its disagreement with counsel's request.  *See id.* at 8 (R. 121).  However, after considering the matter further, the court agreed to provide supplemental instructions and an amended verdict slip.  *See id.* at 9-14 (R. 122-27).  Later that day, the court provided the supplemental instructions, telling jurors that "Count 2 encompasses three separate charges, the most serious of which is manslaughter while operating a vehicle under the influence of liquor."  *Id.* at 16 (R. 129).  The jury should first focus on that "lead charge" and, "if the Commonwealth . . . failed to prove that crime beyond a reasonable doubt, then . . . consider the remaining lesser included offenses in descending order."  *Id.* (R. 129).

On June 28, 2024, the jury sent the following note to the court: "I am writing to inform you on behalf of the jury that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict."  June 28, 2024 Tr. at 4 (R. 156).  The court asked counsel for their views "on whether there ha[d] been due and thorough deliberations" sufficient to support the giving of a so-called *Tuey-Rodriguez* charge.  *Id.* at 5 (R. 157); *see also* G.L. c. 234A, § 68C (permitting charge "[i]f a jury, after due and thorough deliberation, returns to court without having agreed on a verdict").  The Commonwealth responded that the charge should not be given because there "simply ha[d]n't

7

been sufficient time yet." June 28, 2024 Tr. at 5 (R. 157). Counsel for Ms. Read disagreed,

requesting that the court "read the *Tuey-Rodriguez* model instruction and go from there." *Id.* at 6

(R. 158). The trial court sided with the Commonwealth ruling, "I am not prepared to find that

there have been due and thorough deliberations at this point. So I am going to send them back

out." *Id.* at 7 (R. 159).

On July 1, 2024, the jury presented another note, stating:

> despite our commitment to the duty entrusted to us, we find
> ourselves deeply divided by fundamental differences in our
> opinions and state of mind. The divergence in our views are not
> rooted in a lack of understanding or effort but deeply held
> convictions that each of us carry, ultimately leading to a point
> where consensus is unattainable. We recognize the weight of this
> admission and the implications it holds.

July 1, 2024 Tr. at 7 (R. 170). Upon being asked by the court, the parties reiterated their same

previously expressed views, with the Commonwealth taking the position that due and thorough

deliberations had not yet occurred and Ms. Read's counsel arguing that the court should give a

*Tuey-Rodriguez* instruction. *See id.* at 4-6 (R. 167-69). This time, the trial court decided to give

the requested instruction.

Later that day, the jury sent yet another note. Thereafter, without reading the note to

counsel, and without providing counsel with either an opportunity to be heard or an opportunity

to consult with their client about the implication of a potential mistrial on one or more charges,

the trial court simply stated, "The jury is at an impasse" and called in the jurors. *Id.* at 10 (R.

173). It then read the note on the record:

> despite our rigorous efforts, we continue to find ourselves at an
> impasse. Our perspectives on the evidence are starkly divided.
> Some members of the jury firmly believe that the evidence
> surpasses the burden of proof, establishing the elements of the
> charges beyond a reasonable doubt. Conversely, others find the
> evidence fails to meet this standard and does not sufficiently

8

> establish the necessary elements of the charges.  The deep division
> is not due to a lack of effort or diligence but, rather, a sincere
> adherence to our individual principles and moral convictions.  To
> continue to deliberate would be futile and only serve to force us to
> compromise these deeply held beliefs.

*Id.* at 11 (R. 174).

After reading the note, and without soliciting the views of counsel in any respect, the trial

court stated, "I am not going to do that to you, folks.  Your service is complete.  I am declaring a

mistrial in this case."  *Id.* (R. 174).  The jury was then excused and ordered to leave the

courtroom.  Counsel was not invited to speak during this entire interaction.  *See id.* (R. 174).

The following day, on July 2, 2024, unsolicited by any party, one of the jurors ("Juror

A") contacted one of the attorneys for Ms. Read, Alan Jackson.  Juror A stated that s/he

"wish[ed] to inform [Attorney Jackson] of the true *results*" of the jury's deliberations.  Affidavit

of Alan J. Jackson ¶ 4 (R. 192).  According to Juror A, "the jury unanimously agreed that Karen

Read is NOT GUILTY of Count 1 (second degree murder).  Juror A was emphatic that Count 1

(second degree murder) was 'off the table,' and that all 12 of the jurors were in agreement that

she was NOT GUILTY of such crime."  *Id.* ¶ 5 (R. 193).  "[T]he jury also unanimously agreed

that Karen Read is NOT GUILTY of Count 3 (leaving the scene with injury/death)."  *Id.* ¶ 6 (R.

193).

One day later, on July 3, 2024, another attorney for Ms. Read, David Yannetti, was

contacted by "two different individuals (hereinafter, 'Informant B' and 'Informant C') who had

received information from two distinct jurors (hereinafter 'Juror B' and 'Juror C') both of whom

were part of the deliberating jury in this case."  Affidavit of David R. Yannetti ¶ 2 (R. 189).

Informant B sent Attorney Yannetti "a screenshot he/she had received from someone

(hereinafter, 'Intermediary B') of text messages that Intermediary B had received from Juror B.

9

In that screenshot, Juror B texted the following to Intermediary B: 'It was not guilty on second degree. And split in half for the second charge. . . . I thought the prosecution didn't prove the case. No one thought she hit him on purpose or even thought she hit him on purpose [sic].'" *Id.* ¶ 4 (R. 189). Juror B later placed an unsolicited phone call to Attorney Yannetti, confirming that the information contained in the publicly filed Affidavit was accurate. *See* Supplemental Affidavit of David R. Yannetti ¶ 4 (R. 236). "Juror B clarified, however, that he/she meant to write, 'No one thought she hit him on purpose or even knew that she had hit him.'" *Id.* (R. 236-37). Juror B further told Attorney Yannetti s/he "believe[d] that every member of the jury, if asked, w[ould] confirm that the jury reached Not-Guilty verdicts on indictments (1) and (3)." *Id.* ¶ 5 (R. 237).

Informant C had been in contact with another individual ("Intermediary C") who is a co-worker and friend of Juror C and joined a Zoom meeting during which Juror C discussed the trial. Informant C sent Attorney Yannetti the below screenshots of his/her text messages with Intermediary C regarding what Juror C revealed in the Zoom meeting:

|  |  |
|---|---|
| Intermediary C: | "no consideration for murder 2. manslaughter started polling at 6/6 then ended deadlock @ 4no8yes." |
| . . . . | |
| Informant C: | "interesting. if it was no consideration for murder two, shouldn't she have been acquitted on that count. and hung on the remaining chargers [sic] goes back to the jury verdict slip that was all confusing" |
| Intermediary C: | "she should've been acquitted I agree. Yes, the remaining charges were what they were hung on. and that instruction paper was very confusing." |

10

Affidavit of David R. Yannetti ¶ 10 (R. 190-91).

Ms. Read moved to dismiss Counts 1 and 3 on Double Jeopardy grounds, contending (1) that the jury reached a final, unanimous decision to acquit her on those charges; and (2) that there was no manifest necessity supporting the mistrial given the evidence that the jury was not deadlocked, but was instead in agreement, on those counts.

In the ensuing days, after the filing of Ms. Read's initial motion to dismiss, but before the Superior Court hearing on that motion, Attorney Jackson was contacted by two other deliberating jurors. The first, "Juror D," stated "that the jury reached NOT GUILTY verdicts on Count 1 and Count 3, and that the disagreement was solely as to Count 2 and its lesser offenses." Supplemental Affidavit of Alan J. Jackson ¶ 5 (R. 199). S/he recounted that, "after the jury was excused and aboard the bus, many of the jurors appeared uncomfortable with how things ended, wondering, *Is anyone going to know that we acquitted [Karen Read] on Count 1 and 3?*" *Id.* ¶ 8 (R. 199). Juror D unequivocally told counsel, "*Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3. Because that's what happened.*" *Id.* ¶ 10 (R. 199). "Juror E" similarly stated "that the jury was 'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges." Second Supplemental Affidavit of Alan J. Jackson ¶ 4 (R. 229).

The Commonwealth filed a Post-Trial Notice of Disclosure informing the Court that, "[o]n Sunday July 21, 2024, Assistant District Attorney Adam Lally received an unsolicited voicemail on his office's phoneline from an individual, who identified their self as a juror by full name and seat number." Commonwealth Notice at 1 (R. 231). The message stated, "it is true what has come out recently about the jury being unanimous on charges 1 and 3." *Id.* (R. 231). ADA Lally received a subsequent message from the same individual stating he could "confirm

11

unanimous on charges one and three, as not guilty and as of last vote 9-3 guilty on the manslaughter charges . . . ." *Id.* (R. 231).  The Commonwealth additionally "received emails from three individuals who identified themselves as jurors" and "indicated they wished to speak anonymously." *Id.* (R. 231).  The Commonwealth declined to substantively respond to the voice messages or emails, instead claiming in responsive emails that it was ethically prohibited from discussing such matters.  *See id.* (R. 231).

After hearing oral argument on August 9, 2024, on August 23, the trial court issued an order denying Ms. Read's motion to dismiss.  The court "accept[ed]," "for the purposes of" the motion to dismiss, that ***the juror statements quoted in the defense affidavits were "true and accurate."***  Order at 9 (R. 302) (emphasis added).  It went on to hold, however, that "[b]ecause there was no open and public verdict affirmed in open court rendered in this case, the defendant was not acquitted of any of the charges." *Id.* at 10 (R. 303).  The court similarly rejected the defense argument regarding lack of manifest necessity, finding that (a) Ms. Read's counsel consented to a mistrial via their failure to object; and (b) the jury notes reflecting an "impasse" established the requisite manifest necessity.  *See id.* at 15-16 (R. 308-09).  The court did not address the *Taylor* test for declaring a mistrial based on manifest necessity, nor did it address Ms. Read's contention that the burden of demonstrating manifest necessity is squarely on the prosecutor.  The court instead erroneously equated a request for a *Tuey-Rodriguez* instruction, which is designed to encourage a ***verdict***, with consent to a ***mistrial***.  Finally, the court rejected the defense's alternative request for a post-trial inquiry on these issues on the grounds that the request implicated "the substance of the jury's deliberations." *Id.* at 20 (R. 313).

Ms. Read's retrial is currently scheduled to begin on January 27, 2025.  (R. 8).

12

**MEMORANDUM OF LAW**

I.    **The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution**

"[W]hat constitutes an 'acquittal' is not to be controlled by the form" of the action in question. *Taylor*, 486 Mass. at 482 (quoting *Martinez v. Illinois*, 572 U.S. 833, 841-42 (2014)). "Rather, [the Court] must determine whether" the action "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *Commonwealth v. Babb*, 389 Mass. 275, 281 (1983) (quoting *Martin Linen*, 430 U.S. at 571). The mere presence or absence of "checkmarks on a form" is not dispositive. *Taylor*, 486 Mass. at 482 (citation omitted).

Here, the affidavits by Attorneys Jackson and Yannetti reflect statements by five deliberating jurors that the jury had reached a final, unanimous conclusion that Ms. Read is not guilty of Counts 1 and 3. There was nothing tentative about the jurors' statements. To the contrary, they were definitive in describing the result of the jury's deliberations. *See* Affidavit of Alan J. Jackson ¶ 5 (R. 193) ("Juror A was emphatic that Count 1 (second degree murder) was 'off the table,' and that all 12 of the jurors were in agreement that she was NOT GUILTY of such crime."); Affidavit of David R. Yannetti ¶ 4 (R. 189) (reflecting text message from Juror B, "It was not guilty on second degree. . . .  No one thought she hit him on purpose or even [knew that she had hit him]"); *Id.* ¶ 10 (R. 190-91) (reflecting Juror C's statement, relayed by Intermediary C, that there was "no consideration for murder 2" and Ms. Read "should've been acquitted" on that count); Supplemental Affidavit of Alan J. Jackson ¶ 10 (R. 199) ("Juror D, without hesitation, said in substance, *Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3.  Because that's what happened.*"); Second Supplemental Affidavit of Alan J. Jackson ¶ 4 (R. 229) ("Juror E explained that the jury was

13

'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges."). As noted above, the trial court accepted the foregoing averments as true facts. *See* Order at 9 (R. 302).[1]

In rejecting Ms. Read's claim of acquittal, the court relied solely upon the lack of an "open and public verdict affirmed in open court." Order at 10 (R. 303). This reasoning is rooted in a formalism that has been consistently rejected by the United States Supreme Court and Supreme Judicial Court in a string of precedents spanning more than one hundred years. *See supra* page 13 (citing cases); *Ball v. United States*, 163 U.S. 662, 671 (1896) ("However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense."); *Hudson v. Louisiana*, 450 U.S. 40, 41 & n.1 (1981) (holding that judicial grant of new trial prohibited retrial on Double Jeopardy grounds, notwithstanding that the state "Code of Criminal Procedure d[id] not authorize trial judges to enter judgments of acquittal in jury trials").

Indeed, under the trial court's reasoning, affidavits executed by all 12 jurors attesting to a final, unanimous decision to acquit would not be sufficient to mount a successful Double Jeopardy challenge. Surely, that cannot be the law. Indeed, it ***must*** not be the law. And, in the context of this highly publicized case, it strains credulity to suggest that, if the unequivocal statements of five jurors quoted above did not, in fact, represent the unanimous view of all 12, the remaining jurors would allow the inaccuracy to go uncorrected. Instead, they would

---

[1] Just days ago, an article was published online reflecting an interview with an anonymous juror quoted as saying, "It was very clear on charge 1 and 3. Murder was decided on day one. She did not have an intent to murder." Aidan Kearney, *Canton Coverup Part 397: Karen Read Juror Says They Switched on Manslaughter Verdict, Confirms Murder Acquittal, Says Jurors Couldn't Ask Judge Cannone Questions About 2 Verdicts* (Sept. 6, 2024), *available at* https://tbdailynews.com/canton-coverup-part-397-karen-read-juror-says-they-switched-on-manslaughter-verdict-confirms-murder-acquittal-says-jurors-couldnt-ask-judge-cannone-question-about-2-verdicts/.

14

predictably have notified the Commonwealth or the court of their own recollection.  Here, to the contrary, the Commonwealth has received the exact same information as the defense regarding the jury's unanimous agreement to acquit Ms. Read on Counts 1 and 3.

The United States Supreme Court's decision in *Blueford* is not to the contrary, as it is factually distinguishable from the instant case.  There, the foreperson had reported during deliberations that the jury "was unanimous against" the charges of capital murder and first-degree murder but split on manslaughter.  566 U.S. at 603-04.  The court sent the jury back to continue deliberations and, when the jury remained unable to reach a verdict, declared a mistrial.  *See id.* at 604.  The Supreme Court rejected the defendant's argument that the Double Jeopardy Clause prohibited re-prosecution for capital and first-degree murder.  In doing so, the Court relied heavily upon the lack of finality of the juror's report.  "[T]he jury's deliberations had not yet concluded," and it "went back to the jury room to deliberate further."  *Id.* at 606.  "The foreperson's report was not a final resolution of anything," and there was no indication at the conclusion of deliberations that "it was still the case that all 12 jurors believed [the defendant] was not guilty of capital or first-degree murder."  *Id.*  Here, by contrast, the jurors' statements reflect a final and indelible determination that persisted through the end of deliberations and following.

The contrast with *A Juvenile v. Commonwealth*, 392 Mass. 52 (1984), is even clearer.  In that case, after the conclusion of trial, a court officer found four verdict slips in the deliberation room, two of which reflected entries of "not guilty."  There was no indication as to when the entries were made or in what circumstances, much less that they reflected a final, unanimous conclusion of all jurors.

15

Neither the Commonwealth nor the trial court has cited any case in which a defendant was forced to stand trial a second time for an offense a previous jury had found her not guilty of simply because such final, unanimous agreement was not announced in open court. *See* Aug. 9, 2024 Tr. at 18 (R. 255) (counsel arguing that Commonwealth had not cited "a single case with facts like this [that] have been ignored. Not a single precedent have they raised, nationwide, State Courts, murder cases, 50 States, [f]ederal, where there's been this kind of demonstration that we were silent when we shouldn't be, but she was acquitted").[2] The instant case squarely presents that issue, and the defense respectfully submits that this Court should hold that any lack of formality does not supersede the defendant's fundamental constitutional protections. This issue is one of existential importance—not merely to Ms. Read, but to the very foundation of the constitutional safeguards that protect her.

## II.    Alternatively, the Defense Is at Least Entitled to Conduct Post-Verdict Inquiry

The law is clear that, at least in the context of "juror bias," an affidavit by counsel is sufficient to entitle the defendant to a "post-verdict inquiry" on the issue. *Commonwealth v. McCalop*, 485 Mass. 790, 798 (2020) (citation omitted). No less than the right to an unbiased jury, it is "a fundamental tenet of our system of justice" that a defendant may not be retried for a crime of which she was previously acquitted by a jury, and the defense submits that post-verdict

---

[2] Other cases cited by the trial court on this issue did not involve Double Jeopardy challenges at all. *See Commonwealth v. Zekirias*, 443 Mass. 27, 31-34 (2004); *Commonwealth v. Floyd P.*, 415 Mass. 826, 830-32 (1993). Instead, these cases both vacated convictions where courts responded to ambiguous communications by jurors in such a way as to improperly influence the return of guilty verdicts. Given the gravity of criminal conviction, it makes sense to insist on observance of procedural formalities before taking away a defendant's liberty. However, in light of the fundamental constitutional prohibition on Double Jeopardy, refusing to give effect to a verdict of acquittal due to lack of formality is another matter altogether for which neither the Commonwealth nor the trial court has cited any precedent. Additionally, unlike in *Zekirias* and *Floyd P.*, there is nothing ambiguous or tentative about the post-trial evidence of verdicts here.

16

inquiry is equally warranted in the present context.  *Id.*  Other than generally noting that this case does not involve an allegation of juror bias, the trial court did nothing to distinguish *McCalop*.

But there is no apparent reason to limit a defendant's entitlement to a post-trial inquiry to the issue of racial bias alone.  Recently, in *United States v. Tsarnaev*, 96 F.4th 441, 449 (1st Cir. 2024), the First Circuit Court of Appeals remanded the matter for further proceedings in the Boston Marathon bombing case due to two jurors' postings on social media "regarding the bombings and the district court proceedings," which came to light after the jurors had been provisionally selected to serve.  *Id.* at 449.  The comments did not reflect racial bias in any way, but rather possible bias specific to the defendant.  *See id.* at 454, 461.  The comments were also inconsistent with the jurors' assurances that they had not discussed the case online.  *See id.* at 455, 461.  The First Circuit held that the district court erred by ***failing to inquire*** about these issues with the jurors.  *See id.* at 458, 462.  Given that "[t]he right to an impartial jury is a constitutional bedrock[,] . . . when there is a plausible claim that a prospective juror lied in a manner that may reveal bias, a court need conduct some inquiry reasonably calculated to determine whether the prospective juror did lie and, if so, why."  *Id.* at 458 (citation omitted).

Crucially for present purposes, the First Circuit ordered the district court to *voir dire* the jurors.  In doing so, the court acknowledged, "[n]o doubt any juror would have strong incentives to avoid admitting having committed perjury during voir dire.  We also expect that most jurors, having taken time out of their daily lives to receive evidence at trial, deliberate with other jurors, and reach a verdict that they believe is just, would prefer not to have that verdict disturbed – especially as a result of their own actions. . . . .  [W]e have no doubt that the able district court judge can do what judges regularly do – form a considered opinion about the sufficiency of the jurors' explanations once those explanations are given and explored."  *Id.* at 464.

17

In another high-profile case, the South Carolina Supreme Court recently agreed to hear claims by Alex Murdaugh that, during his murder trial, the clerk of court improperly influenced deliberating jurors. *See State v. Murdaugh*, No. 2023-000392 (Aug. 13, 2024), Order attached hereto as Exhibit A. Jurors came forward after the clerk published a book about the trial describing her "efforts to obtain" a "guilty verdict through improper jury tampering." Brief of Appellant (attached hereto as Exhibit B) at 2. The clerk allegedly told jurors after the defense began its case "not to let the defense 'throw you all off,' or 'distract you or mislead you,'" and warned them "'not to be fooled' by Mr. Murdaugh's testimony in his own defense." *Id.* The trial court held an evidentiary hearing on the motion for new trial, including testimony by jurors. *See id.* at 4-8. As in *Tsarnaev*, the issue was not racial bias, but nonetheless implicated fundamental constitutional rights like Ms. Read's right not to be retried for offenses of which she has already been acquitted.

The trial judge dismissed Ms. Read's reliance upon *Tsarnaev* and *Murdaugh* in a brief footnote, simply stating that the circumstances "are readily distinguishable" from those at issue here. Order at 21 (R. 314). But this misses the forest for the trees. While it is certainly true that all three cases raise different issues, the fundamental point remains the same: a defendant who comes forward with credible evidence of a serious constitutional violation post-trial is entitled to an opportunity to prove those claims. There is no apparent reason to artificially limit the availability of such constitutional inquiry to the singular context of racial bias.

The defense request does not, in any manner, infringe upon "the substance of the jury's deliberations." Order at 20 (R. 313). To the contrary, the motion to dismiss was predicated solely upon the **result** of such deliberations, namely a unanimous decision that Ms. Read is not guilty of murder in the second degree. The relevant inquiry could be accomplished by a single

"yes" or "no" question posed to jurors: *did you unanimously acquit Karen Read of the charges in Counts 1 and 3*?  Of course, the results of a jury's deliberations are not secret.  They are, in fact, routinely announced in open court.  Here, the defense has learned post-trial that the jury reached a verdict that was not so announced.  It was at least entitled to the opportunity to substantiate that fact in order to ensure Ms. Read is not unconstitutionally forced to stand trial for criminal offenses of which she has already been acquitted.  Such inquiry in no way intrudes on the deliberative process of the jury.

Indeed, it was the trial court, not the defense, that injected issues regarding jury deliberations into the inquiry.  It is simply not true that, "given the content of the jury's final note to the Court, . . . [a]ny inquiry would necessarily require the Court to understand why the jury's final note communicated a deadlock on charges when post-trial, certain deliberating jurors are purportedly stating that the jury was, in fact, unanimous on most of the charges."  Order at 20 (R. 313).  As explained *infra* pages 28-29, in light of the trial court's instructions repeatedly characterizing the lesser included offenses within Count 2 as discrete "charges," the jury's note is readily susceptible to interpretation consistent with the post-trial evidence supporting the defense motion.[3]  In any event, if the jurors state that they acquitted Ms. Read, no further inquiry

---

[3] This distinguishes the case from *A Juvenile*, where the jury foreman had expressly indicated "that the jurors were deadlocked on the complaint which charged murder," and the jurors subsequently reaffirmed that fact in open court.  392 Mass. at 53.  In these circumstances, a post-trial subpoena to the foreman regarding verdict slips recovered from the deliberation room after trial regarding that very count "could only be aimed" at impermissible "impeachment, months after the fact, of the jury's report to the judge in open court."  *Id.* at 57.  Here, by contrast, no statement or inquiry was made regarding whether the impasse related to any specific count.  *Cf. also Fuentes v. Commonwealth*, 448 Mass. 1017, 1018 (2007) (jury note expressly "stated that the jury could not reach a unanimous verdict as to either" of the two indictments).

19

regarding the contents of the jury note could possibly remove the clear constitutional

implications of such acquittal.[4]

### III.    Re-Prosecution Is Independently Barred Because There Was No Manifest Necessity to Declare a Mistrial on Counts on which the Jury Was Not Deadlocked

Absent the defendant's consent, "State and Federal double jeopardy protections bar, 'as a

general rule,' retrial of a defendant whose initial trial ends . . . without a conviction."  *Ray v.

Commonwealth*, 463 Mass. 1, 3 (2012) (quoting *Washington*, 434 U.S. at 505).  This rule is

rooted in "the importance to the defendant of being able, once and for all, to conclude h[er]

confrontation with society through the verdict of a tribunal [s]he might believe to be favorably

disposed to h[er] fate."  *Cruz v. Commonwealth*, 461 Mass. 664, 670 n.9 (2012) (quoting *United

States v. Jorn*, 400 U.S. 470, 486 (1971) (plurality opinion)); *see also Taylor*, 486 Mass. at 483

("[T]he [d]ouble [j]eopardy [c]lause affords a criminal defendant a 'valued right to have h[er]

trial completed by a particular tribunal.'" (quoting *Oregon v. Kennedy*, 456 U.S. 667, 671-72

(1982)).  "Thus, where a mistrial is entered 'without the defendant's request or consent,' retrial is

impermissible unless there was a manifest necessity for the mistrial."  *Id.* (quoting *United States

v. Dinitz*, 424 U.S. 600, 606-07 (1976)).

Importantly, the "heavy" burden of establishing "manifest necessity" to justify a mistrial

is ***exclusively*** on the Commonwealth.  *Commonwealth v. Nicoll*, 452 Mass. 816, 818 (2008)

(quoting *Washington*, 434 U.S. at 505); *see also Commonwealth v. Steward*, 396 Mass. 76, 79

(1985).  And this burden remains solely upon the Commonwealth regardless of whether or not a

---

[4] In *Commonwealth v. DiBenedetto*, 94 Mass. App. Ct. 682, 688 (2019), the defense argument that the jury's verdict (which had just been announced in open court) was not, in fact, unanimous depended upon "juror testimony concerning internal deliberations," namely "that they misunderstood the unanimity instruction."  *DiBenedetto* also preceded this Court's opinion in *McCalop*, and therefore must be disregarded to the extent the Court perceives an inconsistency between the two.

20

defendant objects to the declaration of a mistrial.  *See Nicoll*, 452 Mass. at 818; *Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337, 340 (1996).  Before a court declares a mistrial for manifest necessity, "(1) counsel must [have been] given full opportunity to be heard and (2) the trial judge must [have given] careful consideration to alternatives to a mistrial."  *Taylor*, 486 Mass. at 484 (citation omitted).

Here, the defense respectfully submits that the lack of opportunity to be heard, alone, is dispositive.  Upon receiving the final jury note, the court declared a mistrial and excused the jury without consulting counsel.  This action "was sudden, brief, and unexpected, neither preceded nor accompanied by discussion with counsel."  *Horrigan*, 41 Mass. App. Ct. at 341; *see also Picard v. Commonwealth*, 400 Mass. 115, 118-19 (1987) (finding no manifest necessity where "[n]o opportunity was given counsel to argue the propriety of the question or of the necessity of a mistrial"); *Steward*, 396 Mass. at 79 (finding no manifest necessity where "the trial judge . . . first ruled that he was going to declare a mistrial and then, almost as an afterthought, unenthusiastically asked whether counsel objected").  The defense was provided no opportunity to object to the declaration of a mistrial, or to advise the court of the imperatives of Mass. R. Crim. P. 27(b), request that the jury be polled, or discuss the issue with Ms. Read.

The defense respectfully submits that, given the importance of Double Jeopardy protections and the profound implications of a retrial for a criminal defendant, an opportunity to be heard must, in order to be meaningful, occur after a reasonable opportunity for counsel to consult with their client.  *Cf. Gonzalez v. United States*, 553 U.S. 242, 250-51 (2008) (observing that "some basic trial choices," including the choices "to plead guilty, waive a jury, testify in . . . her own behalf, or take an appeal," "are so important that an attorney must seek the client's consent in order to waive the right." (citation omitted)); *see also* Aug. 9, 2024 Tr. at 24 (R. 261)

21

(arguing that counsel had "no opportunity . . . to speak to Ms. Read, after all, it's her rights, not theirs"). Counsel for Ms. Read clearly had no such opportunity here.[5] Whether or not the trial court was obligated to obtain Ms. Read's personal consent,[6] its failure to at least ensure that counsel had an opportunity to consult with Ms. Read on the issue undermines the existence of manifest necessity.

The record is independently lacking on the second prong, as it reflects no "careful consideration" of "alternatives to a mistrial." *Taylor*, 486 Mass. at 484 (citation omitted). Here, there was one obvious alternative: to simply ask the jury to specify the charge(s) on which it was deadlocked. This option is apparent from the face of Mass. R. Crim. P. 27(b) which states that "[t]he judge may declare a mistrial as to any charges upon which the jury cannot agree upon a verdict; ***provided***, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded." (Emphasis added). In fact, the reporter's notes expressly indicate that such reception of partial verdicts is ***required*** before a mistrial may be declared for manifest necessity. *See* Mass. R. Crim. P. 27, reporter's notes ("This rule also provides that the court may declare a mistrial in cases where the jury is unable to reach a verdict. However, it ***must*** first receive and record the verdicts which the jury can agree upon." (Emphasis added)). Had the court inquired as to the existence of any partial verdicts, and the jury articulated its verdict consistent with the statements of Juror A, Juror B, Juror C, Juror D, and Juror E, the Double Jeopardy implications would have been clear

---

[5] Notably, the trial judge did ensure that Ms. Read was personally consulted regarding less weighty matters. For example, on May 24, 2024, the court called Ms. Read to sidebar and personally asked her to verbally consent to Attorney Jackson's absence on the Tuesday following Memorial Day, and that co-counsel, Attorney Yannetti, could represent her on that day. *See* May 24, 2024 Tr. at 3-5.

[6] *But see Daniels v. Commonwealth*, 441 Mass. 1017, 1018 & n.2 (2004).

and decisive. "[I]ndeed, with virtual unanimity, the cases have applied collateral estoppel to bar the Government from relitigating a question of fact that was determined in defendant's favor by a partial verdict." *United States v. Mespoulede*, 597 F.2d 329, 336 (2d Cir. 1979); *see also Wallace v. Havener*, 552 F.2d 721, 724 (6th Cir. 1977) ("When the jury hands down a partial verdict, a final judgment is rendered on the counts upon which the jury has reached agreement.").

In denying the motion to dismiss, the trial court erred by relying primarily upon the lack of objection by defense counsel. In doing so, it utterly neglected to acknowledge the clear and longstanding caselaw placing the burden of establishing manifest necessity squarely on the prosecution. *Nicoll* provides a helpful analogue.

The defendant in *Nicoll* was charged with operating a vehicle under the influence of alcohol. Only six jurors were empaneled and, after trial began, one juror recognized a witness "and informed the trial judge that he might not be able to be impartial." 452 Mass. at 817. The judge excused the juror. "Left with five jurors, the judge and attorneys briefly discussed how to proceed. Defense counsel expressed his frustration over the empanelment of only six jurors and then stated, 'I don't think we can go forward with five jurors, can we?' The judge responded, 'Not in a criminal case. . . . Okay, I'm going to declare a mistrial.'" *Id.* After a retrial was scheduled, the defendant moved to dismiss on Double Jeopardy grounds. The trial judge allowed the motion finding "that contrary to his initial understanding, Massachusetts procedural rules would have allowed the trial to continue with five jurors (albeit with [defendant's] consent)." *Id.* The judge therefore found that he "had failed to give careful consideration to the alternative of proceeding with the trial before less than a full jury," and, accordingly, "there had been no 'manifest necessity' for the mistrial." *Id.* (internal quotation marks omitted).

23

On appeal, this Court began from the premise that, "[d]ue to the importance of the double jeopardy protection, the Commonwealth bears the 'heavy' burden of proving that a mistrial rested on manifest necessity." *Id.* at 818 (quoting *Washington*, 434 U.S. at 505). The Court then agreed with the trial judge that the defendant could waive his right to a trial by a jury of at least six. *See id.* at 821. It rejected the Commonwealth's argument that the defendant in the case at hand had not provided such a waiver observing, "the question is not whether [defendant] executed a valid waiver, but whether there was a 'manifest necessity' for declaring a mistrial. Such necessity would have presented itself if [defendant] had declined to execute a waiver, but the record is clear that neither the judge nor counsel was aware of or even considered the option." *Id.* at 821-22. "In these circumstances, the Commonwealth [wa]s unable to satisfy its **heavy burden** of proving that there was a 'manifest necessity' for declaring a mistrial." *Id.* at 822 (emphasis added).

The defense respectfully submits that the same result is required here. It is the prosecution's burden alone to ensure that the declaration of a mistrial is supported by manifest necessity. Even where, unlike in the present case, defense counsel was expressly offered the opportunity to be heard on how to proceed, and explicitly shared the judge's mistaken view that the trial could not continue with fewer than six jurors, this Court held that the alternative to declaring a mistrial was not adequately considered. Here, there is no doubt that the Court was permitted to accept a partial verdict. *See, e.g.*, Mass. R. Crim. P. 27(b). But the record simply reflects no consideration of that option. Accordingly, as in *Nicoll*, the charges in this matter must be dismissed.

Neither Ms. Read nor her counsel consented to the declaration of a mistrial. Consent may be implied "where a defendant had the opportunity to object but failed to do so." *Pellegrine*

*v. Commonwealth*, 446 Mass. 1004, 1005 (2006) (citation omitted). But the law is clear that such consent may not be inferred from counsel's silence alone. *See Commonwealth v. Edwards*, 491 Mass. 1, 13 (2022) (rejecting argument "that the defendant consented to the declaration of a mistrial because he did not object when the judge ordered the case dismissed"); *Commonwealth v. Phetsaya*, 40 Mass. App. Ct. 293, 297-98 (1996) (holding that, where "the trial judge did not ask defense counsel to comment on the possible declaration of a mistrial," "the lack of an objection from defense counsel cannot be construed as consent" to such action). Here, no such consent was sought, nor was it given.

The trial court's ruling that Ms. Read's counsel impliedly consented to the mistrial was based primarily upon counsel's requests for a *Tuey-Rodriguez* instruction. Of course, whether the jury has engaged in "due and thorough deliberation" to support a *Tuey-Rodriguez* instruction and whether there is manifest necessity to declare a mistrial are distinct legal questions. In fact, the *Tuey-Rodriguez* charge is "designed to urge the jury to reach a verdict," not to avoid one. *Commonwealth v. Semedo*, 456 Mass. 1, 20 (2010). Unsurprisingly, neither the Commonwealth nor the trial court cited any case finding a defendant's consent to a mistrial can be based on a prior request for a *Tuey-Rodriguez* charge.[7] Here, defense counsel's requests did not reflect any implicit concession that the jury was deadlocked on all counts, nor did they commit the defense to any position regarding whether the court should *sua sponte* declare a mistrial. It is true that, if

---

[7] In *Ray*, 463 Mass. at 2-3, after the jury reported a deadlock, "the judge indicated that he was inclined to declare a mistrial." The parties responded by "request[ing] that the court give the jury a *Tuey-Rodriguez* instruction" as an alternative. *Id.* at 3. The judge "declined to give this instruction and declared a mistrial over the defendant's objection." *Id.* In these circumstances, where the request for a *Tuey-Rodriguez* charge came in response to a judge's statement of intent to declare a mistrial, it was a fair "inference that both parties were provided an opportunity to be heard on possible alternatives to a mistrial." *Id.* at 4. In the present case, by contrast, the *Tuey-Rodriguez* instruction was requested before any suggestion of a mistrial, not as a possible alternative thereto.

25

the jury reports an impasse after a *Tuey-Rodriguez* instruction, they "shall not be sent out again without their own consent." G.L. c. 234A, § 68C. That fact, however, does nothing to undermine the alternative of simply inquiring, pursuant to Mass. R. Crim. P. 27(b), whether the jury had reached any partial verdict. Doing so would not require the jury to be "sent out again." The trial court was in error in equating a request for a *Tuey-Rodriguez* charge with any acceptance of or acquiescence to a mistrial.

Moreover, the trial court's characterization of the jury's final note as "making it clear that [the jurors] would not consent to continuing their deliberations," is belied by case law cited in the court's Order. Order at 13 (R. 306). In *Commonwealth v. Jenkins*, 416 Mass. 736, 739 (1994), the jury similarly reported, after a *Tuey* charge, "that they felt strongly that there was no hope of progress and requested further instructions." The court responded by telling the jury, "I cannot force you to continue deliberations unless you agree to continue deliberations," but then asking them "to retire and decide whether further deliberations on the next day would be fruitful." *Id.* The jury "promptly reached a verdict." *Id.* at 740. This Court held that "[t]he object of" the statutory prohibition on sending the jury back out without consent "was fulfilled because the jury consented to continue their work. . . . [T]he jury's return of a verdict after sending their last note implicitly satisfied the statutory requirement of jury consent." *Id.* Thus, another alternative to a mistrial (which the trial court did not consider) in this case would have been to (a) inform the jury that it could not be required to continue deliberations without its consent and (b) ask it to retire to consider whether it was prepared to return any partial verdict.

Here, neither Ms. Read nor her counsel were provided an opportunity to object to the declaration of a mistrial (as opposed to the appropriateness of a *Tuey-Rodriguez* instruction). All of the cases cited by the trial court on this issue are readily distinguishable on that basis. For

example, in *Pellegrine*, a witness testified at trial to incriminating evidence that had not been disclosed to the defense. This Court held that the defense had an opportunity to object given that "[t]he mistrial was declared after a voir dire [of the witness] and colloquy after the jury were cleared from the court room." 446 Mass. at 1005. Here, by contrast, the defense did not learn of the contents of the jury note, or the court's intention to declare a mistrial, until the judge called the jury in and stated the declaration of mistrial on the record. Counsel was never shown the note from the jury. The judge indisputably never informed counsel of its intent to declare a mistrial, much less solicited counsel's views on the matter. *Compare United States v. McIntosh*, 380 F.3d 548, 555 (1st Cir. 2004) (ruling, in case where "defense counsel at one point implored the district court to declare a mistrial because the jury was deadlocked," "[i]t would be Kafkaesque–and wrong– . . . to allow parties freely to advocate on appeal positions diametrically opposite to the positions taken by those parties in the trial court"); *United States v. You*, 382 F.3d 958, 962 (9th Cir. 2004) (after co-defendant moved for mistrial, the "court subsequently stated that it was going to declare [one]" and "asked the attorneys if either wished 'to make any record?'"); *United States v. Goldstein*, 479 F.2d 1061, 1067 (2d Cir. 1973) ("Defendants had moved for a mistrial a scant two hours before one was declared, at the first suggestion of jury deadlock . . . .").

As the Appeals Court has explained in an analogous factual context, the suggestion that counsel could or should have immediately objected to the *sua sponte* declaration of a mistrial "underestimates or ignores the difficulty of reaching a decision (in which the defendant has an evident personal stake) whether the defense would be advantaged or the opposite by a second trial: the possibilities ahead (such as the appearance of a new prosecution witness) cannot be instantly calculated. Therefore, ***to equate silence with 'consent' when the occasion comes***

27

***abruptly and unexpectedly seems quite unwise***." *Horrigan*, 41 Mass. App. Ct. at 342 (emphasis added).

The trial court's suggestion that defense counsel had an opportunity to object to the declaration of a mistrial after it had occurred and the jury had been discharged is mistaken. The judge expressly told jurors, "Your service is complete. I am declaring a mistrial in this case." July 1, 2024 Tr. at 11 (R. 174).

Given counsel's lack of an opportunity to be heard and the court's lack of consideration of alternatives, the defense respectfully submits that the prosecution has not satisfied its high burden of establishing manifest necessity for the mistrial. While the trial court correctly observed that jury deadlock may be grounds for a mistrial, *see, e.g.*, *Ray*, 463 Mass. at 3, it cited no precedent for the counter-intuitive proposition that a deadlock with respect to some but not all counts constitutes manifest necessity for the declaration of a mistrial as to all. *Compare Fuentes v. Commonwealth*, 448 Mass. 1017, 1018 (2007) (affirming declaration of mistrial where note expressly "stated that the jury could not reach a unanimous verdict as to either" of the two indictments). This lack of precedential support is no accident: such a rule would run counter to the important interests underlying the constitutional safeguards against Double Jeopardy.

Contrary to the trial court's suggestion, there was nothing in the jury's notes that "directly contradict[ed]" the post-trial affidavits by counsel. Order at 9 n.4 (R. 302). As an initial matter, there is a facial tension between this observation by the court and its stated acceptance of the affidavits as true for purposes of the motion to dismiss. And the jury's reference to "charges" is easily reconciled with the post-trial affidavits affirming that the only deadlock related to the lesser included offenses of Count 2. Indeed, the court repeatedly referred to those lesser included offenses as distinct "charge[s]," both in its initial and supplemental

28

instructions to the jury. *See* June 25, 2024 Tr. at 35, 38 (R. 85, 88); June 26, 2024 Tr. at 16 (R. 129). In this context, the jury's note was facially susceptible to two alternative interpretations: (1) that the jury had reached an impasse as to all charges, or (2) that the deadlock applied to only some of those charges (*e.g.*, on multiple lesser included allegations within a single count such as Count 2). The information received from jurors post-trial proves the latter interpretation was correct. The jury's failure to expressly mention its agreement on Counts 1 and 3 is understandable in light of the court's instruction that it "should continue deliberating until" it had "reached a final verdict on each charge." June 25, 2024 Tr. 46 (R. 96).

This Court's holding, in *Commonwealth v. Roth*, 437 Mass. 777 (2002), that courts should not request partial verdicts on lesser included offenses charged in a single count does not pertain here. *Roth* was rooted in the belief that "[i]nquiry concerning partial verdicts on lesser included offenses" *that have not been separately charged* "carries a significant potential for coercion." *Id.* at 791; *see also Blueford*, 566 U.S. at 609-10 (declining to require court "to consider giving the jury new options for a verdict" in the form of partial verdicts on lesser included offenses where, "under Arkansas law, the jury's options . . . were limited to two: either convict on one of the offenses, or acquit on all"). Such inquiry, in effect, implies that the jury should consider conviction on the lesser count. No similar danger is present where, as here, the jury was asked to return three separate verdicts on three separate counts. *See Roth*, 437 Mass. at 793 n.13 (distinguishing situation "where a defendant has been charged in separate indictments or complaints, each with a separate verdict slip"); *A Juvenile*, 392 Mass. at 55 n.1 ("Where a complaint or indictment, in multiple counts, charges multiple crimes . . . a general verdict could be returned as to one of the counts, despite deadlock on the other counts."). In this circumstance, where the jury reports a deadlock without specifying the count(s) on which it has reached an

29

impasse, it is a straightforward (and, the defense contends, constitutionally required) follow-up to ask whether the deadlock relates to some as opposed to all counts.  Contrary to the trial court's suggestion, an inquiry regarding whether the jury had reached a partial verdict on any of the three separately charged counts would not necessitate any forbidden inquiry on the lesser included offenses contained within Count 2.  *See* Order at 18 (R. 311).  There is simply nothing coercive about asking a jury reporting a deadlock that fails to specify which counts the deadlock relates to the single question of whether its deadlock is on certain but not all counts and if it has reached a unanimous verdict on ***any*** counts.  *See Commonwealth v. Foster*, 411 Mass. 762, 766 (1992) (affirming trial judge's taking of partial verdicts on two of four separate indictments and observing, "[t]o conclude that the jury could have felt pressure to convert provisional verdicts against the defendant into final ones and to abandon all doubts that they may have privately entertained runs counter to the clear instructions of the judge and amounts to mere speculation without any support in the record"); *Roth*, 437 Mass. at 788 (noting, in the context of deadlocked jury, that "rule 27(b) permits taking verdicts on less than all of the charges set forth in . . . separate indictments"); *Commonwealth v. LaFontaine*, 32 Mass. App. Ct. 529, 534-35 (1992) (affirming partial verdicts taken after judge asked jury whether it had "reached a verdict on any of the indictments"); *Commonwealth v. Garteh*, 98 Mass. App. Ct. 1103, at *3 (2020) (unpublished) (holding that "the judge's decision to take a partial verdict and encourage the jury to agree on the remaining charges was sound where the jury indicated they were able to reach a consensus on some charges but not others").

The inflexible prohibition on judicial inquiry regarding partial verdicts advocated by the Commonwealth would inevitably undermine defendants' important, and constitutionally protected, interest in "being able, once and for all, to conclude [their] confrontation[s] with

society through the verdict of a tribunal [they] might believe to be favorably disposed to [their] fate." *Cruz*, 461 Mass. at 670 n.9 (quoting *Jorn*, 400 U.S. at 486 (plurality opinion)). And "[t]he danger of . . . unfairness to the defendant" from multiple prosecutions "exists when[] a trial is aborted before it is completed," as well as when the defendant is actually acquitted. *Washington*, 434 U.S. at 504. The Commonwealth's proposed rule would also undoubtedly hinder law enforcement interests by precluding courts from asking whether a jury may have reached a ***guilty*** verdict on some but not all stand alone counts.

It is uncontroverted that, according to the jury of her peers, following trial Ms. Read was unanimously found not guilty of Counts 1 and 3. That undisputed fact must not be lost in this analysis. It bears repeating that "[a]t the heart of this policy [against Double Jeopardy] is the concern that permitting the sovereign freely to subject the citizen to a second trial for the same offense would arm Government with a potent instrument of oppression." *Martin Linen*, 430 U.S. at 569.

## **CONCLUSION**

For the foregoing reasons, Ms. Read respectfully requests that this Honorable Court reverse the trial court and Order that Counts 1 and 3 must be dismissed.

Respectfully Submitted,
For the Petitioner,
Karen Read
By her attorneys,


**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

31

**/s/ Michael Pabian**
Michael Pabian, Esq.
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq., *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006

Dated: September 11, 2024

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, do hereby certify that on this day, September 11, 2024, I have served a copy of this Petition, as well as all supporting exhibits and the record appendix, via email on Assistant District Attorney Adam Lally.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

# Exhibit A

# The Supreme Court of South Carolina

The State, Respondent,

v.

Richard Alexander Murdaugh, Appellant.

Appellate Case No. 2023-000392

**RECEIVED**

**Aug 13 2024**

**SC Court of Appeals**

---

## ORDER

---

Pursuant to Rule 204(b), SCACR, we certify the appeal in Appellate Case No. 2023-000392. Because the transcript has been delivered, Appellant shall have thirty days from the date of this order to serve and file his initial brief as required by Rule 208(a)(1), SCACR.

|                        |      |
|------------------------|------|
| _John Kittredge_       | C.J. |
| _John Cannon Few_      | J.   |
| _George James_         | J.   |
| _D. Hearn_             | J.   |
| _Letitia H. Verdin_    | J.   |

Columbia, South Carolina
August 13, 2024

cc:
Richard A. Harpootlian
Phillip Donald Barber
James Mixon Griffin
Margaret Nicole Fox

Alan McCrory Wilson
Samuel Creighton Waters
Melody Jane Brown
Donald J. Zelenka
The Honorable Jenny Abbott Kitchings

# Exhibit B

THE STATE OF SOUTH CAROLINA
IN THE SUPREME COURT

RECEIVED

**Aug 13 2024**

S.C. SUPREME COURT

COLLETON COUNTY
Court of General Sessions

The Honorable Jean Hoefer Toal, Chief Justice (Ret.)

Case No. 2024-000576

THE STATE, .................................................................................................. RESPONDENT,

v.

RICHARD ALEXANDER MURDAUGH, ............................................................... APPELLANT.

## INITIAL BRIEF OF APPELLANT

Richard A. Harpootlian, SC Bar No. 2725
Phillip D. Barber, SC Bar No. 103421
Andrew R. Hand, SC Bar No. 101633
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29202
(803) 252-4848
rah@harpootlianlaw.com
pdb@harpootlianlaw.com
arh@harpootlianlaw.com

James M. Griffin, SC Bar No. 9995
Margaret N. Fox, SC Bar No. 76228
GRIFFIN HUMPHRIES, LLC
4408 Forest Drive (29206)
Post Office Box 999
Columbia, South Carolina 29202
(803) 744-0800
jgriffin@griffinhumphries.com
mfox@griffinhumphries.com

*Attorneys for Appellant*

# **TABLE OF CONTENTS**

Table of Contents ................................................................................................................ i

Table of Authorities ........................................................................................................... ii

Statement of Issues on Appeal ........................................................................................... 1

Statement of the Case ......................................................................................................... 1

Standard of Review ............................................................................................................. 9

Argument ........................................................................................................................... 10

    I.     There is an irrebuttable presumption of prejudice when a state official secretly advocates a guilty verdict in the jury room during a criminal trial. .......................................... 11

        A.     The U.S. Supreme Court holds that in a criminal case jury tampering is presumptively prejudicial. .......................................................................................................... 12

        B.     The presumption of prejudice is irrebuttable when a state official tampers with the jury during a criminal trial about the merits of the case. ............................................. 19

        C.     The trial court's "finding" that Ms. Hill's comments to jurors that were "not overt as to opinion" is unsupported by and contrary to the evidence in the record. ............................... 23

        D.     Even if the presumption of prejudice were rebuttable, the State did not rebut—or even attempt to rebut—any presumption of prejudice in this case. ............................... 25

    II.     Prejudice was proven at the evidentiary hearing. ............................................ 28

    III.     Secret advocacy for a guilty verdict in the jury room during a criminal trial by a state official is a structural error in the trial that cannot be harmless. ................................. 34

Conclusion ......................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                    Page(s)

*Barnes v. Joyner,*
    751 F.3d 229 (4th Cir. 2014) ...................................................................12, 14, 17

*Blake by Adams v. Spartanburg Gen. Hosp.,*
    307 S.C. 14, 413 S.E.2d 816 (1992) ........................................................................22

*Bosse v. Oklahoma,*
    580 U.S. 1 (2016) ......................................................................................................16

*Crossmann Communities of N.C., Inc. v. Harleysville Mut. Ins. Co.,*
    395 S.C. 40, 717 S.E.2d 589 (2011) ..........................................................................9

*Godoy v. Spearman,*
    861 F.3d 956 (9th Cir. 2017) ...................................................................................14

*Haugh v. Jones & Laughlin Steel Corp.,*
    949 F.2d 914 (7th Cir. 1991) ...................................................................................36

*Hohn v. United States,*
    524 U.S. 236 (1998). .................................................................................................16

*Holmes v. United States,*
    284 F.2d 716 (4th Cir. 1960) ...................................................................................11

*Irvin v. Dowd,*
    366 U.S. 717 (1961) .................................................................................................38

*Knight v. Freeport,*
    13 Mass. 218 (Mass. 1816) ......................................................................................39

*Limehouse v. Hulsey,*
    404 S.C. 93, 744 S.E.2d 566 (2013)........................................................................16

*Lord Delamere's Case,*
    4 Harg. St. T. 232 (Eng. 1685)................................................................................39

*Mahoney v. Vondergritt,*
    938 F.2d 1490 (1st Cir. 1991) .................................................................................30

*Manley v. AmBase Corp.,*
    337 F.3d 237 (2d Cir. 2003)....................................................................................35

*Massachusetts v. Fidler,*
    385 N.E.2d 513 (Mass. 1979)..................................................................................31

*Mattox v. United States,*
    146 U.S. 140 (1892) .................................................................................................38

*Minnesota v. Cox,*
    322 N.W.2d 555 (Minn. 1982) ........................................................................30

*Neder v. United States,*
    527 U.S. 1 (1999) ...........................................................................................34

*Parker v. Gladden,*
    385 U.S. 363 (1966) ................................................................................. passim

*Pope v. Mississippi,*
    36 Miss. 121 (Miss. Err. & App. 1858). ........................................................39

*Remmer v. United States*
    347 U.S. 227 (1954) ................................................................................. passim

*Simmons v. South Carolina,*
    512 U.S. 154 (1994) ..................................................................................37, 38

*Smith v. Phillips,*
    455 U.S. 209 (1982) ............................................................................13, 15, 16

*State v. Bryant,*
    354 S.C. 390, 581 S.E.2d 157 (2003) .......................................................18, 19

*State v. Cameron,*
    311 S.C. 204, 428 S.E.2d 10 (Ct. App. 1993) ......................................... passim

*State v. Cochran,*
    369 S.C. 308, 631 S.E.2d 294 (Ct. App. 2006) ...........................................9, 10

*State v. Green,*
    427 S.C. 223, 830 S.E.2d 711 (Ct. App. 2019) .........................................21, 22

*State v. Green,*
    432 S.C. 97, 851 S.E.2d 440 (2020)........................................................ passim

*State v. Grovenstein,*
    335 S.C. 347, 517 S.E.2d 216 (1999)............................................................27

*State v. Johnson,*
    302 S.C. 243, 395 S.E.2d 167 (1990)............................................................19

*State v. Kirton,*
    381 S.C. 7, 671 S.E.2d 107 (Ct. App. 2008) .................................................10

*State v. Mercer,*
    381 S.C. 149, 672 S.E.2d 556 (2009)..............................................................9

*State v. Moore,*
    343 S.C. 282, 540 S.E.2d 445 (2000)........................................................10, 25

-iii-

*State v. Murdaugh*,
    Appellate Case No. 2023-000392 ................................................................2

*State v. Simmons*,
    279 S.C. 165, 303 S.E.2d 857 (1983)........................................................25

*State v. Zeigler*,
    364 S.C. 94, 610 S.E.2d 859 (Ct. App. 2005) ............................................30

*Stewart v. Floyd*,
    274 S.C. 437, 265 S.E.2d 254 (1980)..........................................................9

*Tarango v. McDaniel*,
    837 F.3d 936 (9th Cir. 2016) ...............................................................22, 38

*Turner v. Louisiana*,
    379 U.S. 466 (1965) ........................................................................ passim

*United States ex rel. Owen v. McMann*,
    435 F.2d 813 (2d Cir. 1970)......................................................................31

*United States v. Burr*,
    1 Burr's Trial 416 (Cir. Va. 1807)............................................................38

*United States v. Claxton*,
    766 F.3d 280 (3d Cir. 2014)......................................................................14

*United States v. Elbaz*,
    52 F.4th 593 (4th Cir. 2022). .............................................13, 16, 17, 18

*United States v. Gartmon*,
    146 F.3d 1015 (D.C. Cir. 1998) ..........................................................14, 15

*United States v. Greer*,
    285 F.3d 158 (2d Cir. 2002)......................................................................14

*United States v. Hatter*,
    532 U.S. 557 (2001) ...................................................................................16

*United States v. Johnson*,
    954 F.3d 174 (4th Cir. 2020) ....................................................................16

*United States v. Jordan*,
    958 F.3d 331 (5th Cir. 2020) ....................................................................15

United States *v. Lawson*,
    677 F.3d 629 (4th Cir. 2012) ....................................................................17

United States *v. Lloyd*,
    269 F.3d 228 (3d Cir. 2001)......................................................................36

*United States v. Olano,*
    507 U.S. 725 (1993). ..........................................................................13, 15, 16

*United States v. Pagán-Romero,*
    894 F.3d 441 (1st Cir. 2018) ......................................................................14

*United States v. Sylvester,*
    143 F.3d 923 (5th Cir. 1998) .....................................................................16

*United States v. Turner,*
    836 F.3d 849 (7th Cir. 2016) .....................................................................14

*Utah v. Soto,*
    513 P.3d 684 (2022)...................................................................................22

*Ward v. Hall,*
    592 F.3d 1144 (11th Cir. 2010)..................................................................14

### CONSTITUTIONS, STATUTES, AND RULES

Fed. R. Evid. 606(b).............................................................................16, 30, 38

Rule 606(b), SCRE ...............................................................................30, 33, 36

S.C. Code § 14-3-320...........................................................................................9

S.C. Code § 14-3-330...........................................................................................9

S.C. Code § 14-8-200...........................................................................................9

S.C. Code tit. 14 ch. 7..........................................................................................1

S.C. Const. art. V, § 5...........................................................................................9

S.C. Const. art. V, § 9...........................................................................................9

S.C. Const., art. V, § 24........................................................................................1

## STATEMENT OF ISSUES ON APPEAL

1.  Is prejudice to the defendant's right to a fair trial presumed when a state official[1] secretly advocates a guilty verdict in the jury room during a criminal trial?

2.  Is prejudice to a defendant's right to a fair trial proven when it is found that a state official tampered with the jury and a juror testifies that the jury tampering influenced her verdict?

3.  Is secret advocacy for a guilty verdict in the jury room by a state official during a criminal trial a structural error in the trial?

## STATEMENT OF THE CASE

Richard "Alex" Murdaugh is a disgraced former attorney and drug addict.  Once a prominent member of the Bar, Mr. Murdaugh stole millions from his law firm, from his clients, and from others who trusted him.  His law firm confronted him about his thievery on September 3, 2021.  He resigned from the firm and, after a failed suicide attempt assisted by his drug dealer, entered drug rehabilitation.  He was arrested immediately upon leaving a rehabilitation facility and has been incarcerated ever since.

Three months earlier, on June 7, 2021, Mr. Murdaugh's wife, Maggie Murdaugh, and younger son, Paul Murdaugh, were brutally murdered at the dog kennels on their rural family property in Colleton County.  Mr. Murdaugh was indicted for the murders and for related firearms offenses on July 14, 2022, and the jury trial commenced on January 23, 2023.  The Honorable Clifton B. Newman presided.  The State claimed Mr. Murdaugh was confronted at his law firm

---

[1] In trial court proceedings the State has objected to referring to former Colleton County Clerk of Court Rebecca Hill as a "state official."  Mr. Murdaugh does not mean that her improper motives or conduct should be imputed to the prosecution or law enforcement in this case.  But it is inarguable that Ms. Hill acted in this case as an official of the State of South Carolina: She held an elected office created by Section 24 of Article V of the South Carolina Constitution, her duties included summoning, impaneling, and managing the jury (*see* S.C. Code tit. 14 ch. 7), and she was able to interact with the jurors in Mr. Murdaugh's murder trial only by virtue of her office.

earlier that day about missing attorney's fees, and that he came home and killed his wife and son to distract a bookkeeper investigating those fees and to reduce his financial exposure in a negligent entrustment suit filed over two years earlier regarding a boat which Paul allegedly operated while intoxicated, resulting in the horrible death of a young woman. Mr. Murdaugh has admitted all allegations of theft, but vehemently denies murdering his family.

After six weeks of trial, the case was submitted to the jury at about 3:45 pm on March 2, 2023. The verdict was returned early that evening. Jurors' television interviews indicate the actual deliberations took less than one hour. Mr. Murdaugh timely appealed the verdict. That appeal is separate from the instant appeal. *State v. Murdaugh*, Appellate Case No. 2023-000392.

On August 1, 2023, the then-Colleton County Clerk of Court, Rebecca Hill, published a book, *Behind the Doors of Justice*, about Mr. Murdaugh's trial. She had been planning to write a book about the trial even before it began. Evid. Hr'g Tr. 181:11–183:19. She repeatedly said that a guilty verdict would sell more books, and that she needed to sell books because "she needed a lake house." *Id.* 181:20–183:1. The book caused some jurors to come forward to describe Ms. Hill's efforts to obtain her desired guilty verdict through jury tampering during trial. Jurors stated that after the State rested and the defense began its case, Ms. Hill entered the jury rooms often, telling jurors not to let the defense "throw you all off," or "distract you or mislead you," and telling them "not to be fooled" by Mr. Murdaugh's testimony in his own defense. *Id.* 52:7–18, 203:18–25, 209:25–210:18; Mot. New Trial Ex. A (Juror 630 Aff., Aug. 14, 2023) & Ex. H (Juror 785 Aff., Aug. 13, 2023); Juror 741 Aff., Jan. 29, 2024.

On September 5, 2023, Mr. Murdaugh filed a motion to suspend his appeal and for leave to file a motion for a new trial based on the evidence of Ms. Hill's jury tampering. The Court of Appeals granted the motion and Mr. Murdaugh filed his motion for a new trial on October 27. On

November 1, he petitioned the Court for a writ of prohibition to prohibit Judge Newman from adjudicating the new trial motion, based on public statements Judge Newman made after the jury returned guilty verdicts. On November 15, the Court denied the petition as moot because Judge Newman recused himself from hearing the new trial motion. On December 18, the Chief Justice appointed retired Chief Justice Jean H. Toal to serve as the circuit judge hearing Mr. Murdaugh's motion for a new trial.

The trial court ordered an evidentiary hearing, and the parties submitted extensive briefing in advance of the hearing. The trial court held a "prehearing procedure" on January 16, 2024, to determine, *inter alia*, "[w]ho has the burden of proof in this matter, and what must be shown to meet that burden of proof, and what must then be shown to contest what has been shown and proved?" Prehearing Hr'g Tr. 3:1–2, 5:22–25. At this initial hearing, the trial court ruled that Mr. Murdaugh bears the burden of proving actual prejudice in the verdict rendered. *Id.* 21:9–20. It further ruled Mr. Murdaugh would not be permitted to call any witnesses, including eyewitnesses to Ms. Hill's jury tampering, or to examine any jurors called by the court. *Id.* 51:9–54:2. Instead, the trial court would call and itself examine each juror; the only other witness would be Ms. Hill and any cross-examination of her would be strictly limited. *Id.* 41:22–42:2, 43:3–45:14, 46:25–51:7, 49:22–23.

On January 24, 2024, the trial court communicated its proposed questions to jurors to the parties. Mr. Murdaugh's counsel objected to the questions and to the rulings made at the hearing by letter dated January 25, 2024. Ltr. from R. Harpootlian to Ret. Chief Justice Toal, Jan. 25, 2024. The trial court reconsidered its prior rulings and allowed Mr. Murdaugh to call the alternate juror and Barnwell County Clerk Rhonda McElveen and allowed the parties an opportunity for cross-examination of witnesses who were not deliberating jurors.

The evidentiary hearing was held on January 29, 2024. A single juror testified one business day earlier, on January 26, to accommodate a scheduling conflict. The jurors (identified by anonymous letters) testified as follows:

Jurors C, F, L, E, O, Y, W, Q, and K testified that they did not hear Ms. Hill comment on the merits of the case before the verdict.

Juror P testified that he heard Ms. Hill tell jurors, regarding Mr. Murdaugh's decision to testify in his own defense, to "watch his body language." Evid. Hr'g Tr. 77:22–78:7. Juror P testified the comment did not affect his verdict.

Juror X testified that she heard Ms. Hill comment, regarding Mr. Murdaugh's decision to testify in his own defense, that it was rare for a defendant to testify in a criminal case and that "this is an epic day." *Id.* 23:9–24:3. Juror X testified the comments did not affect her verdict.

Juror Z testified that she heard Ms. Hill comment, regarding Mr. Murdaugh's decision to testify in his own defense, to watch Mr. Murdaugh's actions and to watch him closely. Juror Z testified that the comments did affect her verdict:

> Q. All right. Was your verdict influenced in any way by the communications of the clerk of court in this case[?]
>
> A. Yes, ma'am.
>
> Q. And how was it influenced?
>
> A. To me, it felt like she made it seem like he was already guilty.
>
> Q. All right, and I understand that, that that's the tenor of the remarks she made. Did that affect your finding of guilty in this case?
>
> A. Yes, ma'am.

*Id.* 46:6–15. The trial court then examined Juror Z regarding her affidavit attached to Mr. Murdaugh's motion for a new trial, and she affirmed each paragraph therein, including averments that during trial Ms. Hill "told the jury 'not to be fooled' by the evidence presented by Mr.

Murdaugh's attorneys, which I understood to mean that Mr. Murdaugh would lie when he testified," and that Ms. Hill "instructed the jury to 'watch him [Mr. Murdaugh] closely' immediately before he testified, including 'look at his actions' and 'look at his movements,' which I understood to mean that he was guilty." Mot. New Trial Ex. A ¶¶ 2–3.

> The trial court then asked,

> Juror Z, I asked you previously was your verdict on March 2, 2023, influenced in any way by communications from Becky Hill, the clerk of court. You answered that question yes. In light of what you said in the affidavit, which is:

>> I had questions about Mr. Murdaugh's guilt but voted guilty because I felt pressured by the other jurors.

> Is that answer that I just read a more accurate statement of how you felt?

> MR. HARPOOTLIAN: Object to the form, Your Honor.

> THE COURT: Overruled.

> A. Yes, ma'am.

> Q. All right. So, you do stand by the affidavit?

> A. Yes, ma'am.

> Q. Very good.

Evid. Hr'g Tr. 55:1–56:7. After Juror Z left the courtroom, Mr. Murdaugh's counsel objected:

> MR. HARPOOTLIAN: Your Honor, we objected to the questioning because this juror gave two statements under oath, one in an affidavit and one here to you today. The one here to you today was Becky Hill influenced her verdict.

> THE COURT: Yes.

> MR. HARPOOTLIAN: The one she gave in an affidavit six months ago was based on jurors. It could be both. Your Honor picked out the one in the affidavit from six months ago and said is that a more accurate statement. That presupposes and suggests to her what she should say. And we believe that this, this juror's testimony -- and, Your Honor, I'm afraid what you're going to say is, well, she said the

affidavit was more accurate than what she testified under oath here today and, therefore, I'm not going to consider her testimony, and I think that's where we're heading here.

I'd ask you to bring her back in, explain to her there's nothing wrong with it both being true.

THE COURT: I decline to do that and overrule the objection.

*Id.* 58:2–22.  Later during the hearing, Juror Z, through her own counsel, provided an affidavit averring,

1.  I would like to clarify my testimony today.

2.  As I testified, I felt influenced to find Mr. Murdaugh guilty by reason of Ms. Hill's remarks, before I entered the jury room.

3.  Once deliberations began as I stated in paragraph 10 of my earlier affidavit, I felt further, additional pressure to reach the guilty verdict.

Juror Z Aff., January 29, 2024.  Although the trial court introduced Juror Z's prehearing affidavit into evidence on its own motion, it refused to allow Juror Z's affidavit of that day into evidence or to allow any further testimony from Juror Z.

Ms. Hill testified after the jurors.  She denied engaging in any jury tampering.  She also denied stating that she wanted a guilty verdict to promote book sales.  She admitted she plagiarized portions of her book and that her profits from its sale in the six months before it was withdrawn from publication because of her plagiarism were approximately $100,000.  Evid. Hr'g Tr. 133:8–12.  She admitted the book contained unfounded statements included for "poetic license" or "literary ease."  *Id.* 125:18–20, 137:17–19.  Examination by the trial court revealed that Ms. Hill's denial, during direct examination, of questioning a juror during the murder trial was not truthful, and that she did want a guilty verdict.  *Id.* 146:18–159:3.

Barnwell County Clerk of Court Rhonda McElveen testified next to rebut Ms. Hill's denial that she wanted a guilty verdict to promote book sales. Ms. McElveen was assisting in the courtroom during the murder trial. She testified,

Q. And did she discuss with you -- what, if anything, did she discuss with you about how she felt the verdict should turn out to be in the Murdaugh trial vis a vis in reference to the book, what would help the book?

A. A guilty verdict.

Q. Tell the judge and, and me what exactly she said to you that you remember. This is prior to the trial.

A. Okay. Well, first of all, she said we might want to write a book because she needed a lake house and I needed to retire, and from then, further conversation was that a guilty verdict would sell more books, and we left it at that. This was before even in December.

Q. And, and when, when -- did she ever say that again to you during this -- the, the weeks you spent there?

A. Several times. It could be said -- it was, you know, amongst friends in her office or we might be having dinner, that kind of stuff, but that's about it.

Q. That she needed a guilty verdict to sell more books?

A. That would be the best way to sell books, yes, sir.

Q. The best way to sell books.

Now, during this -- during this process, did she ever express to you an opinion on whether or not, in fact, was Mr. Murdaugh guilty of the murders of his son and his, his wife?

A. Yes, sir.

Q. Tell me. Tell me what she said and if you remember when.

A. I don't exactly remember when. I know it's over half of the trial had already happened, but the evidence was coming forth that it looked like he might be guilty. She made a comment that guilty verdict would be better for the sale of books.

*Id.* 181:20–183:1.  She also testified that Ms. Hill made comments to her, like "'[d]on't be fooled by the evidence presented by Mr. Murdaugh's attorneys," identical to statements reported by some jurors.  *Id.* 184:25–185:18.  And she testified that Ms. Hill insisted on allowing a book writer (who wrote the forward to Ms. Hill's book) to sit in the well of the court during trial, where she could see sealed exhibits, under the subterfuge of being a Sunday school teacher.  *Id.* 186:12–190:10.

The final witness was the alternate juror, Juror 741.  She testified that Ms. Hill told jurors "the defense is about to do their side" and "[t]hey're going to say things that will try to confuse you" but "[d]on't let them confuse you or convince you or throw you off."  *Id.* 203:18–204:3.

At the conclusion of the hearing, the trial court ruled from the bench:

Did Clerk of Court Hill make comments to any juror which expressed her opinion what the verdict would be?  Ms. Hill denies [doing so] and so the question becomes was her denial credible.

I find that the clerk of court is not completely credible as a witness.  Ms. Hill was attracted by the siren call of celebrity.  She wanted to write a book about the trial and expressed that as early as November 2022, long before the trial began.  She denies that this is so, but I find that she stated to the clerk of court Rhonda McElveen and others her desire for a guilty verdict because it would sell books.  She made comments about Murdaugh's demeanor as he testified, and she made some of those comments before he testified to at least one and maybe more jurors.

. . .

The clerk of court allowed public attention of the moment to overcome her duty.

*Id.* 251:13–252:1, 23–24.

The trial court nevertheless denied the motion for a new trial, reasoning that there is no presumption of prejudice from tampering with jurors during a trial about the matter pending before the jury and Mr. Murdaugh failed to prove that Ms. Hill's comments changed the jury's verdict.  The trial court discounted the testimony Juror Z, who said Ms. Hill's comments did affect her verdict, because she "was ambivalent in her testimony."  *Id.* 252:13.  In a State-drafted written

order entered 66 days after the ruling from the bench, the trial court further ruled in passing that "this Court also find[s] that any possible presumption of prejudice was overcome," without any reference to any evidence presented at the evidentiary hearing. Order 24, Apr. 4, 2024. Mr. Murdaugh timely appealed the order on April 11, 2024.

On March 25, 2024, Ms. Hill resigned from office. In May 2024 it was reported that the State Ethics Commission had referred ethics complaints against her for criminal prosecution.

On July 10, 2024, Mr. Murdaugh moved for certification of this appeal for review by this Court before it is determined by the Court of Appeals. On August 13, 2024, the Court granted the motion for certification. (Order Granting Certification, Aug. 13, 2024.)

## **STANDARD OF REVIEW**

"The decision whether to grant a new trial rests within the sound discretion of the trial court" and is reviewed for an abuse of discretion. *State v. Mercer*, 381 S.C. 149, 166, 672 S.E.2d 556, 565 (2009). "An abuse of discretion arises in cases in which the judge issuing the order was controlled by some error of law or where the order, based upon factual, as distinguished from legal, conclusions, is without evidentiary support." *Stewart v. Floyd*, 274 S.C. 437, 440, 265 S.E.2d 254, 255 (1980).

When it is asserted the trial court's order was controlled by an error of law, "a question of law is presented" and the "standard of review is plenary" and "without deference to the trial court." *State v. Cochran*, 369 S.C. 308, 312–13, 631 S.E.2d 294, 297 (Ct. App. 2006) (citing S.C. Const. art. V, § 5 & 9; S.C. Code §§ 14-3-320, 14-3-330, & 14-8-200); *Crossmann Communities of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 395 S.C. 40, 47, 717 S.E.2d 589, 592 (2011).

When reviewing the trial court's decision, the appellate court may not make its own findings of fact if the trial court's findings are "reasonably supported by the evidence." *Cochran*,

369 S.C. at 312–13, 631 S.E.2d at 297. "The appellate court does not re-evaluate the facts based on its own view of the evidence but simply determines whether the trial judge's ruling is supported by any evidence." *State v. Kirton*, 381 S.C. 7, 23, 671 S.E.2d 107, 114 (Ct. App. 2008). But "[i]n reviewing mixed questions of law and fact, where the evidence supports but one reasonable inference, the question becomes a matter of law for the court." *State v. Moore*, 343 S.C. 282, 288, 540 S.E.2d 445, 448 (2000).

## **ARGUMENT**

The trial court found Ms. Hill tampered with the jury during Mr. Murdaugh's murder trial. Evid. Hr'g Tr. 251:13–252:1, 23–24. The only evidence the State presented contradicting sworn testimony describing the tampering was Ms. Hill's own denial, which the trial court found not credible. *Id.* The trial court found she was motivated by a desire to sell books. *Id.* The trial court found she was "attracted by the siren call of celebrity" and she "allowed public attention of the moment to overcome her duty." *Id.* And one juror testified that Ms. Hill's tampering did influence her verdict. *Id.* 46:6–15.

But the trial court nonetheless denied the motion for a new trial, by committing legal error and by abusing its discretion. The trial court erred when it refused to presume jury tampering during trial, by a state official advocating a guilty verdict, is prejudicial to the right of the accused to a fair trial. The trial court abused its discretion when finding that the jury's verdict was not affected by Ms. Hill's tampering despite a juror's uncontradicted testimony that her verdict was affected. And the trial court erred when it held that deliberate jury tampering by a state official seeking a guilty verdict was harmless because, in its opinion, the correct verdict was rendered regardless. The Court therefore should reverse the trial court's order denying Mr. Murdaugh's

motion for a new trial, vacate Mr. Murdaugh murder and firearms convictions, and remand for a new trial.

## I.    THERE IS AN IRREBUTTABLE PRESUMPTION OF PREJUDICE WHEN A STATE OFFICIAL SECRETLY ADVOCATES A GUILTY VERDICT IN THE JURY ROOM DURING A CRIMINAL TRIAL.

The trial court identified the wrong legal standard to decide Mr. Murdaugh's motion for a new trial. When a state official communicates with jurors about a criminal case during trial, the law presumes the tampering was prejudicial to the defendant's right to a fair trial, unless the communication was completely innocuous. The burden shifts to the state to show the communication was harmless. The State can meet that burden by, for example, showing the communication did not concern the merits of the case, that it was favorable to the defendant, or that it never reached a deliberating juror—but not by a counterfactual argument that some hypothetical trial before the same jury but without the jury tampering would have had the same verdict. But where it is proven there was an improper communication by a court official to jurors about the merits of the case before them—*ex parte* advocacy by a state official—the presumption is irrebuttable. *State v. Cameron*, 311 S.C. 204, 207–08, 428 S.E.2d 10, 12 (Ct. App. 1993) (Where "'[t]here was the private communication of the court official to members of the jury, an occurrence which cannot be tolerated if the sanctity of the jury system is to be maintained . . . a new trial *must* be granted unless it clearly appears that the *subject matter* of the communication was harmless and could not have affected the verdict.'" (quoting *Holmes v. United States*, 284 F.2d 716, 718 (4th Cir. 1960)) (emphasis added)).

The trial court, however, rejected the correct legal standard and applied an erroneous standard of its own invention: that Mr. Murdaugh, in addition to proving that Ms. Hill did tamper with the jury about the merits of his case during trial, must also prove what the verdict would have been but for that tampering. The Court should hold that in so doing, the trial court abused its

-11-

discretion.  Identification of the correct legal standard is a question of law subject to the Court's plenary review and Justice Toal's legal error is entitled to no deference.

A.    <u>The U.S. Supreme Court holds that in a criminal case jury tampering is presumptively prejudicial.</u>

The trial court erred by ruling that South Carolina courts should disregard binding precedent of the U.S. Supreme Court that requires it to presume jury tampering is prejudicial to the defendant.  In *Remmer v. United States*, the U.S. Supreme Court held, unanimously,

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.  The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

347 U.S. 227, 229 (1954).  The Fourth Circuit holds *Remmer* is still "clearly established federal law."  *Barnes v. Joyner*, 751 F.3d 229, 243 (4th Cir. 2014).  The trial court, however, instead ruled that *State v. Green*, 432 S.C. 97, 851 S.E.2d 440 (2020), directs South Carolina courts to ignore *Remmer*:

> THE COURT: [The] South Carolina Supreme Court said very clearly we do not go by the guidance of the 1950s case of *US v. Remmer*.

> MR. HARPOOTLIAN: That's -- we do not believe that's what Justice Kittredge has said in [*State v. Green*] ---

> THE COURT: He said it straight out as clear as a bell can be, but I've ruled on that.

Evid. Hr'g Tr. 100:19–25.

The Court however has not split with the Fourth Circuit to instruct South Carolina courts to disregard *Remmer*.  In *Green* the Court merely "decline[d] to adopt the *Remmer* presumption of prejudice in every instance of an inappropriate bailiff communication to a juror" because "not every inappropriate comment by a bailiff to a juror rises to the level of constitutional error,"

-12-

including the inappropriate comments at issue in *Green*, which "did not touch the merits, but dealt only with the procedural question of how the judge might handle a jury impasse that apparently never materialized." 432 S.C. at 100–01, 851 S.E.2d at 44. *Green* accords perfectly with recent Fourth Circuit authority: Under *Remmer* "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial," but "[t]o trigger this presumption, a defendant must introduce 'competent evidence of extrajudicial juror contacts' that are 'more than innocuous interventions.'" *United States v. Elbaz*, 52 F.4th 593, 606 (4th Cir. 2022) (Richardson, J.) (internal quotation marks omitted), *cert. denied*, 144 S. Ct. 278 (2023).

If the *Remmer* presumption of prejudice ever applies, it must apply where, as here, an elected state official advocates for a guilty verdict in the jury room during trial so that she can personally profit from selling books about a guilty verdict. That is not an "innocuous intervention."

But the trial court nevertheless held that when there is tampering with a juror during a trial about the matter pending before the jury, prejudice is never presumed but instead always must be proven by the defendant. Prehearing Hr'g Tr. 20:25–21:20; Order 4–5. In doing so, the trial court adopted the State's argument that *Remmer* was abrogated by *Smith v. Phillips*, 455 U.S. 209 (1982), and *United States v. Olano*, 507 U.S. 725 (1993). Resp't's Br. 6–7.

The trial court agreed, ruling from the bench:

> I am not conducting a *Remmer* hearing. *Remmer* is a 1954 decision of the United States Supreme Court that deals with question of influence of the jury and a motion for a new trial on the basis of after-discovered evidence of that influence. I rely on the South Carolina decision of our Supreme Court authored by Justice Kittredge, *State v. Green*, and the *Green* decision specifically says that *Remmer* is not the guidance that South Carolina trial judges should look to in conducting hearings on after-discovered evidence.

Prehearing Hr'g Tr. 11:1–10; *see also* Evid. Hr'g Tr. 100:19–21 ("[The] South Carolina Supreme Court said very clearly we do not go by the guidance of the 1950s case of *US v. Remmer*.").  Its State-drafted order entered months after the evidentiary hearing, however, hides its reasoning, stating only that "Murdaugh argues . . . prejudice must be presumed under *Remmer*" while the State "argues that the overwhelming weight of South Carolina case law is clear that . . . the burden is on the defendant to show not only that the improper influence occurred but also resulting prejudice."  Order 4–5.  The trial court's order then proceeds to review South Carolina cases, some of which are arguably irrelevant (*e.g.*, cases dealing with external influences not touching on the merits of the case before the jury or alternate jurors participating in deliberations) and some of which are inarguably irrelevant (*e.g.*, cases dealing with internal jury influences),[2] without attempting to explain why *Remmer* is not good law.  *Id.* 5–8.

To be sure, the continued viability of *Remmer* is not universally agreed.  There is a three-way federal circuit split on the issue.  The majority position, adopted by the First, Second, Third, Fourth, Seventh, Ninth, Eleventh, and D.C. Circuits and at least 28 states presumes prejudice under *Remmer*, although many, like the Fourth Circuit (and as the Court did in *Green*) decline to apply it categorically to "innocuous" contacts with jurors.  *E.g.*, *United States v. Pagán-Romero*, 894 F.3d 441, 447 (1st Cir. 2018); *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002); *United States v. Claxton*, 766 F.3d 280, 299 (3d Cir. 2014); *Barnes*, 751 F.3d at 245; *United States v. Turner*, 836 F.3d 849, 867 (7th Cir. 2016); *Godoy v. Spearman*, 861 F.3d 956, 968 (9th Cir. 2017); *Ward v. Hall*, 592 F.3d 1144, 1180 (11th Cir. 2010); *United States v. Gartmon*, 146 F.3d 1015, 1028

---

[2] The *Remmer* presumption does not apply to internal influences on the jury, *Barnes*, 751 F.3d at 245–46, and Mr. Murdaugh has not sought any relief based on any alleged improper internal influence on the jury.

(D.C. Cir. 1998).  The Fifth,[3] Sixth, and Tenth Circuits and at least fourteen states decline to apply *Remmer* and instead require defendants to prove prejudice, as the trial court held.  Eighth Circuit and at least seven states leave the question entirely to judicial discretion.

As the State argued, the question driving the split is whether *Remmer* was narrowed or overruled by *Smith v. Phillips* and *United States v. Olano*.  The Court should decline the State's invitation to join the minority position on that question for three reasons.

*First*, the argument that *Olano* or *Phillips* abrogated *Remmer* is unpersuasive—which may explain why that argument remains the minority position 30 and 40 years after those decisions, respectively.  In *Phillips*, a juror applied for employment with the district attorney's office during trial, but the prosecution did not disclose the fact until after the trial.  455 U.S. at 213–14.  In *Olano*, the trial court permitted alternate jurors to attend but not to participate in jury deliberations. 507 U.S. at 728–29.  In each case the Supreme Court held that a new trial was not required.  But neither case involved an "external" influence on the jury from anyone other than alternate jurors. Both cases cited *Remmer* with approval.  *Olano*, 507 U.S. at 738; *Phillips*, 455 U.S. at 215.  *Olano* even stated "[t]here may be cases where an intrusion should be presumed prejudicial," citing *Turner v. Louisiana*, 379 U.S. 466 (1965), as an example of such a case.  507 U.S. at 739.  In *Turner*, prejudice was presumed where the jury was in the charge of sheriff's deputies who were also prosecution witnesses, a fact pattern with a close similarity to the present case.[4]  379 U.S. at 474.

---

[3] The Fifth Circuit may have since moved back to the majority position.  *See United States v. Jordan*, 958 F.3d 331, 335 (5th Cir. 2020) ("To be entitled to a new trial based on an extrinsic influence on the jury, a defendant must first show that the extrinsic influence likely caused prejudice" and "[t]he government then bears the burden of proving the lack of prejudice.")

[4] Like the deputies in *Turner*, Ms. Hill had the jury in her charge.  She was not a prosecution witness, but like a prosecution witness she made statements to the jury advocating a guilty verdict.

*Second*, only the U.S. Supreme Court can decide whether it has overruled its decision in *Remmer*: "'[I]t is this Court's prerogative alone to overrule one of its precedents.'" *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (quoting *United States v. Hatter*, 532 U.S. 557, 567 (2001)). This Court cannot decide that the U.S. Supreme Court has overruled a precedential decision by implication from later decisions that appear to use inconsistent reasoning: "'Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.'" *Id.* (quoting *Hohn v. United States*, 524 U.S. 236, 252–53 (1998)).

*Third*, the Court should defer to the Fourth Circuit's interpretation of a question of federal constitutional law, especially when it adopts the majority position, *see Limehouse v. Hulsey*, 404 S.C. 93, 108–09, 744 S.E.2d 566, 575 (2013),[5] and the Fourth Circuit's position is clear:

> Some courts have suggested that post-*Remmer* developments—*Smith v. Phillips*, 455 U.S. 209, 215 (1982), *United States v. Olano*, 507 U.S. 725, 738–39 (1993), and Federal Rule of Evidence 606(b)—narrowed or overturned *Remmer*'s presumption of prejudice. *See, e.g.*, *United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998) ("[T]he *Remmer* presumption of prejudice cannot survive *Phillips* and *Olano*."). But the Fourth Circuit continues to adhere to a *Remmer* presumption when the contact goes beyond the innocuous.

*Elbaz*, 52 F.4th at 606 n.9; *see also United States v. Johnson*, 954 F.3d 174, 179–80 (4th Cir. 2020) (holding that where "an unauthorized contact was made" with jurors "of such a character as to reasonably draw into question the integrity" of the trial proceedings, the defendant "is entitled under *Remmer*: (1) to a rebuttable presumption that the external influence prejudiced the jury's

---

[5] Although South Carolina's courts are not subject to the mandate of the Fourth Circuit, they must follow what the Fourth Circuit says is "clearly established" federal law regarding the rights of criminal defendants in this State or writs of habeas corpus may be granted. *See* 28 U.S.C. § 2254(d)(1) (providing for a habeas writ where state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States").

-16-

ability to remain impartial" (internal quotation marks omitted)); *Barnes*, 751 F.3d at 243 (holding *Remmer* is "clearly established federal law"); *United States v. Lawson*, 677 F.3d 629, 642 (4th Cir. 2012) ("At issue in this debate are the Supreme Court's decisions in *Smith v. Phillips* and *United States v. Olano* . . . . This Court's decisions addressing such external influences on a jury's deliberations reflect that the *Remmer* rebuttable presumption remains [a]live and well in the Fourth Circuit." (citations omitted)). "To determine whether a contact with a juror is innocuous or triggers the *Remmer* presumption we look to whether there was (1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury." *Elbaz*, 52 F.4th at 607 (internal quotation marks omitted).

Two years before the Fourth Circuit's *Elbaz* decision (its most recent published decision affirming *Remmer*), the Court in *Green* considered a case in which a juror asked a bailiff what would happen if the jury deadlocked, and the bailiff responded that the judge probably would give an *Allen* charge and ask them to stay later. The Court held,

> The trial court questioned each juror and the bailiff, which proved "there was no reasonable possibility the [bailiff's] comments influenced the verdict." Our unwillingness to categorically apply the *Remmer* presumption of prejudice stems from our view that not every inappropriate comment by a bailiff to a juror rises to the level of constitutional error. In *Remmer*, a juror was approached by a "person unnamed" and told "that [the juror] could profit by bringing in a verdict favorable to the [defendant]." The federal district court, without holding a hearing, denied the defendant's motion for a new trial. Ultimately, the Supreme Court recognized the presumption of prejudice from the highly improper juror contact and remanded to the federal district court "to hold a hearing to determine whether the incident complained of was harmful to the [defendant]."

> The attempted bribery of a juror in *Remmer*—conduct which goes to the heart of the merits of the case on trial—is a far cry from the circumstances presented in this case. The bailiff's actions here—though improper—did not touch the merits, but dealt only with the procedural question of how the judge might handle a jury impasse that apparently never materialized.

432 S.C. at 100, 851 S.E.2d at 441 (2020) (citations omitted).  The trial court read that language to hold that South Carolina courts never apply the *Remmer* presumption of prejudice in any circumstances.  Prehearing Hr'g Tr. 11:1–10; Evid. Hr'g Tr. 100:19–21.

*Green* is the only reported South Carolina appellate decision discussing *Remmer*,[6] and the trial court's reading of it is plainly erroneous.  "While we decline to adopt the *Remmer* presumption of prejudice in every instance of an inappropriate bailiff communication to a juror" does not mean "we decline to adopt the *Remmer* presumption of prejudice in *any* instance of inappropriate communication to a juror," nor does "[o]ur unwillingness to categorically apply the *Remmer* presumption of prejudice stems from our view that not every inappropriate comment by a bailiff to a juror rises to the level of constitutional error" mean "no inappropriate comment to a juror ever rises to the level of constitutional error."  *Green*, 432 S.C. at 100–01, 851 S.E.2d at 441.  A more reasonable reading is that the Court's opinion is identical to the Fourth Circuit's opinion expressed in *Elbaz* two years later: prejudice is presumed unless the contact is "innocuous" or does not "touch the merits."  *Compare* 52 F.4th at 606 *with Green*, 432 S.C. at 100, 851 S.E.2d at 441.

That is also consistent with the earlier opinion of the Court of Appeals in *Cameron*:

> In this case, there was the private communication of the court official to members of the jury, an occurrence which cannot be tolerated if the sanctity of the jury system is to be maintained.  When there has been such a communication, a new trial must be granted unless it clearly appears that the subject matter of the communication was harmless and could not have affected the verdict.

311 S.C. at 208, 428 S.E.2d at 12.  The trial court refused even to consider *Cameron* because it is a Court of Appeals decision, Prehearing Hr'g Tr. 21:25–22:3 ("I do not regard *State v. Cameron* as the guidance that needs to be used by me in making a determination about this case.  It's a Court

---

[6] The only other South Carolina appellate case citing *Remmer* is *State v. Bryant*, 354 S.C. 390, 395, 581 S.E.2d 157, 160 (2003), which cites *Remmer* once in a string citation without any discussion.

of Appeals case."), and because, in its view, the later *Green* decision held *Remmer* is no longer good law, *id.* 22:3–10.

Similarly, in *Bryant*, the only South Carolina case other than *Green* to cite *Remmer*, the Court held the defendant must prove "actual juror bias," which he did by proving "the questioning of jurors' family members by Horry County Police detectives in a case in which the victim was a Horry County Police Department Officer was, at minimum, an attempt to influence the jury" that "could have been perceived as an attempt to intimidate jurors."  354 S.C. at 395, 581 S.E.2d at 160–01 (2003).  That jury intimidation was the actual prejudice the defendant had the burden to prove.  There was no suggestion that having proven law enforcement officers engaged in jury intimidation, the defendant then needed to prove what the verdict would have been but for the intimidation.

B.    The presumption of prejudice is irrebuttable when a state official tampers with the jury during a criminal trial about the merits of the case.

Having proven that Ms. Hill communicated with at least one deliberating juror about the evidence presented during his murder trial, Mr. Murdaugh has established that he is entitled to a new trial.  "A defendant in a criminal prosecution is constitutionally guaranteed a fair trial by an impartial jury, and in order to fully safeguard this protection, it is required that the jury render its verdict free from outside influence."  *State v. Johnson*, 302 S.C. 243, 250, 395 S.E.2d 167, 170 (1990) (internal quotation marks omitted).  Where "[t]here was the private communication of the court official to members of the jury, an occurrence which cannot be tolerated if the sanctity of the jury system is to be maintained . . .  a new trial must be granted unless it clearly appears that the subject matter of the communication was harmless and could not have affected the verdict."  *Cameron*, 311 S.C. at 207–08, 428 S.E.2d at 12 (internal quotation marks omitted).  South Carolina

case law requires the "subject matter" of the communication between an official and a juror to be harmless—clearly harmless. *Id.* Otherwise, a new trial must be granted.

When, as here, it is proven that a state official has told jurors not to believe the defendant when he testifies, the State cannot rebut the presumption of prejudice by arguing what the outcome would have been without that tampering. Ms. Hill was a state official who used her official authority to argue the merits of the evidence outside of the presence of the court, the Defendant, and his counsel. This is, fortunately, a rare event, but it is one that requires a new trial. The distinction in *Cameron* between a particular communication itself being harmless in a particular case and the subject matter of the communication being harmless and its requirement that a new trial be granted unless the latter is established recognizes that deliberate jury tampering by a court official cannot be cured or excused by the strength of the evidence presented at trial.

The U.S. Supreme Court addressed this exact issue almost sixty years ago when it held the Sixth Amendment right to a trial before an impartial jury is incorporated to the states via the Fourteenth Amendment. In *Parker v. Gladden*, a bailiff told a juror in a murder trial "that wicked fellow, he is guilty." 385 U.S. 363, 363 (1966) (per curiam). The Supreme Court of Oregon held the statement did not require a new trial because it was not shown the statement changed the outcome of the trial. The U.S. Supreme Court reversed, holding "[t]he evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel," and "[w]e have followed the undeviating rule, that the rights of confrontation and cross-examination are among the fundamental requirements of a constitutionally fair trial." *Id.* at 364–65 (internal quotation marks and citations omitted).

In *Parker,* the state also argued that the bailiff's statement was harmless because ten members of the jury never heard his statement and Oregon law at that time allowed a guilty verdict by ten affirmative votes of the twelve jurors. It argued, as the State does here, that the jury tampering did not require a new trial because the defendant did not show the verdict would have been different but for the improper communication. In *Parker*, that was almost mathematically certain—ten jurors never heard the communication at issue and the vote of ten jurors was at that time enough to convict. *Id.* at 365.

Yet the Supreme Court rejected that reasoning, and, after questioning whether the factual record supported that argument, stated that in "any event, petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors." *Id.* at 366. That reasoning accords with the Court of Appeal's reasoning in *Cameron* 27 years later—the right being protected is not the right to a "correct" verdict but the constitutional right to trial before a fair and impartial jury free from state officials' improper influences.

The Court more recently touched on this point in *Green*. In *Green*, the Court of Appeals held that the bailiff's comments were presumptively prejudicial because of his official position, but that the State rebutted that presumption by showing for various reasons that the remark did not in fact influence the outcome of the jury's deliberations. 427 S.C. 223, 236, 830 S.E.2d 711, 717 (Ct. App. 2019), *aff'd as modified*, 432 S.C. 97, 851 S.E.2d 440 (2020) (citation omitted). The Court affirmed but modified the decision to correct the reasoning. The communication was not prejudicial because the subject matter of the communication was harmless: "The bailiff's actions here—though improper—did not touch the merits, but dealt only with the procedural question of how the judge might handle a jury impasse that apparently never materialized." *Green*, 432 S.C. at 100, 851 S.E.2d at 441. A bailiff presuming to tell the jury that if it is deadlocked, the judge

will instruct them to keep deliberating is improper but likely harmless because the subject matter is procedural or logistical, rather than to the merits of the case. Here, by contrast, the extensive, deliberate, and self-interested jury tampering which it has been proven Ms. Hill committed far exceeds the simple bailiff mistakes that forced a retrial in *Cameron*, where "a bailiff's misleading response to a juror's question about sentencing options compromised the jury's impartiality because it left the impression that their verdict could not affect the trial court's sentencing discretion," or in *Blake by Adams v. Spartanburg General Hospital*, where a bailiff told a juror "that the trial judge 'did not like a hung jury, and that a hung jury places an extra burden on taxpayers.'" *See State v. Green*, 427 S.C. at 237, 830 S.E.2d at 717–18 (citing *Cameron*, 311 S.C. at 208, 428 S.E.2d at 12 and quoting *Blake by Adams*, 307 S.C. 14, 16, 413 S.E.2d 816, 817 (1992)).

Finally, state and federal courts have "found the authority of the speaker to be relevant to Sixth Amendment analyses" of improper external communications with jurors during trial. *Utah v. Soto*, 513 P.3d 684, 695 (2022). In *Parker*, the U.S. Supreme Court noted that the state's argument that no harm could have resulted from a bailiff's comments on the merits "overlooks the fact that the official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury which he had been shepherding for eight days and nights." 385 U.S. at 365. For that reason, "undue contact with a juror by a government officer almost categorically risks influencing the verdict." *Tarango v. McDaniel*, 837 F.3d 936, 947 (9th Cir. 2016). Here, the improper communications about the merits of the case did not come from a bailiff acting as a security guard or as a message courier. They came from an *elected official*—someone whose name nearly every one of the jurors presumably had seen on the same ballot that they used

-22-

to vote for the President of the United States[7]—holding an office established by the state constitution.  It was the very person who summoned the jurors to serve, who impaneled them and administered their oath, who administered the oath to the witnesses presented to them for their consideration, who told when and where to report for each day of their service, and who read their verdict in the courtroom.

The trial court committed legal error by not presuming Mr. Murdaugh's right to a fair trial was prejudiced by Ms. Hill's jury tampering.  Applying the correct legal standard, the evidence—that an elected state official deliberately advocated for a guilty verdict in the jury room during trial so she could personally profit from it—supports only one reasonable inference—the presumption of prejudice to Mr. Murdaugh's right to a fair trial is irrebuttable.  The Court therefore should reverse the trial court and vacate Mr. Murdaugh's convictions.

C.    The trial court's "finding" that Ms. Hill's comments to jurors that were "not overt as to opinion" is unsupported by and contrary to the evidence in the record.

At the evidentiary hearing the trial court examined Juror Z about her affidavit describing Ms. Hill's jury tampering, and she testified,

> [The Court] Q. Very good.  The second -- the first paragraph, of course, is the statement that you were in the case.  Second paragraph says:
>
>> Toward the end of the trial, after the Presidents' Day break but before Mr. Murdaugh testified, the clerk of court, Rebecca Hill, told the jury, quote, not to be fooled, unquote, by the evidence presented by Mr. Murdaugh's attorneys, which I understood to mean that Mr. Murdaugh would lie when he testifies.
>
> Is that what your recollection is of that statement?
>
> [Juror Z] A. Yes, ma'am.

---

[7] Ms. Hill was elected in 2020; the voter turnout in the 2020 general election in Colleton County was over 73% of all registered voters.  *2020 Statewide General Election Results*, S.C. Election Comm'n, https://www.enr-scvotes.org/SC/Colleton/ 106517/Web02.264677/#/.

-23-

Q. Is there anything in the statement that on reflection you think is not correct?

A. No, ma'am.

Evid. Hr'g Tr. 5:4–18. When ruling from the bench that same day, the trial court ruled:

Did Clerk of Court Hill make comments to any juror which expressed her opinion what the verdict would be? Ms. Hill denies, A, and so the question becomes was her denial credible.

I find that the clerk of court is not completely credible as a witness. . . . I find that she stated to the clerk of court Rhonda McElveen and others her desire for a guilty verdict because it would sell books. She made comments about Murdaugh's demeanor as he testified, and she made some of those comments before he testified to at least one and maybe more jurors.

*Id.* 251:13–252:1.

That seems clear enough. But the State-drafted order the trial court entered months later slips in the statement "This Court further finds that the improper comments made by Clerk Hill as expressed by Jurors Z and P were limited in subject and not overt as to opinion . . . ." Order 22. That offhand finding is unsupported by and, indeed, contradicted by, the evidence in the record and it contradicts the ruling the trial court from the bench the same day it received the juror's testimony. Juror Z testified that Ms. Hill said "not to be fooled" by evidence presented in Mr. Murdaugh's defense. Evid. Hr'g Tr. 5:4–18. The alternate juror testified that Ms. Hill told jurors "the defense is about to do their side" and "[t]hey're going to say things that will try to confuse you" but "[d]on't let them confuse you or convince you or throw you off." *Id.* 203:18–204:3. No reasonable person can say those statements are "not overt as to opinion." Certainly, that is not what Justice Toal said when ruling on the motion for a new trial later that same day.[8]

---

[8] Mr. Murdaugh concedes the statements were "limited in subject"—the subject of his testimony in his own defense at trial. The trial court does not identify any other subject to which the statements purportedly were "limited." *See* Order 22.

Allowing the State to insert a "finding" contradicted by all evidence in the record and by the trial court's own ruling from the bench, simply to shore up its position on appeal, was an abuse of discretion by the trial court. The Court therefore should disregard the finding that Ms. Hill's statements were not "overt as to opinion." *See State v. Simmons*, 279 S.C. 165, 167, 303 S.E.2d 857, 859 (1983) (holding the trial court abused its discretion when denying a motion for a new trial where its decision was based on a factual finding but "the record is in all respects void of evidence to support [that] finding"). Ms. Hill's statements as set forth in sworn testimony, uncontroverted by anyone except Ms. Hill (whom the trial court found not credible), speak for themselves. To the extent it is necessary to characterize those statements in a legal analysis, it is a mixed question of law and fact and "[i]n reviewing mixed questions of law and fact, where the evidence supports but one reasonable inference, the question becomes a matter of law for the court." *Moore*, 343 S.C. at 288, 540 S.E.2d at 448. The only reasonable inference here is that Ms. Hill's statements to jurors overtly expressed her opinion that Mr. Murdaugh should be found guilty.

D.   Even if the presumption of prejudice were rebuttable, the State did not rebut—or even attempt to rebut—any presumption of prejudice in this case.

At the evidentiary hearing, the State failed to meet its burden to overcome the presumption that Ms. Hill's conduct was prejudicial to Mr. Murdaugh's right to a fair trial before an impartial jury that considers only the evidence and argument presented in open court. It was impossible to do so, so it did not even try to argue any presumption was overcome. *See, e.g.*, Evid. Hr'g Tr. 230:18–239:19 (closing argument of S. Creighton Waters for the State).

Nevertheless, the trial court nonetheless held that Ms. Hill's jury tampering could not "in any way undermine the fairness and impartiality of [the] six-week trial with its extensive evidentiary presentations, arguments from counsel, and instructions from the trial court" and that "any possible presumption of prejudice was overcome by these facts." Order 24. That finding is

unsupported by any evidence in the record. The trial court does not cite or refer to any evidence presented at the evidentiary hearing to support that finding—for which the State did not even argue.

The evidence presented at the hearing was that nine jurors testified that they did not hear Ms. Hill comment on the merits of the case before the verdict, three jurors (P, X, and Z) and the alternate juror testified that Ms. Hill commented to the jury about Mr. Murdaugh's testimony in his own defense, one deliberating juror and the alternate juror testified that Ms. Hill told jurors not to believe or be fooled by the defense—and that deliberating juror testified that Ms. Hill's comments influenced her decision on the verdict, and the Barnwell County Clerk of Court who participated in the trial nearly every day testified that Ms. Hill made similar comments to her and that Ms. Hill repeatedly stated that a guilty verdict would help her book sales. Statement of the Case, *supra*, at 4–8. Further, the trial court did not examine Juror 785, who was impaneled from the start of the murder trial until the very last day, even though she was at the courthouse and available to testify. Evid. Hr'g Tr. 173:11–19. Juror 785 has also given a sworn statement that she too heard Ms. Hill say that jurors should not be "fooled by" the defense. Mot. New Trial Ex. H ¶ 2.

That record provides no support whatsoever for a finding that the State overcame any presumption of prejudice. Based on the trial court's commentary in same paragraph of order in which it presents this finding about the "six-week trial with its extensive evidentiary presentations" (Order 24) and its unusual action to summon the gallery back to the courtroom after the adjournment of the evidentiary hearing to proclaim, "I agree that the evidence was overwhelming and the jury verdict not surprising" (Evid. Hr'g Tr. 254:3–16, 255:19–20), it appears that its finding that "any possible presumption of prejudice was overcome" is based solely on its own opinion that the correct verdict was rendered at trial. That was an abuse of discretion. Because no evidence

supports the trial court's finding that "any possible presumption was overcome," this Court should disregard it.

Finally, the throwaway line in the state-drafted order that "any comments [from Ms. Hill to jurors] that occurred were cured by the trial court's extensive instructions," Order 22, has no merit whatsoever.  During trial, Judge Newman was unaware of Ms. Hill's jury tampering so of course he gave no curative instructions regarding her tampering.  He only gave the usual jury instructions given in every trial—do not discuss the case with anyone, do not seek outside information or watch news reports about the case, and consider only the evidence presented in the courtroom when deliberating.  Order 22–23.  Jury instructions given to every jury, from a trial judge unaware that any jury tampering is taking place, cannot "cure" jury tampering by a state official going into the jury room to advocate for a guilty verdict so she can sell books about it.  *See Remmer*, 347 U.S. at 229 (jury tampering in a criminal case is presumptively prejudicial); *Cameron*, 311 S.C. at 207-08, 428 S.E.2d at 12 (holding "the private communication of the court official to members of the jury" means "a new trial must be granted unless it clearly appears that the subject matter of the communication was harmless").  The trial court's citation to *State v. Grovenstein*, 335 S.C. 347, 517 S.E.2d 216 (1999), in support of its conclusion that the standard jury instruction not to consider external influences cures all jury tampering, known or unknown, is completely off-point.  *Grovenstein* involved a curative instruction specific to the external influence at issue given by the trial judge to the jury after he learned of the external influence— which was nothing more than the alternate juror remaining with the jury for 20 or 30 minutes after the case was submitted.  335 S.C. at 353, 517 S.E.2d at 219.

Because the undisputed evidence admits only one reasonable inference, that no presumption was (or could have been) overcome, this Court should hold the presumption of

prejudice to Mr. Murdaugh's right to a fair trial was not rebutted, vacate his convictions, and remand for a new trial.

## II.    PREJUDICE WAS PROVEN AT THE EVIDENTIARY HEARING.

As noted above, in *Parker v. Gladden* the U.S. Supreme Court held that the Supreme Court of Oregon erred in holding a bailiff's statement to a juror that the defendant "is guilty" did not require a new trial because the defendant did not prove the comment affected the verdict.  385 U.S. at 366.  The Supreme Court ruled "'the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.'"  *Id.* at 364 (quoting *Turner*, 379 U.S. at 472–473).  It further ruled the state's argument that the defendant did not show the comment prejudiced him ignored the "official character of the bailiff—as an officer of the court as well as the State."  *Id.* at 365.  Here, Mr. Murdaugh's motion for a new trial asserted a much higher-ranking official made equally direct comments (and more of them) to jurors during a criminal trial.  *Parker* therefore would seem to control if the comments were made.   The State's prehearing brief implicitly admitted this point:

> Finally, Murdaugh cites to *Parker v. Gladden*, 385 U.S. 363 (1966), and argues it represents that the statement of "that wicked fellow, he is guilty" cannot be harmless.  However, *Parker* is factually distinguishable because he was able to do what Murdaugh cannot: 'one of the jurors testified that she was prejudiced by the statements[.]' . . . In this case, Murdaugh has presented an affidavit from a single juror who deliberated, and that juror prescribed her verdict to pressure from other jurors—not anything Clerk Hill allegedly said.

Resp't's Prehearing Br. 10.

That point blew up at the evidentiary hearing.[9]   Not only did Mr. Murdaugh prove the comments were made, but a juror also testified they influenced the verdict.  In *Parker*, the juror

---

[9] That was not the only instance in which the State's return to the motion was overtaken by events.  In its return, the State also claimed Mr. Murdaugh's allegations that Ms. Hill committed

only testified, regarding the bailiff's statement, that "all in all it must have influenced me. I didn't realize it at the time." *Parker*, 385 U.S. at 366 n.3. At the evidentiary hearing, Juror Z gave much more definitive testimony:

> Q. All right. Was your verdict influenced in any way by the communications of the clerk of court in this case[?]
>
> A. Yes, ma'am.
>
> Q. And how was it influenced?
>
> A. To me, it felt like she made it seem like he was already guilty.
>
> Q. All right, and I understand that, that that's the tenor of the remarks she made. Did that affect your finding of guilty in this case?
>
> A. Yes, ma'am.

Evid. Hr'g Tr. 46:6–15. In *Parker*, the juror testified "it must have influenced me," but in this case the juror testified "it *did* influence me."

*Parker* therefore controls this case. If a bailiff stating, "that wicked fellow, he is guilty," to a juror who later testifies that statement "must have influenced me," requires a new trial, then a much more senior court official saying not to be "fooled by" evidence presented by the defense and not to believe the defendant when he testifies to a juror who later testifies those statements *did* influence her, must require a new trial. The prejudice is proven. And there is no question about the continued viability of *Parker*—it is a landmark case that incorporated the Sixth Amendment right to an impartial jury to the states. 385 U.S. at 364.

---

wrongdoing were not "even remotely plausible" and that he was merely "projecting his own calculating, manipulative psyche onto a dedicated public servant"—ironically referring to Ms. Hill. State's Return to Mot. New Trial 18. After that filing, Ms. Hill's ethics commissions complaints were referred for criminal prosecution, her book was withdrawn for publication due to plagiarism, and she resigned from office in disgrace.

Although Mr. Murdaugh's counsel argued *Parker* in, *inter alia*, his pretrial brief, his reply pretrial brief, and his written objections to the trial court's proposed questions to the jurors, the trial court studiously avoided the case.   Instead, the trial court erroneously required that Mr. Murdaugh, in addition to proving that Ms. Hill did tamper with the jury about the merits of his case during trial, must also prove that tampering affected the deliberating jurors' subjective decision to vote for a guilty verdict.

Of course, questioning jurors about what motivated them to vote in a certain way when rendering their verdict is improper, and the defense objected.   *E.g.*, Ltr. from R. Harpootlian to Ret. Chief Justice Toal, at 1–2; Evid. Hr'g Tr. 49:9–51:3.  Rule 606(b) of the South Carolina Rules of Evidence provides,

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

"Thus, juror testimony or affidavits are admissible to prove an allegation of extraneous information or influence," *State v. Zeigler*, 364 S.C. 94, 110, 610 S.E.2d 859, 867 (Ct. App. 2005), but not to prove the "effect" of that information "upon that or any other juror's mind or emotions as influence the juror to assent to or dissent to the verdict," Rule 606(b), SCRE.  "[I]nquiry into the motives of individual jurors and conduct during deliberations is *never* permissible; any investigation must focus solely on whether the jury was exposed to external influences and, *from an objective perspective*, whether such influence was likely to have affected the jury's verdict." *Mahoney v. Vondergritt*, 938 F.2d 1490, 1492 (1st Cir. 1991) (emphasis added) (construing substantively identical federal Rule 606(b)); *see also Minnesota v. Cox*, 322 N.W.2d 555, 559 (Minn. 1982)

("Therefore, the proper procedure for reviewing a jury verdict is to determine from juror testimony what outside influences were improperly brought to bear upon the jury and then estimate their probable effect on a hypothetical average jury." (citing *United States ex rel. Owen v. McMann*, 435 F.2d 813, 820 (2d Cir. 1970) & *Massachusetts v. Fidler*, 385 N.E.2d 513, 519 (Mass. 1979)).

The "probable effect on a hypothetical average jury" of being told not to believe the defendant when he testifies in his own defense, by the elected official who administered the oath to them when they were impaneled, is prejudice against the defendant. So, the State requested the trial court instead to ask jurors whether Ms. Hill's comments affected their decision to vote guilty in this case. The State requested this because it thought it knew what the answer would be, as evident by the statement in its prehearing brief that "*Parker* is factually distinguishable because he was able to do what Murdaugh cannot: 'one of the jurors testified that she was prejudiced by the statements[.]'" Resp't's Prehearing Br. 10.

But when Juror Z unexpectedly testified that she was prejudiced by Ms. Hill's statements, the State was cornered. Even under the incorrect legal standard adopted by the trial court, Mr. Murdaugh prevailed. He proved the verdict was influenced by Ms. Hill's jury tampering. One deliberating juror did testify that her verdict was influenced by Ms. Hill's jury tampering. And no evidence was presented to controvert Juror Z's testimony or to show any bias or motive for falsehood.

The only way out was for the trial court to decide that Juror Z's uncontroverted testimony in open court about her own state of mind and her own mental processes was not credible:

> Juror Z, I asked you previously was your verdict on March 2, 2023, influenced in any way by communications from Becky Hill, the clerk of court. You answered that question yes. In light of what you said in the affidavit, which is:
>
>> I had questions about Mr. Murdaugh's guilt but voted guilty because I felt pressured by the other jurors.

Is that answer that I just read a more accurate statement of how you felt?

MR. HARPOOTLIAN: Object to the form, Your Honor.

THE COURT: Overruled.

A. Yes, ma'am.

Q. All right.  So, you do stand by the affidavit?

A. Yes, ma'am.

Q. Very good.

Evid. Hr'g Tr. 55:1–56:7.  After Juror Z left the courtroom, Mr. Murdaugh's counsel objected that there was no inconsistency with being influenced both by Ms. Hill's comments during the presentation of evidence at trial and by other jurors during deliberations.  *Id.* 58:2–22.  Juror Z attempted to make this point herself, but the trial court would not permit any further testimony or examination of her.  So, through her own counsel, she provided an affidavit that day averring,

1. I would like to clarify my testimony today.

2. As I testified, I felt influenced to find Mr. Murdaugh guilty by reason of Ms. Hill's remarks, before I entered the jury room.

3. Once deliberations began as I stated in paragraph 10 of my earlier affidavit, I felt further, additional pressure to reach the guilty verdict.

Juror Z Aff., January 28, 2024.  The trial court nevertheless held "this Court does not find credible Juror Z's ambivalent and self-contradicted statements to the contrary that her verdict was in any way affected by any comments from Clerk Hill."  Order 21.

Because the trial court elected to disregard Rule 606(b), we do not have an objective inquiry into whether Ms. Hill's comments likely would have affected *a* jury, but instead have a credibility determination about whether those comments affected *this* jury.  That determination is based on a court-conducted, inquisitorial inquiry into a juror's own internal mental processes, a subject the

trial court was forbidden by law to inquire into, and based on the strange reasoning that if a juror testifies she was influenced by external tampering, she has violated her oath to follow the judge's instructions not to based her verdict on anything but the evidence presented in court, and therefore her testimony that she was influenced should be disregarded. *See* Order at 20–21. Or that if she testifies that she was influenced by other deliberating jurors during deliberations, any testimony that she also was influenced by events that happened during trial before deliberations should be disregarded. *Id.*

This is a bizarre and legally untenable result. Juror Z, who has direct knowledge of her own mental processes, said those mental processes were influenced by Ms. Hill's comments that she should not be fooled by the defense. The trial judge—who knows nothing of Juror Z's mental processes other than how Juror Z describes them—presumed to tell Juror Z that she was mistaken, and that Ms. Hill did not influence her. It is extraordinary that the trial judge believed she knew Juror Z's mental processes better than Juror Z.

Juror Z did not ask to be placed in this situation. She sat in a courtroom, isolated from her normal life and work, for six weeks because someone she did not know was accused of committing a crime that had nothing to do with her. That is a tremendous public service for which she has not been compensated in any meaningful way. She has maintained her anonymity. She has not "cashed-in" with media appearances. She is not, as the State has scurrilously argued, an ally or advocate for Mr. Murdaugh. *See* Resp't's Prehearing Br. 18 (accusing Juror Z's lawyer of being "an agent of Murdaugh"). She voted to convict him of murder. She has no reason to lie. She has simply been honest about what Ms. Hill did during the trial and the effect it had on her own deliberations.

It was an abuse of discretion for the trial court to disregard Juror Z's testimony about her own mental processes simply because her testimony met a legal standard the State thought that Mr. Murdaugh could not possibly satisfy.  The trial judge's characterization of her testimony as "ambivalent" is unsupported by any evidence in the record.  When asked, "Was your verdict influenced in any way by the communications of the clerk of court in this case[?]" she answered, "Yes, ma'am."  Evid. Hr'g Tr. 46:6–14.  When asked, "And how was it influenced?" she answered, "To me, it felt like she made it seem like he was already guilty."  *Id.*  When asked, "Did that affect your finding of guilty in this case?" she answered "Yes, ma'am."  *Id.*  No reasonable person can say that is "ambivalent" testimony.

The only reasonable inference from the record is that Ms. Hill's jury tampering did influence at least one juror's decision to vote for a guilty verdict.  The Court therefore should reverse the trial court and vacate the murder and firearms convictions.

## III.   SECRET ADVOCACY FOR A GUILTY VERDICT IN THE JURY ROOM DURING A CRIMINAL TRIAL BY A STATE OFFICIAL IS A STRUCTURAL ERROR IN THE TRIAL THAT CANNOT BE HARMLESS.

Sustaining a conviction based on the trial judge's opinion that the strength of the evidence against the accused regardless of improper external influences on the jury from court officials about the merits of the case is effectively a directed verdict for the prosecution—a statement that whatever happened at trial simply does not matter because the evidence can admit only one result regardless.  That would be structural error.  *Cf. Neder v. United States*, 527 U.S. 1, 34 (1999) (Scalia, J., concurring in part) (noting that even if "the judge certainly reached the 'right' result," "a directed verdict against the defendant . . . would be *per se* reversible *no matter how overwhelming the unfavorable evidence*," because "[t]he very premise of structural-error review is that even convictions reflecting the 'right' result are reversed for the sake of protecting a basic right" (emphasis in original)).

-34-

When the jury returned guilty verdicts in this case, the trial court congratulated the jury that "certainly the verdict that you have reached is supported by the evidence, circumstantial evidence, direct evidence, all of the evidence pointed to only one conclusion, that's the conclusion you all have reached. So, I applaud you all for . . . coming to a proper conclusion." Trial Tr. 5877:17–23. Even before Ms. Hill's misconduct was known, the trial court foreshadowed the outcome of the "harmless error" analysis it applied to Mr. Murdaugh's new trial motion: The trial court held that Ms. Hill's jury tampering could not "in any way undermine the fairness and impartiality of [the] six-week trial with its extensive evidentiary presentations, arguments from counsel, and instructions from the trial court" and "any possible presumption of prejudice was overcome by these facts." Order 24.

But, again, the prejudice at issue, whether it is presumed or must be proven, is not an incorrect verdict. Jury tampering is prejudicial if it denies the accused a fair trial. The strength of the State's evidence against the accused cannot cure the denial of his right to a fair trial. *See, e.g.*, *Parker*, 385 U.S. at 363–65. Thus, the rule for deciding whether to grant Mr. Murdaugh a new trial is not whether the trial court believes the outcome of the trial would have been the same had Ms. Hill's jury tampering not occurred. If that were the case, the trial court should deny a motion for a new trial even if she paid the jury to vote guilty, because, in the trial court's opinion, "all of the evidence pointed to only one conclusion"—the guilt of the accused. As explained above, Rule 606(b) forbids asking jurors to give their own opinions as to whether jury tampering influenced them and then basing a decision for a new trial on that testimony. Courts instead must determine what tampering occurred and then undertake an objective analysis of whether that tampering would bias a jury. *See, e.g.*, *Manley v. AmBase Corp.*, 337 F.3d 237, 252 (2d Cir. 2003) ("[C]ourts must apply an 'objective test,' . . . focusing on two factors: (1) 'the nature' of the information or contact

at issue, and (2) 'its probable effect on a hypothetical average jury.'"); *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir. 2001) ("[W]e must conduct 'an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror.'"); *Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 917 (7th Cir. 1991) ("The proper procedure therefore is for the judge to limit the questions asked the jurors to whether the communication was made and what it contained, and then, having determined that the communication took place and what exactly it said, to determine—without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion—whether there is a reasonable possibility that the communication altered their verdict."). Courts cannot avoid that analysis by speculating that an unbiased jury would come to the same verdict as a biased one.[10]

The issue here is not whether a juror engaged in misconduct, not whether some member of the public engaged in misconduct, nor even whether a bailiff made an improper statement. The issue is whether an elected state official using the power of her office to enter the jury room during trial to advocate against the defendant to promote her own interests is a structural error in the conduct under the trial, under the principle that all evidence and argument presented to the jury must be presented in the courtroom. *See Turner*, 379 U.S. at 472–73 ("In a constitutional sense,

---

[10] Additionally, the trial court's belief that the evidence against Mr. Murdaugh is "overwhelming" is unsupported by the record. There was no direct evidence of Mr. Murdaugh's guilt; during the trial the trial court stated this is a circumstantial case. Trial Tr. 2191:4–5. The State's evidence against Mr. Murdaugh was his proximity to his family near the time they were murdered, actions and behaviors by him after the murders that cast suspicion on him, and his bad character as an admitted thief and drug addict. Crime scene and cell phone forensic evidence strongly suggests other persons were involved in committing the murders that night. But argument regarding the weight of the evidence presented at the six-week trial is appropriately made in the direct appeal from that trial and not in this appeal from the one-day evidentiary hearing on the collateral issue of Ms. Hill's jury tampering. No argument or evidence was presented to Justice Toal in the evidentiary hearing proceedings regarding the strength of the evidence presented at trial.

trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."). That would necessarily bias a jury against the defendant. It was an abuse of discretion for the trial court instead to reason that it does not matter whether that happened because any jury, biased or unbiased, would reach the same verdict in this case. Again, the right at issue is the constitutional right to trial before an unbiased jury, not a right to a correct verdict.

The undisputed evidence and findings from the evidentiary hearing are that Ms. Hill did engage in jury tampering. Three jurors and the alternate juror testified that Ms. Hill made comments to them regarding the merits of Mr. Murdaugh's testimony in his own defense. Statement of the Case, *supra*, at 4–8. One juror and the alternate testified that she told them not be "fooled by" the defense. *Id.* The only witness to contradict any of that testimony was Ms. Hill, whom the trial court found to be not credible. *Id.* One juror even testified that Ms. Hill's conduct did influence her decision to vote guilty. *Id.*

It has long been held to be a structural error for a state actor to engage in *ex parte* advocacy to the jury during trial. "The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted). "The evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel . . . ." *Parker*, 385 U.S. at 364. In *Simmons v. South Carolina*, the U.S. Supreme Court similarly held it is unconstitutional for the defendant to receive the death

penalty "on the basis of information which he had no opportunity to deny or explain."  512 U.S. 154, 161 (1994) (internal quotation marks omitted).

The principle is ancient and foundational to our system of trial by jury:

> In the ultimate analysis, only the jury can strip a man of his liberty or his life.  In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.'  His verdict must be based upon the evidence developed at the trial.  This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.  It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807).

*Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citations omitted).  What is now called the *Remmer* presumption is far older than the 1954 *Remmer* decision.  "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."  *Mattox v. United States*, 146 U.S. 140, 150 (1892).[11]  Likewise,

> It is well settled, that it is not necessary to show that the minds of the jury, or of any member of it, were influenced.  It is sufficient to show that intermeddling did take place, to set aside the verdict.  Too much strictness cannot be exercised in guarding trials by jury from improper influence.  It has been said that, "this strictness is necessary to give confidence to parties in the results of their causes; and every one ought to know that, for any, even the least, intermeddling with jurors, a verdict will always be set aside."- *Knight v. Freeport*, 13 Mass. 220.

> This is the language of the Supreme Court of Massachusetts in a civil cause.  How much more important is it, to guard the purity of jury trials, against improper influence, when the matter at stake is the life or liberty of a prisoner.

> The authorities upon this point all agree; and, as they are very numerous . . . .

---

[11] *Maddox* was superseded in 1975 by Rule 606(b) of the Federal Rules of Evidence on a separate issue regarding the admissibility of juror testimony to impeach the verdict.  But it is still currently cited by federal appellate courts for the principle that when state officials communicate *ex parte* with the jury about the merits of the case during trial, a new is required.  *E.g.*, *Tarango*, 837 F.3d at 947 ("*Mattox* and its progeny further establish that undue contact with a juror by a government officer almost categorically risks influencing the verdict.").

*Pope v. Mississippi*, 36 Miss. 121, 124 (Miss. Err. & App. 1858).  For an even older example,

> An officer is sworn to keep the jury, without permitting them to separate, or any one to converse with them; for no man knows what may happen; although the law requires that honest men should be returned upon juries, and, without a known objection, they are presumed to be *probi et legales homines*, yet they are weak men, and perhaps may be wrought upon by undue applications.  The evil to be guarded against, is improper influence; and when an exposure to such an influence is shown, and it is not shown that if failed of effect, then the presumption is against the purity of the verdict.

*Lord Delamere's Case*, 4 Harg. St. T. 232 (Eng. 1685).

Contrary to the State's position before the trial court, the Court has not abrogated or abandoned this foundational principle that when the State's officials engage in *ex parte* communications with the jury during trial about the merits of the case, a new trial is required.  Nor has the U.S. Supreme Court opened a door that could allow states to abandon that principle.  All that has happened is a sensible restriction of the principle to exclude improper communications that do not bear on the merits of the issue before the jurors.  *See Green*, 432 S.C. at 100, 851 S.E.2d at 441.

In the trial court, the State complained that this sort of tampering happens so commonly that it "cannot overstate the impossibility" of considering it a structural error.  Resp't's Br. 12.  That exactly reverses the issue.  Nothing like Ms. Hill's conduct has ever happened before this case.  Most likely it will never happen again.  The impossibility is found in excusing Ms. Hill's conduct with *post hoc* reasoning that her tampering probably did not change the outcome of the trial (even though one juror said it did).  If Ms. Hill's misconduct is excused, then truly anything goes.

The public rightly sees Mr. Murdaugh's downfall as an exposé of privilege and corruption in South Carolina's legal system and the citizens of South Carolina need more from this case than confirmation of their own social-media-fed ideas about the details of a crime they did not witness.

They need to see that their legal system actually works. Satisfying public desire to see a hated man punished is not why we have a legal system. If Mr. Murdaugh is to be convicted of murder, the citizens of South Carolina need to see him convicted by a process they would agree is fair if they were the defendants. No reasonable man would agree, if he were on trial for his life, that having the clerk of court secretly advocate against him in the jury room so she can sell books about his conviction would be a fair trial. Providing Mr. Murdaugh with the fair trial that every citizen of South Carolina would expect for himself is necessary assure all that no one—powerful or humble, innocent or guilty, hated or beloved—is proscribed from due process and the equal protection of the law.

## **CONCLUSION**

Any person accused of a crime—even Alex Murdaugh—has a constitutional right to a fair trial. When a fair trial is denied, he is entitled to a new, fair trial—he is not required to earn it by proving he would have been acquitted had he been given a fair trial the first time. Judges' opinions regarding the strength of the State's evidence against the accused are not a substitute for the presentation of that evidence at a fair trial. The Court therefore should follow clearly established federal constitutional law, which accords fully with the jurisprudence of this State, and reverse the trial court's denial of Mr. Murdaugh's motion for a new trial and vacate his murder and firearms convictions.

[signature block follows]

s/Phillip D. Barber
Richard A. Harpootlian, SC Bar No. 2725
Phillip D. Barber, SC Bar No. 103421
Andrew R. Hand, SC Bar No. 101633
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29202
(803) 252-4848
rah@harpootlianlaw.com
pdb@harpootlianlaw.com
arh@harpootlianlaw.com

James M. Griffin, SC Bar No. 9995
Margaret N. Fox, SC Bar No. 76228
GRIFFIN HUMPHRIES LLC
4408 Forest Drive (29206)
Post Office Box 999
Columbia, South Carolina 29202
(803) 744-0800
jgriffin@griffinhumphries.com
mfox@griffinhumphries.com

*Attorneys for Appellant Richard Alexander Murdaugh*

Columbia, South Carolina
August 13, 2024.

-41-

JA0139

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

Suffolk, ss.                                                          No. SJ-2024-

KAREN READ,
Petitioner

v.

COMMONWEALTH OF MASSACHUSETTS,
Respondent.

_____

RECORD APPENDIX OF PETITIONER KAREN READ
_____

MICHAEL PABIAN                     MARTIN G. WEINBERG
Attorney for Petitioner            Attorney for Petitioner
BBO #684589                        BBO #519480
20 Park Plaza, Suite 1000          20 Park Plaza, Suite 1000
Boston, MA 02116                   Boston, MA 02116
(617) 227-3700                     (617) 227-3700

ALAN J. JACKSON                    DAVID R. YANNETTI
Attorney for Petitioner, *Pro Hac Vice*    Attorney for Petitioner
Werksman Jackson & Quinn LLP       BBO #555713
888 West Sixth Street, Fourth Floor    44 School St., Suite 1000A
Los Angeles, CA 90017              Boston, MA 02108
(213) 688-0460                     (617) 338-6006

September 11, 2024

Table of Contents:

1. Full docket report…………………………………………………………R.001

2. Norfolk County Superior Court Indictments……………………………………...R.045

3. Transcript of the charge to the jury, June 25, 2024…………………………………..R.051

4. Transcript of jury trial, June 26, 2024……………………………………………...R.114

5. Defendant's motion to amend the jury verdict slip associated with Count 2 and supporting affidavit, filed June 26, 2024…………………………………………………R.137

6. Transcript of jury trial, June 27, 2024……………………………………………...R.146

7. Transcript of jury trial, June 28, 2024……………………………………………...R.153

8. Transcript of jury trial, July 1, 2024………………………………………………..R.164

9. Defendant's motion to dismiss and supporting affidavits, filed July 8, 2024………..R.178

10. Defendant's supplemental memorandum in support of her motion to dismiss and supporting affidavit, filed July 10, 2024…………………………………………...R.195

11. Commonwealth's opposition to defendant's post-trial motion to dismiss, filed July 12, 2024………………………………………………………………………...R.201

12. Defendant's reply to the Commonwealth's opposition to her motion to dismiss, filed July 15, 2024……………………………………………………………………R.216

13. Defendant's second supplemental memorandum in support of her motion to dismiss and supporting affidavit, filed July 18, 2024…………………………………………...R.226

14. Commonwealth's post-trial notice of disclosure, filed August 1, 2024……………...R.231

15. Defendant's third supplemental memorandum in support of her motion to dismiss and supporting affidavit, filed August 5, 2024……………………………………………R.233

16. Transcript of non-evidentiary hearing on motion to dismiss, August 9, 2024………..R.238

17. Memorandum of decision and order on defendant's motion to dismiss, issued August 23, 2024……………………………………………………………………..R.294

## 2282CR00117 Commonwealth vs. Read, Karen



- Case Type:
- Indictment
- Case Status:
- Open
- File Date
- 06/09/2022
- DCM Track:
- C - Most Complex
- Initiating Action:
- MURDER c265 §1
- Status Date:
- 06/10/2022
- Case Judge:
-
- Next Event:
- 01/14/2025

| All Information | Party | Charge | Event | Tickler | Docket | Disposition |

### Party Information

**Norfolk County District Attorney**
- Prosecutor

| Alias | Party Attorney |
|-------|----------------|
|       | • Attorney |
|       | • Lally, Esq., Adam C |
|       | • Bar Code |
|       | • 664079 |
|       | • Address |
|       | • Norfolk County District Attorney's Office |
|       |   45 Shawmut Rd |
|       |   Canton, MA  02021 |
|       | • Phone Number |
|       | • (781)830-4800 |
|       | • Attorney |
|       | • McLaughlin, Esq., Laura A |
|       | • Bar Code |
|       | • 684295 |
|       | • Address |
|       | • Norfolk District Attorney's Office |
|       |   45 Shawmut Rd |
|       |   Canton, MA  02021 |
|       | • Phone Number |
|       | • (781)830-4800 |

**More Party Information**

**Read, Karen**
- Defendant

| Alias | Party Attorney |
|-------|----------------|
|       | • Attorney |
|       | • Henchy, Esq., Ian F |
|       | • Bar Code |
|       | • 707284 |
|       | • Address |
|       | • Yannetti Law Firm |
|       |   44 School St 1000A |
|       |   Boston, MA  02108 |
|       | • Phone Number |
|       | • (857)600-1956 |
|       | • Attorney |
|       | • Jackson, Alan |
|       | • Bar Code |
|       | • PHV173647CA |
|       | • Address |
|       | • Phone Number |
|       | • |
|       | • Attorney |
|       | • Little, Elizabeth S |
|       | • Bar Code |

R.001

- PHV307944CA
- Address
- Phone Number
-
- Attorney
- Weinberg, Esq., Martin G
- Bar Code
- 519480
- Address
- Martin G Weinberg P.C.
  20 Park Plaza
  Suite 1000
  Boston, MA  02116
- Phone Number
- (617)227-3700
- Attorney
- Yannetti, Esq., David R
- Bar Code
- 555713
- Address
- Yannetti Criminal Defense Law Firm
  44 School St
  Suite 1000A
  Boston, MA  02108
- Phone Number
- (617)338-6006
- Attorney
- Yannetti, Esq., Tanis M
- Bar Code
- 568090
- Address
- Yannetti Criminal Defense
  44 School St Suite 1000A
  Boston, MA  02108
- Phone Number
- (617)338-6006

**More Party Information**

**Movants, Multiple**
- Defendant

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Randazza, Esq., Marc J |
| | • Bar Code |
| | • 651477 |
| | • Address |
| | • Randazza Legal Group, PLLC |
| |   30 Western Ave |
| |   Gloucester, MA  01930 |
| | • Phone Number |
| | • (888)887-1776 |

**More Party Information**

**Albert, Brian**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Henning, Esq., Gregory D |
| | • Bar Code |
| | • 663189 |
| | • Address |
| | • Henning Strategies |
| |   141 Tremont St |
| |   Suite 300 |
| |   Boston, MA  02111 |
| | • Phone Number |
| | • (617)299-6534 |

**More Party Information**

**McCabe, Jennifer**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Reddington, Esq., Kevin Joseph |
| | • Bar Code |
| | • 414160 |
| | • Address |
| | • Attorney Kevin Reddington |

1342 Belmont St
Suite 203
Brockton, MA  02301
- Phone Number
- (508)583-4280

<u>**More Party Information**</u>

**Proctor, Elizabeth**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | **Party Attorney**<br>- Attorney<br>- Kettlewell, Esq., William Andrew<br>- Bar Code<br>- 682929<br>- Address<br>- Silva Kettlewell and Pignatelli LLP<br>  10 High St<br>  Suite 505<br>  Boston, MA  02110<br>- Phone Number<br>- (617)351-9094 |

<u>**More Party Information**</u>

**Bukhenik, Yuri**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | **Party Attorney**<br>- Attorney<br>- Lundgren, Esq., Gretchen<br>- Bar Code<br>- 644742<br>- Address<br>- Mission Advisory Legal Group<br>  1834 Centre St<br>  Unit 451<br>  Boston, MA  02132<br>- Phone Number<br>- (617)302-6720 |

<u>**More Party Information**</u>

**Proctor, Michael**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | **Party Attorney**<br>- Attorney<br>- DiStefano, Esq., Michael Romeo<br>- Bar Code<br>- 675615<br>- Address<br>- Todd and Weld LLP<br>  One Federal St 27th Floor<br>  Boston, MA  02110<br>- Phone Number<br>- (617)720-2626<br>- Attorney<br>- Lundgren, Esq., Gretchen<br>- Bar Code<br>- 644742<br>- Address<br>- Mission Advisory Legal Group<br>  1834 Centre St<br>  Unit 451<br>  Boston, MA  02132<br>- Phone Number<br>- (617)302-6720 |

<u>**More Party Information**</u>

**Metro Corp, Dba/ Boston Magazine**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | **Party Attorney**<br>- Attorney<br>- Bertsche, Esq., Robert A<br>- Bar Code<br>- 554333<br>- Address<br>- Klaris Law PLLC<br>  6 Liberty Square 2752<br>  2752<br>  Boston, MA  02109 |

- Phone Number
- (857)303-6938

**More Party Information**

**Voss, Gretchen**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Bertsche, Esq., Robert A |
| | • Bar Code |
| | • 554333 |
| | • Address |
| | • Klaris Law PLLC |
| | 6 Liberty Square 2752 |
| | 2752 |
| | Boston, MA  02109 |
| | • Phone Number |
| | • (857)303-6938 |

**More Party Information**

**Albert, Kevin**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Pasciucco, Esq., Peter |
| | • Bar Code |
| | • 679371 |
| | • Address |
| | • Anderson, Goldman, Tobin and Pasciucco, LLP |
| | 50 Redfield St |
| | Suite 201 |
| | Dorchester, MA  02122 |
| | • Phone Number |
| | • (617)265-3900 |

**More Party Information**

**American Civil Liberties Union of MA**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Bourquin, Esq., Ruth A |
| | • Bar Code |
| | • 552985 |
| | • Address |
| | • American Civil Liberties Union Foundation of Massa |
| | One Center Plaza |
| | Suite 850 |
| | Boston, MA  02108 |
| | • Phone Number |
| | • (617)482-3170 |

**More Party Information**

**Boston Globe Media Partners**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Albano, Esq., Jonathan M |
| | • Bar Code |
| | • 013850 |
| | • Address |
| | • Morgan, Lewis and Bockius LLP |
| | 1 Federal St |
| | Boston, MA  02110 |
| | • Phone Number |
| | • (617)951-8360 |

**More Party Information**

**Boston Globe Media Partners**
- Other interested party

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Thomas, Esq., Samuel D |
| | • Bar Code |
| | • 707801 |
| | • Address |

- Morgan Lewis and Bockius LLP
  One Federal St
  Floor 14 Office 19
  Boston, MA 02110
- Phone Number
- (774)263-0309

**More Party Information**

## Party Charge Information

- **Read, Karen**
- - Defendant
  Charge # 1:
  **265/1-0 - Felony    MURDER c265 §1**

- Original Charge
- 265/1-0 MURDER c265 §1 (Felony)
- Indicted Charge
-
- Amended Charge

- **Read, Karen**
- - Defendant
  Charge # 2:
  **265/1312-0 - Felony    MANSLAUGHTER WHILE OUI c265 §13½**

- Original Charge
- 265/1312-0 MANSLAUGHTER WHILE OUI c265 §13½ (Felony)
- Indicted Charge
-
- Amended Charge

- **Read, Karen**
- - Defendant
  Charge # 3:
  **90/24/B-0 - Felony    LEAVE SCENE OF PERSONAL INJURY & DEATH c90 §24(2)(a½)(2)**

- Original Charge
- 90/24/B-0 LEAVE SCENE OF PERSONAL INJURY & DEATH c90 §24(2)(a½)
  (2) (Felony)
- Indicted Charge
-
- Amended Charge

## Events

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 06/10/2022 11:00 AM | Criminal 1 | | Arraignment | | Held as Scheduled |
| 08/12/2022 02:00 PM | Criminal 1 | | Pre-Trial Conference | Krupp, Hon. Peter B | Held as Scheduled |
| 09/22/2022 02:00 PM | Criminal 1 | | Pre-Trial Conference | Krupp, Hon. Peter B | Held as Scheduled |
| 10/03/2022 02:00 PM | Criminal 1 | | Motion Hearing | | Held as Scheduled |
| 11/21/2022 02:00 PM | Criminal 1 | | Hearing RE: Discovery Motion(s) | Cannone, Hon. Beverly J | Held as Scheduled |
| 02/03/2023 02:00 PM | Criminal 1 | | Conference to Review Status | | Rescheduled |
| 02/08/2023 02:00 PM | Criminal 1 | | Conference to Review Status | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/03/2023 02:00 PM | Criminal 1 | | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/24/2023 10:00 AM | Criminal 1 | | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/25/2023 09:30 AM | Criminal 1 | | Motion Hearing | Cannone, Hon. Beverly J | Canceled |
| 07/25/2023 02:00 PM | Criminal 1 | | Pre-Trial Hearing | O'Shea, Hon. Daniel J. | Held as Scheduled |

| Date | Session | Location | Type | Event Judge | Result |
|---|---|---|---|---|---|
| 09/15/2023 09:00 AM | Criminal 1 | | Motion Hearing | O'Shea, Hon. Daniel J. | Held as Scheduled |
| 09/15/2023 02:00 PM | Criminal 1 | | Conference to Review Status | O'Shea, Hon. Daniel J. | Rescheduled |
| 01/05/2024 09:00 AM | Criminal 1 | | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 01/18/2024 03:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 02/15/2024 02:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 02/26/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Final Pre-Trial Conference | Cannone, Hon. Beverly J | Rescheduled |
| 02/26/2024 02:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 03/12/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Rescheduled |
| 03/12/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 03/20/2024 02:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 03/26/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 03/28/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Rescheduled |
| 04/04/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/09/2024 02:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/12/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Final Pre-Trial Conference | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/16/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/17/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/18/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/22/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/23/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Not Held |
| 04/24/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/25/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/29/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/30/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/02/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/03/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/06/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/07/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/08/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |

| Date | Session | Location | Type | Event Judge | Result |
|---|---|---|---|---|---|
| 05/09/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/10/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/13/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/14/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/15/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/16/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/17/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/21/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/22/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/23/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Not Held |
| 05/24/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/28/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/03/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/05/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/06/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/10/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/12/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/13/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/14/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/17/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/18/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/20/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/21/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/24/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/25/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/26/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/27/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/28/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 07/01/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | | Held as Scheduled |

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 07/02/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | | Canceled |
| 07/22/2024 02:00 PM | Civil C | DED-2nd FL, CR 20 (SC) | Trial Assignment Conference | Cannone, Hon. Beverly J | Held as Scheduled |
| 08/09/2024 02:00 PM | Civil C | DED-2nd FL, CR 20 (SC) | Non-Evidentiary Hearing to Dismiss | Cannone, Hon. Beverly J | Held as Scheduled |
| 01/14/2025 02:00 PM | Criminal 1 | | Final Pre-Trial Conference | | |
| 01/27/2025 09:00 AM | Criminal 1 | | Jury Trial | | |

### Ticklers

| Tickler | Start Date | Due Date | Days Due | Completed Date |
|---------|-----------|----------|----------|----------------|
| Pre-Trial Hearing | 06/09/2022 | 12/06/2022 | 180 | 07/25/2023 |
| Final Pre-Trial Conference | 06/09/2022 | 05/19/2023 | 344 | 04/12/2024 |
| Case Disposition | 06/09/2022 | 06/02/2023 | 358 | |

### Docket Information

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|-------------|-------------|---------------|--------------|
| 06/09/2022 | Case assigned to: DCM Track C - Most Complex was added on 06/09/2022 | | |
| 06/09/2022 | Indictment(s) returned | 1 | Image |
| 06/09/2022 | Issued: Straight Warrant issued on 06/09/2022 for Read, Karen | | |
| 06/09/2022 | Attorney appearance On this date David R Yannetti, Esq. added as Private Counsel for Defendant Karen Read | | |
| 06/10/2022 | Recalled: Straight Warrant cancelled on 06/10/2022 for Read, Karen | | |
| 06/10/2022 | Event Result:: Arraignment scheduled on: 06/10/2022 11:00 AM Has been: Held as Scheduled Hon. Beverly J Cannone, Presiding | | |
| 06/10/2022 | Defendant arraigned before Court. Judge: Cannone, Hon. Beverly J | | |
| 06/10/2022 | Defendant waives reading of indictment Judge: Cannone, Hon. Beverly J | | |
| 06/10/2022 | Plea of not guilty entered on all charges. Judge: Cannone, Hon. Beverly J | | |
| 06/10/2022 | Bail set at $1,000,000.00 Surety, $100,000.00 Cash. Conditions: 1) stay away/no contact with victim O'Keefe's family and their residences 2) no operation of any motor vehicle | | |
| 06/10/2022 | Bail warnings read Judge: Cannone, Hon. Beverly J | | |
| 06/10/2022 | Issued on this date: Mittimus in Lieu of Bail Sent On: 06/10/2022 11:50:54 | 2 | |
| 06/10/2022 | Order for the transmittal of Bail sent to the clerk of the Stoughton District Court. | 3 | |
| 06/10/2022 | The following form was generated: Order for Transmittal of Bail Sent On: 06/10/2022 12:02:57 | | |
| 06/13/2022 | Commonwealth 's Statement of the Case | 5 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 06/13/2022 | Commonwealth 's Notice of Discovery I | 6 | Image |
| 06/13/2022 | Commonwealth 's Motion for Protective Order Regarding Discovery of Digital Video Recordings of Sain Interview | 7 | Image Image |
| 06/13/2022 | Finding and Order on Bail:<br><br>SEE Findings  (Cannone, RAJ) dated 06/10/2022<br><br>Judge: Cannone, Hon. Beverly J | 8 | Image |
| 06/23/2022 | Financial Note:<br><br>RETURN OF ASSIGNMENT OF BAIL re: surety William J. Read in the amount of $50,000.00 dated 6/23/2022 (Check #8528) | | |
| 07/28/2022 | General correspondence regarding Media Request from Court TV | 10 | Image |
| 08/12/2022 | Defendant 's EMERGENCY Motion to Compel Production of Requests for Preservation of Google Geofence Data and Confirmation from Google that Geofence Data Will be Preserved with Exhibits<br>- ALLOWED without objection. (Krupp, J.) dated 08/12/2022 | 11 | Image Image |
| 08/12/2022 | Affidavit of Counsel in Support of Defendant's Emergency Motion with Certificate of Service | 12 | Image |
| 08/12/2022 | Defendant 's Motion to Compel Production of Materials Listed in "Commonwealth's Notice of Discovery I"<br>- No action taken in light of the Commonwealth's response. (Krupp, J.) dated 08/12/2022 | 13 | Image Image |
| 08/12/2022 | Affidavit of Counsel in Support of Motion to Compel with Certificate of Service | 14 | Image |
| 08/12/2022 | Defendant 's Motion to Inspect Tail Light and Housing<br>- ALLOWED after items are back from the lab. (Krupp, J.) dated 08/12/22 | 15 | Image Image |
| 08/12/2022 | Affidavit of Counsel in Support of Motion to Inspect Tail Light and Housing with Certificate of Service | 16 | Image |
| 08/12/2022 | Defendant 's Motion to Inspect John O'Keefe's Clothing<br>- ALLOWED after items are back from the lab. (Krupp, J.) dated 08/12/22 | 17 | Image Image |
| 08/12/2022 | Affidavit of Counsel in Support of Defendant's Motion to Inspect Clothing with Certificate of Service | 18 | Image |
| 08/12/2022 | Event Result::  Pre-Trial Conference scheduled on:<br>          08/12/2022 02:00 PM<br>Has been: Held as Scheduled<br>Hon. Peter B Krupp, Presiding | | |
| 08/18/2022 | Commonwealth 's Notice of Discovery II (rec'd 08/12/2022) | 19 | Image |
| 08/29/2022 | Commonwealth 's Notice of Discovery III (rec'd 08/17/2022) | 20 | Image Image |
| 08/31/2022 | Attorney appearance<br>On this date Ian F Henchy, Esq. added for Defendant Karen Read | | |
| 09/08/2022 | General correspondence regarding Request from  Bruce Conover, Court TV, to Cover the Hearing | 21 | Image |
| 09/19/2022 | Defendant 's Motion to Compel Discovery with Certificate of Service (rec'd 9/16/2022)<br>- - ALLOWED as to #'s 1, 2, 3, 4, 5, 12 as amended, 13, & 15 , - #11 , Counsel may view original exhibits through arrangements with ADA  -  DENIED without prejudice as to #'s 5, 6, 7, 8, 9, 10 & 14 (Cannone, RAJ) dated 10/5/22<br>(copies sent -cm) | 22 | Image Image |
| 09/19/2022 | Defendant 's Motion for Discovery Regarding the Circumstances of Massachusetts State Trooper Michael D. Procter's Assignment to the Investigation of this Matter (rec'd 9/16/2022)<br>- Commonwealth will provide written protocols/policies. If defendant is not satisfied that Commonwealth has responded pursuant to Mass. R. Crim. P. 14, defendant is to file a motion and supporting affidavit for the discovery - not in the form of interrogatories. (Cannone, RAJ.) dated 10/5/2022<br>copies sent -cm | 23 | Image |
| 09/19/2022 | Affidavit of Counsel in Support with Certificate of Service (rec'd 9/16/2022) | 24 | Image |
| 09/19/2022 | Defendant 's Motion for Preservation of Samples for Independent Forensic Testing with Affidavit in Support and with Certificate of Service (rec'd 9/16/2022)<br>- ALLOWED without opposition. (Krupp, J.) dated 09/22/2022 | 25 | Image Image |
| 09/19/2022 | Defendant 's Motion to Renew Motions Previously Filed in Stoughton District Court with Affidavit and with Certificate of Service (rec'd 9/16/2022)  - DENIED (Cannone, RAJ) dated 10/3/22  - copies sent -cm | 26 | Image Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 09/19/2022 | Defendant 's Motion for Order Pursuant to Mass. R. Crim. P. 17 directed to Brian Albert, Julie Albert, Colin Albert Brian Higgins and the Commonwealth and Memorandum in Support Thereof with Affidavit with Certificate of Service (rec'd 9/16/2022)<br>(with Exhibits not Scanned) -  DENIED. The defendant has not met her burden under Mass. R. Crim. P. 17 Lampron. The Court is not satisfied that the requested phones contain information that is evidentiary and relevant nor is the Court satisfied that the application is made in good faith and is not intended as a general fishing expedition. (Cannone, RAJ) dated 10/5/22 - copies sent-cm | 27 | ✪ Image |
| 09/19/2022 | Defendant 's Amended Motion to Compel Modification of Google Preservation Requests and for Production of Geofence Data and Memorandum in Support Thereof with Affidavit and with Certificate of Service (rec'd 9/16/2022) - Exhibits not scanned<br>- After hearing, no action taken at this time. (Cannone, RAJ) dated 10/5/22 | 28 | ✪ Image |
| 09/21/2022 | Defendant 's Motion for Admission Pro Hac Vice of Alan Jackson and Elizabeth Little with Certificate of Service and Exhibits  - ALLOWED (Krupp, J.) dated 09/22/2022 | 29 | ✪ Image |
| 09/22/2022 | Event Result:: Pre-Trial Conference scheduled on:<br>    09/22/2022 02:00 PM<br>Has been: Held as Scheduled<br>Hon. Peter B Krupp, Presiding | | |
| 09/27/2022 | Attorney appearance<br>On this date Alan Jackson added as Pro Hac Vice (SJC 3:15) for Defendant Karen Read<br>(SEE Page #29) | | |
| 09/27/2022 | Attorney appearance<br>On this date Elizabeth S Little added as Pro Hac Vice (SJC 3:15) for Defendant Karen Read<br>(SEE Page #29) | | |
| 09/27/2022 | ORDER: RE: Preservation of Cellular Telephones (Krupp, J.) dated 9/23/2022<br>SEE Order | 30 | ✪ Image |
| 10/03/2022 | Event Result:: Motion Hearing scheduled on:<br>    10/03/2022 02:00 PM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 10/14/2022 | Commonwealth 's Notice of Discovery IV | 31 | ✪ Image |
| 11/01/2022 | Commonwealth 's Notice of Discovery V | 32 | ✪ Image |
| 11/18/2022 | Norfolk County District Attorney's Memorandum in opposition to Defendant's Motion Pursuant to Rule 17 of Criminal Procedure | 33 | ✪ Image |
| 11/18/2022 | Defendant 's Proposed Memorandum of Decision and Order on Defendant's Rule 17 Motion with Certificate of Service | 34 | |
| 11/21/2022 | Event Result:: Hearing RE: Discovery Motion(s) scheduled on:<br>    11/21/2022 02:00 PM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 11/21/2022 | Commonwealth 's Notice of Discovery VI | 35 | ✪ Image |
| 12/19/2022 | Event Result:: Conference to Review Status scheduled on:<br>    02/08/2023 02:00 PM<br>Has been: Rescheduled      For the following reason: Request of Defendant<br>Hon. Beverly J Cannone, Presiding | | |
| 12/19/2022 | Defendant 's Assented to Motion to Advance and Continue with Affidavit and Certificate of Service -*<br>ALLOWED in so much as the Status Conference is Continued to 02/28/23 at 2PM (Kirpalani, J.) dated 12/19/2022 | 34.1 | ✪ Image |
| 01/23/2023 | Commonwealth 's Notice of Discovery VII | 36 | ✪ Image |
| 01/23/2023 | Commonwealth 's Notice of Discovery VIII | 37 | ✪ Image |
| 02/02/2023 | Defendant 's Motion for production of original photographs complete with Metadata - filed 2/2/23 | 38 | ✪ Image |
| 02/02/2023 | Affidavit of David R. Yannetti in support of motion for production of original photographs complete with Metadata - filed 2/2/2023 | 39 | ✪ Image |
| 02/02/2023 | Affidavit of Richard Green in support of motion for production of original photographs complete with Metadata - filed 2/2/23 | 40 | ✪ Image |
| 02/02/2023 | Defendant 's Motion for production of search warrant and missing ring video recordings from One Meadow Avenue in Canton, MA - filed 2/2/23 | 41 | ✪ Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 02/02/2023 | Affidavit of David R. Yannetti in support of motion for production of search warrant and missing ring video recordings from One Meadows Avenue Canton, MA - filed 2/2/23 | 42 | Image |
| 02/02/2023 | Defendant 's Motion for production of Greykey supplemental filed - filed 2/2/23 | 43 | Image |
| 02/02/2023 | Affidavit of Richard Green in support of motion for production of Greykey supplemental files - filed 2/2/23 | 44 | Image |
| 02/02/2023 | Defendant 's Certificate of service - filed 2/2/23 | 45 | Image |
| 02/02/2023 | Defendant 's Motion for inspection, access and independent forensic testing of John O'Keefe's clothing - filed 2/2/23 | 46 | Image |
| 02/02/2023 | Affidavit of David R. Yannetti in support of motion for inspection, access and independent forensic testing of John O'Keefe's clothing filed 2/2/23 | 47 | Image |
| 02/02/2023 | Defendant 's Certificate of service - filed 2/2/23 | 48 | Image |
| 02/02/2023 | Defendant 's Motion for inspection, access and independent testing of pieces of tail light seized by the Commonwealth - filed 2/2/23 | 49 | Image |
| 02/02/2023 | Affidavit of of David R. Yannetti in support of motion for inspection, access and independent testing of pieces or tail light seized by the Commonwealth filed 2/2/23 | 50 | Image |
| 02/02/2023 | Defendant 's Motion to compel production on previously ordered discovery filed 2/2/23  - No Action Taken (Cannone, RAJ) dated 02/8/2023 | 51 | Image |
| 02/02/2023 | Affidavit of David R. Yannetti in support of motion to compel production of previously ordered discovery filed 2/2/23 | 52 | Image |
| 02/02/2023 | Defendant 's Motion for order pursuant to Mass.R.Crim.P.17 directed to Canton Animal Control and the Canton Clerk's Office - filed 2/2/23  IMPOUNDED | 53 | |
| 02/02/2023 | Affidavit of Elizabeth S. Little in support of motion for order pursuant to Mass.R.Crim.P.17 directed to Canton Animal Control and the Canton Town Clerk - IMPOUNDED filed 2/2/23 | 54 | |
| 02/02/2023 | Affidavit of Forensic Pathologist Frank Sheridan, M.D.in support of motion for order pursuant to Mass.R.Crim.P.17directed to Canton Animal Control and the Canton Clerk's Office - filed 2/2/23 IMPOUNDED | 55 | |
| 02/02/2023 | Defendant 's Motion to modify conditions of release - filed 2/2/23 IMPOUNDED | 56 | |
| 02/02/2023 | Affidavit of counsel in support of Defendant's motion to modify pretrial conditions of release and certificate of service  - filed 2/2/23 IMPOUNDED | 57 | |
| 02/08/2023 | Event Result::  Conference to Review Status scheduled on: 02/08/2023 02:00 PM Has been: Held as Scheduled Hon. Beverly J Cannone, Presiding | | |
| 02/08/2023 | Bail warnings read Judge: Cannone, Hon. Beverly J | | |
| 02/08/2023 | Bail set at $800,000.00 Surety, $80,000.00 Cash.  $20,000 cash of posted bail may be returned to Surety | | |
| 02/09/2023 | Commonwealth 's Notice of Discovery IX | 58 | Image |
| 02/09/2023 | Financial Note:  RETURN OR ASSIGNMENT OF BAIL re: surety William J. Read in the amount of $20,000.00 dated 2/9/2023 (Check #8888) | | |
| 02/22/2023 | Commonwealth 's Notice of Discovery X | 59 | Image |
| 03/21/2023 | Commonwealth 's Notice of Discovery XI | 60 | Image |
| 03/24/2023 | Commonwealth 's Notice of Discovery XII | 61 | Image |
| 03/27/2023 | Commonwealth 's Proposed Procedure RE: Communications Stored on Cell Phone for Examination of IPhone Pursuant to a Search Warrant Issued on February 2, 2022 ALLOWED WITHOUT OBJECTION (CANNONE,J) ATT.J.MCDERMOTT,AC (5/3/23) | 62 | Image |
| 04/12/2023 | Commonwealth 's Notice of Discovery XIII | 63 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 04/12/2023 | Defendant 's Motion For Order Pursuant to Mass. R. Crim. P. 17 Directed to Brian Albert, Verizon and AT&T | 64 | Image |
| 04/12/2023 | Affidavit of Alan J. Jackson, Esq. in support of Motion For Order Pursuant to Mass. R. Crim. P. 17 Directed to Brian Albert, Verizon and AT&T | 65 | Image |
| 04/12/2023 | Affidavit of Richard Green in support of Defendant's Motion For Order Pursuant to Mass. R. Crim. P. 17 Directed to Brian Albert, Verizon and AT&T | 66 | Image |
| 04/26/2023 | Defendant 's Renewed Motion to Compel Discovery  - See Rulings on Paper #131 (Cannone, RAJ) dated 09/15/2023 | 67 | Image |
| 04/26/2023 | Affidavit of David R. Yannetti in Support of Defendant's Renewed Motion to Compel Discovery with Certificate of Service | 68 | Image |
| 04/26/2023 | List of exhibits  #1 - #6  in Support of Defendant's Renewed Motion to Compel Discovery | 69 | Image |
| 05/02/2023 | Norfolk County District Attorney's Memorandum in opposition to Defendant's Motion Pursuant to Rule 17 of Criminal Procedure - Directed to Brian Albert, Verizon, and AT&T | 70 | Image |
| 05/02/2023 | Norfolk County District Attorney's Memorandum in opposition to Defendant's Motion Pursuant to Rule 17 of Criminal Procedure - Production of Records from Canton Animal Control and the Canton Clerk's Office | 71 | Image |
| 05/03/2023 | Attorney appearance On this date Gregory D Henning, Esq. added as Private Counsel for Other interested party Brian Albert | 72 | Image |
| 05/03/2023 | Opposition to Defendant's Rule 17 Motion for Cellular Devices and Records filed by Brian Albert  Applies To: Henning, Esq., Gregory D (Attorney) on behalf of Albert, Brian (Other interested party) | 73 | Image |
| 05/03/2023 | Affidavit of Support of Brian Albert's Opposition to Rule 17 Motion  Applies To: Henning, Esq., Gregory D (Attorney) on behalf of Albert, Brian (Other interested party) | 74 | Image |
| 05/03/2023 | Gregory D Henning, Esq.'s Motion for Copies of Grand Jury Minutes of Brian and Nicole Albert  Applies To: Henning, Esq., Gregory D (Attorney) on behalf of Albert, Brian (Other interested party) | 75 | Image |
| 05/03/2023 | Affidavit of Support of Motion for Copies of Grand Jury Minutes of Brian and Nicole Albert  Applies To: Henning, Esq., Gregory D (Attorney) on behalf of Albert, Brian (Other interested party) | 76 | Image |
| 05/03/2023 | Event Result::  Motion Hearing scheduled on: 05/03/2023 02:00 PM Has been: Held as Scheduled Hon. Beverly J Cannone, Presiding | | |
| 05/04/2023 | Endorsement on Motion for copies of Grand Jury Mintues of Brian and Nicole Albert, (#75.0):  ALLOWED dated 5/3/23. Copies mailed  Judge: Cannone, Hon. Beverly J | | Image |
| 05/04/2023 | Commonwealth 's Notice of Discovery XV - filed 5/3/23 | 77 | Image |
| 05/11/2023 | Commonwealth 's Notice of Discovery XVI - filed 5/10/23 | 78 | Image |
| 05/19/2023 | MEMORANDUM & ORDER:  on Defendant's Motion for an Order Pursuant to Mass. R. Crim. P. 17 Directed to Canton Animal Control and the Canton Clerk's Office. ALLOWED. (Cannone, RAJ) dated 05/19/2023  Judge: Cannone, Hon. Beverly J  (copies sent to all attorneys) | 79 | Image |
| 05/19/2023 | ORDER: for Production of Records from Canton Animal Control and the Canton Clerk's Office (dated 05/19/2023) | 80 | Image |
| 05/19/2023 | The following form was generated: A Clerk's Notice was generated and sent to: Defendant, Attorney:  David R Yannetti, Esq. Yannetti Criminal Defense Law Firm 44 School St Suite 1000A, Boston, MA 02108 Defendant, Attorney:  Alan Jackson 888 W. 6th Street 4th Floor, Los Angeles, CA 90017 Defendant, Attorney:  Ian F Henchy, Esq. Yannetti Law Firm 44 School St 1000A, Boston, MA 02108 Prosecutor, Attorney:  Adam C Lally, Esq. Norfolk County District Attorney's Office 45 Shawmut Rd, | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| | Canton, MA 02021<br>Other interested party, Attorney: Gregory D Henning, Esq. Henning Strategies 141 Tremont St Suite 300, Boston, MA 02111 | | |
| 05/22/2023 | Gregory D Henning, Esq.'s Motion to Quash the Subpoena of Defendant Karen Read<br><br>Applies To: Albert, Brian (Other interested party) | 81 | Image |
| 05/22/2023 | Affidavit of Gregory Henning in Opposition to Rule 17 Motion with Exhibit A<br><br>Applies To: Albert, Brian (Other interested party) | 82 | Image |
| 05/22/2023 | Opposition to to Defendant's Request for Evidentiary Hearing on Mass. R. Crim. P. 17 with Exhibit A filed by Norfolk County District Attorney | 83 | Image |
| 05/22/2023 | Attorney appearance<br>On this date Kevin Joseph Reddington, Esq. added as Private Counsel for Other interested party Jennifer McCabe | | |
| 05/22/2023 | Kevin Joseph Reddington, Esq.'s Motion to Quash Subpoena | 84 | Image |
| 05/22/2023 | Jennifer McCabe's Memorandum in support of<br>Motion to Quash Subpoena Served on Jennifer McCabe, Government Witness | 85 | Image |
| 05/23/2023 | Other Records All Records Relating to Any Animals Registered to Brian Albert received from Canton Town Hall - IMPOUNDED | 86 | |
| 05/23/2023 | Commonwealth 's Notice of Discovery XIV - 5/3/23 | 76.1 | Image |
| 05/24/2023 | Opposition to to Jennifer McCabe's Motion to Quash Subpoena filed by Karen Readwith Certificate of Service | 87 | Image |
| 05/24/2023 | Opposition to to Brian Albert's Motion to Quash Subpoena filed by Karen Read | 88 | Image |
| 05/24/2023 | Opposition to Commonwealth's Opposition to Defendant's Request for Evidentiary Hearing on Mass. R. Crim. P. 17 filed by Karen Read | 89 | Image |
| 05/24/2023 | Event Result:: Motion Hearing scheduled on:<br>    05/24/2023 10:00 AM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 05/24/2023 | Event Result:: Motion Hearing scheduled on:<br>    05/25/2023 09:30 AM<br>Has been: Canceled    For the following reason: By Court prior to date<br>Hon. Beverly J Cannone, Presiding | | |
| 05/25/2023 | Other Records received from Canton Animal Control - IMPOUNDED | 90 | |
| 06/07/2023 | Defendant 's Motion for Permission to Copy and Inspect Impounded Records Pursuant to Dwyer Protocol - ALLOWED (Cannone, RAJ) dated 06/08/2023 | 91 | Image |
| 06/07/2023 | Affidavit of Counsel in support of motion for permission to copy and inspect impounded Records with Certificate of Service | 92 | Image |
| 06/09/2023 | Commonwealth 's Motion to Prohibit Prejudicial Extrajudicial Statements of Counsel in Compliance with Massachusetts Rules of Professional Conduct 3.6(a) with Exhibits | 93 | Image |
| 06/09/2023 | Commonwealth 's Motion to Inspect and Copy Impounded Records from the Town of Canton | 94 | Image |
| 06/13/2023 | Commonwealth 's Notice<br>of Discovery XVII (rec'd 5/25/23) | 95 | Image |
| 06/13/2023 | Commonwealth 's Notice of Discovery XVIII | 96 | Image |
| 06/20/2023 | MEMORANDUM & ORDER:<br><br>on Defendant's motion for order pursuant to MASS.R.CRIM.P.17 directed to Brian Albert, Verizon, and AT&T. (Cannone, RAJ) DENIED see memorandum and order. ns<br><br>Judge: Cannone, Hon. Beverly J | 97 | Image |
| 06/21/2023 | Opposition to Motion to Inspect and Copy Impounded Records from the Town of Canton with Certificate of Service (rec'd 06/20/2023) filed by Karen ReadALLOWED, only as far as allowing for inspection and copying of the records. The remainder of the Motion is reserved for hearing on 7/25. (Cannone,J) 7/18/23 | 98 | Image |
| 06/21/2023 | Affidavit of Counsel in Support of Defendant's Opposition to Motion to Inspect and Copy Impounded Records from the Town of Canton (rec'd 6/20/2023) | 99 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 07/17/2023 | Defendant 's Motion for Recusal and Disqualification of Justice Beverly Cannone with Certificate of Service | 100 | Image |
| 07/17/2023 | Affidavit of Aidan Kearney in Support of Defendant's Motion for Recusal and Disqualification of Justice Beverly Cannone | 101 | Image |
| 07/17/2023 | Affidavit of Alan J. Jackson, Esq. in Support of Defendant's Motion for Recusal and Disqualification of Justice Beverly Cannone | 102 | |
| 07/18/2023 | Opposition to Commonwealth's "Motion to Prohibit Prejudicial Extrajudicial Statements of Counsel in Compliance with Massachusetts Rules of Professional Conduct 3.6(a) with Certificate of Service filed by Karen Read | 103 | |
| 07/18/2023 | Affidavit of Counsel in Support of Opposition to Commonwealth's "Motion to Prohibit Prejudicial Extrajudicial Statements of Counsel | 104 | |
| 07/19/2023 | Commonwealth 's Notice of Discovery XIX | 105 | Image |
| 07/20/2023 | Defendant's EX PARTE Confidential Privilege Log Regarding Data Obtained From Ms. Read's Cell Phone for the Court's In Camera Review - The Court does not need to review the content of the messages referenced by counsel for the defendant. Axiom ID #104589, #122346. This Court orders that the additional referenced text messages, which contain Attorney-Client privileged information, be redacted by the appointed forensic examiner prior to the information being produced to the Commonwealth. Further, this Court orders the Digital Evidence Laboratory to provide the Commonwealth with the redacted extraction report of the defendant's cellphone forthwith (Cannone, RAJ) dated 07/25/2023 | 106 | |
| 07/20/2023 | Affidavit of Counsel in Support of Defendant's I Privilege Log Regarding Data Obtained From Ms. Read's Cell Phone for the Court's In Camera Review with Exhibit A | 107 | |
| 07/24/2023 | Commonwealth 's Motion to Establish Timely Protocols for Evidentiary Testing | 108 | Image |
| 07/24/2023 | Commonwealth 's Motion to Compel Defendant to Comply with the Agreed Upon Privilege Filtration Procedures Relative to the Defendant's Cellphone and to Provide the Commonwealth with the Redacted Extraction Report | 109 | Image Image |
| 07/25/2023 | Event Result:: Pre-Trial Hearing scheduled on: 07/25/2023 02:00 PM Has been: Held as Scheduled Comments: FTR Hon. Beverly J Cannone, Presiding | | |
| 07/25/2023 | MEMORANDUM & ORDER: on Defendant's Motion for Recusal and Disqualification of Justice Beverly Cannone - - ORDER : Motion for recusal and disqualification is DENIED. (Cannone, RAJ) dated 7/25/2023 - SEE Memorandum of this Date Judge: Cannone, Hon. Beverly J | 110 | Image |
| 07/31/2023 | MEMORANDUM & ORDER: on Commonwealth's Motion to Prohibit Prejudicial Extrajudicial Statements of Counsel in Compliance with Massachusetts Rules of Professional Conduct 3.6(a) - It is ORDERED that the Commonwealth's Motion is DENIED without prejudice. (Cannone, RAJ) dated 7/31/2023 - SEE Memorandum (copies sent to all counsel -cm) Judge: Cannone, Hon. Beverly J | 111 | Image |
| 08/11/2023 | Commonwealth 's Notice of Discovery XX | 112 | Image |
| 08/14/2023 | Defendant 's Renewed Motion to Compel Discovery and Access to Evidence with Certificate of Service and Exhibits A-C | 113 | Image Image |
| 08/14/2023 | Affidavit of David Yannetti in Support of Defendant's Renewed Motion to Compel Discovery | 114 | Image |
| 08/17/2023 | Event Result:: Conference to Review Status scheduled on: 09/15/2023 02:00 PM Has been: Rescheduled    For the following reason: By Court prior to date Hon. Beverly J Cannone, Presiding | | |
| 08/22/2023 | Commonwealth 's Notice of Discovery XXI. | 115 | Image |
| 09/01/2023 | Defendant 's Motion for Order Pursuant to Mass.R.Crim. P.17 directed to the Canton Department of Public Works and the Canton Town Clerk and Certificate of Service - ** ALLOWED - no objection. (Cannone, RAJ) dated 09/15/2023 filed 9/1/23 | 116 | Image Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 09/01/2023 | Affidavit of Private Investigator Paul Mackowski in support of Motion for Order Pursuant to Mass.R.Crim.P.17 directed to the Canton Department of Public Works and the Canton Town Clerk filed 9/1/23 | 117 | Image |
| 09/01/2023 | Affidavit of Alan J. Jackson in support of Motion for Order pursuant to Mass.R.Crim. P.17 directed to the Canton Department of Public Works and the Canton Town Clerk filed 9/1/23 | 118 | Image |
| 09/01/2023 | Commonwealth 's Motion for Records: ABC News and Affidavit in support of Commonwealth's Motion for Records with Exhibits  - * DENIED without prejudice. (Cannone, RAJ.) filed 9/1/23 | 119 | Image |
| 09/01/2023 | Commonwealth 's Response to "Defendant's Renewed Motion to Compel Discovery and Access to Evidence" filed 9/1/23 | 120 | Image |
| 09/01/2023 | Commonwealth 's Motion for Records - ALARM.COM and Affidavit in support of Commonwealth's Motion for Records  -  ALLOWED with out objection. (Cannone, RAJ) dated 09/15/2023 filed 9/1/23 | 121 | Image |
| 09/01/2023 | Commonwealth 's Motion for Records NBCU News Group Legal and Affidavit in support of Commonwealth's Motion for Records with exhibits filed 9/1/23  - *DENIED without Prejudice, SEE Decision and Order. (Cannone, RAJ) dated 10/11/2023 | 122 | Image |
| 09/07/2023 | Defendant 's Motion to modify conditions of release - filed 9/7/23 | 123 | Image |
| 09/07/2023 | Affidavit of counsel in support of Defendant's motion to modify conditions of release and certificate of service filed 9/7/23 | 124 | Image Image |
| 09/07/2023 | Defendant 's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Google, LLC. with Certificate of Service **** ALLOWED (Cannone, RAJ) dated 09/15/2023 | 125 | Image |
| 09/07/2023 | Affidavit of Alan J. Jackson in Support of Motion | 126 | Image |
| 09/08/2023 | Commonwealth 's Notice of Discovery XXII | 127 | Image Image |
| 09/08/2023 | Commonwealth 's Notice of Discovery XXIII | 128 | Image Image |
| 09/08/2023 | Commonwealth 's Notice of Discovery XXIV | 129 | Image Image |
| 09/08/2023 | Defendant 's Supplemental Affidavit of Alan J. Jackson in Support of Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to the Canton Department of Public Works ant the Canton Town Clerk with Certificate of Service and Exhibit A | 130 | Image Image |
| 09/13/2023 | Defendant 's Reply to Commonwealth's Response to "Defendant's Renewed Motion to Compel Discovery and Access to Evidence" with Exhibit A & B - -*** SEE All Endorsements on Scanned Motion (Cannone, RAJ) dated 9/15/2023 | 131 | Image |
| 09/14/2023 | Commonwealth 's Proposed Order for "Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Google, LLC" | 132 | |
| 09/14/2023 | Commonwealth 's Motion to Impound the Commonwealth's Attachments in Support of "Commonwealth's Motion for Order for Exhaustive DNA Testing - Item #: 3-6.1" -  ***** Attachments Exhibits A & B to be Impounded until completion of the case. (Cannone, RAJ) dated 09/15/2023 | 133 | Image |
| 09/14/2023 | Commonwealth 's Motion for Order for Exhaustive DNA Testing - Item #: 3-6.1 | 134 | Image |
| 09/15/2023 | Event Result:: Motion Hearing scheduled on:      09/15/2023 09:00 AM Has been: Held as Scheduled Hon. Daniel J. O'Shea, Presiding | | |
| 09/19/2023 | ORDER for Other Records for William Read from Alarm.com (SEE Order dated 09/15/23) | 135 | |
| 09/20/2023 | Scheduled: Event: Jury Trial Date: 03/12/2024  Time: 09:00 AM Result: Rescheduled | | |
| 09/21/2023 | General correspondence regarding Letter from Morgan Lewis, Attorney Jonathan M. Albano, representing American Broadcasting Companies, Inc. and NBCUniversal Media, LLC | 136 | |
| 09/21/2023 | Affidavit of Forensic Expert Samuel "Skip" Palenik in Support of Defendant' Request for Non-Destructive Examination of Evidence Item 3-6 (Suspected "Hair")  - Declaration of Samuel Palenik | 137 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 09/22/2023 | Notice of docket entry received from Supreme Judicial Court<br>RE: No. SJ-2023-0343<br><br>You are hereby notified that on September 15, 2023, the following was entered on the docket of the above-referenced case:<br><br>MOTION for Pro Hac Vice Admission of Alan Jackson and Elizabeth Little in the Supreme Judicial Court with Certificate of Service and attachments filed by Attorney. David Yannetti. (9/22/23: "Per the within, MOTION for Pro Hac Vice Admission is ALLOWED without hearing." (Kafker, J.)) | 138 | Image |
| 09/22/2023 | Notice of docket entry received from Supreme Judicial Court<br>RE: No. SJ-2023-0343<br><br>You are hereby notified that on September 18, 2023, the following was entered on the docket of the above-referenced case:<br><br>Brian Albert's MOTION to Intervene with Certificate of Service, filed by Attorney Gregory Henning. (9/22/23: "Per the within, MOTION to Intervene is ALLOWED without hearing." (Kafker, J.)) | 139 | Image |
| 09/22/2023 | General correspondence regarding Letter from David Yannetti withdrawing the motion for bail-reduction - SEE Correspondence | 140 | Image |
| 09/25/2023 | Notice of docket entry received from Supreme Judicial Court<br>RE: No. SJ-2023-0343<br><br>You are hereby notified that on September 21, 2023, the following was entered on the docket of the above-referenced case:<br><br>Petitioner/Defendant Karen Read's MOTION For Leave to File Reply Brief and to Enlarge Time For Filing with Affidavit of Counsel in Support and Certificate of Service, filed by Attorney Ian F. Henchy. (9/25/2023: "Per the within, MOTION is ALLOWED without hearing." (Kafker, J.)) | 141 | Image |
| 09/27/2023 | Commonwealth 's Motion to Compel Defendant to Preserve all Evidence Including Video Footage from 345 Country Hill Drive, Dighton, MA and Commonwealth's Request for Court Ordered Production (rec'd 9/15/2023)<br>** ALLOWED - (Cannone, RAJ) dated 09/15/2023 | 142 | Image |
| 09/27/2023 | ORDER: for Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Google, LLC (dated 09/27/2023) | 143 | Image |
| 09/27/2023 | Defendant 's EX PARTE Affidavit | 144 | |
| 09/27/2023 | ORDER: for Production of Records from Canton Department of Public Works (Cannone, RAJ) | 145 | Image |
| 09/28/2023 | ORDER: Modified Scheduling Order (Cannone, RAJ) dated 9/27/23 | 146 | Image |
| 09/29/2023 | Defendant 's Post-Hearing Motion to Amend Proposed Order Regarding Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Google, LLC. | 147 | Image |
| 09/29/2023 | Affidavit of Counsel in Support of Post-Hearing Motion to Amend Proposed Order Regarding Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Google, LLC. | 148 | Image |
| 09/29/2023 | ORDER for Business Records for GPS data associated with all snowplows deployed by the Canton Department of Public Works (DPW) from Canton Town Clerk (Cannone, RAJ) dated 9/27/2023 - SEE ORDER | 149 | Image |
| 10/02/2023 | Commonwealth 's Notice of<br>Discovery XXV - filed 10/2/23 | 150 | Image |
| 10/10/2023 | Business Records received from Town of Canton Department of Public Works ( CD ) --Rule 17 (a)(2) - Non Privileged Records: Not for Public Inspection | 151 | |
| 10/12/2023 | MEMORANDUM & ORDER:<br><br>on Commonwealth's Motion for Records (Paper #119 & #126) - ORDER: The Commonwealth's Motion for Records is DENIED without PREJUDICE. The Commonwealth must comply with the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings. (Cannone, RAJ) dated 10/11/2023<br><br>Judge: Cannone, Hon. Beverly J | 152 | Image |
| 10/26/2023 | Commonwealth 's Notice of Discovery XXVI | 153 | Image |
| 10/30/2023 | Commonwealth 's Notice of Discovery XXVII | 154 | Image |
| 10/30/2023 | Commonwealth 's Motion to Impound Commonwealth's Exhibit A in Support of " Commonwealth's Motion for Protective Order Pertaining to DNA Profiles of Investigating Law Enforcement Officers" | 155 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 10/30/2023 | Commonwealth 's Motion for Protective Order Pertaining to DNA Profiles of Investigating Law Enforcement Officers with Exhibits A & B | 156 | |
| 11/01/2023 | Affidavit of Eric Shiff , (SUPPLEMENTAL) | 157 | Image |
| 11/07/2023 | Commonwealth 's Notice of Discovery XXVII | 158 | Image |
| 11/07/2023 | Commonwealth 's Notice of Discovery XXVIII | 159 | Image |
| 11/09/2023 | Other 's Correspondence  received from Google - RE: Nest Labs Inc. - Google can NOT comply with the Order - SEE Correspondence (rec'd 10/11/23) | 160 | Image |
| 11/10/2023 | ORDER: In order for Nest Labs, Inc. c/o Google LLC to comply with the order to produce records, the order must be clarified. At a minimum, Google needs the Nest Cam serial number, or the email address associated with the Nest Cam device to identify the Nest Cam account. Parties are ordered to produce information to the Court within 7 days of this order. (Cannone, RAJ) dated 11/10/2023 - (SEE Order) (copies sent to all parties -cm) | 161 | Image Image |
| 11/14/2023 | Commonwealth 's Notice of Discovery XXVIV | 162 | Image |
| 11/15/2023 | Notice of docket entry received from Supreme Judicial Court RE:  No. SJ-2023-0343 "You are hereby notified that on November 15, 2023, the following was entered on the docket of the above-referenced case: JUDGMENT: as on file. (Kafker, J.)" | 163 | Image Image |
| 11/16/2023 | ORDER: and Decision on Commonwealth's Motion for Exhaustive DNA Testing-Item #: 3-6.1 and Defendant 's Request for Non Destructive Examination of Item 3-6 -  SEE ORDER - (Cannone, RAJ) dated 11/14/2023 (copies sent to all parties -cm) | 164 | Image Image |
| 11/16/2023 | Pre-trial conference report filed | 165 | Image |
| 11/16/2023 | Defendant 's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Jennifer McCabe, Trooper Michael Proctor, and Elizabeth Proctor with Certificate of Service | 166 | Image Image |
| 11/16/2023 | Affidavit of Alan J. Jackson in support of Motion for Order Pursuant to Mass. R. Crim. P. 17 with Exhibits | 167 | Image |
| 11/16/2023 | ORDER: to Verizon for cell phone records to be produced no later than December 15, 2023 - SEE ORDER (Cannone, RAJ) | 168 | |
| 11/17/2023 | Gregory D Henning, Esq.'s Motion to Seal Third Party Response to Court Order of November 10, 2023 -  *** ALLOWED (Cannone, RAJ) dated 11/16/2023 | 169 | Image |
| 11/17/2023 | Gregory D Henning, Esq.'s Third-Party Response to the Court Order of November 10, 2023 - ** SEALED 11/17/2023 - (Cannone, RAJ) | 170 | |
| 11/17/2023 | Affidavit of Support of Third-Party Motion to Seal Response to November 10, 2023 Court Order (Sealed Pending Review) Applies To: Henning, Esq., Gregory D (Attorney) on behalf of Albert, Brian (Other interested party) | 171 | |
| 11/17/2023 | Affidavit of Support of Third-Party Motion to Seal Response to November 10, 2023 Court Order (Sealed Pending Review) Applies To: Albert, Brian (Other interested party) | 172 | |
| 11/30/2023 | Commonwealth 's Motion for Order Permitting Destructive Testing of Defendant's Lexus' Telematics Systems with Exhibit A | 173 | Image |
| 12/04/2023 | Commonwealth 's Motion to Compel Defendant to Timely Provide and Opposition and Proposed Order to the "Commonwealth's Motion for Pretective Order Pertaining to DNA profiles of Investigating Law Enforcement Officers" | 174 | |
| 12/04/2023 | Commonwealth 's Notice of Discovery Pursuant to Mass. R. Crim. P. 14(A)(!)(E)(i) | 175 | |
| 12/15/2023 | Attorney appearance On this date William Andrew Kettlewell, Esq. added as Private Counsel for Other interested party Elizabeth Proctor | 175.1 | Image |
| 12/26/2023 | Kevin Joseph Reddington, Esq.'s Motion to continue January 5, 2024 hearing dated 12/26/23 | 176 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 12/28/2023 | Witness 's Motion to join in third party's opposition to Rule 17 motion to subpoena records of third party, Proctor<br>filed 12/28/23 - * ALLOWED (Cannone, RAJ) dated 12/28/23 | 177 | Image |
| 12/28/2023 | Endorsement on Motion to continue, (#176.0): DENIED<br>ZOOM link to be sent to Counsel. (Cannone, RAJ) ns (ZOOM info emailed to Atty Reddington) | | Image |
| 12/28/2023 | Opposition to to Defendant's Rule 17 motion to subpoena records of third party, Elizabeth Proctor. filed by Elizabeth Proctor | 178 | Image |
| 12/28/2023 | Affidavit of of Counsel in support of Opposition to Defendant's Rule 17 motion to subpoena records of third party, Elizabeth Proctor | 179 | Image |
| 12/28/2023 | Endorsement on Motion to join in third party's opposition to Rule 17 motion to subpoena records of third party, Proctor, (#177.0): ALLOWED<br>(Cannone,RAJ) ns | | Image |
| 01/02/2024 | Defendant 's<br>Karen Read's opposition to motion for protective order pertaining to "Commonwealth's notice of discovery pursuant to Mass.R.Crim.P.14(A)(1)(E)(i)" with associated six attachments and certificate of service - filed 1/2/24 | 180 | Image |
| 01/02/2024 | Defendant 's<br>Karen Read's opposition to motion for protective order pertaining to DNA profiles of investigating law enforcement officers and certificate of service - filed 1/2/2024 | 181 | Image |
| 01/04/2024 | Commonwealth 's Motion for Records | 182 | Image |
| 01/04/2024 | Affidavit of in Support of Commonwealth's Motion for Records with Exhibit | 183 | Image |
| 01/04/2024 | Commonwealth 's Motion for Protective Order Pertaining to "Commonwealth's Notice of Discovery Pursuant to Mass. R. Crim. P. 14 (A)(1)(E)(i)" with Associated Six Attachments | 184 | Image |
| 01/04/2024 | Commonwealth 's Response to " Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Jennifer McCabe, Trooper Michael Proctor, and Elizabeth Proctor" | 185 | Image |
| 01/04/2024 | Commonwealth 's Motion to Impound "Commonwealth's Supplemental Notice of Discovery Pursuant to Mass. R. Crim. P. 14(A)(1)(E)(i)"<br>with Associated Two Attachments | 186 | Image |
| 01/04/2024 | Commonwealth 's Commonwealth's Supplemental Notice of Discovery Pursuant to Mass. R. Crim. P. 14(A)(1)(E)(i) | 187 | |
| 01/05/2024 | Commonwealth 's Notice of Discovery XXX | 188 | |
| 01/05/2024 | ORDER: for " Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Google, LLC" (Cannone, RAJ) dated 01/05/24 - (REDACTED)<br>(original is IMPOUNDED)<br>This Order has been satisfied by Google's correspondence dated 2/28/2024. | 189 | Image |
| 01/05/2024 | Attorney appearance<br>On this date Gretchen Lundgren, Esq. added as Private Counsel for Other interested party Yuri Bukhenik<br><br>Applies To: Bukhenik, Yuri (Other interested party); Lundgren, Esq., Gretchen (Attorney) on behalf of Bukhenik, Yuri (Other interested party)<br><br>Applies To: Bukhenik, Yuri (Other interested party); Proctor, Michael (Other interested party); Lundgren, Esq., Gretchen (Attorney) on behalf of Bukhenik, Yuri, Proctor, Michael (Other interested party) | 189.1 | |
| 01/05/2024 | Attorney appearance<br>On this date Gretchen Lundgren, Esq. added as Private Counsel for Other interested party Michael Proctor | | |
| 01/05/2024 | Event Result:: Motion Hearing scheduled on:<br>01/05/2024 09:00 AM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 01/05/2024 | Defendant 's Motion for<br>Sanctions and for Disqualification of the Norfolk County District Attorney and Memorandum in Support thereof with Affidavit of Counsel | 190 | Image |
| 01/05/2024 | MEMORANDUM & ORDER:<br><br>of Decision on Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Jennifer McCabe, Trooper Michael Proctor, and Elizabeth Proctor -<br>SEE Memorandum and Order - (Cannone, RAJ) dated 01/05/2024<br>(parties notified -cm)<br><br>Judge: Cannone, Hon. Beverly J | 191 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 01/05/2024 | ORDER: On Commonwealth's Motion for Protective Order Pertaining to DNA Profiles of Investigating Law Enforcement Officers<br>dated 1/5/24 | 192 | ✪ Image |
| 01/08/2024 | ORDER: of Impoundment. The Court finds good cause to impound the Defendants' Motion for Sanctions and for disqualification of the Norfolk County District Attorney and memorandum in support thereof (paper #190). The order of impoundment shall be in effect until after the motion hearing scheduled on January 18, 2024 | 193 | ✪ Image |
| 01/08/2024 | Clarification / Correction of the docket:<br><br>RE: P#190 Should read: Defendant's Motion for Sanctions and for Disqualification of the Norfolk County District Attorney and Memorandum in support thereof - IMPOUNDED | | |
| 01/08/2024 | Defendant 's Notice<br>filing of Impounded Information (Grand Jury Mintues) - filed 1/8/24 | 194 | ✪ Image |
| 01/08/2024 | Defendant 's Motion to Impound Defendant's Motion to Dismiss Indictments and Memorandum in support thereof; and Grand Jury Mintues and Exhibits lodged in support of Defendant's Motion to Dismiss Indictments<br>filed 1/8/24 | 195 | ✪ Image |
| 01/08/2024 | Affidavit of Alan J. Jackson in support of Defendant's Motion to Impound Defendant's Motion to Dismiss and supporting exhibits and certificate of service<br>filed 1/8/24 | 196 | ✪ Image |
| 01/08/2024 | Docket Note: Letter from MASS LIVE to take photographs and use a an audio recorder during the motions of Karen Read in Norfolk Superior Court, January 5, 2024. (ALLOWED J. Beverly Cannone 01/05/2024) | 197 | |
| 01/10/2024 | General correspondence regarding Notification of  hearing via Zoom on January 18, 2024 at 3PM from David R. Yannetti sent to United States Attorney, Joshua Levy. | 198 | ✪ Image |
| 01/10/2024 | Defendant 's Motion to Dismiss Indictments and Memorandum in Support Thereof - IMPOUNDED | 199 | |
| 01/10/2024 | Affidavit of Alan J. Jackson in Support of Defendant's Motion to Dismiss Indictments - IMPOUNDED | 200 | |
| 01/10/2024 | Defendant 's Notice of Grand Jury Minutes and Exhibits Lodged in Support of Defendant's Motion to Dismiss Indictments with Thumb Drive - IMPOUNDED | 201 | |
| 01/12/2024 | General correspondence regarding Notice from Joshua S. Levy, Acting United States Attorney RE: "Commonwealth's Notice of Discovery Pursuant to Mass. R.. Crim. P. 14 (A)(1)(E)(i) | 202 | ✪ Image |
| 01/18/2024 | Opposition to to Commonwealth's Motion for records, and Motion for Protective Order (LIMITED) with Exhibit A filed by Non-Parties Boston Magazine and Gretchen Voss | 203 | ✪ Image |
| 01/18/2024 | Other 's Memorandum of Non-Parties Boston Magazine and Gretchen Voss in Limited Opposition to Commonwealth's Motion for Records, and In Support of Motion for Protective Order | 204 | ✪ Image |
| 01/18/2024 | Affidavit of Chris Vogel | 205 | ✪ Image |
| 01/18/2024 | Affidavit of Gretchen Voss | 206 | ✪ Image |
| 01/18/2024 | Event Result:: Motion Hearing scheduled on:<br>     01/18/2024 03:00 PM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 01/18/2024 | Attorney appearance<br>On this date Robert A Bertsche, Esq. added for Other interested party Dba/ Boston Magazine Metro Corp | | |
| 01/18/2024 | Attorney appearance<br>On this date Robert A Bertsche, Esq. added for Other interested party Gretchen Voss | | |
| 01/19/2024 | Commonwealth 's Motion to Withdraw "Protective Order Pertaining to Commonwealth's Notice of Discovery Pursuant to mass. R. Crim. P. 14(A)(1)(E)(i) with Associated Attachments"<br>ALLOWED 1/22/24 (Cannone,J) att.J.McDermott,ac | 207 | ✪ Image |
| 01/22/2024 | Commonwealth 's Notice of Discovery XXXI | 208 | |
| 01/23/2024 | MEMORANDUM & ORDER:<br><br>on Commonwealth's Motion for Records -  ORDER: The Commonwealth's Motion for Records is ALLOWED as to the portions of the audio recordings of the June 30, 2023 and July 13, 2023 interviews that were "on the record." The Motion is DENIED without Prejudice as to the portions of the June 30, 2023 and July 13, 2023 interviews that were "off the record" and as to Gretchen Voss's handwritten notes of the July 7, 2023 interview. (Cannone, RAJ) dated 01/23/2024<br><br>Judge: Cannone, Hon. Beverly J | 209 | ✪ Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 01/25/2024 | Cell Phone Records received from Verizon<br>Rec'd 1/19/24 INSPECTION BY ATTORNEYS ONLY | 210 | |
| 02/09/2024 | Defendant, Commonwealth 's Joint Motion of the Parties to Continue Motion-Hearing Date, Cancel Final Pre-trial Conference Date and Convert Trial Date to Motion-Hearing Date | 211 | Image |
| 02/09/2024 | Affidavit of Counsel in Support of Joint Motion of the Parties to Continue Motion-Hearing Date, Cancel Final Pre-Trial Conference Date and Convert Trial Date to Motion-Hearing Date with Exhibits | 212 | Image |
| 02/15/2024 | Kevin Joseph Reddington, Esq.'s Submission of a Thumb Drive of all Pertinent Records and Communications Taken Off of Ms. McCabe's Phone - IMPOUNDED | 213 | Image |
| 02/15/2024 | Event Result: Motion Hearing scheduled on:<br>02/15/2024 02:00 PM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 02/16/2024 | Opposition to "Defendant's Motion for Sanctions and for Disqualification of the Norfolk County District Attorney" with Exhibits A - T filed by Norfolk County District Attorney | 214 | Image |
| 02/21/2024 | Event Result: Final Pre-Trial Conference scheduled on:<br>02/26/2024 09:00 AM<br>Has been: Rescheduled        For the following reason: By Court prior to date<br>Hon. Beverly J Cannone, Presiding | | |
| 02/21/2024 | General correspondence regarding Thumb drive of Proctor / McCabe calls and emails (only for inspection by attorneys of record) - IMPOUNDED | 215 | |
| 02/21/2024 | Opposition to "Defendant's Motion to Dismiss Indictments and Memorandum in Support Thereof" filed by Norfolk County District Attorney | 216 | Image |
| 02/23/2024 | Cell Phone Records received from Verizon (Attorney's of Record Only) - IMPOUNDED | 217 | |
| 02/23/2024 | Defendant 's Motion to Impound Defendant's Motion to Continue the Hearing on Defendant's Motion to Dismiss Indictments with Certificate of Service | 218 | |
| 02/23/2024 | Affidavit of of Counsel in Support of Motion to Impound Defendant's Motion to Continue the Hearing on Defendant's Motion to Dismiss Indictments | 219 | |
| 02/23/2024 | Defendant 's Motion to Continue the hearing on Defendant's Motion to Dismiss Indictments with Certificate of Service | 220 | |
| 02/23/2024 | Affidavit of Counsel in Support of Defendant's Motion to Continue the hearing on Defendant's Motion to Dismiss Indictments | 221 | |
| 02/23/2024 | Commonwealth 's Notice of<br>Discovery XXXII - filed 2/23/24 | 222 | Image |
| 02/26/2024 | Event Result: Motion Hearing scheduled on:<br>02/26/2024 02:00 PM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 02/27/2024 | Event Result: Jury Trial scheduled on:<br>03/12/2024 09:00 AM<br>Has been: Rescheduled        For the following reason: Court Order<br>Hon. Beverly J Cannone, Presiding | | |
| 02/27/2024 | Scheduled:<br>Event: Jury Trial<br>Date: 04/16/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 03/05/2024 | Defendant 's Motion to Impound Defendant's Motion to Continue the Pretrial Hearing Dates, Briefing Schedule, and Jury Trial Dates with Affidavit and Attachments | 223 | |
| 03/05/2024 | Defendant 's Motion to Continue the Pretrial Hearing Dates, Briefing Schedule, and Jury Trial Dates with Certificate of Service and Affidavits from Attorney Jackson and Attorney Yannetti - **** IMPOUNDED, per request of Defense | 224 | |
| 03/05/2024 | ORDER: Modified Scheduling Order in Response to Defendant's Motion to Continue the Pretrial Hearing Dates, Briefing Schedule, and Jury Trial Dates - SEE ORDER (Cannone, RAJ) dated 03/05/2024 (copies sent to all counsel -cm) | 225 | Image |
| 03/06/2024 | Commonwealth 's Motion for Protective Order - * So Ordered (Cannone, RAJ) 03/06/2024 - IMPOUNDED | 226 | |
| 03/07/2024 | Defendant 's Motion to Impound Supplemental Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss Indictments with Affidavit - **ALLOWED (Cannone, RAJ) dated 03/07/2024 - IMPOUNDED | 227 | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 03/07/2024 | Defendant 's Supplemental Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss Indictments with Affidavit of Counsel  - IMPOUNDED | 228 | |
| 03/11/2024 | Commonwealth 's Notice of<br>Discovery XXXIIII - filed 3/11/24 | 229 | Image |
| 03/11/2024 | Docket Note: Correspondence from Google - IMPOUNDED | 230 | |
| 03/11/2024 | Commonwealth 's Motion to Impound Commonwealth's Supplemental Opposition to Defendant's Motion to Dismiss Indictments and Defendant's Motions for Sanctions and Disqualification of The Norfolk District Attorney's Office<br>Allowed (Cannone, RAJ) dated 3/11/24 (Exhibits in Vault ) | 231 | |
| 03/11/2024 | Commonwealth 's Supplemental<br>Opposition to Defendant's Motion to Dismiss Indictments and Defendant's Motion for Sanctions and Disqualification of The Norfolk District Attorney's Office - filed 3/11/24 IMPOUNDED | 232 | |
| 03/12/2024 | Event Result::  Motion Hearing scheduled on:<br>    03/28/2024 09:00 AM<br>Has been: Rescheduled      For the following reason: Other event activity needed<br>Hon. Beverly J Cannone, Presiding | | |
| 03/12/2024 | Event Result::  Final Pre-Trial Conference scheduled on:<br>    04/12/2024 09:00 AM<br>Has been: Rescheduled      For the following reason: By Court prior to date<br>Hon. Beverly J Cannone, Presiding | | |
| 03/12/2024 | Event Result::  Motion Hearing scheduled on:<br>    03/12/2024 09:00 AM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 03/12/2024 | Other Records received from Boston Magazine<br>Received 3/12/24 IMPOUNDED | 233 | |
| 03/13/2024 | ORDER: And Decision Re: Service of Motions for Records Pursuant to Mass. R. Crim .P 17<br>dated 3/13/24<br><br>Judge: Cannone, Hon. Beverly J | 234 | Image |
| 03/13/2024 | Defendant 's Motion to Impound Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Kevin Albert, Brian Higgins and Brian Albert with Affidavit | 235 | |
| 03/13/2024 | Defendant 's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Kevin Albert, Brian Higgins and Brian Albert with Affidavit and Certificate of Service | 236 | |
| 03/13/2024 | Defendant 's Motion to Impound " Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Brian Albert, Kenneth Berkowitz, Brian Higgins, Verizon, Sprint, and NEXTGEN/METROPCS" with Affidavit and Certificate of Service | 237 | |
| 03/13/2024 | Defendant 's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Brian Albert, Kenneth Berkowitz, Brian Higgins, Verizon, Sprint, and NEXTGEN/METROPCS" with Affidavit and Certificate of Service | 238 | |
| 03/13/2024 | Defendant 's Motion to Impound<br>Clarification/Correction Docket should read "Motion to Impound" perJ.McDermott 3/14/2024 | 239 | |
| 03/15/2024 | Attorney appearance<br>On this date Tanis M Yannetti, Esq. added as Private Counsel for Defendant Karen Read | 240 | Image |
| 03/18/2024 | Defendant 's Motion for Admission Pro Hac Vice of Alan Jackson and Elizabeth Little<br>filed 3/15/24 | 241 | Image |
| 03/19/2024 | Defendant 's Motion for Order and Order are IMPOUNDED<br><br>Judge: Cannone, Hon. Beverly J | 242 | |
| 03/20/2024 | Attorney appearance<br>On this date Michael Romeo DiStefano, Esq. added for Other interested party Michael Proctor | 243 | Image |
| 03/20/2024 | Other 's , Michael Proctor, Response to Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17 Directed to Massachusetts State Police, Internal Affairs Section | 244 | Image |
| 03/20/2024 | Event Result::  Motion Hearing scheduled on:<br>    03/20/2024 02:00 PM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 03/21/2024 | Commonwealth 's Motion for Reciprocal Discovery and Notice of Any Experts | 245 | Image |
| 03/21/2024 | ORDER for Other Records for from Massachusetts State Police - IMPOUNDED | 246 | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 03/21/2024 | ORDER for Cell Phone Records for from Verizon - IMPOUNDED | 247 | |
| 03/21/2024 | ORDER for Cell Phone Records for from Sprint - IMPOUNDED - ** SEE Docket Entry of 4/25/24 (Summons returned as undeliverable as addressed) | 248 | |
| 03/21/2024 | ORDER for Cell Phone Records for from Nextel/Metro PCS - IMPOUNDED | 249 | |
| 03/21/2024 | Defendant 's Motion to Lodge Evidence of the Canton Police Department's Conflict of Interest with the Court with Exhibit A | 250 | Image |
| 03/25/2024 | Attorney appearance<br>On this date Peter Pasciucco, Esq. added for Other interested party Kevin Albert | 251 | Image |
| 03/25/2024 | 's<br>Opposition of Kevin Albert to the Defendant's Rule 17 Motion For Records of Communications with Brian Higgins and Certificate of Service - filed 3/25/24 | 252 | Image |
| 03/25/2024 | Commonwealth 's Response to the Defendant's Motion to Compel Production of Notes, Reports, Memoranda and logs<br>filed 3/25/24 | 253 | Image |
| 03/26/2024 | Commonwealth 's Motion for Buffer Zone Surrounding Norfolk Superior Court | 254 | Image |
| 03/26/2024 | Event Result:: Motion Hearing scheduled on:<br>03/26/2024 09:00 AM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 03/26/2024 | MEMORANDUM & ORDER:<br><br>on Defendant's Motion to Dismiss - ** Defendant's Motion to Dismiss is DENIED. (Cannone, RAJ) dated 03/26/2024<br><br>Judge: Cannone, Hon. Beverly J | 255 | Image |
| 03/26/2024 | Protective Order issued for defense counsel access to presumptively privileged records. (IMPOUNDED)<br>Judge: Cannone, Hon. Beverly J<br>Applies To: Henning, Esq., Gregory D (Attorney) on behalf of Albert, Brian (Other interested party) | 256 | |
| 03/26/2024 | Protective Order issued for defense counsel access to presumptively privileged records. (IMPOUNDED)<br>Judge: Cannone, Hon. Beverly J<br>Applies To: Henning, Esq., Gregory D (Attorney) on behalf of Albert, Brian (Other interested party); Pasciucco, Esq., Peter (Attorney) on behalf of Albert, Kevin (Other interested party) | 257 | |
| 03/26/2024 | Protective Order issued for defense counsel access to presumptively privileged records - applies to Kenneth H. Anderson, Esq.<br>(IMPOUNDED)<br>Judge: Cannone, Hon. Beverly J | 258 | |
| 03/26/2024 | Protective Order issued for defense counsel access to presumptively privileged records - applies to William H. Connolly, Esq.<br>(IMPOUNDED)<br>Judge: Cannone, Hon. Beverly J | 259 | |
| 03/27/2024 | Opposition to to Defendant's Rule 17 Motion by Third Party with Certificate of Service - IMPOUNDED filed by | 260 | |
| 03/28/2024 | ORDER: and Decision on Defendant's Motion to Compel Production of Notes, Reports, Memoranda and Logs - ** So ORDERED,<br>(Cannone, RAJ) dated 03/28/2024 | 261 | Image |
| 03/28/2024 | MEMORANDUM & ORDER:<br><br>and Decision on Defendant's Motion for Sanctions and for Disqualification of the Norfolk County District Attorney - * ORDER : The Defendant's Motion is DENIED.<br>(Cannone, RAJ) dated 03/28/2024<br>(copies sent to all parties -cm)<br><br>Judge: Cannone, Hon. Beverly J | 262 | Image |
| 03/29/2024 | MEMORANDUM & ORDER:<br><br>and Decision on Defendant's Motion for Order Pursuant to Mass. R. Crim. P. 17- ** ORDER: Defendant's Motion is DENIED. (Cannone, RAJ) dated 03/29/2024<br>(copy sent to all counsel -cm)<br><br>Judge: Cannone, Hon. Beverly J | 263 | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 04/03/2024 | Attorney appearance<br>On this date Marc J Randazza, Esq. added for Defendant Multiple Movants with Certificate of Service | 264 | ✪<br>Image |
| 04/03/2024 | Marc J Randazza, Esq.'s Citizens' Motion to Intervene for the Limited Purpose of Upholding and Defending the First Amendment by Opposing the Commonwealth's Motion for a Buffer Zone and Restraining Signs or Clothing that Express a Viewpoint About the Trial - ** DENIED for reasons stated on the record. (Cannone, RAJ) dated 04/04/2024<br>(copy sent to counsel -cm) | 265 | ✪<br>Image |
| 04/03/2024 | Attorney appearance<br>On this date Ruth A Bourquin, Esq. added for Other interested party American Civil Liberties Union of MA | | |
| 04/03/2024 | Ruth A Bourquin, Esq.'s Motion of the Civil Liberties Union for Leave to File Amicus Curiae Memorandum with Regard to Norfolk District Attorney's Request for an Expansive Buffer Zone During Trial and Other Measures that Impact Free Expression - * ALLOWED (Cannone, RAJ) dated 04/04/2024 | 266 | ✪<br>Image |
| 04/04/2024 | Ruth A Bourquin, Esq.'s Amicus Curiae Memorandum of the American Civil Liberties Union of Massachusetts, INC. with Regard to Norfolk District Attorney's Request for an Expansive Buffer Zone During Trial and Other Measures that Impact Free Expression with Certificate of Service | 267 | ✪<br>Image |
| 04/04/2024 | Attorney appearance<br>On this date Jonathan M Albano, Esq. added for Other interested party Boston Globe Media Partners, LLC with Certificate of Service | 268 | |
| 04/04/2024 | Attorney appearance<br>On this date Samuel D Thomas, Esq. added for Other interested party Boston Globe Media Partners, LLC. with Certificate of Service | 269 | ✪<br>Image |
| 04/04/2024 | Other 's Motion to Terminate or Modify Impoundment Orders with Certificate of Service<br><br>Applies To: Albano, Esq., Jonathan M (Attorney) on behalf of Boston Globe Media Partners (Other interested party) | 270 | ✪<br>Image |
| 04/04/2024 | Boston Globe Media Partners's Memorandum in support of<br>Motion of Boston Globe Media Partners, LLC to Terminate or Modify Impoundment Orders with Certificate of Service<br><br>Applies To: Albano, Esq., Jonathan M (Attorney) on behalf of Boston Globe Media Partners (Other interested party) | 271 | ✪<br>Image |
| 04/04/2024 | Other 's Declaration of John R. Ellement in Support of Motion of Boston Globe Media Partners, LLC Motion to Vacate Impoundment Order with Certificate of Service filed by Samuel D. Thomas<br><br>Applies To: Albano, Esq., Jonathan M (Attorney) on behalf of Boston Globe Media Partners (Other interested party) | 272 | ✪<br>Image |
| 04/04/2024 | Event Result:: Motion Hearing scheduled on:<br>04/04/2024 09:00 AM<br>Has been: Held as Scheduled<br>Hon. Beverly J Cannone, Presiding | | |
| 04/04/2024 | Commonwealth 's Notice of Discovery XXXV | 273 | ✪ |
| 04/04/2024 | MEMORANDUM & ORDER:<br><br>on Commonwealth's Motion for Buffer Zone Surrounding Norfolk Superior Court and Request for Order Prohibiting Signs or Clothing in Favor of Either party or Law Enforcement -  ORDER: It is Ordered that no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the Courthouse Complex during trial unless otherwise Ordered by this Court. This complex includes the Norfolk Superior Courthouse building and the parking area behind the Norfolk County Registry of Deeds building. Individuals are also prohibited from using audio enhancing devices while protesting.<br> It is further ORDERED that no individuals will be permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the Courthouse during the trial. Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the Courthouse.  (Cannone, RAJ) dated 04/04/2024<br><br>Judge: Cannone, Hon. Beverly J | 274 | Image<br>✪<br>Image |
| 04/05/2024 | ORDER: This Court has received and reviewed Motion of Boston Globe Media Partners, LLC to Terminate of Modify Impoundment Orders. I intend to hold a hearing as soon as possible, preferably Tuesday April 9, 2024, at 2PM. As a preliminary matter, I Order the moving party to give notice and provide a copy of the motion to the United States Attorney's office because the motion implicates materials in which they have an interest. (Cannone, RAJ) dated 4/5/2024<br>(copies sent to all counsel -cm) | 275 | ✪<br>Image |
| 04/08/2024 | ORDER: Regarding Media Protocol and Coverage<br>dated 4/8/2024<br><br>Judge: Cannone, Hon. Beverly J | 276 | ✪<br>Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 04/09/2024 | Commonwealth 's Notice of Discovery XXXIV (rec'd 3/26/24) | 277 | |
| 04/09/2024 | Jonathan M Albano, Esq.'s Motion of COX Media Group/WFXT-TV to Terminate or Modify Impoundment Orders with Certificate of Service | 278 | Image |
| 04/09/2024 | Other 's U.S. Department of Justice , Attorney Joshua S. Levy's, Letter Regarding the Motion of Boston Globe Medial Partners,LLC to Terminate or Modify Impoundment Orders | 279 | Image |
| 04/09/2024 | Defendant 's Motion to Waive Defendant's Appearance - ** ALLOWED  (Cannone, RAJ) dated 04/09/2024 | 280 | Image |
| 04/09/2024 | Affidavit of Counsel in Support of Motion to Waive Defendant's Appearance with Certificate of Service | 281 | Image |
| 04/09/2024 | Event Result:: Motion Hearing scheduled on: 04/09/2024 02:00 PM Has been: Held as Scheduled Hon. Beverly J Cannone, Presiding | | |
| 04/10/2024 | Defendant 's Motion in limine to Exclude Irrelevant, Inadmissible, and Prejudicial Prior Bad Character and Propensity Evidence with Certificate of Service and Attachments (rec'd 4/9/24) | 282 | Image |
| 04/10/2024 | Affidavit of Counsel in Support of Defendant's Motion in Limine to Exclude Irrelevant, Inadmissible and Prejudicial Prior Bad Character and Propensity Evidence (rec'd 4/9/24) | 283 | Image |
| 04/10/2024 | Defendant 's Motion for Sanctions and Exclusion of Evidence Based on the Commonwealth's Failure to Timely Comply with Discovery Orders (rec'd 4/9/24) 4/25/24 WITHDRAWN | 284 | Image |
| 04/10/2024 | Affidavit of Counsel in Support of Motion for Sanctions and Exclusion of Evidence Based on the Commonwealth's Failure to Timely Comply with Discovery Orders (rec'd 4/9/24) | 285 | Image |
| 04/10/2024 | Defendant 's Motion for Attorney-Conducted Panel Voir Dire with Certificate of Service  (rec'd 4/9/24) - **DENIED (Cannone, RAJ) dated 04/12/2024 | 286 | Image |
| 04/10/2024 | Defendant 's Motion in limine for View with Certificate of Service (rec'd 4/9/24) - ** Motion for View- ALLOWED; Parties are to Coordinate locations and route. The Court takes Under Advisement whether the Defendant is Permitted to be Present. (Cannone, RAJ) dated 04/12/2024 | 287 | Image |
| 04/10/2024 | Defendant 's Motion in limine to Exclude Irrelevant and Prejudicial Evidence Regarding Alleged Harassment and/or Intimidation of Witnesses with Certificate of Service  (rec'd 4/9/24) - ** Both parties have agreed to not introduce the evidence in this Case in Chief. If anyone opens the door, this motion will be revisited. (Cannone, RAJ) dated 04/12/2024 | 288 | Image |
| 04/10/2024 | Defendant 's Motion in limine to Exclude Serum/Plasma Ethanol Concentration, Blood Ethanol Concentration Conversion, and Corresponding Retrograde Extrapolation Analysis with Certificate of Service (rec'd 4/9/24) - ** Under Advisement, Commonwealth will provide written Memorandum (Cannone, RAJ) dated 04/12/2024 | 289 | Image |
| 04/10/2024 | Marc J Randazza, Esq.'s and Movants Notice of Filing of Petition for Interlocutory Relief Pursuant to G.L. c.231, s118, First Par with Certificate of Service and Attachment | 290 | |
| 04/10/2024 | Commonwealth 's Motion in limine for Appointment of Court Stenographer, Ongoing Order to Impound All Sidebar Conferences, and Impoundment of Juror Names During Trial - *** ALLOWED by Agreement (Cannone, RAJ) 04/12/24 | 291 | Image |
| 04/10/2024 | Commonwealth 's Motion to Disable Ability of Observers on Remote Platforms from Being Heard in Courtroom and Commonwealth's Request for Notice Regarding Television Cameras ALLOWED,agreed. (Cannone,J) att.j.McDermott,ac | 292 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine for Sequestration Order and for Relief from that Order for Family Members of the Victim ALLOWED, INCLUDING THE DECEASED FATHER. (Cannone,J) att.J.McDermott,ac | 293 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Allow In-Court Identification ALLOWED,agreed. (Cannone,J) att.J.McDermott,ac 4/25/24 | 294 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Admit Victim's Photograph ALLOWED. (Cannone,J) att.J.McDermott,ac | 295 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Admit Photographs of the Victim's Injuries as Observed by Medical Providers on January 29, 2022 and Photographs from the Autopsy | 296 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Preclude Reference to and Redact the Manner of Death Contained on the Victim's Death Certificate | 297 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Admit 911 Call - ** ALLOWED by Agreement (Cannone, RAJ) | 298 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Introduce Certified Records from the Registry of Motor Vehicles | 299 | Image |

R.024

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 04/10/2024 | Commonwealth 's Motion in limine of Intent to Obtain Cori Records of Potential Jurors ALLOWED , After hearing. (Cannne,J) Att.J.McDermott,ac | 300 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine for View - ** See Decision on Paper #287 (Cannone, RAJ) dated 04/12/2024 | 301 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine Regarding the Use of Leading Questions RULING WITHHELD AT THIS TIME (Cannone,J) Att.J.McDermott | 302 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Admit Evidence that the Defendant was in Custody for a Period of Time After her Arrest Audio only. Commonwealth states event takes place at Milton State Police Barracks in Milton on 6/9/22 w/o objection (Cannone,J) att.J.McDermott,ac | 303 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine for Order Regarding Opening Statements and Notice of Any Visual Aids Defense Intends to Display to Jury During Opening Statement  - ALLOWED,by agreement (Cannone,J) att.J.McDermott,ac (4/12/24) | 304 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine Regarding Visual Presentations to Display Evidence as "Chalks" - ALLOWED,agreed. (Cannone,J) att.J.McDermott,ac | 305 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Admit Expert Cellebrite Demonstration ALLOWED (Cannone,J) att.J.McDermott,ac | 306 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Admit Defendant's Out- of -Court Statements for Purposes of Medical Treatment and Certified Medical Records from Good Samaritan Hospital - *** Defendant has no objection to the admission of statements made for the purpose of medical treatments and medical records. The Court takes under advisement testimony regarding blood alcohol testing. (Cannone, RAJ) dated 04/12/2024 | 307 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Admit Defendant's  Out - of -Court Statements as Statements of a Party Opponent ALLOWED, Agreed. (Cannone,J) att.J.McDermott,ac (4/12/24) | 308 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Admit Recorded Statements of the Defendant Made to the Media ALLOWED. Agreed. (Cannone,J) att.J.McDermott,ac. | 309 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Introduce Evidence of Motive and Nature of Relationship - * Under Advisement (Cannone, RAJ) att J. McDermott dated 04/12/2024 | 310 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Admit the Victim's Out of Court Statements Relating to his State of Mind ALLOWED (Cannone,J) att.J.McDermott,ac | 311 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Preclude Reference to any Alleged "Bad Character" and any Prior "Misconduct" of the Victim or any Witness - * ALLOWED (Cannone, RAJ) dated 04/12/2024 | 312 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Exclude Character/Reputation Evidence of the Defendant - ** ALLOWED, Defendant can review (Cannone, RAJ) att J. McDermott -dated 04/12/2024 | 313 | Image |
| 04/10/2024 | Commonwealth 's Motion for Voir Dire of any Witness to be Asked for Opinion or Character of Defendant or any Witness - ** ALLOWED  (Cannone, RAJ) dated 04/12/2024 | 314 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Prohibit Defense Experts from Testifying Regarding Scientific Studies or Anecdotal Experiences and Request for Voir Dire of any Proposed Defense Experts  - * No Action (Cannone, RAJ) dated 04/12/2024 | 315 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Exclude Mention of Aidan Kearney A/K/A "Turtleboy" and his Pending Criminal Charges for Witness Intimidation | 316 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Prohibit Reference to Any Federal Investigations Conducted by the U.S. Attorney's Office and/or Federal Bureau of Investigations  - ** ALLOWED (Cannone, RAJ) dated 04/12/2024 | 317 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Prohibit Reference to Any Pending Internal Affairs Investigations or Unfounded Allegations of Misconduct - Under advisement. Defendant will file by 4/16/2024 Memorandum explaining how the  proposed evidence complies with the holdings of Comm v McFarlane and Comm v Graham (Cannone, RAJ) 04/12/2024 | 318 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine for Advances Notice if Defendant Intends to Cross-Examine any Witness about Alleged Bias and Request for Pre-Trial Ruling on Whether the Proposed Evidence Demonstrates a Plausible Showing of Alleged Bias - *No Action Taken. Commonwealth to file further clarification (Cannone, RAJ) dated 04/12/2024 - | 319 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine to Preclude the Defendant from raising a Third-Party Culprit Defense | 320 | Image |
| 04/10/2024 | Commonwealth 's Motion in limine for Notice and Voir Dire of Bowden Defense ALLOWED (Cannone,J) att.J.McDermott,ac | 321 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 04/10/2024 | Commonwealth 's Motion for Attorney-Conducted and Individual Voir Dire of Potential Jurors and Proposed Jury Questionnaire - * The Court permits Attorney conducted Voir Dire. Individual voir dire will be done at sidebar and the parties are to amend the proposed supplemental questionnaire to comply with rulings made by the Court at sidebar. (Cannone, RAJ) dated 04/12/24 | 322 | Image |
| 04/10/2024 | ORDER: on Motion of Boston Globe Media Partners, LLC to Terminate or Modify Impoundment Orders. At the conclusion of the hearing, the motion was Allowed in Part - The Commonwealth has submitted to the Court redacted versions of the motion papers #199, #228 and #232 which are subject to that Order. (Cannone, RAJ) dated 4/10/2024 with Attachment of Exhibit A  ** SEE ORDER ***  Judge: Cannone, Hon. Beverly J | 323 | |
| 04/10/2024 | Other 's U.S. Department of Justice , Attorney Joshua S. Levy's, Letter Regarding the Motion of Boston Globe Medial Partners, LLC to Terminate or Modify Impoundment Orders (dated 4/10/2024) | 324 | Image |
| 04/11/2024 | Notice of docket entry received from Appeals Court on April 9, 2024 the following entry was made: Petition pursuant to G.L. c. 231, s. 118 filed for Tracey Anne Spicuzza, Lorena Jenkinson, Dana Stewart Leonard and Paul Christoford by Attorney Marc J. Randazza. | 325 | Image |
| 04/11/2024 | Notice of docket entry received from Appeals Court Please take note that, with respect to the Motion for stay under M.R.A.P.6(a) files for Tracey Spicuzza, Lorena Jenkinson, Dana Stewart Leonard and Paul Cristoford by Attorney Marc J. Randazza. (Pater #4), on April 10,2024, the following order was entered on the docket of the above-referenced case: RE#4: See order on paper #1. | 326 | Image |
| 04/11/2024 | Notice of docket entry received from Appeals Court on April 10,2024 the following entry was made: ORDER (RE #1): The Petitioner seeks review of Orders (1) denying their motion to intervene for limited purposes; and (2) creating a buffer zone around the Courthouse, and limiting certain activities in the Courthouse, at an upcoming criminal trial. | 327 | Image |
| 04/11/2024 | General correspondence regarding :Clerk is directed to return this document. This pleading does not comply with the Uniform Rules of Impoundment. The only alternative would be for the Court to accept it without Impoundment. I decline to do that. (Cannone, RAJ) dated 4/11/24 | | |
| 04/12/2024 | Event Result:  Final Pre-Trial Conference scheduled on: 04/12/2024 09:00 AM Has been: Held as Scheduled Hon. Beverly J Cannone, Presiding | | |
| 04/16/2024 | Karen Read's Memorandum in support of Defendant's Opposition to the Commonwealth's Motion in Limine #28 with Certificate of Service | 328 | Image |
| 04/16/2024 | Commonwealth 's Pre-Trial Memorandum with Attachment | 329 | Image |
| 04/16/2024 | Commonwealth 's Notice of Discovery XXXVI (rec'd 04/12/24) | 330 | Image |
| 04/16/2024 | Notice of docket entry received from Supreme Judicial Court Notice of record assembly. | 331 | Image |
| 04/16/2024 | Scheduled: Judge: Cannone, Hon. Beverly J Event: Jury Trial Date: 04/17/2024  Time: 09:00 AM Result: Held as Scheduled | | |
| 04/16/2024 | Scheduled: Judge: Cannone, Hon. Beverly J Event: Jury Trial Date: 04/18/2024  Time: 09:00 AM Result: Held as Scheduled | | |
| 04/16/2024 | Event Result:  Jury Trial scheduled on: 04/16/2024 09:00 AM Has been: Held as Scheduled Comments: Nancy King,crt.rep. Hon. Beverly J Cannone, Presiding | | |
| 04/16/2024 | Scheduled: Judge: Cannone, Hon. Beverly J Event: Jury Trial Date: 04/22/2024  Time: 09:00 AM Result: Held as Scheduled | | |
| 04/16/2024 | Notice of docket entry received from Supreme Judicial Court Notice of record assembly to parties/counsel. (Petitioner's consolidated Notice of Appeal). | 332 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 04/16/2024 | Notice of docket entry received from Supreme Judicial Court Memorandum and Decision & Judgement: as on file. (Georges,J) Conclude that the buffer zone order is content-neutral and does not violate the First Amendment. The oetitions are denied. (dated 4/12/24) | 333 | Image |
| 04/17/2024 | General correspondence regarding Supplemental Juror Questionnaire | 334 | Image |
| 04/17/2024 | Notice of docket entry received from Supreme Judicial Court Notice of entry of Appeal No. SJC-13589. | 335 | Image |
| 04/17/2024 | Event Result:: Jury Trial scheduled on: 04/17/2024 09:00 AM Has been: Held as Scheduled Comments: Nancy King,crt.rep. Hon. Beverly J Cannone, Presiding | | |
| 04/17/2024 | Notice of docket entry received from Supreme Judicial Court RE: SJC-13589 | 336 | Image |
| 04/18/2024 | Commonwealth 's Notice of Discovery XXXVII (rec'd 4/16/24) | 337 | Image |
| 04/18/2024 | Commonwealth 's Notice of Discovery XXXVIII (rec'd 4/16/24) | 338 | Image |
| 04/18/2024 | Commonwealth 's Motion in limine to Admit Results of Defendant's Blood Draw at Good Samaritan Hospital and Resulting Serum Conversion and Retrograde Extrapolation | 339 | Image |
| 04/18/2024 | Event Result:: Jury Trial scheduled on: 04/18/2024 09:00 AM Has been: Held as Scheduled Comments: Nancy King,crt.rep. Hon. Beverly J Cannone, Presiding | | |
| 04/19/2024 | Defendant 's Karen Read's Motion to Enforce Her Constitutional Right to Face-To-Face Confrontation with Certificate of Service - filed 4/19/24 | 340 | Image |
| 04/19/2024 | Affidavit of Counsel In Support of Defendant Karen Read's Motion to Enforce Her Constitutional Right to Face-to-Face Confrontation with Exhibits filed 4/19/24 | 341 | Image |
| 04/19/2024 | Scheduled: Judge: Cannone, Hon. Beverly J Event: Jury Trial Date: 04/23/2024 Time: 09:00 AM Result: Not Held | | |
| 04/19/2024 | Scheduled: Judge: Cannone, Hon. Beverly J Event: Jury Trial Date: 04/24/2024 Time: 09:00 AM Result: Held as Scheduled | | |
| 04/19/2024 | Scheduled: Judge: Cannone, Hon. Beverly J Event: Jury Trial Date: 04/25/2024 Time: 09:00 AM Result: Held as Scheduled | | |
| 04/19/2024 | Scheduled: Judge: Cannone, Hon. Beverly J Event: Jury Trial Date: 04/29/2024 Time: 09:00 AM Result: Held as Scheduled | | |
| 04/19/2024 | Scheduled: Judge: Cannone, Hon. Beverly J Event: Jury Trial Date: 04/30/2024 Time: 09:00 AM Result: Held as Scheduled | | |
| 04/19/2024 | David R Yannetti, Esq.'s Supplemental Affidavit of Counsel in support of Defendant Karen Read's Motion to Enforce her Constitutional Right to Face-to-Face Confrontation. filed 4/19/24 | 342 | Image |
| 04/19/2024 | Defendant 's Karen Read's Motion to have Information Technology/Audio-Visual Assistant at Counsel Table and Certificate of Service - filed 4/19/24 | 343 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 04/19/2024 | Affidavit of Counsel in support of Defendant Karen Read's Motion to have Information Technology/Audio-Visual Assistant at Counsel Table<br>filed 4/19/24 | 344 | ⊘<br>Image |
| 04/22/2024 | Event Result:: Jury Trial scheduled on:<br>    04/22/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 04/22/2024 | Commonwealth 's Response to "Defendant Karen Read's Motion to Enforce her Constitutional Right to Face-to-Face Confrontation "<br>filed 4/19/24 | 345 | ⊘<br>Image |
| 04/22/2024 | Commonwealth 's Motion for Offer of Proof Prior to Defendant Calling or Summonsing The Norfolk District Attorney and Victim Witness Advocate As Witnesses and Request for an Order that neither is subject to a Sequestration Order<br>filed 4/19/24 | 346 | ⊘<br>Image |
| 04/23/2024 | Event Result:: Jury Trial scheduled on:<br>    04/23/2024 09:00 AM<br>Has been: Not Held      For the following reason: Court Order<br>Hon. Beverly J Cannone, Presiding | | |
| 04/24/2024 | Commonwealth 's Notice of<br>Discovery XL - dated  4/23/24 | 347 | ⊘<br>Image |
| 04/24/2024 | Event Result:: Jury Trial scheduled on:<br>    04/24/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 04/25/2024 | Summons returned to court:  UNSERVED<br>( Return to Sender Not Deliverable as Addressed - Unable to Forward)  Regarding the Order for Sprint Records -(SEE Pg # 248) | 348 | ⊘<br>Image |
| 04/25/2024 | Event Result:: Jury Trial scheduled on:<br>    04/25/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King,crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 04/29/2024 | Notice of docket entry received from Supreme Judicial Court<br>RE:  No. SJC-13589<br><br>"Please take note that the following entry was made on the docket of the above-referenced case:<br><br>April 26, 2024 - ORDER: It is ORDERED that the single justice's judgment denying the petitions for relief pursuant to G. L. c. 211, s. 3 is affirmed. Opinion to follow.<br><br>Dated: April 26, 2024" | 349 | ⊘<br>Image |
| 04/29/2024 | Event Result:: Jury Trial scheduled on:<br>    04/29/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King,crt.rep.<br>Openings<br>Hon. Beverly J Cannone, Presiding | | |
| 04/29/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/02/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 04/29/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/03/2024  Time: 09:00 AM<br>Nancy King, crt.rep.<br>Result: Held as Scheduled | | |
| 04/29/2024 | Commonwealth 's Notice of Discovery XLI | 350 | |
| 04/30/2024 | Event Result:: Jury Trial scheduled on:<br>    04/30/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 04/30/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/06/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/01/2024 | ORDER: Regarding Protocol, Public Attendance and Media Coverage of View (Cannone, RAJ) dated 05/01/24 | 351 | ⊘<br>Image |
| 05/02/2024 | Notice of docket entry received from Supreme Judicial Court<br>RE:  No. SJC-13589<br><br>TRACEY ANNE SPICUZZA & others vs. COMMONWEALTH & another.<br><br>FREEDOM TO PROTEST COALITION & others vs. COMMONWEALTH & another.<br><br>NOTICE OF DECISION dated May 2, 2024 | 352 | |
| 05/02/2024 | Event Result::  Jury Trial scheduled on:<br>    05/02/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King,crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/03/2024 | Event Result::  Jury Trial scheduled on:<br>    05/03/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King,crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/06/2024 | Event Result::  Jury Trial scheduled on:<br>    05/06/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/06/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/07/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/06/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/08/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/06/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/09/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/06/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/10/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/06/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/13/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/07/2024 | Event Result::  Jury Trial scheduled on:<br>    05/07/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King,crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/08/2024 | ORDER: Regarding Media Protocol and Coverage (Cannone, RAJ) Dated 5/7/24 | 353 | ⊘<br>Image |
| 05/08/2024 | Event Result::  Jury Trial scheduled on:<br>    05/08/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King,crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 05/09/2024 | Event Result:: Jury Trial scheduled on:<br>    05/09/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King,crt.rep UNTIL 12:30 PM. ftr BECOMES OFFICIAL.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/10/2024 | Event Result:  Jury Trial scheduled on:<br>    05/10/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/10/2024 | Commonwealth 's Notice of Discovery XLII | 354 | Image |
| 05/10/2024 | Commonwealth 's Motion to Exclude an Individual Charged with Witness Intimidation in Connection with this Case from the Courtroom During the Testimony of Certain Witnesses  - *** ALLOWED as stated in open Court. (Cannone, RAJ) dated 05/10/2024 | 355 | Image |
| 05/10/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/14/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/13/2024 | Event Result:  Jury Trial scheduled on:<br>    05/13/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/13/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/15/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/13/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/16/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/14/2024 | Event Result:  Jury Trial scheduled on:<br>    05/14/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/14/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/17/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/14/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/21/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/14/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/22/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/14/2024 | ORDER: (REVISED) - on Commonwealth's Motion to Exclude an Individual Charged with Witness Intimidation in Connection with this Case from the Courtroom During the Testimony of Certain Witnesses (Cannone, RAJ) dated 05/14/2024<br>(copies sent to all parties - cm) | 356 | Image |
| 05/15/2024 | Event Result:  Jury Trial scheduled on:<br>    05/15/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/16/2024 | Event Result:  Jury Trial scheduled on:<br>    05/16/2024 09:00 AM<br>Has been: Held as Scheduled | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| | Comments: Nancy King, crt.rep<br>Hon. Beverly J Cannone, Presiding | | |
| 05/16/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/23/2024 Time: 09:00 AM<br>Result: Not Held | | |
| 05/17/2024 | Commonwealth 's Notice of Discovery XLIII. (rec'd 5/16/24) | 357 | Image |
| 05/17/2024 | Event Result: Jury Trial scheduled on:<br>05/17/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/21/2024 | Event Result: Jury Trial scheduled on:<br>05/21/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/22/2024 | Event Result: Jury Trial scheduled on:<br>05/22/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/22/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/24/2024 Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/22/2024 | Event Result: Jury Trial scheduled on:<br>05/23/2024 09:00 AM<br>Has been: Not Held    For the following reason: Court Order<br>Hon. Beverly J Cannone, Presiding | | |
| 05/22/2024 | Commonwealth 's Notice of Discovery XLIV | 358 | Image |
| 05/24/2024 | Event Result: Jury Trial scheduled on:<br>05/24/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King,crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/24/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 05/28/2024 Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/24/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/03/2024 Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/28/2024 | Event Result: Jury Trial scheduled on:<br>05/28/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King,crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 05/28/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/04/2024 Time: 09:00 AM | | |
| 05/28/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/05/2024 Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 05/28/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| | Date: 06/06/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/03/2024 | Cell Phone Records received from Verizon (SEE page #247) - IMPOUNDED | 359 | |
| 06/03/2024 | Event Result:: Jury Trial scheduled on:<br>06/03/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/05/2024 | Event Result:: Jury Trial scheduled on:<br>06/05/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/05/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/10/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/05/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/12/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/05/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/13/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/05/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/14/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/05/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/17/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/05/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/18/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/05/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/24/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/06/2024 | Commonwealth 's Renewed Motion for Reciprocal Discovery and Motion to Exclude Defendant's Expert Dr. Marie Russell | 360 | Image |
| 06/06/2024 | Event Result:: Jury Trial scheduled on:<br>06/06/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt. rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/10/2024 | Event Result:: Jury Trial scheduled on:<br>06/10/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/10/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/21/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 06/12/2024 | Defendant 's Additional Discovery with Regard to Dr. Russell | 361 | ⊘ Image |
| 06/12/2024 | Event Result:  Jury Trial scheduled on:<br>06/12/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/13/2024 | Event Result:  Jury Trial scheduled on:<br>06/13/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/14/2024 | Event Result:  Jury Trial scheduled on:<br>06/14/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King Crt.Rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/14/2024 | Commonwealth 's Notice of Discovery XLV | 362 | ⊘ |
| 06/14/2024 | Commonwealth 's Request for Jury Instructions | 363 | Image ⊘ Image |
| 06/17/2024 | Event Result:  Jury Trial scheduled on:<br>06/17/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/18/2024 | Event Result:  Jury Trial scheduled on:<br>06/18/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Voir Dire; No Jury<br>Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/20/2024 | Comes into court.  Trial continues before Cannone, RAJ. with jury of fifteen members.<br>Event Result:  Jury Trial scheduled on:<br>06/20/2024 09:00 AM<br>Has been: Held as Scheduled in Courtroom 25.<br>Hon. Beverly J Cannone, Presiding<br><br>Applies To: Read, Karen (Defendant); Yannetti, Esq., David R (Attorney) on behalf of Read, Karen (Defendant); Lally, Esq., Adam C (Attorney) on behalf of Norfolk County District Attorney (Prosecutor); McLaughlin, Esq., Laura A (Attorney) on behalf of Norfolk County District Attorney (Prosecutor); Jackson, Alan (Attorney) on behalf of Read, Karen (Defendant); Little, Elizabeth S (Attorney) on behalf of Read, Karen (Defendant); Event Judge: Cannone, Hon. Beverly J. - N. King, CR - Attest: Margaret H. Sanel, AC. | | |
| 06/21/2024 | Event Result:  Jury Trial scheduled on:<br>06/21/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt. Rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/21/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/26/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/21/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/25/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/21/2024 | Defendant 's Motion for Required Finding of Not Guilty<br>DENIED (Cannone,) att. J.McDermott,ac | 364 | |
| 06/21/2024 | Commonwealth 's Notice of Discovery XLVI | 365 | ⊘ Image |

Showing 1 to 500 of 537
<< < *1* *2* > >>

**Case Disposition**

| Disposition | Date | Case Judge |
|---|---|---|
| Active | 06/10/2022 | |

# 2282CR00117 Commonwealth vs. Read, Karen



- Case Type:
- Indictment
- Case Status:
- Open
- File Date
- 06/09/2022
- DCM Track:
- C - Most Complex
- Initiating Action:
- MURDER c265 §1
- Status Date:
- 06/10/2022
- Case Judge:
-
- Next Event:
- 01/14/2025

| All Information | Party | Charge | Event | Tickler | Docket | Disposition |

## Party Information

### Norfolk County District Attorney
### - Prosecutor

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Lally, Esq., Adam C |
| | • Bar Code |
| | • 664079 |
| | • Address |
| | • Norfolk County District Attorney's Office |
| | 45 Shawmut Rd |
| | Canton, MA  02021 |
| | • Phone Number |
| | • (781)830-4800 |
| | • Attorney |
| | • McLaughlin, Esq., Laura A |
| | • Bar Code |
| | • 684295 |
| | • Address |
| | • Norfolk District Attorney's Office |
| | 45 Shawmut Rd |
| | Canton, MA  02021 |
| | • Phone Number |
| | • (781)830-4800 |

**More Party Information**

### Read, Karen
### - Defendant

| Alias | Party Attorney |
|---|---|
| | • Attorney |
| | • Henchy, Esq., Ian F |
| | • Bar Code |
| | • 707284 |
| | • Address |
| | • Yannetti Law Firm |
| | 44 School St 1000A |
| | Boston, MA  02108 |
| | • Phone Number |
| | • (857)600-1956 |
| | • Attorney |
| | • Jackson, Alan |
| | • Bar Code |
| | • PHV173647CA |
| | • Address |
| | • Phone Number |
| | • |
| | • Attorney |
| | • Little, Elizabeth S |
| | • Bar Code |

- PHV307944CA
- Address
- Phone Number
- 
- Attorney
- Weinberg, Esq., Martin G
- Bar Code
- 519480
- Address
- Martin G Weinberg P.C.
  20 Park Plaza
  Suite 1000
  Boston, MA  02116
- Phone Number
- (617)227-3700
- Attorney
- Yannetti, Esq., David R
- Bar Code
- 555713
- Address
- Yannetti Criminal Defense Law Firm
  44 School St
  Suite 1000A
  Boston, MA  02108
- Phone Number
- (617)338-6006
- Attorney
- Yannetti, Esq., Tanis M
- Bar Code
- 568090
- Address
- Yannetti Criminal Defense
  44 School St Suite 1000A
  Boston, MA  02108
- Phone Number
- (617)338-6006

**More Party Information**

**Movants, Multiple**
- Defendant

| Alias | Party Attorney |
| --- | --- |
| | - Attorney<br>- Randazza, Esq., Marc J<br>- Bar Code<br>- 651477<br>- Address<br>- Randazza Legal Group, PLLC<br>  30 Western Ave<br>  Gloucester, MA  01930<br>- Phone Number<br>- (888)887-1776 |

**More Party Information**

**Albert, Brian**
- Other interested party

| Alias | Party Attorney |
| --- | --- |
| | - Attorney<br>- Henning, Esq., Gregory D<br>- Bar Code<br>- 663189<br>- Address<br>- Henning Strategies<br>  141 Tremont St<br>  Suite 300<br>  Boston, MA  02111<br>- Phone Number<br>- (617)299-6534 |

**More Party Information**

**McCabe, Jennifer**
- Other interested party

| Alias | Party Attorney |
| --- | --- |
| | - Attorney<br>- Reddington, Esq., Kevin Joseph<br>- Bar Code<br>- 414160<br>- Address<br>- Attorney Kevin Reddington |

1342 Belmont St
Suite 203
Brockton, MA  02301
- Phone Number
- (508)583-4280

More Party Information

**Proctor, Elizabeth**
- Other interested party

| Alias | **Party Attorney** |
|---|---|
| | - Attorney |
| | - Kettlewell, Esq., William Andrew |
| | - Bar Code |
| | - 682929 |
| | - Address |
| | - Silva Kettlewell and Pignatelli LLP |
| | 10 High St |
| | Suite 505 |
| | Boston, MA  02110 |
| | - Phone Number |
| | - (617)351-9094 |

More Party Information

**Bukhenik, Yuri**
- Other interested party

| Alias | **Party Attorney** |
|---|---|
| | - Attorney |
| | - Lundgren, Esq., Gretchen |
| | - Bar Code |
| | - 644742 |
| | - Address |
| | - Mission Advisory Legal Group |
| | 1834 Centre St |
| | Unit 451 |
| | Boston, MA  02132 |
| | - Phone Number |
| | - (617)302-6720 |

More Party Information

**Proctor, Michael**
- Other interested party

| Alias | **Party Attorney** |
|---|---|
| | - Attorney |
| | - DiStefano, Esq., Michael Romeo |
| | - Bar Code |
| | - 675615 |
| | - Address |
| | - Todd and Weld LLP |
| | One Federal St 27th Floor |
| | Boston, MA  02110 |
| | - Phone Number |
| | - (617)720-2626 |
| | - Attorney |
| | - Lundgren, Esq., Gretchen |
| | - Bar Code |
| | - 644742 |
| | - Address |
| | - Mission Advisory Legal Group |
| | 1834 Centre St |
| | Unit 451 |
| | Boston, MA  02132 |
| | - Phone Number |
| | - (617)302-6720 |

More Party Information

**Metro Corp, Dba/ Boston Magazine**
- Other interested party

| Alias | **Party Attorney** |
|---|---|
| | - Attorney |
| | - Bertsche, Esq., Robert A |
| | - Bar Code |
| | - 554333 |
| | - Address |
| | - Klaris Law PLLC |
| | 6 Liberty Square 2752 |
| | 2752 |
| | Boston, MA  02109 |

- Phone Number
- (857)303-6938

**More Party Information**

**Voss, Gretchen**
- Other interested party

| Alias | **Party Attorney** |
|---|---|
| | - Attorney |
| | - Bertsche, Esq., Robert A |
| | - Bar Code |
| | - 554333 |
| | - Address |
| | - Klaris Law PLLC |
| | 6 Liberty Square 2752 |
| | 2752 |
| | Boston, MA  02109 |
| | - Phone Number |
| | - (857)303-6938 |

**More Party Information**

**Albert, Kevin**
- Other interested party

| Alias | **Party Attorney** |
|---|---|
| | - Attorney |
| | - Pasciucco, Esq., Peter |
| | - Bar Code |
| | - 679371 |
| | - Address |
| | - Anderson, Goldman, Tobin and Pasciucco, LLP |
| | 50 Redfield St |
| | Suite 201 |
| | Dorchester, MA  02122 |
| | - Phone Number |
| | - (617)265-3900 |

**More Party Information**

**American Civil Liberties Union of MA**
- Other interested party

| Alias | **Party Attorney** |
|---|---|
| | - Attorney |
| | - Bourquin, Esq., Ruth A |
| | - Bar Code |
| | - 552985 |
| | - Address |
| | - American Civil Liberties Union Foundation of Massa |
| | One Center Plaza |
| | Suite 850 |
| | Boston, MA  02108 |
| | - Phone Number |
| | - (617)482-3170 |

**More Party Information**

**Boston Globe Media Partners**
- Other interested party

| Alias | **Party Attorney** |
|---|---|
| | - Attorney |
| | - Albano, Esq., Jonathan M |
| | - Bar Code |
| | - 013850 |
| | - Address |
| | - Morgan, Lewis and Bockius LLP |
| | 1 Federal St |
| | Boston, MA  02110 |
| | - Phone Number |
| | - (617)951-8360 |

**More Party Information**

**Boston Globe Media Partners**
- Other interested party

| Alias | **Party Attorney** |
|---|---|
| | - Attorney |
| | - Thomas, Esq., Samuel D |
| | - Bar Code |
| | - 707801 |
| | - Address |

R.038

- Morgan Lewis and Bockius LLP
  One Federal St
  Floor 14 Office 19
  Boston, MA  02110
- Phone Number
- (774)263-0309

**More Party Information**

## Party Charge Information

- **Read, Karen**
- **- Defendant**
  - Charge # 1:
    **265/1-0 - Felony**      MURDER c265 §1

- Original Charge
- 265/1-0 MURDER c265 §1 (Felony)
- Indicted Charge
- Amended Charge

---

- **Read, Karen**
- **- Defendant**
  - Charge # 2:
    **265/1312-0 - Felony**      MANSLAUGHTER WHILE OUI c265 §13½

- Original Charge
- 265/1312-0 MANSLAUGHTER WHILE OUI c265 §13½ (Felony)
- Indicted Charge
- Amended Charge

---

- **Read, Karen**
- **- Defendant**
  - Charge # 3:
    **90/24/B-0 - Felony**      LEAVE SCENE OF PERSONAL INJURY & DEATH c90 §24(2)(a½)(2)

- Original Charge
- 90/24/B-0 LEAVE SCENE OF PERSONAL INJURY & DEATH c90 §24(2)(a½) (2) (Felony)
- Indicted Charge
- Amended Charge

## Events

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 06/10/2022 11:00 AM | Criminal 1 | | Arraignment | | Held as Scheduled |
| 08/12/2022 02:00 PM | Criminal 1 | | Pre-Trial Conference | Krupp, Hon. Peter B | Held as Scheduled |
| 09/22/2022 02:00 PM | Criminal 1 | | Pre-Trial Conference | Krupp, Hon. Peter B | Held as Scheduled |
| 10/03/2022 02:00 PM | Criminal 1 | | Motion Hearing | | Held as Scheduled |
| 11/21/2022 02:00 PM | Criminal 1 | | Hearing RE: Discovery Motion(s) | Cannone, Hon. Beverly J | Held as Scheduled |
| 02/03/2023 02:00 PM | Criminal 1 | | Conference to Review Status | | Rescheduled |
| 02/08/2023 02:00 PM | Criminal 1 | | Conference to Review Status | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/03/2023 02:00 PM | Criminal 1 | | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/24/2023 10:00 AM | Criminal 1 | | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/25/2023 09:30 AM | Criminal 1 | | Motion Hearing | Cannone, Hon. Beverly J | Canceled |
| 07/25/2023 02:00 PM | Criminal 1 | | Pre-Trial Hearing | O'Shea, Hon. Daniel J. | Held as Scheduled |

| Date | Session | Location | Type | Event Judge | Result |
|---|---|---|---|---|---|
| 09/15/2023 09:00 AM | Criminal 1 | | Motion Hearing | O'Shea, Hon. Daniel J. | Held as Scheduled |
| 09/15/2023 02:00 PM | Criminal 1 | | Conference to Review Status | O'Shea, Hon. Daniel J. | Rescheduled |
| 01/05/2024 09:00 AM | Criminal 1 | | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 01/18/2024 03:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 02/15/2024 02:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 02/26/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Final Pre-Trial Conference | Cannone, Hon. Beverly J | Rescheduled |
| 02/26/2024 02:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 03/12/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Rescheduled |
| 03/12/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 03/20/2024 02:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 03/26/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 03/28/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Rescheduled |
| 04/04/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/09/2024 02:00 PM | Criminal 1 | DED-2nd FL, CR Main (SC) | Motion Hearing | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/12/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Final Pre-Trial Conference | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/16/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/17/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/18/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/22/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/23/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Not Held |
| 04/24/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/25/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/29/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 04/30/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/02/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/03/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/06/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/07/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/08/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 05/09/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/10/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/13/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/14/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/15/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/16/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/17/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/21/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/22/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/23/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Not Held |
| 05/24/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 05/28/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/03/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/05/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/06/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/10/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/12/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/13/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/14/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/17/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/18/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/20/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/21/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/24/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/25/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/26/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/27/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 06/28/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | Cannone, Hon. Beverly J | Held as Scheduled |
| 07/01/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | | Held as Scheduled |

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 07/02/2024 09:00 AM | Criminal 1 | DED-2nd FL, CR Main (SC) | Jury Trial | | Canceled |
| 07/22/2024 02:00 PM | Civil C | DED-2nd FL, CR 20 (SC) | Trial Assignment Conference | Cannone, Hon. Beverly J | Held as Scheduled |
| 08/09/2024 02:00 PM | Civil C | DED-2nd FL, CR 20 (SC) | Non-Evidentiary Hearing to Dismiss | Cannone, Hon. Beverly J | Held as Scheduled |
| 01/14/2025 02:00 PM | Criminal 1 | | Final Pre-Trial Conference | | |
| 01/27/2025 09:00 AM | Criminal 1 | | Jury Trial | | |

## Ticklers

| Tickler | Start Date | Due Date | Days Due | Completed Date |
|---------|-----------|----------|----------|----------------|
| Pre-Trial Hearing | 06/09/2022 | 12/06/2022 | 180 | 07/25/2023 |
| Final Pre-Trial Conference | 06/09/2022 | 05/19/2023 | 344 | 04/12/2024 |
| Case Disposition | 06/09/2022 | 06/02/2023 | 358 | |

## Docket Information

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|-------------|-------------|---------------|--------------|
| 06/24/2024 | Event Result:: Jury Trial scheduled on:<br>06/24/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep<br>Hon. Beverly J Cannone, Presiding | | |
| 06/24/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/27/2024 Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/24/2024 | Scheduled:<br>Judge: Cannone, Hon. Beverly J<br>Event: Jury Trial<br>Date: 06/28/2024 Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 06/24/2024 | Defendant 's Motion for Additional Jury Instructions | 366 | |
| 06/25/2024 | Event Result:: Jury Trial scheduled on:<br>06/25/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/26/2024 | Defendant 's Emergency Motion to Amend the Jury Verdict Slip Associated with Count Two | 367 | Image |
| 06/26/2024 | Affidavit of Counsel in Support of Defendant's Emergency Motion to Amend the Jury Verdict Slip Associated with Count Two, with Certificate of Service and Exhibits A and B | 368 | Image<br>Image |
| 06/26/2024 | Event Result:: Jury Trial scheduled on:<br>06/26/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt. rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/27/2024 | Event Result:: Jury Trial scheduled on:<br>06/27/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |
| 06/28/2024 | Event Result:: Jury Trial scheduled on:<br>06/28/2024 09:00 AM<br>Has been: Held as Scheduled<br>Comments: Nancy King, crt.rep.<br>Hon. Beverly J Cannone, Presiding | | |

| Docket Date | Docket Text | File Ref Nbr | Image Avail. |
|---|---|---|---|
| 07/01/2024 | Scheduled:<br>Event: Jury Trial<br>Date: 07/01/2024  Time: 09:00 AM<br>Result: Held as Scheduled | | |
| 07/01/2024 | Scheduled:<br>Event: Jury Trial<br>Date: 07/02/2024  Time: 09:00 AM<br>Result: Canceled | | |
| 07/01/2024 | Event Result:  Jury Trial scheduled on:<br>     07/02/2024 09:00 AM<br>Has been: Canceled       For the following reason: Court Order<br>Hon. Beverly J Cannone, Presiding | | |
| 07/08/2024 | Attorney appearance<br>On this date Martin G Weinberg, Esq. added as Limited Appearance Counsel for Defendant Karen Read | | Image |
| 07/08/2024 | Defendant 's Motion to Dismiss with Certificate of Service | 369 | |
| 07/08/2024 | Affidavit of David R. Yannetti In Support of Defendant's Motion to Dismiss | 370 | Image |
| 07/08/2024 | Affidavit of Alan J. Jackson in Support of Defendant's Motion to Dismiss | 371 | Image |
| 07/08/2024 | ORDER: Of Impoundment. Re: Jurors List<br>dated 7/8/24<br><br>Judge: Cannone, Hon. Beverly J | 372 | Image<br><br>Image |
| 07/10/2024 | Defendant 's Supplemental Memorandum in Support of Her Motion to Dismiss with Certificate of Service | 373 | Image |
| 07/10/2024 | Affidavit of (SUPPLEMENTAL) Alan Jackson in Support of Motion to Dismiss | 374 | Image |
| 07/12/2024 | Opposition to Defendant's Post-Trial Motion to Dismiss filed by Commonwealth and Certificate of Service - filed 7/12/24 | 375 | Image |
| 07/16/2024 | Defendant 's Reply to the Commonwealth's Opposition to her Motion to Dismiss and Certificate of Service<br>rec'd 7/15/24 | 376 | Image |
| 07/18/2024 | Other 's EMERGENCY Motion of Interested Non-Party Juror Doe to extend Order of Impoundment of Jury List with certificate of service. | 377 | Image |
| 07/18/2024 | Other 's Memorandum in support of EMERGENCY Motion of Interested Non-Party Juror Doe to extend Order of Impoundment of Jury List with certificate of service. | 378 | Image |
| 07/18/2024 | Affidavit of of Service | 379 | |
| 07/18/2024 | Affidavit of of Juror Doe with certificate of service. | 380 | Image |
| 07/18/2024 | Finding by Court: and Order on Juror Doe's Emergency Motion to extend July 8, 2024 Impoundment Order. | 381 | Image |
| 07/18/2024 | Defendant 's<br>Karen Read's Second Supplemental Memorandum in Support of her Motion to Dismiss and Certificate of Service - filed 7/18/24 | 382 | Image |
| 07/18/2024 | Defendant 's<br>Second Supplemental Affidavit by Alan Jackson in support of Karen Read's Motion to Dismiss - filed 7/18/24 | 383 | Image |
| 07/22/2024 | Event Result:  Trial Assignment Conference scheduled on:<br>     07/22/2024 02:00 PM<br>Has been: Held as Scheduled<br>Comments: Courtroom 20<br>Hon. Beverly J Cannone, Presiding | | |
| 07/22/2024 | Scheduled:<br>Event: Jury Trial<br>Date: 01/27/2025  Time: 09:00 AM | | |
| 07/22/2024 | Commonwealth 's Motion for Order and Order are IMPOUNDED | 384 | |
| 08/02/2024 | Commonwealth 's<br>Post-Trial Notice of Disclosure - dated 8/1/24 | 385 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 08/05/2024 | Defendant 's Third Supplement Memorandum in Support of her Motion to Dismiss with Certificate of Service | 386 | Image |
| 08/05/2024 | David R Yannetti, Esq.'s Supplemental Affidavit in Support of Defendant's Motion to Dismiss | 387 | Image |
| 08/09/2024 | Event Result::  Non-Evidentiary Hearing to Dismiss scheduled on: 08/09/2024 02:00 PM Has been: Held as Scheduled Hon. Beverly J Cannone, Presiding | | |
| 08/23/2024 | MEMORANDUM & ORDER: on Defendant's Motion to Dismiss filed by the Court, Cannone, RAJ. denying the defendant's Motion to Dismiss.  (Copy emailed to the parties). Judge: Cannone, Hon. Beverly J | 388 | Image |

Showing 501 to 537 of 537
<< < 1 2 > >>

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Active | 06/10/2022 | |

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss    At the SUPERIOR COURT, begun and holden at DEDHAM, within and for the County of Norfolk,

**on the second Thursday of June, 2022**

THE JURORS for the Commonwealth of Massachusetts, on their oath present that

**KAREN READ**

**of Mansfield in the County of Bristol**
**on or about January 29, 2022**
**at Canton in the County of Norfolk**

**did assault and beat John O'Keefe, with intent to murder such person and by such assault and battery did kill and murder the said John O'Keefe, and is guilty of murder in the second degree and not in the first degree in violation of M.G.L. c. 265, §. 1,**

against the peace of said Commonwealth, and contrary to the form of the Statute in such case made and provided.

A TRUE BILL

........................................................ { Foreman of the
  Grand Jury

........................................................ { Assistant District Attorney
  Norfolk District

2nd Degree Murder

No. 2282CR00117(001)

## COMMONWEALTH
## VS.

**KAREN READ**
Canton

Date ...6/9/22...

Returned into said Superior Court, by the
Grand Jurors, and ordered to be filed:

Attest:

..................................................... CLERK.

**Date:** _____
     **TRACK** _____
     **Plea Not Guilty**
     **Bail:** _____
              _____

     **Atty. Fee** _____
     **Continued to** _____ **for**
     **Pre-Trial Conference.**

     **Pre-Trial Hearing** _____
     ( _____ **J.)**

     **Attest:** _____
     **Assistant Clerk**
     **Stenographer:** _____

| Date | Event |
|------|-------|
|      |       |

## PROCEEDINGS

| Date | Event |
|------|-------|
|      |       |
|      |       |
|      |       |
|      |       |
|      |       |
|      |       |

R.046

JA0187

Printed on recycled paper

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss                    At the SUPERIOR COURT, begun and holden
at DEDHAM, within and for the County of Norfolk,

**on the second Thursday of June, 2022**

THE JURORS for the Commonwealth of Massachusetts, on their oath present that

### KAREN READ

**of Mansfield in the County of Bristol
on or about January 29, 2022
at Canton in the County of Norfolk**

**did operate a motor vehicle upon a way as defined in M.G.L. c. 90, s. 1, or in a place to which the public has a right of access, or upon a way or in a place to which members of the public have access as invitees or licensees, with a percentage, by weight, of alcohol in her blood of eight one-hundredths or greater, or while under the influence of intoxicating liquor, and did so operate said motor vehicle so that the lives and safety of the public might be endangered, and by such wanton and reckless conduct so described, did cause the death of another person, to wit: John O'Keefe, in violation of M.G.L. c. 265, s. 13 ½;**

against the peace of said Commonwealth, and contrary to the form of the Statute in such case made and provided.

A TRUE BILL

*Tanny Pugsley* ................................... { Foreman of the Grand Jury

*Adam Lally* ........................ { Assistant District Attorney
                                              Norfolk District

Vehicular Manslaughter – OUI - Liquor

| Date | Event |
|------|-------|
| | |

No. 2282CR00117(002)

## COMMONWEALTH
## VS.
### KAREN READ
Canton

Date 6/9/22

Returned into said Superior Court, by the
Grand Jurors, and ordered to be filed:

Attest:

Beeen 6. Rohe ............................. CLERK.

**Date:** _____

TRACK _____
**Plea Not Guilty**
**Bail:** _____
_____

**Atty. Fee** _____
**Continued to** _____ **for**
**Pre-Trial Conference.**

**Pre-Trial Hearing** _____
( _____ **J.)**

**Attest:** _____
**Assistant Clerk**
**Stenographer:** _____

PROCEEDINGS

| Date | Event |
|------|-------|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

R.048

Printed on recycled paper

2282CR00117(003)

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss    At the SUPERIOR COURT, begun and holden at DEDHAM, within and for the County of Norfolk,

**on the second Thursday of June, 2022**

THE JURORS for the Commonwealth of Massachusetts, on their oath present that

## KAREN READ

**of Mansfield in the County of Bristol
on or about January 29, 2022
at Canton in the County of Norfolk**

**did operate a motor vehicle upon a way or in a place to which the public has a right of access or upon a way or in a place to which members of the public have access as invitees or licensees, and without stopping and making known her name, residence and the registration number of her motor vehicle, did go away to avoid prosecution or evade apprehension after knowingly colliding with, or otherwise causing injury to John O'Keefe, such injuries having resulted in the death of said person, in violation of M.G.L. c.90, s.24,(2)(a ½ )(2),**

against the peace of said Commonwealth, and contrary to the form of the Statute in such case made and provided.

A TRUE BILL

.........*Tanny Purphley*.................{ Foreman of the Grand Jury

.............*signature*...........{ Assistant District Attorney
Norfolk District

Leaving the Scene of Personal Injury & Death

| Date | Event |
|------|-------|

No. 2282CR00117(003)

## COMMONWEALTH
### VS.

**KAREN READ**
Canton

Date 6/9/22

Returned into said Superior Court, by the
Grand Jurors, and ordered to be filed:

Attest:

.......... Brian S. Roche .......... CLERK.

**Date:** _____
**TRACK** _____
**Plea Not Guilty**
**Bail:** _____

_____

**Atty. Fee** _____
**Continued to** _____ **for**
**Pre-Trial Conference.**

**Pre-Trial Hearing** _____
**(** _____ **J.)**

**Attest:** _____
**Assistant Clerk**
**Stenographer:** _____

PROCEEDINGS

| Date | Event |
|------|-------|

R.050

Printed on recycled paper

```
                                    Volume:  XXXVII
                                    Pages:   63
                                    Exhibits: (See Index)
```

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT


```
* * * * * * * * * * * * * * * * *
                                *
COMMONWEALTH OF MASSACHUSETTS   *
                                *
vs.                             *    Indictment No.
                                *    2282CR00117
KAREN READ                      *
                                *
* * * * * * * * * * * * * * * * *
```


                    Day 37 - Trial with Jury
                Before the Honorable Beverly Cannone

                Transcript of the Charge to the Jury


APPEARANCES:

For The Commonwealth:
BY: Adam Lally
    Laura McLaughlin
    Assistants District Attorney

For Karen Read:
BY: Alan Jackson
    David Yannetti
    Elizabeth Little
    Attorneys at Law


                              Norfolk Superior Courthouse
                              Dedham, Massachusetts
                              Tuesday, June 25, 2024


                    Paula M. Mills
              Retired Certified Court Reporter
                and Court Transcriptionist

37-2

<u>I N D E X</u>

PAGE

Judge's Charge to the Jury                              37-3

<u>E X H I B I T S</u>

NUMBER                                                 PAGE

"OOO"    Juror communication                           37-62

37-3

 1                  P R O C E E D I N G S

 2                      June 25, 2024

 3     (Court in session.)

 4     (Defendant present.  Jury present.)

 5               **JUDGE'S CHARGE TO THE JURY**

 6          THE COURT:  All right, jurors.  Thank you for

 7     serving on this jury and for being so attentive.

 8     You will soon deliberate for the purposes of

 9     reaching a verdict in this case.  But, before you

10     do that, it's my responsibility to give you

11     instructions concerning the law.

12          The instructions are divided into three parts.

13     The first is general instructions that are provided

14     in every criminal case; the second, specific

15     instructions concerning the crimes alleged in this

16     case; and, third, guidelines for your

17     deliberations.  Please listen carefully to all of

18     the instructions.  Do not ignore any instruction or

19     give special attention to any other instruction.

20          To make sure that I give you the instructions

21     accurately, I will read them to you.  You will also

22     get a written copy.  I'll probably send in three or

23     four to the jury so that you can refer to it in the

24     jury room during your deliberations.  I will try to

25     make sure that my oral instructions match the

37-4

1        written instructions.  If there is any difference

2        between what I say aloud and what the written

3        instructions say, please follow what I say aloud.

4             You must take the law as I give it to you.

5        You may not quarrel with it.  You can't do that

6        regardless of any opinion you may have as to what

7        you think the law ought to be.  What the lawyers or

8        witnesses may say or suggest about the law is not

9        necessarily the law.  That's because it's my

10       responsibility as the judge and mine, alone, to

11       instruct you on what the law is.  So I now will

12       turn to part one of the instructions, the general

13       instructions that apply to all criminal cases.

14            As I explained to you at the beginning of the

15       trial, there is a fundamental rule that applies in

16       all criminal case, including this case.  Every

17       person who is accused of a crime is presumed to be

18       innocent of that crime.  Ms. Read is presumed

19       innocent of the charges in this case.  That means

20       you must consider Ms. Read to be innocent unless

21       the prosecution has proved beyond a reasonable

22       doubt through evidence presented during the trial

23       that Ms. Read committed the crimes charged.  I will

24       explain reasonable doubt in just a moment.

25            Ms. Read does not have to do anything to

37-5

1        convince you that she is innocent.  She does not

2        have to explain anything.  Ms. Read does not have

3        to testify, call or question witnesses or provide

4        any evidence at all because you must presume she is

5        innocent.

6             Instead, it is up to the Commonwealth to prove

7        the charges against Ms. Read beyond a reasonable

8        doubt.  The burden of proof never shifts to the

9        defendant.

10            After you have considered all the evidence

11       carefully and fairly, if you have a reasonable

12       doubt about Ms. Read's guilt on a particular

13       charge, then your verdict must be not guilty on

14       that charge.  You may find Ms. Read guilty of a

15       charge only if all 12 deliberating jurors agree

16       that the Commonwealth has proved the charge beyond

17       a reasonable doubt.

18            What is proof beyond a reasonable doubt?  The

19       term is often used and probably pretty well

20       understood, though it is not easily defined.  Proof

21       beyond a reasonable doubt does not mean proof

22       beyond all possible doubt for everything in the

23       lives of human beings is open to some possible or

24       imaginary doubt.

25            A charge is proved beyond a reasonable doubt

1      if after you have compared and considered all the

2      evidence, you have in your minds an abiding

3      conviction to a moral certainty that the charge is

4      true.

5          When we refer to moral certainty, we mean the

6      highest degree of certainty possible in matters

7      relating to human affairs based solely on the

8      evidence that has been put before you in this case.

9          I have told you that every person is presumed

10     to be innocent unless and until he or she is proved

11     guilty and that the burden of proof is on the

12     Commonwealth.  If you evaluate all the evidence and

13     you still have a reasonable doubt remaining, the

14     defendant is entitled to the benefit of that doubt

15     and must be acquitted.

16         It is not enough for the Commonwealth to

17     establish a probability, even a strong probability,

18     that the defendant is more likely to be guilty than

19     not guilty.  That is not enough.  Instead, the

20     evidence must convince you of the defendant's guilt

21     to a reasonable and moral certainty, a certainty

22     that convinces your understanding and satisfies

23     your reason and judgment as jurors who are sworn to

24     act conscientiously on the evidence.  This is what

25     we mean by proof beyond a reasonable doubt.

37-7

1              Now, how do you decide whether the

2        Commonwealth has proven each element of an

3        indictment is true beyond a reasonable doubt?

4        Let's talk first about the rules we all have.

5              You folks are the most important people in the

6        courtroom.  It all begins and ends with your

7        function.  You will determine the facts in this

8        case, and that is your job and your job, alone.

9        You are the sole and exclusive judges of the facts.

10       If there are any conflicts in the testimony, it is

11       your job to resolve those conflicts if you can do

12       so.

13             Once you determine the facts, it is your duty

14       to apply those facts to the law as I explain it to

15       you and to determine whether the Commonwealth has

16       proven its case beyond a reasonable doubt.  You

17       must determine the facts solely and entirely on the

18       evidence as you have heard it and seen it in this

19       courtroom and on nothing else, no prejudice, no

20       bias, no fear, no favor.

21             You must not be swayed by personal likes or

22       dislikes.  Your deliberations are no place for

23       emotion or sympathy, passion or prejudice.  The

24       Commonwealth and Karen Read have a right to have

25       the case judged by fair and impartial jurors.  All

37-8

1    parties who come before the court stand as equals

2    before you.  Therefore, your verdicts must be based

3    on the law as I've given it to you and on the

4    evidence and the facts that you find and nothing

5    else.

6         You cannot allow yourselves to be influenced

7    by any personal feelings you may have about the

8    nature of the crimes with which Ms. Read has been

9    charged or the consequences of your verdict, just

10   the cool, reflective and impartial sifting of the

11   evidence so that here in this courtroom justice may

12   be done.

13        Now, your focus is on the evidence.  I am the

14   judge of the law.  My job is to teach you the law

15   that you must follow in this case.  However, I have

16   no opinion about how you decide this case.  You

17   should not consider anything I have said or done

18   during the trial as reflecting any opinion by me

19   about how you should decide this case.

20        If you believe that I have an opinion about

21   the facts of this case, you must disregard it.  You

22   must decide this case based solely on the

23   evaluations of the evidence.

24        Now, the arguments of the lawyers are not

25   evidence.  They are not witnesses.  If a lawyer

1    during argument made a mistake in summarizing the

2    evidence or argued something not supported by the

3    evidence, you must disregard it.  It is the jury's

4    collective memory of the evidence that controls the

5    matter.

6        Lawyers' objections are a proper part of the

7    Court's procedure and are not part of the evidence.

8    So don't hold it against the lawyers or their

9    client if they made objections, motions or other

10   requests.  They are simply doing their job during a

11   trial.

12       There was testimony at trial that the lawyers

13   interviewed witnesses when preparing for and during

14   the course of the trial.  You may not draw any

15   unfavorable inferences solely from that fact.

16   There is nothing improper about conducting such

17   interviews.  On the contrary.  The lawyers are

18   obliged to prepare their case as thoroughly as

19   possible and may interview witnesses.

20       Now, the verdict must be based only on the

21   evidence and the jury's collective reasoning

22   applied to the evidence in a fair and impartial

23   manner.  The extent to which you believe or

24   disbelieve a witness or what a witness purports to

25   show, the importance to give any testimony or other

1    evidence is entirely up to your own good judgment.

2    The evidence consists of the testimony of the

3    witnesses and the exhibits in the case.

4         There are some things you have heard about

5    that have not been introduced into evidence such as

6    written statements by witnesses, police reports,

7    autopsy and accident reconstruction reports.

8    Occasionally during the trial, you have heard

9    references to such documents and you may naturally

10   wonder why neither side introduced any of them into

11   evidence.

12        The answer is that under our rules of

13   evidence, such reports usually may not be admitted,

14   although the parties may refer to them for certain

15   limited purposes while questioning witnesses.  So

16   you should not hold it against any party that you

17   do not have them, and neither should you speculate

18   on what they may or may not contain.

19        Similarly, as you review exhibits, you may

20   find that some information has been removed because

21   it is not relevant.  Please ignore that and don't

22   try to guess what may have been removed or why.

23        Any information that you may have read, heard

24   or seen about this case outside of the courtroom is

25   not evidence.  My instructions to you and any other

1       comments I made, the lawyers' opening and closing

2       statements and any comments they may have made are

3       not evidence.  Answers that I struck from the

4       record and told you to disregard are not evidence.

5       Only the testimony of the witnesses, that is, their

6       answers to questions, and the exhibits are

7       evidence.

8            It is important to remind you folks that the

9       verdict cannot be based on emotional reaction or

10      sympathy for any person or side of this case.

11      Certain of the testimony and exhibits may have

12      provoked an emotional reaction in all of us.  You

13      may feel sympathy for the family of Mr. O'Keefe,

14      and you may feel sympathy for the defendant as she

15      sits here in this courtroom.  But your job is to

16      decide the case without bias, fear, sympathy or

17      favor, to view the evidence with a certain clinical

18      detachment and to decide the case based solely on

19      the evidence and the application of the law to that

20      evidence.

21           I have allowed you to take notes during the

22      trial, and you may refer to those notes during your

23      deliberations.  But remember, they are not evidence

24      or a substitute for the evidence and your

25      recollection.  They are for your personal use.

1       Please do not share them with other jurors.

2           Consider the evidence as a whole.  Do not make

3       up your mind about what the verdict should be until

4       after you've gone to the jury room to decide the

5       case and you and your fellow jurors have discussed

6       the evidence.  Please keep an open mind until then.

7           You'll remember that we took a view in this

8       case.  The purpose of the view was to help you

9       better understand the evidence that you heard

10      during the trial and to help you appreciate the

11      locations and their surroundings.  Your

12      responsibility in the view was to see the places,

13      observe them carefully and remember what you saw.

14          The view is part of this case.  You may use

15      and consider the observations that you made while

16      on the view in your deliberations in reaching a

17      verdict.  The same is true about the demonstration

18      we saw from the witness stand.  The demonstration

19      was done simply to help you understand the

20      evidence, and you may consider it in your

21      deliberations.

22          It is the jury's job to earnestly seek the

23      truth of the matter.  In doing that, the jury must

24      decide questions of credibility and reliability.

25      The jury must decide how truthful or reliable or

37-13

1    convincing any part of the evidence is.

2         In deciding questions of credibility and

3    reliability, you may rely on your common sense and

4    reasoning powers and your life experiences.

5    Consider a witness's testimony in the context of

6    all the other evidence, not in isolation.  You may

7    consider the demeanor, candor and appearance of the

8    witness in testifying.  Who was the witness?  What

9    relationship do they have to the case or to the

10    other witnesses or the parties?  Did the witness

11    have any bias, reason or motive to give false or

12    shaded testimony?  If so, you may consider that

13    bias or motive in your deliberations and ultimately

14    as to whether or not it impacts the credibility of

15    the witness and the assessment of the evidence

16    presented.

17         Is the witness someone likely to give an

18    honest and impartial account?  Consider not just

19    whether the witness was honest but also whether the

20    witness's testimony was accurate and reliable or

21    honestly mistaken.

22         A prior statement by a witness, if

23    inconsistent with his or her trial testimony in any

24    way, may be considered on the witness's credibility

25    and reliability and only for that purpose.

37-14

1          Now, you've heard some evidence suggesting

2      that the Commonwealth did not conduct certain

3      scientific tests or otherwise follow standard

4      procedure during the police investigation.  This is

5      a factor you may consider in evaluating the

6      evidence presented in this case.

7          With respect to this factor, you should

8      consider three questions:  First, whether the

9      omitted tests or other actions were standard

10     procedure or steps that would otherwise normally be

11     taken under the circumstances; second, whether

12     omitted tests or actions could reasonably have been

13     expected to lead to significant evidence of the

14     defendant's guilt or innocence; and, third, whether

15     the evidence provides a reasonable and adequate

16     explanation for the omission of the tests or other

17     actions.

18          If you find that any omissions in the

19     investigation were significant and not adequately

20     explained, you may consider whether the omissions

21     tend to affect the quality, reliability or

22     credibility of the evidence presented by the

23     Commonwealth.

24          All of these considerations involve factual

25     determinations that are entirely up to you, and you

1      are free to give this matter whatever weight, if

2      any, you deem appropriate based on all the

3      circumstances.

4          Now, during the trial, I gave you some

5      limiting instructions on how you were to consider

6      some of the evidence you heard and, importantly,

7      how you were not to consider the evidence.  I am

8      going to summarize those limiting instructions

9      here.

10         Ms. Read is not charged with committing any

11     crime other than the charges contained in the

12     indictments.  You have heard evidence about

13     interactions that Ms. Read had with Mr. O'Keefe and

14     other witnesses in Aruba.  The evidence was

15     admitted solely for your consideration as evidence

16     of the nature of the defendant's relationship with

17     Mr. O'Keefe and whether it goes to her knowledge or

18     intent or motive on January 29th, 2022.

19         You may not consider that evidence as proof

20     that she has a criminal personality or bad

21     character.  You may not take the defendant's prior

22     acts as a substitute for proof that the defendant

23     committed the crimes charged here or to conclude

24     that if she committed the acts in Aruba, she must

25     also have committed the offenses with which she is

1       charged here.  You can only use the evidence for

2       the limited purpose of how it goes to the

3       defendant's state of mind, motive and nature of her

4       relationship with John O'Keefe.

5           Before you consider any electronic

6       communication in your deliberations, you must

7       first find that it is more likely true than not

8       that the persons who authored them were, in fact,

9       John O'Keefe, the defendant, or the witnesses who

10      testified about their communication with John

11      O'Keefe and/or the defendant.

12          If you do not find that it is more likely true

13      than not that John O'Keefe, Karen Read or the

14      witnesses who testified here before you were the

15      person who authored or transmitted the electronic

16      communications, then you may not consider the

17      electronic communications in deciding the case.

18          Now, the Commonwealth has introduced

19      photographs into evidence.  The photographs may be

20      graphic and unpleasant.  As I told you when you

21      first saw them, your verdict must not in any way be

22      influenced by the fact that these photographs may

23      be graphic or unpleasant.  The defendant is

24      entitled to a verdict based solely on the evidence

25      and not one based on pity or sympathy.  Consider a

37-17

1      photograph only as it may show a medical condition,

2      the nature of the injuries or the details of the

3      incident, itself.

4          You've heard evidence of statements made by

5      John O'Keefe.  These statements were admitted only

6      for a limited purpose of establishing John

7      O'Keefe's state of mind.  You are not to consider

8      this testimony as proof that the defendant has bad

9      character or propensity to commit crimes.

10         The testimony of witnesses recounting

11     conversations with Mr. O'Keefe or messages the

12     defendant's cell phone received from him can only

13     be used as they go to the defendant's motive or

14     intent on January 29th and only if you find that

15     the defendant was aware of John O'Keefe's state of

16     mind at the time of the crime and would be likely

17     to respond to it.

18         There need not be direct evidence that the

19     defendant learned of Mr. O'Keefe's state of mind so

20     long as you reasonably can infer from the evidence

21     that she did learn of it.

22         You also heard testimony about statements

23     allegedly made by Ms. Read.  Before you may

24     consider any such statement, you are going to have

25     to make a preliminary determination whether it can

37-18

1       be considered as evidence or not and for what

2       purpose it may be used.

3           You may not consider any such statement in

4       your deliberations for the truth of any such

5       statement unless from all the evidence in the case

6       the Commonwealth has proven beyond a reasonable

7       doubt that the defendant made the statement that

8       she is alleged to have made and that she made it

9       voluntarily, freely and rationally.

10          In determining whether or not any statement

11      made by the defendant was voluntary, you may

12      consider all of the surrounding circumstances.  You

13      may consider any evidence that you have heard about

14      the defendant's physical and mental condition, her

15      intelligence, age, education and experience.  Your

16      decision does not turn on any one factor.  You must

17      consider the totality of the circumstances.

18          Some testimony came from witnesses who saw or

19      heard something.  Some witnesses also told you

20      about opinions or conclusions they reached based on

21      some special training or experience.  But special

22      training or experience does not necessarily make

23      the witness's testimony any more believable or

24      important than any other evidence.

25          So you should consider the same questions

37-19

1       about witness testimony that I mentioned early,

2       including any bias or motive these opinion

3       witnesses may have had to testify in a certain way.

4             You may also consider the witness's level of

5       experience and training and whether they base their

6       opinions on the facts that you find to be true.

7       There were hypothetical questions asked of some of

8       these witnesses.  You may give whatever weight you

9       deem appropriate to the opinion based on the

10      hypothetical but only if after careful

11      consideration you find that all the assumed facts

12      are true.

13            Remember that witnesses, even those with

14      special training or experience, do not decide

15      cases.  Juries do.  It is up to you whether to

16      accept or reject in whole or in part any opinion or

17      conclusion that a witness offered during the trial.

18            Now, you have the same powers with respect to

19      the exhibits that you have and the testimony of the

20      witnesses.  Look them over and decide the weight,

21      that is, the value they deserve to receive, in

22      helping you resolve the case as you make your

23      ultimate judgment about whether the Commonwealth

24      has proved its case beyond a reasonable doubt.

25            You do not have to believe something simply

37-20

1    because it is written on a piece of paper or

2    appears in a photograph.  You are not, of course,

3    required to disbelieve it because it appears there.

4    You decide whether to believe what the exhibit

5    purports to show and how much weight, if any, you

6    give each exhibit.

7        Now, you've heard me talk about the sources of

8    evidence in this case.  Those are the tools that we

9    have to decide the case.  Now, with the evidence in

10   mind, what can you do with it?

11       As jurors, you may bring to bear all your

12   knowledge and experience.  You don't check your

13   common sense at the door to the jury room; just the

14   reverse.  I instruct you to use your common sense.

15   Give the evidence a reasonable and fair

16   construction in light of your common knowledge and

17   experience.

18       In determining the facts in this case, you may

19   draw reasonable inferences from the evidence that

20   you believe because you are entitled to rely upon

21   both direct and indirect or circumstantial

22   evidence.

23       Direct evidence is evidence of what a witness

24   claims to have seen or heard or touched or somehow

25   perceived with their own senses.  Circumstantial

37-21

1    evidence exists where a witness does not testify

2    directly to the fact that it sought to be proven

3    but you are provided with evidence of other facts

4    and then asked to draw reasonable inferences from

5    them about the fact that is sought to be proved.

6    Such inferences may be considered with all of the

7    other evidence in reaching your verdict.

8    Circumstantial evidence is competent to establish

9    guilt beyond a reasonable doubt.

10        Now, what do I mean by an inference?  An

11    inference is a logical deduction or conclusion that

12    you may but are not required to draw from evidence

13    that you have accepted as believable.

14        Inferences are little steps in reasoning,

15    steps in which you take some known information,

16    apply your experience in life to it and then draw a

17    conclusion.  Sometimes you can draw more than one

18    inference.  You have to decide which inferences are

19    reasonable and decide which seems more reasonable

20    to you.

21        Remember, when you are dealing with

22    inferences, you never have to infer anything.  You

23    may but do not have to draw any inferences

24    whatsoever.  An inference drawn from circumstantial

25    evidence need not be necessary or inescapable, but

37-22

1    any inference which you do draw must be reasonable

2    and possible.  It must be logical.  It must be a

3    natural one which is not too remote in the ordinary

4    course of events.  You may not guess.  You may not

5    speculate.  You may not engage is surmise.

6        You should not pile inference upon inference

7    until the pile gets so high that it tips over

8    logically or the chain gets so weak that it doesn't

9    hold together anymore.  When you run through your

10    inferences, check the starting point and the ending

11    point to make sure that they are still reasonable.

12        Further, when the evidence tends equally to

13    give rise to either of two inconsistent

14    propositions, the Commonwealth has established

15    neither proposition.  In order to convict the

16    defendant, you must find that all the evidence and

17    the reasonable inferences that you have drawn,

18    taken together, prove that she is guilty beyond a

19    reasonable doubt.

20        Let me give you an example of an inference.

21    Suppose that the issue that you must decide is

22    whether the U.S. Postal Service delivered the mail

23    today.  If you go home and someone in your

24    household, a child, roommate or spouse, hands you

25    the mail and states that he or she observed the

1        letter carrier deliver the mail and retrieved it

2        from the mailbox, this would be direct evidence

3        that the U.S. Postal Service delivered the mail,

4        the witness perceived the event with his or her own

5        senses and told you what he or she observed.  The

6        issue you would have to decide is whether the

7        witness is credible.

8            On the other hand, if you go home from court

9        and find mail in the mailbox, you may infer that it

10        was delivered by the U.S. Postal Service today.

11        You draw this reasonable inference based on the

12        following known facts:  The mailbox was emptied

13        yesterday.  You know that the mail is delivered by

14        the U.S. Postal Service Monday through Saturday.

15        The letters in the box are postmarked.

16            You have exactly the same power in this case,

17        not the power to speculate or to guess but the

18        power to draw reasonable inferences warranted by

19        the evidence in the fashion I have just described.

20            You may have noticed that the defendant did

21        not testify at this trial.  The defendant has an

22        absolute right not to testify since the entire

23        burden of proof in this case is on the Commonwealth

24        to prove that the defendant is guilty.  It is not

25        up to the defendant to prove that she is innocent.

1          The fact that the defendant did not testify

2     has nothing to do with the question of whether she

3     is guilty or not guilty.  You are not to draw any

4     adverse inference against the defendant because she

5     did not testify.  You are not to consider it in any

6     way or even discuss it in your deliberations.  You

7     must determine whether the Commonwealth has proved

8     its case against the defendant based solely on the

9     testimony of the witnesses and the exhibits.

10          That completes my first part of the

11     instructions.  Now I'm going to turn to the

12     elements of the charges against Ms. Read.

13          The Commonwealth has alleged that on January

14     29th, 2022, Ms. Read did assault and beat John

15     O'Keefe with the intent to murder him and by such

16     assault and battery did kill and murder John

17     O'Keefe.  Ms. Read is charged with second degree

18     murder.

19          In order to prove murder in the second degree,

20     the Commonwealth must prove the following elements:

21     First, the defendant caused the death of John

22     O'Keefe; two, the defendant intended to kill John

23     O'Keefe or intended to cause grievous bodily harm

24     to John O'Keefe or intended to do an act which, in

25     the circumstances know to the defendant, a

37-25

1    reasonable person would have known created a plain

2    and strong likelihood that death would result.  I

3    will now discuss each of these requirements in more

4    detail.

5        The first element is that the defendant caused

6    the death of John O'Keefe.  A defendant's act is

7    the cause of death where the act is a natural and

8    continuous sequence, results in death and without

9    which death would not have occurred.

10       The second element is that the defendant

11   intended to kill John O'Keefe or intended to cause

12   grievous bodily harm to John O'Keefe or intended to

13   do an act which, in the circumstances known to the

14   defendant, a reasonable person would have known

15   created a plain and strong likelihood that death

16   would result.

17       As you can see, the second element has three

18   subparts which I will call prongs, and the

19   Commonwealth satisfies its burden of proof if it

20   proves any one of the three prongs beyond a

21   reasonable doubt.

22       The first prong is that the defendant intended

23   to kill John O'Keefe.  This means that the

24   defendant consciously and purposefully intended to

25   cause John O'Keefe's death.

1          The second prong is that the defendant

2     intended to cause grievous bodily harm to John

3     O'Keefe.  Grievous bodily harm means severe injury

4     to the body.

5          The third prong is that the defendant intended

6     to do an act which, in the circumstances known to

7     the defendant, a reasonable person would have known

8     created a plain and strong likelihood that death

9     would result.  Let me help you understand how to

10     analyze this third prong.

11          You must first determine whether the defendant

12     intended to perform the act that caused the

13     victim's death.  If you find that she intended to

14     perform the act, you must then determine what the

15     defendant, herself, actually knew about the

16     relevant circumstances at the time she acted.

17          Then you must determine whether under the

18     circumstances known to the defendant a reasonable

19     person would have known that the act intended by

20     the defendant created a plain and strong likelihood

21     that death would result.

22          If you have a reasonable doubt as to whether

23     Mr. O'Keefe's death was accidental because the

24     defendant -- I'm sorry -- because the death was

25     caused by a negligent, careless or mistaken act of

1    the defendant or resulted in a cause separate from

2    the defendant's conduct, you may not find that the

3    Commonwealth has proved that the defendant intended

4    to kill, intended to cause grievous bodily harm or

5    intended to do an act which, in the circumstances

6    known to the defendant, a reasonable person would

7    have known created a plain and strong likelihood

8    that death would result.

9        In deciding whether the defendant intended to

10    kill, intended to cause grievous bodily harm or

11    intended to do an act which, in the circumstances

12    known to the defendant, a reasonable person would

13    have known created a plain and strong likelihood

14    that death would result, you may consider any

15    credible evidence that the defendant was affected

16    by her consumption of alcohol.

17        If the Commonwealth has proven both elements

18    beyond a reasonable doubt, you should return a

19    verdict of guilty.  If the Commonwealth has failed

20    to prove one or more of those elements beyond a

21    reasonable doubt, you must return a verdict of not

22    guilty.

23        The next is manslaughter while operating a

24    motor vehicle under the influence of liquor.  In

25    order to prove manslaughter while operating a motor

1     vehicle, the Commonwealth must prove the following

2     five elements:  First, that the defendant operated

3     a motor vehicle; second, that she operated the

4     motor vehicle upon a public way or in a place in

5     which the public has a right of access; third, that

6     while the defendant was operating the motor

7     vehicle, she was under the influence of

8     intoxicating liquor and/or the percent of alcohol

9     in the defendant's blood was a .08 or greater; --

10    you will have both of these choices on your verdict

11    slip -- fourth, that the defendant operated the

12    vehicle wantonly or recklessly so as to create a

13    high degree of likelihood that substantial harm

14    will result to another; and, fifth, that by such

15    operation of the motor vehicle, the defendant

16    caused the death of John O'Keefe.

17         So to prove the first element, the

18    Commonwealth must prove beyond a reasonable doubt

19    that the defendant was operating a motor vehicle.

20    A person operates a motor vehicle while doing all

21    of the well-known things that drivers do as they

22    travel on a street or highway and also in doing any

23    act which directly tends to set the vehicle in

24    motion.

25         A person is operating a motor vehicle whenever

37-29

1      they are in the vehicle and intentionally

2      manipulates some mechanical or electrical part of

3      the vehicle like the gearshift or the ignition

4      which, alone or in sequence, will set the vehicle

5      in motion.

6          To prove the second element, the Commonwealth

7      must prove beyond a reasonable doubt that the

8      defendant operated a motor vehicle in a public way.

9      Any street or highway that is open to the public

10     and is controlled and maintained by some level of

11     government is a public way.  This would include,

12     for example, interstate and state highways as well

13     as municipal streets and roads.

14         In determining whether any particular street

15     or road is a public way, you may consider evidence,

16     if any, about whether it has some of the usual

17     indications of a public way.  For example, whether

18     it is paved, whether it has streetlights, street

19     signs, curbing and fire hydrants, whether there are

20     buildings along the street, whether it has any

21     crossroads intersecting it and whether it is

22     publicly maintained.

23         To prove the third element, the Commonwealth

24     must prove beyond a reasonable doubt that while

25     operating a motor vehicle, the defendant was under

37-30

1        the influence of intoxicating liquor, that is,

2        alcohol, and/or the percent of alcohol in the

3        defendant's blood was a .08 or greater.  I will now

4        instruct you on both theories.

5            What does it mean to be under the influence of

6        alcohol?  It is not illegal to drive after

7        consuming alcohol as long as the operator is not

8        under the influence of alcohol.  However, neither

9        does someone have to be drunk to be under the

10       influence of alcohol.

11           A person is under the influence of alcohol if

12       they have consumed enough alcohol to reduce their

13       ability to operate a motor vehicle safely by

14       decreasing their judgment, alertness and ability to

15       respond promptly and effectively to unexpected

16       emergencies.  The amount of alcohol necessary to do

17       this may vary from person to person.

18           The Commonwealth is not required to prove that

19       the defendant actually drove in an unsafe or

20       erratic manner, but it is required to prove that

21       their ability to drive safely was diminished by

22       alcohol.  You may rely on your experience and

23       common sense about the effects of alcohol.  You

24       should consider any believable evidence about the

25       defendant's alleged consumption of alcohol as well

1    as the defendant's appearance, condition and

2    behavior.

3         In deciding this first theory of whether the

4    defendant operated a motor vehicle under the

5    influence of alcohol, you may also consider whether

6    a blood test showed that the defendant had consumed

7    any alcohol.  However, no matter what the reading

8    is, the blood test is not sufficient, itself, to

9    prove that the defendant was under the influence of

10   alcohol.

11        Now, under the second theory -- and, again,

12   both will be on the verdict slip and you should

13   decide each one -- the Commonwealth must prove

14   beyond a reasonable doubt that at the time of

15   operation, the percent of alcohol in the

16   defendant's blood was a .08 or greater.  The

17   Commonwealth may prove a person's blood alcohol

18   level by a chemical test or analysis of their

19   breath or blood.

20        In deciding whether the Commonwealth has

21   proved the defendant's blood alcohol beyond a

22   reasonable doubt, you may consider evidence, if

23   any, about whether the test was administered within

24   a reasonable time of operation of the motor

25   vehicle, whether the person who administered the

37-32

1         test was properly certified, whether and how the

2         pre-test procedures were followed and employed;

3         whether the testing device was working properly at

4         the time the test was administered; and whether the

5         test was administered properly.  You may also

6         consider any other evidence pertaining to the test.

7              Mr. Court Officer?  I know it's traditional to

8         not allow anybody in and out of the courtroom while

9         I'm charging.  So I'm going to ask you to follow

10        that at this point.  Thank you.  It's distracting,

11        and I don't want it to be distracting for you

12        folks.  Okay?

13             The fourth element that the Commonwealth must

14        prove beyond a reasonable doubt is that the

15        defendant operated the vehicle wantonly or

16        recklessly.  A person drives recklessly when they

17        ignore the fact that their manner of driving is

18        very likely to result in death or serious injury to

19        someone or they are indifferent to whether someone

20        is killed or seriously injured.  It is not enough

21        for the Commonwealth to prove that the defendant

22        acted negligently; that is, acted in a way that a

23        reasonably careful person would not.  It must be

24        shown that the defendant's actions went beyond mere

25        negligence and amounted to recklessness.

1          The defendant was reckless if she knew or

2    should have known that such actions would pose a

3    grave danger or death or serious injury to others

4    but chose, nevertheless, to run the risk and go

5    ahead.

6          Whenever I refer to the defendant's state of

7    mind or her intent, you may consider any credible

8    evidence that the defendant was affected by her

9    consumption of alcohol.  A defendant may have the

10   requisite state of mind or intent even if she

11   consumed alcohol, but you may consider such

12   evidence in determining whether the Commonwealth

13   has proved beyond that.

14         Here, the defendant must have intended her

15   acts in the sense that they were not accidental.

16   But it is not necessary that the defendant intended

17   or foresaw the consequences of those acts as long

18   as a reasonable person would know that they were so

19   dangerous that death or serious injury would

20   probably result.

21         As such, the Commonwealth does not need to

22   prove that the defendant intended to kill John

23   O'Keefe; rather, this is in the category of cases

24   where public safety requires each driver, once they

25   know what the situation is, to determine and to

1       adhere to an objective standard of behavior.

2           In determining whether the defendant drove

3       recklessly, you should take into account all the

4       facts of the situation: the defendant's rate of

5       speed and manner of operation, the defendant's

6       physical condition and how well the defendant could

7       see and control the vehicle, the condition of the

8       defendant's vehicle, what kind of road it was and

9       who else was on the road, what was the time of day,

10      what the weather and the condition on the roads

11      were and what any other vehicles or pedestrians

12      were doing and any other factors, including the

13      defendant's consumption of alcohol that you think

14      are relevant.

15          The fifth element that the Commonwealth must

16      prove beyond a reasonable doubt is that the

17      defendant, by her actions, caused the death of

18      John O'Keefe.  The defendant caused the death if

19      her actions directly and substantially set in

20      motion the entire chain of events that produced the

21      death.  A defendant's act is the cause of death

22      where the act, in a natural and continuous

23      sequence, results in death and without which death

24      would not have occurred.

25          If the Commonwealth has proven all five

1    elements beyond a reasonable doubt, you shall

2    return a verdict of guilty.  If the Commonwealth

3    has failed to prove one or more of these elements

4    beyond a reasonable doubt, you must return a

5    verdict of not guilty.

6        Now, the lesser offense of manslaughter while

7    operating a motor vehicle under the influence of

8    liquor includes the lesser offense of involuntary

9    manslaughter.  As a matter of law, the indictment

10   that is before you which charges the defendant with

11   manslaughter while operating a motor vehicle under

12   the influence of liquor also charges her with the

13   lesser included offense.

14       The Commonwealth may prove the lesser included

15   charge of involuntary manslaughter even if it fails

16   to prove the greater charge of manslaughter while

17   operating a motor vehicle under the influence of

18   liquor.  So I will define involuntary manslaughter.

19       To prove that the defendant is guilty of

20   involuntary manslaughter because of wanton or

21   reckless conduct, the Commonwealth must prove the

22   following elements beyond a reasonable doubt:

23   First, that the defendant caused John O'Keefe's

24   death; second, that the defendant intended the

25   conduct that caused John O'Keefe's death; third,

1      that the defendant's conduct was wanton or

2      reckless.  I will now discuss each element in more

3      detail.

4          The first element is that the defendant caused

5      the death of John O'Keefe.  Remember, Ms. Read

6      caused John O'Keefe's death if her actions directly

7      and substantially set in motion the entire chain of

8      events that produced the death.  A defendant's act

9      is the cause of death where the act, in a natural

10     and continuous sequence, results in death and

11     without which death would not have occurred.

12         The second element is that the defendant

13     intended the conduct that caused the death.  The

14     Commonwealth is not required to prove the defendant

15     intended to cause the death.  You may consider any

16     credible evidence that the defendant was affected

17     by her consumption of alcohol.

18         The third element is that the defendant's

19     conduct was wanton or reckless.  Wanton or reckless

20     conduct is conduct that creates a high degree of

21     likelihood that substantial harm will result to

22     another.  It is conduct involving a grave risk of

23     harm to another person that a person undertakes

24     within indifference or with disregard of the

25     consequences of such conduct.  Whether the conduct

1    is wanton or reckless depends either on what the

2    defendant knew or how a reasonable person would

3    have acted knowing what the defendant knew.

4         If the defendant realized the grave risk

5    created by her conduct, her subsequent act amounts

6    to wanton or reckless conduct whether or not a

7    reasonable person would have realized the risk of

8    grave danger.  Even if the defendant, herself, did

9    not realize the grave risk of harm to another, the

10   act would constitute wanton or reckless conduct if

11   a reasonable person, knowing what the defendant

12   knew, would have realized the act posed a risk of

13   grave danger to another.

14        It is not enough for the Commonwealth to prove

15   the defendant acted negligently; that is, in a

16   manner that a reasonably careful person would not

17   have acted.  The Commonwealth must prove that the

18   defendant's actions went beyond negligence and

19   amounted to wanton or reckless conduct as I have

20   defined it.

21        In deciding whether the defendant knew or

22   should have known her conduct created a high degree

23   of likelihood that substantial harm would result to

24   another, you may consider credible evidence that

25   the defendant was affected by her consumption of

1     alcohol.

2          A defendant may have the requisite knowledge

3     even if she consumed alcohol, but you may consider

4     such evidence in determining whether the

5     Commonwealth has proved this element.

6          Now, the offense of manslaughter while

7     operating a motor vehicle under the influence of

8     liquor also includes the lesser offense of motor

9     vehicle homicide, felony OUI liquor and negligence.

10    As a matter of law, the indictment that is before

11    you which charges the defendant with manslaughter

12    while operating a motor vehicle under the influence

13    of liquor also charges her with the lesser included

14    offense.

15         The Commonwealth may prove the lesser included

16    charge of motor vehicle homicide even if it fails

17    to prove the greater charge of manslaughter while

18    operating a motor vehicle under the influence of

19    liquor.

20         You may find the defendant guilty of motor

21    vehicle homicide only if you are not convinced

22    beyond a reasonable doubt that the defendant is

23    guilty of manslaughter and you are convinced beyond

24    a reasonable doubt that the defendant is guilty of

25    motor vehicle homicide.  So I will define that for

37-39

1        you now.

2              In order to prove the defendant guilty of

3        motor vehicle homicide, the Commonwealth must prove

4        the following five elements beyond a reasonable

5        doubt:  First, that the defendant operated a motor

6        vehicle; second, that she operated the motor

7        vehicle upon a public way or in a place in which

8        the public has a right of access; third, that while

9        the defendant was operating the motor vehicle, she

10       was under the influence of intoxicating liquor

11       and/or the percent of alcohol in the defendant's

12       blood was .08 or greater; fourth, that while

13       operating a motor vehicle, the defendant did so in

14       a negligent manner so that the lives or safety of

15       the public might be in danger; fifth, that by such

16       operation of the motor vehicle, the defendant

17       caused the death of John O'Keefe.

18             Elements 1, 2, 3 and 5 are the same as

19       manslaughter while under the influence of alcohol

20       as I've previously instructed you just moments ago.

21       The difference between manslaughter while operating

22       under the influence and motor vehicle homicide is

23       the fourth element.

24             To prove the fourth element of motor vehicle

25       homicide, the Commonwealth must prove beyond a

37-40

1    reasonable doubt that the defendant drove

2    negligently in a manner that might have endangered

3    the lives or safety of other people.    A person

4    acts negligently when she fails to use due care;

5    that is, when they act in a way that a reasonable

6    person would not act.    This can happen either by

7    doing something that a reasonable person would not

8    do under the circumstances or by failing to do

9    something that a reasonable person would do.

10    The defendant acted negligently if she drove

11    in a way that a reasonable person would not have

12    and by doing so created an unnecessary danger to

13    other people, a danger that she could have avoided

14    by driving more carefully.

15    The defendant's intent does not matter.    So do

16    not consider it in determining whether or not the

17    defendant was negligent.

18    There is no requirement that the Commonwealth

19    show that the defendant intended to act negligently

20    or unlawfully.    Under our laws, public safety

21    requires each driver to determine and to adhere to

22    an objective standard of reasonable behavior.

23    Therefore, what the defendant may or may not

24    have intended to result from her actions is

25    irrelevant.    The issue is whether or not she drove

37-41

1       as a reasonable person would have under the

2       circumstances.

3            In determining whether the defendant drove

4       negligently in a manner that might have endangered

5       the lives or safety of other people, you should

6       take into account evidence, if any, about the

7       defendant's rate of speed and manner of operation,

8       the defendant's physical condition and how well she

9       could see and control her vehicle, the condition of

10      the defendant's vehicle, the kind of road it was

11      and who else was on the road, the time of day, the

12      weather and the road conditions, what any other

13      vehicles or pedestrians were doing and any other

14      factors, including the defendant's consumption of

15      alcohol, that you think are relevant.

16           The next indictment is leaving the scene of an

17      accident, resulting in death.  In order to prove

18      the defendant guilty of leaving the scene of an

19      accident resulting in death, the Commonwealth must

20      prove six things beyond a reasonable doubt:  First,

21      that the defendant operated a motor vehicle;

22      second, that she operated on a public way or in a

23      place in which the public has a right of access;

24      third, that the defendant knowingly collided with

25      John O'Keefe; fourth, that the collision caused

37-42

1    injury to John O'Keefe, resulting in his death; and

2    fifth, that after causing such injury, the

3    defendant failed to stop and provide name, home

4    address and registration number of the motor

5    vehicle; and, six, that the defendant failed to do

6    so for the purpose of avoiding prosecution or

7    apprehension.

8    Jurors, I've already instructed you on the

9    first and second elements.  The other four elements

10    should be given their plain meaning, and the

11    parties agree that I do not need to define them any

12    further.  That will save a little time for you.

13    As a general rule, you are permitted but not

14    required to infer that a person who intentionally

15    uses a dangerous weapon on another person intends

16    to kill that person or cause him grievous bodily

17    harm or intends to do an act which, in the

18    circumstances known to him, a reasonable person

19    would know creates a plain and strong likelihood

20    that death would result.

21    An item that is normally used for innocent

22    purposes can become a dangerous weapon if it is

23    used in a dangerous or a potentially dangerous

24    fashion.  The law considers an item, in this case,

25    a motor vehicle, to be used in a dangerous fashion

1    if it is used in a way that it reasonably appears

2    to be capable of causing serious injury or death to

3    another person.

4        In deciding whether an item was used as a

5    dangerous weapon, you may consider the

6    circumstances surrounding the alleged crime, the

7    nature, size and shape of the item and the manner

8    in which it was handled or controlled.

9        Now, that completes the second part of my

10    instructions.  I will now turn to the final

11    instructions.

12        In order for a jury to return a verdict, that

13    is, to reach a decision in a criminal case, the law

14    provides that there may only be 12 persons on the

15    deliberating jury, and you will note that there are

16    still 14 of you.

17        To avoid the need for a new trial if one or

18    more jurors becomes ill or has to be excused for

19    some good reason, we customarily impanel extra

20    jurors at the beginning of a trial as we did in

21    this case.  However, when you begin your

22    deliberations, the law of Massachusetts is that

23    there can only be 12 jurors.

24        Therefore, at the conclusion of my

25    instructions, the clerk will reduce your number to

37-44

1          12 on a random basis.  The jurors not selected to

2          serve on the jury will become the alternate jurors.

3              If you are selected as an alternate juror,

4          please do not feel that your efforts in this case

5          have been wasted because, as I've indicated, it is

6          important that we have extra jurors in the case of

7          an emergency.  If we did not impanel extra jurors

8          and a juror became ill or for some other reason had

9          to be excused, we would have to try the case all

10         over again with a new jury.

11             In the event that a juror has to be excused

12         once the jury starts deliberating, then an

13         alternate juror will be chosen to take that juror's

14         position and the jury will be required to start

15         their deliberations all over again from the very

16         beginning.

17             Therefore, it is important that the alternates

18         not discuss the case with anyone, including each

19         other, for if an alternate becomes a member of the

20         jury for deliberations, the alternates' views

21         should be his or her own and not influenced by

22         anyone else.

23             Now, different states and jurisdictions use

24         different means to select a foreperson of the jury.

25         In some jurisdictions, the jurors select their own

37-45

1    foreperson.  In Massachusetts, the judge is

2    responsible for selecting a foreperson.  A

3    foreperson of a jury has been described as the

4    first among equals.  He or she is responsible for

5    organizing the deliberations, communicating with

6    the Court if necessary during deliberations and

7    presenting the verdict following your

8    deliberations.  The foreperson has no greater say

9    or vote in the jury's deliberations.  However, in

10   that sense, he's exactly equal with all of the

11   jurors.

12        I am going to ask the juror in Seat No. 1,

13   Juror No. 400, would you be our foreperson, please,

14   sir?

15        THE JUROR:  I will.

16        THE COURT:  Thank you.  When you return to the

17   jury room to deliberate, the court officers will

18   deliver to you all of the exhibits in this case as

19   well as the verdict slips that you will use in

20   returning your verdict.  Your foreperson will be

21   given verdict slips setting forth the charges

22   against the defendant.  Twelve jurors must agree

23   before you have a decision as to any charge.  That

24   means that to find the defendant guilty, all 12

25   must agree.  To find the defendant not guilty, all

1    12 must agree.  You should continue deliberating

2    until you have reached a final verdict on each

3    charge.  You should not begin deliberating until

4    all 12 jurors are together in the jury room and

5    should cease deliberating if any one juror is not

6    present in the jury room.

7         It is important that you not communicate with

8    anyone outside the jury room about the

9    deliberations or about anything concerning this

10   case.  Further, I instruct you that no juror is

11   better qualified to determine the truth of the

12   facts in dispute or to deliberate on a verdict

13   solely because of education, background or

14   experience.

15        The parties and I have chosen each of you as

16   fair and impartial jurors and your voices have

17   equal weight.  To reach a unanimous verdict, each

18   juror must agree.  Jurors have a duty to consult

19   with one another and to deliberate with a view to

20   reaching an agreement if it can be done without

21   violence to individual judgment.  At the same time,

22   each juror must decide the case for himself or

23   herself but only after impartially considering the

24   evidence with his or her fellow jurors.  Don't

25   hesitate to re-examine your views and change your

1    opinion if convinced it is wrong, but no juror

2    should surrender an honest conviction to the

3    opinion of fellow jurors simply for the purpose of

4    returning a verdict.

5        Although how you conduct your deliberations is

6    up to you, I urge you not to begin conducting an

7    immediate straw vote; rather, I encourage you not

8    to take any votes until you have completed a

9    careful and thorough collective view of all of the

10    evidence.

11        At this point, I want to remind you of an

12    important issue that I raised with you at the

13    beginning of this trial.  I told you that our

14    system of justice depends on judges like me and

15    jurors like you being able and willing to make

16    careful and fair decisions.  All people deserve

17    fair and equal treatment in our system of justice,

18    regardless of their race, national origin,

19    religion, age, ability, gender, sexual orientation,

20    education, income level or any other personal

21    characteristic.

22        I also pointed out that we all have our own

23    built-in expectations and assumptions, even if we

24    are not consciously aware of them, and I talked

25    about some of the ways we can try to deal with

1    them.

2         First, slow down.  Do not rush to a decision.

3    Hasty decisions are the most likely to reflect

4    stereotypes or hidden biases.  Take time to

5    consider all of the evidence.

6         Second, as you start to draw conclusions,

7    consider what evidence, if any, supports the

8    conclusions you are drawing and whether any

9    evidence casts doubt on those conclusions.  Double-

10   check whether you are actually using unsupported

11   assumptions instead of the evidence.

12        Third, as you think about the people involved

13   in this case, consider them as individuals rather

14   than as a member of a particular group.

15        Fourth, I might ask myself, would I view the

16   evidence differently if the people were from

17   different groups such as different racial, ethnic

18   or gender identity groups?

19        Fifth, listen to your fellow jurors.  They may

20   have different points of view.  If so, they may

21   help you determine whether you are focusing on the

22   facts or making assumptions perhaps based on

23   stereotypes.  Of course, your fellow jurors could

24   be influenced by their own unstated assumptions.

25   So don't be shy or hesitate to speak up.

1          You should participate actively, particularly

2      if you think the other jurors are overlooking or

3      undervaluing evidence you find important.  In fact,

4      when you explain your thoughts out loud to other

5      jurors, you are also helping yourself to focus on

6      the evidence instead of assumptions.  If you use

7      these strategies, you will do your part to reach a

8      decision that is as fair as humanly possibly.  That

9      is your responsibility as jurors.

10         Now, during the course of your deliberations,

11     you might have a question concerning the law in

12     this case.  I'm not suggesting that you will but

13     you might.  Perhaps I said something you did not

14     understand.  If you have any questions, please feel

15     free to bring them to my attention by writing a

16     note dated and signed by the foreperson and sending

17     it to me by way of the court officer.

18         Because your role as the jury is to determine

19     the facts of the case, I cannot answer any

20     questions you have concerning the facts of the

21     case.  I have no role in this case when it comes to

22     deciding what the facts are, neither is it possible

23     to provide you with a transcript of the testimony,

24     even though we have had a phenomenal court reporter

25     throughout this whole trial.

1          If you send a question to me, I will respond

2     after consulting with the lawyers.  Please do not

3     ask a court officer or anyone else to answer any

4     questions concerning anything material to the case.

5     We will not answer a question or take a verdict

6     between one and two.  You will have lunch brought

7     in to you and decide whether you want to stop your

8     deliberations during lunch or deliberate.

9          At the end of the day if you're still

10    deliberating, I'll send in a note asking if you

11    want to continue deliberating or break for the day

12    and return tomorrow morning.  Don't tell anyone,

13    including me, how the jury stands numerically or

14    otherwise on the questions before such time as you

15    have reached a unanimous verdict.

16         You are going to notice shortly that the court

17    officers are going to take an oath, and you will

18    hear from that that they, too, as well as all other

19    persons, are forbidden to communicate in any way or

20    manner with any member of this jury on any subject

21    touching on the merits of this case.

22         Remember that the decision of the jury must be

23    unanimous and the foreperson should be certain that

24    each member of the jury is in complete agreement

25    with the verdict.

37-51

1              After the final vote of the jury, the

2        foreperson should check the appropriate boxes as to

3        each charge, then sign and date the verdict slips

4        and notify the court officer that you have reached

5        a unanimous verdict.  You will then be brought back

6        into the courtroom, where the foreperson will

7        deliver the verdicts to the Court.

8              I am going to see counsel before we reduce

9        your number to 12.

10       SEALED SIDEBAR

11             THE COURT:  So, Mr. Clerk, will you choose the

12       alternates, please?

13             THE CLERK:  Could the juror sitting in Seat

14       No. 3, Juror 79, step down and take your place as

15       an alternate?  And the juror sitting in Seat No. 2,

16       Juror 14.

17             THE COURT:  Ladies and gentlemen, we need to

18       swear in the court officers.  They are going to be

19       in charge of you during your deliberations.  I

20       suggest that you listen to the oath that they are

21       taking so that you can be aware of their

22       responsibilities.

23             You can swear them, Mr. Clerk.

24             THE CLERK:  Do you swear that you will keep

25       this jury and alternates in a separate but

37-52

1      convenient place until they agree, that they do not

2      suffer any person to speak to them or speak to them

3      yourselves or ask them if they have agreed, nor

4      suffer them to disperse until they discharge their

5      verdict except by order of the Court, so help you

6      God?

7            THE COURT OFFICERS:  So help me God (in

8      unison).

9            THE CLERK:  Thank you.

10           THE COURT:  All right.  So, jurors, I need not

11     remind you that you have an important

12     responsibility, but I believe that you will bring

13     to bear all the wisdom and the judgment and

14     conscience that you possess in reaching your

15     verdict in this case.  All that we can expect from

16     you is that you decide the case with integrity and

17     with principle.

18           We all expect you to reach an impartial

19     verdict dictated by your logic without bias,

20     without prejudice or sympathy, and not prompted by

21     any facts except those that you have heard in here

22     in the court during trial.  We are looking for

23     impartial judgment dictated by your reasoning in

24     the fullest discharge of your oaths as jurors.

25           You may now retire and deliberate your

1      verdict.

2          (Whereupon, the jury exits the courtroom to

3          commence deliberations at 1:25 p.m.)

4              THE COURT:  So, counsel, I'll give you a few

5          minutes to work with Mr. McDermott on the verdict

6          slip, and then I'll come back.

7          (Whereupon, there was a brief recess taken.)

8      (Court resumes.)

9      (Defendant present.  Jury not present.)

10             THE CLERK:  Back on the record in 22-117,

11         Commonwealth versus Karen Read.

12             THE COURT:  I don't have my charge, all the

13         typos, finished yet.  So I'll have to do that.

14         It's in the process.  It's almost done.  So we'll

15         get that back to the jury.

16             THE CLERK:  Counsel, having looked at the

17         verdict slips, are they acceptable?

18             MR. LALLY:  The Commonwealth is content.

19             MR. JACKSON:  We are content.

20             THE COURT:  All right.  Just give me a minute.

21             MR. JACKSON:  I did have one question, Your

22         Honor, when you are done looking.

23             THE COURT:  Okay.

24             MR. JACKSON:  So in my entire career, Judge,

25         I've never seen it done this way, but it was done

37-54

1    this way in the last trial that I had before this

2    one where it was a superior court case with lesser

3    included charges.  The clerk read off the offense

4    as charged and asked the jury if it was guilty or

5    not guilty.  They came back not guilty.  And I

6    thought that charge was done.  And then the clerk

7    asked the jury is the defendant guilty or not

8    guilty of the lesser included charge.

9        And so to get to the ultimate -- I can't even

10   remember if that was one of the charges that she

11   was convicted of.  But my point is to get to the

12   ultimate not guilty for that charge, we had to go

13   through four separate charges.  I imagine that's

14   not the way it will be done here?

15       THE COURT:  So I always told my clients

16   forever, do not get either your hopes up or upset

17   until you hear everything.  This is a very long

18   process.

19       MR. JACKSON:  Of course.

20       THE COURT:  So we will go through it the way

21   Mr. McDermott always goes through it, starting from

22   top to bottom, Jim?

23       THE CLERK:  Yes.

24       THE COURT:  Okay.  So that is how it is going

25   to be done.

1          MR. JACKSON:  So they're not going to be asked

2     with regard to each lesser included charge guilty

3     or not guilty?  That's my question.

4          THE COURT:  It depends on what the answer is

5     for the first one, right, Jim?

6          THE CLERK:  Yes.

7          THE COURT:  You don't get to the lesser

8     included if it's a guilty on the first one, right?

9          MR. JACKSON:  True.  But, if it's a not

10    guilty, then they are going to be asked about the

11    lesser includeds individually?

12         THE COURT:  Yes.

13         MR. JACKSON:  Okay.  Then that raises the

14    question on the verdict form, and maybe I'm missing

15    something.  Then shouldn't there be a guilty or not

16    guilty for each of the lessers and they're

17    instructed you don't even get to these --

18         THE CLERK:  Yes.  That's right.

19         MR. JACKSON:  That's got to be on every one of

20    them.

21         THE COURT:  Yes.  Yes.

22         MR. JACKSON:  Okay.

23         THE COURT:  I'm at a loss.  I don't have my

24    instructions.  I was in the middle of typing them.

25    I thought I was coming out for the exhibits.  So

37-56

1          yes, I agree.

2                   MR. JACKSON:  Okay.

3                   THE COURT:  Actually, Jim, do you have --

4                   MR. JACKSON:  I'm sorry, Your Honor?

5                   THE CLERK:  No.  She is asking me.

6                   MR. JACKSON:  Oh.  Sorry.  Sorry.

7                   THE COURT:  What does the Commonwealth say?

8                   MR. LALLY:  On the verdict slips, Your Honor?

9                   THE COURT:  Yes, on the lesser includeds on

10         Offense 2.  It just says, not guilty, guilty of the

11         offense charged and then guilty of the lesser

12         included, guilty of the lesser included, without a

13         not guilty option.

14              MR. LALLY:  That's how it is.  That's

15         typically how I've seen it.  But if that's what

16         counsel is requesting, I don't have any issue with

17         that.

18              THE COURT:  Any objection, Mr. Lally, to

19         putting a "not guilty" on that?

20                   MR. LALLY:  For each of the lesser includeds?

21                   THE COURT:  Yes.

22                   MR. LALLY:  No, Your Honor.

23                   THE COURT:  But it would have to follow --

24         instead of it being not guilty first, it would have

25         to be guilty or not guilty.

1          MR. LALLY:  Correct.  Yes.

2          THE COURT:  So it would be reversed and it

3     would draw attention to it?

4          THE CLERK:  Three not guilties on one

5     indictment?

6          THE COURT:  Yes.

7          THE CLERK:  They would check not guilty on all

8     three times as opposed to just checking not guilty

9     once?

10         MR. JACKSON:  That then leaves open the

11    question for the subsequent, the subordinate lesser

12    includeds.

13         THE CLERK:  Not guilty is not guilty.

14         MR. JACKSON:  No, it's not.

15         THE COURT:  Of the first one.  And then if

16    they --

17         THE CLERK:  Yes.  That's right.

18         MR. JACKSON:  They have to find her not guilty

19    of the superior charge to even get to the

20    subordinate charges.  And then they have to have a

21    choice of guilty or not guilty on each of the

22    subordinate charges.  And my suggestion would be it

23    has to be in the same order.  In other words, not

24    guilty comes first, then guilty as charged.  Then

25    the subordinate charge, not guilty of the

37-58

1      subordinate and guilty of the subordinate.

2              THE COURT:  All right.  So let's hold the

3      verdict slips.  I'm sure you're all tired, but let

4      me take a look at this.  I've been trying to get my

5      instructions ready.  So let me take a look at this.

6              MR. YANNETTI:  We are going to be around.

7      We are going to go across the street and have

8      lunch, but I have given my cell phone number to

9      Mr. McDermott.

10             THE COURT:  I'll see counsel at sidebar.

11     SEALED SIDEBAR

12             MR. JACKSON:  Also, for the record, may we be

13     excused until --

14             THE COURT:  Not until we do whether the

15     exhibits are in order.

16             THE CLERK:  Counsel and I had a chance to go

17     over the exhibits and they are ready to go to the

18     jury.

19             MR. JACKSON:  Yes.  For the defense, I have.

20             MR. MCLAUGHLIN:  Yes, Your Honor.  For the

21     Commonwealth, I've personally gone through all of

22     the exhibit books, and I am content that all of the

23     exhibits are there.

24             THE COURT:  Okay.  There was one that had not

25     been redacted.  Has that been done?

37-59

1              THE CLERK:  That particular exhibit needs to

2         go back into the book.  It's already evidence.

3              THE COURT:  All right.  Thank you.  Just make

4         sure the court officers have your cell phone

5         numbers.

6              THE CLERK:  I need to put one more thing on

7         the record.  The case always goes with the laptop

8         -- it's clean.  That's the case here, correct?

9              MR. LALLY:  Yes.  All that's in there is a

10        clean laptop, as well as a charger.

11             THE COURT:  All right.  We are still in

12        session.  Is the defense content?

13             MR. JACKSON:  We're content.  Yes.

14             THE COURT:  No.  There was another question.

15             MR. JACKSON:  I'm sorry.

16             THE CLERK:  The laptop.

17             MR. JACKSON:  Yes, we are.

18             THE COURT:  All right.  Thank you.

19        (Whereupon, there was a luncheon recess taken.)

20

21

22

23

24

25

37-60

1              A F T E R N O O N   S E S S I O N

2      (Court resumes at 4:11 p.m.)

3      (Defendant present.  Jury not present.)

4              THE COURT:  All right.  So I want to bring

5          that alternate juror in.  So that is what we are

6          going to do first.  And, actually, too, I came out

7          here on three different occasions.  I think it was

8          one on verdict slips, one to send my charge in and

9          nobody was around.  Certainly by 10 minutes of

10         4:00, you all should have been around.

11             Please don't shake your head.  Your lawyers

12         probably don't want to see you shaking your head at

13         me on that.  All right, Ms. Read?

14             So tomorrow morning, counsel, all counsel must

15         remain in the building from 9:00 until 10:00, at

16         least, until I tell you you can leave, and, at the

17         end of the day from 3:30 to 4:30, and we will take

18         it from there.  Okay?

19             Mr. Yannetti, you certainly know that when

20         jurors are going out, oftentimes there are things

21         that need to be done.  So I would have liked to

22         have talked to this juror before now.

23             MR. YANNETTI:  Oh.

24             THE COURT:  And I sent a note in to the jurors

25         at 4:00.  There was nobody here when I wanted to

37-61

1    send that note in.  So there was a note that was

2    sent to the jurors at 4:00 o'clock about whether

3    they want to go home.  They do want to go home.

4    Okay?

5        MR. YANNETTI:  That will not happen again.

6        THE COURT:  Okay.  Thank you.  So let's bring

7    that juror in and then you can bring whoever, the

8    public.  But let's bring the juror in first.

9        THE COURT OFFICER:  Yes, Your Honor.

10       THE COURT:  Why don't counsel come on over as

11   she's coming in.

12   SEALED SIDEBAR

13       THE COURT:  Bring in all of the jurors.

14   (Whereupon, the jury entered the courtroom at

15   4:22 p.m.)

16       THE COURT:  All right, jurors.  So as you

17   know, I sent you in a note at 4:00, asking if you

18   wanted to go home and come back tomorrow.  You said

19   yes.  I apologize it took us so long to get

20   everybody together to do this.

21       So I am going to excuse you for today.  When

22   you come back tomorrow, you will start again after

23   coming into the courtroom.  So I do have to give

24   you those three cautions.  And the cautions also

25   concern the alternates.  So please do not discuss

37-62

1    this case or any aspect of this case with anybody.

2    Do not do any independent research or investigation

3    into this case.  If you happen to see, hear or read

4    anything about this case, please disregard it and

5    let us know.

6         You've all worked so hard for this last eight,

7    nine, 10 weeks, however long it is.  Let's just

8    make sure that you continue to be as secure in how

9    you've done things as you have been.  We really

10   appreciate it.  So we will see you tomorrow

11   morning.  Have a good night.

12   (Whereupon, the jury exits the courtroom.)

13   (Whereupon, juror communication was entered and

14   marked Exhibit "OOO" for Identification.)

15        THE COURT:  All right.  We'll see everybody

16   tomorrow.

17   (Whereupon, the Court adjourned.)

18

19

20

21

22

23

24

25

37-63

1                    C E R T I F I C A T E

2

3          I, Paula M. Mills, retired certified court

4     reporter, do hereby certify that the foregoing

5     pages, page 37-3 to 37-62, is a true and accurate

6     transcription of the voice recording in the

7     aforementioned matter to the best of my skill and

8     ability.

9          This, the 12th day of July, 2024.

10

11

12                    _____

13                    Paula M. Mills

14                    Retired Certified Court Reporter

15                    and Court Transcriptionist

16

17

18

19

20

21

22

23

24

25

```
                                     Volume:   XXXVIII
                                     Pages:    23
                                     Exhibits: (See Index)
```

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                    SUPERIOR COURT DEPARTMENT
                                OF THE TRIAL COURT


```
* * * * * * * * * * * * * * * * *
                                *
COMMONWEALTH OF MASSACHUSETTS   *
                                *
vs.                             *   Indictment No.
                                *   2282CR00117
KAREN READ                      *
                                *
* * * * * * * * * * * * * * * * *
```


Day 38 - Trial with Jury
Before the Honorable Beverly Cannone



APPEARANCES:

For The Commonwealth:
BY: Adam Lally
    Laura McLaughlin
    Assistants District Attorney

For Karen Read:
BY: Alan Jackson
    David Yannetti
    Elizabeth Little
    Attorneys at Law


```
                         Norfolk Superior Courthouse
                         Dedham, Massachusetts
                         Wednesday, June 26, 2024
```


Paula M. Mills
Retired Certified Court Reporter
and Court Transcriptionist

<u>I N D E X</u>

WITNESS:            DIRECT    CROSS    REDIRECT    RECROSS

(None)

<u>E X H I B I T S</u>

NUMBER                                                PAGE

"PPP"    Communication from the jury              38-5

"QQQ"    Communication from the jury              38-9

"RRR"    Additional written jury charge           38-19

"SSS"    Initial verdict slip for Count 2         38-20
         in sealed envelope

"TTT"    Communication from the jury              38-21

1                    P R O C E E D I N G S

2                       June 26, 2024

3    (Court in session at 9:12 a.m.)

4    (Defendant present.  Jury present.)

5         THE CLERK:  22-117, the Commonwealth versus

6    Karen Read.

7         THE COURT:  All right.  Good morning, counsel.

8    Good morning, Ms. Read.  Good morning, jurors.

9         So I have to ask you all, including the

10   alternates, three questions:  Were you all able to

11   follow the instructions and refrain from discussing

12   this case with anyone since we left the courtroom

13   yesterday?

14        Everyone said "yes" or nodded affirmatively.

15        Were you also able to follow the instructions

16   and refrain from doing an independent research or

17   investigation into this case?

18        Everyone said "yes" or nodded affirmatively.

19        Did anyone happen to see, hear or read

20   anything about this case since we left here

21   yesterday?

22        Everyone said "no" or shook their heads.

23        All right.  With that, we'll send you back out

24   to deliberate.  Thank you.

25   (Whereupon, the jury exited the courtroom to resume

38-4

1    deliberations at 9:13 a.m.)

2         THE COURT:  All right.  So, counsel, I don't

3    want the jury to have to wait for us for anything

4    today.  So you are to stay in the building until

5    10.  I need you back here for the afternoon no

6    later than 3:30.  You will be free to leave during

7    the day as long as you can definitely be in here,

8    in your seats, ready to go on five minutes notice.

9    Okay?  So we'll see you then.

10    (Whereupon, there was a brief recess taken at

11    9:14 a.m.)

12  (Court resumes at 9:29 a.m.)

13  (Defendant present.  Jury not present.)

14         THE CLERK:  Judge, we are back on the record

15    on 22-117.  I believe we have a question from the

16    jury.

17         THE COURT:  Yes.  It is simply, "Good morning.

18    The jury is kindly requesting to conclude

19    deliberations in time to board the bus at 4:00 p.m.

20    A juror has a long-existing scheduling conflict."

21         So I'm just going to simply say yes and send

22    it back.

23         MR. JACKSON:  No objection.

24         MR. LALLY:  That's fine, Your Honor.

25         THE COURT:  Could you mark this, please?

1          THE COURT REPORTER:  Sure.  That would be

2      "PPP" for Identification.

3          THE COURT:  Thank you.

4      (Whereupon, communication from the jury was entered

5      and marked Exhibit "PPP" for Identification.)

6          THE COURT:  All right.  We will send it back

7      in with you, Officer Delano.  All set.

8      (Whereupon, there was a brief recess taken at

9      9:30 a.m.)

10  (Court resumes at 10:02 a.m.)

11  (Defendant present.  Jury not present.)

12          THE CLERK:  22-117.

13          THE COURT:  So why are we out here?

14          MR. JACKSON:  Your Honor, I just saw the

15      verdict forms and, as we discussed yesterday, the

16      amendments that the Court indicated it would make

17      on the verdict forms have not been made.

18          THE COURT:  Oh, no, no, no.  Okay.  I did not

19      say I'd make it.  I said I would think about it.  I

20      said I was tired and I needed to think about it.

21          MR. JACKSON:  Well, what you said before you

22      were tired and you needed to think about it was you

23      agreed that there needs to be not guilty options

24      for the subordinate charges under Count 2.

25          THE COURT:  I said that it made sense to me.

38-6

1    But no.  I did not change it upon looking at it

2    because the verdict slip, this verdict slip as

3    submitted to the jury, is exactly how it always is

4    in Massachusetts.

5         MR. JACKSON:  Well, can I ask you a question,

6    then?  I don't really care how it always in is

7    Massachusetts.  I care about whether or not it is

8    appropriate.

9         THE COURT:  It's appropriate.

10        MR. JACKSON:  Those are two different things.

11        THE COURT:  It's appropriate.

12        MR. JACKSON:  Let me make my argument, if you

13   wouldn't mind, Judge, why it's not appropriate.

14        For a superior charge, they have to decide

15   that she is not guilty of the superior charge, and

16   that is the starting point of whether or not she is

17   guilty or not guilty of any subordinate charge,

18   often called a lesser included.

19        Once they decide that she's not guilty of the

20   superior charge, now there's two additional charges

21   that they've been instructed they must decide

22   whether she's guilty or not guilty of.  How do they

23   decide that she's not guilty of the first

24   subordinate charge, involuntary manslaughter?

25        THE COURT:  Anything else you want to say,

38-7

1          Mr. Jackson?

2                  MR. JACKSON:  I'd like an answer from the

3          Court.  How do they decide that she's to guilty of

4          involuntary manslaughter on that verdict form?

5                  THE COURT:  That's their decision to make.

6                  MR. JACKSON:  And how do they make it if they

7          don't have an option to check a box that says "not

8          guilty"?  I don't --

9                  THE COURT:  They don't check the box that says

10         "guilty," do they?  And then when they go to the

11         next block, they don't check the block that says

12         "guilty."  And, on the top, you're left with not

13         guilty.  Okay?

14                 MR. JACKSON:  So it's the absence of the check

15         mark that the Court determines is the not guilty

16         finding by the jury?

17                 THE COURT:  Yes.  That's what the verdict slip

18         reads.  It reads "not guilty."  If they don't check

19         Block 2, 3 or 4, the verdict slip reads "not

20         guilty."  Okay?

21                 MR. JACKSON:  That is --

22                 THE COURT:  That's how it is, Mr. Jackson.

23                 MR. JACKSON:  Well, apparently that's how it's

24         going to be because Court's ordered it.  But that's

25         not how it should be, and it's over our strong

38-8

1    objection.  They need to see that there is a not

2    guilty option for the subordinate charges.  If they

3    come back guilty on, for instance, involuntary

4    manslaughter, that's immediately appealable.  They

5    didn't have an option on the verdict form to find

6    her not guilty.  It's almost like the Court is

7    directing a verdict of the subordinate charges.

8         THE COURT:  I disagree with you.

9         Mr. Yannetti, you've seen verdict slips

10    exactly like this?

11         MR. YANNETTI:  I actually haven't, Your Honor.

12         THE COURT:  You've had no lesser includeds?

13         MR. YANNETTI:  No.  We've always had lesser

14    includeds, but I have not seen a verdict slip there

15    where not guilty is not an option for a lesser

16    included.

17         THE COURT:  I disagree.

18         MR. JACKSON:  And I don't see the --

19         THE COURT:  Excuse me?  This is funny,

20    Ms. Read?

21         All right.  We're done.

22    (Whereupon, a brief recess is taken.)

23    (Court resumes at 11:49 a.m.)

24    (Defendant present.  Jury not present.)

25         THE COURT OFFICER:  Court is back in session.

1      You may be seated.

2      (Whereupon, jury communication was entered and

3      marked "QQQ" for Identification.)

4          THE CLERK:  Judge, we have a question from the

5      jury.  It's been marked "QQQ" for Identification.

6          THE COURT:  Okay.  The question, "Can we

7      request the SERT report detailing the search

8      performed?"

9          So they can request it, but they can't get it.

10     So I'm just going to say, you have all of the

11     evidence in this case.

12         We will figure that out.  I'll get some

13     language from you.

14         But, Mr. Jackson, after our hearing this

15     morning, I considered what you said.  I went back

16     and I read the jury instructions I gave yesterday.

17     So I do appreciate the concern about the confusion

18     this might cause the jury. I think it is easily

19     clarified with a supplemental instruction.  I don't

20     think it's the verdict slip.  I think it's how they

21     are to follow the verdict slip.

22         So what I've written up, this is a very rough

23     draft.  I'll read it to you.  I'll take a break and

24     let you consider it if you want, but this works out

25     -- I received this about 15 minutes ago, the letter

38-10

1      -- the question from the jury, so it seems a good

2      time.  So I was working on this.  It seems a good

3      time to bring them in for an answer to the

4      question.

5          And I would say, "As long as I have you here,

6      I want to clarify my instructions regarding your

7      verdict as to Count 2 of the indictment.

8          "As I instructed you yesterday, there are two

9      lesser offenses of that crime which are involuntary

10     manslaughter and motor vehicle homicide, felony,

11     OUI liquor and negligence.  Therefore, Count 2

12     encompasses three separate charges, the most

13     serious of which is manslaughter while operating a

14     motor vehicle under the influence of liquor.

15         "In considering Count 2, you should first

16     focus on the crime of manslaughter while operating

17     a motor vehicle under the influence of liquor and,

18     if the Commonwealth has failed to prove that crime

19     beyond a reasonable doubt, then you are to consider

20     the remaining lesser included offenses in

21     descending order.

22         "The lead charge is manslaughter while

23     operating a motor vehicle under the influence of

24     liquor.  If you find that the Commonwealth has

25     proved all five elements, proven all five elements

38-11

1      of this charge beyond a reasonable doubt, then your

2      verdict shall be guilty of manslaughter while

3      operating a motor vehicle under the influence of

4      liquor.

5          "If, however, you find that the Commonwealth

6      has not proven all five elements of manslaughter

7      while operating a motor vehicle under the influence

8      of liquor, then you are to consider whether the

9      Commonwealth has proven beyond a reasonable doubt

10     the three elements of the lesser included offense

11     of involuntary manslaughter.

12         "If the Commonwealth has proven the three

13     elements of involuntary manslaughter, then your

14     verdict shall be guilty on the lesser included

15     offense of involuntary manslaughter.  If, however,

16     you find the Commonwealth has failed to prove

17     beyond a reasonable doubt the crime of manslaughter

18     while operating a motor vehicle under the influence

19     of liquor and the lesser included offense of

20     involuntary manslaughter, then you are to consider

21     whether the Commonwealth has proven beyond a

22     reasonable doubt the five elements of motor vehicle

23     homicide, felony, OUI, liquor and negligence.

24         "If the Commonwealth has proven beyond a

25     reasonable doubt the five elements of motor vehicle

38-12

1    homicide, then your verdict shall be guilty of the

2    lesser included offense of motor vehicle homicide,

3    OUI, liquor and negligence.  If, however, the

4    Commonwealth has failed to prove beyond a

5    reasonable doubt all elements of manslaughter while

6    operating a motor vehicle under the influence of

7    liquor and has failed to prove all of the elements

8    of the lesser included offenses of involuntary

9    manslaughter or motor vehicle homicide, felony,

10   OUI, liquor and negligence, then your verdict must

11   be not guilty to Count 2.

12        MR. JACKSON:  May I have just a moment?

13        THE COURT:  Yes.

14   (Whereupon, there was a brief pause.)

15        MR. JACKSON:  Thank you, Your Honor.  May I be

16   heard?

17        THE COURT:  Yes.

18        MR. JACKSON:  I deeply appreciate the Court's

19   additional clarifying language.  I would simply ask

20   for one very simple amendment; and, that is, at the

21   top of the verdict slip, it says the two words "not

22   guilty."  We would ask that the verdict slip read,

23   "Not guilty of the offense charged or any lesser

24   included offense."

25        That's it.  And I think that and the Court's

38-13

1    clarifying instruction would satisfy the defense.

2    Not I think.  I know it will.  That's all we ask.

3    And I can repeat that if the Court wishes.

4         THE COURT:  So there are some like minor

5    changes we have to make to the verdict slip anyway.

6    It has to be consistent.  So the manslaughter while

7    operating a motor vehicle under the influence, the

8    tab needs to -- actually, Tori -- so there needs to

9    be some physical changes in the verdict slip

10   anyway.  It needs to be indented.  There needs to

11   be a colon after "guilty of offense charged."  It's

12   not complete.  It doesn't have "under the influence

13   of liquor."  It just says "under the influence."

14   So there are some minor changes that need to be

15   made to the verdict slip.

16        Does the Commonwealth oppose the suggestion

17   made by Mr. Jackson which seems like a reasonable

18   one?

19        MR. LALLY:  No, Your Honor.

20        THE COURT:  All right.  So it will be not

21   guilty -- so tell me again how you want it?

22        MR. JACKSON:  Sure.  "Not guilty of the

23   offense charged or any lesser included offense."

24        THE COURT:  I think the clarifying language

25   that I proposed is important.

1          MR. JACKSON:  I do too, and I appreciate that.

2     I think with that amendment to the slip and the

3     clarifying language, I think coupling those up is

4     exactly what the defense was asking for, and I

5     appreciate that.

6          THE COURT:  So I need to -- I'd like to send

7     in a written copy of what I just read.  There are a

8     couple of things bolded.  I need to fix this up a

9     little bit.  It was just done quickly.

10          MR. JACKSON:  Okay.

11          THE COURT:  The jury has been waiting.  Why

12     don't we bring them in and I will tell them that a

13     new verdict slip will be in.

14          MR. JACKSON:  Thank you, Your Honor.

15          THE COURT:  I do, though, have to make a

16     finding that the verdict slip as is was proper.

17     All right.  So we will just leave it at that.  I

18     will read the amendment that you wanted.  That is

19     my fault.

20          MR. JACKSON:  Thank you, Your Honor.  Just

21     from a logistics standpoint, once the new verdict

22     slip is prepared and ready --

23          THE COURT:  We all need to see it.

24          MR. JACKSON:  I was just going to ask.  Can we

25     have that emailed to us or something?

38-15

1          THE COURT:  Yes.  We all need to see it.  I

2     will work -- all right.  Bring the jurors in,

3     please.

4          I'm sorry.  Suggested language on the SERT

5     report?

6          MR. JACKSON:  I'm sorry, Judge?

7          THE COURT:  Any suggested language on their

8     question?

9          MR. JACKSON:  No.  I think the Court's

10     correct, that in terms of the SERT report request,

11     the Court's answer is right on point, which is you

12     are directed to review the evidence that is in

13     front of you and that's it, or however you --

14          THE COURT:  I am just going to say, you have

15     all the evidence in this case.

16          MR. JACKSON:  Yes.  Yes.  I was stumbling.

17     (Whereupon, the jury enters the courtroom at

18     11:58 a.m.)

19          THE COURT:  All right.  So, jurors, we are in

20     receipt of your question, "Can we request the SERT

21     report detailing the search performed?"

22          I take this as a request, and the answer is

23     that you folks, you have all the evidence in the

24     case.  So what you have is the evidence in this

25     case.  You won't be receiving any additional

38-16

 1    evidence.  But, as long as I have you here, I want

 2    to clarify my instructions regarding your verdict

 3    as to Count 2 of the Indictment.

 4        As I instructed you yesterday, there are two

 5    lesser offenses of that crime which are involuntary

 6    manslaughter and motor vehicle homicide, felony,

 7    OUI, liquor and negligence.

 8        Therefore, Count 2 encompasses three separate

 9    charges, the most serious of which is manslaughter

10    while operating a vehicle under the influence of

11    liquor.

12        In considering Count 2, you should first focus

13    on the crime of manslaughter while operating a

14    motor vehicle under the influence of liquor and, if

15    the Commonwealth has failed to prove that crime

16    beyond a reasonable doubt, then you are to consider

17    the remaining lesser included offenses in

18    descending order.  So the lead charge is

19    manslaughter while operating a motor vehicle under

20    the influence of liquor.

21        If you find that the Commonwealth has proven

22    all five elements of this charge beyond a

23    reasonable doubt, then you verdict shall be guilty

24    of manslaughter while operating a motor vehicle

25    under the influence of liquor.

38-17

1              If, however, you find that the Commonwealth

2         has not proven all five elements of manslaughter

3         while operating a motor vehicle under the influence

4         of liquor, then you are to consider whether the

5         Commonwealth has proven beyond a reasonable doubt

6         the three elements of the lesser included offense

7         of involuntary manslaughter.

8              If the Commonwealth has proven the three

9         elements of involuntary manslaughter, then your

10        verdict shall be guilty on the lesser included

11        offense of involuntary manslaughter.

12             If, however, you find the Commonwealth has

13        failed to prove beyond a reasonable doubt the crime

14        of manslaughter while operating a motor vehicle

15        under the influence of liquor and the lesser

16        included offense of involuntary manslaughter, then

17        you are to consider whether the Commonwealth has

18        proven beyond a reasonable doubt the five elements

19        of motor vehicle homicide, felony, OUI, liquor and

20        negligence.

21             If the Commonwealth has proven beyond a

22        reasonable doubt the five elements of motor vehicle

23        homicide, then your verdict shall be guilty of the

24        lesser included offense of motor vehicle homicide,

25        OUI, liquor and negligence.

1          If, however, the Commonwealth has failed to

2     prove beyond a reasonable doubt all the elements of

3     manslaughter while operating a motor vehicle under

4     the influence of liquor and has failed to prove all

5     the elements of the lesser included offenses of

6     involuntary manslaughter or motor vehicle homicide,

7     felony, OUI, liquor and negligence, then your

8     verdict must be not guilty to Count 2.

9          So I am going to send in a new verdict slip on

10    Count 2.  It's just a little bit different and we

11    have to sort of change the -- we have to indent

12    something and change the spacing a little bit to

13    make it a little bit clearer for you.  Okay?

14         So we will get that in to you in the next 10

15    minutes.  All right?  Thank you all very much.

16    (Whereupon, the jury exits the courtroom to resume

17    deliberations at 12:02 p.m., and a brief recess is

18    taken.)

19  (Court resumes at 12:45 p.m.)

20  (Defendant present.  Jury not present.)

21         THE COURT OFFICER:  Court is back in session.

22    You may be seated.

23         THE CLERK:  Judge, we are back on the record

24    in 22-117.  Counsel have both had an opportunity to

25    look at the new verdict slip.

38-19

```
 1                THE COURT:  All right.  So does the defense
 2       say the verdict slip is in order?
 3                MR. JACKSON:  It is, Your Honor.  Thank you,
 4       and we appreciate the Court.
 5                THE COURT:  Okay.  Does the Commonwealth say
 6       the verdict slip is in order?
 7                MR. LALLY:  Yes, Your Honor.
 8                THE COURT:  All right.  So the verdict slip
 9       will go in.  Officer Delano, I'll let you do what
10       you do.
11                So the verdict slip will go in to the jury and
12       I instruct you or Officer Lydon to remove the
13       verdict slip for Count No. 2 from the jury.  Have
14       the jurors fold it, put it in an envelope and seal
15       it.  And we will bring that in and we will mark
16       that for identification.
17                I am also going to send in a transcript of the
18       supplemental instruction I gave this morning.  May
19       we mark that, Madam Court Reporter, please?
20                THE COURT REPORTER:  Yes, Your Honor.  That is
21       "RRR" for Identification.
22       (Whereupon, additional written jury charge was
23       entered and marked Exhibit "RRR" for
24       Identification.)
25                THE COURT:  I have copies for counsel.
```

38-20

1           MR. JACKSON:  May I approach?

2           THE COURT:  Yes.  All right.  So with that, we

3      will be in recess.  And you'll remember that the

4      jurors were instructed that we won't take any

5      questions or verdict from 1:00 o'clock to 2:00

6      o'clock.

7           MR. JACKSON:  I missed that last part, Judge.

8           THE COURT:  The jurors were instructed in the

9      instructions I gave yesterday that we will not take

10     a verdict or a question from one to two.

11          MR. JACKSON:  Understood.

12          THE COURT:  So everybody is free.

13          MR. LALLY:  Thank you.

14          MR. JACKSON:  Thank you, Your Honor.

15          THE COURT REPORTER:  "S" for identification is

16     the initial verdict slip on Count 2 in a sealed

17     envelope brought by Officer Paul Delano.

18          To correct the record, it is marked "SSS" for

19     Identification.

20     (Whereupon, initial verdict slip for Count 2 in

21     sealed envelope was entered and marked Exhibit

22     "SSS" for Identification.)

23     (Whereupon, there was a luncheon recess taken at

24     12:55 p.m.)

25

1           A F T E R N O O N   S E S S I O N

2      (Court resumes at 3:35 p.m.)

3      (Defendant present.  Jury not present.)

4           THE COURT OFFICER:  Court is back in session.

5      You may be seated.

6           THE COURT:  So the jurors have indicated they

7      want to go home.

8           THE COURT REPORTER:  This will be "TTT" for

9      Identification.

10     (Whereupon, communication from the jury was entered

11     and marked Exhibit "TTT" for Identification, and

12     the jury entered the courtroom at 3:38 p.m.)

13          THE COURT:  All right, jurors.  You've been

14     working hard today.  I understand you want to go

15     home.  So we will suspend for the day and we will

16     see you tomorrow morning, ready to start right at

17     nine.

18          So please follow those same three

19     instructions.  Do not discuss this case with

20     anyone.  Don't do any independent research or

21     investigation into this case.  If you happen to

22     see, hear or read anything about this case, please

23     disregard it.  Put the whole case out of your mind

24     until tomorrow.  We will see you tomorrow morning.

25     Thank you.

38-22

1          (Whereupon, the jury exited the courtroom.)

2               THE COURT:  All right.  We will see you

3       tomorrow.

4          (Whereupon, the Court adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

38-23

1                    C E R T I F I C A T E

2

3          I, Paula M. Mills, retired certified court

4      reporter, do hereby certify that the foregoing

5      pages, page 38-3 to 38-22, is a true and accurate

6      transcription of the voice recording in the

7      aforementioned matter to the best of my skill and

8      ability.

9          This, the 9th day of June, 2024.

10

11

12              _____

13              Paula M. Mills

14              Retired Certified Court Reporter

15              and Court Transcriptionist

16

17

18

19

20

21

22

23

24

25

367

# COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, SS.**
                                        **SUPERIOR COURT DEPARTMENT**
                                        **NO.  2282-CR-00117**

COMMONWEALTH OF            )
MASSACHUSETTS,             )
   **Plaintiff**          )
                          )
V.                        )
                          )
KAREN READ,               )
   **Defendant**          )
                          )

## DEFENDANT'S EMERGENCY MOTION TO AMEND THE JURY VERDICT SLIP ASSOCIATED WITH COUNT TWO

Now comes Karen Read, the defendant in the above-captioned matter, and respectfully moves this Honorable Court, pursuant to Mass R. of Crim. Procedure 27, to immediately amend the verdict forms for Count Two, Manslaughter by Operating Under the Influence of Alcohol such that it provides the jury with the option of finding Ms. Read "Not Guilty"—not only of Count Two, but also all lesser included offenses associated with that count.

As grounds therefore, the language currently included on the verdict form for Count Two has the effect of directing a verdict as to the lesser included offenses of Count Two such that the jury may be improperly believe they have no option but to find Ms. Read guilty of the lesser included offenses—because no such option exists on the verdict form to find her "Not Guilty" of the lesser included offenses. Attached hereto as **Exhibit A** is a copy of a Sample Jury Verdict Form from the Commonwealth of Massachusetts for a Count with lesser included offenses, which shows the language that should have been included next to the option of "Not Guilty", namely: "We find the defendant **NOT GUILTY** of the offenses charged or any lesser included offenses." That language from the model instruction is notably missing from the verdict form that was provided to the jury in this case. (*See* **Exhibit B**, Verdict Form for Count Two.)

Wherefore, the defendant respectfully requests that this Honorable Court immediately allow this motion.

Respectfully Submitted
for the defendant,
Karen Read,

Respectfully Submitted
for the defendant,
Karen Read,

Alan Jackson, Esq.
Werksman Jackson & Quinn LLP
888 West Sixth Street
Fourth Floor
Los Angeles, CA  90017
(213) 688-0460
BBO#555713

David R. Yannetti, Esq.
Yannetti Criminal Defense Law Firm
44 School Street,
Suite 1000A
Boston, MA  02108
(617) 338-6006

Dated: June 26, 2024

368

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.
                                 **SUPERIOR COURT DEPARTMENT**
                                 **NO.  2282-CR-00117**

|  |  |
|---|---|
| **COMMONWEALTH OF** | ) |
| **MASSACHUSETTS,** | ) |
|     **Plaintiff** | ) |
|  | ) |
| **V.** | ) |
|  | ) |
| **KAREN READ,** | ) |
|     **Defendant** | ) |

## AFFIDAVIT OF COUNSEL IN SUPPORT OF DEFENDANT'S EMERGENCY MOTION TO AMEND THE JURY VERDICT SLIP ASSOCIATED WITH COUNT TWO

    I, Alan J. Jackson, Esq., under oath do depose and state as follows:

1.  I am a Partner at the firm Werksman, Jackson & Quinn LLP. I represent Defendant Karen Read, *pro hac vice*.

2.  I submit this affidavit on personal knowledge in support of the Defendant's Emergency Motion to Amend the Jury Verdict Slip Associated with Count Two.

3.  Attached to this motion as **Exhibit A** is a sample model Jury Verdict Form from the Commonwealth of Massachusetts for a count with lesser included offenses.

4.  This sample Jury Verdict Form indicates that — when a charge includes lesser included offenses — the verdict form should read "We find the defendant NOT GUILTY of the offense charged or any lesser included offense."

5.  On the Verdict Form before the jurors in this case, at present, this language is notably absent.

6.  Further, there is no indication to the jurors that they may return a verdict of "NOT GUILTY" for the lesser-included offenses delineated on the form. *See* **Exhibit B**.

7. In my view, this is likely to confuse the jurors, and will have the effect of directing a verdict as to these lesser-included offenses.

8. The jurors will be led to improperly believe that they have no option to return a verdict of "NOT GUILTY" as to the lesser-included offenses.

9. For these reasons, I believe it is in the interests of justice for this Honorable Court to amend the Verdict Slip to mirror the sample, model jury instruction provided by the Commonwealth of Massachusetts.

Signed and sworn under the pains and penalties of perjury, this 26th day of June, 2024.

Alan J. Jackson, Esq.

## CERTIFICATE OF SERVICE

I, Alan J. Jackson, Esq., hereby certify that I served a copy of the foregoing motion and affidavit upon the Commonwealth via electronic mail, adam.lally@mass.gov, on this date, June 26, 2024.


Alan J. Jackson, Esq.

# Exhibit A

Instruction 5.501

Revised January 2013

**SAMPLE JURY VERDICT FORM**

### COMMONWEALTH OF MASSACHUSETTS
### DISTRICT COURT DEPARTMENT OF THE TRIAL COURT

_____ Division

Complaint No. _____

|  |  |  |
|---|---|---|
| COMMONWEALTH | ) | |
|  | ) | |
| vs. | ) | **JURY VERDICT** |
|  | ) | |
| _____ | ) | |

We, the jury, unanimously return the following verdict:

*(Check only one of the following four choices:)*

☐     1.  We find the defendant **NOT GUILTY** of the offense charged or any lesser included offense

☐     2.  We find the defendant **GUILTY** as charged, of the offense of operating a motor vehicle on a way, or in a place to which the public has a right of access, or on a way or in a place to which members of the public have access as invitees or licensees, while under the influence of  *[tailor to complaint]*  , and so operating a motor vehicle  *[tailor to complaint]*  , and by such operation causing serious bodily injury to a person.  *General Laws chapter 90, section 24L(1).*

☐     3.  We find the defendant **GUILTY** only of the lesser included offense of operating a motor vehicle on a way, or in a place to which the public has a right of access, or on a way or in a place to which members of the public have access as invitees or licensees, while under the influence of  *[tailor to complaint]*  and by such operation causing serious bodily injury to a person.  *General Laws chapter 90, section 24L(2).*

☐     4.  We find the defendant **GUILTY** only of the lesser included offense of operating a motor vehicle on a way, or in a place to which the public has a right of access, or on a way or in a place to which members of the public have access as invitees or licensees, while under the influence of  *[tailor to complaint]*  .  *General Laws chapter 90, section 24(1).*

Date: _____       Signature:_____

Foreperson of the Jury

# Exhibit B

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

### COMMONWEALTH

v.

### KAREN READ

### <u>VERDICT  SLIP</u>

**2282CR117 - Offense 002 — Manslaughter while Operating a Motor Vehicle under the influence.**

In the above-entitled case, we the Jury say that the Defendant is:

    **1.** \_\_\_\_\_ **Not Guilty**

    **2.** \_\_\_\_\_ **Guilty of Offense as Charged**
**Manslaughter while Operating a Motor Vehicle under the Influence**
**(check one or both of the following):**
    \_\_\_\_\_ **Manslaughter while Operating a Motor Vehicle under the Influence of Alcohol**
         **and/or**
    \_\_\_\_\_ **Manslaughter while Operating a Motor Vehicle With a Blood Alcohol Level of .08% or greater**

    **3.** \_\_\_\_\_ **Guilty of lessor included offense:**
         **Involuntary Manslaughter**

    **4.** \_\_\_\_\_ **Guilty of Lessor Included charge of:**
         **Motor Vehicle Homicide (Felony–OUI Liquor and Negligence)**
         **(check one or both of the following):**
    \_\_\_\_\_ **Motor Vehicle Homicide by Operating a Motor Vehicle under the influence of Alcohol**
         **and/or**
    \_\_\_\_\_ **Motor Vehicle Homicide by Operating a Motor Vehicle With a Blood Alcohol Level of .08% or greater**

And this is the unanimous decision of all twelve members.

Date: _____, 2024          Foreperson

```
                                     Volume:   XXXVIII
                                     Pages:    7
                                     Exhibits: (See Index)
```

### COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT


```
* * * * * * * * * * * * * * * * *
                                *
COMMONWEALTH OF MASSACHUSETTS   *
                                *
vs.                             *   Indictment No.
                                *   2282CR00117
KAREN READ                      *
                                *
* * * * * * * * * * * * * * * * *
```


Day 39 - Trial with Jury
Before the Honorable Beverly Cannone



APPEARANCES:

For The Commonwealth:
BY: Adam Lally
    Laura McLaughlin
    Assistants District Attorney

For Karen Read:
BY: Alan Jackson
    David Yannetti
    Elizabeth Little
    Attorneys at Law


                            Norfolk Superior Courthouse
                            Dedham, Massachusetts
                            Thursday, June 27, 2024


                    Paula M. Mills
            Retired Certified Court Reporter
               and Court Transcriptionist

39-2

<u>I N D E X</u>

WITNESS:              DIRECT     CROSS     REDIRECT     RECROSS

(None)


<u>E X H I B I T S</u>

NUMBER                                                    PAGE

"UUU"      Communication from the jury                    39-5

39-3

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | June 27, 2024 |
| 3 | (Court in session at 9:03 a.m.) |
| 4 | (Defendant present.  Jury present.) |
| 5 | THE COURT OFFICER:  Hear ye, hear ye, hear ye. |
| 6 | All persons having any business before the |
| 7 | Honorable Beverly Cannone, Justice of the Norfolk |
| 8 | Superior Court and for the County of Norfolk, draw |
| 9 | near, give your attendance.  You shall be heard. |
| 10 | God save the Commonwealth of Massachusetts.  This |
| 11 | court is now open.  You may be seated. |
| 12 | THE CLERK:  22-117, Commonwealth versus |
| 13 | Karen Read. |
| 14 | THE COURT:  Good morning, counsel.  Good |
| 15 | morning, Ms. Read.  Good morning, jurors. |
| 16 | THE JURORS:  Good morning (in unison). |
| 17 | THE COURT:  I have those same three questions |
| 18 | for you.  Were you all able to follow the |
| 19 | instructions and refrain from discussing this case |
| 20 | with anyone since we left yesterday? |
| 21 | Everyone said "yes" or nodded affirmatively. |
| 22 | Were you also able to follow the instructions |
| 23 | and refrain from doing any independent research or |
| 24 | investigation into this case? |
| 25 | Everyone said "yes" or nodded affirmatively. |

39-4

```
 1           Did anyone happen to see, hear or read
 2       anything about this case since we left here
 3       yesterday?
 4           Everyone said "no" or shook their heads.
 5           All right.  With that, Mr. Foreman, I am
 6       sending you and the rest of the jurors out to
 7       deliberate.
 8       (Whereupon, the jury exited the courtroom to resume
 9       deliberations at 9:04 a.m.)
10           THE COURT:  All right.  The same as yesterday.
11       Please stay in the building until 10:00 o'clock.
12       Be back here at 3:30.  If you leave the building,
13       let the court officers know where you are going to
14       be and be prepared to be back in your seats within
15       five minutes.  Okay?  Thank you.
16           MR. JACKSON:  Thank you, Your Honor.
17           MR. LALLY:  Thank you.
18       (Whereupon, there was a brief recess taken.)
19
20
21
22
23
24
25
```

39-5

1          A F T E R N O O N   S E S S I O N

2     (Court resumes at 3:39 p.m.)

3     (Defendant present.  Jury not present.)

4          THE COURT OFFICER:  Court is back in session.

5     You may be seated.

6          THE COURT:  The jury indicates they want to go

7     home, but I'd like to see counsel at sidebar,

8     please.

9     SEALED SIDEBAR

10         THE COURT REPORTER:  "UUU."

11    (Whereupon, communication from the jury was entered

12    and marked Exhibit "UUU" for Identification.)

13    (Whereupon, the jury entered the courtroom at

14    3:42 p.m.)

15         THE COURT OFFICER:  Court is in session.

16    Please be seated.

17         THE COURT:  Okay, jurors.  We all appreciate

18    how hard you've been working and I understand you'd

19    like to stop for the day.  So we will certainly do

20    that.  We appreciate everything you're doing.

21         I do have to give you those same three

22    cautions.  Please do not discuss this case with

23    anyone.  Don't do any independent research or

24    investigation into this case.  If you happen to

25    see, hear or read anything about this case, please

39-6

1       disregard it and let us know.  Clear your heads.

2       We'll see you tomorrow morning.  Thank you very

3       much.

4       (Whereupon, the jury exited the courtroom.)

5            THE COURT:  All right.  We will see everybody

6       tomorrow morning.

7            MR. JACKSON:  Thank you, Your Honor.

8       (Whereupon, the Court adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39-7

1                    C E R T I F I C A T E

2

3          I, Paula M. Mills, retired certified court

4    reporter, do hereby certify that the foregoing

5    pages, page 39-3 to 39-6, is a true and accurate

6    transcription of the voice recording in the

7    aforementioned matter to the best of my skill and

8    ability.

9          This, the 13th day of July, 2024.

10

11

12                    _____

13                    Paula M. Mills

14                    Retired Certified Court Reporter

15                    and Court Transcriptionist

16

17

18

19

20

21

22

23

24

25

Volume:    XL
Pages:     11
Exhibits: (See Index)

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT


* * * * * * * * * * * * * * * * *
                                *
COMMONWEALTH OF MASSACHUSETTS   *
                                *
vs.                             *    Indictment No.
                                *    2282CR00117
KAREN READ                      *
                                *
* * * * * * * * * * * * * * * * *



Day 40 - Trial with Jury
Before the Honorable Beverly Cannone



APPEARANCES:

For The Commonwealth:
BY: Adam Lally
    Laura McLaughlin
    Assistants District Attorney

For Karen Read:
BY: Alan Jackson
    David Yannetti
    Elizabeth Little
    Attorneys at Law


                          Norfolk Superior Courthouse
                          Dedham, Massachusetts
                          Friday, June 28, 2024


                   Paula M. Mills
            Retired Certified Court Reporter
              and Court Transcriptionist

40-2

<u>I N D E X</u>

WITNESS:            DIRECT    CROSS    REDIRECT    RECROSS

(None)


<u>E X H I B I T S</u>

NUMBER                                              PAGE

"VVV"    Communication from the jury              40-7

"WWW"    Communication from the jury              40-9

"XXX"    Two envelopes Re: media                  40-10

40-3

1                    P R O C E E D I N G S

2                       June 27, 2024

3   (Court in session at 9:06 a.m.)

4   (Defendant present.  Jury present.)

5          THE CLERK:  Hear ye, hear ye, hear ye.  All

6       parties that have anything to do before the

7       Honorable First Justice Beverly Cannone, now

8       sitting in the Dedham Superior Court, within and

9       for the County of Norfolk, draw near, give your

10      attendance and you shall be heard.  God save the

11      Commonwealth and this court.

12          Thank you.  You may be seated.  Court is now

13      in session.

14          THE CLERK:  Good morning, Your Honor.  22-117,

15      Commonwealth versus Karen Read.

16          THE COURT:  Good morning.  Counsel, good

17      morning.  Good morning, Ms. Read.  Good morning,

18      jurors.

19          I want to thank you for getting here promptly.

20      I do have those three questions for you.  Were you

21      all able to follow the instructions and refrain

22      from discussing this case with anyone since we left

23      yesterday?

24          Everyone said "yes" or nodded affirmatively.

25          Were you also able to follow the instructions

40-4

1    and refrain from doing any independent research or

2    investigation into this case?

3        Everyone said "yes" or nodded affirmatively.

4        Did anyone happen to see, hear or read

5    anything about this case since we left yesterday?

6        Everyone said "no" or shook their heads.

7        With that, Mr. Foreman, I'm going to send you

8    all back out to deliberate.

9    (Whereupon, the jury exited the courtroom to resume

10    deliberations at 9:08 a.m. and a brief recess was

11    taken.)

12  (Court resumes at 12:10 p.m.)

13  (Defendant present.  Jury not present.)

14        THE COURT OFFICER:  Thank you.  Please be

15    seated.  Court is in session.

16        THE CLERK:  We are back on the record on

17    22-117, Commonwealth versus Karen Read.

18        THE COURT:  All right.  So, counsel,

19    you're aware of our note from the jury.  "Dear

20    Judge Cannone:  I am writing to inform you on

21    behalf of the jury that despite our exhaustive

22    review of the evidence and our diligent

23    consideration of all disputed evidence, we have

24    been unable to reach a unanimous verdict," signed

25    by the foreperson.

40-5

 1            So I want to hear from counsel your view on

 2       whether there has been due and thorough

 3       deliberations.  So let's start with the

 4       Commonwealth.

 5            MR. LALLY:  My answer would be "no," Your

 6       Honor.  There simply hasn't been sufficient time

 7       yet.

 8            THE COURT:  And what does the defense say?

 9            MR. JACKSON:  We believe that there has been

10       sufficient time.

11            THE COURT:  All right.  So I'll hear from both

12       of you in more detail.  Mr. Lally, I will hear you.

13            MR. LALLY:  Your Honor, the jury received this

14       case earlier this week.  They've had slightly

15       shortened days, and I'm not in any way, shape or

16       form suggesting that they haven't conducted their

17       due diligence in regard to their deliberative

18       process.  But I would submit that it is far, far,

19       far too early in their deliberative process to even

20       consider giving them any kind of *Tuey-Rodriguez*

21       instruction or anything close to that.

22            Furthermore, the note doesn't really indicate

23       affirmatively that they can't come to a conclusion.

24       It just says that they haven't come to a conclusion

25       through their deliberative process at this time.

40-6

 1     They are not even asking for one, is what I would
 2     say.
 3          THE COURT:  All right.  Thank you.
 4          Mr. Yannetti, I'll hear you.
 5          MR. YANNETTI:  Your Honor, I would disagree
 6     with Mr. Lally's characterization of the note.  The
 7     word "exhaustive" is the word I think that's
 8     operative here.  They are communicating to the
 9     Court that they've exhausted all manner of
10     compromise, all manner of persuasion and they are
11     at an impasse.
12          You know, this is a case where the jury has
13     the legal instructions.  They've only really asked
14     one question, which was to try to get a report that
15     they were not allowed to get.  And I think the
16     message has been received that the evidence is
17     closed.  They won't get anything more.
18          They've been working essentially nonstop over
19     the last, you know, three, four days.  You know, we
20     are approaching a weekend.  They didn't come back
21     with this at 3:00 o'clock or 4:00 o'clock.  They
22     are at 12:00 o'clock, and they have nowhere to
23     turn.
24          So our position is the jury should be read the
25     *Tuey-Rodriguez* model instruction and go from there.

```
 1              THE COURT:  Okay.  All right.  So you all know
 2      that it is within my discretion.  I decide.  So a
 3      case that has been -- it is a long case.  This is
 4      our fourth day of deliberations, but Tuesday was a
 5      short afternoon, maybe two and a half hours.
 6      Wednesday, they left early because of an
 7      appointment.  Yesterday was also shortened a little
 8      bit.  And this note arrived with less than three
 9      hours of deliberations today, so that the length of
10      the trial, the length of the deliberations -- I
11      know the case had -- we heard from 74 witnesses.
12      There are 657 exhibits, very complex issues in this
13      case.
14              I am not prepared to find that there have been
15      due and thorough deliberations at this point.  So I
16      am going to send them back out.  We will bring them
17      in, and we will do that now.
18      (Whereupon, communication from the jury was entered
19      and marked Exhibit "VVV for Identification.)
20      (Whereupon, the jury entered the courtroom at
21      12:14 p.m.)
22              THE COURT:  All right.  So, jurors, I am in
23      receipt of your note.  "I am writing to inform you
24      on behalf of the jury that despite our exhaustive
25      review of the evidence and our diligent
```

40-8

1      consideration of all disputed evidence, we have

2      been unable to reach a unanimous verdict," signed

3      by your foreperson.

4          We all know how hard you've been working.

5      Lunch will be arriving shortly.  When it comes, I

6      would ask you to clear your heads, have lunch and

7      begin your deliberations again or continue your

8      deliberations.  All right?  So I am sending you

9      back up.

10     (Whereupon, the jury exited the courtroom to resume

11     deliberations at 12:16 p.m.)

12         THE COURT OFFICER:  Thank you.  Be seated.

13     Court is still in session.

14         THE COURT:  All right.  So the note has been

15     marked for identification and we will see you all

16     either at 3:30 or when you get a phone call.

17         THE COURT REPORTER:  For the record, that is

18     "VVV" for Identification.

19         THE CLERK:  "VVV."  Thank you.

20     (Whereupon, there was a brief recess taken.)

21

22

23

24

25

40-9

1              A F T E R N O O N   S E S S I O N

2      (Court resumes at 3:42 p.m.)

3      (Defendant present.  Jury not present.)

4              THE COURT:  All right.  So I sent the note in

5          at 3:30 like I've done each day, asking if they

6          want to go home or continue.  They indicated that

7          they want to continue until 4:15.  So we will

8          continue until 4:15.

9              Madam Court Reporter?

10             THE COURT REPORTER:  Yes, Your Honor.  That

11         will be "WWW."

12     (Whereupon, communication from the jury was entered

13         and marked Exhibit "WWW" for Identification.)

14             THE COURT:  All right.  So I'll see you at

15         4:15.

16     (Whereupon, there was a brief recess taken.)

17     (Court resumes at 4:17 p.m.)

18     (Defendant present.  Jury present.)

19             THE COURT:  All right.  So, jurors, we all

20         know how hard you've been working.  It's been a

21         long day.  We are going to let you go home.  We

22         will see you Monday morning at 9:00 o'clock.  To

23         the extent that you can, please just not think

24         about this case this weekend.  Clear your heads.

25         We will start fresh on Monday.

1          So please follow those instructions.  Do not

2     discuss this case with anyone.  Don't do any

3     independent research or investigation into the

4     case.  If you happen to see, hear or read anything

5     about the case, please disregard it.  We'll see you

6     Monday morning.  Thank you.

7     (Whereupon, the jury exits the courtroom.)

8     (Whereupon, two envelopes Re: Media were entered

9     and marked "XXX" for Identification.)

10          THE COURT REPORTER:  For the record, that's

11     "XXX" for Identification.)

12          THE COURT OFFICER:  Please be seated.  Court

13     is still in session.

14          THE COURT:  All right.  We will see you Monday

15     morning.

16     (Whereupon, the Court adjourned.)

17

18

19

20

21

22

23

24

25

40-11

1                    C E R T I F I C A T E

2

3         I, Paula M. Mills, retired certified court

4    reporter, do hereby certify that the foregoing

5    pages, page 40-3 to 40-10, is a true and accurate

6    transcription of the voice recording in the

7    aforementioned matter to the best of my skill and

8    ability.

9         This, the 13th day of July, 2024.

10

11

12                    _____

13                    Paula M. Mills

14                    Retired Certified Court Reporter

15                    and Court Transcriptionist

16

17

18

19

20

21

22

23

24

25

```
                                        Volume:   XLI
                                        Pages:    14
                                        Exhibits: (See Index)


              COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                    SUPERIOR COURT DEPARTMENT
                                OF THE TRIAL COURT


    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                        *
COMMONWEALTH OF MASSACHUSETTS   *
                                        *
vs.                                     *   Indictment No.
                                        *   2282CR00117
KAREN READ                              *
                                        *
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *



                  Day 41 - Trial with Jury
             Before the Honorable Beverly Cannone



APPEARANCES:

For The Commonwealth:
BY: Adam Lally
    Laura McLaughlin
    Assistants District Attorney

For Karen Read:
BY: Alan Jackson
    David Yannetti
    Elizabeth Little
    Attorneys at Law


                            Norfolk Superior Courthouse
                            Dedham, Massachusetts
                            Monday, July 1, 2024


                  Paula M. Mills
            Retired Certified Court Reporter
             and Court Transcriptionist
```

41-2

<u>I N D E X</u>

WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

(None)


<u>E X H I B I T S</u>

NUMBER                                              PAGE

"YYY"     Communication from the jury              41-7

"ZZZ"     Communication from the jury              41-10

"AAAA"    Communication from the jury              41-12

41-3

1                    P R O C E E D I N G S

2                       July 1, 2024

3    (Court in session.)

4    (Defendant present.  Jury present.)

5         THE COURT OFFICER:  Hear ye, hear ye, hear ye.

6         All parties having anything to do before the

7         Honorable First Justice Beverly Cannone, now

8         sitting in the Dedham Superior Court, in and for

9         the County of Norfolk, draw near, give your

10        attendance and you shall be heard.  God save the

11        Commonwealth and this honorable court.  Court is

12        now in session.

13        THE CLERK:  22-117, Commonwealth versus

14        Karen Read.

15        THE COURT:  Good morning, counsel.  Good

16        morning, Ms. Read.  Good morning, jurors.  Welcome

17        back.

18             We will ask you those same three questions.

19        Was everyone able to follow the instructions and

20        refrain from discussing this case with anyone since

21        we left here Friday?

22             Everyone said "yes" and nodded affirmatively.

23             Were you also able to follow the instructions

24        and refrain from doing any independent research or

25        investigation into this case?

41-4

1          Everyone said "yes" or nodded affirmatively.

2          Did anyone happen to see, hear or read

3     anything about this case since we left here on

4     Friday?

5          All right.  So, Mr. Foreman, we are going to

6     send you folks back out.  Thank you.

7     (Whereupon, the jury exits the courtroom to resume

8     deliberations.)

9          THE COURT:  All right.  Thank you, everybody.

10    (Whereupon, there was a brief recess.)

11   (Court resumes.)

12   (Defendant present.  Jury not present.)

13         THE CLERK:  We are back on the record on

14    Karen Read, Your Honor.  We have a question from

15    the jury.

16         THE COURT:  All right.  So, Mr. Lally, I'd

17    like to hear from the Commonwealth first about due

18    and thorough deliberations.

19         MR. LALLY:  I'm sorry.  I didn't hear that,

20    Your Honor.

21         THE COURT:  I'd like to hear from the

22    Commonwealth first about your view on whether the

23    jury has conducted due and thorough deliberations.

24         MR. LALLY:  Your Honor, while I understand

25    that they have been at this for a while, I would

41-5

1    submit that they have not and I would ask the Court

2    not to make such a finding.

3        The reasons for that, Your Honor, is this jury

4    heard, I believe, about 29 days or so of testimony,

5    657 different exhibits marked as evidence, 74

6    different witnesses who testified before them.

7    And, while I believe they've been out for somewhere

8    in the vicinity of 22 or 23 hours, what I would

9    submit to the Court, based on all of that, as well

10   as the complexity of the issues presented to them,

11   they really haven't even had one hour of

12   deliberation equivalent to one day of testimony, to

13   each of the days of testimony that they've heard.

14       So while they have been at it for a while, I

15   would submit that based on the evidence and

16   testimony and witnesses and the complexity of

17   issues in this case, I would submit that they have

18   not done a thorough deliberation up to this point.

19       THE COURT:  Mr. Yannetti?

20       MR. YANNETTI:  Our view is that it's time for

21   a *Tuey-Rodriguez*, Your Honor.  They have come back

22   now twice, indicating essentially that they are

23   hopelessly deadlocked.  The content of this latest

24   message is that they have been over all the

25   evidence.  The previous message said they did an

41-6

1        exhaustive review.  This time they said that we

2        have, they have, fundamental disagreements about

3        what the evidence means and it's a matter of

4        opinion.  It's not a matter of lack of

5        understanding.

6            This Court, when you sent the jury out,

7        encouraged them not to take a straw vote,

8        encouraged them to go over all of the evidence in a

9        very methodical manner.  I think all indications

10       are that they've done that, and this is what

11       *Tuey-Rodriguez* is for.  We'd ask the Court to give

12       it.

13           THE COURT:  I think this has been an

14       extraordinary jury.  I've never seen a note like

15       this reporting to be at an impasse.  I do find that

16       they are now, with the additional time that they

17       went out without coming back Friday, saying that

18       they were deadlocked, is due and thorough

19       deliberations.  So I am going to give *Tuey-*

20       *Rodriguez*.

21           So are they ready to come in?  So why don't I

22       take a recess.

23           Nancy, you need this.

24           THE COURT REPORTER:  Communication from the

25       jury is "YYY" for Identification.

41-7

1         (Whereupon, communication from the jury was entered

2         and marked Exhibit "YYY" for Identification.)

3         (Whereupon, there was as brief recess taken.)

4    (Court resumes.)

5    (Defendant present.  Jury present.)

6         THE COURT OFFICER:  Please rise for the jury.

7         Court is in session.  Please be seated.

8         THE COURT:  All right.  So, jurors, I am in

9         receipt of your note.  "Judge Cannone, despite our

10        commitment to the duty entrusted to us, we find

11        ourselves deeply divided by fundamental differences

12        in our opinions and state of mind.  The divergence

13        in our views are not rooted in a lack of

14        understanding or effort but deeply held convictions

15        that each of us carry, ultimately leading to a

16        point where consensus is unattainable.  We

17        recognize the weight of this admission and the

18        implications it holds."

19        So, Mr. Foreman and members of the jury, I

20        have an instruction for you.  Our Constitution and

21        laws provide that in a criminal case, the principal

22        method for deciding questions of fact is the

23        verdict of a jury.  In most cases, and perhaps

24        strictly speaking in all cases, absolute certainty

25        cannot be attained nor is it expected.

41-8

1        The verdict to which each juror agrees must,

2   of course, be his or her own verdict, the result of

3   his or her own convictions and not merely an

4   acquiescence in the conclusions of the other

5   jurors.

6        Still, in order to bring 12 minds to a

7   unanimous result, you must examine the issues you

8   have to decide with candor and with a proper regard

9   and respect for each other's opinions.  You should

10  consider that it is desirable that this case be

11  decided.  You have been selected in the same manner

12  and from the same source as any future jury would

13  be selected.

14       There is no reason to suppose that this case

15  will ever be submitted to 12 persons who are more

16  intelligent, more impartial or more competent to

17  decide it than you are, or that more or clearer

18  evidence will be produced in another trial.

19       With all this in mind, it is your duty to

20  decide this case if you can do so conscientiously.

21  In order to make a decision more attainable, the

22  law always imposes the burden of proof on the

23  Commonwealth to establish every essential element

24  of each indictment beyond a reasonable doubt.  If

25  you are left with a reasonable doubt as to any

41-9

1      essential element of any indictment, then the

2      defendant is entitled to the benefit of that doubt

3      and must be found not guilty on that indictment.

4           In conferring together, you are to give proper

5      respect to each other's opinions and listen with an

6      open mind to each other's arguments.  Where there

7      is disagreement, those jurors who would find the

8      defendant not guilty should consider whether the

9      doubt in their own minds is a reasonable one if it

10     makes no impression upon the minds of the other

11     jurors, who are equally honest and equally

12     intelligent, who have heard the same evidence with

13     the same attention, who have an equal desire to

14     arrive at the truth and who have taken the same

15     oath as jurors.

16          At the same time, those jurors who would find

17     the defendant guilty ought seriously to ask

18     themselves whether they may not reasonably doubt

19     the correctness of their judgment if it is not

20     shared by other members of the jury.  They should

21     ask themselves whether they should distrust the

22     weight or sufficiency of the evidence if it has

23     failed to convince the minds of their fellow jurors

24     beyond a reasonable doubt.

25          I will now ask you, Mr. Foreman and members of

41-10

1   the jury, to return to your deliberations with

2   these instructions in mind.  And, as with my final

3   instructions and the supplemental instructions I

4   sent in, I will send in a copy of this charge, as

5   well.

6        All right.  So may that be marked, Madam Court

7   Reporter, please?

8        THE COURT REPORTER:  Yes, Your Honor.

9   (Whereupon, communication from the jury was entered

10  and marked Exhibit "ZZZ" for Identification.)

11       THE COURT:  We will send you folks back out to

12  deliberate.

13  (Whereupon, the jury exits the courtroom to resume

14  deliberations, and a brief recess was taken.)

15  (Court resumes.)

16  (Defendant present.  Jury not present.)

17       THE COURT OFFICER:  Please be seated.  Court

18  is in session.

19       THE CLERK:  22-117, Commonwealth versus

20  Karen Read.

21       THE COURT:  All right.  The jury is at an

22  impasse.

23       THE COURT OFFICER:  Please rise for the jury.

24  (Whereupon, the jury enters the courtroom.)

25       THE COURT OFFICER:  This court is in session.

41-11

 1          Please be seated.

 2              THE COURT:  All right.  Mr. Foreman, I am in

 3          receipt of your note.  "Judge Cannone, despite our

 4          rigorous efforts, we continue to find ourselves at

 5          an impasse.  Our perspectives on the evidence are

 6          starkly divided.  Some members of the jury firmly

 7          believe that the evidence surpasses the burden of

 8          proof, establishing the elements of the charges

 9          beyond a reasonable doubt.  Conversely, others find

10          the evidence fails to meet this standard and does

11          not sufficiently establish the necessary elements

12          of the charges.

13              The deep division is not due to a lack of

14          effort or diligence but, rather, a sincere

15          adherence to our individual principles and moral

16          convictions.  To continue to deliberate would be

17          futile and only serve to force us to compromise

18          these deeply held beliefs."

19              I am not going to do that to you, folks.  Your

20          service is complete.  I am declaring a mistrial in

21          this case.  I will be in to see you privately in a

22          few minutes, and thank you so much for your

23          service.

24          (Whereupon, the jury exits the courtroom and is

25          discharged.)

41-12

1          THE COURT REPORTER:  "AAAA" for

2     Identification.

3     (Whereupon, communication from the jury was entered

4     and marked Exhibit "AAAA" for Identification.)

5          THE COURT:  All right.  I'd like to pick a

6     status date to find out what our next move is.  So

7     I'd like to come back sometime maybe the end of

8     July.  I understand people have vacation schedules.

9     Can we come in the week of the 21st?

10          THE LALLY:  That's fine.

11          MR. YANNETTI:  Your Honor, I'm just looking at

12     my calendar.  Could we do the 22nd at 2:00 p.m.,

13     Your Honor?  And I would appear for my client.

14          THE COURT:  Is there another day that week?

15     Could you do the 25th or 26th?

16          MR. YANNETTI:  Unfortunately, I think I am

17     supposed to leave for vacation on the 25th.

18          THE COURT:  The 22nd and the 24th are not

19     great dates.

20          MR. YANNETTI:  What about the 19th at nine?

21     Is that whole week not good?

22          THE COURT:  No.  That week is not good.  I'm

23     teaching and I cannot get out of it.

24          MR. YANNETTI:  Can we do August 7th, 8th, 9th,

25     any of those days?

41-13

1          THE COURT:  No.  We'll do the 22nd.  We'll go

2      back to the 22nd.

3          MR. JACKSON:  Your Honor, so the Court knows,

4      Ms. Little and I are not available on the 22nd.  We

5      have a hearing in Los Angeles on the 22nd.  We

6      would be proposing to appear remotely, anyway.

7          THE COURT:  Okay.

8          MR. JACKSON:  But, for a status conference, I

9      don't want the Court to think it's disrespectful to

10      the Court, but Ms. Little and I probably will not

11      appear.

12          THE COURT:  Okay.  So you and your client will

13      be here in person, Mr. Yannetti?

14          MR. YANNETTI:  Yes.

15          THE COURT:  All right.  Thank you.  We'll see

16      you then.

17      (Whereupon, the Court adjourned.)

18

19

20

21

22

23

24

25

41-14

1                   C E R T I F I C A T E

2

3           I, Paula M. Mills, retired certified court

4       reporter, do hereby certify that the foregoing

5       pages, page 41-3 to 41-13, is a true and accurate

6       transcription of the voice recording in the

7       aforementioned matter to the best of my skill and

8       ability.

9           This, the 13th day of July, 2024.

10

11

12                      _____

13                      Paula M. Mills

14                      Retired Certified Court Reporter

15                      and Court Transcriptionist

16

17

18

19

20

21

22

23

24

25

369

## COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, SS.**

**SUPERIOR COURT
NO.  2282-CR-00117**

| | |
|---|---|
| **COMMONWEALTH OF MASSACHUSETTS,**      Plaintiff | ) ) ) ) |
| **V.** | ) ) |
| **KAREN READ,**      Defendant | ) ) ) ) |

## <u>DEFENDANT KAREN READ'S MOTION TO DISMISS</u>

Now comes the Defendant Karen Read, by and through undersigned counsel, and hereby

moves this Honorable Court, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the

United States Constitution and Article 12 of the Massachusetts Declaration of Rights, to dismiss

Counts 1 and 3 currently pending against her on the grounds that the jury reached a unanimous

decision to acquit her on those charges and, alternatively, because there was no manifest

necessity supporting the declaration of a mistrial with respect to the charges on which the jury

had agreed that Ms. Read was not guilty and that therefore a retrial on such counts would violate

the Double Jeopardy protections of both federal and state constitutions.

The ancient right to a jury trial is no mere "procedural formalit[y] but [rather a]

fundamental reservation[] of power to the American people." *Erlinger v. United States*, No. 23-

370, 2024 WL 3074427, at *6 (June 21, 2024) (citation omitted).  "By requiring the Executive

Branch to prove its charges to a unanimous jury beyond a reasonable doubt, the Fifth and Sixth

Amendments seek to mitigate the risk of prosecutorial overreach and misconduct, including the

pursuit of 'pretended offenses' and 'arbitrary convictions.'" *Id.* (quoting The Federalist No. 83,

1

p. 499 (C. Rossiter ed. 1961)). "Prominent among the reasons colonists cited in the Declaration of Independence for their break with Great Britain was the fact Parliament and the Crown had 'depriv[ed] [them] in many cases, of the benefits of Trial by Jury.'" *Id.* at *5 (citation omitted). "After securing their independence, the founding generation sought to ensure what happened before would not happen again. As John Adams put it, the founders saw representative government and trial by jury as 'the heart and lungs' of liberty." *Id.* (citation omitted).

It follows that a jury acquittal is entitled to the utmost respect in our criminal justice system. "The Double Jeopardy Clause provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Blueford v. Arkansas*, 566 U.S. 599, 605, (2012) (quoting U.S. Const., Amdt. 5). "The Clause guarantees that the State shall not be permitted to make repeated attempts to convict the accused, thereby subjecting h[er] to embarrassment, expense and ordeal and compelling h[er] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent [s]he may be found guilty." *Id.* (citation omitted). "Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that [a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution." *Commonwealth v. Taylor*, 486 Mass. 469, 481 (2020) (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977)).

Here, the very day after a mistrial was declared, undersigned counsel began receiving unsolicited communications from three of the twelve deliberating jurors indicating in no uncertain terms that the jury had a firm 12-0 agreement that Ms. Read was not guilty of two of the three charges against her, including the charge of murder in the second degree. Given the central importance that acquittals have held in our criminal justice system for hundreds of years,

2

the defense respectfully submits that the jury's unanimous agreement precludes re-prosecution of

Ms. Read on Counts 1 and 3 and mandates dismissal of those charges. Alternatively, to the

extent the Court believes further factual development is required, the defense respectfully

requests that a post-verdict inquiry be held on the issue and that the Court authorize defense

counsel to seek additional proof from the jurors regarding their having unanimously acquitted the

defendant of two of the three charges against her prior to indicating to the Court that they could

not reach a verdict on the third charge alone.

## I.     BACKGROUND

On June 9, 2022, Ms. Read was charged via three separate indictments with murder in

violation of M.G.L. ch. 265, § 1 (Count 1); vehicular manslaughter in violation of M.G.L. ch.

265, § 13½ (Count 2); and leaving the scene of personal injury or death in violation of M.G.L.

ch. 90, § 24(2)(a½)(2). A jury trial began on April 16, 2024. On June 25, 2024, the jury began

deliberations.

On July 1, 2024, when the jury presented a note to the Court, all counsel were ordered to

the courtroom. *See* Alan J. Jackson Affidavit ¶ 7. The note was not presented to counsel for

review. *See id.* Rather, the Court indicated that the jury was at an impasse. *See id.* Once the

jury was seated, the Court then read the jury note verbatim in open court and, without providing

any opportunity for defense counsel to be heard, the Court declared a mistrial and excused the

jury. *See id.* ¶ 8.[1] In short, neither defense counsel nor the defendant consented to the mistrial

---

[1] While the jurors' note as read by this Honorable Court indicated the impasse was on "charges," it did not say whether the "charges" were those within Count 2 *i.e.* the multiple ways to find guilt on Count 2 or extended to other Counts. The affidavits attached herein indicate the former not the latter.

3

and the Court never ascertained from the jury whether its deadlock was in relation to one, two, or all of the charges in the indictments.

The following day, on July 2, 2024, Attorney Jackson was contacted by a juror in this matter ("Juror A") who stated that s/he "wish[ed] to inform [him] of the true *results*" of the jury's deliberations. *Id.* ¶ 4. According to Juror A, "the jury unanimously agreed that Karen Read is NOT GUILTY of Count 1 (second degree murder). Juror A was emphatic that Count 1 (second degree murder) was 'off the table,' and that all 12 of the jurors were in agreement that she was NOT GUILTY of such crime." *Id.* ¶ 5. "[T]he jury also unanimously agreed that Karen Read is NOT GUILTY of Count 3 (leaving the scene with injury/death)." *Id.* ¶ 6.

Another day later, on July 3, 2024, Attorney Yannetti was contacted by "two different individuals (hereinafter, 'Informant B' and 'Informant C') who had received information from two distinct jurors (hereinafter 'Juror B' and 'Juror C') both of whom were part of the deliberating jury in this case." David R. Yannetti Affidavit ¶ 2. Informant B sent Attorney Yannetti "a screenshot he/she had received from someone (hereinafter, 'Intermediary B') of text messages that Intermediary B had received from Juror B. In that screenshot, Juror B texted the following to Intermediary B: 'It was not guilty on second degree. And split in half for the second charge. . . . I thought the prosecution didn't prove the case. No one thought she hit him on purpose or even thought she hit him on purpose [sic].'" *Id.* ¶ 4. Informant C had been in contact with another individual ("Intermediary C") who is a co-worker and friend of Juror C and joined a Zoom meeting during which Juror C discussed the trial. Informant C sent Attorney Yannetti the below screenshots of his/her text messages with Intermediary C regarding what Juror C revealed in the Zoom meeting:

Intermediary C:    "no consideration for murder 2. manslaughter

4

started polling at 6/6 then ended deadlock @ 4no8yes."

. . . .

Informant C:      "interesting.  if it was no consideration for
                  murder two, shouldn't she have been acquitted
                  on that count.   and hung on the remaining
                  chargers [sic]  goes back to the jury verdict
                  slip that was all confusing"

Intermediary C:   "she should've been acquitted I agree.  Yes, the
                  remaining charges were what they were hung
                  on.  and that instruction paper was very
                  confusing."

*Id.* ¶ 10.

## II.    ARGUMENT

### A.    The Jury's Unanimous Conclusion that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution

"[W]hat constitutes an 'acquittal' is not to be controlled by" the form of the action in question. *Taylor*, 486 Mass. at 482 (quoting *Martinez v. Illinois*, 572 U.S. 833, 841-42 (2014)). "Rather, [the Court] must determine whether" the action "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *Commonwealth v. Babb*, 389 Mass. 275, 281 (1983) (quoting *Martin Linen*, 430 U.S. at 571).  The mere presence or absence of "checkmarks on a form" is not dispositive. *Taylor*, 486 Mass. at 482 (citation omitted).

Here, the attached affidavits by Attorneys Jackson and Yannetti reflect statements by three deliberating jurors that the jury had reached a final, unanimous conclusion that Ms. Read was not guilty on Counts 1 and 3.  There was nothing tentative about the jurors' statements.  To the contrary, they were definitive in describing the result of the jury's deliberations. *See* Alan J. Jackson Affidavit ¶ 5 ("Juror A was emphatic that Count 1 (second degree murder) was 'off the

5

table,' and that all 12 of the jurors were in agreement that she was NOT GUILTY of such crime."); David R. Yannetti Affidavit ¶ 4 (reflecting text message from Juror B, "It was not guilty on second degree. . . . No one thought she hit him on purpose or even thought she hit him on purpose [sic]"); *Id.* ¶ 10 (reflecting Juror C's statement, relayed by Intermediary C, that there was "no consideration for murder 2" and Ms. Read "should've been acquitted" on that count). To hold that this firm conclusion did not amount to an acquittal simply because it was not recorded in a verdict form would be to elevate form over substance in a manner prohibited by the foregoing United States Supreme Court and Supreme Judicial Court precedents.

The Supreme Court's decision in *Blueford* is not to the contrary. There, a juror had reported during deliberations that the jury "was unanimous against" the charges of capital murder and first-degree murder but split on manslaughter. 566 U.S. at 603-04. The court sent the jury back to continue deliberations and, when the jury remained unable to reach a verdict, declared a mistrial. *See id.* at 604. The Supreme Court rejected the defendant's argument that the Double Jeopardy Clause prohibited re-prosecution for capital and first-degree murder. In doing so, the Court relied heavily upon the lack of finality of the juror's report. "[T]he jury's deliberations had not yet concluded," and it "went back to the jury room to deliberate further." *Id.* at 606. Here, by contrast, the jurors' statements reflect a final determination that persisted through the end of deliberations. Even assuming *arguendo*, and contrary to the foregoing, this Court finds that retrial would not be prohibited under *Blueford*, this Court can and should afford broader protection under Massachusetts state law. *See Commonwealth v. Tinsley*, 487 Mass. 380, 391 n.6 (2021) ("Unlike the United States Constitution, the Massachusetts Declaration of Rights does not include a double jeopardy clause, but our statutory and common law have long embraced the same principles and protections." (citation omitted)).

6

**B.    Re-Prosecution Is Independently Barred Because There Was No Manifest Necessity to Declare a Mistrial on Counts on which the Jury Was Unanimously Agreed**

"[T]he [d]ouble [j]eopardy [c]lause affords a criminal defendant a 'valued right to have h[er] trial completed by a particular tribunal.'" *Taylor*, 486 Mass. at 483 (quoting *Oregon v. Kennedy*, 456 U.S. 667, 671-72 (1982)). "Thus, where a mistrial is entered 'without the defendant's request or consent,' retrial is impermissible unless there was a manifest necessity for the mistrial." *Id.* (quoting *United States v. Dinitz*, 424 U.S. 600, 606-07 (1976)). Here, Ms. Read did not consent to the declaration of a mistrial. *See* Alan J. Jackson Affidavit ¶ 9; *see also Commonwealth v. Edwards*, 491 Mass. 1, 13 (2022) (rejecting argument "that the defendant consented to the declaration of a mistrial because he did not object when the judge ordered the case dismissed").

Absent the defendant's consent, "State and Federal double jeopardy protections bar, 'as a general rule,' retrial of a defendant whose initial trial ends . . . without a conviction." *Ray v. Commonwealth*, 463 Mass. 1, 3 (2012) (quoting *Arizona v. Washington*, 434 U.S. 497, 505 (1978)). This rule is rooted in "the importance to the defendant of being able, once and for all, to conclude h[er] confrontation with society through the verdict of a tribunal [s]he might believe to be favorably disposed to h[er] fate." *Cruz v. Commonwealth*, 461 Mass. 664, 670 n.9 (2012) (quoting *United States v. Jorn*, 400 U.S. 470, 486 (1971) (plurality opinion)). Accordingly, the "heavy" burden of establishing "manifest necessity" to justify a mistrial is exclusively on the Commonwealth. *Washington*, 434 U.S. at 505. Before a court declares a mistrial for manifest necessity, "(1) counsel must [have been] given full opportunity to be heard and (2) the trial judge must [have given] careful consideration to alternatives to a mistrial." *Ray*, 463 Mass. at 4 (citation omitted).

7

Here, the defense respectfully submits that the lack of opportunity to be heard is, alone, dispositive. Upon receiving a jury note, the Court declared a mistrial and excused the jury without consulting counsel. *See Alan J. Jackson Affidavit ¶ 8.* This action "was sudden, brief, and unexpected, neither preceded nor accompanied by discussion with counsel." *Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337, 341 (1996); *see also Picard v. Commonwealth*, 400 Mass. 115, 118-19 (1987) (finding no manifest necessity where "[n]o opportunity was given counsel to argue the propriety of the question or of the necessity of a mistrial"); *Commonwealth v. Steward*, 396 Mass. 76, 79 (1985) (finding no manifest necessity where "the trial judge . . . first ruled that he was going to declare a mistrial and then, almost as an afterthought, unenthusiastically asked whether counsel objected").

The record is independently lacking on the second prong, as it reflects no "careful consideration" of "alternatives to a mistrial." *Ray*, 463 Mass. at 4 (citation omitted). Here, there was one obvious alternative: to simply ask the jury to specify the charge(s) on which it was deadlocked. Had the Court done so, and the jury articulated its verdict consistent with the statements of Jurors A, B, and C, the Double Jeopardy implications would have been clear and decisive. "[I]ndeed, with virtual unanimity, the cases have applied collateral estoppel to bar the Government from relitigating a question of fact that was determined in defendant's favor by a partial verdict." *United States v. Mespoulede*, 597 F.2d 329, 336 (2d Cir. 1979); *see also Wallace v. Havener*, 552 F.2d 721, 724 (6th Cir. 1977) ("When the jury hands down a partial verdict, a final judgment is rendered on the counts upon which the jury has reached agreement.").

The Supreme Judicial Court's holding, in *Commonwealth v. Roth*, 437 Mass. 777 (2002), that courts should not request partial verdicts on lesser included offenses charged in a single count does not pertain here. As the *Roth* Court acknowledged, "[i]nquiry concerning partial

8

verdicts on lesser included offenses" *that have not been separately charged* "carries a significant potential for coercion." *Id.* at 791; *see also Blueford*, 566 U.S. at 609 (declining to require court "to consider giving the jury new options for a verdict" in the form of partial verdicts on lesser included offenses where, "under Arkansas law, the jury's options . . . were limited to two: either convict on one of the offenses, or acquit on all").[2]  Such inquiry, in effect, implies that the jury should consider conviction on the lesser count.  No similar danger is present where, as here, the jury was asked to return three separate verdicts on three separate counts. *See Roth*, 437 Mass. at 793 n.13 (distinguishing situation "where a defendant has been charged in separate indictments or complaints, each with a separate verdict slip").  In this circumstance, where the jury reports a deadlock without specifying the count(s) on which it has reached an impasse, it is a straightforward (and, the defense contends, Constitutionally required) follow-up to ask whether the deadlock relates to some as opposed to all counts.  Indeed, the Supreme Judicial Court has explicitly stated, "[w]here a complaint or indictment, in multiple counts, charges multiple crimes . . . a general verdict could be returned as to one of the counts, despite deadlock on the other counts." *A Juvenile v. Commonwealth*, 392 Mass. 52, 55 n.1 (1984).

## C.    Alternatively, the Defense Is at Least Entitled to Conduct Post-Verdict Inquiry

Undersigned counsel did not initiate the communication with Jurors "A," "B," and "C," which resulted in the disclosure of information that is memorialized in counsel's affidavits that are appended to this motion.  Should this Court find that further factual development is required, the defense respectfully requests that the Court conduct a *voir dire* of the jury and/or an evidentiary hearing to substantiate the existence of an acquittal.  Should the Court seek the

---

[2] Massachusetts law, to the contrary, clearly permitted the jury to return a partial verdict on some, but not all, counts. *See* Mass. R. Crim. P. 27(b).

9

affidavit of each juror (*i.e.*, jurors "A", "B", and "C" *supra*) the defendant asks for the Court to authorize undersigned counsel to initiate contact for the sole purpose of asking each juror whether the jury had unanimously agreed that the defendant was not guilty of Counts 1 and 3. The Supreme Judicial Court has held that, because of the importance of the issue, "juror bias is a legitimate subject for post-verdict inquiry." *Commonwealth v. McCalop*, 485 Mass. 790, 798 (2020) (citation omitted). It is similarly "a fundamental tenet of our system of justice" that a defendant may not be retried for a crime on which she was previously acquitted by a jury, and the defense submits that post-verdict inquiry is equally warranted in the present context. *Id.* at 790. Just as the Court in *McCalop* approved questions as to the existence of racial bias, questions about a matter more attenuated from the content of deliberations – whether the jury had unanimously concluded that Ms. Read was not guilty of Counts 1 and 3 – do not invade the heartland of jury deliberations but preserve the defendant's precious rights to the favorable outcome of a jury trial and to the protections of the Double Jeopardy Clause and its related state judicial protections.

## III.    CONCLUSION

For the foregoing reasons, Ms. Read respectfully requests that this Honorable Court issue an Order dismissing Counts 1 and 3.

Respectfully Submitted,
For the Defendant,
Karen Read
By her attorneys,


**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO No. 555713
44 School St.
Suite 1000A
Boston, MA 02108

10

(617) 338-6006
law@davidyannetti.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq. *Pro Hac Vice*
Elizabeth S. Little, Esq. *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
T : (213) 688-0460
F: (213) 688-1942

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

On Brief
Michael Pabian, Esq.
BBO No. 684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

Dated: July 8, 2024

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, do hereby certify that on this day, July 8, 2024, I have served a copy of this Motion and the attached affidavits on Assistant District Attorney Adam Lally via email.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

11

370

# COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, SS.**

**SUPERIOR COURT**
**NO. 2282-CR-00117**

| | |
|---|---|
| **COMMONWEALTH OF** | ) |
| **MASSACHUSETTS,** | ) |
|     **Plaintiff** | ) |
| | ) |
| **V.** | ) |
| | ) |
| **KAREN READ,** | ) |
|     **Defendant** | ) |

## AFFIDAVIT OF DAVID R. YANNETTI IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

I, David R. Yannetti, do hereby depose and state that the following is true to the best of my knowledge and belief:

1. I am an attorney licensed in Massachusetts since December 20, 1989. My main office address is 44 School Street, Suite 1000A, Boston, MA 02108. On January 29, 2022, I was retained to represent the defendant, Karen Read, regarding the above captioned matter.

2. On July 3, 2024, I received communications from two different individuals (hereinafter, "Informant B" and "Informant C") who had received information from two distinct jurors (hereinafter "Juror B" and "Juror C") both of whom were part of the deliberating jury in this case.

3. To my knowledge, Informant B and Informant C do not know each other.

4. On July 3, 2024, Informant B sent me a screenshot he/she had received from someone (hereinafter, "Intermediary B") of text messages that Intermediary B had received from Juror B. In that screenshot, Juror B texted the following to Intermediary B: "It was not guilty on second degree. And split in half for the second charge. When the judge sent us back with that Hernandez [sic] thing to look at the other side it turned into a bully match. I thought the prosecution didn't prove the case. No one thought she hit him on purpose or even thought she hit him on purpose [sic]. They gave us free counseling forms when we left."

5. Based upon the first name of Juror B given to me by Informant B, I believe I am able to positively identify which juror he/she was and confirm that he/she was a deliberating juror.

6. On July 3, 2024, Informant C contacted me to say that he/she personally knows Juror C, as they used to work together. Informant C and Juror C also have a mutual friend (hereinafter, "Intermediary C") who is a current co-worker and friend of Juror C.

7. Informant C told me that he/she had posted something about the Karen Read case on Facebook on Monday, July 1, 2024. He/She told me that he/she believes that post led Intermediary C to text him/her and inform him/her that Juror C was a deliberating juror on the case.

8. Informant C told me that he/she thereafter reached out to Juror C via text message and discussed his/her experience as a juror in very general terms. They discussed what an exhausting experience it was and that Juror C was relieved that it was finally over.

9. Intermediary C told Informant C that Juror C would be participating in a Zoom meeting with a number of friends to discuss what happened with the trial.

10. Today, Informant C sent me three screenshots of a text message exchange he/she had with Intermediary C. Informant C told me that Intermediary C was reporting to him/her during this exchange what Juror C had revealed during the Zoom meeting. The text message exchange reads as follows:

|  |  |
|---|---|
| Intermediary C: | "no consideration for murder 2. manslaughter started polling at 6/6 then ended deadlock @ 4no8yes. |
|  | "[he/she] was very consistent in the fact that they could only consider things that were admitted into evidence. Ultimately, [he/she] voted no because the cause of death was twofold of hypothermia and head injury of which [he/she] was convinced that the vehicle did not cause both. |
|  | "The whole jury felt very intimidated by Higgins [sic] presence at the end. |
|  | "[he's/she's] not sure what [he's/she's] going to do. [He's/She's] going to lay low for a couple of days and see where it takes [him/her]. Hasn't ruled out anything. |
|  | "The jurors all have a group text going" |
| Informant C: | "interesting. if it was no consideration for murder two, shouldn't she have been acquitted on that count. and hung on the remaining chargers [sic] goes back to the jury verdict |

slip that was all confusing"

| | |
|---|---|
| Intermediary C: | "she should've been acquitted I agree. Yes, the remaining charges were what they were hung on. and that instruction paper was very confusing." |
| Informant C: | "what a great experience for [him/her]. amazing that they let the alberta [sic] in the last day." |
| Intermediary C: | "[He/She] felt very honored to be part of it. [He/She] was [redacted physical description of Juror C]. Everybody else was from a professional walk of life. They all got along and never heated. They agreed to disagree and respected each other." |
| Informant C: | "that's the way it should be. o [sic] knew it was an intelligent jury. |
| | "they will be studying this case in law programs for years to come. i'e [sic] how not to investigate and try a case." |
| | "if they all agreed on no for murder two. they should make that clear to the DA. and the court. it's basically a case of double jeopardy if she is retried on that charge." |

11. Based upon the description of Juror C given to me by Informant C and confirmed by the redacted content of the above text message exchange, I am able to positively identify which juror he/she was and confirm that he/she was a deliberating juror.

Signed under the pains and penalties of perjury this 6th day of July, 2024.

**/s/ David R. Yannetti**
David R. Yannetti

371

## COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, SS.**

**SUPERIOR COURT**
**NO. 2282-CR-00117**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br>    Plaintiff | ) |
| V. | ) |
| KAREN READ,<br>    Defendant | ) |

### AFFIDAVIT OF ALAN J. JACKSON IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

I, Alan Jackson, declare:

1. I am a partner at the Los Angeles law firm of Werksman Jackson & Quinn LLP, and I have been licensed to practice law since 1994. I am counsel for Karen Read (Docket No. 2282CR0117), appearing on her behalf in the Commonwealth of Massachusetts *pro hac vice*.

2. On Tuesday, July 2, 2024, I was contacted by "Juror A" (true name and identity withheld to maintain anonymity). Based on my conversation with Juror A and that juror's description of who he/she is, where he/she was seated, and certain identifying information (name / occupation) disclosed during the *voir dire* process, I was able to positively identify which juror he/she was.

3. Juror A told me that he/she was seeing inaccurate reports about the "split" among the jurors related to the mistrial that the Court declared the day before.

4. Juror A stated that he/she wished to be respectful of the privacy of the deliberative *process* but did wish to inform me of the true *results* of such process. Juror A indicated that he/she believes it important to disclose such

results because he/she believes that those results significantly impact Ms. Read's rights.

5. Juror A told me that the result of the deliberations was that the jury unanimously agreed that Karen Read is NOT GUILTY of Count 1 (second degree murder). Juror A was emphatic that Count 1 (second degree murder) was "off the table," and that all 12 of the jurors were in agreement that she was NOT GUILTY of such crime.

6. Juror A told me that shortly following that determination regarding Count 1, the jury also unanimously agreed that Karen Read is NOT GUILTY of Count 3 (leaving the scene with injury/death).

7. On July 1, 2024, when the jury presented a note to the Court, all counsel were ordered to the courtroom. The note was not presented to counsel for review. Rather, the Court indicated that the jury was at an impasse.

8. Once the jury was seated, the Court then read the jury note verbatim in open court and, without providing any opportunity for defense counsel to be heard, the Court declared a mistrial and excused the jury.

9. Neither Ms. Read nor her counsel consented to the entry of the mistrial.

10. Defense counsel was denied the opportunity to request that the Court inquire on which count or counts the jury may have been deadlocked (including lesser included offenses), and on which count or counts the jury may have arrived at a verdict.

11. Nor did the Court, on its own, inquire of the jury foreperson on which counts the jury was at an impasse, and whether the jury could or did reach unanimous agreement on any of the other counts.

12. Had the Court so inquired, it appears clear that NOT GUILTY verdicts would have been recorded for Count 1 and Count 3. Ms. Read was denied her right to receive those verdicts in her favor.

The foregoing is true and correct to the best of my knowledge and belief, under penalty of perjury under the laws of the United States and the State of California and the Commonwealth of Massachusetts.

Executed this date of July 3, 2024, at Los Angeles, California.

**/s/ Alan J. Jackson**

ALAN J. JACKSON

RECEIVED & FILED
2024 JUL 10
CLERK OF THE COURT
NORFOLK COUNTY

**COMMONWEALTH OF MASSACHUSETTS**

NORFOLK, SS.                                      **SUPERIOR COURT**
                                                  **NO. 2282-CR-00117**

```
                              )
COMMONWEALTH OF               )
MASSACHUSETTS,                )
        Plaintiff             )
                              )
V.                            )
                              )
KAREN READ,                   )
        Defendant             )
                              )
```

## DEFENDANT KAREN READ'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HER MOTION TO DISMISS

Now comes the Defendant Karen Read, by and through undersigned counsel, and hereby respectfully submits this Supplemental Memorandum in Support of Her Motion to Dismiss, filed July 8, 2024.

As reflected in the attached Affidavit of Alan J. Jackson, a fourth deliberating juror ("Juror D") has now confirmed "that the jury reached NOT GUILTY verdicts on Count 1 and Count 3." Alan J. Jackson Affidavit ¶ 5. Once they were dismissed, "many of the jurors appeared uncomfortable with how things ended, wondering, *Is anyone going know that we acquitted [Karen Read] on Count 1 and 3? No one ever asked about those counts.*" *Id.* ¶ 8. Juror D told counsel "part of his/her discomfort was that he/she knew that the jury had reached verdicts on two counts and Karen Read might be retried on those two counts and, 'That's just not right.'" *Id.* ¶ 9. Juror D further stated, "*Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3. Because that's what happened.*" *Id.* ¶ 10.

Based on the attached Affidavit, and all of the reasons set forth in its opening Motion, and the fact that the disclosures of Juror "D" completely confirm the veracity of the previously

1

filed affidavits regarding Jurors "A", "B", and "C", the defense respectfully renews its contention that the jury acquitted Ms. Read on Counts 1 and 3, or, alternatively, there was no manifest necessity for a mistrial as to those counts, and therefore the Double Jeopardy protections of the federal and state Constitutions require that those counts not be retried.

Respectfully Submitted,
For the Defendant,
Karen Read
By her attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO No. 555713
44 School St.
Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq. *Pro Hac Vice*
Elizabeth S. Little, Esq. *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
T : (213) 688-0460
F: (213) 688-1942

On Brief
Michael Pabian, Esq.

2

BBO No. 684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

Dated: July 10, 2024

## CERTIFICATE OF SERVICE

    I, Martin G. Weinberg, do hereby certify that on this day, July 10, 2024, I have served a copy of this document and the attached affidavit on Assistant District Attorney Adam Lally via email.

                                       **/s/ Martin G. Weinberg**
                                       Martin G. Weinberg

3

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                                    SUPERIOR COURT
                                               NO. 2282-CR-00117

```
                          )
COMMONWEALTH OF           )
MASSACHUSETTS,            )
      Plaintiff           )
                          )
V.                        )
                          )
KAREN READ,               )
      Defendant           )
                          )
```

## SUPPLEMENTAL AFFIDAVIT BY ALAN JACKSON IN SUPPORT OF KAREN READ'S MOTION TO DISMISS

I, Alan Jackson, declare:

1. I am a partner at the Los Angeles law firm of Werksman Jackson & Quinn LLP, and I have been licensed to practice law since 1994. I am counsel for Karen Read (Docket No. 2282CR0117), appearing on her behalf in the Commonwealth of Massachusetts *pro hac vice*.

2. On Monday, July 8, 2024, I was contacted by "Juror D" (true name and identity withheld to maintain anonymity). Based on my conversation with Juror D and that juror's description of who he/she is, where he/she was seated, and certain identifying information (name / occupation) disclosed during the *voir dire* process, I was able to positively identify Juror D as a sitting juror in the trial of this matter, including Juror D's seat position.

3. Juror D told me that he/she decided to reach out to me because he/she was "uncomfortable" with how the trial ended. He/she said that the last day of trial was a "whirlwind" and everything happened fast. He/she recounted that his/her perspective was that the jury was brought into the courtroom, the note was read, the mistrial was declared, and the jury was then rushed out of the courtroom. Following a brief meeting with the judge, the next thing they all knew, the jury was on the bus. He/she described the end of the trial as very confusing.

4. Juror D said that it was very troubling that the entire case ended without the jury being asked about each count, especially Count 1 and Count 3.

5. Juror D explained that the jury reached NOT GUILTY verdicts on Count 1 and Count 3, and that the disagreement was solely as to Count 2 and its lesser offenses.

6. Juror D said that the jury actually discussed telling the judge that they had agreed unanimously on NOT GUILTY verdicts for Counts 1 and 3, but they were not sure if they were allowed to say so.

7. The jury believed that they were compelled to come to a resolution on *all* counts before they could or should report verdicts on *any* of the counts. After discussion, the jury decided to inform the court that they were deadlocked, and they expected they would get further instruction about the remaining (decided) counts thereafter. Juror D explained that he/she was confused and upset that such further instruction never came.

8. Juror D explained that after the jury was excused and aboard the bus, many of the jurors appeared uncomfortable with how things ended, wondering, *Is anyone going know that we acquitted [Karen Read] on Count 1 and 3? No one ever asked about those counts.*

9. Juror D stated that once the case was over, he/she remained "very uncomfortable" with the result. He/she reiterated, "It did not feel right." He/she said that part of his/her discomfort was that he/she knew that the jury had reached verdicts on two counts and Karen Read might be retried on those two counts and, "That's just not right."

10. I inquired whether, in his/her opinion, other jurors would agree and acknowledge that NOT GUILTY verdicts were reached on Count 1 and Count 3. Juror D, without hesitation, said in substance, *Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3. Because that's what happened.*

11. Juror D reiterated that he/she believes that it would be unjust for Karen Read to be re-tried on either Count 1 (second degree murder) or Count 3 (leaving the scene with injury/death) because the jury has already unanimously found her NOT GUILTY of those charges.

12. Juror D further stated that if necessary, he/she would agree to testify in order to explain to the court that the jury unanimously reached NOT GUILTY verdicts on Count 1 and Count 3, as long as his/her identity remained protected.

The foregoing is true and correct to the best of my knowledge and belief, under penalty of perjury under the laws of the United States and the State of California and the Commonwealth of Massachusetts.

Executed this date of July 9, 2024, at Los Angeles, California.


/S/ Alan Jackson

_____

ALAN J. JACKSON

RECEIVED & FILED

2024 JUL 12 AM 11: 20

CLERK OF THE COURTS
NORFOLK COUNTY

**NORFOLK SUPERIOR COURT**
**DOCKET NO. 2282CR0117**

**COMMONWEALTH**

**v.**

**KAREN READ**

## COMMONWEALTH'S OPPOSITION TO DEFENDANT'S POST-TRIAL MOTION TO DISMISS

Now Comes the Commonwealth in opposition to the defendant's post-trial motion to dismiss her indictments for second degree murder and leaving the scene after causing death, as the defendant's motion is premised upon hearsay, conjecture, and legally inappropriate reliance as to the substance of jury deliberations. Further, contrary to the defendant's claims, throughout jury deliberations the defendant was given a full opportunity to be heard, the jury's communications to the court explicitly indicated an impasse on all charges, and the court carefully considered alternatives before declaring a mistrial. The defendant's unsubstantiated but sensational post-trial claim that the "jury reached a unanimous decision to acquit" lacks any merit or legal foundation.

On June 9, 2022 the defendant was indicted by a Norfolk grand jury for second degree murder, in violation of G. L. c. 265, §1; manslaughter while operating under the influence, in violation of G. L. c. 265, §13 ½; and leaving the scene of personal injury/death in violation, of G. L. c. 90, §24 (2)(a ½ )(2). On April 16, 2024, a ten-week jury trial commenced (Beverly Cannone, J.)  The jury began their deliberations on June 25, 2024. In addition to the three indictments, the jury was instructed to consider two lesser included offenses to manslaughter while operating under the influence: (1)

**Page 1 of 15**

involuntary manslaughter, in violation of G. L. c. 265, §13; and (2) motor vehicle

homicide – OUI liquor and negligence, in violation of G.L. c. 90, §24G (a).

The defendant's motion states that the court's decision to declare a mistrial "was

sudden, brief, and unexpected, neither preceded nor accompanied by discussion with

counsel" yet the defendant's motion and supporting affidavits of counsel, inexplicably

omit the full opportunity that the defendant was given to be heard and the defendant's

consent to the mistrial. Beginning on Friday June 28, 2024, at approximately 12:15 p.m.

the jury sent a note stating: "I am writing to inform you on behalf of the jury that despite

our exhaustive review of the evidence and our diligent consideration of all disputed

evidence, we have been unable to reach a unanimous verdict." At that time, the court

requested argument from the Commonwealth and defendant as to whether the jury had

engaged in due and thorough deliberations. See G.L. c. 234A, §68C.[1]

The Commonwealth responded that the jury had not had sufficient time to

deliberate and requested that the jury be instructed to continue their deliberations. On the

contrary, Attorney Yannetti argued "we believe that there has been sufficient time"[2] and

advocated for the jury to be declared deadlocked and provided the Tuey-Rodriguez

instruction. Attorney Yannetti stated: "The word exhaustive is the word that I think is

---

[1] G.L. c. 234A, §68C – "Failure of jury to agree" states: "If a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

[2] Trial transcripts are not yet available. However, the trial was widely broadcasted across national media. Attorney Yannetti's statements are available for view at: https://www.nbcboston.com/on-air/as-seen-on/karen-read-trial-jury-says-theyre-unable-to-reach-unanimous-verdict/3413411/ (counsel's argument begins at 1:33).

operative here. They're communicating to the court that they've exhausted all manner of compromise, all manner of persuasion and they're at an impasse. You know, this is a case where the jury has the legal instructions - they've only really asked one question, which was to try to get a report they were not allowed to get, and I think the message has been received that the evidence is closed and they won't be getting anything more ... They've been working essentially nonstop over the last three, four days, we're approaching a weekend. They didn't come back with this at 3 o'clock or 4 o'clock - they're at 12 o'clock and they have nowhere to turn. So our position is the jury should be read the Tuey-Rodriguez model instruction and go from there." See Commonwealth v. Rodriguez, 364 Mass. 87, 101-103 (1973); Commonwealth v. Tuey, 8 Cush. 1, 2-3 (1851) (instruction is for situations where after due deliberation the jury has expressed that they are at an impasse); see also Ray v. Commonwealth, 463 Mass. 1, 6 (2012) (The Tuey-Rodriguez instruction has a certain "sting" to it); Commonwealth v. Rollins, 354 Mass. 630, 638 (1968) (A Tuey-Rodriguez instruction "should not be employed prematurely or indiscriminately"). The court ruled that given the length of the trial, number of exhibits, and complex issues in the case, there had not been due and thorough deliberations and instructed the jury to continue deliberating.

On Monday July 1, 2024, at approximately 10:45 a.m. the jury sent another note to the court stating: "Judge Cannone, despite our commitment to the duty entrusted in us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind. The divergence in our views are not rooted in a lack of understanding or effort but deeply held convictions that each of us carry, ultimately leading to a point where consensus is unattainable. We recognize the weight of this admission, and the

implications it holds." Following receipt of that note, the court again inquired of the Commonwealth and defendant as to whether there had been due and thorough deliberations. G.L. c. 234A, §68C. The Commonwealth argued that although the jury had been deliberating for approximately 22 hours, given the length of the trial and number of witnesses, the jury had yet to engage in thorough deliberations. Attorney Yannetti again sought a Tuey-Rodriguez instruction stating that the jury has, "come back twice indicating essentially that they're hopelessly deadlocked ... they said they've been over all the evidence. . . At this time they say they have fundamental disagreements about what the evidence means. It's a matter of opinion, it's not a matter of lack of understanding."[3]

The court found that at this point, the jury had engaged in due and thorough deliberations, noting that "this has been an extraordinary jury, [the court indicated it had] never seen a note like this, reporting to be at an impasse." At approximately 11:00 a.m. on July 1, 2024, the jury was advised of the full Tuey-Rodriguez instruction, including that it was the jury's "duty to decide this case if you can do so conscientiously," and that there is no reason to believe another jury would be more competent to decide this case.

On July 1, 2024, at approximately 2:30 p.m., the jury sent a final note to the court stating: "Despite our rigorous efforts we continue to find ourselves at an impasse. Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyond reasonable doubt, conversely, others find the evidence fails to meet this

---

[3] Counsel's argument is available at: https://www.nbcboston.com/news/local/full-video-deeply-divided-karen-read-jurys-note-on-being-deadlocked/3415315/ (beginning at 1:30).

standard and does not sufficiently establish the necessary elements of the charges. The deep division is not due to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions. To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs." Following receipt of that note, the court discharged the jury and declared a mistrial.

The representations made in counsels' affidavits have no legal bearing on the mistrial, as the jury did not reach any verdicts, partial or otherwise. A Juvenile v. Commonwealth, 392 Mass. 52, 56 (1984); Mass. R. Crim. P. 27(a) (verdicts must be reported in open court). "The only verdict which can be received and regarded, as a complete and valid verdict of a jury, upon which a judgment can be rendered, is an open and public verdict, given in and assented to, in open court, as the unanimous act of the jury, and affirmed and entered of record, in the presence and under the sanction of the court." Lawrence v. Stearns, 11 Pick. 501, 502 (1831): see also Commonwealth v. Tobin, 125 Mass. 203, 206 (1878) ("[T]he verdict which determines the rights of the parties, and is admitted of record, and upon which judgment is rendered, is the verdict received from the lips of the foreman in open court"). "It is not enough to show that the jury may have agreed on some issues at some time; if that limited showing were to control, uncertainties would be invited." A Juvenile, 392 Mass. at 56-57 (no error in the judge's refusal to accept the "not guilty" verdict slips found in jury deliberation room, after the jury was discharged, where those slips were in contradiction of the jury's report to the judge in open court that they were deadlocked.)

The hearsay comments and juror statements about what happened are legally irrelevant as the jury failed to reach any verdicts. See Blueford v. Arkansas, 566 U.S. 599

(2012). In Blueford, the jury sent a note to the court indicating they were "hopelessly deadlocked", and the court asked the foreperson to disclose the jury's votes on the three charges: first-degree murder, manslaughter, and negligent homicide. Id. at 603-604. The foreperson reported the jury unanimously agreed the defendant was not guilty of murder, but were deadlocked on manslaughter, and had not voted on negligent homicide. Id. The court gave the jury an Allen instruction (akin to the Tuey-Rodriguez instruction) that emphasized the importance of reaching a verdict and instructed the jury to continue deliberations. See Id. at 604; Allen v. United States, 164 U.S. 492, 501-502 (1896). After a half-hour, the jury reported that they had not reached a verdict and a mistrial was declared. Id. at 605.

The United States Supreme Court rebuffed the defendant's claim that the jury acquitted him of murder, as the foreperson's report was not a final verdict because the jury had continued to deliberate and more importantly, gave no indication that they were still unanimous on the murder charge. Id. at 605-606. The United States Supreme Court emphasized that when jurors engage in discussions about the circumstances of the crime, it often causes one to rethink their stance on a greater offense and revisit a prior vote. Id. "The very object of the jury system, after all, is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. A single juror's change of mind is all it takes to require the jury to reconsider a greater offense." Id. at 606 (internal citation omitted); Commonwealth v. Carnes, 457 Mass. 812, 827 (2010) (A Tuey-Rodriguez instruction "is designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view.")

"[I]t must be recognized as a practical matter that jury votes on included offenses may be the result of a temporary compromise in an effort to reach unanimity. A jury should not be precluded from reconsidering a previous vote on any issue, and the weight of final adjudication should not be given to any jury action that is not returned in a final verdict." A Juvenile, 392 Mass. at 56. citing People v. Griffin, 66 Cal. 2d. 459 (1967); Lawrence, 11 Pick. at 502 (oral affirmation of guilt or acquittal in open court "is the only evidence the court can receive of the free and unanimous assent of the jury to the verdict.")

The jury's notes were unambiguous that the jurors were "deeply divided by fundamental differences in our opinions and state of mind" that resulted in a "starkly divided" jury as to the "charges" (emphasis on plural). The jury consistently indicated that their impasse was not due to a lack of understanding of the law or the charges, but a profound divergence in "deeply held convictions . . . ultimately leading to a point where consensus is unattainable". The jury's notes did not indicate agreement or acquittal on any of the charges, rather it was evident that the jury was unable to agree on any charges due to their "sincere adherence" to their "individual principles and moral convictions".

Contrary to representations made in the defendant's motion and supporting affidavits, the defendant advocated for and consented to a mistrial, as she had adequate opportunities to object and instead remained silent, which removes any double jeopardy bar to retrial. See Commonwealth v. Phetsaya, 40 Mass. App. Ct. 293, 298 (1996) ("[C]onsent to a mistrial may be inferred from silence where a defendant had the opportunity to object and failed to do so."); Daniels v. Commonwealth, 441 Mass. 1017, 1018 (2004) (where defense counsel told judge he believed jury was at impasse in

Page **7** of **15**

deliberations and had no objection to judge declaring mistrial, such consent removed any

double jeopardy bar to retrial); Pellegrine v. Commonwealth, 446 Mass. 1004, 1005

(2006) (despite having an adequate opportunity to object, defense counsel remained

silent, proper to infer from counsel's conduct that defendant consented to the mistrial);

see also Commonwealth v. Curtis, 53 Mass. App. Ct. 636, 640 (2002) ("the manifest

necessity test has no application in situations where, as here, the defendant requested or

effectively consented to the mistrial.")

During her full opportunities to be heard on June 28, 2024, and July 1, 2024, at no

time did any of the defendant's three counsels request inquiry as to what charge or

charges the jury was deadlocked on. Rather, the defendant was quick to request a Tuey-

Rodriguez instruction at first opportunity, indicating a belief based on the clear and

obvious language of the jury's notes, that as stated by Attorney Yannetti, the jury was

"hopelessly deadlocked", had "exhausted all manner of compromise" and was engaged in

"fundamental disagreements of what the evidence means. It's a matter of opinion, it's not

a matter of understanding." See Ray v. Commonwealth, 463 Mass. 1, 4 (2012) (counsel's

request for a Tuey-Rodriguez instruction permits "the inference that both parties were

provided an opportunity to be heard on possible alternatives to a mistrial."); see also

Commonwealth v. Parreira, 72 Mass. App. Ct. 308, 316 (2008) ("The timing of a Tuey–

Rodriquez charge is committed to the discretion of the trial judge"); G.L. 234A § 68C

(once a Tuey-Rodriguez instruction is given, the jury could not be sent out again to

continue deliberations without their consent.) Furthermore, following the discharge of the

jury, the court engaged the Commonwealth and defendant in discussions about choosing

a status date for scheduling a retrial. At no time during that hearing did the defendant object or indicate displeasure with the mistrial.

The mistrial was also supported by a manifest necessity: jury deadlock. See Commonwealth v. Bryan, 476 Mass. 351, 357 (2017) (in considering whether to declare a mistrial over a defendant's objection, the court must give counsel a full opportunity to be heard and careful consideration to alternatives to a mistrial). A frequent and "traditional example" of manifest necessity to declare a mistrial is "where the jury were discharged because they were unable to come to an agreement" on a verdict. Thames v. Commonwealth, 365 Mass. 477, 479–480 (1974) (mistrial warranted where jury reported inability to reach decision after four and one-half hours of deliberation, during which jury twice sent judge messages about impasse and judge inquired about jury's ability to reach agreement); Oregon v. Kennedy, 456 U.S. 667, 672 (1982) (describing "hung jury" as "prototypical example" of manifest necessity); see also A Juvenile, 392 Mass. at 55 (mistrial warranted where jury reported deadlock on fourth day of deliberations after judge inquired about ability to reach verdict).

The trial judge is "best situated" to determine whether "the ends of substantial justice cannot be attained without discontinuing the trial." Commonwealth v. Cassidy, 410 Mass. 174, 177 (1991), citing Gori v. United States, 367 U.S. 364 (1961). In declaring a mistrial, "premised upon the trial judge's belief that the jury is unable to reach a verdict" that decision is treated with great deference "because otherwise there would be danger that the judge would employ coercive means to break the apparent deadlock." A Juvenile, 392 Mass. at 56; Fuentes v. Commonwealth, 448 Mass. 1017, 1018 (2007); Commonwealth v. Roth, 437 Mass. 777, 791 (2002) ("deadlock juries are particularly

susceptible to coercion); see also Cruz v. Commonwealth, 461 Mass. 664, 671 (2012)

("The term manifest necessity is another way of saying that in a particular case, the right

of the defendant must yield to that of the public."); Ray, 463 Mass. at 2–7 (trial judge

interacts directly with jurors and is in best position to determine whether jury is

deadlocked).

      The court engaged in considerable efforts and sent the jury back to deliberate two

times following notes that they were at an impasse and in addition to finding that the jury

had engaged in due and thorough deliberations and providing the Tuey–Rodriquez

instruction, at the request of the defendant and to her satisfaction, during deliberations the

court amended the verdict slips to depict clearly the lesser included offenses and provided

the jury a supplemental instruction on how to consider lesser-included offenses. See

Blueford, 566 U.S. at 609 (the United States Supreme Court has "never required a trial

court, before declaring a mistrial because of a hung jury, to consider any particular means

of breaking the impasse—let alone to consider giving the jury new options for a

verdict.")

      The defendant's claim that the judge should have inquired of the jury holds no

merit as "[n]othing in our case law or in [G.L. c. 234, §34] required the judge to make

either inquiry [whether there was reasonable probability of any unanimous verdicts or if

the jury would consent to further deliberations] as a matter of course, and the

circumstances before the judge did not necessitate either inquiry. The final note from the

foreperson unequivocally stated that the jury were "unable to come to a unanimous

decision," in other words, that the jury were deadlocked. The note did not suggest, for

example, that the jury were merely having trouble making a decision or needed further

instructions from the judge." <u>Fuentes</u>, 448 Mass. at 1018-1019. Given the four days of

deliberations, the jury's indication that they had carefully reviewed all the evidence, and

that their divergent opinions were premised upon deeply held moral convictions, the

court was left with no reasonable alternative other than to declare a mistrial. Further

consultation with counsel would not have produced any fruitful alternatives nor was there

a reasonable probability the jury would have consented to deliberate further, particularly

when the jury wrote: "to continue to deliberate would be futile and only serve to force us

to compromise these deeply held beliefs." See <u>Id</u>. at 1019; G.L. c. 234A, §68C.

Moreover, whether counsel initiates contact with a discharged juror, by first

sending notice to the opposing party with the substance of the proposed communication,

or if the juror initiates contact with counsel, as alleged in the defendant's motion, counsel

may communicate with jurors only about permissible subjects. See Mass. R. Prof. C. 3.5

(c). Permissible subjects include counsel's performance during the trial, extraneous

influence on the jury's deliberation, or a juror's bias towards a defendant. See

<u>Commonwealth</u> v. <u>McCowen</u>, 458 Mass. 461, 494 (2010). Neither extraneous influence

nor a claim of juror bias is alleged by the defendant to have been an issue. See

<u>Commonwealth</u> v. <u>McCalop</u>, 485 Mass. 790, 799-800 (2020) (even in circumstances

where juror testimony is needed to ascertain whether there was racial or ethnic bias or

extrajudicial influence, a judge may not inquire into the jury's subjective thought

processes, content of deliberations, or reasons for concluding guilt or acquittal). Rather,

what the defendant's motion is entirely premised upon and what is expressly prohibited

inquiry, is that of the jury's deliberative processes and the substance of the jury's

deliberations. See <u>Commonwealth</u> v. <u>Moore</u>, 474 Mass. 541, 553 (2016). "The secrecy of

jury deliberations has served as a bedrock of our judicial system, and inquiry into the jury's deliberative processes . . . would intrude improperly into the jury's function. The common-law principle that it is essential to the freedom and independence of [jury] deliberations that their discussions in the jury room should be kept secret and inviolable was not, and arguably could not be, overruled by [the 2015 adoption of] rule 3.5(c)." Id. at 548-549 (internal citations and quotation omitted). It is improper for counsel to inquire with jurors or through intermediaries, the individual or collective thought processes of the jury, the reasons for their decision, or the substance of their deliberations. Id. at 548. (Massachusetts continues to adhere to common-law principles barring inquiry into the contents of jury deliberations and any impeachment of jury verdicts based on information gained from such inappropriate inquiry).

　　Similarly, it would be improper for the court to inquire, through affidavits or an evidentiary hearing, the substance of the jury's deliberations. Id. at 552 ("if, after communicating with a juror, an attorney wishes to secure an affidavit from the juror . . . any such affidavit must focus on extraneous influences, and not the substance of the jury's deliberations or the individual or collective thought processes of the juror or the jury as a whole"); Cassidy, 410 Mass. at 179 (trial judge acted within discretion to declare mistrial where proposed inquiry of deliberating juror could not be made without inquiring into the deliberative processes of the jury). The Supreme Judicial Court has instructed that "[w]henever a judge asks individual jurors about the possibility of extraneous influences on jury deliberations—whether of jurors who are still sitting as such or jurors who have been discharged—the purpose of the individual voir dire is not to delve into the jury's deliberations . . . there should not be an inquiry into a juror's

individual or the jury's collective thought processes." <u>Commonwealth</u> v. <u>Blanchard</u>, 476

Mass. 1026, 1027-1028 (2017) (emphasis included in original).

Likewise, polling the jury on the various possible verdicts during their deliberations

or after their discharge, would constitute an unwarranted and unwise intrusion into the

province of the jury and the Supreme Judicial Court has "cautioned strongly against the

risk of coercion inherent in questioning jurors, particularly in individual colloquies."

<u>Ray</u>, 463 Mass. at 6, n. 8.  Moreover,

> [O]ne cannot assume, from the mere report of deadlock, that
> there is any final verdict lurking within that deadlock that
> may be extracted. In many instances, asking a deadlocked
> jury about partial verdicts would constitute attempting to
> extract from the jury something that does not exist. . . Asking
> a jury to report where they stand on the offense as charged
> invites a report that may be based on only preliminary,
> tentative deliberation (if any) on that level of offense, or
> hasty resumption of deliberations concerning that level of
> offense in an effort to satisfy the judge's apparent desire for
> a decision. Such inquiries of the jury may succeed in
> extracting a partial verdict, but we could not have confidence
> that that partial verdict was the product of a thoughtful and
> thorough deliberation process . . . the risks of juror coercion
> are too high, and the reliability of any such partial verdict
> returned is too low, to warrant such an approach to salvaging
> some partial result from a deadlocked jury."

<u>Commonwealth</u> v. <u>Roth</u>, 437 Mass 777, 793-795.

Similarly, "[e]ven if the deadlock does pertain to some distinction between the

various levels of an offense, a judge has no way of knowing whether the jury have in fact

fully considered the offense as charged." <u>Id.</u> at 794. A desire to extract information from

a deadlocked jury "does not solve the significant problems in attempting to do so". <u>Id.</u> at

790. A court's inquiry into possible verdicts "improperly intrudes on the jury's function"

and the "ostensible benefits to be gained by such a procedure are outweighed by its risks." Id.

For the foregoing reasons, the defendant's motion should be DENIED as there was no verdict that acquits the defendant, no grounds for the court or counsel to inquire into the deliberative process of a discharged jury, the defendant consented to the mistrial, and the court properly declared a mistrial due to a deadlocked jury, who was at an impasse due to their "starkly divided" perspectives on the evidence and their "sincere adherence . . . [to] individual principles and moral convictions". As such, retrial is not barred by double jeopardy or constitutional principles, and the Commonwealth may retry the defendant on the three indictments and any appropriate lesser included offenses.

Respectfully Submitted
For the Commonwealth,

MICHAEL W. MORRISSEY
DISTRICT ATTORNEY

Date: July 12, 2024                    By:    /s/ Adam C. Lally
                                              Adam C. Lally
                                              Assistant District Attorney

                                              /s/ Laura A. McLaughlin
                                              Laura A. McLaughlin
                                              Assistant District Attorney

Page **14** of **15**

**Certificate of Service**

I hereby certify that on July 12, 2024, I served via email to all counsel of record for the

defendant the Commonwealth's opposition to the defendant's post-trial motion to

dismiss.

/s/ *Laura A. McLaughlin*
Laura A. McLaughlin
Assistant District Attorney

376

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                                                    SUPERIOR COURT
                                                               NO. 2282-CR-00117

COMMONWEALTH OF                    )
MASSACHUSETTS,                     )
        Plaintiff                  )
                                   )
V.                                 )
                                   )
KAREN READ,                        )
        Defendant                  )

## DEFENDANT KAREN READ'S REPLY TO THE COMMONWEALTH'S OPPOSITION TO HER MOTION TO DISMISS

Now comes the Defendant Karen Read, by and through undersigned counsel, and hereby

respectfully submits this Reply to the Commonwealth's Opposition to her Motion to Dismiss.

The Commonwealth's Opposition is, perhaps, most notable for what it does not dispute:

that, according to information from four deliberating jurors, the jury had reached a unanimous

decision that Ms. Read is not guilty on two of the three charges pending against her, namely

Counts 1 and 3. The Commonwealth's insistence that Ms. Read must nonetheless be "forced to

run the gantlet" once more is based on several clear fallacies. *Green v. United States*, 355 U.S.

185, 190 (1957). First, while the defense was given an opportunity to be heard on other issues

arising during jury deliberations, *i.e.*, the appropriateness of a *Tuey-Rodriguez* instruction, the

defense was provided no opportunity to be heard regarding the declaration of a mis-trial. Rather,

upon receiving the final jury note, the Court *sua sponte* declared a mis-trial with no warning to,

or solicitation of objections from, the parties. Second, the jury's note did not "explicitly

indicate[] an impasse on all charges." Opposition at 1. To the contrary, it was readily

susceptible to the interpretation, proven correct based on information received post-trial from

1

deliberating jurors, that the deadlock applied only to the multiple offenses included within Count 2 and not to Counts 1 and 3. Third and finally, the defense respectfully submits that neither the Commonwealth nor the Court "carefully considered alternatives before declaring a mistrial." *Id.* The record reflects no discussion of any such alternatives, including, importantly, inquiry regarding whether the jury had reached an impasse on all, as contrasted to just some of the counts.

"The underlying idea" of the Constitutional protection against Double Jeopardy, "one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." *Green*, 355 U.S. at 187. "Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which [s]he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. . . . Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Arizona v. Washington*, 434 U.S. 497, 504-05 (1978) (internal footnotes omitted); *see also United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569 (1977) ("At the heart of this policy is the concern that permitting the sovereign freely to subject the citizen to a second trial for the same offense would arm Government with a potent instrument of oppression."). Thus, *whether the jury acquitted Ms. Read or, alternatively, was merely not deadlocked on the relevant counts, the Constitution compels the same result: dismissal.* Given the unambiguous post-trial evidence, it would simply be wrong to require the defendant to obtain two acquittals from two different juries for the same crime.

2

The Commonwealth's leading argument is rooted in pure formalism: that no verdict was entered on the record in Court. *See* Opposition at 5. But precisely this formalistic mode of analysis has been consistently rejected by the United States Supreme Court and Supreme Judicial Court in a string of precedents spanning more than one hundred years. *See* Motion at 5 (citing cases); *Ball v. United States*, 163 U.S. 662, 671 (1896) ("[T]he reception of the verdict and discharge of the jury is but a ministerial act, involving no judicial discretion . . . . However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense."); *Hudson v. Louisiana*, 450 U.S. 40, 41 & n.1 (1981) (holding that judicial grant of new trial prohibited retrial on Double Jeopardy grounds, notwithstanding that the state "Code of Criminal Procedure d[id] not authorize trial judges to enter judgments of acquittal in jury trials"). Indeed, "the prohibition against double jeopardy . . . was plainly intended to condemn" the "abhorrent practice" of English judges "exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict." *Washington*, 434 U.S. at 507-08 (citation omitted).[1]

The Commonwealth's heavy reliance upon *Blueford v. Arkansas*, 566 U.S. 599 (2012), fails for reasons set forth in the defense's opening Motion. *See* Motion at 6. In that case, after the foreperson reported that the jury was unanimous against conviction on certain charges, the jury was sent back to continue deliberations. "The foreperson's report was not a final resolution of anything," and there was no indication at the conclusion of deliberations that "it was still the

---

[1] The primary authorities cited by the Commonwealth in support of its position on this point are a pair of opinions from 1831 and 1878, respectively, neither of which addressed Constitutional Double Jeopardy protections in any respect. *See Commonwealth v. Tobin*, 125 Mass. 203, 208 (1878) ("A verdict which has never been spoken by the jury cannot be implied from the mere omission of the jury to contradict the statements of the clerk, or from the silence of the prisoner and his counsel."). In any event, state law requirements are "not binding" as to what constitutes an acquittal under the United States Constitution's Double Jeopardy Clause. *Smith v. Massachusetts*, 543 U.S. 462, 469 (2005) (citation omitted).

3

case that all 12 jurors believed [the defendant] was not guilty of capital or first-degree murder." 566 U.S. at 606.  Here, by contrast, four deliberating jurors attest that there was a final, unanimous agreement that Ms. Read is not guilty of second-degree murder persisting through the conclusion of deliberations.  According to one such juror, "Juror D," "after the jury was excused and aboard the bus, many of the jurors appeared uncomfortable with how things ended, wondering, *Is anyone going to know that we acquitted [Karen Read] on Count 1 and 3?*"  Alan J. Jackson Supplemental Affidavit ¶ 8.[2]  Most importantly, unlike *Blueford*, this was not a case where the defendant was charged in a single count which incorporated lesser included offenses. Indeed, the Arkansas law at issue in *Blueford* did not even permit the jury to return partial verdicts of acquittal.  *See* 566 U.S. at 610 (noting that "the jury's options . . . were limited to two: either convict on one of the offenses, or acquit on all").  *Here, by contrast, the defendant was charged with three stand alone counts, and state law expressly allowed for partial verdicts on any charges with respect to which the jury was agreed.  See* Mass. R. Crim. P. 27(b).  Only if the jury in fact was deadlocked on all three should a mistrial on all three be declared; any other result would require either a verdict (if a unanimous one had been reached as the affidavits in this case reflect) or at minimum further deliberations.

The lack of manifest necessity to support a mis-trial provides a second independent basis for dismissal.  While there is no doubt that a jury deadlock may constitute manifest necessity, the Commonwealth unsurprisingly cites no support for its contention that a deadlock on some, but not all, **separately** indicted charges supports declaration of a mis-trial with respect to all counts. Contrary to the Commonwealth's characterization as "unambiguous," Opposition at 7, the jury

---

[2] The contrast with *A Juvenile v. Commonwealth*, 392 Mass. 52, 54 (1984), is even clearer.  There, after the conclusion of trial, a court officer had picked up four verdict slips from the deliberation room, two of which reflected entries of "not guilty."  There was no indication as to when the entries were made or in what circumstances, much less that they reflected a final, unanimous conclusion of all jurors.

4

note at issue here was facially susceptible to two alternative interpretations: (1) that the jury had reached an impasse as to all charges, or (2) that the deadlock applied to only some of those charges (*e.g.*, on multiple lesser included allegations within a single count such as Count 2). The information received from jurors post-trial proves the latter interpretation was correct. The jury's failure to expressly mention its agreement on Counts 1 and 3 is understandable in light of the Court's instruction that it "should continue deliberating until" it had "reached a final verdict on each charge." June 25, 2024 Tr. 46. Given that there was no deadlock on two of the three counts, it follows that there was no manifest necessity to dismiss the jury without receiving its verdict on those two charges. The defense does not suggest that the Court was required to give the jury "new options for a verdict," *Blueford*, 566 U.S. at 609; only that it should have asked the straightforward question of which of the separate indictments the professed deadlock related to.

In essence, the Commonwealth's contrary position asks this Court to close its eyes to the possible (or even, as here, very likely) existence of partial unanimous verdicts on some, but not all, separately charged counts to avoid "the risks of juror coercion." Opposition at 13 (quoting *Commonwealth v. Roth*, 437 Mass. 777, 795 (2002)). The Commonwealth utterly fails to acknowledge that *Roth*, *Blueford*, and *A Juvenile* are all clearly distinguishable because they all arose in the context of lesser included offenses contained within a single charge. The *Roth* Court's concern about coercion makes sense in that context: when the jury reports a deadlock on one charge, follow-up questioning regarding the possibility of reaching a verdict on a lesser included offense would imply that the jury should consider conviction on that lesser offense. But this logic does not extend to the present circumstances, and no existing precedent cited by the Commonwealth requires judges to disregard the possibility of partial verdicts when the verdicts would be on stand-alone separate charges such as those in the current indictments. *See Roth*, 437

5

Mass. at 788 ("[R]ule 27(b) permits taking verdicts on less than all of the charges set forth in . . .
separate indictments . . . ."); *A Juvenile v. Commonwealth*, 392 Mass. 52, 55 n.1 (1984) ("Where
a complaint or indictment, in multiple counts, charges multiple crimes . . . a general verdict could
be returned as to one of the counts, despite deadlock on the other counts."); Mass. R. Crim. P.
27, reporter's notes (providing "that the court may declare a mistrial in cases where the jury is
unable to reach a verdict[,] [h]owever, it must first receive and record the verdicts which the jury
can agree upon").   There is simply nothing coercive about asking a jury reporting a deadlock
that fails to specify which counts the deadlock relates to the single question of whether its
deadlock is on certain but not all counts and if it has reached a unanimous verdict on any counts.
*See Commonwealth v. Foster*, 411 Mass. 762, 766 (1992) (affirming trial judge's taking of
partial verdicts on two of four separate indictments and observing, "[t]o conclude that the jury
could have felt pressure to convert provisional verdicts against the defendant into final ones and
to abandon all doubts that they may have privately entertained runs counter to the clear
instructions of the judge and amounts to mere speculation without any support in the record");
*Commonwealth v. LaFontaine*, 32 Mass. App. Ct. 529, 534-35 (1992) (affirming partial verdicts
taken after judge asked jury whether it had "reached a verdict on any of the indictments").

        The inflexible prohibition on judicial inquiry regarding partial verdicts advocated by the
Commonwealth would inevitably undermine defendants' important, and Constitutionally
protected, interest in "being able, once and for all, to conclude [their] confrontation[s] with
society through the verdict of a tribunal [they] might believe to be favorably disposed to [their]
fate." *Cruz v. Commonwealth*, 461 Mass. 664, 670 n.9 (2012) (quoting *United States v. Jorn*,
400 U.S. 470, 486 (1971) (plurality opinion)).  And "[t]he danger of . . . unfairness to the
defendant" from multiple prosecutions "exists when[] a trial is aborted before it is completed," as

well as when the defendant is actually acquitted. *Washington*, 434 U.S. at 504. The Commonwealth's proposed rule would also undoubtedly hinder law enforcement interests by precluding courts from asking whether a jury may have reached a ***guilty*** verdict on some but not all stand alone counts.

The Commonwealth's attempt to shift blame to the defense overlooks the blackletter rule that the prosecution alone bears the "heavy" burden of establishing manifest necessity for a mis-trial. *Washington*, 434 U.S. at 505. The defense's request for a *Tuey-Rodriguez* instruction did not, of course, reflect any implicit concession that the jury was deadlocked on ***all*** counts, nor did it commit the defense to any position regarding whether the Court should *sua sponte* declare a mis-trial. A discussion with counsel such as that occurring twice earlier in response to jury notes and either the consent of the defendant to a mis-trial or further judicial inquiry of the jury instead was required. It is indisputable that the Court provided no opportunity for defense counsel to be heard regarding the declaration of a mis-trial (as opposed to the appropriateness of a *Tuey-Rodriguez* instruction). In short, mere silence, absent an opportunity to object, does not amount to consent. *See* Motion at 8 (citing cases). The cases relied upon by the Commonwealth are readily distinguishable on this basis, or even support the defense position. *See Commonwealth v. Phetsaya*, 40 Mass. App. Ct. 293, 297-98 (1996) (holding that, where "the trial judge did not ask defense counsel to comment on the possible declaration of a mistrial," "the lack of an objection from defense counsel cannot be construed as consent" to such action); *Compare Commonwealth v. Curtis*, 53 Mass. App. Ct. 636, 639 (2002) ("The judge declared a mistrial upon the defendant's request . . . ."); *Pellegrine v. Commonwealth*, 446 Mass. 1004, 1005 (2006) (finding that defendant "plainly had the opportunity to object" where "[t]he mistrial was declared after a voir dire and colloquy after the jury were cleared from the court room").

7

R.222

JA0363

In only one case cited by the Commonwealth, *Fuentes v. Commonwealth*, 448 Mass. 1017 (2007), was the defense, as in the present case, afforded no opportunity to be heard before a mis-trial was declared. But there, the Commonwealth fails to mention the crucial fact that the jury's note preceding the declaration of a mis-trial expressly "stated that the jury could not reach a unanimous verdict as to either" of the two indictments. *Id.* at 1018. In those circumstances, while "the more prudent course would have been to consult with counsel," the record did "not show that such consultation would have produced any fruitful alternatives." *Id.* at 1019. Here, the opposite is true. The note did not expressly state that the deadlock applied to all counts. And it is patently clear from the affidavits submitted in support of the defense Motion that consultation with counsel may well have produced a "fruitful" alternative, namely inquiry regarding whether the jury had reached a unanimous verdict on any of the three counts, which, according to the information from Jurors "A," "B," "C," and "D," would have resulted in acquittals on Counts 1 and 3. In any event, *Fuentes* did not alter the Court's clear obligations, repeatedly reaffirmed since that decision, before declaring a mis-trial: "(1) counsel must [have been] given full opportunity to be heard and (2) the trial judge must [have given] careful consideration to alternatives to a mistrial." *Ray v. Commonwealth*, 463 Mass. 1, 4 (2012) (citation omitted).

The Commonwealth cites no support for its suggestion that an attorney who receives a call post-trial stating that the jury had acquitted his or her client must simply hang up the phone and not act upon that information. The jury's agreement that Ms. Read is not guilty on Counts 1 and 3 reflects the "*results*" of its deliberative process, Motion at 4 (citation omitted), not "the contents of jury deliberations" or "thought processes of jurors." *Commonwealth v. Moore*, 474 Mass. 541, 548 (2016); *see also Commonwealth v. Cassidy*, 410 Mass. 174, 179 (1991)

8

(remarking that trial judge "was rightly loathe to examine the entire panel to attempt to determine the impact of the errant juror on the rest of the jury"). The defense is not relying upon jurors to attest to any particular "statement made or incident that occurred during the jury's deliberations, the effect of anything on [any] juror's vote, or any juror's mental processes concerning a verdict." Mass. Guid. Evid. 606(b). Rather, the defense is relying upon the simple fact of the jury's agreement that Ms. Read is not guilty on the relevant counts. *Cf.* Mass. Guid. Evid. 606(c)(5) (permitting juror testimony that "a mistake was made in entering the verdict on the verdict form"). The permissible subjects of juror contact listed by the Commonwealth are not exclusive, and the Commonwealth fails to cite any authority establishing that the fact of a jury verdict constitutes a "prohibited" subject matter under Rule 3.5(c).

At the same time that the Commonwealth criticizes the defense for purportedly infringing upon the jury's deliberative process, it also paradoxically faults the defense for reliance on hearsay. But the affidavit by counsel in *Commonwealth v. McCalop*, 485 Mass. 790, 799 (2020), attesting to alleged juror bias was no less hearsay, and the Supreme Judicial Court squarely held that it entitled the defendant to further inquiry on the subject. The defense submits that the same result is warranted here.

For all of the reasons set forth above, as well as in its opening Motion, Supplemental Memorandum, and attached affidavits, the defense respectfully requests that this Honorable Court issue an Order dismissing Counts 1 and 3.

Respectfully Submitted,
For the Defendant,
Karen Read
By her attorneys,


**/s/ Martin G. Weinberg**

9

Martin G. Weinberg, Esq.
BBO No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO No. 555713
44 School St.
Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq. *Pro Hac Vice*
Elizabeth S. Little, Esq. *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
T : (213) 688-0460
F: (213) 688-1942

On Brief
Michael Pabian, Esq.
BBO No. 684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

Dated: July 15, 2024

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, do hereby certify that on this day, July 15, 2024, I have served a copy of this document on Assistant District Attorney Adam Lally via email.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

10

382

## COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, SS.**                                    **SUPERIOR COURT**
                                                    **NO. 2282-CR-00117**

| | |
|---|---|
| COMMONWEALTH OF | ) |
| MASSACHUSETTS, | ) |
|     Plaintiff | ) |
| | ) |
| V. | ) |
| | ) |
| KAREN READ, | ) |
|     Defendant | ) |

## DEFENDANT KAREN READ'S SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HER MOTION TO DISMISS

Now comes the Defendant Karen Read, by and through undersigned counsel, and hereby respectfully submits this Second Supplemental Memorandum in Support of Her Motion to Dismiss, filed July 8, 2024.

As reflected in the attached Affidavit of Alan J. Jackson, a fifth deliberating juror ("Juror E") has confirmed "that the jury was 'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges." Alan J. Jackson Second Supplemental Affidavit ¶ 4.

Based on the attached Affidavit, and all of the reasons set forth in its opening Motion, first Supplemental Memorandum, and Reply, the defense respectfully renews its contention that the jury acquitted Ms. Read on Counts 1 and 3, or, alternatively, there was no manifest necessity for a mistrial as to those counts, and therefore the Double Jeopardy protections of the federal and state Constitutions require that those counts not be retried. If the Court would prefer to rule on the basis of affidavits executed directly by the jurors, the defense respectfully requests permission to initiate contact with Jurors "A," "D," and "E" for the sole purpose of asking them to affirm the accuracy of the three Affidavits of Alan J. Jackson.

1

Respectfully Submitted,
For the Defendant,
Karen Read
By her attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO No. 555713
44 School St.
Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq. *Pro Hac Vice*
Elizabeth S. Little, Esq. *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
T : (213) 688-0460
F: (213) 688-1942

On Brief
Michael Pabian, Esq.
BBO No. 684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

Dated: July 18, 2024

2

**<u>CERTIFICATE OF SERVICE</u>**

I, Martin G. Weinberg, do hereby certify that on this day, July 18, 2024, I have served a copy of this document and the attached affidavit on Assistant District Attorney Adam Lally via email.

**<u>/s/ Martin G. Weinberg</u>**
Martin G. Weinberg

3

383

## COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, SS.**                    **SUPERIOR COURT**
                                    **NO. 2282-CR-00117**

COMMONWEALTH OF          )
MASSACHUSETTS,           )
    **Plaintiff**         )
                         )
**v.**                   )
                         )
KAREN READ,              )
    **Defendant**        )

## SECOND SUPPLEMENTAL AFFIDAVIT BY ALAN JACKSON IN SUPPORT OF KAREN READ'S MOTION TO DISMISS

I, Alan Jackson, declare:

1. I am a partner at the Los Angeles law firm of Werksman Jackson & Quinn LLP, and I have been licensed to practice law since 1994. I am counsel for Karen Read (Docket No. 2282CR0117), appearing on her behalf in the Commonwealth of Massachusetts *pro hac vice*.

2. On Wednesday, July 17, 2024, I was contacted by "Juror E" (true name and identity withheld to maintain anonymity). Based on my conversation with Juror E and that juror's physical description of himself/herself, where that juror was seated, and that juror's name and occupation, which was also disclosed during the *voir dire* process, I was able to positively identify Juror E as a seated deliberating juror in the trial of this matter.

3. Juror E stated that he/she decided to contact me to provide information about the results of the jury's decision-making following deliberations.

4. Juror E explained that the jury was "unanimous on 1 and 3" that Karen Read was NOT GUILTY of those charges.

5. Juror E went on to state that the only count on which the jury was deadlocked was in relation to the "lower charges" on Count 2. I took that to mean the lesser included offenses associated with Count 2.

6. Juror E indicated that he/she was happy to provide such information but wished to remain publicly anonymous.


The foregoing is true and correct to the best of my knowledge and belief, under penalty of perjury under the laws of the United States and the State of California and the Commonwealth of Massachusetts.

Executed this date of July 18, 2024, at Los Angeles, California.


/S/ Alan Jackson

_____

ALAN J. JACKSON

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.
SUPERIOR COURT DEPARTMENT
NORFOLK SUPERIOR COURT
DOCKET NO. 2282CR00117

COMMONWEALTH

v.

KAREN READ

---

## COMMONWEALTH'S POST-TRIAL NOTICE OF DISCLOSURE

Now comes the Commonwealth in the above-captioned matter and provides notice regarding the defendant's post-trial claims regarding the jury's deliberations. On Sunday July 21, 2024, Assistant District Attorney Adam Lally received an unsolicited voicemail on his office's phoneline from an individual, who identified their self as a juror by full name and seat number. This individual stated: "it is true what has come out recently about the jury being unanimous on charges 1 and 3". On Friday July 26, 2024, Assistant District Attorney Adam Lally received another unsolicited voicemail on his office's phoneline from this same individual who stated: "can confirm unanimous on charges one and three, as not guilty and as of last vote 9-3 guilty on the manslaughter charges . . . on the lower-level manslaughter charges." The Commonwealth did not respond to this individual as the Commonwealth is ethically prohibited from engaging in discussions about the jury's deliberative process.

Similarly, the Commonwealth received emails from three individuals who identified themselves as jurors. These individuals indicated they wished to speak anonymously. On July 16, 2024, the Commonwealth responded to the emails by stating that the Commonwealth would "welcome the opportunity to discuss the evidence or the Commonwealth's case, however we are ethically prohibited from inquiring as to the substance of your jury deliberations. That would include your individual or the jury's collective thought process, the content of your deliberations, or the reasons for your decisions." It was further explained that the Commonwealth could not promise confidentiality and that the substance of any communications may necessitate disclosure

1

to the defendant or the court. All three jurors declined to further communicate with the Commonwealth and provided no information about the jury's purported votes.

Respectfully Submitted
For the Commonwealth,

MICHAEL W. MORRISSEY
DISTRICT ATTORNEY

By:

/s/ *Adam C. Lally*
Adam C. Lally
Assistant District Attorney

DATED: August 1, 2024

386

RECEIVED & FILED
2024 AUG -5 AM 11:46
CLERK OF THE COURT
NORFOLK COUNTY

**COMMONWEALTH OF MASSACHUSETTS**

NORFOLK, SS.                                          **SUPERIOR COURT**
                                                     **NO. 2282-CR-00117**

|  |  |
|---|---|
| **COMMONWEALTH OF** | ) |
| **MASSACHUSETTS,** | ) |
| **Plaintiff** | ) |
|  | ) |
| **V.** | ) |
|  | ) |
| **KAREN READ,** | ) |
| **Defendant** | ) |

## DEFENDANT KAREN READ'S THIRD SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HER MOTION TO DISMISS

Now comes the Defendant Karen Read, by and through undersigned counsel, and hereby respectfully submits this Third Supplemental Memorandum in Support of Her Motion to Dismiss, filed July 8, 2024.

As reflected in the attached Supplemental Affidavit of David R. Yannetti, a deliberating juror in this case ("Juror B") placed an unsolicited phone call to Attorney Yannetti confirming that the prior Affidavit of David R. Yannetti accurately quoted his/her text messages saying, "It was not guilty on second degree. . . . No one thought she hit him on purpose or even thought she hit him on purpose." Supplemental Affidavit of David R. Yannetti ¶ 4. Juror B "clarified . . . that he/she meant to write, 'No one thought she hit him on purpose or even knew that she had hit him.'" *Id.* Juror B further confirmed that "the jury reached unanimous Not-Guilty verdicts on indictments (1) and (3)." *Id.* ¶ 2. S/he "believes that every member of the jury, if asked, will confirm that the jury reached Not-Guilty verdicts on indictments (1) and (3)." *Id.* ¶ 5.

Based on the attached Affidavit, and all of the reasons set forth in its opening Motion, first and second Supplemental Memoranda, and Reply, the defense respectfully renews its

1

contention that the jury acquitted Ms. Read on Counts 1 and 3, or, alternatively, there was no

manifest necessity for a mistrial as to those counts, and therefore the Double Jeopardy

protections of the federal and state Constitutions require that those counts not be retried.  If the

Court for any reason would not credit the affidavits of counsel in the same manner as the Court

would credit identical affidavits from the juror in question – or an affidavit that the juror has

reviewed counsel's affidavits and confirms the accuracy of the representations attributed to them

– then the defense respectfully requests permission to initiate contact with Jurors "A," "B," "D,"

and "E" for the sole purpose of asking them to affirm the accuracy of the three Affidavits of Alan

J. Jackson and the Supplemental Affidavit of David R. Yannetti.

Respectfully Submitted,
For the Defendant,
Karen Read
By her attorneys,


**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net


**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO No. 555713
44 School St.
Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com


**/s/ Alan J. Jackson**
Alan J. Jackson, Esq. *Pro Hac Vice*

2

Elizabeth S. Little, Esq. *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
T : (213) 688-0460
F: (213) 688-1942

On Brief
Michael Pabian, Esq.
BBO No. 684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

Dated: August 5, 2024

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, do hereby certify that on this day, August 5, 2024, I have served a copy of this document and the attached affidavit on Assistant District Attorney Adam Lally via email.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

3

387

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                                          **SUPERIOR COURT**
                                                     **NO. 2282-CR-00117**

_____

COMMONWEALTH OF              )
MASSACHUSETTS,               )
    **Plaintiff**              )
                             )
V.                           )
                             )
KAREN READ,                  )
    **Defendant**             )
_____)

### SUPPLEMENTAL AFFIDAVIT OF DAVID R. YANNETTI IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

I, David R. Yannetti, do hereby depose and state that the following is true to the best of my knowledge and belief:

1. I am an attorney licensed in Massachusetts since December 20, 1989.  My main office address is 44 School Street, Suite 1000A, Boston, MA. 02108.  On January 29, 2022, I was retained to represent the defendant, Karen Read, regarding the above captioned matter.

2. On July 31, 2024, I received an unsolicited phone call from someone who informed me that he/she was a juror at the trial of this matter.  The caller informed me of his/her full name, which confirmed for me that he/she was "Juror B," information about whom I had included in my previous affidavit filed in support of this motion.

3. During my phone conversation with Juror B, he/she confirmed for me that the jury reached unanimous Not-Guilty verdicts on indictments (1) and (3).  He/she told me that the only charge on which the jury was deadlocked was indictment (2).

4. Juror B told me that he/she was familiar with the affidavit that I previously filed in support of this motion.  Juror B confirmed for me that the screenshot of a text-message exchange that I referenced in paragraph (4) of that affidavit was accurate.  Specifically, Juror B confirmed that he/she had texted, "It was not guilty on second degree.  And split in half for the second charge.  When the judge sent us back with that Hernandez [sic] thing to look at the other side it turned into a bully match.  I thought the prosecution didn't prove the case.  No one thought she hit him on purpose or even thought she hit him on purpose [sic].  They gave us free counseling forms when we left."  Juror B clarified,

however, that he/she meant to write, "No one thought she hit him on purpose or even knew that she had hit him."

5. Juror B believes that every member of the jury, if asked, will confirm that the jury reached Not-Guilty verdicts on indictments (1) and (3).   Juror B believes that even jurors who were leaning toward a conviction on some part of indictment (2) will confirm that the other two indictments were acquittals. He/she believes that other jurors have been reluctant to come forward because there is so much public and media attention focused on this case.

Signed under the pains and penalties of perjury this _____ 4ᵗʰ _____ day of August, 2024

_____
David R. Yannetti

```
                                    Volume I of I
                                    Pages:  1-45
                                    Exhibits: None

                 COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS                        SUPERIOR COURT DEPARTMENT

*********************************
                              *
COMMONWEALTH OF MASSACHUSETTS *
                              *      DOCKET NO.
v.                            *      2282CR00117
                              *
KAREN READ                    *
                              *
*********************************


            NON-EVIDENTIARY HEARING TO DISMISS

         BEFORE THE HONORABLE BEVERLY J. CANNONE

APPEARANCES:

For the Commonwealth:

Norfolk County District Attorney's Office
45 Shawmut Road
Canton, MA 02021
By:  Adam C. Lally, Assistant District Attorney
     Laura McLaughlin, Esq.


For the Defendant:                For the Defendant:

Yannetti Criminal Defense Law Firm  Martin G. Weinberg, P.C.
44 School Street, Suite 100A        20 Park, Plaza, Suite 1000
Boston, MA 02108                    Boston, MA 02116
By:  David Yannetti, Esq.           By:  Martin G. Weinberg, Esq.




                         Friday,  August 9, 2024
                         Courtroom 25
                         Dedham, MA


                   SUSAN  M. LOBIE, CET
                   OFFICE SOLUTIONS PLUS
              15 Marion Road, Salem, MA 01970
                    (617) 471-3510
              SueLobie@osptranscriptionservices.com
```

2

<u>I N D E X</u>

<u>PAGE</u>

NON-EVIDENTIARY HEARING TO DISMISS                    3

1                      P R O C E E D I N G S

2

3       (Court in session at 2:00 p.m.)

4

5            THE CLERK:  Judge, 22117, Commonwealth v. Karen Read.

6            Counsel, identify themselves, starting with the

7       Commonwealth.

8            MR. LALLY:  Adam Lally for the Commonwealth.

9            Good afternoon, Your Honor.

10           THE COURT:  Good afternoon, Mr. Lally.

11           MS. MCLAUGHLIN:  Good afternoon, Your Honor.

12           Laura McLaughlin for the Commonwealth.

13           THE COURT:  Good afternoon, Ms. McLaughlin.

14           MR. WEINBERG:  Good afternoon, Your Honor.

15           Martin Weinberg on behalf of Karen Read, who sits

16      to my left, and co-counsel David Yannetti.

17           THE COURT:  Good afternoon Mr. Weinberg, good

18      afternoon Mr. Yannetti, good afternoon Ms. Read.

19

20                  NON-EVIDENTIARY HEARING TO DISMISS

21

22           THE COURT:  All right.  Mr. Weinberg, I will hear

23      you on your Motion.

24           MR. WEINBERG:  Thank you, your Honor.

25           May I use the podium?

4

```
 1        THE COURT:  Of course.

 2        MR. WEINBERG:  Thank you.

 3        Judge, there are two central issues.

 4        THE COURT:  I don't know if there's a microphone

 5   there.  Is there a microphone?

 6        THE CLERK:  There's not one for amplification.

 7   There is one for recording.

 8        THE COURT:  If I could ask you to keep you voice

 9   up or turn off the air-conditioning, please.

10        THE CLERK:  Yes, Your Honor.

11        THE COURT:  I just want to make sure that I hear

12   everything.

13        MR. WEINBERG:  On a day like this, I'll keep my

14   voice up.

15        THE COURT:  Okay.

16        MR. WEINBERG:  And thank you, Your Honor.

17        There are two central issues that raised by the

18   Motion to Dismiss and the Supplemental Affidavits that

19   have been filed on behalf of Ms. Read.

20        The first of them is whether or not where there's

21   strong and I contend uncontradicted evidence that the

22   jury reached to unanimous decision, even if it wasn't

23   formalized into a vote or into a polling announcement

24   to the Court, but it's strong and uncontradicted as a

25   result of the juror declarations that were made through
```

1    counsel to the Court, one to by counsel, that the jury

2    reached a unanimous verdict on two of the three counts

3    of the three-count indictment.

4         So, the legal issue is in the face of that evidence,

5    you know, whether or not Ms. Read can again be re-

6    prosecuted for the same offense by the same prosecutor

7    who we contend failed to prove her guilt to even one,

8    much less twelve jurors in trial one.

9         And when I address that, Judge, I will, you know,

10   make a proposal to Your Honor that's close to the

11   procedural pathway used by other judges --

12        THE COURT:  Okay.

13        MR. WEINBERG:  -- in cases similar to this in

14   terms of just how do we transform representations in

15   attorney affidavits into a hard proof that we believe

16   will convince the Court, and in fact, believe it will

17   convince Mr. Lally and the District Attorney's Office

18   that that jury, a jury that Your Honor described as an

19   extraordinary jury, reached a decision --

20        THE COURT:  Okay.

21        MR. WEINBERG:  -- that will be consistent with

22   their jury service and consistent with respecting that

23   jury service that would give at least the jurors who

24   are willing to appear before the Court anonymously the

25   opportunity to inform the Court that this was a final

1    unanimous decision, t didn't get further deliberation.

2    It was a unanimous decision on two of the three counts,

3    and the impasse was, in fact, on the third count, which

4    was Count II of the lesser included of the manslaughter

5    count.

6         The second of the legal issues that I want to address,

7    and they both together center under double jeopardy

8    clause, is unique history, and it's discouraging, if

9    not deterring, if not prohibiting second trials when

10   there's any rationale that would justify the verdict of

11   the first jury or the continuation of the first jury's

12   deliberations, is whether or not now that we have

13   evidence that the jury was not at an impasse, evidence

14   that was not known to Your Honor at the time that you

15   ordered that they be disbanded and ordered a mistrial,

16   evidence not known to Mr. Lally of the prosecution or

17   the defense, that, in fact, the note they wrote to

18   Your Honor, after the two-week charge on July 1, was

19   not unambiguous as Mr. Lally wrote in his pleading.

20   It was ambiguous.  It was subject to two constructions.

21        One that their impasse covered all three counts

22   and therefore would lead ineluctably to a mistrial

23   declaration, or two, that the impasse was on one count

24   with multiple lesser included charges that did not

25   encompass Counts I and III.

1          Your Honor didn't know what was in the jury's mind,

2     what was in their mind when they authored a note to

3     the Court, neither did counsel.  But the issue now --

4     and, again, it's in the context of double jeopardy,

5     which is such a historic and important clause, it was

6     enacted by our Founding Fathers to give them some

7     protection against the sovereign at that point that

8     came against simply choosing to mistrial prosecutions

9     that weren't going well.

10          And the Founding Fathers wanted citizens not to

11     have to face re-prosecution.  They understood the ordeal

12     and anxiety and the risks of having to prove to a second

13     jury what they had proven to a first jury, which is that

14     they were not guilty.

15          And so, the real reason issue here is legally what

16     do we do when we now know that jurors are declaring to

17     the Court that they believed they reached a verdict of

18     not guilty.  What can we do on August 8th, if I've got

19     the date correct, you know, six weeks after the July 1

20     trial that Your Honor presided over a lengthy trial with

21     an exceptional jury.

22          And I contend, Judge, that we don't -- we can't

23     just accept the fiction that the jury was at an impasse

24     on all three Counts when four jurors are saying to you

25     through counsel there was not, a fifth juror saying

1    to counsel indirectly they were not.

2        We have to embrace the fact that these are now

3    facts.  And yes, they come after the end of the trial,

4    but it doesn't mean that there's not some procedural

5    pathway to integrate those facts into Your Honor's

6    decision-making.

7        And the second one, the manifest necessity issue

8    has got a lot more SJC and Supreme Court guidance.

9    It's been the subject of lots of cases.  We're walking

10    a little bit down a pathway that has some precedence

11    about jurors and their being reconvened, but it doesn't

12    have the clarify of the precedence regarding the manifest

13    necessity standards, guidelines, principles that we'll

14    address second.

15        But here, what we know is that four jurors reached

16    out to defense counsel.  Jurors A, B, D, and E, I think

17    as the way they've been described by Mr. Jackson, who

18    received calls from three of the jurors, and Mr. Yannetti,

19    who received the call from one juror, and talked to

20    somebody who himself or herself spoke to a fifth juror.

21        We also have the corroboration, not just internally,

22    where these four jurors are essentially saying the same

23    thing, we reached a decision, we didn't announce it.

24    Some said we felt bad about it.  We didn't know what

25    to do, but they are internally consistent and not self-

1    contradictory, and that makes them more trustworthy.

2    They corroborate each other.

3        And I contend that the voicemail left on  Mr.

4    Lally's phone, which he responsively shared with counsel

5    and shared with the Court, essentially saying this is

6    probably one of the four jurors, but we don't know for

7    sure, said essentially the same thing.  We reached a

8    decision that Ms. Read was not guilty on murder, the

9    most serious charge that can be brought, a charge that

10    would imperil her for the rest of her life if there

11    was a conviction.

12        Other jurors tried to reach the prosecutor.  They

13    didn't succeed.  The prosecutor made a decision that

14    he couldn't promise anonymity, which every juror seems

15    to want, and that's understandable given the level of

16    media and public attention on this case.

17        And I understand the Court gave several -- gave them

18    discretion, and Your Honor made an Order that the defense

19    didn't dispute, that they were entitled to that anonymity.

20    That the public interest did not weigh the interest of

21    the jury in anonymity.

22        But we now have the declarations of the jurors

23    through defense counsel.  We have a voicemail of one

24    juror through Mr. Lally.  We have e-mails of other

25    jurors who only wanted anonymity as a condition precedent

1     to talking to the prosecutor.

2          And this case, because it has catalyzed so much

3     publicity, it's plausible to believe, if not compelling

4     to believe, that other jurors who sat through so many

5     weeks of testimony, this was probably one of the

6     monumental, central events of their life.

7          Not many people, certainly not people that go into

8     military service have opportunities to at least to serve

9     their community like these jurors did, not one of them,

10    to our knowledge, has picked up the phone to defense

11    counsel and said those jurors that you're memorializing

12    in affidavits and in motions, I don't agree with that.

13         No one has called the District Attorney, nobody

14    has e-mailed anybody.  Nobody has called Your Honor

15    through the Court Clerks.  Nobody disputes -- in other

16    words, none of the seven or eight jurors that are not,

17    you know, represented by the series of affidavits of

18    defense counsel dispute the truth of the representations

19    made by counsel.

20         We don't have certainty.  We only have the reasonable

21    inferences from the absence of other declarations, which

22    is that this jury was unanimous in its acquittal of Ms.

23    Read on Counts I and III.

24         So, then we get to the legal issue, and again as

25    I tried to say, the legal framework here, the landscape

1    is not quite as crystal clear as it is in standards of

2    manifest necessity and whether or not double jeopardy

3    commits a re-prosecution in the context of this unique

4    case.

5         But what we have is Court decisions saying, for

6    instance, what constitutes in criminal is not to be

7    controlled by the form of a judge's actions.  We're

8    not bound by labels.  That's the SJC in Commonwealth

9    v. Taylor.

10        We have Justice Ginsburg joining Justice Sotomayor

11   and Justice Kagan in a decent in the Blueford case saying

12   in ascertaining whether an acquittal has occurred, form

13   is not to be exalted over substance.

14        And they are making that point.  I mean, I've done

15   this for 52 years, and procedures is important and form

16   sometimes governs, and it's the recognition that double

17   jeopardy is different.

18        For instance, as I get to in the manifest necessity

19   phase of the argument, all of the courts put a heavy

20   burden on the prosecutor to justify a mistrial, to

21   justify a re-prosecution.  Ordinarily, I'm used to the

22   burden speaking on me as a defense counsel.  I'm used

23   to having an affirmative obligation to lay out for an

24   Appeals Court exactly what I want.

25        But in this unique area, the disincentive to

1   re-prosecuting somebody, the same prosecutor for the

2   same offense, when there's evidence of an acquittal

3   or evidence that the jury wasn't at an impasse overall

4   counts is so significant, it's so core to our values

5   that they put the burden on the prosecutor, and I will

6   get to the cases that support that, what I call the

7   central proposition, which is where's the default.

8       Is the default from not asking the jury about these

9   other counts, Ms. Read goes to trial again, or is the

10  default instead that the prosecution simply cannot again

11  re-prosecute her when there is not manifest necessity

12  in the first place for the Counts I and III.

13      The Supreme Court 67 years ago, and I remember it

14  because it was the tail end of the Warren Court, and

15  it revolutionized criminal justice, and it talked about

16  Miranda rights.  Nobody knew to Mr. Miranda back in the

17  1950s, Gideon gave right to counsel rights, Mapp v. Ohio

18  extended suppression remedies, the Fourth Amendment

19  violations.  These were all unknown until the Warren

20  Court.

21      The Warren Court in the case of Green v. The United

22  States, and it's in our pleadings, said -- and it's

23  important, that double jeopardy was designed to protect

24  an individual from being subjected to the hazards of

25  trial more than once, that the State with all its power

1    should not subject the citizen to the ordeal of living

2    in a, quote, "continuing state of anxiety," as well as

3    enhancing the possibility that even though innocent,

4    he may be found guilty by a second jury.

5        So, what we do in a world where we have facts not

6    known on July 1 that are known on August 8th, nd we're

7    not -- this is not completely novel territory.

8        For instance, the First Circuit of the Federal Court

9    of Appeals, it's eleven years since the Boston Marathon

10   bombing, and they're still dealing because of capital

11   punishment with whether the punishment should be life

12   or death for Tsarnaev that was arrested and survived.

13   And they recently in a lengthy opinion of over a hundred

14   pages said bring back these two jurors where we have a

15   principle basis to question their impartiality.

16       The SJC just four years ago in a case dealing with

17   a lawyer's allegation that there had been a racial

18   statement, I think it's called the McCulloch case, 485,

19   Mass. 790, said to the defense counsel did the judge

20   authorize you to re-contact that juror and get an

21   affidavit, and if there's any skepticism regarding the

22   truth of the Affidavit, we will have a hearing and make

23   decisions.

24       The nation was affixed to the Murdaugh case from

25   South Carolina, where a lawyer was accused of killing

1    his family, and there, there was evidence recently,

2    according to the media, that a Clerk spoke to a juror,

3    and the judge convened the hearing, questioned the

4    people who were connected to it in order to make a

5    decision.

6        In other words, regularly, judges who receive

7    reliable evidence that there was extrinsic evidence

8    that a marshal talked to a juror, there was a juror

9    bias, was the questionnaire fair, did something happen

10   during -- did the jurors access the internet when

11   they were judicially prohibited from doing so, Courts

12   reconvene hearings, and I can attest that it can be

13   done anonymously, it doesn't have to ineluctably lead

14   to the identity of jurors.

15       And we're going to ask the Court to do just that,

16   because without in any way diminishing the centrality

17   and the importance of an impartial jury that tells

18   the truth on voir dire, it's not being ethnically or

19   racially biased.  There's nothing more central about

20   making sure that jury was not influenced adversely by

21   something from the outside or even by something from

22   the internal discussions that reflected on a juror's

23   racial and ethnic impartiality.

24       Why isn't that acquittal entitled to just the same

25   kind of deference.  You know, we have not evidence that

1  the jury was not impartial or that they were influenced

2  externally, we have hard evidence that they reached

3  a decision.

4      We're not asking to have any inquiry, whether by

5  counsel or the Court, into the content or deliberations,

6  into their reasoning, into all of those matters that

7  are forever private, but here, we're asking that no

8  more than Your Honor could have asked by polling them,

9  which is, did you reach your verdict on Count I, what

10  was that verdict?  What about Count II, no.  What about

11  Count III, yes.

12      So, there is precedent, although it's slightly

13  different, but we contend no less important to Your

14  Honor making a decision.  If Your Honor is skeptical

15  in any way of the attorneys declarations, if you cannot

16  accept them because they're not the sworn affidavits

17  of lawyers -- of the jurors, I'm sorry, I acquiesce,

18  authorize them to do what they haven't, which is to

19  reinitiate a call to these four or five jurors, ask

20  them whether they would read the lawyers' Affidavits

21  and affirm if they're accurate.

22      Or alternatively authorize the lawyers to ask the

23  jurors whether or not they would execute an Affidavit.

24  It could be two sentences.  We reached a final decision

25  unanimously to acquit Ms. Read of Counts I and III.

1    Your Honor doesn't have to accept 4 out 12 or 5

2  out of 12.  Your Honor has a lot of discretion in terms

3  of how to get to the bottom line, which is what is the

4  truth here.

5    Your Honor could schedule a hearing and have the

6  four jurors in.  They would remain anonymous.  We would

7  even waive public trial, I'm not sure the media would,

8  but to keep this private and keep this confidential,

9  because we don't want the jurors to, you know, risk

10  identity.

11    Your Honor could do in it, you know, in any number

12  of ways.  You know, we have responsible Court Officers

13  that can meet four jurors anywhere Your Honor selects.

14  We have responsible lawyers and responsible prosecutors.

15  This doesn't have to be an event that challenges the

16  jurors' anonymity.

17    I guess what I'm saying is that we're asking the

18  Court not to close the door to this new evidence and

19  literally adopting a fiction that the impasse was on

20  all three counts when we now know that there's strong

21  corroborated, trustworthy evidence that was not.

22    To establish a procedure consistent with McCulloch,

23  consistent with Tsarnaev, consistent with the Supreme

24  Court decision in Reyna, and take those cases where

25  jurors do come in after the fact, when there's credible,

1    responsible evidence that they were either biased or

2    that they had some extrinsic evidence, whether through

3    the Internet or from improper an contact with a third

4    party, and help us investigate this.

5         I don't believe that if the Norfolk DA was convinced

6    from that process, and it could be 4 jurors, it could

7    be 12, but if all of them tell the Court we made a final

8    decision, we never went back like the Blueford case or

9    to re-examine it.  There was not an immediate decision,

10   it was a final decision.  All of our impasse was about

11   Count II and the multiple lesser includeds.

12        I am hopeful that the prosecution would join with

13   us in not seeking a new trial.  If they were convinced

14   by these jurors, under oath, to what they've not yet

15   been convinced by, which is defense counsel, this was

16   a hard-fought case, and I'm not being critical with the

17   DA, but I've done this for a long time, and I believe

18   in our system of justice.  People say it's not perfect,

19   but it's the best that the world has.  You know, this,

20   to me, is hallowed ground in a courthouse named after

21   someone I was a friend, who I deeply respected.

22        I want the prosecutor to get the facts in the best

23   way we can at this point in the case, which is through

24   Your Honor.  Order a hearing, Judge.  Don't make Ms. Read

25   be the first person in the history of the Commonwealth

1      to face re-prosecution for murder by the same prosecutor's

2      office that tried her once and failed to persuade the

3      jury she was guilty.

4          They've not given a single case with facts like

5      this have been ignored.  Not a single precedent have

6      they raised, nationwide, State Courts, murder cases,

7      50 States, Federal, where there's been this kind of

8      demonstration that we were silent when we shouldn't

9      be, but she was acquitted.

10          They've got Commonwealth v. a Juvenile where there

11      was a verdict slip, nobody knows when it was written.

12      We have Blueford, that there, there was clearly further

13      jury deliberation after a juror told the Judge that

14      we had reached a decision on two counts.

15          I'm convinced perhaps, you know, through many years

16      of doing this, that acquittals count, and if she was

17      acquitted, nobody wants to re-prosecute her on the

18      Counts for which she's been acquitted.

19          And form is important, procedure is important,

20      but what's more important is substance.  What's more

21      important is to find out whether that jury, in fact,

22      voted to acquit, and it was a final vote.  And then

23      I hope there's no dispute.  I hope Mr. Lally will stand

24      up in front of you and join me in asking that those

25      two charges not be re-prosecuted.

1    But let me switch from the equivalent and its

2    implications, the manifest necessity.

3    In this case, we have explicit guidelines which

4    have been set out by the Supreme Judicial Court that

5    look to whether or not there was manifest necessity

6    for the declaration of the mistrial.  And manifest

7    is a word that says to show clearly, and whether the

8    mistrial order was avoidable, whether there were any

9    viable options, whether the Court essentially had no

10    choice, no options.

11    And here a minimum with 4 or 5 jurors saying, you

12    know, we believed her to be innocent, and we believe

13    there was a vote, there's no evidence from those

14    declarations that there was an impasse on Counts I

15    and III, an impasse that would have rationalized and

16    justified the order of the mistrial.

17    The notice, I said, was believed to be unambiguous

18    by the prosecutor, but in truth was ambiguous.  It led

19    to one or two constructions.

20    So, this really becomes a burden of proof issue.

21    You know, who bears the burden when there was an

22    understanding by the Court that the note reflected an

23    impasse encompassing all charges when we now know there

24    was a rational alternative of explanation for the note,

25    a logical one, which is we were addressing only the

1    charges in Count II, the multiple charges, the multiple

2    decisions within the manslaughter count.

3        Here's where the Court helps us.  The Supreme Court

4    in Arizona v. Washington placed the heavy burden on

5    the government, on the prosecutor to justify a mistrial.

6    The SJC has issued multiple opinions, and I'll read

7    just a couple, because I think the burden of proof

8    issue is central, Judge.

9        Commonwealth v. Steward, which goes back to 1985,

10    and was one of the central decisions that started

11    formulating the jurisprudence around double jeopardy

12    and manifest necessity, says, "The prosecutor must

13    shoulder the burden of justifying the mistrial if he

14    is to avoid the double jeopardy bar.  His burden is

15    a heavy one, citing to Arizona v. Washington.

16        Cruz v. Commonwealth, SJC 2012, "The heavy burden

17    of proving that a mistrial was due to manifest necessity

18    lies with the Commonwealth."

19        Commonwealth v. Nicoll, 452 Mass. 816, 2008, "The

20    Commonwealth is unable to satisfy its heavy burden of

21    proving that there was manifest necessity for declaring

22    a mistrial, and the Commonwealth is therefore barred by

23    the principles of double jeopardy from retrying Nicoll."

24    And I have a copy of the Nicoll decision, because it's

25    the one that is not referenced yet for Your Honor's

1    consideration.

2         _Nicoll_ is an interesting case.  It was driving

3    case, jury of 6, and there was belief that one of the

4    jurors should not be sitting because he knew a witness,

5    if I'm recalling the facts correctly.  And everybody

6    considered it and thought there was no procedure to

7    allow the trial to continue with the jury of 5.  The

8    defense counsel thought that and the Court thought

9    that, and the Court, therefore, declared a mistrial.

10        Afterward, everybody discovered that it was, in

11   fact of rule of Criminal Procedure and the defendants

12   could waive a jury of 6 just like they could waive a

13   jury of 12.

14        And the Court determined, as I just read, that

15   there was no manifest necessity because there was a

16   viable option to the declaration of a mistrial that

17   the Court have asked the defendant whether or not they

18   would agree to a jury of 6, but they didn't recognize

19   it at the time.

20        And then the Court had a decision.  Are they going

21   to blame the defendant and make them go to trial a second

22   time in the face of double jeopardy's manifest necessity

23   requirement, or are we going to put the burden on the

24   prosecutor to have advised us of that rule.

25        This case is similar, Judge, because what you

1    weren't advised of is Mass. Rule 27B.  See, everybody

2    focused on <u>Roth</u> and <u>Juvenile</u> and <u>Blueford</u>, where all

3    of them were single counts with lesser includeds.

4    In the <u>Roth</u> case, the SJC decided that it prohibited

5    judges like yourselves from inquiring into the vote.

6    You couldn't ask the jury, well, if you haven't decided

7    on manslaughter, what about involuntary manslaughter,

8    what about OUI.

9        But this is different because we had three counts,

10    not one.  And Rule 27B that you were not advised of,

11    and we contend, of course, the burden was on the table

12    of the side that wants to re-prosecute her, says as

13    follows, "The judge may declare a mistrial as to any

14    charges upon which the jury cannot agree upon a verdict

15    provided, however, that the judge may first require the

16    jury to return verdicts on those charges upon which the

17    jury can agree and direct that such verdicts be received

18    and recorded."

19        The advisory note is even more explicit.  "This

20    rule also provides that the Court may declare a mistrial

21    in cases where the jury is unable to reach a verdict,

22    however, it must first receive and record the verdicts

23    which the jury can agree on."

24        That rule, had it been brought to the Court's view,

25    provided a viable option to a declaration of a mistrial.

1   It would have justified the Court's -- it would have

2   required the Court, as well as justify, to ask the jury

3   whether or not there was an impasse on all counts or

4   rather than just one.

5       So, the Supreme Court not only puts the heavy

6   burden on the prosecutor, it provides a set a guidelines

7   in which were established back by the Steward case and

8   repeated most recently by the Taylor case, and they even

9   called them two principles guiding our review of manifest

10  necessity.  One is counsel must have been given -- and

11  the word "must" implies it as a mandatory, as in

12  imperative, quote, "Counsel must have been given full

13  opportunity to be heard," and I'll address that second.

14  And, quote, "The trial judge must have given careful

15  consideration to alternatives to a mistrial."

16      These are the legal imperatives, and we contend

17  respectfully, for a variety of reasons, that neither

18  of those two guiding principles were met by the evidence

19  of what occurred on July 1, where we have the chronology

20  of Your Honor taking argument from counsel regarding the

21  first -- the morning note, and the prosecutor didn't

22  want a Tuey instruction, defense counsel did, Your Honor

23  elected to give Tuey instruction.

24      And four hours later, the jury sent a second note,

25  and unfortunately, there was no convening of counsel

1   and no request of counsel's position, no opportunity

2   for Mr. Yannetti and Jackson to speak to Ms. Read,

3   after all, it's her rights, not just theirs.

4        And there was this lack of consideration, careful

5   consideration of Rule 27B, which the prosecutor failed

6   to bring to the Court's attention.

7        Again, usually, this would be an issue where the

8   defense counsel could be criticized when they don't

9   object to instructions, after trial instructions.

10  The Court of Appeals makes it very hard for appellate

11  lawyers to succeed in reversing the judge's not providing

12  an instruction that later they wanted.

13       But this is double jeopardy.  This is different.

14  This is why all of those cases, the U.S. Supreme Court

15  in Arizona, the Supreme Judicial Court in Steward and

16  Nicoll, the Appeals Court in a case Commonwealth v.

17  Horrigan that we cited, "In light of the importance to

18  the defendant's right to be free of exposure to second

19  jeopardy, the burden of justifying a mistrial rests on

20  the prosecutor."

21       And so, again, it's the default.  If these procedural

22  guidelines, these principles where the Court must consider

23  any viable alternative, the Judge may not know every

24  rule at every moment, just like the judge in Nicoll

25  didn't, it's on the Commonwealth to have advised you,

1    Judge.

2         So, this was a case that really comes down to

3    whether or not there can be deference to a judicial

4    ruling when it was made without meeting the criteria,

5    a full opportunity for the defense to be heard before

6    the Court read the final note and issued its final

7    order, and a full opportunity for the Court to consider

8    the alternatives to the declaration of mistrial.

9         I would say to Your Honor that this is not easy.

10   This was a long trial.  The prosecutor's got strong

11   evidence that the jury was in fact deadlocked, in fact

12   at an impasse on Count II.  The prosecutor has strong

13   evidence that, in fact, the jury was not at an impasse

14   on Counts I and III.

15        They have to meet a burden of demonstrating to the

16   Court that they gave you all of the alternatives to the

17   declaration of mistrial.  And they should want, I submit,

18   that a search for justice in this courthouse, where we

19   don't want somebody who's found innocent wants to face

20   the second trial for the very same offense.

21        That's the whole principle, the centrality of double

22   jeopardy, Justice Douglas and Black's words in Green.

23   They should join us in asking the Court to establish a

24   procedure in Your Honor's discretion that either allows

25   the defense lawyers to supplement the declarations with

1    juror affidavits or cut right to it, that the attorney

2    declarations satisfy our burden of production that Ms.

3    Read was acquitted, bring the jurors in, Judge, hear

4    from them.  I beg you, it's the right thing to do.

5         Thank you, very much.

6         THE COURT:  All right.  Thank you.

7         MR. LALLY:  Good afternoon, Your Honor.

8         THE COURT:  Good afternoon.

9         MR. LALLY:  Do you want me there or over there.

10        THE COURT:  Wherever you want to be.

11        MR. LALLY:  Your Honor, the Commonwealth would

12   ask -- request that the Defendant's Motion to Dismiss

13   be denied, as there was not a verdict returned.

14        Counsel had more than adequate opportunity to be

15   heard and object to the declaration of the mistrial

16   in this case, and then a mistrial was declared as a

17   manifest of necessity.

18        To that last point, as it applies to where counsel

19   was referencing in regard to Rule 27B, what I would

20   submit there is there's a stalk difference between what

21   Rule 27B encompasses and what counsel is asking for the

22   Court to do.  And what I would say is there's a difference

23   between what Rule 27B talks about, which is taking or

24   the right of the Court to take partial verdicts, which

25   certainly the Court is entitled to do if there were at

1    any point in time indicated in any of the communications

2    from the jury or if there had been any communication

3    whatsoever from the jury that they had reached a partial

4    verdict.

5        So, Rule 27B has to do with taking of those partial

6    verdicts, not inquiring or trying to extract or coerce

7    a partial verdict by polling the jury who has declared

8    repeatedly to the Court that they're at an impasse.

9    So, simply put, Rule 27B just does not apply.

10       When it comes to each of those respective points,

11   the jury in this case, number one, did not return a

12   verdict; number two, counsel had adequate an ample

13   opportunity to object to the declaration of a mistrial;

14   and three, that the mistrial was declared out of clear

15   manifest necessity, which the Court, in caselaw, after

16   repeatedly stated, there's the typical sort of evidence

17   or example of what manifest necessity is.

18       But to those points, it is backed by decades if not

19   centuries, of caselaw.  And counsel and the defendant

20   in the Memorandum and in argument does quite a twisting

21   of logic into sort of a pretzel in order to have the

22   circumstances of this case fit into the precedent, and

23   there's a reason for that, because there is clear and

24   unequivocal precedent on each of those points that goes

25   back decades, if not centuries.

1        Commonwealth v. a Juvenile is a case directly on

2   point.  And as the Court is well aware, that's a case

3   in which following jury deliberations and the defendant

4   having been convicted after trial, one of the Court

5   Officers found a verdict slip in the jury deliberation

6   room in which the verdict slip was marked as not guilty.

7        That case stands for the proposition that where

8   those slips were in contradiction of the jury's report

9   to the judge in open court that they were deadlocked,

10  that that does not -- the not guilty finding on the

11  verdict slips does not contravene or overrule the

12  verdict as it is applied in open court.

13       In quoting from that case, and I think it's directly

14  applicable to what's been provided to the Court so far,

15  it states, "It is not enough to show that the jury may

16  have agreed on some issues at some time.  If that limited

17  showing were to control, uncertainties would be invited."

18  And that's exactly what the defendant is asking the Court

19  to do in this case, is in contravention to that caselaw

20  and in a Juvenile, in Blueford, in Roth, in Ray.

21       In all of the cases over the decades and centuries

22  dealing with this, Blueford itself, states very clearly,

23  "The very object of the jury system, after all, is to

24  secure unanimity by comparison of views and by arguments

25  among the jurors themselves.  A single juror's change

1    of mind is all it takes to require to the jury to

2    reconsider a greater offense."  And that also comes

3    from Commonwealth v. Carnes, as well.

4        But it states, Your Honor, this jury was instructed

5    -- not only instructed orally for a lengthy time, but

6    was provided with written copies of those instructions

7    that the Court gave, that stated on at least 9 or 10

8    different times exactly what a unanimous verdict was

9    and how to come to that unanimous verdict and how to

10   record that unanimous verdict, and there is no verdict

11   slip returned stating anything in this case.

12       In particular, the two charges that the defendant

13   now complains of dealt with simple choice.  There was

14   a box for guilty and a box for not guilty, and neither

15   was checked, neither was returned to the Court at any

16   point in time.  There is no verdict in this case.

17       Now, as far as whatever those communications that

18   the jurors are referenced, what the Commonwealth would

19   submit, Your Honor, is the jurors did nothing wrong in

20   this case, the Court did nothing wrong in this case.

21   The Court applied the law as it exists to this case.

22       There is nothing special about this case, there

23   is no special application or procedure that needs to

24   be developed, created, or employed as it applies to

25   this case or this defendant.  This defendant in this

1    case should be treated as any similarly situated defendant

2    or any similarly situated case within the court system.

3        These jurors, as the Court refers to them as an

4    extraordinary juror, and I know the Court had opportunity

5    to observe the jury throughout the course of a lengthy

6    trial and to review the many communications that the

7    jury submitted to the Court, which the Commonwealth

8    would submit were thoughtful, were deliberate, were

9    intelligent, were insightful.

10       This jury told the Court on multiple times that

11   they had reached an impasse as far as their deliberations

12   were concerned, as it pertained to the charges.  In the

13   final note that was submitted to the Court, they refer

14   to the charges in the plurality twice within that note,

15   as it pertains to exactly what they were stuck on.

16       When it comes to what they were communicating and

17   reporting to be at an impasse in regard to, they refer

18   to it as the charges multiple times.

19       Whatever point jurors may have felt -- the other

20   thing I would say about the jury is, and this goes to

21   the precise reason of why the procedures suggested by

22   counsel are completely inappropriate in direct

23   contradiction of what the caselaw says, I can't imagine

24   whatever the jurors have undergone since July 1st as

25   far as extraneous influences, whether they be personal,

1    professional, who they've talked to, what they talked

2    about, how those things have formulated in their minds.

3    The intense pressure that they felt just looking at the

4    Affidavit from the one juror in regard to the impoundment

5    that the Court had allowed with reference to the jurors'

6    information remaining anonymous at least for the time

7    being.

8        With respect to that is exactly what the caselaw

9    advises against and governs against as far as taking

10   this sort of post-hoc weeks or months after a verdict

11   has been returned or not returned and then asking people

12   to put themselves back in a position and indicate to

13   the Court exactly what was going on in that deliberative

14   process.

15       Asking them how they voted or what their vote was

16   is infringing into that deliberative process that is

17   specifically excluded from any sort of point of contention

18   or inquiry by counsel, by the Court at any point in time.

19       When it comes to the adequate opportunity that

20   counsel has to object or to suggest anything else, this

21   is a very first time that the jury gave any sort of

22   note or indication beyond their first note asking for

23   a report, Mr. Yannetti was asking for a <u>Tuey-Rodriquez</u>,

24   and understanding that asking for a <u>Tuey-Rodriquez</u> is

25   not equivalent to requesting a mistrial, it's the first

1   step in that process, and experienced counsel knows that.

2        And even in that first note, the jury had not

3   indicated that their deliberations were done or that

4   they had done thorough deliberations.  They weren't

5   asking anything.  They were just reporting to the Court

6   simply where they were in their deliberative process

7   at that point, reported to be at an impasse.

8        Counsel, and these are Mr. Yannetti's own words,

9   on both occasions, indicated that from that or argued

10  Tuey-Rodriquez on both of those first two notes that

11  came from the jury, that this jury was emphatic and

12  that they were, quote/unquote, "hopelessly deadlocked."

13  That is what counsel was asking for.  What counsel is

14  intimating there, making an argument about, is for a

15  mistrial at those particular points, or at least leading

16  down there.

17       Now, as far -- and this is also, again, as I stated

18  backed by the caselaw, Ray v. Commonwealth, states,

19  "Counsel's request for a Tuey-Rodriquez instruction

20  permits," quote, "the inference that both parties were

21  provided an opportunity to be heard on possible

22  alternatives to a mistrial".  Commonwealth v. Pereira

23  is on point with that particular point, as well.

24       And I think it's also important to consider this

25  in the context of this particular case, in this particular

1   trial.  This is counsel who did -- was not shy, did not

2   have any misgivings about presenting any sort of argument

3   or any sort of argument against the Court's decisions

4   when it came to anything that was even perceived a slight

5   or measure against the defendant's interest, and I would

6   direct the Court to the verdict slip argument that was

7   made post-trial, as well.

8        Getting to the manifest necessity, Your Honor,

9   as I stated what the caselaw clearly states, is that

10  a prototypical example of the manifest necessity is

11  a deadlocked jury or a hung jury, and that is what we

12  have in this case.  It's clear and unambiguous from

13  all the communications, even Mr. Yannetti, during his

14  arguments for the Tuey-Rodriquez, recognized the same.

15       The dangers of coercion when it comes to a deadlocked

16  jury are amply stated throughout the caselaw as far as

17  Ray, as far Cruz.  The Court was never required and has

18  never been required, and that goes from the Blueford

19  decision, from the United States Supreme Court, to the

20  Supreme Judicial Court of this Commonwealth, that there

21  is no requirement that the Court makes any sort of

22  polling or has any sort of asking when it comes to those

23  -- how the jury stands or whether or not they have a

24  vote or whether or not they have a partial verdict.

25       And I would also submit, Your Honor, that counsel's

1  argument is a little disingenuous when it comes to

2  indicating that those cases only apply when you're

3  talking about charges with lesser includeds or charges

4  that have a multiplicity of different findings that

5  the jury can make, because it ignores the fact that

6  there are those two, and two very charges or indictments

7  that the defendant is seeking to dismiss here were very

8  simple, not guilty or guilty.  Those were the two boxes

9  to be checked.

10      So, in those instances, it may be permissible for

11  the Court to inquire and poll.  But the coercion and

12  the fear of that that developed through the caselaw

13  is inherent within the second count which had all of

14  those lesser included charges, which is exactly what the

15  caselaw and the rules prescribe as far as not allowing

16  for the Court to inquire in those types of scenarios.

17      So, I guess the defendant's position is the Court

18  should has to have polled only as to Indictments I and

19  III and not to Indictment Number II, but again I don't

20  know that there's any requirement for the Court to do

21  that, and I don't know exactly how the Court is to do

22  that when it comes to those types of coercive pollings

23  of the jury while they're still deliberating.

24      The notes and the communications from the jury again

25  on three separate occasions and very deliberately as

1   far as the language that was used to declare themselves

2   to be at an impasse on three separate occasions, the

3   last of which included language to the effect that any

4   further deliberations would be futile.  That is the

5   very definition of manifest necessity, and left this

6   Court with absolutely no alternative other than to

7   declare a mistrial.

8        And that is clear from the language of the jury's

9   communications to the Court, and it's clear from the

10  caselaw and the rules and the law itself as far as what

11  the Court can do.

12       The two areas that counsel is talking about and

13  sort of asking for an extension or creation of new law

14  again, sort of special or differential treatment to this

15  case or this defendant, the two areas in which the Court

16  can make post-trial inquiry have to do with some sort

17  of bias, if there's an issue raised in regard to whether

18  it's due to racial discrimination, gender discrimination,

19  or some other protected class, so that sort of bias

20  implicit in the jury's deliberative processes, or in an

21  instance -- I'm sorry, Your Honor, one moment -- and in

22  an instance in which there is some sort of allegation

23  or some sort of evidence of extraneous inference.  The

24  defendant is not raising either of those issues.

25       Specifically within those cases, what the Court

1    states, which is obviously binding on your Honor, is

2    that those carve-outs for extraneous influences or bias

3    on the parts of the deliberating jurors are permissible

4    areas for post-trial inquiry.

5         What all those cases also say is any inquiry into

6    the deliberative process or exactly what counsel is

7    proposing here is specifically prohibited by those

8    caselaw, by those cases that have developed over the

9    decades.

10        Commonwealth v. Morris states specifically that,

11   "Massachusetts continues to adhere to common law

12   principles, barring inquiry into the contents of jury

13   deliberations, and any impeachment of jury verdicts

14   based on information gained from such inappropriate

15   inquiry."

16        Now, the reason that the Commonwealth did not

17   respond directly to the jurors when it came to them

18   expressing or wishing to have discussions about their

19   deliberative process or their votes is specifically

20   for that.  Rule of Professional Conduct 3.5C states

21   specifically that inquiries into those topics are not

22   allowed.  The caselaw that is derived around that and

23   since that corroborates.

24        Simply because someone called you first does not

25   then allow for that inquiry to occur.  So, whether or

1   not you initiate the call to the juror or the juror

2   calls you, it still does not allow for counsel or the

3   Court to then have these conversations with these jurors

4   that delve into their deliberative processes or their

5   deliberations.

6        The specific type of coercion that is feared by

7   the Courts when it comes into this, and I'll sort of

8   condense the quote from Commonwealth v. Roth, and it

9   states simply, "One cannot assume from the mere report

10  of deadlock that there is any final verdict lurking

11  within that deadlock that may be extracted.

12       Such inquiries of the jury may succeed in extracting

13  a partial verdict, but we could not have confidence that

14  that partial verdict was the product of a thoughtful and

15  thorough deliberation process.

16       The risk of jurors' coercion are too high and the

17  liability of any such partial verdict returned is too

18  low to warrant such an approach to salvaging some partial

19  result from a deadlocked jury."

20       Simply put, Your Honor, what counsel is proposing

21  as far as what the Court should do is prohibited by the

22  rules, it's prohibited by the law, it's prohibited by

23  the development of caselaw over decades and centuries

24  as to what is permitted.

25       Certainly, the Commonwealth nor anyone wants to

1    try someone who has been acquitted by jury of their

2    peers or retry them in the same offense.  That's not

3    what happened here.  There was no verdict returned by

4    this jury.

5        Counsel had more than an adequate opportunity to

6    address the Court in relation to the declaration of

7    mistrial, and the Court did absolutely nothing wrong

8    in finding manifest necessity as the only alternative

9    that could have been employed in that particular instance,

10   polling the jury then, polling the jury now, it's simply

11   not permitted by the rules, it's not appropriate, and

12   therefore, the defendant's motion should be denied.

13       Thank you.

14       THE COURT:  Thank you.

15       MR. WEINBERG:  May I reply.

16       THE COURT:  Yes.

17       MR. WEINBERG:  There were two cases that Mr. Lally

18   relied on, and they both stand for very different

19   propositions of law.  Commonwealth v. a Juvenile --

20   it's actually A Juvenile v. Commonwealth, at 392 Mass.

21   52, 1984, says, "The judge was under no duty to inquire

22   as to the status of the jury's deliberations on each of

23   the lesser included charges within the murder complaint."

24       Footnote one of that opinion says, quote, "We deal

25   here with the Complaint charging a single murder.

1    Where a complaint or indictment, in multiple counts,

2    charges multiple crimes (e.g., two separate murders),

3    a general verdict could be returned as to one of the

4    counts, despite deadlock on other counts."

5         Commonwealth v. a Juvenile was as if Count II in

6    this case was the only count, and they discouraged and

7    kind of the Court questions as to where the jury stood

8    on lesser included.

9         And that's the principle of Commonwealth v. Ross

10   -- v. Roth, the other case that Mr. Lally quoted.

11   That case created a dichotomy where the Court was asked

12   whether or not a judge was permitted to ask the jury

13   about lesser includeds, and because of the fear that

14   a Court's mere question could have a kind of domino

15   effect coercing jurors to reach compromises as to

16   lesser includeds, the Court prohibited such questioning

17   as to less included.

18        But the Court distinguished throughout this lengthy

19   SJC command, our case. We're now dealing with one count

20   verdict with multiple charges, we're dealing horizontally

21   with three separate charges.

22        Blueford and a Juvenile had evidence that the

23   unanimous verdict that the defense was claiming occurred

24   before the end of deliberations. In a Juvenile, weeks

25   or days later, the Court Officer found some verdict

1    slips.  Nobody knew when they were written.

2        In <u>Blueford</u>, the Supreme Court case, where there

3    was a statement to the Court that we've reached a

4    decision on one count, the Count sent them out under

5    our initial because they hadn't decided, you know,

6    just what -- they needed to decide all the different

7    allegations within a single charge, and they came back

8    and said that we're deadlocked on everything.

9        But there's no risk of jury coercion when a Court

10   is asking the jury whether they reached a verdict on

11   other charges other than the one they were deadlocked

12   on.  There's no risk of jury coercion saying does your

13   note should reflect all charges rather than one.

14       Your Honor instructed the jury, page 46 of the

15   instructions, "You should continue deliberating until

16   you have reached a final verdict on each charge."  We

17   don't know whether the jury understood that instruction

18   to mean that we can't come back and tell the Court

19   affirmatively that we've reached two decisions, two

20   general verdicts, but we're at an impasse on a third one.

21       The Commonwealth talked about the risks that some

22   of the jurors might be exposed to the media, and that's

23   certainly more than true in the <u>Tsarnaev</u> case where

24   they've had, you know, just an overwhelming amount of

25   media regarding the catastrophe of the Boston Marathon

1 | in 2013, the government's investigation, the trials,

2 | jurors knew what one jury decided, and yet the First

3 | Circuit said that's not a prohibition about a court

4 | exercising authority to ask the right questions.

5 | Judge, you're an experienced jurist. I trust you

6 | to be able to determine whether or not a juror telling

7 | you they reached a verdict, to determine whether it was

8 | final or whether it was somehow influenced by the media.

9 | Your Honor does that every day when you pick jurors on

10 | the front end to determine whether they're biased or

11 | unbiased. It's certainly not a prohibition that should

12 | insulate a requittal and allow a re-prosecution.

13 | The question at the end for the jurors would not

14 | be a, in fact, a deliberative process. I understand

15 | Mr. Lally's citation to lure and discomfort of rules

16 | that say jurors should not be asked questions by anyone

17 | regarding, you know, why did the Commonwealth not persuade

18 | you that Ms. Read was guilty, or what did you think of

19 | this witness's credibility, or why did you vote a certain

20 | way, or what did the other 11 jurors say. A deliberating

21 | jury is not a focus group, it's not a place for lawyers

22 | to ask about the views of 12 jurors, even if you were

23 | one juror.

24 | But Your Honor is being asked to do no more than

25 | ask them what you would ask if they came out and said

1   we have a verdict, which is did you unanimously determine

2   as a final determination that Ms. Read is innocent on

3   Counts I and III.  Was your decision unanimous, did any

4   juror dispute it?  That's very different than probing

5   the subjective state of mind or probing for what other

6   jurors said that caused somebody to reach that unanimous

7   verdict.

8        If Mr. Lally is concerned it wasn't a final verdict,

9   Your Honor can ask the question, was it a final verdict,

10  was there ever a deliberation again after you reached

11  that unanimous decision?

12       In terms of the argument about Tuey and Mr. Yannetti

13  saying, well, if they're deadlocked, if he wanted the

14  mistrial, he could have asked for a mistrial, and Your

15  Honor would have, of course, had the discretion to deny

16  it after four or five days of deliberation.

17       He asked for a Tuey instruction, and it's inferred

18  by a Tuey-Rodriquez instruction in the State Court, Tuey

19  is the 19th Century Federal case, is that you have hope

20  when you're asking for the Tuey instruction.

21       My experience, usually the prosecutor is confident

22  in the jury that once the Tuey instruction to try to get

23  the juror to overcome the minority and get to a guilty

24  verdict, here you have the defense lawyer asking for

25  a Tuey instruction reflecting that he wanted further

1 | deliberations.

2 | So, there's no answer, and the <u>Ray</u> case does not

3 | say that when you ask for a <u>Tuey</u> instruction, you are

4 | really asking for something more than a <u>Tuey</u> instruction.

5 | <u>Tuey</u> means, I want this jury to reach a decision, and

6 | that's what Mr. Yannetti was saying during those two

7 | colloquies on the Friday before and then on July 1.

8 | We're not asking the jury to impeach a verdict.

9 | We're not asking for an inquiry that would be prohibited.

10 | I know the Federal Rule 606B, I think, state it might

11 | be about the same way in terms of asking the jury for

12 | their state of mind.  We're asking the Court to conduct

13 | a voir dire that Mr. Lally agreed with the done.  If our

14 | argument is 1 of the 12 jurors was biased, our argument

15 | was well, we now have new evidence one the jurors read

16 | an Internet.

17 | We have evidence here that the jury acquitted Ms.

18 | Read.  What could be more central to the core values

19 | of our criminal justice system than to make a judicial

20 | determination with a respected and experienced Superior

21 | Court Judge whether that's so or not, and if it's so,

22 | stop her re-prosecution, because that would be a horror

23 | to make her convince 24 jurors of her innocence a second

24 | trial when she's already convinced the first trial.

25 | Thank you, Judge.

1        THE COURT:   Thank you.

2        Any response, Mr. Lally, or are you all set?

3        MR. LALLY:   No, thank you.

4        THE COURT:   Okay.   All right.   Thank you very much.

5    I'll take this under advisement.

6        MR. WEINBERG:   Judge, I have the <u>Nicoll</u> case if

7    you want it.

8        THE COURT:   Sure.   Thank you.

9    (Hearing Concluded at 3:04 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

      I, Susan M. Lobie, Certified Electronic Transcriptionist and Notary Public for the Commonwealth of Massachusetts, and a Court Approved Transcriptionist for Office Solutions Plus, do hereby certify that the foregoing is a true and accurate transcript prepared to the best of my ability, from audio recordings of a Non-Evidentiary Hearing to Dismiss, held on Friday, August 9, 2024, in the matter of <u>Commonwealth v. Karen Read</u>, Docket No. 2282CR00117, before the Honorable Beverly J. Cannone.

      I, Susan M. Lobie, further certify that the foregoing is in compliance with the Administrative Office of the Trial Court Directive on Transcript Format.

      I, Susan M. Lobie, further certify that I neither am counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

      Proceedings recorded by electronic sound recording equipment. Transcript produced from computer.

*Susan M Lobie* DATE: <u>September 4, 2024</u>

Susan M. Lobie, President
Office Solutions Plus
15 Marion Road
Salem, MA 01970
(617) 471-3510
<u>SueLobie@osptranscriptionservices.com</u>

Notary Public, Commonwealth of Massachusetts
My Commission Expires March 3, 2028



**The Commonwealth of Massachusetts**
**OFFICE OF COURT MANAGEMENT, Transcription Services**

**AUDIO ASSESSMENT FORM**

*For court transcribers:* *Complete this assessment form for each volume of transcript produced, and include it at the back of very original and copy transcript with the certificate page, word index, and CD PDF transcript.*

**TODAY'S DATE:** 9/4/2024          **TRANSCRIBER NAME:** Susan M. Lobie

**CASE NAME:** Commonwealth v. Karen Read          **DOCKET NO:** 2282CR00117

**RECORDING DATE** 8/9/2024          **TRANSCRIPT INTERVIEW:** 1 OF 1

---

(circle one)  **TYPE:**   **(CD)**   **TAPE**    **QUALITY:**   **EXCELLENT**   **(GOOD)**   **FAIR**   **POOR**

(circle all that apply) **ISSUES** (include time stamp):

**background noise**                              time stamp: _____

**low audio**                                    _____

**low audio at sidebar**                         _____

**simultaneous speech**                          _____

**speaking away from microphone**                _____

**other:** _____              time stamp: _____

_____              _____

_____              _____

_____              _____

**COMMENTS:**          The audio for this transcript was fine.

_____

_____

COMMONWEALTH V. KAREN READ
DOCKET NO. 2282CR00117
NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024

**1**

**1** [6] 6:18 7:19 13:6 23:19 43:7,14
**10** [1] 29:7
**11** [1] 41:20
**12** [6] 16:1,2 17:7 21:13 41:22 43:14
**1950s** [1] 12:17
**1984** [1] 38:21
**1985** [1] 20:9
**19th** [1] 42:19
**1st** [1] 30:24

**2**

**2:00** [1] 3:2
**2008** [1] 20:19
**2012** [1] 20:16
**2013** [1] 41:1
**22117** [1] 3:3
**24** [1] 43:23
**27b** [8] 22:1,10 24:5 26:19, 21,23 27:5,9

**3**

**3.5c** [1] 36:20
**3:04** [1] 44:9
**392** [1] 38:20

**4**

**4** [3] 16:1 17:6 19:11
**452** [1] 20:19
**46** [1] 40:14
**485** [1] 13:18

**5**

**5** [3] 16:1 19:11 21:7
**50** [1] 18:7
**52** [2] 11:15 38:21

**6**

**6** [3] 21:3,12,18
**606b** [1] 43:10
**67** [1] 12:13

**7**

**790** [1] 13:19

**8**

**816** [1] 20:19
**8th** [2] 7:18 13:6

**9**

**9** [1] 29:7

**A**

**able** [1] 41:6
**absence** [1] 10:21
**absolutely** [2] 35:6 38:7
**accept** [3] 7:23 15:16 16:1
**access** [1] 14:10
**according** [1] 14:2
**accurate** [1] 15:21
**accused** [1] 13:25
**acquiesce** [1] 15:17
**acquit** [2] 15:25 18:22
**acquittal** [4] 10:22 11:12 12:2 14:24
**acquittals** [1] 18:16
**acquitted** [6] 18:9,17,18 26:3 38:1 43:17
**actions** [1] 11:7
**actually** [1] 38:20
**adam** [1] 3:6
**address** [5] 5:9 6:6 8:14 23:13 38:6
**addressing** [1] 19:25
**adequate** [4] 26:14 27:12 31:19 38:5
**adhere** [1] 36:11
**adopting** [1] 16:19
**adversely** [1] 14:20
**advised** [4] 21:24 22:1,10 24:25
**advisement** [1] 44:5
**advises** [1] 31:9
**advisory** [1] 22:19
**affidavit** [4] 13:21,22 15:23 31:4
**affidavits** [7] 4:18 5:15 10:12,17 15:16,20 26:1
**affirm** [1] 15:21
**affirmative** [1] 11:23

**affirmatively** [1] 40:19
**affixed** [1] 13:24
**afternoon** [10] 3:7,8,9,11, 12,15,16,16 26:7,8
**afterward** [1] 21:10
**ago** [2] 12:13 13:16
**agree** [5] 10:12 21:18 22:14,17,23
**agreed** [2] 28:16 43:13
**air-conditioning** [1] 4:9
**allegation** [2] 13:17 35:22
**allegations** [1] 40:7
**allow** [4] 21:7 36:25 37:2 41:12
**allowed** [2] 31:5 36:22
**allowing** [1] 34:15
**allows** [1] 25:24
**already** [1] 43:24
**alternative** [4] 19:24 24:23 35:6 38:8
**alternatively** [1] 15:22
**alternatives** [4] 23:15 25:8,16 32:22
**although** [1] 15:12
**ambiguous** [2] 6:20 19:18
**amendment** [1] 12:18
**among** [1] 28:25
**amount** [1] 40:24
**ample** [1] 27:12
**amplification** [1] 4:6
**amply** [1] 33:16
**announce** [1] 8:23
**announcement** [1] 4:23
**anonymity** [5] 9:14,19,21, 25 16:16
**anonymous** [2] 16:6 31:6
**anonymously** [2] 5:24 14:13
**answer** [1] 43:2
**anxiety** [2] 7:12 13:2
**anybody** [1] 10:14
**appeals** [4] 11:24 13:9 24:10,16
**appear** [1] 5:24

**appellate** [1] 24:10
**applicable** [1] 28:14
**application** [1] 29:23
**applied** [2] 28:12 29:21
**applies** [2] 26:18 29:24
**apply** [2] 27:9 34:2
**approach** [1] 37:18
**appropriate** [1] 38:11
**area** [1] 11:25
**areas** [3] 35:12,15 36:4
**argued** [1] 32:9
**argument** [11] 11:19 23:20 27:20 32:14 33:2,3,6 34:1 42:12 43:14,14
**arguments** [2] 28:24 33:14
**arizona** [3] 20:4,15 24:15
**around** [2] 20:11 36:22
**arrested** [1] 13:12
**ascertaining** [1] 11:12
**assume** [1] 37:9
**attention** [2] 9:16 24:6
**attest** [1] 14:12
**attorney** [3] 5:15 10:13 26:1
**attorneys** [1] 15:15
**attorney's** [1] 5:17
**august** [2] 7:18 13:6
**authored** [1] 7:2
**authority** [1] 41:4
**authorize** [3] 13:20 15:18, 22
**avoid** [1] 20:14
**avoidable** [1] 19:8
**aware** [1] 28:2

**B**

**back** [9] 12:16 13:14 17:8 20:9 23:7 27:25 31:12 40:7, 18
**backed** [2] 27:18 32:18
**bad** [1] 8:24
**bar** [1] 20:14
**barred** [1] 20:22
**barring** [1] 36:12

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA  01970
(617) 471-3510 · SueLobie@osptranscriptionservices.com
Sheet 1

R.284
JA0425

COMMONWEALTH V. KAREN READ
DOCKET NO. 2282CR00117
NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024

**based** [1] 36:14
**basis** [1] 13:15
**bears** [1] 19:21
**becomes** [1] 19:20
**beg** [1] 26:4
**behalf** [2] 3:13 4:19
**belief** [1] 21:3
**believe** [7] 5:15,16 10:3,4 17:5,17 19:12
**believed** [3] 7:17 19:12,17
**best** [2] 17:19,22
**between** [2] 26:20,23
**beyond** [1] 31:22
**bias** [4] 14:9 35:17,19 36:2
**biased** [4] 14:19 17:1 41:10 43:14
**binding** [1] 36:1
**bit** [1] 8:10
**black's** [1] 25:22
**blame** [1] 21:21
**blueford** [9] 11:11 17:8 18:12 22:2 28:20,22 33:18 39:22 40:2
**bombing** [1] 13:10
**boston** [2] 13:9 40:25
**both** [5] 6:7 32:9,10,20 38:18
**bottom** [1] 16:3
**bound** [1] 11:8
**box** [2] 29:14,14
**boxes** [1] 34:8
**bring** [3] 13:14 24:6 26:3
**brought** [2] 9:9 22:24
**burden** [17] 11:20,22 12:5 19:20,21 20:4,7,13,14,16,20 21:23 22:11 23:6 24:19 25:15 26:2

## C

**call** [4] 8:19 12:6 15:19 37:1
**called** [5] 10:13,14 13:18 23:9 36:24
**calls** [2] 8:18 37:2
**came** [7] 8:12 32:11 33:4 36:

17 40:7 41:25
**cannot** [4] 12:10 15:15 22:14 37:9
**capital** [1] 13:10
**careful** [2] 23:14 24:4
**carnes** [1] 29:3
**carolina** [1] 13:25
**carve-outs** [1] 36:2
**case** [50] 9:16 10:2 11:4,11 12:21 13:16,18,24 17:8,16,23 18:4 19:3 21:2,3,25 22:4 23:7,8 24:16 25:2 26:16 27:11,22 28:1,2,7,13,19 29:11,16,20,20,21,22,25 30:1,2 32:25 33:12 35:15 39:6,10,11,19 40:2,23 42:19 43:2 44:6
**caselaw** [14] 27:15,19 28:19 30:23 31:8 32:18 33:9,16 34:12,15 35:10 36:8,22 37:23
**cases** [13] 5:13 8:9 12:6 16:24 18:6 22:21 24:14 28:21 34:2 35:25 36:5,8 38:17
**catalyzed** [1] 10:2
**catastrophe** [1] 40:25
**caused** [1] 42:6
**center** [1] 6:7
**central** [8] 4:3,17 10:6 12:7 14:19 20:8,10 43:18
**centrality** [2] 14:16 25:21
**centuries** [4] 27:19,25 28:21 37:23
**century** [1] 42:19
**certain** [1] 41:19
**certainly** [5] 10:7 26:25 37:25 40:23 41:11
**certainty** [1] 10:20
**challenges** [1] 16:15
**change** [1] 28:25
**charge** [5] 6:18 9:9,9 40:7,16
**charges** [21] 6:24 18:25 19:23 20:1,1 22:14,16 29:12 30:12,14,18 34:3,3,6,14

**38**:23 **39**:2,20,21 **40**:11,13
**charging** [1] 38:25
**checked** [2] 29:15 34:9
**choice** [2] 19:10 29:13
**choosing** [1] 7:8
**chronology** [1] 23:19
**circuit** [2] 13:8 41:3
**circumstances** [1] 27:22
**citation** [1] 41:15
**cited** [1] 24:17
**citing** [1] 20:15
**citizen** [1] 13:1
**citizens** [1] 7:10
**claiming** [1] 39:23
**clarify** [1] 8:12
**class** [1] 35:19
**clause** [2] 6:8 7:5
**clear** [6] 11:1 27:14,23 33:12 35:8,9
**clearly** [4] 18:12 19:7 28:22 33:9
**clerk** [4] 3:3 4:6,10 14:2
**clerks** [1] 10:15
**close** [2] 5:10 16:18
**co-counsel** [1] 3:14
**coerce** [1] 27:6
**coercing** [1] 39:15
**coercion** [6] 33:15 34:11 37:6,16 40:9,12
**coercive** [1] 34:22
**colloquies** [1] 43:7
**come** [4] 8:3 16:25 29:9 40:18
**comes** [10] 25:2 27:10 29:2 30:16 31:19 33:15,22 34:1,22 37:7
**command** [1] 39:19
**commits** [1] 11:3
**common** [1] 36:11
**commonwealth** [33] 3:3, 5,6,10 11:8 17:25 18:10 20:9,16,18,19,20,22 24:16,25 26:11 28:1 29:3,18 30:7 32:18,22 33:20 36:10,16 37:8,25 38:19,20 39:5,9 40:21

**41**:17
**communicating** [1] 30:16
**communication** [1] 27:2
**communications** [6] 27:1 29:17 30:6 33:13 34:24 35:9
**community** [1] 10:9
**comparison** [1] 28:24
**compelling** [1] 10:3
**complains** [1] 29:13
**complaint** [3] 38:23,25 39:1
**completely** [2] 13:7 30:22
**compromises** [1] 39:15
**concerned** [2] 30:12 42:8
**concluded** [1] 44:9
**condense** [1] 37:8
**condition** [1] 9:25
**conduct** [2] 36:20 43:12
**confidence** [1] 37:13
**confident** [1] 42:21
**confidential** [1] 16:8
**connected** [1] 14:4
**consider** [3] 24:22 25:7 32:24
**consideration** [4] 21:1 23:15 24:4,5
**considered** [1] 21:6
**consistent** [6] 5:21,22 8:25 16:22,23,23
**constitutes** [1] 11:6
**constructions** [2] 6:20 19:19
**contact** [1] 17:3
**contend** [7] 4:21 5:7 7:22 9:3 15:13 22:11 23:16
**content** [1] 15:5
**contention** [1] 31:17
**contents** [1] 36:12
**context** [3] 7:4 11:3 32:25
**continuation** [1] 6:11
**continue** [2] 21:7 40:15
**continues** [1] 36:11
**continuing** [1] 13:2

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA 01970
(617) 471-3510 - SueLobie@osptranscriptionservices.com
**Sheet 2**

COMMONWEALTH V. KAREN READ
DOCKET NO. 2282CR00117
NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024

**contradiction** [2] 28:8 30:23

**contradictory** [1] 9:1

**contravene** [1] 28:11

**contravention** [1] 28:19

**control** [1] 28:17

**controlled** [1] 11:7

**convened** [1] 14:3

**convening** [1] 23:25

**conversations** [1] 37:3

**convicted** [1] 28:4

**conviction** [1] 9:11

**convince** [3] 5:16,17 43:23

**convinced** [5] 17:5,13,15 18:15 43:24

**copies** [1] 29:6

**copy** [1] 20:24

**core** [2] 12:4 43:18

**correct** [1] 7:19

**correctly** [1] 21:5

**corroborate** [1] 9:2

**corroborated** [1] 16:21

**corroborates** [1] 36:23

**corroboration** [1] 8:21

**couldn't** [2] 9:14 22:6

**counsel** [42] 3:4 5:1,1 7:3,25 8:1,16 9:4,23 10:11,18,19 11:22 12:17 13:19 15:5 17:15 21:8 23:10,12,20,22,25 24:8 26:14,18,21 27:12,19 30:22 31:18,20 32:1,8,13,13 33:1 35:12 36:6 37:2,20 38:5

**counsel's** [3] 24:1 32:19 33:25

**count** [18] 6:3,4,5,23 15:9,10,11 17:11 18:16 20:1,2 25:12 34:13 39:5,6,19 40:4,4

**counts** [22] 5:2 6:2,21,25 7:24 10:23 12:4,9,12 15:25 16:20 18:14,18 19:14 22:3,9 23:3 25:14 39:1,4,4 42:3

**couple** [1] 20:7

**course** [4] 4:1 22:11 30:5 42:15

**courthouse** [2] 17:20 25:18

**courts** [4] 11:19 14:11 18:6 37:7

**court's** [5] 22:24 23:1 24:6 33:3 39:14

**covered** [1] 6:21

**created** [2] 29:24 39:11

**creation** [1] 35:13

**credibility** [1] 41:19

**credible** [1] 16:25

**crimes** [1] 39:2

**criminal** [4] 11:6 12:15 21:11 43:19

**criteria** [1] 25:4

**critical** [1] 17:16

**criticized** [1] 24:8

**cruz** [2] 20:16 33:17

**crystal** [1] 11:1

**cut** [1] 26:1

# D

**da** [2] 17:5,17

**dangers** [1] 33:15

**date** [1] 7:19

**david** [1] 3:14

**day** [2] 4:13 41:9

**days** [2] 39:25 42:16

**deadlock** [3] 37:10,11 39:4

**deadlocked** [9] 25:11 28:9 32:12 33:11,15 37:19 40:8,11 42:13

**deal** [1] 38:24

**dealing** [5] 13:10,16 28:22 39:19,20

**dealt** [1] 29:13

**death** [1] 13:12

**decades** [5] 27:18,25 28:21 36:9 37:23

**decent** [1] 11:11

**decide** [1] 40:6

**decided** [4] 22:4,6 40:5 41:2

**decision** [23] 4:22 5:19 6:1,2 8:23 9:8,13 14:5 15:3,14,24 16:24 17:8,9,10 18:14 20:24 21:20 33:19 40:4 42:3,11 43:5

**decision-making** [1] 8:6

**decisions** [6] 11:5 13:23 20:2,10 33:3 40:19

**declaration** [9] 6:23 19:6 21:16 22:25 25:8,17 26:15 27:13 38:6

**declarations** [7] 4:25 9:22 10:21 15:15 19:14 25:25 26:2

**declare** [4] 22:13,20 35:1,7

**declared** [4] 21:9 26:16 27:7,14

**declaring** [2] 7:16 20:21

**deeply** [1] 17:21

**default** [4] 12:7,8,10 24:21

**defendant** [12] 21:17,21 27:19 28:3,18 29:12,25,25 30:1 34:7 35:15,24

**defendants** [1] 21:11

**defendant's** [5] 24:18 26:12 33:5 34:17 38:12

**defense** [16] 6:17 8:16 9:18,23 10:10,18 11:22 13:19 17:15 21:8 23:22 24:8 25:5,25 39:23 42:24

**deference** [2] 14:25 25:3

**definition** [1] 35:5

**deliberate** [1] 30:8

**deliberately** [1] 34:25

**deliberating** [4] 34:23 36:3 40:15 41:20

**deliberation** [6] 6:1 18:13 28:5 37:15 42:10,16

**deliberations** [12] 6:12 15:5 28:3 30:11 32:3,4 35:4 36:13 37:5 38:22 39:24 43:1

**deliberative** [8] 31:13,16

2

**decision** [23] 4:22 5:19 6:1,2 8:23 9:8,13 14:5 15:3,14,24 16:24 17:8,9,10 18:14 20:24 21:20 33:19 40:4 42:3,11 43:5

**32:6 35:20 36:6,19 37:4 41:14**

**delve** [1] 37:4

**demonstrating** [1] 25:15

**demonstration** [1] 18:8

**denied** [2] 26:13 38:12

**deny** [1] 42:15

**derived** [1] 36:22

**described** [2] 5:18 8:17

**designed** [1] 12:23

**despite** [1] 39:4

**determination** [2] 42:2 43:20

**determine** [4] 41:6,7,10 42:1

**determined** [1] 21:14

**deterring** [1] 6:9

**developed** [3] 29:24 34:12 36:8

**development** [1] 37:23

**dichotomy** [1] 39:11

**difference** [2] 26:20,22

**different** [9] 11:17 15:13 22:9 24:13 29:8 34:4 38:18 40:6 42:4

**differential** [1] 35:14

**diminishing** [1] 14:16

**dire** [2] 14:18 43:13

**direct** [3] 22:17 30:22 33:6

**directly** [3] 28:1,13 36:17

**disbanded** [1] 6:15

**discomfort** [1] 41:15

**discouraged** [1] 39:6

**discouraging** [1] 6:8

**discovered** [1] 21:10

**discretion** [4] 9:18 16:2 25:24 42:15

**discrimination** [2] 35:18,18

**discussions** [2] 14:22 36:18

**disincentive** [1] 11:25

**disingenuous** [1] 34:1

**dismiss** [4] 3:17 4:18 26:12 34:7

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA 01970
(617) 471-3510 - SueLobie@osptranscriptionservices.com
**Sheet 3**

**COMMONWEALTH V. KAREN READ**
**DOCKET NO. 2282CR00117**
**NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024**

**dispute** [4] 9:19 10:18 18: 23 42:4
**disputes** [1] 10:15
**distinguished** [1] 39:18
**district** [2] 5:17 10:13
**doing** [2] 14:11 18:16
**domino** [1] 39:14
**done** [6] 11:14 14:13 17:17 32:3,4 43:13
**door** [1] 16:18
**double** [11] 6:7 7:4 11:2, 16 12:23 20:11,14,23 21: 22 24:13 25:21
**douglas** [1] 25:22
**down** [3] 8:10 25:2 32:16
**driving** [1] 21:2
**due** [2] 20:17 35:18
**during** [3] 14:10 33:13 43: 6
**duty** [1] 38:21

### E

**e.g** [1] 39:2
**each** [5] 9:2 27:10,24 38: 22 40:16
**easy** [1] 25:9
**effect** [2] 35:3 39:15
**eight** [1] 10:16
**either** [3] 17:1 25:24 35:24
**elected** [1] 23:23
**eleven** [1] 13:9
**e-mailed** [1] 10:14
**e-mails** [1] 9:24
**embrace** [1] 8:2
**emphatic** [1] 32:11
**employed** [2] 29:24 38:9
**enacted** [1] 7:6
**encompass** [1] 6:25
**encompasses** [1] 26:21
**encompassing** [1] 19:23
**end** [5] 8:3 12:14 39:24 41: 10,13
**enhancing** [1] 13:3
**enough** [1] 28:15
**entitled** [3] 9:19 14:24 26:

25
**equivalent** [2] 19:1 31:25
**essentially** [4] 8:22 9:5,7 19:9
**establish** [2] 16:22 25:23
**established** [1] 23:7
**ethnic** [1] 14:23
**ethnically** [1] 14:18
**even** [11] 4:22 5:7 13:3 14: 21 16:7 22:19 23:8 32:2 33: 4,13 41:22
**event** [1] 16:15
**events** [1] 10:6
**everybody** [3] 21:5,10 22: 1
**everything** [2] 4:12 40:8
**evidence** [25] 4:21 5:4 6: 13,13,16 12:2,3 14:1,7,7, 25 15:2 16:18,21 17:1,2 19: 13 23:18 25:11,13 27:16 35:23 39:22 43:15,17
**exactly** [9] 11:24 28:18 29: 8 30:15 31:8,13 34:14,21 36:6
**exalted** [1] 11:13
**example** [2] 27:17 33:10
**exceptional** [1] 7:21
**excluded** [1] 31:17
**execute** [1] 15:23
**exercising** [1] 41:4
**exists** [1] 29:21
**experience** [1] 42:21
**experienced** [3] 32:1 41: 5 43:20
**explanation** [1] 19:24
**explicit** [2] 19:3 22:19
**exposed** [1] 40:22
**exposure** [1] 24:18
**expressing** [1] 36:18
**extended** [1] 12:18
**extension** [1] 35:13
**externally** [1] 15:2
**extract** [1] 27:6
**extracted** [1] 37:11
**extracting** [1] 37:12

**extraneous** [3] 30:25 35: 23 36:2
**extraordinary** [2] 5:19 30: 4
**extrinsic** [2] 14:7 17:2

### F

**face** [5] 5:4 7:11 18:1 21: 22 25:19
**fact** [12] 5:16 6:3,17 8:2 16: 25 18:21 21:11 25:11,11, 13 34:5 41:14
**facts** [6] 8:3,5 13:5 17:22 18:4 21:5
**failed** [3] 5:7 18:2 24:5
**fair** [1] 14:9
**family** [1] 14:1
**far** [12] 28:14 29:17 30:11, 25 31:9 32:17 33:16,17 34: 15 35:1,10 37:21
**fathers** [2] 7:6,10
**fear** [2] 34:12 39:13
**feared** [1] 37:6
**federal** [4] 13:8 18:7 42:19 43:10
**felt** [3] 8:24 30:19 31:3
**fiction** [2] 7:23 16:19
**fifth** [2] 7:25 8:20
**filed** [1] 4:19
**final** [14] 5:25 15:24 17:7, 10 18:22 25:6,6 30:13 37: 10 40:16 41:8 42:2,8,9
**find** [1] 18:21
**finding** [2] 28:10 38:8
**findings** [1] 34:4
**first** [18] 4:20 6:11,11 7:13 12:12 13:8 17:25 22:15,22 23:21 31:21,22,25 32:2,10 36:24 41:2 43:24
**fit** [1] 27:22
**five** [2] 15:19 42:16
**focus** [1] 41:21
**focused** [1] 22:2
**following** [1] 28:3
**follows** [1] 22:13

**footnote** [1] 38:24
**forever** [1] 15:7
**form** [4] 11:7,12,15 18:19
**formalized** [1] 4:23
**formulated** [1] 31:2
**formulating** [1] 20:11
**found** [4] 13:4 25:19 28:5 39:25
**founding** [2] 7:6,10
**four** [10] 7:24 8:15,22 9:6 13:16 15:19 16:6,13 23:24 42:16
**fourth** [1] 12:18
**framework** [1] 10:25
**free** [1] 24:18
**friday** [1] 43:7
**friend** [1] 17:21
**front** [2] 18:24 41:10
**full** [3] 23:12 25:5,7
**further** [4] 6:1 18:12 35:4 42:25
**futile** [1] 35:4

### G

**gained** [1] 36:14
**gave** [6] 9:17,17 12:17 25: 16 29:7 31:21
**gender** [1] 35:18
**general** [2] 39:3 40:20
**getting** [1] 33:8
**gideon** [1] 12:17
**ginsburg** [1] 11:10
**give** [3] 5:23 7:6 23:23
**given** [5] 9:15 18:4 23:10, 12,14
**got** [4] 7:18 8:8 18:10 25: 10
**government** [1] 20:5
**government's** [1] 41:1
**governs** [2] 11:16 31:9
**greater** [1] 29:2
**green** [2] 12:21 25:22
**ground** [1] 17:20
**group** [1] 41:21
**guess** [2] 16:17 34:17

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA  01970
(617) 471-3510 - SueLobie@osptranscriptionservices.com
**Sheet 4**

**COMMONWEALTH V. KAREN READ**
**DOCKET NO. 2282CR00117**
**NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024**

guidance [1] 8:8
guidelines [4] 8:13 19:3
23:6 24:22
guiding [2] 23:9,18
guilt [1] 5:7
guilty [13] 7:14,18 9:8 13:4
18:3 28:6,10 29:14,14 34:8,
8 41:18 42:23

**H**

hallowed [1] 17:20
happen [1] 14:9
happened [1] 38:3
hard [3] 5:15 15:2 24:10
hard-fought [1] 17:16
hazards [1] 12:24
hear [3] 3:18 4:11 26:3
heard [4] 23:13 25:5 26:15
32:21
hearing [6] 3:17 13:22 14:
3 16:5 17:24 44:9
hearings [1] 14:12
heavy [6] 11:19 20:4,15,16,
20 23:5
help [1] 17:4
helps [1] 20:3
herself [1] 8:20
high [1] 37:16
himself [1] 8:20
historic [1] 7:5
history [2] 6:8 17:25
honor [40] 3:7,9,12,20 4:
10,16 5:10,18 6:14,18 7:1,
20 9:18 10:14 15:8,14,14
16:1,2,5,11,13 17:24 23:20,
22 25:9 26:7,11 29:4,19 33:
8,25 35:21 36:1 37:20 40:
14 41:9,24 42:9,15
honor's [3] 8:5 20:25 25:
24
hope [3] 18:23,23 42:19
hopeful [1] 17:12
hopelessly [1] 32:12
horizontally [1] 39:20
horrigan [1] 24:17

horror [1] 43:22
hours [1] 23:24
however [2] 22:15,22
hundred [1] 13:13
hung [1] 33:11

**I**

identify [1] 3:4
identity [2] 14:14 16:10
ignored [1] 18:5
ignores [1] 34:5
ii [7] 6:4 15:10 17:11 20:1
25:12 34:19 39:5
iii [9] 6:25 10:23 12:12 15:
11,25 19:15 25:14 34:19
42:3
imagine [1] 30:23
immediate [1] 17:9
impartial [2] 14:17 15:1
impartiality [2] 13:15 14:
23
impasse [20] 6:3,13,21,23
7:23 12:3 16:19 17:10 19:
14,15,23 23:3 25:12,13 27:
8 30:11,17 32:7 35:2 40:20
impeach [1] 43:8
impeachment [1] 36:13
imperative [1] 23:12
imperatives [1] 23:16
imperil [1] 9:10
implications [1] 19:2
implicit [1] 35:20
implies [1] 23:11
importance [2] 14:17 24:
17
important [9] 7:5 11:15
12:23 15:13 18:19,19,20,
21 32:24
impoundment [1] 31:4
improper [1] 17:3
inappropriate [2] 30:22
36:14
included [7] 6:4,24 34:14
35:3 38:23 39:8,17
includeds [5] 17:11 22:3

34:3 39:13,16
indicate [1] 31:12
indicated [3] 27:1 32:3,9
indicating [1] 34:2
indication [1] 31:22
indictment [3] 5:3 34:19
39:1
indictments [2] 34:6,18
indirectly [1] 8:1
individual [1] 12:24
ineluctably [2] 6:22 14:13
inference [2] 32:20 35:23
inferences [1] 10:21
inferred [1] 42:17
influenced [3] 14:20 15:1
41:8
influences [2] 30:25 36:2
inform [1] 5:25
information [2] 31:6 36:
14
infringing [1] 31:16
inherent [1] 34:13
initial [1] 40:5
initiate [1] 37:1
innocence [1] 43:23
innocent [4] 13:3 19:12
25:19 42:2
inquire [3] 34:11,16 38:21
inquiries [2] 36:21 37:12
inquiring [2] 22:5 27:6
inquiry [9] 15:4 31:18 35:
16 36:4,5,12,15,25 43:9
insightful [1] 30:9
instance [6] 11:6,18 13:8
35:21,22 38:9
instances [1] 34:10
instead [1] 12:10
instructed [3] 29:4,5 40:
14
instruction [12] 23:22,23
24:12 32:19 40:17 42:17,
18,20,22,25 43:3,4
instructions [4] 24:9,9 29:
6 40:15
insulate [1] 41:12

integrate [1] 8:5
intelligent [1] 30:9
intense [1] 31:3
interest [3] 9:20,20 33:5
interesting [1] 21:2
internal [1] 14:22
internally [2] 8:21,25
internet [3] 14:10 17:3 43:
16
intimating [1] 32:14
investigate [1] 17:4
investigation [2] 41:1
invited [1] 28:17
involuntary [1] 22:7
isn't [1] 14:24
issue [9] 5:4 7:3,15 8:7 10:
24 19:20 20:8 24:7 35:17
issued [2] 20:6 25:6
issues [5] 4:3,17 6:6 28:16
35:24
itself [2] 28:22 35:10

**J**

jackson [2] 8:17 24:2
jeopardy [11] 6:7 7:4 11:2,
17 12:23 20:11,14,23 24:
13,19 25:22
jeopardy's [1] 21:22
join [3] 17:12 18:24 25:23
joining [1] 11:10
judge [24] 3:3 4:3 5:9 7:22
13:19 14:3 17:24 18:13 20:
8 21:25 22:13,15 23:14 24:
23,24 25:1 26:3 28:9 38:21
39:12 41:5 43:21,25 44:6
judges [3] 5:11 14:6 22:5
judge's [1] 11:7 24:11
judicial [5] 19:4 24:15 25:
3 33:20 43:19
judicially [1] 14:11
july [6] 6:18 7:19 13:6 23:
19 30:24 43:7
jurisprudence [1] 20:11
jurist [1] 41:5
juror [20] 4:25 7:25 8:19,20

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA  01970
(617) 471-3510 - SueLobie@osptranscriptionservices.com
**Sheet 5**

R.288

JA0429

**COMMONWEALTH V. KAREN READ**
**DOCKET NO. 2282CR00117**
**NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024**

**9:**14,24 **13:**20 **14:**2,8,8 **18:**13 **26:**1 **30:**4 **31:**4 **37:**1,1 **41:**6,23 **42:**4,23

**jurors** [53] **5:**8,23 **7:**16,24 **8:**11,15,16,18,22 **9:**6,12,22,25 **10:**4,9,11,16 **13:**14 **14:**10,14 **15:**17,19,23 **16:**6,9,13,25 **17:**6,14 **19:**11 **21:**4 **26:**3 **28:**25 **29:**18,19 **30:**3,19,24 **36:**3,17 **37:**3 **39:**15 **40:**22 **41:**2,9,13,16,20,22 **42:**6 **43:**14,15,23

**jurors'** [3] **16:**16 **31:**5 **37:**16

**juror's** [2] **14:**22 **28:**25

**jury's** [6] **6:**11 **7:**1 **28:**8 **35:**8,20 **38:**22

**justice** [8] **11:**10,10,11 **12:**15 **17:**18 **25:**18,22 **43:**19

**justified** [2] **19:**16 **23:**1

**justify** [5] **6:**10 **11:**20,21 **20:**5 **23:**2

**justifying** [2] **20:**13 **24:**19

**juvenile** [9] **18:**10 **22:**2 **28:**1,20 **38:**19,20 **39:**5,22,24

**K**

**kagan** [1] **11:**11

**karen** [2] **3:**3,13

**keep** [4] **4:**8,13 **16:**8,8

**killing** [1] **13:**25

**kind** [4] **14:**25 **18:**7 **39:**7,14

**knowledge** [1] **10:**10

**known** [4] **6:**14,16 **13:**6,6

**knows** [2] **18:**11 **32:**1

**L**

**labels** [1] **11:**8

**lack** [1] **24:**4

**lally** [17] **3:**6,6,8 **5:**17 **6:**16,19 **9:**24 **18:**23 **26:**7,9,11 **38:**17 **39:**10 **42:**8 **43:**13 **44:**2,3

**lally's** [2] **9:**4 **41:**15

**landscape** [1] **10:**25

**language** [3] **35:**1,3,8

**last** [2] **26:**18 **35:**3

**later** [3] **23:**24 **24:**12 **39:**25

**laura** [1] **3:**10

**law** [6] **29:**21 **35:**10,13 **36:**11 **37:**22 **38:**19

**lawyer** [2] **13:**25 **42:**24

**lawyers** [6] **15:**17,22 **16:**14 **24:**11 **25:**25 **41:**21

**lawyers'** [1] **15:**20

**lawyer's** [1] **13:**17

**lay** [1] **11:**23

**lead** [2] **6:**22 **14:**13

**leading** [1] **32:**15

**least** [5] **5:**23 **10:**8 **29:**7 **31:**6 **32:**15

**led** [1] **19:**18

**left** [3] **3:**14 **9:**3 **35:**5

**legal** [5] **5:**4 **6:**6 **10:**24,25 **23:**16

**legally** [1] **7:**15

**lengthy** [5] **7:**20 **13:**13 **29:**5 **30:**5 **39:**18

**less** [3] **5:**8 **15:**13 **39:**17

**lesser** [10] **6:**4,24 **17:**11 **22:**3 **34:**3,14 **38:**23 **39:**8,13,16

**level** [1] **9:**15

**liability** [1] **37:**17

**lies** [1] **20:**18

**life** [3] **9:**10 **10:**6 **13:**11

**light** [1] **24:**17

**limited** [1] **28:**16

**line** [1] **16:**3

**literally** [1] **16:**19

**little** [2] **8:**10 **34:**1

**living** [1] **13:**1

**logic** [1] **27:**21

**logical** [1] **19:**25

**long** [2] **17:**17 **25:**10

**look** [1] **19:**5

**looking** [1] **31:**3

**lot** [2] **8:**8 **16:**2

**lots** [1] **8:**9

**low** [1] **37:**18

**lure** [1] **41:**15

**lurking** [1] **37:**10

**M**

**made** [7] **4:**25 **9:**13,18 **10:**19 **17:**7 **25:**4 **33:**7

**mandatory** [1] **23:**11

**manifest** [21] **8:**7,12 **11:**2,18 **12:**11 **19:**2,5,6 **20:**12,17,21 **21:**15,22 **23:**9 **26:**17 **27:**15,17 **33:**8,10 **35:**5 **38:**8

**manslaughter** [4] **6:**4 **20:**2 **22:**7,7

**many** [4] **10:**4,7 **18:**15 **30:**6

**mapp** [1] **12:**17

**marathon** [2] **13:**9 **40:**25

**marked** [1] **28:**6

**marshal** [1] **14:**8

**martin** [1] **3:**13

**mass** [4] **13:**19 **20:**19 **22:**1 **38:**20

**massachusetts** [1] **36:**11

**matters** [1] **15:**6

**mcculloch** [2] **13:**18 **16:**22

**mclaughlin** [3] **3:**9,10,11

**mean** [3] **8:**4 **11:**14 **40:**18

**means** [1] **43:**5

**measure** [1] **33:**5

**media** [6] **9:**16 **14:**2 **16:**7 **40:**22,25 **41:**8

**meet** [2] **16:**13 **25:**15

**meeting** [1] **25:**4

**memorandum** [1] **27:**20

**memorializing** [1] **10:**11

**mere** [2] **37:**9 **39:**14

**met** [1] **23:**18

**microphone** [2] **4:**4,5

**might** [2] **40:**22 **43:**10

**military** [1] **10:**8

**mind** [5] **7:**1,2 **29:**1 **42:**5 **43:**12

**minds** [1] **31:**2

**minimum** [1] **19:**11

**minority** [1] **42:**23

**miranda** [2] **12:**16,16

**misgivings** [1] **33:**2

**mistrial** [31] **6:**15,22 **7:**8 **11:**20 **19:**6,8,16 **20:**5,13,17,22 **21:**9,16 **22:**13,20,25 **23:**15 **24:**19 **25:**8,17 **26:**15,16 **27:**13,14 **31:**25 **32:**15,22 **35:**7 **38:**7 **42:**14,14

**moment** [2] **24:**24 **35:**21

**months** [1] **31:**10

**monumental** [1] **10:**6

**morning** [1] **23:**21

**morris** [1] **36:**10

**most** [2] **9:**9 **23:**8

**motion** [4] **3:**19 **4:**18 **26:**12 **38:**12

**motions** [1] **10:**12

**ms** [15] **3:**9,11,16 **4:**19 **5:**5 **9:**8 **10:**22 **12:**9 **15:**25 **17:**24 **24:**2 **26:**2 **41:**18 **42:**2 **43:**17

**much** [4] **5:**8 **10:**2 **26:**5 **44:**4

**multiple** [10] **6:**24 **17:**11 **20:**1,1,6 **30:**10,18 **39:**1,2,20

**multiplicity** [1] **34:**4

**murdaugh** [1] **13:**24

**murder** [5] **9:**8 **18:**1,6 **38:**23,25

**murders** [1] **39:**2

**must** [7] **20:**12 **22:**22 **23:**10,11,12,14 **24:**22

**N**

**named** [1] **17:**20

**nation** [1] **13:**24

**nationwide** [1] **18:**6

**nd** [1] **13:**6

**necessity** [20] **8:**7,13 **11:**2,18 **12:**11 **19:**2,5 **20:**12,17,21 **21:**15,22 **23:**1 **26:**17 **27:**15,17 **33:**8,10 **35:**5 **38:**8

**needed** [1] **40:**6

**needs** [1] **29:**23

**neither** [4] **7:**3 **23:**17 **29:**14,15

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA  01970
(617) 471-3510 - SueLobie@osptranscriptionservices.com
**Sheet 6**

R.289
JA0430

**COMMONWEALTH V. KAREN READ**
**DOCKET NO. 2282CR00117**
**NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024**

**never** [3] 17:8 33:17,18
**new** [4] 16:18 17:13 35:13 43:15
**nicoll** [7] 20:19,23,24 21:2 24:16,24 44:6
**nobody** [7] 10:13,14,15 12:16 18:11,17 40:1
**none** [1] 10:16
**non-evidentiary** [1] 3:17
**nor** [1] 37:25
**norfolk** [1] 17:5
**note** [14] 6:17 7:2 19:22,24 22:19 23:21,24 25:6 30:13,14 31:22,22 32:2 40:13
**notes** [2] 32:10 34:24
**nothing** [5] 14:19 29:19, 20,22 38:7
**notice** [1] 19:17
**novel** [1] 13:7
**number** [4] 16:11 27:11, 12 34:19

## O

**oath** [1] 17:14
**object** [5] 24:9 26:15 27:13 28:23 31:20
**obligation** [1] 11:23
**observe** [1] 30:5
**obviously** [1] 36:1
**occasions** [3] 32:9 34:25 35:2
**occur** [1] 36:25
**occurred** [3] 11:12 23:19 39:23
**offense** [5] 5:6 12:2 25:20 29:2 38:2
**office** [2] 5:17 18:2
**officer** [1] 39:25
**officers** [2] 16:12 28:5
**ohio** [1] 12:17
**okay** [4] 4:15 5:12,20 44:4
**once** [3] 12:25 18:2 42:22
**one** [38] 4:6,7 5:1,7,8 6:21,23 8:7,19 9:6,23 10:5,9,13 19:19,25 20:10,15,25 21:3

22:10 23:4,10 27:11 28:4 31:4 35:21 37:9 38:24 39:3, 19 40:4,11,13,20 41:2,23 43:15
**only** [9] 9:25 10:20 19:25 23:5 29:5 34:2,18 38:8 39:6
**open** [2] 28:9,12
**opinion** [2] 13:13 38:24
**opinions** [1] 20:6
**opportunities** [1] 10:8
**opportunity** [11] 5:25 23:13 24:1 25:5,7 26:14 27:13 30:4 31:19 32:21 38:5
**option** [2] 21:16 22:25
**options** [2] 19:9,10
**orally** [1] 29:5
**ordeal** [2] 7:11 13:1
**order** [7] 9:18 14:4 17:24 19:8,16 25:7 27:21
**ordered** [2] 6:15,15
**ordinarily** [1] 11:21
**other** [18] 5:11 9:2,12,24 10:4,15,21 12:9 14:6 30:19 35:6,19 39:4,10 40:11,11 41:20 42:5
**oui** [1] 22:8
**out** [9] 8:16 11:23 16:1,2 18:21 19:4 27:14 40:4 41:25
**outside** [1] 14:21
**over** [7] 7:20 11:13 13:13 26:9 28:21 36:8 37:23
**overall** [1] 12:3
**overcome** [1] 42:23
**overrule** [1] 28:11
**overwhelming** [1] 40:24
**own** [1] 32:8

## P

**p.m** [2] 3:2 44:9
**page** [1] 40:14
**pages** [1] 13:14
**partial** [9] 26:24 27:3,5,7 33:24 37:13,14,17,18

**particular** [6] 29:12 32:15, 23,25,25 38:9
**parties** [1] 32:20
**parts** [1] 36:3
**party** [1] 17:4
**pathway** [3] 5:11 8:5,10
**peers** [1] 38:2
**people** [5] 10:7,7 14:4 17:18 31:11
**perceived** [1] 33:4
**pereira** [1] 32:22
**perfect** [1] 17:18
**perhaps** [1] 18:15
**permissible** [2] 34:10 36:3
**permits** [1] 32:20
**permitted** [3] 37:24 38:11 39:12
**person** [1] 17:25
**personal** [1] 30:25
**persuade** [2] 18:2 41:17
**pertained** [1] 30:12
**pertains** [1] 30:15
**phase** [1] 11:19
**phone** [2] 9:4 10:10
**pick** [1] 41:9
**picked** [1] 10:10
**place** [2] 12:12 41:21
**placed** [1] 20:4
**plausible** [1] 10:3
**pleading** [1] 6:19
**pleadings** [1] 12:22
**please** [1] 4:9
**plurality** [1] 30:14
**podium** [1] 3:21
**point** [13] 7:7 11:14 17:23 26:18 27:1 28:2 29:16 30:19 31:17,18 32:7,23,23
**points** [4] 27:10,18,24 32:15
**poll** [1] 34:11
**polled** [1] 34:18
**polling** [6] 4:23 15:8 27:7 33:22 38:10,10
**pollings** [1] 34:22

**position** [3] 24:1 31:12 34:17
**possibility** [1] 13:3
**possible** [1] 32:21
**post-hoc** [1] 31:10
**post-trial** [3] 33:7 35:16 36:4
**power** [1] 12:25
**precedence** [2] 8:10,12
**precedent** [5] 9:25 15:12 18:5 27:22,24
**precise** [1] 30:21
**prescribe** [1] 34:15
**presenting** [1] 33:2
**presided** [1] 7:20
**pressure** [1] 31:3
**pretzel** [1] 27:21
**principle** [3] 13:15 25:21 39:9
**principles** [6] 8:13 20:23 23:9,18 24:22 36:12
**private** [2] 15:7 16:8
**probably** [2] 9:6 10:5
**probing** [2] 42:4,5
**procedural** [3] 5:11 8:4 24:21
**procedure** [6] 16:22 18:19 21:6,11 25:24 29:23
**procedures** [2] 11:15 30:21
**process** [9] 17:6 31:14,16 32:1,6 36:6,19 37:15 41:14
**processes** [2] 35:20 37:4
**product** [1] 37:14
**production** [1] 26:2
**professional** [2] 31:1 36:20
**prohibited** [8] 14:11 22:4 36:7 37:21,22,22 39:16 43:9
**prohibiting** [1] 6:9
**prohibition** [2] 41:3,11
**promise** [1] 9:14
**proof** [3] 5:15 19:20 20:7
**proposal** [1] 5:10

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA  01970
(617) 471-3510 - SueLobie@osptranscriptionservices.com
**Sheet 7**

R.290

JA0431

COMMONWEALTH V. KAREN READ
DOCKET NO. 2282CR00117
NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024

**proposing** [2] **36**:7 **37**:20
**proposition** [2] **12**:7 **28**:7
**propositions** [1] **38**:19
**prosecuted** [1] **5**:6
**prosecution** [3] **6**:16 **12**:
10 **17**:12
**prosecutions** [1] **7**:8
**prosecutor** [18] **5**:6 **9**:12,
13 **10**:1 **11**:20 **12**:1,5 **17**:22
**19**:18 **20**:5,12 **21**:24 **23**:6,
21 **24**:5,20 **25**:12 **42**:21
**prosecutors** [1] **16**:14
**prosecutor's** [2] **18**:1 **25**:
10
**protect** [1] **12**:23
**protected** [1] **35**:19
**protection** [1] **7**:7
**prototypical** [1] **33**:10
**prove** [2] **5**:7 **7**:12
**proven** [1] **7**:13
**provided** [5] **22**:15,25 **28**:
14 **29**:6 **32**:21
**provides** [2] **22**:20 **23**:6
**providing** [1] **24**:11
**proving** [1] **20**:17,21
**public** [3] **9**:16,20 **16**:7
**publicity** [1] **10**:3
**punishment** [2] **13**:11,11
**put** [6] **11**:19 **12**:5 **21**:23 **27**:
9 **31**:12 **37**:20
**puts** [1] **23**:5

**Q**

**question** [4] **13**:15 **39**:14
**41**:13 **42**:9
**questioned** [1] **14**:3
**questioning** [1] **39**:16
**questionnaire** [1] **14**:9
**questions** [3] **39**:7 **41**:4,
16
**quite** [2] **11**:1 **27**:20
**quote** [6] **13**:2 **23**:12,14 **32**:
20 **37**:8 **38**:24
**quote/unquote** [1] **32**:12
**quoted** [1] **39**:10

**quoting** [1] **28**:13

**R**

**racial** [3] **13**:17 **14**:23 **35**:
18
**racially** [1] **14**:19
**raised** [3] **4**:17 **18**:6 **35**:17
**raising** [1] **35**:24
**rather** [2] **23**:4 **40**:13
**rational** [1] **19**:24
**rationale** [1] **6**:10
**rationalized** [1] **19**:15
**ray** [4] **28**:20 **32**:18 **33**:17
**43**:2
**re** [1] **5**:5
**reach** [6] **9**:12 **15**:9 **22**:21
**39**:15 **42**:6 **43**:5
**reached** [18] **4**:22 **5**:2,19 **7**:
17 **8**:15,23 **9**:7 **15**:2,24 **18**:
14 **27**:3 **30**:11 **40**:3,10,16,
19 **41**:7 **42**:10
**read** [20] **3**:3,13,16 **4**:19 **5**:
5 **9**:8 **10**:23 **12**:9 **15**:20,25
**17**:24 **20**:6 **21**:14 **24**:2 **25**:6
**26**:3 **41**:18 **42**:2 **43**:15,18
**real** [1] **7**:15
**really** [3] **19**:20 **25**:2 **43**:4
**reason** [4] **7**:15 **27**:23 **30**:
21 **36**:16
**reasonable** [1] **10**:20
**reasoning** [1] **15**:6
**reasons** [1] **23**:17
**recalling** [1] **21**:5
**receive** [2] **14**:6 **22**:22
**received** [3] **8**:18,19 **22**:17
**recently** [3] **13**:13 **14**:1 **23**:
8
**recognition** [1] **11**:16
**recognize** [1] **21**:18
**recognized** [1] **33**:14
**reconsider** [1] **29**:2
**re-contact** [1] **13**:20
**reconvene** [1] **14**:12
**reconvened** [1] **8**:11
**record** [2] **22**:22 **29**:10

**recorded** [1] **22**:18
**recording** [1] **4**:7
**re-examine** [1] **17**:9
**refer** [2] **30**:13,17
**reference** [1] **31**:5
**referenced** [2] **20**:25 **29**:
18
**referencing** [1] **26**:19
**refers** [1] **30**:3
**reflect** [1] **40**:13
**reflected** [2] **14**:22 **19**:22
**reflecting** [1] **42**:25
**regard** [4] **26**:19 **30**:17 **31**:
4 **35**:17
**regarding** [5] **8**:12 **13**:21
**23**:20 **40**:25 **41**:17
**regularly** [1] **14**:6
**reinitiate** [1] **15**:19
**relation** [1] **38**:6
**reliable** [1] **42**:25
**relied** [1] **38**:18
**remain** [1] **16**:6
**remaining** [1] **31**:6
**remedies** [1] **12**:18
**remember** [1] **12**:13
**repeated** [1] **23**:8
**repeatedly** [2] **27**:8,16
**reply** [1] **38**:15
**report** [3] **28**:8 **31**:23 **37**:9
**reported** [1] **32**:7
**reporting** [2] **30**:17 **32**:5
**representations** [2] **5**:14
**10**:18
**represented** [1] **10**:17
**re-prosecute** [3] **12**:11
**18**:17 **22**:12
**re-prosecuted** [1] **18**:25
**re-prosecuting** [1] **12**:1
**re-prosecution** [6] **7**:11
**11**:3,21 **18**:1 **41**:12 **43**:22
**request** [3] **24**:1 **26**:12 **32**:
19
**requesting** [1] **31**:25
**require** [2] **22**:15 **29**:1
**required** [3] **23**:2 **33**:17,18

**requirement** [3] **21**:23 **33**:
21 **34**:20
**requittal** [1] **41**:12
**respect** [1] **31**:8
**respected** [2] **17**:21 **43**:20
**respectfully** [1] **23**:17
**respecting** [1] **5**:22
**respective** [1] **27**:10
**respond** [1] **36**:17
**response** [1] **44**:2
**responsible** [4] **16**:12,14,
14 **17**:1
**responsively** [1] **9**:4
**rest** [1] **9**:10
**rests** [1] **24**:19
**result** [2] **4**:25 **37**:19
**retry** [1] **38**:2
**retrying** [1] **20**:23
**return** [2] **22**:16 **27**:11
**returned** [8] **26**:13 **29**:11,
15 **31**:11,11 **37**:17 **38**:3 **39**:
3
**reversing** [1] **24**:11
**review** [2] **23**:9 **30**:6
**revolutionized** [1] **12**:15
**reyna** [1] **16**:24
**rights** [3] **12**:16,17 **24**:3
**risk** [4] **16**:9 **37**:16 **40**:9,12
**risks** [2] **7**:12 **40**:21
**room** [1] **28**:6
**ross** [1] **39**:9
**roth** [5] **22**:2,4 **28**:20 **37**:8
**39**:10
**rule** [15] **21**:11,24 **22**:1,10,
20,24 **24**:5,24 **26**:19,21,23
**27**:5,9 **36**:20 **43**:10
**rules** [5] **34**:15 **35**:10 **37**:22
**38**:11 **41**:15
**ruling** [1] **25**:4

**S**

**salvaging** [1] **37**:18
**same** [12] **5**:6,6 **8**:22 **9**:7
**12**:1,2 **14**:24 **18**:1 **25**:20 **33**:
14 **38**:2 **43**:11

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA  01970
(617) 471-3510 · SueLobie@osptranscriptionservices.com
Sheet 8

R.291

JA0432

**COMMONWEALTH V. KAREN READ**
**DOCKET NO. 2282CR00117**
**NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024**

| | | | |
|---|---|---|---|
| **sat** [1] 10:4 | **32**:6 **36**:24 **37**:9,20 **38**:10 | 17 **33**:9,16 | **talked** [6] **8**:19 **12**:15 **14**:8 |
| **satisfy** [2] **20**:20 **26**:2 | **since** [3] **13**:9 **30**:24 **36**:23 | **statement** [2] **13**:18 **40**:3 | **31**:1,1 **40**:21 |
| **saying** [11] **7**:24,25 **8**:22 **9**: | **single** [6] **18**:4,5 **22**:3 **28**: | **states** [12] **12**:22 **18**:7 **28**: | **talks** [1] **26**:23 |
| 5 **11**:5,11 **16**:17 **19**:11 **40**: | 25 **38**:25 **40**:7 | 15,22 **29**:4 **32**:18 **33**:9,19 | **taylor** [1] **11**:9 **23**:8 |
| 12 **42**:13 **43**:6 | **sits** [1] 3:13 | **36**:1,10,20 **37**:9 | **tells** [1] **14**:17 |
| **says** [6] **19**:7 **20**:12 **22**:12 | **sitting** [1] 21:4 | **stating** [1] **29**:11 | **terms** [4] **5**:14 **16**:2 **42**:12 |
| **30**:23 **38**:21,24 | **situated** [2] **30**:1,2 | **status** [1] **38**:22 | **43**:11 |
| **scenarios** [1] **34**:16 | **six** [1] 7:19 | **step** [1] 32:1 | **territory** [1] **13**:7 |
| **schedule** [1] **16**:5 | **sjc** [7] **8**:8 **11**:8 **13**:16 **20**:6, | **steward** [3] **20**:9 **23**:7 **24**: | **testimony** [1] **10**:5 |
| **search** [1] **25**:18 | 16 **22**:4 **39**:19 | 15 | **theirs** [1] **24**:3 |
| **second** [13] **6**:6,9 **7**:12 **8**:7, | **skeptical** [1] **15**:14 | **still** [3] **13**:10 **34**:23 **37**:2 | **themselves** [4] 3:4 **28**:25 |
| 14 **13**:4 **21**:21 **23**:13,24 **24**: | **skepticism** [1] **13**:21 | **stood** [1] **39**:7 | **31**:12 **35**:1 |
| 18 **25**:20 **34**:13 **43**:23 | **slight** [1] 33:4 | **stop** [1] **43**:22 | **therefore** [4] **6**:22 **20**:22 |
| **secure** [1] **28**:24 | **slightly** [1] **15**:12 | **strong** [5] **4**:21,24 **16**:20 | **21**:9 **38**:12 |
| **see** [1] 22:1 | **slip** [5] **18**:11 **28**:5,6 **29**:11 | **25**:10,12 | **there's** [22] **4**:4,6,20 **6**:10 **8**: |
| **seeking** [2] **17**:13 **34**:7 | **33**:6 | **stuck** [1] **30**:15 | 4 **12**:2 **13**:21 **14**:19 **16**:20, |
| **seems** [1] 9:14 | **slips** [3] **28**:8,11 **40**:1 | **subject** [3] **6**:20 **8**:9 **13**:1 | 25 **18**:7,23 **19**:13 **26**:20,22 |
| **selects** [1] **16**:13 | **somebody** [4] **8**:20 **12**:1 | **subjected** [1] **12**:24 | **27**:16,23 **34**:20 **35**:17 **40**:9, |
| **self** [1] 8:25 | **25**:19 **42**:6 | **subjective** [1] **42**:5 | 12 **43**:2 |
| **sent** [2] **23**:24 **40**:4 | **somehow** [1] **41**:8 | **submit** [5] **25**:17 **26**:20 **29**: | **they've** [6] **8**:17 **17**:14 **18**: |
| **sentences** [1] **15**:24 | **someone** [3] **17**:21 **36**:24 | 19 **30**:8 **33**:25 | 4,10 **31**:1 **40**:24 |
| **separate** [4] **34**:25 **35**:2 | **38**:1 | **submitted** [2] **30**:7,13 | **third** [3] **6**:3 **17**:3 **40**:20 |
| **39**:2,21 | **sometimes** [1] **11**:16 | **substance** [2] **11**:13 **18**: | **thorough** [2] **32**:4 **37**:15 |
| **series** [1] **10**:17 | **sorry** [2] **15**:17 **35**:21 | 20 | **though** [1] **13**:3 |
| **serious** [1] 9:9 | **sort** [16] **27**:16,21 **31**:10,17, | **succeed** [3] **9**:13 **24**:11 **37**: | **thoughtful** [2] **30**:8 **37**:14 |
| **serve** [1] **10**:8 | 21 **33**:2,3,21,22 **35**:13,14, | 12 | **three** [11] **5**:2 **6**:2,21 **7**:24 **8**: |
| **service** [3] **5**:22,23 **10**:8 | 16,19,22,23 **37**:7 | **suggest** [1] **31**:20 | 18 **16**:20 **22**:9 **27**:14 **34**:25 |
| **session** [1] 3:2 | **sotomayor** [1] **11**:10 | **suggested** [1] **30**:21 | **35**:2 **39**:21 |
| **set** [3] **19**:4 **23**:6 **44**:2 | **south** [1] **13**:25 | **superior** [1] **43**:20 | **three-count** [1] 5:3 |
| **seven** [1] **10**:16 | **sovereign** [1] 7:7 | **supplement** [1] **25**:25 | **throughout** [3] **30**:5 **33**: |
| **several** [1] 9:17 | **speaking** [1] **11**:22 | **supplemental** [1] **4**:18 | 16 **39**:18 |
| **shared** [2] **9**:4,5 | **special** [3] **29**:22,23 **35**:14 | **support** [1] **12**:6 | **together** [1] 6:7 |
| **she's** [2] **18**:18 **43**:24 | **specific** [1] **37**:6 | **suppression** [1] **12**:18 | **topics** [1] **36**:21 |
| **shoulder** [1] **20**:13 | **specifically** [6] **31**:17 **35**: | **supreme** [11] **8**:8 **12**:13 **16**: | **transform** [1] **5**:14 |
| **shouldn't** [1] **18**:8 | 25 **36**:7,10,19,21 | 23 **19**:4 **20**:3 **23**:5 **24**:14,15 | **treated** [1] **30**:1 |
| **show** [2] **19**:7 **28**:15 | **spoke** [2] **8**:20 **14**:2 | **33**:19,20 **40**:2 | **treatment** [1] **35**:14 |
| **showing** [1] **28**:17 | **stalk** [1] **26**:20 | **survived** [1] **13**:12 | **trial** [19] **5**:8 **7**:20,20 **8**:3 **12**: |
| **shy** [1] 33:1 | **stand** [2] **18**:23 **38**:18 | **switch** [1] **19**:1 | 9,25 **16**:7 **17**:13 **21**:7,21 **23**: |
| **side** [1] **22**:12 | **standards** [2] **8**:13 **11**:1 | **sworn** [1] **15**:16 | 14 **24**:9 **25**:10,20 **28**:4 **30**:6 |
| **significant** [1] **12**:4 | **stands** [2] **28**:7 **33**:23 | **system** [4] **17**:18 **28**:23 **30**: | **33**:1 **43**:24,24 |
| **silent** [1] **18**:8 | **started** [1] **20**:10 | 2 **43**:19 | **trials** [2] **6**:9 **41**:1 |
| **similar** [2] **5**:13 **21**:25 | **starting** [1] 3:4 | | **tried** [3] **9**:12 **10**:25 **18**:2 |
| **similarly** [2] **30**:1,2 | **state** [7] **12**:25 **13**:2 **18**:6 | **T** | **true** [1] **40**:23 |
| **simple** [2] **29**:13 **34**:8 | **42**:5,18 **43**:10,12 | | **trust** [1] **41**:5 |
| **simply** [8] **7**:8 **12**:10 **27**:9 | **stated** [5] **27**:16 **29**:7 **32**: | **table** [1] **22**:11 | **trustworthy** [2] **9**:1 **16**:21 |
| | | **tail** [1] **12**:14 | |

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA  01970
(617) 471-3510 - SueLobie@osptranscriptionservices.com
**Sheet 9**

**COMMONWEALTH V. KAREN READ**
**DOCKET NO. 2282CR00117**
**NON-EVIDENTIARY HEARING TO DISMISS - 8/9/2024**

truth [5] 10:18 13:22 14:18 16:4 19:18

try [2] 38:1 42:22

trying [1] 27:6

tsarnaev [3] 13:12 16:23 40:23

tuey [11] 23:22,23 42:12,17, 18,20,22,25 43:3,4,5

tuey-rodriguez [6] 31:23, 24 32:10,19 33:14 42:18

turn [1] 4:9

twelve [1] 5:8

twice [1] 30:14

twisting [1] 27:20

two [26] 4:3,17 5:2 6:2,20, 23 13:14 15:24 18:14,25 19:19 23:9,18 27:12 29:12 32:10 34:6,6,8 35:12,15 38: 17 39:2 40:19,19 43:6

two-week [1] 6:18

type [1] 37:6

types [2] 34:16,22

typical [1] 27:16

### U

u.s [1] 24:14

unable [2] 20:20 22:21

unambiguous [3] 6:19 19:17 33:12

unanimity [1] 28:24

unanimous [12] 4:22 5:2 6:1,2 10:22 29:8,9,10 39: 23 42:3,6,11

unanimously [2] 15:25 42:1

unbiased [1] 41:11

uncertainties [1] 28:17

uncontradicted [2] 4:21, 24

under [5] 6:7 17:14 38:21 40:4 44:5

undergone [1] 30:24

understand [2] 9:17 41: 14

understandable [1] 9:15

understanding [2] 19:22 31:24

understood [2] 7:11 40: 17

unequivocal [1] 27:24

unfortunately [1] 23:25

unique [3] 6:8 11:3,25

united [2] 12:21 33:19

unknown [1] 12:19

until [2] 12:19 40:15

up [4] 4:9,14 10:10 18:24

### V

values [2] 12:4 43:18

variety [1] 23:17

verdict [42] 5:2 6:10 7:17 15:9,10 18:11 22:14,21 26: 13 27:4,7,12 28:5,6,11,12 29:8,9,10,10,16 31:10 33:6, 24 37:10,13,14,17 38:3 39: 3,20,23,25 40:10,16 41:7 42:1,7,8,9,24 43:8

verdicts [7] 22:16,17,22 26:24 27:6 36:13 40:20

viable [4] 19:9 21:16 22:25 24:23

view [1] 22:24

views [3] 28:24 41:22

violations [1] 12:19

voice [2] 4:8,14

voicemail [2] 9:3,23

voir [2] 14:18 43:13

vote [7] 4:23 18:22 19:13 22:5 31:15 33:24 41:19

voted [2] 18:22 31:15

votes [1] 36:19

### W

waive [3] 16:7 21:12,12

walking [1] 8:9

wanted [5] 7:10 9:25 24: 12 42:13,25

wants [4] 18:17 22:12 25: 19 37:25

warrant [1] 37:18

warren [3] 12:14,19,21

washington [2] 20:4,15

way [6] 8:17 14:16 15:15 17:23 41:20 43:11

ways [1] 16:12

weeks [4] 7:19 10:5 31:10 39:24

weigh [1] 9:20

weinberg [13] 3:12,13,15, 18,20 4:2,13,16 5:13,21 38: 15,17 44:6

whatever [3] 29:17 30:19, 24

whatsoever [1] 27:3

where's [1] 12:7

wherever [1] 26:10

whether [31] 4:20 5:5 6:12 11:2,12 13:11 15:4,20,23 17:2 18:21 19:5,7,8,9 21: 17 23:3 25:3 30:25 33:23, 24 35:17 36:25 39:12 40: 10,17 41:6,7,8,10 43:21

whole [1] 25:21

who's [1] 25:19

will [8] 3:18 5:9,16,16,21 12:5 13:22 18:23

willing [1] 5:24

wishing [1] 36:18

within [8] 20:2 30:2,14 34: 13 35:25 37:11 38:23 40:7

without [2] 14:16 25:4

witness [1] 21:4

witness's [1] 41:19

word [2] 19:7 23:11

words [4] 10:16 14:6 25: 22 32:8

world [2] 13:5 17:19

written [3] 18:11 29:6 40:1

wrote [2] 6:17,19

### Y

yannetti [8] 3:14,16 8:18 24:2 31:23 33:13 42:12 43: 6

yannetti's [1] 32:8

years [5] 11:15 12:13 13:9, 16 18:15

yourselves [1] 22:5

SUSAN M. LOBIE, CET
15 Marion Road, Salem, MA  01970
(617) 471-3510 · SueLobie@osptranscriptionservices.com
**Sheet 10**

# COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, ss.**

**SUPERIOR COURT
CRIMINAL ACTION
22-00117**

## COMMONWEALTH

### vs.

## KAREN READ

## MEMORANDUM OF DECISION AND ORDER ON
## DEFENDANT'S MOTION TO DISMISS

On June 9, 2022, a Norfolk County grand jury indicted defendant Karen Read on charges of murder in the second degree (Indictment 1), manslaughter while operating under the influence of alcohol (Indictment 2), and leaving the scene of personal injury and death (Indictment 3) following the death of her boyfriend, John O'Keefe, on January 29, 2022. Trial on the matter began in April 2024. There were eight weeks of evidence and nearly five days of deliberations. After the jurors expressed to the Court that they were deadlocked for a third time, the Court declared a mistrial.

The defendant now moves to dismiss the charges for murder in the second degree and leaving the scene of personal injury and death arguing that retrial would violate the double jeopardy protections of the federal and state constitutions because the jury, in fact, reached a unanimous decision to acquit the defendant on those charges. Alternatively, the defendant argues that dismissal is required because there was no manifest necessity to support the declaration of the mistrial with respect to those charges. After careful consideration, this Court concludes that because the defendant was not acquitted of any charges and defense counsel consented to the Court's declaration of a mistrial, double jeopardy is not implicated by retrial of the defendant. The motion is therefore **DENIED**.

## **BACKGROUND**

On June 25, 2024, the jury began its deliberations in the defendant's trial. In addition to the three indictments, the Court had instructed the jury to consider two lesser included offenses to manslaughter while operating under the influence of alcohol – involuntary manslaughter and motor vehicle homicide (OUI liquor and negligence).

On Friday, June 28, 2024, at approximately 12:10 p.m., the jury foreperson sent a note to the Court. It stated: "I am writing to inform you on behalf of the jury that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict." The Court requested argument from the Commonwealth and the defendant as to whether there had been due and thorough deliberation from the jury. Assistant District Attorney Lally, on behalf of the Commonwealth, argued that the jury had not had sufficient time to deliberate and that therefore, it was far too early in the deliberative process to give the jury the *Tuey-Rodriguez* instruction.[1] He also pointed out that although the note indicated that the jury had not yet come to a conclusion, it did not indicate that doing so was not possible. Attorney Yannetti, on behalf of the defendant, "disagree[d] with Mr. Lally's characterization of the note." He argued:

> "The word exhaustive is the word that I think is operative here. [The jury is] communicating to the court that they've exhausted all manner of compromise, all manner of persuasion and they're at an impasse. You know, this is a case where they jury has the legal instructions. They've only really asked one question, which was to try and get a report they were not allowed to get, and I think the message has been received that the evidence is closed and they won't get anything more. They've been essentially working nonstop

---

[1] The use of the *Tuey-Rodriguez* instruction is a matter of discretion of the trial judge. *Commonwealth* v. *Parreira*, 72 Mass. App. Ct. 308, 316 (2008). It is the "orthodox approach to dealing with a deadlocked jury" see *Commonwealth* v. *Firmin*, 89 Mass. App. Ct. 62, 64 (2016) (citation omitted), and "designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view." *Commonwealth* v. *Semedo*, 456 Mass. 1, 20 (2010).

> over the last three, four days. We're approaching a weekend. They
> didn't come back with this at three o'clock or four o'clock. They're
> at twelve o'clock and they have nowhere to turn. So our position is
> the jury should be read the *Tuey-Rodriguez* model instructions and
> go from there."

The Court ruled that given the length of the trial, the number of exhibits and witnesses, the

complexity of the issues, and that the jury had only been deliberating for three days,

deliberations had not been sufficiently due and thorough to warrant a *Tuey-Rodriguiez*

instruction. It instructed the jury to continue deliberating.

On Monday, July 1, 2024, at approximately 10:45 a.m., the jury sent another note to this

Court. This note stated:

> "Despite our commitment to the duty entrusted in us, we find
> ourselves deeply divided by fundamental differences in our opinions
> and state of mind. The divergence in our views are not rooted in a
> lack of understanding or effort but deeply held convictions that each
> of us carry, ultimately leading to a point where consensus is
> unattainable. We recognize the weight of this admission, and the
> implications it holds."

The Court again requested argument from counsel as to whether there had been due and

thorough deliberations. The Commonwealth argued that the jury had been deliberating twenty-

two to twenty-three hours but given the length of trial, number of exhibits and witnesses, and

complexity of issues, they had not done a thorough deliberation up to this point. Attorney

Yannetti, again, had a vastly different view. He argued:

> "Our view is that it is time for a *Tuey-Rodriguez* [instruction]. They
> have come back twice indicating essentially that they're hopelessly
> deadlocked but the content of this latest message is that they have
> been over all the evidence. The previous message said they did an
> exhaustive review. This time they said that . . . they have
> fundamental disagreements about what the evidence means. It's a
> matter of opinion. It's not a matter of lack of understanding. This
> court when you sent the jury out encouraged them not to take a straw
> vote, encouraged them to go over all the evidence in a very

methodical manner. I think all indications are that they have done that. This is what *Tuey-Rodriguez* is for."

The Court agreed that the jury had engaged in due and thorough deliberations, noting that this jury had been "extraordinary" and it had never seen a note like this from a jury. It thereafter provided the jury of the full *Tuey-Rodriguez* instruction and asked them to return to the deliberations with those instructions in mind.[2]

That same day, at approximately 2:30 p.m., the jury sent another note to the Court. The Court stated to counsel that the jury was at an impasse. After the jurors filed into the courtroom, the Court read the note:

> "Despite our rigorous efforts we continue to find ourselves at an impasse. Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyond a reasonable doubt. Conversely, others find the evidence fails to meet this standard and does not sufficiently establish the necessary elements of the charges. The deep division is not due to lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions. To continue to deliberate would

---

[2] The *Tuey-Rodriguez* instruction states: "Our Constitution and laws provide that in a criminal case, the principal method for deciding questions of fact is the verdict of a jury. In most cases and perhaps strictly speaking in all cases absolute certainly cannot be obtained nor is it expected. The verdict to which each juror agrees must of course be his or her own verdict, the result of his or her own convictions, and not merely an acquiescence in the conclusions of other jurors. Still, in order to bring twelve minds to a unanimous result, you must examine the issues you have to decide with candor and with the proper regard and respect for each other's opinions. You should consider that it is desirable that this case be decided. You have been selected in the same manner and from the same source as any future jury would be selected. There is no reason to suppose that this case will ever be submitted to twelve persons who are more intelligent, more impartial, or more competent to decide it than you are or that more or clearer evidence will be produced at another trial. With all this in mind it is your duty to decide this case if you can do so conscientiously. In order to make a decision more attainable, the law always imposes the burden of proof on the Commonwealth to establish every essential element of each indictment beyond a reasonable doubt. If you are left with a reasonable doubt as to any essential element of any indictment, then the defendant is entitled to the benefit of that doubt and must be found 'not guilty' on that indictment. In conferring together, you are to give proper respect to each other's opinions, and listen with an open mind to each other's arguments. Where there is disagreement, those jurors who would find the defendant 'not guilty' should consider whether the doubt in their minds is a reasonable one if it makes no impression on the minds of the other jurors who are equally intelligent, who have heard the same evidence with the same attention, who have an equal desire to arrive at the truth and who have taken the same oath as jurors. At the same time, those jurors who would find the defendant 'guilty' ought seriously to ask themselves whether they may not reasonably doubt the correctness of their judgment if it is not shared by other members of the jury. They should ask themselves whether they should distrust the weight or sufficiency of the evidence if it has failed to convince the minds of their fellow jurors beyond a reasonable doubt."

be futile and only serve to force us to compromise these deeply held beliefs."

After reading this note, the Court declared a mistrial and discharged the jury back to the deliberation room to wait for the judge. Counsel remained in the courtroom to discuss an agreeable date to return for a status conference.

On July 8, 2024, the defendant filed the instant motion to dismiss supported by affidavits from Attorney Yannetti and co-counsel, Attorney Jackson. Attorney Jackson's affidavit stated that on July 2, 2024, a juror in the case ("Juror A") contacted him. Attorney Jackson was able to identify the person as a deliberating juror based on his/her description of who he/she is, where he/she was seated, and certain identifying information (name and occupation) disclosed during the voir dire process. According to Attorney Jackson's affidavit, Juror A told him that he/she wished to inform him of the true results of the deliberations because he/she believed those results significantly impact the defendant's rights. Juror A said the jury unanimously agreed that the defendant was not guilty of Counts 1 and 3 and specifically that the murder charge was "off the table." First Jackson Affidavit at par. 5.

In his affidavit, Attorney Jackson also stated: "Neither Ms. Read nor her counsel consented to the entry of the mistrial. Defense counsel was denied the opportunity to request that the Court inquire on which count or counts the jury may have been deadlocked (including lesser included offenses), and on which count or counts the jury may have arrived at a verdict." *Id.* at pars. 9 and 10.

Attorney Yannetti's affidavit averred that on July 3, 2024, he received communications from two "informants" who had received information from two deliberating jurors in the case. The first informant ("Informant B") sent him a screenshot he/she had received from someone else ("Intermediary B") of text messages that Intermediary B had purportedly received from a

juror ("Juror B").  Attorney Yannetti averred that he was able to positively identify which juror was Juror B based on a first name given to him from Informant B.  In the screenshot, Juror B texted Intermediary B, "It was not guilty on second degree.  And split in half for the second charge.  When the judge sent us back with that Hernandez thing to look at the other side it turned into a bully match.  I thought the prosecution didn't prove the case.  No one thought she hit him on purpose or even thought she hit him on purpose. . . ."  Yannetti Affidavit at par. 4.

Attorney Yannetti stated that another informant ("Informant C") contacted him on July 3, 2024.  Informant C told him he or she personally knows a juror ("Juror C") and that Informant C and Juror C have a mutual friend ("Intermediary C") who is a current coworker and friend of Juror C.  Intermediary C told Informant C via text message that Juror C was a deliberating juror in the case.  Intermediary C had a discussion over text message with Juror C about the experience of being a juror.  Intermediary C said that Juror C said there was "no consideration for murder 2.  Manslaughter started polling at 6/6 then ended deadlocked [at] 4no8yes. . ."  Yannetti Affidavit at par. 10.  Informant C texted back, "interesting. If there was no consideration for murder two, shouldn't she have been acquitted on that count[] and hung on the remaining chargers [sic] goes back to the jury verdict slip that was confusing."[3] *Id.* Intermediary C texted, "she should've been acquitted I agree.  Yes, the remaining charges were what they were hung on. And that instruction paper was very confusing." *Id.*

Attorney Yannetti stated that based on the description of Juror C he received from Informant C and the description of what Juror C told Intermediary C, he could positively identify that Juror C was a deliberating juror.

---

[3] As noted below, defense counsel argued to the Court that the verdict slip for Indictment 2, which allowed the foreperson to check "guilty" for the lesser included offenses, would be confusing for the jury if they decided the defendant was not guilty of all the lesser included offenses.

Attorney Yannetti later filed a supplemental affidavit in support of the defendant's motion to dismiss wherein he stated that he received an unsolicited phone call from an individual identifying himself/herself as Juror B. Juror B told Attorney Yannetti that he/she was familiar with the affidavit he had previously filed and confirmed the substance of the conversation between Informant B and Intermediary B. Juror B clarified that he/she meant to write, "No one thought she hit him on purpose or even knew that she had hit him." Yannetti Supplemental Affidavit at par. 4.

On July 10, 2024, Attorney Jackson submitted a supplemental affidavit stating that on July 8, 2024, another juror ("Juror D") contacted him. He identified this person as a juror by the description of who he/she is, where he/she was seated, and certain identifying information (name and occupation) disclosed during the voir dire process. Juror D told Attorney Jackson that "he/she was 'uncomfortable' with how the trial ended. . . . Juror D said that it was very troubling that the entire case ended without the jury being asked about each count, especially Count 1 and Count 3." Jackson Supplemental Affidavit at pars. 3-4. According to Jackson's Supplemental Affidavit, Juror D told him that the jury agreed that the defendant was not guilty on Counts 1 and 3, that they disagreed solely on Count 2's lesser offenses, but that they believed that they were compelled to come to a resolution on all counts before they could or should report verdicts on any counts. Juror D believed all jurors would corroborate his/her account. He/she also stated that if necessary, he/she would testify before the court as long as his/her identity remained protected.

On July 18, 2024, Attorney Jackson submitted a second supplemental affidavit stating that on July 17, 2024, he was contacted by another juror ("Juror E") who he identified by the description of who he/she is, where he/she was seated, and certain identifying information (name

and occupation) disclosed during the voir dire process.  Juror E also stated that the jury was unanimous on Counts 1 and 3, that the defendant was not guilty of those charges, and that they were deadlocked on one of the "lower charges" on Count 2.  Jackson Second Supplemental Affidavit at par. 5.

On August 1, 2024, the Commonwealth filed a Post-Trial Notice of Disclosure stating that ADA Lally had received two unsolicited voicemails from an individual identifying themselves as a deliberating juror stating that the jury had been unanimous on Counts 1 and 3. The Commonwealth also received emails from three individuals identifying themselves as jurors stating that they wished to speak anonymously.  In its response to the emails, the Commonwealth stated that it was ethically prohibited from inquiring as to the substance of the jury deliberations, and that it could not promise confidentiality as it may be required to disclose the substance of any conversation to the defendant or the Court.  All three jurors declined to communicate further with the Commonwealth.

## DISCUSSION

The Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment to the United States Constitution, and Massachusetts common and statutory law protect an individual defendant from being twice placed in jeopardy for the same crime.  *Perrier* v. *Commonwealth*, 489 Mass. 28, 31 (2022).  See *Commonwealth* v. *Taylor*, 486 Mass. 469, 483 (2020), quoting *Oregon* v. *Kennedy*, 456 U.S. 667, 671–672 (1982) ("[T]he [d]ouble [j]eopardy [c]lause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal'" [citation omitted]).  A defendant is entitled to protection from double jeopardy "if there had been some event, such as an acquittal, which terminates the original jeopardy," see *Commonwealth* v. *Hebb*, 477 Mass. 409, 413 (2017), or if a mistrial is

8

entered "without the defendant's request or consent . . . unless there was a manifest necessity for the mistrial" (quotation and citations omitted). *Taylor*, 486 Mass. at 483. See *Hebb*, 477 Mass. at 413, quoting *Yeager* v. *United States*, 557 U.S. 110, 118 (2009) ("The 'interest in giving the prosecution one complete opportunity to convict those who have violated its laws' justifies treating the jury's inability to reach a verdict as a nonevent that does not bar retrial.").

In her motion to dismiss, the defendant argues that retrial on Indictments 1 and 3 would violate the double jeopardy protections of the federal and state constitutions because, despite absence of a jury verdict, the jury, in fact, reached a unanimous decision to acquit her on those charges, or alternatively, because there was no manifest necessity to support the declaration of the mistrial with respect to the charges. After careful consideration, the Court concludes that the defendant's arguments are without merit.

## I.    Acquittal of the Defendant

The defendant first contends that she was acquitted on Indictments 1 and 3, and that therefore retrial is barred based on her attorneys' affidavits purporting to reflect statements by jurors that the jury reached a unanimous conclusion that she was not guilty on those charges. Although all the statements in the affidavits are from purported jurors who wish to remain anonymous, for the purposes of this motion, the Court accepts the statements as true and accurate.[4] Even doing so, any agreement among the jurors as to Counts 1 and 3 cannot be considered acquittals for purposes of double jeopardy.

To trigger double jeopardy protection, "[a]n acquittal requires a verdict on the facts and merits" (citations and quotations omitted). *Commonwealth* v. *Brown*, 470 Mass. 595, 603

---

[4] While the Court accepts the averments as true and accurate, it disagrees with defense counsel's characterization of the statements as "strong and uncontradicted." The substance of the conversations directly contradicts the notes the jury wrote to the Court during deliberations, the last of which expresses disagreement over whether the Commonwealth met its burden as to the "elements of the *charges*." (Emphasis added).

(2015).  See G. L. c. 263, § 7 ("A person shall not be held to answer on a second indictment or complaint for a crime of which he has been acquitted upon the facts and merits . . .").  And, "the only verdict which can be received and regarded, as a complete and valid verdict of a jury . . ., is an open and public verdict . . . affirmed in open court, as the unanimous act of the jury, and in presence of the whole panel, so that each juror has an opportunity to express his dissent to the court, in case his decision has been mistaken or misrepresented by the foreman or his fellows, or in case he has been forced into acquiescence by improper means" (citations omitted). *Commonwealth* v. *Zekirias*, 443 Mass. 27, 33 (2004).  See Mass. R. Crim. P. 27(a) ("The verdict shall be unanimous. It shall be a general verdict returned by the jury to the judge in open court. The jury shall file a verdict slip with the clerk upon the return of the verdict.").  As such, "the weight of final adjudication" cannot "be given to any jury action that is not returned in a final verdict" and a distinction must be made "between agreement on a verdict, and return, receipt, and recording of a verdict" (citations omitted).  *A Juvenile* v. *Commonwealth*, 392 Mass. 52, 56-57 (1984).

Because there was no open and public verdict affirmed in open court rendered in this case, the defendant was not acquitted of any of the charges.  The only unanimous act of the jury here was their representation to the Court that they were "at an impasse" and unable to agree on whether the Commonwealth had established beyond a reasonable doubt the "elements of the *charges*."  The purported later attestations by some jurors, after they had been dismissed, that the jury had in fact agreed on some of the charges during deliberations do not have the "force of a final verdict." *Commonwealth* v. *Floyd P.*, 415 Mass. 826, 831 (1993).  See *A Juvenile*, 392 Mass. at 57 (after mistrial was declared due to deadlock, judge did not err in refusing to accept signed verdict slips recovered from deliberation room showing "not guilty" because "[i]t is not

10

R.303

JA0444

enough to show that the jury may have agreed on some issues at some time; if that limited showing were to control, uncertainties would be invited"); see also *Blueford* v. *Arkansas*, 566 U.S. 599, 606 (2012) (double jeopardy did not bar retrial after hung jury where foreperson reported unanimous vote on offense before deliberations had concluded but deadlock at conclusion).

The defendant argues that it is elevating form over substance to not accept that the statements in the affidavits reflect an acquittal of the defendants on Counts 1 and 3. However, the rendering of a verdict in open court is not a "ministerial act" as the defendant contends. Rather, it communicates the finality of the deliberations, and its pronouncement in open court ensures its unanimity. See *A Juvenile*, 392 Mass. at 57 ("Public affirmation in open court provides safeguards against mistakes."). Indeed, the authority upon which the defendant relies places particular importance upon the jury's pronouncement of its findings in open court. See *Blueford*, 566 U.S. at 613 (Sotomayor, J., dissenting) (arguing that "the forewoman's *announcement in open court* that the jury was 'unanimous against' conviction on capital and first-degree murder . . . was an acquittal for double jeopardy purposes").[5] Thus, a "verdict in substance" is a "final collective decision . . . reached after full deliberation, consideration, and compromise among the individual jurors . . . And when that decision [is] *announced in open court*, it [becomes] entitled to full double jeopardy protection" (emphasis added). *Id.* at 616, citing *Commonwealth* v. *Roth*, 437 Mass. 777, 796 (2002) ("declining to give effect to 'the verdict received from the lips of the foreman in open court' would 'elevate form over

---

[5] In written and oral argument, the defendant also relies on language from *Taylor*, 486 Mass. at 482. *Taylor* discussed whether a judicial determination to terminate proceeding based on a procedural ground implicated double jeopardy. The Supreme Judicial Court explained, "What constitutes an 'acquittal' is not to be controlled by the form of the judge's action," and that the determination does not depend on "checkmarks on a form." *Id.* This language in *Taylor* does not inform the Court as to the circumstances here.

substance'"").  Where there was no verdict announced in open court here, retrial of the defendant does not violate the principle of double jeopardy.

## II.     Manifest Necessity of Mistrial

The defendant's motion to dismiss also argues that double jeopardy bars re-prosecution because she did not consent to a mistrial and there was no manifest necessity to declare one. This argument, too, is without merit.

"A defendant's consent to a mistrial removes any double jeopardy bar to retrial" (quotation and citation omitted).  *Pellegrine* v. *Commonwealth*, 446 Mass. 1004, 1005 (2006). Consent may be explicit or implicit.  Explicit consent may occur by either moving for a mistrial or agreeing to one.  *Commonwealth* v. *Edwards*, 491 Mass. 1, 13 (2022).  Consent to a mistrial may be implied "where a defendant had the opportunity to object [to a declaration of a mistrial] and failed to do so."  *Pellegrine*, 446 Mass. at 1005.  See *United States* v. *McIntosh*, 380 F.3d 548, 554 (1st Cir. 2004) ("Where the defendant sits silently by and does not object to the declaration of a mistrial even though he has a fair opportunity to do so, a court may presume his consent" [quotation and citation omitted]).  See also *United States* v. *You*, 382 F.3d 958, 964-965 (9th Cir. 2004), cert. denied, 543 U.S. 1076 (2005) ("a court may infer consent only where the circumstances positively indicate a defendant's willingness to acquiesce in the mistrial order" [quotations and citations omitted]); *United States* v. *Goldstein*, 479 F.2d 1061, 1067 (2d Cir. 1973) ("Consent [to a mistrial] need not be express, but may be implied from the totality of the circumstances attendant on a declaration of a mistrial.").

As noted, the Court here declared a mistrial after the jury reported three times that they were deadlocked.  After the second time, the Court determined that the jury had engaged in due and thorough deliberations and gave the *Tuey-Rodriguez* instruction before sending the jury to

12

R.305

JA0446

deliberate further.  Massachusetts General Laws c. 234A, § 68C, provides that if "a jury, after

due and thorough deliberation, returns to court without having agreed on a verdict, the court may

state anew the evidence or any part of the evidence, explain to them anew the law applicable to

the case and send them out for further deliberation; *but if they return a second time without*

*having agreed on a verdict, they shall not be sent out again without their own consent,* unless

they ask from the court some further explanation of the law" (emphasis added).  See

*Commonwealth* v. *Jenkins*, 416 Mass. 736, 737 (1994) ("If, after due and thorough deliberation,

the jury twice advise the judge that they are unable to reach a verdict, the judge may not properly

send the jury out again without their consent, unless the jury ask for some further explanation of

the law.").  In their note to the Court, the jury specifically stated, "[t]o continue to deliberate

would be futile and only serve to force us to compromise these deeply held beliefs," making it

clear that they would not consent to continuing their deliberations.

    Attorney Yannetti *twice* argued for the Court to give the *Tuey-Rodriguez* instruction—the

final step before the Court would declare a mistrial.  See *Jenkins*, 416 Mass. at 737; see also *Ray*

v. *Commonwealth*, 463 Mass. 1, 4 (2012) (counsels' request for *Tuey-Rodriquez* instruction

"permit[ed] the inference that both parties were provided an opportunity to be heard on possible

alternatives to a mistrial").  Specifically, on Friday, June 28, 2024, after three days of

deliberations, when the jury sent their first note indicating that they had engaged in an

"exhaustive review of the evidence" and "ha[d] been unable to reach a unanimous verdict,"

Attorney Yannetti argued that the jury had engaged in due and thorough deliberations, was at an

impasse, and should be given the *Tuey-Rodriguez* instruction.  The following Monday, when the

jury sent a second note after deliberating for approximately two hours, stating that "consensus

was unattainable," Attorney Yannetti again argued that due and thorough deliberations had

occurred and described the jury as "hopelessly deadlocked." Defense counsel, in arguing twice that due and thorough deliberations had occurred and pushing for the instruction, presumably was aware of the legal implications if the jury returned deadlocked again. Nevertheless, in a remarkable turnaround, defense counsel now argues that the result they twice advocated for was "sudden" and "unexpected." See Defendant Karen Read's Motion to Dismiss at 8.

Although the Court did not specifically ask defense counsel if they had any objection to the declaration of a mistrial, counsel had multiple opportunities to voice an objection if they in fact had one. While waiting for the jury to enter the courtroom after the Court announced the jury was again at an impasse on the afternoon of July 1, 2024, defense counsel could have asked to be heard on the issue. During the subsequent discussion about scheduling a status hearing right after the Court declared a mistrial, counsel had yet another opportunity to inform the Court of its dissatisfaction. Lastly, counsel could have communicated to the Court any objection or request to poll the jurors while the jury was still at the courthouse waiting in the deliberation room after the declaration of the mistrial. Instead, defense counsel said nothing to the Court about the mistrial and then proceeded to the courthouse steps where Attorney Jackson declared to the media and onlookers that the "[Commonwealth] failed miserably and will continue to fail" with its prosecution of the defendant.[6]

It strains credulity to believe that if defense counsel wanted to voice any objection to the Court, it would not have been heard. Significantly, defense counsel were no shrinking violets. Neither Attorney Jackson nor Attorney Yannetti has ever needed this Court to inquire whether counsel had an objection in order to be heard, and the Court has never denied counsel the opportunity to be heard in open court or at sidebar. The Court reconvened many times at

---

[6] See https://www.youtube.com/watch?v=TrsJPBRVqDg

counsel's request. Just days before the declaration of mistrial, defense counsel asked to address the Court while the jury was deliberating to raise an objection about the verdict slip. Attorney Jackson was not shy in informing the Court that he wanted to "make [his] argument" and that the Court's decision about the verdict slip was "not how it should be and it's over our strong objection."[7] Attorney Jackson went so far as to suggest that "it was almost like the Court is directing a verdict of the subordinate charges" by not making changes he wanted. The Court finds it hard to believe that when counsel heard that the jury was at an impasse for a third time and a mistrial was inevitable, at perhaps the most crucial point in the trial, counsel would sit silently if they did not consent to a mistrial.

As such, the Court does not credit Attorney Jackson's averment that he lacked an opportunity to be heard. Defense counsel's silence despite ample opportunity to be heard is deemed consent. See *Pellegrine*, 446 Mass. at 1005 (when trial judge on own initiative declared mistrial, defendant's silence was deemed consent where there was ample time to object despite not being directly asked by judge). Cf. *Commonwealth* v. *Phetsaya*, 40 Mass. App. Ct. 293, 298 (1996) (silence was not consent where judge's conduct was "so intimidating to defense counsel . . . as to foreclose any objection from defense counsel to the declaration of a mistrial").

Even assuming *arguendo* that the defendant here did not consent to the mistrial, the law is clear that a retrial is permissible so long as there was manifest necessity for the mistrial. *Taylor*, 486 Mass. at 483. "The trial judge's belief that the jury is unable to reach a verdict has long been considered the classic basis for a proper mistrial" (quotation and citation omitted). *Ray*, 463 Mass. at 3. See *Oregon*, 456 U.S. at 672 (describing "hung jury" as "prototypical example" of manifest necessity). Because the Court here had no doubt based on the jury's notes

---

[7] See https://www.youtube.com/watch?v=BjPsNvnLXV0

to the Court that it was unable to reach a unanimous verdict and the jury represented to the Court that continued deliberations would be futile, there was manifest necessity for the mistrial based on the deadlock.

As stated above, the foreperson, on behalf of the jury in this case, sent the Court three notes, none of which indicated agreement on any of the charges. In the first note, the jury wrote that they had been "unable to reach a unanimous verdict." In the second note, they stated that they were "deeply divided by fundamental differences in our opinions and state of mind" and that "consensus is unattainable." In their third and final note, after they had been given the *Tuey-Rodriguez* instruction, the jury stated that they continued to be "at an impasse." They described themselves as "starkly divided" on their "perspectives on the evidence" explaining:

> "Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyond a reasonable doubt. Conversely, others find the evidence fails to meet this standard and does not sufficiently establish the necessary elements of the charges. The deep division is not due to lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions. To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs."

The only reasonable interpretation of these notes, and specifically the final note, was that the jury could not agree on any of the three charges and further deliberations would serve no purpose.[8]

For the defense to now claim that the notes were susceptible to different interpretations such that the Court should have inquired further rings hollow, particularly where Attorney Yannetti had twice argued that the jury had engaged in due and thorough deliberations and could not agree. See *United States* v. *Keene*, 287 F.3d 229, 234 (1st Cir. 2002) (no abuse of discretion

---

[8] Given the care that went into writing the notes and how articulately they expressed the jurors' disagreement, it strikes this Court as odd that there was no inkling of an indication of agreement in the content of the notes or that if the jurors were uncertain whether they could return a partial verdict, they would not have asked the Court.

16

in declaring a mistrial given "the increasingly adamant manner in which the jurors announced that they were deadlocked"). Moreover, defense counsel's conduct immediately after the declaration of the mistrial in no way suggests that they thought otherwise.

The defendant contends that the Court failed to carefully consider that as an alternative to a mistrial, it could have "simply ask[ed] the jury to specify the charge(s) on which it was deadlocked." Defendant Karen Read's Motion to Dismiss at 8. However, "[t]he question whether a mistrial is appropriate in the circumstances of a given case is not answered by application of a 'mechanical formula.'" *Ray*, 463 Mass. at 4, quoting *Illinois* v. *Somerville*, 410 U.S. 458, 462 (1973). See *Commonwealth* v. *Bryant*, 447 Mass. 494, 503 (2006) (decision whether to declare a mistrial is within the discretion of the trial judge). Rather, the Court considers several facts such as the statements in a jury's note concerning their inability to reach an agreement, the time spent in deliberations, and the length and complexity of the trial. *Ray*, 463 Mass. at 4-5. See *Renico* v. *Lett*, 559 U.S. 766, 775 (2010) ("we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse").

Where here, the jury had been deliberating five days, had returned to the Court three times stating they could not agree, had been given the *Tuey-Rodrigez* instruction and returned hours later with a note plainly indicating that they could not agree as to the "elements of the *charges*" and that "to continue to deliberate would be futile," asking the jury on which charges they were deadlocked was not necessary to determine that there was manifest necessity for a mistrial. See *Fuentes* v. *Commonwealth*, 448 Mass. 1017, 1018–1019 (2007) (where final note

17

from the foreperson unequivocally stated that the jury were "unable to come to a unanimous decision," judge was not required to inquire whether there was any reasonable probability of unanimous verdicts or if the jury would consent to further deliberations); *Ray*, 463 Mass. at 6 n.5 (judge did not err in declining to poll jury on whether further instructions or deliberation would be likely to resolve the deadlock).

Moreover, the defendant's argument ignores the fact that one of the three charges had lesser included offenses. Therefore, if upon questioning, the jury had indicated to the Court that they were not deadlocked on all the charges, the only option would have been for the Court to send the jury back for further deliberations. See *A Juvenile*, 392 Mass. at 56 (judge should not inquire as to partial verdicts on lesser included offenses). Such action would be improperly coercive under the circumstances. It has been repeatedly recognized that deadlocked juries are particularly susceptible to coercion. *Roth*, 437 Mass. at 791. "Where the jurors have twice reported themselves deadlocked, and have already heard the *Tuey-Rodriquez* charge, a judge's inquiry concerning partial verdicts cannot avoid communicating to the jury the judge's desire to salvage *something* from the trial." *Id.* at 792 (emphasis in original). Where here the jury had before it one indictment which included lesser included offenses, had three times reported themselves deadlocked on separate charges, had already heard the *Tuey-Rodriguez* charge, and had sent a final note indicating that continued deliberations would only "serve to force [them] to compromise [their] deeply held beliefs," sending them to deliberate further would have been improperly coercive.[9]

---

[9] It is the Court's view that under these circumstances, even posing the question to the jury of whether they actually were deadlocked would have implied to the jurors that the Court wanted them to resume deliberations to reach a verdict. Given that Attorney Jackson had already expressed concern that the Court was "directing a verdict of the subordinate charges," the Court was extremely cautious to not give any appearance of partiality. See *United States* v. *Hotz*, 620 F.2d 5, 7 (1st Cir. 1980) (noting that a court must avoid putting pressure on the jury).

18

R.311

JA0452

The defendant's argument suggests that questioning or polling jurors who report a deadlock is best practice or at least commonly done by trial judges. However, the defendant has not cited any cases saying as much and indeed, such an inquiry is not undertaken in the regular course.[10] For a judge to make such an inquiry on her own accord could impede upon the strategic decision of counsel to not make such a request. The defendant's argument is based on hindsight. No one other than the jury knew that questioning the jurors as to their deadlock would have yielded a favorable outcome for the defendant. It is likely for that reason, defense counsel consented to this Court's declaration of a mistrial.

### III.    Post-Trial Inquiry

The defendant alternatively requests that the Court allow counsel to conduct a post-trial inquiry of the jurors to "substantiate the existence of an acquittal." Defendant Karen Read's Motion to Dismiss at 9. Such an inquiry is impermissible.

The defendant's argument relies solely on *Commonwealth* v. *McCalop*, 485 Mass. 790 (2020). In *McCalop*, the Supreme Judicial Court held that the trial court should have allowed the defendant's motion for jurors' names and contact information based on the post-trial statement of a deliberating juror regarding racist statements made during deliberations. *Id.* at 791. The Supreme Judicial Court explained, "[t]he presence of even one juror who is not impartial violated a defendant's right to trial by an impartial jury." *Id.* at 798, quoting *Commonwealth* v. *McCowen*, 458 Mass. 461, 494 (2010). Recognizing that "[r]acial bias in the jury system is 'a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the

---

[10] The defendant relies on *Commonwealth* v. *Foster*, 411 Mass. 762 (1992) and *Commonwealth* v. *LaFontaine*, 32 Mass. App. Ct. 529 (1992) to argue that there would be nothing coercive about asking a jury reporting a deadlock whether they had reached a unanimous verdict on any of the counts. Because neither the jury in *Foster* nor the jury in *LaFontaine* reported being deadlock in its deliberations, and none of the offenses charged had lesser included offenses, there was clearly no risk of coercion in the courts seeking partial verdicts on the separate indictments in those case. The circumstances here are markedly different.

19

administration of justice,'" the *McCalop* court held that the defendant should have been given a "fair opportunity to obtain an affidavit from that juror setting forth with some specificity who among the jurors made statements reflecting racial bias . . . and the statements that were made." *McCalop*, 485 Mass. at 799, quoting *Pena-Rodriguez* v. *Colorado*, 580 U.S. 206, 224 (2017). The defendant's argument here does not implicate racial bias or her right to receive an impartial trial. Thus, the reasoning the Court employed in *McCalop* does not extend to this case. See *Commonwealth* v. *DiBenedetto*, 94 Mass. App. Ct. 682, 687 (2019) (declining to extend racial bias exception to inquiry of jury unanimity because "infection of the criminal justice system with racial or ethnic bias is a unique type of constitutional deprivation that requires a vigilant response not warranted in the circumstances presented here").

The defendant's request effectively seeks permission from the Court to inquire from deliberating jurors that which is impermissible—information regarding the substance of the jury's deliberations. "The secrecy of jury deliberations has served as a bedrock of our judicial system, and inquiry into the 'jury's deliberative processes . . . would intrude improperly into the jury's function" (quotation and citation omitted). *Commonwealth* v. *Moore*, 474 Mass. 541, 548 (2016). It is simply not the case, given the content of the jury's final note to the Court, that any inquiry to jurors now could be limited solely to the results of the deliberative process and not implicate the process itself. Any inquiry would necessarily require the Court to understand why the jury's final note communicated a deadlock on the charges when post-trial, certain deliberating jurors are purportedly stating that the jury was, in fact, unanimous on most of the charges. While the defendant contends that the conflict is reflective of the fact that the instructions given to the jury by the Court were confusing, determining whether this is true would necessarily require inquiry into the back and forth among the jurors during deliberations.

20

See *DiBenedetto*, 94 Mass. App. Ct. at 686 ("The judge is precluded from inquiring into the internal decision making process of the jury as a whole or of the individual juror being questioned . . . Accordingly, evidence that jurors misunderstood the instructions of the presiding judge . . . cannot be considered" [internal quotations and citations omitted]). Thus, such an inquiry is prohibited.

The defense counsel has not cited one case suggesting the post-trial inquiry they now seek is appropriate or that it could change the outcome of the proceedings.[11] For the reasons already discussed, an acquittal of the defendant now on Indictments 1 and 3 based on conclusions purportedly reached during the jury's deliberations is not possible. Therefore, there is no reason for the Court to allow post-trial inquiry of the jurors. See *A Juvenile*, 392 Mass. at 57 (no error in denial of motion to subpoena the foreman where process would only serve to impeach jury's report to the judge in open court).

## CONCLUSION AND ORDER

This Court recognizes that the bar on retrials following acquittals is "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence." *Taylor*, 486 Mass. at 481, quoting *United States* v. *Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977). However, where there was no acquittal on any of the charges in the defendant's first trial, there is no risk of subjecting the defendant to double jeopardy by retrial on all the charges.

Therefore, the Defendant's Motion to Dismiss is **DENIED**.

Date:    August 22, 2024

Beverly J. Cannone
Justice of the Superior Court

---

[11] Cases that defense counsel referred to at the hearing on this motion concerning post-trial inquiry of jurors where juror bias or outside influence was at issue are readily distinguishable from the circumstances here.

21

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

Suffolk, ss.                                                                 No. SJ-2024-


KAREN READ,
Petitioner

v.

COMMONWEALTH OF MASSACHUSETTS,
Respondent.


**MOTION FOR LEAVE TO FILE TRANSCRIPT OF MAY 24, 2024 SEALED SIDEBAR UNDER SEAL**

Now comes the Petitioner, Karen Read, by and through undersigned counsel, and hereby respectfully requests leave to file the attached transcript of a May 24, 2024 sealed sidebar under seal in this Court.  As grounds and reasons for this request, Ms. Read states that the May 24, 2024 transcript is referenced in her Petition, and the transcript remains under seal in the Norfolk County Superior Court.

Wherefore, the Petitioner respectfully requests that this Court grant her leave to file the May 24, 2024 transcript under seal.

Respectfully Submitted,
For the Petitioner,
Karen Read
By her attorney,


**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

## <u>CERTIFICATE OF SERVICE</u>

I, Martin G. Weinberg, do hereby certify that on this day, September 11, 2024, I have served a copy of this Motion and the attached transcript via email on Assistant District Attorney Adam Lally.

<u>**/s/ Martin G. Weinberg**</u>
Martin G. Weinberg

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT FOR SUFFOLK COUNTY

SUFFOLK, ss.                                          SJC-2024-

                                                     Norfolk Superior Court
                                                     No. 2282CR00117

_____
                                          )
                                          )
KAREN READ,                               )
                                          )
Petitioner                                )
                                          )
v.                                        )
                                          )
THE COMMONWEALTH OF                       )
MASSACHUSETTS,                            )
                                          )
Respondent                                )
                                          )
_____)

**MOTION FOR *PRO HAC VICE* ADMISSION OF
ALAN JACKSON IN THE SUPREME JUDICIAL COURT**

David R. Yannetti, of the Yannetti Criminal Defense Law Firm and a member in good

standing of the Massachusetts bar, hereby moves to admit *pro hac vice* Alan Jackson ("Attorney

Jackson") in the Supreme Judicial Court so that he may associate as counsel of record for

Petitioner Karen Read in connection with the Petition for Relief Pursuant to G.L. c. 211, §3,

which was filed in this Court on September 11, 2024. Attorney Jackson seeks *pro hac vice*

admission in this Court on the following grounds:

1.      Attorney Jackson is a Partner at the California law firm of Werksman Jackson &

Quinn LLP, 888 West Sixth Street, Fourth Floor, Los Angeles, CA 90017. His telephone number

is 213-688-0460. Attorney Jackson's email address is ajackson@werksmanjackson.com. He is

admitted to practice law in the State of California, and his membership is in good standing. Mr.

Jackson is admitted *pro hac vice* in Norfolk County Superior Court, and represents Defendant Karen Read in connection with Norfolk Superior Court Docket No. 2282CR00117.

2.    Defendant/Petitioner Karen Read herein requests that Mr. Jackson be associated in as counsel of record for the c. 211 § 3 petition, which is currently pending before the Supreme Judicial Court of Massachusetts.

3.    Good cause exists to grant this motion because Attorney Jackson has institutional knowledge regarding the facts of this case, and has specialized skills representing Petitioner/Defendants in criminal appeals.

4.    Should the Court grant this motion, I will act as co-counsel during the pendency of this matter, along with attorneys Michael Pabian (BBO # 684589) and Martin Weinberg (BBO # 519480).

5.    In conjunction with this motion, counsel previously paid the Board of Bar Overseers registration fees of $355 per attorney, as required by Supreme Judicial Court Rule 3:15. Attached hereto as Exhibit A is the Registration Statement for Attorney Jackson issued by the Board of Bar Overseer in connection with Norfolk Superior Court Docket No. 2282CR00117.

WHEREFORE, for good cause shown, David Yannetti respectfully requests that this Motion for Admission *Pro Hac Vice* of Alan Jackson in the Supreme Judicial Court of Massachusetts be granted.

//

//

2

Respectfully Submitted,

_____

David R. Yannetti
Yannetti Criminal Defense Law Firm
44 School Street
Suite 1000A
Boston, MA  02108
Tel: (617) 338-6006
Fax: (617) 451-2570
law@davidyannetti.com

<u>Certificate of Service</u>

I, David Yannetti, hereby certify that a copy of the above document was served on ADA Adam C. Lally, Norfolk County District Attorney's Office 45 Shawmut Road Canton, MA 02021 on September 11, 2024.

_____

David Yannetti

3

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix):  **Alan J. Jackson**
Email address: ajackson@werksmanjackson.com
Complete Business/Mailing Address:

    **Alan J. Jackson**
    **Werksman Jackson & Quinn LLP**
    **888  W. 6th Street, 4th Floor**
    **Los Angeles, CA  90017**

| Board of Bar Overseers Administrative Use Only |
| --- |
| Date Received: *9-15-22* |
| Amount Paid: *$355.00* |
| Date confirmation mailed: *9-15-22* |

Business phone: **(213) 688-0460**

Court in which pro hac vice admission is sought: **Norfolk Superior Court**

Contact number for court:  **(781) 326-1600**

Party to be represented: **Karen Read**

Docket number of case (if available): **2282CR00117**

Jurisdictions to which you have been admitted:  (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
| --- | --- | --- |
| **State** | **California** | **173647** |



RECEIVED
SEP 1 5 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS
REGISTRATION DEPARTMENT

I certify that (check one): (☐) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (☑) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers.  I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Signature (Please sign inside box above.)                    Date: **September 8, 2022**

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

JA0461

Page 2

Jurisdictions continued:

---

**Alan J. Jackson**

Type      Jurisdiction                                                              License number

---

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

FBC-125

JA0462

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                                    SUPREME JUDICIAL COURT
                                                  FOR SUFFOLK COUNTY

```
_____
                              )
COMMONWEALTH,                 )
      Respondent,             )
                              )
v.                            )    No. SJ-2024-0332
                              )
KAREN READ,                   )
      Defendant-Petitioner.)
_____)
```

## PROPOSED BRIEFING SCHEDULE

At a hearing held in this matter on September 12, 2024, the Single Justice (Dewar, J.) indicated that she intends to reserve and report this case, without decision, for determination by the Supreme Judicial Court for the Commonwealth. The Single Justice directed the parties to submit a proposed schedule for briefing to the full Court, with briefing to be completed by October 25 to allow for oral argument in November 2024. The parties have conferred and hereby submit the following agreed-upon, proposed schedule:

1.   Defendant's principal brief due by September 25, 2024.

2.   Commonwealth's brief due by October 16, 2024.

3.   Defendant's reply brief due by October 25, 2024.

For scheduling purposes, the Commonwealth further notes that its counsel will be out of State and unavailable to argue on November 7 and 8.

Respectfully submitted for Karen Read by her counsel,

/s/ Martin G. Weinberg
Martin G. Weinberg
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

Michael Pabian
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

Alan J. Jackson
Admitted Pro Hac Vice
Werksman Jackson & Quinn LLP
888 West Sixth Street, Floor 4
Los Angeles, CA 90017
(213) 688-0460

David R. Yannetti
BBO #555713
44 School Street, Suite 1000A
Boston, MA 02108
(617) 338-6006

Respectfully submitted for the Commonwealth,

Michael W. Morrissey
District Attorney for the
Norfolk District

/s/ Caleb J. Schillinger
Caleb J. Schillinger
Assistant District Attorney
BBO #676592
45 Shawmut Road
Canton, MA 02021
(781) 830-4934

Dated:  September 17, 2024

2

SUPREME JUDICIAL COURT
for Suffolk County
Case Docket

_____

COMMONWEALTH v. KAREN READ
THIS CASE CONTAINS IMPOUNDED MATERIAL OR PID
SJ-2024-0332

| CASE HEADER | |
|---|---|
| Case Status | Active |
| Status Date | 09/12/2024 |
| Nature | Superintendence c 211 s 3 |
| Entry Date | 09/11/2024 |
| Sub-Nature | Mot to Dismiss-Dbl Jeopdy |
| Single Justice | |
| TC Ruling | |
| TC Ruling Date | |
| SJ Ruling | |
| TC Number | |
| Pet Role Below | |
| Full Ct Number | |
| Lower Court | |
| Lower Ct Judge | Beverly J. Cannone, J. |

| INVOLVED PARTY | ATTORNEY APPEARANCE |
|---|---|
| Karen Read<br>Defendant/Petitioner | Martin G. Weinberg, Esquire<br>Michael Pabian, Esquire<br>David R. Yannetti, Esquire<br>Alan J. Jackson, Pro Hac Vice Attorney |
| Commonwealth<br>Plaintiff/Respondent | Adam C. Lally, Assistant District Attorney<br>Pamela Alford, Chief, App. Div.<br>Caleb J. Schillinger, Assistant District Attorney |

| DOCKET ENTRIES | | |
|---|---|---|
| Entry Date | Paper | Entry Text |
| 09/11/2024 | | Case entered. |
| 09/11/2024 | | Docket Note: P.# 5 is TEMPORARILY IMPOUNDED pursuant to S.J.C. Rule 1:15. |
| 09/11/2024 | #1 | Petition for Relief Pursuant to G.L.c. 211, sec. 3 with Certificate of Service, filed for Karen Read by Attys. Martin G. Weinberg, Michael Pabian, Alan J. Jackson, and David R. Yannetti. |
| 09/11/2024 | #2 | Exhibits A and B to P.# 1, filed by Attys. Martin G. Weinberg, Michael Pabian, Alan J. Jackson, and David R. Yannetti. |
| 09/11/2024 | #3 | Record Appendix of Petitioner Karen Read, filed by Attys. Martin G. Weinberg, Michael Pabian, Alan J. Jackson, and David R. Yannetti. |
| 09/11/2024 | #4 | MOTION for Leave to File Transcript of May 24, 2024 Sealed Sidebar Under Seal with Certificate of Service, filed by Attys. Martin G. Weinberg, Michael Pabian, Alan J. Jackson, and David R. Yannetti. (9/12/2024: "Per the within, MOTION is ALLOWED." (Dewar, J.)] |
| 09/11/2024 | #5 | (IMPOUNDED) Transcript of May 24, 2024 Sealed Sidebar, filed by Attys. Martin G. Weinberg, Michael Pabian, Alan J. Jackson, and David R. Yannetti. |
| 09/11/2024 | #6 | MOTION for Pro Hac Vice Admission of Alan Jackson in the Supreme Judicial Court with Certificate of Service and Attachments, filed by Attys. Martin G. Weinberg, Michael Pabian, Alan J. Jackson, and David R. Yannetti. (9/12/2024: "Per the within, MOTION is ALLOWED." (Dewar, J.)] |
| 09/12/2024 | | Remote Scheduling Conference Scheduled on 09/12/2024 at 3:00 PM via Zoom. (Dewar, J.) |
| 09/12/2024 | #7 | eNotice to Counsel/Parties and Lower Court Re: Scheduling Conference filed. |
| 09/12/2024 | | Remote Scheduling Conference held via Zoom before Dewar, J. |
| 09/12/2024 | | Appearance of ADA Caleb J. Schillinger on Behalf of the Commonwealth. |
| 09/12/2024 | | Appearance of Atty. Martin Weinberg on Behalf of Defendant/Petitioner Karen Read. |
| 09/12/2024 | | Appearance of Atty. Michael Pabian on Behalf of Defendant/Petitioner Karen Read. |
| 09/12/2024 | #8 | eNotice to Counsel/Parties and Lower Court Re: P.#'s 4 and 6 filed. |
| 09/13/2024 | | Filing fee paid. ($315) |

Proposed Briefing Schedule, filed by Atty. Martin G. Weinberg, Atty. Michael Pabian, Atty. Alan J. Jackson, Atty. David R. Yannetti, and ADA Caleb J. Schillinger.

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPREME JUDICIAL COURT
                                                 FOR THE COMMONWEALTH

                                                    No. SJC-13663

COMMONWEALTH,
                Appellee

vs.

KAREN READ,
                Appellant

### STATEMENT OF AGREED FACTS

As directed by the Single Justice's reservation and report of this case to the full Court (No. SJ-2024-0332, Paper #10), the parties hereby submit this statement of the following agreed facts:

On June 9, 2022, a Norfolk County grand jury indicted the defendant, Karen Read, for murder in the second degree, G.L. c. 265, § 1; manslaughter while operating a motor vehicle under the influence of alcohol or having a blood alcohol concentration of 0.08 percent or greater, G.L. c. 265, § $13^1/_2$; and leaving the scene of personal injury resulting in death, G.L. c. 90, § 24(2)(a$^1/_2$)(2).

A jury trial on the three indictments began on April 16, 2024, with the Honorable Beverly J. Cannone presiding. On June 25, 2024, the thirty-seventh day of trial, the jury began their

deliberations.  On July 1, 2024, the trial judge declared a mistrial and discharged the jury.

On July 8, 2024, the defendant moved to dismiss on double jeopardy grounds the charges of second-degree murder and leaving the scene.  The motion was accompanied by two affidavits from her attorneys.  The Commonwealth filed a written opposition to the motion, and the defendant filed a reply.  The defendant also filed three supplemental memoranda in further support of her motion to dismiss, each accompanied by an affidavit of counsel. The Commonwealth filed a post-trial notice of disclosure.

On August 9, 2024, the trial judge heard oral arguments on the motion to dismiss.  In a written memorandum of decision and order dated August 22, 2024, and entered the next day, the trial judge denied the motion.

The defendant's retrial is currently scheduled to begin on January 27, 2025.

The parties may additionally rely on other facts reflected in the record materials, including the transcripts of the trial court proceedings.

Respectfully submitted for
Karen Read by her counsel,

*/s/ Martin G. Weinberg*
Martin G. Weinberg
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

Michael Pabian
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

Alan J. Jackson
*Admitted Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Floor 4
Los Angeles, CA 90017
(213) 688-0460

David R. Yannetti
BBO #555713
44 School Street, Suite 1000A
Boston, MA 02108
(617) 338-6006

Respectfully submitted for
the Commonwealth,

Michael W. Morrissey
District Attorney for the
Norfolk District

*/s/ Caleb J. Schillinger*
Caleb J. Schillinger
Assistant District Attorney
BBO #676592
45 Shawmut Road
Canton, MA 02021
(781) 830-4934

Dated:  September 23, 2024

3

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPREME JUDICIAL COURT
                                     FOR SUFFOLK COUNTY
                                     No. SJ-2024-0332

                                     Norfolk Superior Court
                                     No. 2282CR00117


                        COMMONWEALTH

                            <u>vs</u>.

                         KAREN READ


                 <u>RESERVATION AND REPORT</u>

        This matter came before the court, Dewar, J., on a petition

for extraordinary relief, pursuant to G. L. c. 211, § 3.  Upon

consideration thereof,[1] I hereby reserve and report this case,

without decision, for determination by the Supreme Judicial Court

for the Commonwealth.  The parties shall prepare and file in the

full court a comprehensive statement of agreed facts necessary to

resolve the issues raised by the petition.  The statement shall be

prepared in time for inclusion in the parties' record appendix.

---

        [1] At a scheduling conference held on September 12, 2024,
following this court's review of the petition as well as its
record appendix (containing, among other things, the relevant
papers filed by the Commonwealth before the Superior Court), the
court expressed its intention to reserve and report this matter to
the full court.  The court also (a) requested that the parties
confer regarding a briefing schedule before the full court, and
(b) gave the Commonwealth until September 18, 2024, to file a
response to the petition in the county court, if any.  The parties
jointly filed a proposed briefing schedule on September 17, 2024.

The record before the full court shall consist of the following:

(1)  all papers filed in SJ-2024-0332;

(2)  the docket sheet for SJ-2024-0332;

(3)  the parties' statement of agreed facts; and

(4)  this court's reservation and report.

This matter shall proceed in all respects in conformance with the Massachusetts Rules of Appellate Procedure.  The defendant-petitioner shall be designated the appellant, and the Commonwealth shall be designated the appellee.  The defendant's principal brief shall be filed no later than September 25, 2024.  The Commonwealth's brief shall be filed no later than October 16, 2024.  The defendant's reply brief, if any, shall be filed no later than October 25, 2024.  Enlargements of time should not be anticipated.  Oral argument shall take place in November 2024, or such other time as the full court may order.


                              By the Court,

                              /s/ Elizabeth N. Dewar
                              Elizabeth N. Dewar
                              Associate Justice


Entered:  September 19, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

Dated: March 18, 2025