No. 25-1257

# United States Court of Appeals
## For the First Circuit

———————————

KAREN READ,
*Petitioner-Appellant*,

*v.*

NORFOLK COUNTY SUPERIOR COURT;
ANDREA J. CAMPBELL, Massachusetts Attorney General,
*Respondents-Appellees.*

———————————

ON APPEAL FROM A FINAL ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————

**BRIEF OF RESPONDENT-APPELLEE
NORFOLK COUNTY SUPERIOR COURT**

———————————

ANDREA JOY CAMPBELL
   *Attorney General of Massachusetts*

Caleb J. Schillinger, 1st Cir. No. 1155113
   *Special Assistant Attorney General*
Assistant Norfolk District Attorney
45 Shawmut Road
Canton, Massachusetts 02021
(781) 830-4800

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

JURISDICTIONAL STATEMENT ......................................................... 1

ISSUES PRESENTED ............................................................................. 1

STATEMENT OF THE CASE .................................................................. 3

    I.      Procedural History ............................................................. 3

    II.     Jury Deadlock and Mistrial ............................................... 5

    III.    Purported Posttrial Juror Statements ................................. 9

SUMMARY OF ARGUMENT ............................................................... 14

ARGUMENT .......................................................................................... 16

    I.      Standard of Review ........................................................... 16

    II.     As a matter of federal constitutional law, the trial judge exercised sound discretion in declaring a mistrial based on the jury's deadlock .......................................................... 16

    III.    Alternatively, the petitioner may be retried on counts one and three because she consented to the mistrial ........................... 32

    IV.    The petitioner was not acquitted of any charge because no verdicts of acquittal were returned, announced, and affirmed by the jurors in open court ..................................... 34

    V.     The petitioner's requested posttrial inquiry would require delving into the jury's deliberations, an impermissible subject ......................................................... 40

CONCLUSION ....................................................................................... 50

CERTIFICATES OF COMPLIANCE AND SERVICE ......................... 51

ADDENDUM .......................................................................................... 52

# TABLE OF AUTHORITIES

**Cases**

A Juvenile v. Commonwealth,
    392 Mass. 52, 465 N.E.2d 240 (1984) ................................................. 36

Allen v. United States,
    164 U.S. 492 (1896) ................................................................................. 6

Arizona v. Washington,
    434 U.S. 497 (1978) .................................................................... 16, 17, 22

Blueford v. Arkansas,
    566 U.S. 599 (2012) ...................................... 18, 24, 28, 38, 39, 40

Commonwealth v. Fidler,
    377 Mass. 192, 385 N.E.2d 513 (1979) ............................................. 48

Commonwealth v. Nettis,
    418 Mass. 715, 640 N.E.2d 468 (1994) ............................................. 37

Commonwealth v. Rodriguez,
    364 Mass. 87, 300 N.E.2d 192 (1973) ................................................. 6

Commonwealth v. Roth,
    437 Mass. 777, 776 N.E.2d 437 (2002) ............................................. 39

Commonwealth v. Tuey,
    8 Cush. 1 (1851) ....................................................................................... 6

Commonwealth v. Zekirias,
    443 Mass. 27, 819 N.E.2d 166 (2004) ............................................... 36

Dietz v. Bouldin,
    579 U.S. 40 (2016) .................................................................... 42, 46, 48

Estelle v. McGuire,
    502 U.S. 62 (1991) ................................................................................. 28

Marshall v. Bristol Superior Ct.,
    753 F.3d 10 (1st Cir. 2014) ............................................... 16, 22, 28

McElrath v. Georgia,
   601 U.S. 87 (2024)........................................................................34, 35

Read v. Commonwealth,
   495 Mass. 312, 250 N.E.3d 551 (2025).....................................*passim*

Renico v. Lett,
   559 U.S. 766 (2010)..................................... 16, 17, 18, 22, 23, 24, 28

Smith v. Massachusetts,
   543 U.S. 462 (2005)..............................................................................34

Tanner v. United States,
   483 U.S. 107 (1987).......................................................................41, 42

United States v. Campbell,
   684 F.2d 141 (D.C. Cir. 1982) ............................................................41

United States v. Candelario-Santana,
   977 F.3d 146 (1st Cir. 2020) ...................................................18, 21, 24

United States v. Dennison,
   73 F.4th 70 (1st Cir. 2023) ............................................................24, 25

United States v. DiPietro,
   936 F.2d 6 (1st Cir. 1991) ...........................................................29, 33, 34

United States v. Dotson,
   817 F.2d 1127 (5th Cir. 1987) .............................................................37

United States v. Garske,
   939 F.3d 321 (1st Cir. 2019) .........................................................24, 25

United States v. Stauffer,
   922 F.2d 508 (9th Cir. 1990) ...............................................................37

United States v. Toribio-Lugo,
   376 F.3d 33 (1st Cir. 2004) ...........................................................27, 34

United States v. Tsarnaev,
   96 F.4th 441 (1st Cir. 2024) ................................................................48

<u>Warger</u> v. <u>Shauers</u>,
 574 U.S. 40 (2014) ................................................................41

**Statutes**

28 U.S.C. § 1291 .........................................................................1

28 U.S.C. § 2241 ......................................................................1, 28

28 U.S.C. § 2253 .........................................................................1

28 U.S.C. § 2254 ........................................................................24

Mass. Gen. Laws ch. 90, § 24(2)(a½)(2) ..................................3

Mass. Gen. Laws ch. 211, § 3 ...................................................4

Mass. Gen. Laws ch. 234A, § 68C .................................6, 21, 26

Mass. Gen. Laws ch. 265, § 1 ....................................................3

Mass. Gen. Laws ch. 265, § 13½ ...............................................3

**Other Authorities**

Fed. R. Evid. 606(b) ..............................................................41, 42

Mass. R. Crim. P. 27(a) ............................................................35

Mass. R. Crim. P. 27(b) ............................................................26

# JURISDICTIONAL STATEMENT

The petitioner-appellant, Karen Read ("petitioner"), appeals a final order of the United States District Court for the District of Massachusetts ("District Court"), denying her petition for a writ of habeas corpus. The District Court had subject matter jurisdiction of the petition under 28 U.S.C. § 2241 ("section 2241"). Add. 9.[1] The petitioner is on pretrial release and remains subject to state-imposed restrictions on her liberty while awaiting retrial on criminal charges in Massachusetts state court. JA 149, 152, 516.

On March 13, 2025, the District Court issued its final order and granted a certificate of appealability as to all grounds raised in the petition. JA 4; Add. 29-30. The petitioner timely filed a notice of appeal that same day. JA 4, 653. This Court has jurisdiction of the appeal pursuant to 28 U.S.C. §§ 1291 and 2253.

# ISSUES PRESENTED

I.     Whether the trial judge abused her broad discretion in declaring a mistrial, where the jury had deliberated nearly 30 hours over five days, and had sent the judge three increasingly emphatic notes reporting that they were deadlocked, the state courts found that the jury was genuinely deadlocked, the Massachusetts Supreme Judicial Court further held as a matter of state law that inquiring about a

---

[1] The petitioner's appellate brief is cited as Pet. Br. __; the addendum to that brief as Add. __; and the parties' joint appendix as JA __.

1

partial verdict or polling the jury risked coercing a verdict, state law barred the judge from ordering further deliberation unless the jury consented and the jury's third note made clear that they would not consent, and the Supreme Court has repeatedly reaffirmed that trial judges are not required as a matter of federal constitutional law to consider any particular means of breaking a jury's impasse or to take any specific steps before declaring a mistrial.

II.     Whether the trial judge erred in concluding that the petitioner consented to the mistrial, where counsel did not object to the mistrial, express disagreement with that outcome, or ask to be heard on the matter, despite having had multiple opportunities to do so, including while counsel and the judge remained in the courtroom and discussed scheduling further proceedings in the case.

III.    Whether the petitioner was acquitted of the charges of second-degree murder and leaving the scene, where the jury did not return, announce, and affirm any verdicts in open court.

IV.     Whether the petitioner is entitled to a posttrial inquiry to probe the jurors' deliberations concerning whether there were, and the nature of, any votes to acquit her on two charges, where the Supreme Court has repeatedly reaffirmed that jurors should not be asked to testify about the substance of their deliberations in order to protect the sanctity of those deliberations and avoid the possibility of jurors being beset by harassment, pressure, and coercion.

# STATEMENT OF THE CASE

## I.    Procedural History

In 2022, a Norfolk County grand jury returned three indictments against the petitioner, charging her with murder in the second degree, Mass. Gen. Laws ch. 265, § 1 ("count one"); manslaughter while operating a motor vehicle under the influence of alcohol, Mass. Gen. Laws ch. 265, § 13½ ("count two"); and leaving the scene of personal injury resulting in death, Mass. Gen. Laws ch. 90, § 24(2)(a½)(2) ("count three").  JA 186-191.  A jury trial on the three indictments began in Norfolk County Superior Court on April 16, 2024, and lasted over two months.  JA 147-148.  On July 1, 2024, the fifth day of deliberations, the trial judge declared a mistrial based on jury deadlock.  JA 315.

Following the mistrial, the petitioner filed a motion to dismiss counts one and three on double jeopardy grounds, or in the alternative, to conduct a posttrial juror inquiry.  JA 184, 319.  The motion was accompanied by two affidavits from her attorneys describing statements purportedly made by some jurors after the mistrial.  JA 184, 330-335.  The Commonwealth filed an opposition to the motion, and the petitioner filed a reply.  JA 184, 342, 357.  The petitioner also filed three supplemental memoranda, each accompanied by an affidavit of counsel that included additional alleged posttrial juror statements.  JA 184-185, 336-341, 367-

371, 374-378.  On August 9, 2024, the trial judge heard argument.  JA 185, 379.

On August 23, 2024, the judge denied the motion.  JA 185, 435.

On September 11, 2024, the petitioner filed a petition for extraordinary relief

pursuant to Mass. Gen. Laws ch. 211, § 3, seeking review by the Massachusetts

Supreme Judicial Court ("SJC") of the order denying her motion to dismiss.[2]

JA 52, 465.  A single justice of the SJC reserved and reported the case for

determination by the full court.  JA 470.  On February 11, 2025, the full SJC issued

a unanimous opinion affirming the trial judge's denial of the petitioner's motion.

Read v. Commonwealth, 495 Mass. 312, 250 N.E.3d 551 (2025).

On February 18, 2025, the petitioner filed in the District Court her habeas

corpus petition pursuant to section 2241.  JA 2, 5.  The District Court issued an

expedited briefing and hearing schedule in light of the petitioner's retrial set to

begin on April 1, 2025.  JA 2; Add. 8.  Respondent Norfolk County Superior Court

filed an opposition; the petitioner submitted a reply; and the District Court heard

oral arguments on March 5, 2025.  JA 3.  On March 13, 2025, the District Court

issued memoranda and orders denying the petition and granting a certificate of

appealability.  JA 4, Add. 1-30.

---

[2] Mass. Gen. Laws ch. 211, § 3 confers upon the SJC a power of "general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided . . . ."

## II.    Jury Deadlock and Mistrial

On Tuesday, June 25, 2024, the thirty-seventh day of the petitioner's first trial, the judge charged the jury.  JA 192, 194.  She instructed the jury on the three indictments, as well as two lesser-included offenses of count two:  involuntary manslaughter and motor vehicle homicide.  JA 215-234.  Before deliberations began, the judge indicated that the jury would be given separate verdict slips for each of the three indictments.  JA 236.  She explained to the jury the procedure for delivering the verdicts:

> After the final vote of the jury, the foreperson should check the appropriate boxes as to each charge, then sign and date the verdict slips and notify the court officer that you have reached a unanimous verdict.  You will then be brought back into the courtroom, where the foreperson will deliver the verdicts to the Court.

JA 242.  She also instructed the jury to "continue deliberating until [they] ha[d] reached a final verdict on each charge," and not to disclose to anyone, including the judge, their progress or numerical standing "before such time as [they] ha[d] reached a unanimous verdict."  JA 237, 241.  The jury then began deliberations that same afternoon.  JA 244.

Deliberations continued over the next three days.  JA 257-258, 275-276, 289-292, 294-297.  On Friday, June 28, after approximately 19 hours of deliberations, the foreperson submitted a note to the judge ("first note") that stated:

> I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict.

JA 538, 297; <u>Read</u>, 495 Mass. at 314, 250 N.E.3d at 555.  After reading the note into the record, the judge requested argument from the parties on whether the jury had engaged in "due and thorough" deliberation.[3]  JA 298.  The Commonwealth argued that the jury had not had sufficient time to deliberate, and that it was therefore too soon to give a <u>Tuey</u>-<u>Rodriguez</u> instruction.[4]  JA 298.  The defense disagreed and argued that the jury were "communicating to the Court that they've exhausted all manner of compromise, all manner of persuasion and they are at an impasse."  JA 299.  Defense counsel asked the judge to give the <u>Tuey</u>-<u>Rodriguez</u>

---

[3] Mass. Gen. Laws ch. 234A, § 68C provides:

> If a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law.

[4] See <u>Commonwealth</u> v. <u>Rodriguez</u>, 364 Mass. 87, 98-103, 300 N.E.2d 192, 200-203 (1973) (approving modified version of charge set out in <u>Commonwealth</u> v. <u>Tuey</u>, 8 Cush. 1, 2-3 [1851], for prospective use with deadlocked juries).  The so-called <u>Tuey</u>-<u>Rodriguez</u> is the Massachusetts equivalent of the federal <u>Allen</u> charge. See <u>Allen</u> v. <u>United States</u>, 164 U.S. 492 (1896).  It is "a model instruction given when jurors report deadlock after due and thorough deliberation that is designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view.  Once a deadlocked jury receives the <u>Tuey</u>-<u>Rodriguez</u> charge and resumes their deliberations, 'they shall not be sent out again without their own consent.'"  <u>Read</u>, 495 Mass. at 315 n.4, 250 N.E.3d at 555, quoting Mass. Gen. Laws ch. 234A, § 68C (other internal quotations and citation omitted).

instruction.  JA 299.  The judge determined that there had not yet been due and thorough deliberation, given the length of the trial, the amount of evidence presented through 74 witnesses and 657 exhibits, the complexity of the issues, and the fact that each of the prior days of deliberations had been shortened.  JA 300.  She instructed the jury to continue deliberating.  JA 301.

Deliberations extended through that Friday afternoon and resumed the following Monday morning, July 1, 2024.  JA 302-303, 307-308.  At around 10:45 a.m. on Monday, the jury foreperson submitted another note to the judge ("second note"), which stated:

> Despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind.
>
> The divergence in our views are [sic] not rooted in a lack of understanding or effort, but deeply held convictions that each of us carry ultimately leading to a point where consensus is unattainable.
>
> We recognize the weight of this admission and the implications it holds.

JA 539, 308, 311, 437.  Upon receiving this note, the judge again invited argument on whether there had been due and thorough deliberation.  JA 308-309.  Although by this point the jury had already deliberated for approximately 24 to 25 hours, the Commonwealth argued it was still premature to conclude that their deliberations had been due and thorough.  JA 308-309; Read, 495 Mass. at 315 n.5, 250 N.E.3d at 556.  Defense counsel, however, maintained that the jury had "come back now twice, indicating essentially that they are hopelessly deadlocked," and that it was

"time for a Tuey-Rodriguez." JA 309. The defense again requested the <u>Tuey-Rodriguez</u> instruction. JA 310. The judge determined that the jury had engaged in due and thorough deliberation, noting that this jury had been "extraordinary" and that she had "never seen a note like this reporting to be at an impasse." JA 310. The judge gave the jury the <u>Tuey</u>-<u>Rodriguez</u> instruction and sent them back to deliberate further. JA 311-314.

Later that day, at around 2:30 p.m., the foreperson submitted yet another note to the judge ("third note"). JA 314-315, 438. By that point, the jury had deliberated for approximately 28 hours. <u>Read</u>, 495 Mass. at 320, 250 N.E.3d at 560. The third note stated:

> Despite our rigorous efforts, we continue to find ourselves at an impasse.
>
> Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyound [sic] a reasonable doubt. Convers[e]ly, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of the charges[.]
>
> The deep division is not due to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions.
>
> To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs.

JA 540, 314-315. After the judge received the third note, the parties returned to the courtroom, the case was called, and the judge informed counsel that "[t]he jury is at an impasse." JA 314. The jury were called back into the courtroom, and the third note was read aloud into the record. JA 314-315. Upon reaching the final

line of the note—stating that further deliberation would "force [the jury] to compromise these deeply held beliefs"—the judge addressed the jury, saying, "I am not going to do that to you, folks," and she declared a mistrial. JA 315.

The judge discharged the jury back to the deliberation room, explaining that she would meet them there privately to thank them for their service. JA 315. The judge and the parties remained in the courtroom and scheduled a date to return for a status conference. JA 316-317. At no point during this discussion did defense counsel object to the declaration of a mistrial, express disagreement with that outcome, or ask to be heard on the matter. JA 316-317; <u>Read</u>, 495 Mass. at 316, 250 N.E.3d at 557.

## III. Purported Posttrial Juror Statements

One week later, on July 8, the petitioner filed her motion to dismiss along with affidavits from her counsel, Attorneys Alan Jackson and David Yannetti. JA 184, 330, 333. Attorney Jackson's affidavit stated that, on July 2, a purported juror ("Juror A") contacted him. JA 333. He said he was able to identify which juror they were from his conversation with them. JA 333. According to Attorney Jackson, Juror A said the jury had unanimously agreed that the petitioner was not guilty of count one (murder in the second degree), and "shortly following that determination," they also had unanimously agreed that she was not guilty of count three (leaving the scene of personal injury resulting in death). JA 334.

Attorney Yannetti's affidavit stated that he had received communications from two "informants," both on July 3. JA 330. He said one of these informants ("Informant B") sent him a screenshot that Informant B had received from some other person ("Intermediary B") of text messages that Intermediary B allegedly had received from a purported juror ("Juror B"). JA 330. Attorney Yannetti believed he could confirm Juror B had been a deliberating juror based on a first name for Juror B given to him by Informant B. JA 330. According to Attorney Yannetti, Juror B allegedly texted Intermediary B: "It was not guilty on second degree. And split in half for the second charge. When the judge sent us back with that Hernandez [sic] thing to look at the other side it turned into a bully match. I thought the prosecution didn't prove the case. No one thought she hit him on purpose or even thought she hit him on purpose [sic]." JA 330.

Attorney Yannetti stated that the other informant ("Informant C") had contacted him to say that they personally knew a purported juror ("Juror C"), as they and Juror C used to work together and had a mutual friend ("Intermediary C") who was a current co-worker and friend of Juror C. JA 331. Informant C also knew from Intermediary C that Juror C would be participating in a Zoom meeting with friends to discuss the trial. JA 331. Three days later, Informant C sent Attorney Yannetti screenshots of text messages exchanged between Informant C

and Intermediary C, in which Intermediary C purportedly reported what Juror C had allegedly said during the Zoom meeting.  JA 331.

According to Attorney Yannetti, Intermediary C texted, "no consideration for murder 2.  manslaughter started polling at 6/6 then ended deadlocked @ 4no8yes"; Informant C texted back, "if it was no consideration for murder two, shouldn't she have been acquitted on that count. [A]nd hung on the remaining chargers [sic]," and Intermediary C responded, "she should've been acquitted I agree.  Yes, the remaining charges were what they were hung on."  JA 331-332.  Based on the descriptions of Juror C by Informant C and Intermediary C, Attorney Yannetti said he could positively identify Juror C as a deliberating juror.  JA 332.

On July 10, Attorney Jackson submitted a supplemental affidavit stating that, on July 8, he was contacted by a purported juror ("Juror D").  JA 184, 339.  He said he was able to identify which juror they were from his conversation with them.  JA 339.  According to Attorney Jackson, Juror D said the jury had unanimously agreed that the petitioner was not guilty of counts one and three, and that the jury's disagreement was solely as to count two and its lesser-included offenses.  JA 340.

Attorney Jackson submitted a second supplemental affidavit on July 18.  JA 184, 370.  He stated that he had been contacted the day before, July 17, by a purported juror ("Juror E").  JA 370.  He again said he could identify the individual

as a deliberating juror.  JA 370.  According to Attorney Jackson, Juror E said the jury was "unanimous on 1 and 3," the petitioner was not guilty, and the jurors deadlocked only on the "lower charges" on count two.  JA 370.

On August 1, 2024, the Commonwealth filed in the trial court a notice disclosing that, on July 21, an unsolicited voicemail was left on the office phoneline of one of the trial prosecutors.  JA 184, 372.  The caller, who identified themself as a juror by full name and seat number, stated, "it is true what has come out recently about the jury being unanimous on charges 1 and 3."  JA 372.  That same individual left another unsolicited voicemail for the prosecutor on July 26, stating that they "can confirm unanimous on charges one and three, as not guilty[,] and as of last vote 9-3 guilty on the manslaughter charges . . . on the lower-level manslaughter charges."  JA 372.

The Commonwealth further disclosed in this notice that it also had received emails from three individuals who identified themselves as jurors and wished to speak anonymously.  JA 372.  The Commonwealth had responded to the emails by stating that, although it would welcome the opportunity to discuss the evidence or its case, it was ethically prohibited from inquiring into the substance of the jury's deliberations and could not promise confidentiality, as it might be required to disclose any such communications to the defense or the court.  JA 372-373.

All three individuals declined to communicate further and provided no information about the jury's purported votes.  JA 373.

On August 5, Attorney Yannetti submitted a supplemental affidavit stating that he had received an unsolicited phone call on July 31.  JA 185, 377.  The caller said they had been a juror in the case, and based on what they represented to be their full name, Attorney Yannetti stated that he was able to confirm that the caller was the person identified as Juror B in his prior affidavit.  JA 377.  According to Attorney Yannetti, the caller said the jury had reached unanimous not-guilty verdicts on "indictments (1) and (3)" and had been deadlocked only on "indictment (2)."  JA 377.  The caller also said they were familiar with Attorney Yannetti's prior affidavit and the text message exchange referenced in paragraph four of the affidavit (quoted above) was accurate, except that they had meant to write, "No one thought she hit him on purpose or even knew that she had hit him." JA 377-378.  The caller "believe[d] that other jurors ha[d] been reluctant to come forward because there is so much public and media attention focused on this case." JA 378.

## SUMMARY OF ARGUMENT

The trial judge exercised sound discretion in declaring a mistrial based on the jury's deadlock, as reported in three increasingly emphatic notes over five days and nearly 30 hours of deliberations. The judge did not act rashly or prematurely. She took a measured and iterative approach, declaring a mistrial only when it became clear that the jury was genuinely deadlocked, they did not consent to continue deliberating and could not be compelled to do so, and further inquiry risked coercing a verdict. Nothing more was required here as a matter of federal constitutional law.

Irrespective of whether there was a manifest necessity for the mistrial, the petitioner may be retried on counts one and three because she consented to the mistrial. Counsel did not object to the mistrial, express disagreement with that outcome, or ask to be heard on the matter, despite ample opportunity to do so, including while counsel and the judge remained in the courtroom and discussed scheduling further proceedings in the case.

As the state courts and the District Court correctly concluded, the petitioner was not acquitted of any charges. The jury did not return, announce, and affirm any verdicts in open court; to the contrary, their only open and public, unanimous acts were their repeated statements that they were deadlocked. The alleged private, unreported, and unrecorded agreements that some of the jurors purportedly say

were reached at some unidentified point during their deliberations are not acquittals.

The District Court, like the SJC, also correctly concluded that the petitioner is not entitled to a posttrial inquiry of the jurors. The proposed inquiry necessarily would require a court to delve into the substance of the jurors' deliberations. But Massachusetts law probits probing the content of a jury's deliberations. And federal law is not to the contrary. The anti-impeachment principle in Federal Rule of Evidence 606(b) reflects sound policy considerations that apply to deliberations generally, namely those of protecting jurors from harassment or coercion, and shielding deliberations from public scrutiny to encourage frankness and freedom of discussion among the jurors. Both of those considerations are implicated here. Any inquiry would need to resolve at least (1) inconsistencies between the jurors' notes during trial and their posttrial communications, (2) inconsistences among their posttrial communications, (3) whether any votes were tentative or part of evolving compromise(s), and (4) whether the jurors have experienced any posttrial pressures or influences that may affect their memories or answers to questions posed during the inquiry. Convening a posttrial inquiry to probe those topics may leave jurors reluctant to serve if they believe that their service may not end when the trial concludes but could instead lead to future inconvenience, embarrassment, or harassment. The Constitution does not require such a result.

# ARGUMENT

## I. Standard of Review

This Court reviews "a district court's disposition of a section 2241 petition de novo." Marshall v. Bristol Superior Ct., 753 F.3d 10, 16 (1st Cir. 2014). "[A]s a federal habeas court reviewing a petition under section 2241," this Court "must defer to the SJC's findings of fact but must undertake plenary review of that court's resolution of issues of law." Id. (quotation and citation omitted). In conducting its "plenary" review, however, this Court is bound by and must accept the SJC's interpretations of Massachusetts law. See id. at 12, 19 ("We are similarly bound by the state court's construction of its state statutes and other issues of state law.").

## II. As a matter of federal constitutional law, the trial judge exercised sound discretion in declaring a mistrial based on the jury's deadlock.

"A mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict has been long considered the classic basis for a proper mistrial" and poses no double jeopardy bar to retrial. Renico v. Lett, 559 U.S. 766, 774 (2010) (quotation omitted).[5] The decision to declare a mistrial because of a deadlocked jury is entrusted to the trial judge's "broad discretion" and "accorded great deference" on review. Id. at 774, quoting Arizona v. Washington, 434 U.S. 497,

---

[5] The petitioner presented no claim in the state-court proceedings or in her habeas petition that the evidence at her first trial "was legally insufficient to support a conviction on any of the charges, which would preclude retrial." Read, 495 Mass. at 313, 250 N.E.3d at 554. See JA 10-11.

509, 510 (1978). In <u>Renico</u>, the Court reiterated that "[t]he reasons for 'allowing the trial judge to exercise broad discretion' are 'especially compelling' in cases involving a potentially deadlocked jury" because "'the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate,'" and absent "such deference, trial judges might otherwise 'employ coercive means to break the apparent deadlock,' thereby creating a 'significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors.'" <u>Renico</u>, 559 U.S. at 774, quoting <u>Washington</u>, 434 U.S. at 509-510 & n.28. See also <u>Read</u>, 495 Mass. at 319, 250 N.E.3d at 559 ("Trial judges receive such discretion to avoid the possibility of coercive measures being used to force jury agreement, thereby protecting the fairness of the proceedings.").

In addition, the Court went on to reaffirm what is *not* required as a matter of federal constitutional law in exercising that broad discretion:

> We have expressly declined to require the mechanical application of any rigid formula when trial judges decide whether jury deadlock warrants a mistrial. We have also explicitly held that a trial judge declaring a mistrial is not required to make explicit findings of manifest necessity nor to articulate on the record all the factors which informed the deliberate exercise of [their] discretion. And we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the

impasse. In 1981, then-Justice Rehnquist noted that this Court had never
overturned a trial court's declaration of a mistrial after a jury was unable to
reach a verdict on the ground that the manifest necessity standard had not
been met. The same remains true today, nearly 30 years later.

Renico, 559 U.S. at 775 (quotations and citations omitted). Accord Blueford v.

Arkansas, 566 U.S. 599, 609 (2012) (rejecting defendant's argument that, before

declaring mistrial, trial court was required to take "'some action,' whether through

partial verdict forms or other means, to allow the jury to give effect" to any

purported unanimity on charges despite reported deadlock, and reaffirming that

"[w]e have never required a trial court, before declaring a mistrial because of a

hung jury, to consider any particular means of breaking the impasse"). Following

Renico and Blueford, this Court similarly has held that trial judges are not required

"to take specific steps or make specific findings before concluding that a jury is

deadlocked and unlikely to reach a verdict." United States v. Candelario-Santana,

977 F.3d 146, 158 (1st Cir. 2020), citing Renico, 559 U.S. at 775-776. Rather, a

judge exercises sound discretion to declare a mistrial based on deadlock so long as

she "take[s] some step to ensure that the jury truly is unable to reach a verdict

before discharging it." Id. (emphasis in original).

Here, the trial judge more than satisfied this requirement. The jury's first

note came after approximately 19 hours of deliberations over four days. Read, 495

Mass. at 314, 250 N.E.3d at 555. In it, they stated that "despite our exhaustive

review of the evidence and our diligent consideration of all disputed evidence,

we have been unable to reach a unanimous verdict." JA 538. The judge did not rush to declare a mistrial. Instead, she heard from the parties. JA 298. And even though defense counsel insisted that the jury already had "exhausted all manner of compromise, all manner of persuasion," and were "at an impasse," the judge still did not immediately declare a mistrial. JA 299. She took the measured approach of considering the extent of the jury's deliberations in view of the trial length, the amount of evidence presented, and the complexity of the issues; she concluded the deliberations had not yet been due and thorough; and she instructed the jury to continue deliberating. JA 300-301.

The jury then "deliberated for another five to six hours -- spanning a Friday afternoon and the following Monday morning -- before sending a second note that was noticeably more definitive." Read, 495 Mass. at 320, 250 N.E.3d at 559. The second note stated, "we find ourselves deeply divided by fundamental differences in our opinions and state of mind," the "divergence in our views are [sic] not rooted in a lack of understanding or efforts, but deeply held convictions," and "consensus is unattainable." JA 539. See Read, 495 Mass. at 320, 250 N.E.3d at 559 (this second note "echo[ed] language from other cases where [the SJC has] characterized a jury's report of deadlock as 'unambiguous'"). Again, the judge did not race to declare a mistrial. She once more gave the parties an opportunity to be heard. JA 308-309. Defense counsel again insisted the jury were "hopelessly

deadlocked." JA 309. Still, the judge did not declare a mistrial. See <u>Read</u>, 495 Mass. at 320, 250 N.E.3d at 559-560 (despite second note's definitive language and defense counsel's argument, judge still "did not immediately conclude that all hope of attaining a verdict was lost"). Instead, she gave the <u>Tuey</u>-<u>Rodriguez</u> charge as requested by the petitioner. JA 310-314.

"After nearly four hours of additional deliberation -[-] bringing the total to approximately twenty-eight hours -- the jury submitted a third note that was even more emphatic." <u>Read</u>, 495 Mass. at 320, 250 N.E.3d at 560. The third note stated, "we continue to find ourselves at an impasse," "[o]ur perspectives on the evidence are starkly divided" stemming from "a sincere adherence to our individual principles and moral convictions," and further deliberations "would be futile and only serve to force us to compromise these deeply held beliefs." JA 540. It was only then, after all of the steps described above, and in light of Mass. Gen. Laws ch. 234A, § 68C and the tone and content of the jury's final note, that the judge declared a mistrial.

In denying the petitioner's motion to dismiss, the trial judge explained that she "had no doubt based on the jury's notes to the Court that [the jury] was unable to reach a unanimous verdict." JA 449-450. Nothing in the jury's three notes, she found, "indicated agreement on any of the charges," or even an "inkling of an indication of agreement," despite the evident "care that went into writing the notes

and how articulately they expressed the jurors' disagreement." JA 450. It was also "clear" to the judge from the third note that the jurors "would not consent to continuing their deliberations." JA 447. And at that point the judge was precluded by Massachusetts law from ordering the jury to continue deliberations without their consent. See Mass. Gen. Laws ch. 234A, § 68C; Read, 495 Mass. at 321, 323, 250 N.E.3d at 560, 562; Add. 16 (District Court finding that trial judge "reasonably determined under the circumstances that the jury would not consent to do so").

The SJC likewise found that "[t]he jury clearly stated during deliberations that they had not reached a unanimous verdict on any of the charges and could not do so." Read, 495 Mass. at 313, 250 N.E.3d at 555. "The first and second notes provided no indication of a partial consensus, and the third note"—with its repeated references to "the charges"—"plainly implied the opposite." Id. at 322, 561. "In short, the record before the trial judge suggested complete deadlock." Id.

The trial judge took not just "some step," but multiple steps, to determine that the jury was "genuinely deadlocked" before declaring a mistrial. Candelario-Santana, 977 F.3d at 158 (emphases in original). Both the trial judge and the SJC found that the jury truly was unable to reach a verdict. See Read, 495 Mass. at 326, 250 N.E.3d at 563-564 ("Considering the length of jury deliberations, the judge's prior efforts to encourage consensus, and the increasingly emphatic tone of the jury notes indicating deadlock, it was clear the jury had reached an impasse.");

Marshall, 753 F.3d at 16 (federal habeas court must defer to state courts' factual findings). As the District Court correctly concluded, "[t]he evidence that the jury was at an unresolvable impasse was substantial, and the trial judge, in the exercise of her 'broad discretion,' made a well-grounded decision to declare a mistrial." Add. 16. See Renico, 559 U.S. at 775, quoting Washington, 434 U.S. at 510 n.28, 514 (exercise of discretion is sound where judge does not act "irrationally or irresponsibly" or "for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling").

The petitioner's argument to the contrary rests on several flawed grounds. Pointing to the language in Washington that the burden of justifying a mistrial rests on the prosecution, she claims the SJC and the District Court improperly shifted that burden to her. See Pet. Br. 20, quoting Washington, 434 U.S. at 505. But Washington explains that a deadlocked jury is the type of manifest necessity sufficient to meet that burden—indeed, it is the "classic basis for a proper mistrial." Washington, 434 U.S. at 509. Moreover, it is the type of mistrial for which the trial judge's exercise of discretion is accorded the greatest level of deference on the continuum of appellate scrutiny. See id. at 509-510. The question then becomes whether the judge here abused her "broad discretion" in declaring a mistrial based on jury deadlock, id., which is exactly the question that the SJC and the District Court addressed. There was no burden shifting.

The petitioner further contends that the question of whether the trial judge abused her discretion reduces to three dispositive criteria. See Pet. Br. 20-22. In Renico, the Court expressly rejected this same proposition: that a judge's exercise of sound discretion in the context of a deadlocked jury hinges on "whether the judge (1) heard the opinions of the parties' counsel about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly." Renico, 559 U.S. at 778-779 (quotation omitted). The Court cautioned that Washington "nowhere established these three factors as a constitutional test that determines whether a trial judge has exercised sound discretion in declaring a mistrial," nor could such factors properly be understood as merely an "illuminat[ion]" of Washington. Id. at 779 (quotations and citations omitted). The Court further noted that although the trial judge in that case "could have asked the foreperson additional followup questions, granted additional time for further deliberations, or consulted with the prosecutor and defense counsel before acting," and that "[a]ny of these steps would have been appropriate under the circumstances," none of these steps "was required" under the Court's "double jeopardy precedents." Id. at 779. The trial judge's alleged failure here to do that which was not required under the Constitution is not a basis for granting habeas relief.

*Renico* is not inapposite, despite the petitioner's suggestion to the contrary. See Pet. Br. 29-30. Although the habeas petition in that case was brought pursuant to 28 U.S.C. § 2254 ("section 2254"), the Court's discussion of what trial judges are not obligated do before declaring a mistrial when the jury is at an impasse, and its rejection of a multi-factor test for determining whether a judge has exercised sound discretion in declaring such a mistrial, were based on the Court's double jeopardy precedents, separate and apart from the additional deference required under section 2254. See *Renico*, 559 U.S. at 778-779. In *Blueford*, the Court rebuffed a similar attempt to distinguish *Renico* on the basis of section 2254. There, the dissent argued, like the petitioner does here, that because the mistrial question in *Renico* arose in the context of a section 2254 case, *Renico* "has little to say about a trial judge's responsibilities, or this Court's, on direct review." *Blueford*, 566 U.S. at 620 n.4 (Sotomayor, J., dissenting). The majority opinion by Chief Justice Roberts (who also wrote for the majority in *Renico*) disagreed, noting that *Renico*'s "discussion of the applicable legal principles concerns just that, and the dissent in any event does not dispute that we have never required a trial court to consider any particular means of breaking a jury impasse." Id. at 609 n.2.

To be sure, this Court has referenced these three factors post-*Renico* and *Blueford*. See *United States* v. *Dennison*, 73 F.4th 70, 78 (1st Cir. 2023); *Candelario-Santana*, 977 F.3d at 158; *United States* v. *Garske*, 939 F.3d 321, 334

(1st Cir. 2019).  But the petitioner asks this Court to go further and, in this habeas case reviewing a state high court's unanimous decision, to essentially declare that they are dispositive criteria that must be satisfied to support a finding of manifest necessity.  Even putting aside Renico and Blueford, they are not.  See Dennison, 73 F.4th at 78 ("We caution, though, that those factors serve only as a starting point, and that our review must attend to the particular problem that confronted the trial judge" [quotations and citations omitted]); Garske, 939 F.3d at 334 (while "useful to consider" those factors, they "serve only as a starting point" and "[e]ach case is sui generis and must be assessed on its idiosyncratic facts" [quotations omitted]).

Yet, even if this Court were to conclude otherwise, the petitioner still would not be entitled to relief.  See Read, 495 Mass. at 319, 250 N.E.3d at 559 (under state law, reviewing court "considers whether the judge carefully explored alternatives to a mistrial, and whether counsel were given full opportunity to be heard" [quotations and citation omitted]).  As described above, and as the SJC and the District Court found, the judge "did consider and pursue such alternatives."  Id. at 321, 560.  See Add. 16 (District Court finding trial judge "did, in fact, consider such alternatives").  After the jury's first note reporting a deadlock, the judge instructed the jury to continue deliberating.  JA 300-301.  Following the second note, reporting a deadlock in even stronger terms, she issued the Tuey-Rodriguez instruction.  JA 310-314.  "It was only when the jury submitted their third report of

25

deadlock, at which point the judge was statutorily precluded from ordering them to continue deliberations without their consent, see [Mass. Gen. Laws ch.] 234A, § 68C, that the judge declared a mistrial." Read, 495 Mass. at 321, 250 N.E.3d at 560.

The petitioner argues that the judge's actions in response to the first and second notes are of no moment. They concerned a "separate legal issue," she claims, "namely the propriety of a *Tuey-Rodriguez* instruction," and thus "say[] nothing about the requisite consideration of alternatives *to a mistrial*." Pet. Br. 24-25 (emphasis in original). These were not unrelated issues. Instructing the jury to continue deliberating, and then giving the Tuey-Rodriguez charge to encourage consensus among the jurors, were alternatives to declaring a mistrial based on the jury's deadlock as reported in the first and second notes.

The petitioner further contends that the trial judge, in response to the jury's third note, should have inquired pursuant to Mass. R. Crim. P. 27(b) as to the existence of any partial verdicts. See Pet. Br. 2, 23-24. The SJC, construing Massachusetts law—Rule 27; ch. 234A, § 68C; and the SJC's prior precedents—held that the judge was not required to make additional inquiry into the jury's deliberations, including the possibility of a partial verdict, or to poll the jurors to confirm their deadlock, and that had she done so, it would have improperly "risked coercing a verdict." See Read, 495 Mass. at 321-324, 326, 250 N.E.3d at 560-562.

"Indeed, if the judge had inquired about a partial verdict on her own initiative, and the jury returned a verdict of guilty on any of the counts, there is no question that this [petitioner] would be making a strenuous -- and potentially meritorious -- argument that that guilty verdict was the product of coercive intrusion into the function of the jury." Id. at 324, 562 (quotation omitted).[6]

Alternatively, the petitioner claims that there would have been nothing coercive about asking the jury if they would consent to further deliberation. See Pet. Br. 25-26. But this ignores the clear and emphatic language in the third note, which stated that the jury's "deep division [was] not due to a lack of effort or diligence, but rather a sincere adherence to [their] individual principles and moral convictions" and that "[t]o continue to deliberate would be futile and only serve to force [them] to compromise these deeply held beliefs." JA 540. The SJC held that, in these circumstances, "[a]sking jurors whether they would nonetheless consent to further deliberation would have implicitly pressured them to compromise those beliefs in order to salvage some part of the trial," and "there is simply too great a risk that any resulting verdict would merely be the product of one hasty, final

---

[6] This Court's decision in United States v. Toribio-Lugo, 376 F.3d 33 (1st Cir. 2004), which the petitioner cites at length (see Pet. Br. 26-28 & 30 n.7), is readily distinguishable. That case dealt with an absent juror, not a deadlocked jury, and there was an evident and viable alternative to a mistrial—the parties could have agreed to proceed with eleven jurors. See Toribio-Lugo, 376 F.3d at 39.

attempt to satisfy the judge's apparent desire for some form of decision on the case." Read, 495 Mass. at 323-324, 250 N.E.3d at 562 (quotations omitted).

As there was no federal constitutional imperative that the trial judge make these inquiries, see Renico, 559 U.S. at 775, and Blueford, 566 U.S. at 609, the SJC's determination that further inquiry was not a viable alternative to a mistrial as a matter of state law is dispositive. See Marshall, 753 F.3d at 12, 19 (federal habeas court "bound by the state court's construction of its state statutes and other issues of state law").[7]

Nor did the trial judge fail to provide defense counsel an opportunity to be heard. See Read, 495 Mass. at 325-326, 250 N.E.3d at 563; Add. 15-16. The judge solicited counsel's views after the first and second notes. As the District Court observed, "by the time of the second note, if not earlier, it should have been obvious to all parties that a mistrial was highly likely." Add. 15. Counsel had insisted based on those notes that the jury were "at an impasse" and "hopelessly deadlocked." JA 299, 309. The trial judge noted that experienced counsel, "in

---

[7] Even if there had been an error under state law in the application of Mass. R. Crim. P. 27, such a state-law error alone would not be a basis for relief. As relevant here, section 2241 does not permit relief unless a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Cf. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (affirming, in section 2254 context, that "federal habeas corpus relief does not lie for errors of state law" and "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States" [quotation omitted]).

arguing twice that due and thorough deliberations had occurred and pushing for the [Tuey-Rodriguez] instruction, presumably was aware of the legal implications if the jury returned deadlocked again." JA 448. The record does not support the petitioner's suggestions that counsel requested the Tuey-Rodriguez with no consideration that a mistrial would be declared if the jury remained at an impasse after the charge, or that counsel had no reasonable opportunity to discuss the possibility of a mistrial with the petitioner at any point during the three-day period between the first and the third notes. See Pet. Br. 33-34.

The trial judge, the SJC, and the District Court also found that counsel had multiple opportunities to object to the declaration of a mistrial if counsel in fact wanted to do so at the time. Counsel could have objected, or at least have asked to be heard on the matter—whether counsel made a request to be heard at that moment or at some point before any final decision was made on a mistrial—while waiting for the jurors to enter the courtroom, especially since the judge had announced to counsel that the jury remained at an impasse. JA 448; Add. 15-16. The defense also could have objected or asked to be heard during the subsequent discussion with the judge about scheduling a status hearing, or even while the jurors were still at the courthouse and waiting in the deliberation room for the judge to speak to them. JA 448; Add. 16; Read, 495 Mass. at 316, 325, 250 N.E.3d at 557, 563. See, e.g., United States v. DiPietro, 936 F.2d 6, 11 (1st Cir. 1991)

(noting that "[a]lthough the jury was dismissed when the mistrial was declared, upon an immediate objection, the court could have asked the jury to remain while reconsidering its decision").

The judge further found that, had counsel objected or raised an issue, she would have heard from counsel. JA 448. She made a point to note that "defense counsel were no shrinking violets."[8] JA 448. They had never needed the judge to inquire whether they had an objection in order to be heard, and she had never refused them an opportunity to be heard, making it difficult for the judge "to believe that when counsel heard that the jury was at an impasse for a third time and a mistrial was inevitable, at perhaps the most crucial point in the trial, counsel would sit silently if they did not consent to a mistrial." JA 448-449. See Read, 495 Mass. at 318, 250 N.E.3d at 558.

Despite these several opportunities, defense counsel neither objected to nor expressed any disagreement with the declaration of a mistrial. See id. at 325, 563. The trial judge therefore found not credible the assertions in the petitioner's motion to dismiss that the declaration of the mistrial was "sudden" and "unexpected," or defense counsel's assertion in his affidavit in support of the motion that he lacked an opportunity to be heard. See id.; JA 334, 448-449. These findings and

_____

[8] For an illustrative example, see JA 260-262, 449.

credibility determinations belie the petitioner's claim that counsel was not afforded "a sufficient opportunity to be heard." Pet. Br. 33.

The SJC additionally found that, in all events, there was "no indication that inviting defense counsel to participate in a third round of consultation would have produced any fruitful alternatives" to a mistrial. Read, 495 Mass. at 325, 250 N.E.3d at 563 (quotation omitted). As discussed, the judge was statutorily barred from requiring further deliberation without the jury's consent, and the third note made clear that the jury would not consent. "Furthermore, nothing suggested that defense counsel would have requested an inquiry into the possibility of a partial verdict based on the content of the jury notes." Id. Quoting the language in the third note, the SJC observed, "[i]t is difficult to imagine that a competent defense attorney, upon learning that some members of the jury 'firmly believe[d]' the evidence proved 'the elements of the charges' beyond a reasonable doubt, would request that the jury be instructed to return verdicts on any charges where agreement had been reached." Id. at n.12.

Finally, and as the District Court found, the trial judge "cannot be said to have acted precipitately and without adequate time for reflection." Add. 15. Although the petitioner's arguments repeatedly focus in insolation on the interval of time between the receipt of the third note and the judge's declaration of a mistrial, "the relevant inquiry is not confined to" that interval. Id. "By that point,

the jury had deliberated for nearly 30 hours, and had sent three notes to the court indicating that they were deadlocked—the latter two making that point with considerable emphasis." Id. Far from being sudden, unexpected, or a rush to judgment "in the span of over two minutes" (Pet. Br. 39), the decision to declare a mistrial was, in fact, "the product of a multi-day discussion between counsel and the court." Add. 15.

III. **Alternatively, the petitioner may be retried on counts one and three because she consented to the mistrial.**

The trial judge concluded that defense counsel's silence despite ample opportunity to be heard constituted implied consent to the mistrial. JA 446-449. Having determined that the mistrial was manifestly necessary, the SJC and the District Court did not need to reach that issue of consent, and they declined to do so. See Read, 495 Mass. at 326 n.13, 250 N.E.3d at 564; Add. 17 n.9. The petitioner addresses the issue in a footnote in her brief, asserting that this Court should find that she did not consent because she did not affirmatively request a mistrial and she did not impliedly consent because she had no opportunity to object. See Pet. Br. 19 n.4. As detailed above, however, counsel had ample opportunity to object but neither did so nor even asked to be heard concerning the mistrial declaration, including while still in the courtroom and discussing with the judge a date for a status conference. JA 316-317. That is sufficient to permit a finding of implied consent, which independently removes any bar to retrying the

petitioner, irrespective of whether there was a manifest necessity for the mistrial. See <u>DiPietro</u>, 936 F.2d at 9-10 (manifest necessity test inapplicable "when the defendant has requested or effectually consented to the mistrial," and consent "may be inferred from silence where a defendant had the opportunity to object and failed to do so").

In <u>DiPietro</u>, the trial judge declared a mistrial *sua sponte* because of prejudicial error in the government's closing argument and excused the jury. <u>Id</u>. at 7-8. Afterward, counsel and the judge remained in the courtroom as the judge explained the reason for the mistrial, defense counsel made a motion for judgment of acquittal, and counsel discussed with the judge acceptable dates for a new trial. <u>Id</u>. at 11. This Court held that defense counsel had "ample opportunity to object" to the mistrial while still in the courtroom with the judge, and because she did not object, the defendant was deemed to have consented to the mistrial. See <u>id</u>. at 11-12.

Here too, if the petitioner objected to the mistrial or believed the judge's ruling to be in error, counsel had ample opportunity to lodge an objection or ask to be heard on the matter while conferring with the judge in the courtroom after the jury had been excused. That would have been a pertinent and appropriate subject to raise with the judge before (or at least in connection with) scheduling further proceedings in preparation for a retrial. But at no point did defense counsel do so.

Contrast <u>Toribio-Lugo</u>, 376 F.3d at 40-41 (counsel had no fair opportunity to object to mistrial where she made attempts to be heard but judge repeatedly cut her off). The petitioner therefore should be found to have consented to the mistrial.[9]

## IV.  The petitioner was not acquitted of any charge because no verdicts of acquittal were returned, announced, and affirmed by the jurors in open court.

In determining "whether the Double Jeopardy Clause recognizes an event as an acquittal," the question is whether—"given the operation of state law"—the jury "acted on [their] view that the prosecution had failed to prove its case" and there has been a "ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." <u>McElrath</u> v. <u>Georgia</u>, 601 U.S. 87, 96 (2024) (quotations omitted).  See <u>Read</u>, 495 Mass. at 327, 250 N.E.3d at 564 (acknowledging same); <u>Smith</u> v. <u>Massachusetts</u>, 543 U.S. 462, 470-474 (2005) (suggesting double-jeopardy ruling might be different if state had adopted different procedural rules).

---

[9] <u>DiPietro</u> is not distinguishable on the grounds the petitioner argued to the District Court.  See JA 586-587.  In particular, this Court found that counsel in that case had ample opportunity to object based solely on the discussion in the courtroom after the mistrial was declared—the Court specifically noted that it did not matter whether counsel may have been on "inquiry notice" of the possibility of a mistrial because of an earlier conference with the judge to review a transcript of the government's argument, nor was counsel's ample opportunity to object based on the courtroom discussion "in combination with the other prior opportunities to object" (JA 586).  See <u>DiPietro</u>, 936 F.2d at 11 ("Even absent such a reasonable expectation [that counsel was on inquiry notice and should have been prepared for a potential mistrial], there was ample opportunity to object when the mistrial decision was declared by the trial court.").

The SJC's declaration of what constitutes a valid jury verdict under "the operation of state law" is definitive and binding in this habeas action:

> [T]he fundamental requirements for a jury's issuance of a verdict in a criminal case are set forth in Mass. R. Crim. P. 27(a). Pursuant to that rule, a valid jury verdict must be unanimous and returned by the jury to the judge in open court. Our case law confirms that a criminal verdict is effective only when affirmed by jurors in open court. In other words, the distinction between informal agreement on a verdict and the actual return, receipt, and recording of a verdict in open court is central -- only the latter constitutes a final verdict of the jury on a criminal charge. We have consistently reaffirmed this long-standing distinction throughout our jurisprudence.

Read, 495 Mass. at 327-328, 250 N.E.3d at 565 (quotations and citations omitted).

Here, the jury did not return, announce, and affirm a final verdict on any charge. Their only open and public, unanimous acts were their statements to the judge that they were unable to reach a unanimous verdict or to attain consensus, remained at an impasse, and were starkly divided on whether the evidence was sufficient to establish the elements of "the charges." See id. at 328, 565 ("Far from an affirmation in open court of unanimous agreement on counts one and three, these notes clearly reflected a lack of consensus on 'the charges.' Even if the jury's deadlock pertained specifically to count two, their notes made no such distinction, nor did they indicate any verdict would be returned to the judge in open court, as required by Mass. R. Crim. P. 27(a)" [quotations and citations omitted]). As such, the trial judge, the SJC, and the District Court correctly ruled that the petitioner was not acquitted of any charge. See id., quoting McElrath, 601 U.S. at 96 ("In the

absence of a verdict returned, received, and recorded in open court, we cannot conclude that the jury 'acted on [their] view that the prosecution had failed to prove its case.'"); Add. 21.

The requirement of an open and public verdict announced and affirmed in court "is far from a mere formality," Read, 495 Mass. at 329, 250 N.E.3d at 566, though the petitioner argues otherwise. See Pet. Br. 42. "Public affirmation in open court provides safeguards against mistakes." A Juvenile v. Commonwealth, 392 Mass. 52, 57, 465 N.E.2d 240, 244 (1984). See also Commonwealth v. Zekirias, 443 Mass. 27, 33, 819 N.E.2d 166, 170 (2004) (verdict must be "affirmed in open court, as the unanimous act of the jury, and in presence of the whole panel," so that each juror may express dissent if their decision has been mistaken, misrepresented, or coerced by other jurors [quotation omitted]). It also protects each juror's right to re-evaluate their position and to change their mind on any issue or their vote on any charge during deliberations. See Read, 495 Mass. at 329, 250 N.E.3d at 566 ("these principles recognize that, as a practical matter, jurors may agree in the course of deliberations to a tentative compromise on the facts of a case or on the disposition of related charges as they attempt to reach unanimous agreement," and "[s]ince a jury should not be precluded from reconsidering a previous vote on any issue, tentative or conditional agreements reached amid deliberations cannot have the force of a final verdict" [quotations and citations

omitted]).[10]  Indeed, under state law, even after jurors agree upon a verdict, fill out

a verdict slip, and walk into the courtroom, any juror still remains free to change

their mind before the verdict is affirmed and recorded.  See Commonwealth v.

Nettis, 418 Mass. 715, 718-719, 640 N.E.2d 468, 471 (1994).  "Requiring a jury to

publicly affirm their verdict in open court thus serves a vital purpose -- it ensures

that the verdict agreed upon in private truly reflects the unanimous and deliberate

judgment of each juror under public scrutiny, rather than a tentative compromise."

Read, 495 Mass. at 329, 250 N.E.3d at 566.

Federal precedent does not command a different result here, as Blueford

makes clear.[11]  There, the foreperson disclosed to the judge—in open court, in the

---

[10] State law confirms that the possibility of a juror changing their mind is not
merely hypothetical.  See, e.g., JA 527 n.10 (listing cases).

[11] The petitioner relies on several inapposite cases, in which juries *did* return
verdicts or the proceedings were terminated by judicial action.  See Pet. Br. 40, 42-
43.  She also cites two cases where juries returned verdicts but filled out the verdict
forms incorrectly, and the courts amended the forms to correct those clerical errors.
See Pet. Br. 43-44; United States v. Dotson, 817 F.2d 1127, 1129-1131 (5th Cir.
1987); United States v. Stauffer, 922 F.2d 508, 511, 513-514 (9th Cir. 1990).  That
is quite different from the situation here, where the jury never returned and
affirmed any verdict showing that they had reached a final and unanimous
agreement (whatever it might be), and instead repeatedly reported that they were
deadlocked.  In the context of cases terminated by judicial action, double jeopardy
principles distinguish between a ruling on the merits and a ruling on procedural
grounds; the substance of the ruling, regardless of its form or how it is styled,
makes a difference.  There is no such distinction with a jury determination at least
because juries do not make procedural rulings.  Nor does judicial action require the
same safeguards that are served by the verdict-in-open-court requirement to
confirm the actual and final outcome of deliberations by twelve individuals.

presence of the other jurors—that the jury had voted unanimously against guilt on two of the offenses, were deadlocked on a third, and had not voted on a fourth. See Blueford, 566 U.S. at 603-604.  The jury continued to deliberate, later reported to the judge that they had not reached a verdict, and the judge declared a mistrial. See id. at 604.

The defendant in that case similarly argued "acquittal is a matter of substance, not form," and that he had been "actually acquitted" of the two offenses based on the foreperson's earlier report of the jury's unanimous votes.  Id. at 605-606.  The Supreme Court expressed no endorsement of his premise of substance-not-form and instead rejected the argument on its own terms.  See id. at 606, 608 (reported votes "lacked the finality necessary to amount to an acquittal on those offenses, *quite apart from any requirement that a formal verdict be returned or judgment entered*" [emphasis added]).  "The foreperson's report was not a final resolution of anything," the Court held, because the jurors continued to deliberate after that report and therefore were free to revisit their prior votes and to change their minds.  Id. at 606-608.  The Court further noted that it would be "unjustified" to assume the reported votes did not later change given the possibility that even a single juror could have rethought their position on those offenses.  Id. at 608.

The petitioner seeks to distinguish Blueford on the ground that the purported juror statements at issue here supposedly reflect the jury's position at the end of

their deliberations.  See Pet. Br. 46.  For one thing, as the District Court noted, a closer reading of the statements reveals that they do not actually identify at what point during the five days of deliberations the jury allegedly reached unanimous agreements on two of the charges.  See Add.21; JA 330-334, 339-340, 370-373, 377-378.  They therefore do not foreclose the possibility that the supposed unanimity perceived by some jurors was based on a preliminary discussion or straw poll conducted early on in, or at the start of, the deliberations—the very scenario cited by the Supreme Court as a cautionary example.  See Blueford, 566 U.S. at 607-608 ("A single juror's change of mind is all it takes to require the jury to reconsider").  See also Commonwealth v. Roth, 437 Mass. 777, 793, 776 N.E.2d 437, 448 (2002) (even "most recent 'vote' immediately prior to reporting deadlock may well be tentative, a failed experiment in compromise, and not a true expression of each juror's assessment of the case").  For another thing, the purported statements also do not—and cannot—establish that none of the twelve jurors would have changed their mind had the jury gone through the process of returning and affirming a verdict in open court, and the solemnity that attends such an occasion.  It is the rendering of a verdict that communicates the *true* finality and unanimity of the deliberations.  And "[b]ecause the jury did not publicly affirm that the [petitioner] was not guilty of the charges, there was no acquittal barring retrial

under the double jeopardy clause." Read, 495 Mass. at 329-330, 250 N.E.3d at 566.[12]

## V. The petitioner's requested posttrial inquiry would require delving into the jury's deliberations, an impermissible subject.

The petitioner contends, in the alternative, that she is entitled to a posttrial inquiry of the jurors. See Pet. Br. 47-58. The SJC and the District Court rightly rejected that contention. The requested inquiry would contravene Massachusetts law and its "prohibition on probing the content of juror deliberations," Read, 495 Mass. at 330, 250 N.E.3d at 567, and it would be "fraught with potential problems," Add. 23. As the SJC emphasized, "[m]aintaining the secrecy of those deliberations is a bedrock of our judicial system," which "not only prevents jury tampering but also upholds the finality of jury verdicts and fosters confidence in the judicial process." Read, 495 Mass. at 330-331, 250 N.E.3d at 567 (quotation omitted). "Probing secret deliberations to determine whether the jurors may have privately agreed on a verdict they never returned would undermine these fundamental principles." Id. at 331, 567.

---

[12] The petitioner points to additional substance-not-form language in the dissent in Blueford to support her position (see Pet. Br. 45), but even the dissent considered the announcement of the foreperson's report in open court to be essential. See Blueford, 566 U.S. at 616 (Sotomayor, J., dissenting) ("And when that decision was announced in open court, it became entitled to full double jeopardy protection."). Here, unlike in Blueford, "any such agreement was not reported in open court in the presence of the other jurors, casting further doubt on the finality of any vote." Add. 21.

Federal law is not to the contrary and does not compel such an inquiry to be made notwithstanding state law. The Supreme Court has repeatedly affirmed the common law anti-impeachment principle, which is embodied in Federal Rule of Evidence 606(b)(1) and provides that jurors may not be asked to impeach a verdict by testifying about matters internal to their deliberations.[13] See, e.g., <u>Warger</u> v. <u>Shauers</u>, 574 U.S. 40, 47 (2014) (juror may not testify to remarks made by another juror during deliberations which showed that the juror at issue lied during voir dire); <u>Tanner</u> v. <u>United States</u>, 483 U.S. 107, 127 (1987) (anti-impeachment rule bars juror testimony about the consumption of drugs and alcohol by members of the jury during trial). The Court has explained that "[s]ubstantial policy considerations" give rise to "the necessity of shielding jury deliberations from public scrutiny." <u>Tanner</u>, 483 U.S. at 119. If the rule were otherwise, the Court

---

[13] Federal Rule of Evidence 606(b)(2) sets forth three exceptions to the general rule that jurors may not testify about deliberations. None of those exceptions applies here. Further, the extraneous-influence cases cited in the petitioner's brief (e.g., Pet. Br. 47, 50) are readily distinguishable. Those cases involved inquiry, in certain circumstances, into external or outside-the-courtroom matters that may impermissibly have intruded into deliberations. They rest largely on the principle that a verdict should be based on the evidence heard in court. As described in more detail below, the inquiry proposed here goes directly to the deliberations themselves. And as one court has explained, "[t]he reasons for the distinction between 'extraneous' and 'intra-jury' influences on the verdict are self-evident. Outside pressures may distort the jury's deliberation to the point that its verdict results in injustice. In contrast, the give-and-take within this microcosm of the community leads to a verdict that is often the only way our legal system can define what it means by 'justice.'" <u>United States</u> v. <u>Campbell</u>, 684 F.2d 141, 151-152 (D.C. Cir. 1982) (citations omitted).

warned, "[j]urors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." Id. at 120 (quotation omitted). And, the Court continued, "[i]f evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation— to the destruction of all frankness and freedom of discussion and conference." Id. (quotation omitted).

This Court, like the District Court, should conclude that the principles and policy considerations that animate Rule 606(b) apply here in the context of the jury's deliberations preceding the mistrial declaration. Additionally, it should conclude that the proposed inquiry would require a court to conduct an impermissible probe into those deliberations.

First, while the plain terms of Rule 606(b) admittedly speak of an "inquiry into the validity of a verdict or indictment," "the same policy considerations concerning the freedom of juror deliberations and the protection of jurors against harassment are unquestionably implicated in the circumstances of this case [even though it involves a mistrial]. In fact, they apply with unusual force." Add. 25, 26. "Trials are society's way of channeling disputes into fair and impartial resolutions. But these disputes can be bitter and emotional." Dietz v. Bouldin, 579 U.S. 40, 50 (2016). Here, as the District Court noted, and as discussed in more detail infra, the

public "scrutiny" surrounding this case has been intense, the case has proven to be "unusually divisive," and jurors already have expressed fear or a desire to remain anonymous. Add. 26; JA 340, 371-72, 551. If the jurors were called upon to discuss their deliberations at this point, there is a "strong likelihood" that they would be subject to the types of harassment, pressure, and coercion that the policy underlying Rule 606(b) is intended to prevent. Add. 26.

Moreover, if the anti-impeachment principle prohibits inquiring into the deliberations that led to a guilty verdict (where a defendant is being subjected to punishment as the result of a conviction), it would seem incongruous to conclude that it permits inquiring into deliberations where a mistrial is declared (and a defendant is not serving a prison sentence upon conviction or subjected to other forms of punishment). If anything, the stakes in the scenario involving a conviction would seem higher. See also Add. 27 (District Court's decision noting that "the policy underlying Rule 606(b)(1) that favors finality is implicated, if only by analogy" because the "jury notes reporting a deadlock . . . led ineluctably to a substantial, if not final, legal consequence: the declaration of a mistrial and the termination of the first trial").

Second, the requested inquiry necessarily would entail delving into the jury's subjective reasoning and deliberative content. Although the trial judge accepted the purported juror statements (which contain two, three, or even four levels of

hearsay) as true and accurate for purposes of deciding the motion to dismiss, as did the SJC for purposes of the appeal, the judge explicitly disagreed with the petitioner's characterization of those statements as being "strong and uncontradicted." JA 443 n.4. The judge found that the statements "directly contradict[ed]" the jury's notes during their deliberations, including their final note expressing their stark divide as to the elements of "the charges." JA 443 n.4. The SJC also found that the statements were "inconsistent with" and "contradict[ed] their prior notes." Read, 495 Mass. at 313-314, 250 N.E.3d at 555. Any questioning of the jurors would need to involve questions—directly targeting the contents of the deliberations—to resolve these inconsistencies, as the District Court aptly recognized. Add. 24.

Likewise, the deliberations would need to be probed to resolve another of the petitioner's arguments, namely her contention that the jury's reference to "the charges" in its final note can readily be understood to mean count two and its lesser-included offenses. See Pet. Br. 37-38. As an initial matter, that is not the more natural and straightforward reading, it is not what the trial judge and the SJC found it to mean (findings that are entitled to deference here), and it is not consistent with the petitioner's position at trial. See JA 450 (trial judge noting, "[f]or the defense to now claim that the notes were susceptible to different interpretations such that the Court should have inquired further rings hollow,

particularly where [defense counsel] had twice argued that the jury had engaged in due and thorough deliberations and could not agree"). But more importantly, it does not matter what the petitioner now, in hindsight, claims the reference to "the charges" might mean; it matters what the jury meant at the time, and why they said it. That, too, cannot be determined without inquiring into their thinking and deliberations.

Further undermining the petitioner's assertions of some form of finality and further adding to the complexity of any inquiry at this point is the inconsistency even among the jurors who are said to have made statements after the trial. For example, according to Juror C, the jury were unanimous only as to second-degree murder and "the remaining charges were what they were hung on." JA 331-332.[14] Such a statement does not reflect unanimity on counts one *and* three. Apparently even the five purported jurors, to say nothing of the seven other jurors, were not of one mind. These and other discrepancies would need to be reconciled to establish with any confidence whether in fact, or to what extent, any unanimity may have

---

[14] There are additional contradictions. Juror B said that following Tuey-Rodriguez, the deliberations "turned into a bully match." JA 330, 377. Juror C, however, said the jurors "all got along and never heated. They agreed to disagree and respected each other." JA 332. Juror B also said the jury's vote on count two was "split in half" (JA 330, 377); Juror C said the vote "started polling at 6/6," but "ended deadlock[ed] @ 4no8yes" (JA 331); and the purported juror who left a voicemail for the prosecutor said the final vote was "9-3 guilty" (JA 372).

been reached.  That, again, would require an inquiry into the jurors' deliberative process, as the District Court properly observed.  Add. 24.

The petitioner seeks to depict her proposed inquiry as a narrow one, directed solely to the "result" of the jury's deliberations, and she claims that it can be accomplished with a single "yes" or "no" question (or series of such questions) to each juror.  See Pet. Br. 57.  "But," as the District court aptly recognized, "surely more than that would be required."  Add. 24.  In addition to exploring the discrepancies described above, any inquiry would need to resolve whether views expressed in the jury room were tentative or offered in conjunction with what the jurors believed to be an evolving compromise.  A juror could not disclose where they truly stood—that is, whether any stated position was merely tentative and depended on the resolution of the other charges, on the jury's further discussion of evidence, or on some other contingency—without "intrud[ing] into the heart of jury deliberations."  Pet. Br. 57.

Additional considerations militate against the requested inquiry.  As the Supreme Court has recognized in the context of rescinding discharge orders in civil cases, "[t]he longer the jury has been discharged, the greater the likelihood of prejudice."  Dietz, 579 U.S. at 49.  See also id. at 50 (with passage of time, "they are more likely to be exposed to potentially prejudicial sources of information or discuss the case with others, even if they do not realize they have done so or forget

when questioned after being recalled by the court").  Jurors questioned at this

point, more than eight months after they were discharged, may feel pressured to

provide responses that they believe will minimize their risk of being harmed or

harassed.  See Read, 495 Mass. at 332, 250 N.E.3d 568 (noting an inquiry of the

jurors, now, would "occur well after they became susceptible to outside

influences").  People associated with this case have been charged criminally with

witness intimidation.  JA 541.  Individuals have also expressed outrage at the jurors

and sought to identify them and release their personal information.  JA 548-550.

One of the jurors has said they fear for their personal safety and that of their

family, and they worry that they will be subject to harassment or even physical

harm because of what they did or did not do on the jury and the outcome of the

jury's deliberations.  JA 551.  Several of the purported jurors wish to remain

anonymous.  JA 340, 371-372.[15]  These circumstances explain why a "yes"/"no"

question (or series of "yes"/"no" questions) may not capture a juror's nuanced

views or concerns, lead to a reliable and accurate understanding, or sufficiently

---

[15] The petitioner appears to suggest that, given the publicity surrounding this case, if the purported juror statements did not represent the unanimous view of the jury, the remaining jurors would not have allowed the inaccuracy to go uncorrected. Pet. Br. 41.  Clearly, there is another reasonable explanation for why other jurors have not drawn further attention to themselves, as the District Court appropriately recognized.  Add. 27 n.16.  See also JA 378 (Juror B stating they believe "other jurors have been reluctant to come forward because there is so much public and media attention focused on this case").

constitute the type of solemn and formal ruling that is embodied by an actual or official verdict.  Add. 27-28.  Cf. <u>Dietz</u>, 579 U.S. at 50 ("after discharging jurors from their obligations and the passage of time, a judge should be reluctant to reempanel a jury that has witnessed emotional reactions to its verdict").[16]

Allowing such an inquiry raises forward-looking concerns as well:

> The proper evidence of the decision of the jury is the verdict returned by them upon oath and affirmed in open court; it is essential to the freedom and independence of their deliberations that their discussions in the jury room should be kept secret and inviolable; and to admit the testimony of jurors to what took place there would create distrust, embarrassment and uncertainty.

<u>Commonwealth</u> v. <u>Fidler</u>, 377 Mass. 192, 196, 385 N.E.2d 513 (1979) (quotation omitted).  If jurors' deliberations are allowed to become the subject of a posttrial inquiry because of purported statements like those here, future jurors may be hesitant to express their views fully and honestly during deliberations.  It also may be more difficult to find jurors willing to serve, both in the retrial here and in other cases, when jurors know their service may not end when the trial ends but could

---

[16] <u>United States</u> v. <u>Tsarnaev</u>, 96 F.4th 441, 453-58 (1st Cir. 2024), cited by the petitioner (Pet. Br. 48-49), is not to the contrary.  <u>Tsarnaev</u> is about how the failure of federal venirepersons to disclose information concerning potential biases during jury selection should be handled by a federal judge.  96 F.4th at 449, 458, 462.  It is not about whether the Constitution requires a posttrial inquiry of a state jury concerning its deliberations based upon anything like the showing made, or circumstances presented, here.

instead subject them to further inconvenience, embarrassment, or harassment well into the future. Simply put, the inquiry proposed here is not appropriate.[17]

*     *     *

In the end, a state jury sent three increasingly adamant notes reporting their deadlock. An experienced and careful state trial judge did not race to declare a mistrial. When the third note and the operation of state law made clear that the jury would not be able to reach a verdict on "the charges," the judge declared a mistrial. Later purported communications from five jurors, containing multiple levels of hearsay and at least some inconsistencies, did not require the judge to conclude that the jurors' public reports of deadlock were incorrect and that not-guilty verdicts had been reached on two of the charges. Nor did those communications require or permit her to call the jurors back and bypass well-established principles that forbid inquiring about deliberations. The Constitution does not compel a different result. The SJC so concluded, as did the District Court. This Court should too.

---

[17] If this Court concludes that the state courts erred by refusing to conduct a posttrial inquiry, it should, in the interest of comity, remand this matter to the state courts to undertake that task.

# **CONCLUSION**

For the foregoing reasons, the Court should affirm the decision of the

District Court.

Respectfully submitted,

NORFOLK COUNTY SUPERIOR COURT

By its attorney:

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

By: */s/ Caleb J. Schillinger*
Caleb J. Schillinger
Special Assistant Attorney General
(1st Cir. No. 1155113)
Assistant Norfolk District Attorney
45 Shawmut Road
Canton, MA 02021
(781) 830-4800

Dated: March 24, 2025

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,936 words, according to the Microsoft Word word-processing system used to the prepare the document.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Caleb J. Schillinger*
Caleb J. Schillinger
Counsel for Respondent-Appellee

Dated:  March 24, 2025

**Certificate of Service**

I hereby certify that on March 24, 2025, I filed this document with the United States Court of Appeals for the First Circuit through its CM/ECF system, and the document will be sent electronically to the registered participants as identified on the Notice of Docket Activity, including Martin G. Weinberg, Esq., and Michael F. Pabian, Esq., counsel for the petitioner-appellant, thereby effectuating service on all parties to this appeal.

*/s/ Caleb J. Schillinger*
Caleb J. Schillinger
Counsel for Respondent-Appellee

Dated:  March 24, 2025

# **ADDENDUM**

28 U.S.C. § 2241(c) ..................................................................................53

Mass. Gen. Laws ch. 234A, § 68C ........................................................53

Fed. R. Evid. 606(b)................................................................................54

Mass. R. Crim. P. 27...............................................................................54

## 28 U.S.C. § 2241(c)

(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

(5) It is necessary to bring him into court to testify or for trial.


## Mass. Gen. Laws ch. 234A, § 68C

(formerly codified at Mass. Gen. Laws ch. 234, § 34, see Mass. St. 2016, ch. 36, §§ 1 & 5, effective May 10, 2016)

If a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law.

## Fed. R. Evid. 606(b)

(b) DURING AN INQUIRY INTO THE VALIDITY OF A VERDICT OR INDICTMENT.

(1) *Prohibited Testimony or Other Evidence.* During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) *Exceptions.* A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

## Mass. R. Crim. P. 27

**(a) Return.** The verdict shall be unanimous. It shall be a general verdict returned by the jury to the judge in open court. The jury shall file a verdict slip with the clerk upon the return of the verdict.

**(b) Several Offenses or Defendants.** If there are two or more offenses or defendants tried together, the jury may with the consent of the judge at any time during its deliberations return or be required by the judge to return a verdict or verdicts with respect to the defendants or charges as to which a verdict has been reached; and thereafter the jury may in the discretion of the judge resume deliberation. The judge may declare a mistrial as to any charges upon which the jury cannot agree upon a verdict; provided, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded.

**(c) Special Questions.** The trial judge may submit special questions to the jury.

**(d) Poll of Jury.** When a verdict is returned and before the verdict is recorded, the jury may be polled in the discretion of the judge. If after the poll there is not a unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.