# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————

## No. 25-1257

———————

### KAREN READ,
**Petitioner - Appellant**

*v.*

### NORFOLK COUNTY SUPERIOR COURT; ANDREA J. CAMPBELL, MASSACHUSETTS ATTORNEY GENERAL,
**Respondents - Appellees**

———————

**On Appeal from an Order of the United States District Court
for the District of Massachusetts Denying Petition for Habeas Corpus**

———————

**REPLY BRIEF OF APPELLANT KAREN READ**

———————

Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
pabianlaw38@gmail.com

Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

## TABLE OF CONTENTS

INTRODUCTION……………………………………………………………1

ARGUMENT……………………………………………………………......2

I.    RE-PROSECUTION ON COUNTS 1 AND 3 WILL VIOLATE READ'S DOUBLE JEOPARDY RIGHTS……………………………………………2

    A.    Re-Prosecution Is Barred Because There Was No Manifest Necessity to Declare a Mistrial………………………………………………..2

        1.    *The manifest necessity standard*……………………………......2

        2.    *The record reflects no consideration of alternatives to a mistrial*………………………………………………………5

        3.    *The trial court never consulted counsel regarding the possibility of a mistrial*…………………………………………11

        4.    *The Commonwealth did not otherwise satisfy its burden of establishing manifest necessity*………………………………15

        5.    *The declaration of mistrial here was a precipitous decision made with no evident consideration of Read's Double Jeopardy rights*…………………………………………………………..18

        6.    *Read did not consent to a mistrial*……………………………19

    B.    The Jury's Unanimous Conclusion Following Trial that Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution…………………………………………………………..21

    C.    Alternatively, Petitioner Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Read………………………24

i

CONCLUSION……………………………………………………………...29

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*A Juvenile v. Commonwealth*, 392 Mass. 52 (1984)..................................................9

*Arizona v. Washington*, 434 U.S. 497 (1978) ..........................................................18

*Blueford v. Arkansas*, 566 U.S. 599 (2012) .......................................................9, 23

*Brady v. Samaha*, 667 F.2d 224 (1st Cir. 1981) ............................................ *passim*

*Camden v. Cir. Ct.*, 892 F.2d 610 (7th Cir. 1989)…………………………………...20

*Commonwealth v. Roth*, 437 Mass. 777 (2002)…………………………………….9

*Commonwealth v. Steward*, 396 Mass. 76 (1985) ..................................................12

*Commonwealth v. Valentin*, 470 Mass. 186 (2014)…………………………………20

*Commonwealth v. Villafuerte*, 72 Mass. App. Ct. 908 (2008)……………………11

*Dietz v. Bouldin*, 579 U.S. 40 (2016)……………………………………………..27

*Evans v. Thompson*, 524 F.3d 1 (1st Cir. 2008)………………………………………5

*Green v. United States*, 355 U.S. 185 (1957) .........................................................18

*McElrath v. Georgia*, 601 U.S. 87 (2024) ................................................. 21, 22, 26

*Read v. Commonwealth*, 495 Mass. 312 (2025) .......................................................8

*Renico v. Lett*, 559 U.S. 766 (2010).................................................................. *passim*

*Scott v. Harris*, 550 U.S. 372 (2007)……………………………………………...14

*Smith v. Massachusetts*, 543 U.S. 462 (2005)………………………………………22

*Tanner v. United States*, 483 U.S. 107 (1987)………………………………………27

*United States v. Campbell*, 684 F.2d 141 (D.C. Cir. 1982)............................27

*United States v. Candelario-Santana*, 977 F.3d 146 (1st Cir. 2020).............. *passim*

*United States v. DiPietro*, 936 F.2d 6 (1st Cir. 1991)............................19, 20, 21

*United States v. Donald*, 84 F.4th 59 (1st Cir. 2023)..............................14

*United States v. Dotson*, 817 F.2d 1127 (5th Cir. 1987) ........................................23

*United States v. Jorn*, 400 U.S. 470 (1971) (plurality opinion) ..............................18

*United States v. Lara-Ramirez*, 519 F.3d 76 (1st Cir. 2008) ..................................28

*United States v. Perez*, 22 U.S. 579 (1824) ............................................................5

*United States v. Ramirez*, 884 F.2d 1524 (1st Cir. 1989) ............................... *passim*

*United States v. Stauffer*, 922 F.2d 508 (9th Cir. 1990) ........................................23

*United States v. Toribio-Lugo*, 376 F.3d 33 (1st Cir. 2004)........................... *passim*

*United States v. Tsarnaev*, 96 F.4th 441 (1st Cir. 2024) ........................................24

*United States v. Villar*, 586 F.3d 76 (1st Cir. 2009) ................................................28

*Warger v. Shauers*, 574 U.S. 40 (2014)...........................................27, 28

**Constitutional Provisions**
Fifth Amendment to U.S. Constitution ....................................................................24

Sixth Amendment to U.S. Constitution ...................................................................24

**Statutes**
28 U.S.C. §2241 .....................................................................................................1, 5

28 U.S.C. §2254 .............................................................................................. 1, 3, 4, 5

Mass. Gen. Laws c. 234A, §68C ...............................................................11

**Rules**

Mass. R. Crim. P. 27(b) ................................................................. 8, 9, 11

### Note on Citations to the Record

Material contained in the Addendum to the Brief is cited as "Add:_____."

Material contained in the Appendix is cited in the Brief as "App:_____."  Read's

principal Brief is cited as "Pet.Br._____," and Respondent's Brief is cited as

"Resp.Br.___."

v

# INTRODUCTION

The district court's finding that the *sua sponte* mistrial order was supported by manifest necessity is irreconcilable with a series of this Court's precedents spanning the last four decades.  Despite Read's expressly describing those precedents as "dispositive," Respondent utterly fails to address several of them.  Respondent's silence speaks volumes.  In the context of this 28 U.S.C. §2241 petition where, unlike in §2254 cases, this Court's manifest-necessity precedents are binding, the absence of any indication in the record that the trial court considered any alternatives to a mistrial, consulted with counsel regarding its intention of declaring a mistrial, or expressed any consideration of Read's Double Jeopardy rights requires a finding that there was no manifest necessity.

Additionally, Respondent (like the district court and state courts) takes the position that there exists no possible showing, no matter how compelling, that a jury unanimously, unconditionally, and finally agreed to acquit a defendant but failed to announce such acquittal in open court that could ever entitle the defendant to a post-trial judicial inquiry to substantiate the fact of such a decision to acquit.  Respondent cites no similar or binding precedent requiring this result.  Respondent fails to convincingly explain why such a judicial inquiry should be foreclosed

when the issue is Double Jeopardy where post-trial *voir dires* are regularly

conducted upon lesser showings of extraneous influence or juror bias. Petitioner

contends that post-verdict juror *voir dires* are required when a defendant like Read

comes forward with evidence showing such a high probability that the jury reached

a final, unanimous verdict of not guilty.

## ARGUMENT

## I. RE-PROSECUTION ON COUNTS 1 AND 3 WILL VIOLATE READ'S DOUBLE JEOPARDY RIGHTS

### A. Re-Prosecution Is Barred Because There Was No Manifest Necessity to Declare a Mistrial

#### 1. *The manifest necessity standard*

Petitioner explained in detail in her opening brief why this Court's

precedents, both before and after Respondent's leading authority, *Renico v. Lett*,

559 U.S. 766 (2010), preclude any finding of manifest necessity here. Pet.Br.23,

26-30, 32, 35-39 (citing *United States v. Candelario-Santana*, 977 F.3d 146 (1st

Cir. 2020); *United States v. Toribio-Lugo*, 376 F.3d 33 (1st Cir. 2004); *United

States v. Ramirez*, 884 F.2d 1524 (1st Cir. 1989); *Brady v. Samaha*, 667 F.2d 224

(1st Cir. 1981)). Respondent largely fails to acknowledge these binding

precedents, much less convincingly distinguish them. Respondent cites

*Candelario-Santana* only for general language regarding the manifest-necessity standard, Resp.Br.18, 21, 24, without engaging at all with Petitioner's arguments regarding the applicability of that precedent to the facts *sub judice*.  Respondent fails to include even a single citation to *Ramirez* or *Brady*, despite Read's express argument that those precedents are "dispositive" here.  Pet.Br.36.  Respondent's attempt to distinguish *Toribio-Lugo*, in a two-sentence footnote, is unconvincing for reasons set forth *infra* page 10.  The foregoing precedents require reversal.  Read is not asking this Court to, as Respondent suggests, "go further" than its precedents, Resp.Br.25, but merely to apply them.

Respondent appears to mistakenly take *Renico* as license to ignore this Court's manifest-necessity caselaw.  Respondent concedes, as it must, that *Renico* involved a petition under §2254, and thus the Court's review was bound by the strictures of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which are not applicable here.  Respondent contends, however, that *Renico*'s "rejection of a multi-factor test for determining whether a judge has exercised sound discretion in declaring…a mistrial" was "separate and apart" from the limitations imposed by §2254.  Resp.Br.24.  This reading cannot be squared with the *Renico* opinion itself.

3

In addition to imposing an onerous standard of review, §2254 also severely restricts the scope of authority on which petitioners may rely. It requires "an unreasonable application of…clearly established Federal law, ***as determined by the Supreme Court of the United States***." *Renico*, 559 U.S. at 772 (quoting §2254(d)(1)) (emphasis added). It was based on this statutory provision, inapplicable here, that *Renico* "expressly rejected," Resp.Br.23, the petitioner's reliance on Sixth Circuit precedent analyzing "whether the judge (1) heard the opinions of the parties' counsel about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly." *Renico*, 559 U.S. at 778-79 (citation omitted). The Sixth Circuit caselaw did "not constitute 'clearly established Federal law, ***as determined by the Supreme Court***,' so any failure to apply that decision [could not] independently authorize habeas relief under AEDPA." *Id.* at 779 (citation omitted) (emphasis added).

*Renico*'s holding on this point did not suggest that the Sixth Circuit's multi-factorial analysis was incorrect. In fact, to the contrary, the *Renico* Court repeatedly noted that, under the deferential §2254 standard, it was not called upon to determine the correctness of the result reached by the state court. Pet.Br.30. This Court has never understood *Renico* to prevent it from outlining factors

4

relevant to the manifest-necessity analysis.  To the contrary, it has continued to rely upon the same factors.   Pet.Br.29 & n.6.  If this appeal had arisen from a §2254 petition, AEDPA would demand that the Court "essentially ignore" its own "binding precedents" and apply only clearly established Supreme Court law. *Evans v. Thompson*, 524 F.3d 1, 3 (1st Cir. 2008) (Lipez, J., dissenting from denial of rehearing *en banc* in constitutional challenge to AEDPA).  But, because Read's petition was correctly brought under §2241, this Court's precedents apply with full force.

This is no "mechanical" analysis.  *Renico*, 559 U.S. at 775 (citation omitted). The factors, to be sure, are non-exclusive and vary from case to case.  But here all three factors are clearly unsatisfied and Respondent points to no compelling additional consideration.  In these circumstances, the declaration of mistrial simply cannot be squared with the 200-year-old rule that the "power" to discharge a jury without a verdict "ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious cases." *United States v. Perez*, 22 U.S. 579, 580 (1824).

2.    *The record reflects no consideration of alternatives to a mistrial*

It has long been clear in this circuit that one "significant" consideration in

the manifest-necessity analysis is "[w]hether or not the record indicates [the court] has considered alternatives ***to a mistrial***." *Brady*, 667 F.2d at 229 (emphasis added). Here, the word "mistrial" appears only once in the trial-court record: when the judge *sua sponte* declared a mistrial in open court. Thus, there is self-evidently no indication that the court considered alternatives to a mistrial at the critical stage – when it was first considering a mistrial order rather than deciding the very distinct issue of whether to give the supplemental *Tuey-Rodriguez* instruction. Respondent nonetheless contends that the court's consideration of whether to give a *Tuey-Rodriguez* charge suffices because the issue was "not unrelated" to the prospect of a mistrial. Resp.Br.26.

As Petitioner's opening brief made clear, this Court's precedents require more. "The test is not whether the judge considered that [s]he had a problem on h[er] hands but rather whether [s]he accorded careful consideration to [defendant's] interest in having the trial concluded in a single proceeding." *Brady*, 667 F.2d at 230 (citation omitted). Thus, in *Toribio-Lugo*, the Court found consideration of the alternative of proceeding with 11 jurors inadequate, notwithstanding that the court "consulted with both" parties regarding the missing juror and defense counsel stated that she preferred to wait for the twelfth juror as

6

opposed to proceeding with 11.  376 F.3d at 36.  The absent juror was certainly "not unrelated" to the subsequent mistrial; indeed, that was the very reason a mistrial was declared.  This Court nonetheless found no manifest necessity because the court "never exhausted" the possibility of proceeding with 11 jurors.  *Id.* at 39.  Instead, the trial "court mistakenly concluded that the alternative was foreclosed by the appellant's initial expression of a preference to wait and see if the twelfth juror could be found," and, "***during the pertinent time frame, made no effort to ascertain the appellant's attitude or wishes with regard to the possibility of a mistrial***."  *Id.* (emphasis added).  So too here.  Any inference by the trial court that Read's request for a *Tuey-Rodriguez* charge indicated she was not opposed to a mistrial was clearly unjustified given that the purpose of such charge is to encourage a verdict.  But, in any event, the failure to "ascertain [Read's] attitude or wishes" about a mistrial before *sua sponte* declaring one precludes a finding of manifest necessity as does the court's failure to consider alternatives such as making a non-coercive inquiry into whether the jury had reached a decision on any one of the three separate charges.

Similarly, in *Brady*, the state court held that the trial judge had considered alternatives to a mistrial by instructing "defendants to read a case on contempt" in

response to the same type of conduct that ultimately resulted in the mistrial. 667

F.2d at 230. Again, the contempt issue was "not unrelated" to the mistrial. "But

there [wa]s nothing in the record to indicate that the judge was considering a

mistrial at that time" and ***no "hint whatsoever that the judge was aware of the***

***double jeopardy implications of his decision***," so the Court found no manifest

necessity. *Id.* at 230-31 (emphasis added); *see also Ramirez*, 884 F.2d at 1526

(finding insufficient consideration of alternatives notwithstanding that, upon

discovering potential flaw in jury venire and before declaring a mistrial, court

heard testimony from the jury clerk and deputy clerk).

There were alternatives to consider here. Neither the trial court nor the SJC

held that state law precluded inquiry (setting aside whether such inquiry is required

by state law) into the existence of any partial verdicts on separately charged

counts. *See Read v. Commonwealth*, 495 Mass. 312, 321 (2025) ("Rule

27(b)…gives a trial judge discretion to require a jury to return a verdict for charges

on which they have unanimously agreed before declaring a mistrial." (citation

omitted)). Indeed, the state courts could not have reached any such conclusion

because it would be contrary to both the applicable rule and binding SJC

precedent. *See* Mass. R. Crim. P. 27(b) ("The judge may declare a mistrial as to

any charges upon which the jury cannot agree upon a verdict; provided, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded.");[1] *A Juvenile v. Commonwealth*, 392 Mass. 52, 55 n.1 (1984) ("Where [an] indictment, in multiple counts, charges multiple crimes…a general verdict could be returned as to one of the counts, despite deadlock on the other counts.").[2]

Absent a state-law prohibition, this Court is not bound by the SJC's determination of what constitutes "a viable alternative to a mistrial" as a matter of federal constitutional law. Resp.Br.28. Importantly, this Court need not hold that the trial judge was required to pursue any particular alternative. Rather, it is the trial court's demonstrated failure to consider any available alternative that in combination with the court's failure to elicit the views of the parties and to express any consideration for the importance of Read's Double Jeopardy protections

---

[1] By contrast, the SJC has clearly prohibited judges from "initiat[ing] any inquiry into partial verdicts premised on lesser included offenses within a single…count of an indictment." *Commonwealth v. Roth*, 437 Mass. 777, 794-95 (2002). But *Roth* expressly distinguished the situation at issue here, observing that "rule 27(b) permits taking verdicts on less than all of the charges set forth in …separate indictments." *Id.* at 788.

[2] In *Blueford v. Arkansas*, 566 U.S. 599, 610 (2012), by contrast, state law prohibited a partial verdict.

precludes a finding of manifest necessity.

Again, *Toribio-Lugo* is instructive.[3]  Respondent, in an effort to distinguish that precedent, asserts that "there was an evident and viable alternative to a mistrial—the parties could have agreed to proceed with eleven jurors."  Resp.Br.27 n.6.  But that assumes the parties would, in fact, have agreed.  As noted *supra*, the defense had previously indicated its preference for 12 jurors.  And the district court relied on that fact in denying the motion to dismiss because the defendant "had [previously] refused to proceed with fewer than twelve."  376 F.3d at 37.  ***This Court did not, as Respondent invites it to do here, just accept the trial judge's assumption that the alternative was not viable at face value.  Rather, the burden was upon the trial court (and the prosecution as the party seeking retrial) to "exhaust[]" the alternative rather than precipitously declaring a mistrial.***

The same analysis should apply here.  This Court's manifest-necessity caselaw does not permit it to simply assume that the defense would have opposed inquiry regarding partial verdicts, that the trial court would have ultimately deemed such inquiry unduly coercive, or that the jury would have declined to consent to

---

[3] *See supra* pages 6-7.

further deliberations.[4]  Resp.Br.26-28.  It is the very **consideration** of those alternatives that ensures defendants' Double Jeopardy rights are not taken lightly, and that consideration is utterly lacking here.  Respondent cites no remotely similar precedent in which this Court or any other has found manifest necessity to support a mistrial.

3.    *The trial court never consulted counsel regarding the possibility of a mistrial*

It is indisputable that the trial court never consulted counsel regarding its intent to declare a mistrial or even mentioned the possibility before it *sua sponte* declared a mistrial in the presence of the jury.  As set forth in Petitioner's opening brief, this Court has found an inadequate opportunity to object in materially indistinguishable circumstances.  Pet.Br.35-36.  Respondent cites no remotely analogous case in which this or any other Court concluded there was sufficient opportunity to be heard.

It bears repeating that the word "mistrial" was not uttered, or even alluded to in any way, in the discussions following the first two jury notes.  Petitioner does

---

[4] The statutory bar on continuing deliberations without consent did not affect the court's ability to simply ask the jury whether it had reached any partial verdicts. *See* Mass. Gen. Laws c. 234A, §68C.  Otherwise, the statute would eviscerate Mass. R. Crim. P. 27(b).  *See Commonwealth v. Villafuerte*, 72 Mass. App. Ct. 908, 910 (2008) (reflecting return of partial verdict after *Tuey-Rodriguez* charge).

not contend, as Respondent suggests, that her counsel gave "no consideration" to the possibility that a mistrial might ultimately be declared. Resp.Br.29. Rather, Petitioner contends that trial counsel reasonably believed that, prior to declaring any mistrial, the judge would comply with clear caselaw entitling them to a "full opportunity to be heard." *Commonwealth v. Steward*, 396 Mass. 76, 79 (1985). Counsel also had a right to rely on the trial court's consistent practice in this case of sharing the contents of jury notes with counsel and expressly inviting them to be heard before any decision was reached by the court. Pet.Br.32. It was the court's deviation from precedent and prior practice that rendered the mistrial declaration "sudden" and "unexpected." Resp.Br.30.

Respondent next suggests that Read's counsel "could have objected" in the approximately 30 seconds that elapsed "while waiting for the jurors to enter the courtroom." Resp.Br.29. The court called for the jury immediately after informing counsel that the jury was at an impasse and without sharing the contents of the note. At the time, counsel had no way of knowing whether the jury would arrive in 30 seconds, as opposed to a mere 5 or 10 seconds. Additionally, at that time, the trial court had not yet stated its intent to declare a mistrial. After reading the jury note on the record, constituting the first time counsel learned its contents,

12

and where it was still foreseeable that the trial court would invite counsel to state

their position either with the jury being sent back to the jury room or at the sidebar,

the trial court instead, precipitously, without notice to counsel, and without having

provided counsel with any opportunity to be heard, declared a mistrial,

immediately, leaving no more than 1-2 seconds for counsel to attempt to interject.

The caselaw does not support a finding that this "opportunity" to object was

sufficient.  To the contrary, in *Ramirez* and *Brady*, which Respondent fails to even

acknowledge, the Court found no adequate opportunity, notwithstanding that

(unlike here) the trial court expressly informed counsel of its intent to declare a

mistrial outside the presence of the jury.

Similarly, Respondent persists in contending that Read's counsel could have

objected after the trial court had already declared a mistrial and discharged the

jury.  As Petitioner pointed out in her opening brief, and Respondent fails to

address, this Court has held such after-the-fact opportunity insufficient.  *See*

*Candelario-Santana*, 977 F.3d at 162 (finding insufficient opportunity where

district court "only addressed counsel after reading and confirming the verdict in

open court to ask if there was '[a]nything else' before discharging the jury");

*Renico*, 559 U.S. at 794 n.17 (Stevens, J., dissenting) ("[W]e have never suggested

13

that defendants must object to [mistrial] orders to preserve a claim, much less

object to an order issued *sua sponte* and without any advance notice.").

Whether counsel was afforded sufficient opportunity to be heard regarding a

mistrial declaration is not a "credibility determination[]," Resp.Br.30-31, or a state

court finding of fact, but a legal conclusion that the Court reaches based on review

of the transcripts and application of caselaw.  In addition to transcripts, the

interactions here between court and counsel are reflected in undisputed video

footage.  Pet.Br.31.  In these circumstances, the Court should be guided by its own

independent review of the proceedings.  *See United States v. Donald*, 84 F.4th 59,

68 (1st Cir. 2023) (rejecting district court finding as to officer's statement during

recorded interrogation because Court's "review of the recording" led it "to

conclude that it [wa]s clear" the officer made the disputed statement); *Scott v.

Harris*, 550 U.S. 372, 380-81 (2007) (granting summary judgment where

"[r]espondent's version of events [wa]s so utterly discredited by the [recording of

the car chase] that no reasonable jury could have believed him" and commenting

that the "Court of Appeals should not have relied on such visible fiction; it should

have viewed the facts in the light depicted by the videotape").

4. *The Commonwealth did not otherwise satisfy its burden of establishing manifest necessity*

Respondent's argument that there was manifest necessity based on a jury deadlock suffers from multiple fundamental errors.

First, Respondent's (as well as the district court and state courts') heavy and repeated reliance upon the trial court's purported "discretion," Resp.Br.1, 14, 16-18, 22-24, is misplaced because no deference is due where, as here, the record reflects a failure to exercise "sound discretion."  Pet.Br.39 (citing cases).  There is, of course, no discretion to *sua sponte* declare a mistrial upon receiving a jury note without more.  "With the record barren of any hint whatsoever that the judge was aware of the double jeopardy implications of h[er] decision, [the Court] cannot [find] that h[er] discretion was sound."  *Brady*, 667 F.2d 230-31.

Second, while nominally acknowledging that the prosecution, as the party seeking retrial, bears the burden of establishing manifest necessity, Respondent conclusorily asserts that the burden is satisfied because there was a deadlock.  Resp.Br.22.  This only begs the question of whether a genuine deadlock has been sufficiently proven **on all the counts (including Counts 1 and 3) rather than less than all**.  Respondent cites no authority for the proposition that a deadlock on one count could somehow constitute manifest necessity for a mistrial on all counts.

15

Contrary to clear and binding caselaw, in arguing the manifest-necessity issue, Respondent (like the district court and state courts) repeatedly reads silent or ambiguous aspects of the record against Petitioner.  Resp.Br.20-21, 31.  This is forbidden burden-shifting.

This Court's decision in *Candelario-Santana* is instructive.  There, at the sentencing phase of a death-penalty proceeding, the jury informed the court "that it was unable to come to a unanimous agreement on the issue of punishment and 'under[stood] that the Court w[ould] impose a sentence of life imprisonment without the possibility of release."  977 F.3d at 153.  The Court found it was "possible to read the verdict form as stating that the jury was divided between a sentence of life imprisonment and some lesser sentence."  *Id.* at 160.  In reaching that conclusion, it did not ask which of the competing readings offered by the parties was "more natural and straightforward," Resp.Br.44; rather, it read the "ambiguous verdict[]…in favor of the defendant."  977 F.3d at 161.

The same result is warranted here.  The jury never stated which charges it was deadlocked on, and the trial court never asked or took any other "step[] to clarify" the scope of the deadlock.  *Id.* at 160.  The Commonwealth, who bears the burden of establishing manifest necessity, similarly failed to suggest any attempted

clarification.  These circumstances preclude a finding that the Commonwealth satisfied its burden of establishing a deadlock as to all counts.  In fact, the post-trial juror statements make clear that the deadlock related only to the lesser-included "charges" within Count 2.  While this Court does "not require the [trial] court to take any specific step before" discharging a jury, it does "require *something* more than what the [trial] court did here."  *Id.* at 162.[5]

Third and finally, in an apparent attempt to shield the foregoing points from review, Respondent suggests that the state courts made a factual finding, subject to habeas deference, "that the jury truly was unable to reach a verdict."  Resp.Br.21-22.  Respondent cites no authority for the suggestion that the existence, scope, and intractability of a jury deadlock constitutes a factual finding, nor does it address or even acknowledge this Court's holding that "the inquiry into the [trial] judge's discretion and the existence vel non of manifest necessity" is "a question of law or, at most, a mixed question of law and fact," "***not*** a habeas corpus factual review."  *Brady*, 667 F. 2d at 229 n.6 (emphasis added).  Consistent with this precedent, the

---

[5] In *Candelario-Santana*, the trial court did not literally take no step to confirm the jury deadlock.  It "asked the individual members of the jury" whether the verdict was theirs.  *Id.* at 161-62.  This step was, however, unhelpful to understanding what the verdict meant.  So too here.  A *Tuey-Rodriguez* instruction may break whatever deadlock exists, but it does nothing to clarify the scope of any deadlock – something a jury poll or non-coercive question would have illuminated.

17

district court did not identify any factual findings subject to habeas deference. Instead, it found, with Respondent's express agreement, that Read's petition presented "a legal question…to consider de novo."  App:598.

5.    *The declaration of mistrial here was a precipitous decision made with no evident consideration of Read's Double Jeopardy rights*

Despite Respondent's desire to characterize the mistrial decision as "the product of a multi-day discussion," Resp.Br.32 (citation omitted), the fact remains that neither the court nor the parties mentioned or alluded to a mistrial until one was declared.  The record reflects no acknowledgment of "the financial and emotional burden" that retrial would predictably carry for Read, the continuing "stigma[]" of "an unresolved accusation of" murder, or the possibility that a second trial might increase Read's risk of suffering wrongful conviction.  *Arizona v. Washington*, 434 U.S. 497, 503-04 (1978); *see also Green v. United Sates*, 355 U.S. 184, 187-88 (1957).  In these circumstances, it simply cannot be said that the trial court "temper[ed] the decision whether…to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude h[er] confrontation with society through the verdict of a tribunal [s]he might believe to be favorably disposed to h[er] fate."  *United States v. Jorn*, 400 U.S. 470, 486

18

(1971).  As such, binding precedent makes clear that the mistrial declaration cannot stand.

### 6.    *Read did not consent to a mistrial*

The Court should reject Respondent's alternative contention, which neither the district court nor the SJC ruled upon, that Read's counsel consented to the mistrial.  The sole authority cited in support of that argument, *United States v. DiPietro*, 936 F.2d 6 (1st Cir. 1991), is readily distinguishable.  *DiPietro* did not involve a jury deadlock.  Instead, the court declared a mistrial after "the government asserted that the guilty pleas and convictions of" other alleged participants in the criminal conduct "constituted evidence that all the elements of the accusations against [defendant] had been proved."  *Id.* at 7.  After a recess, the court "summoned counsel and the court reporter, and took notes while the reporter read back the government's rebuttal argument," after which the attorneys withdrew "with no further comment."  *Id.* at 8.  Upon reconvening, "the court declared a mistrial and excused the jury."  *Id.*

*DiPietro* is inapposite here for a number of reasons.   First, "the error occurred several hours before the declaration of a mistrial" and "[d]efense counsel was arguably on inquiry notice when the court summoned the attorneys for

19

conference and reviewed the erroneous government argument to the jury." *Id.* at 11. Here, by contrast, the trial court called in the jury immediately after informing counsel that the jury was at an impasse and before it even disclosed the contents of the note to counsel contrary to its consistent prior practice and to state law. *See Commonwealth v. Valentin*, 470 Mass. 186, 194 (2014). Second, while *DiPietro* found "ample opportunity to object when the mistrial decision was declared," 936 F.2d at 11, such an opportunity to object in the presence of the jury is not sufficient where, as here, a mistrial is declared for a jury deadlock. As one authority heavily relied upon by *DiPietro* observed, "[w]hen defense counsel objects in the jury's presence after a mistrial declaration due to jury deadlock, he endures the risk that the jury will hold him responsible for compelling them to continue deliberations contrary to the opinion of both judge and jury." *Camden v. Cir. Ct.*, 892 F.2d 610, 615 n.6 (7th Cir. 1989). Finally, while *DiPietro* noted counsel's failure to object after the jury was dismissed in combination with the other prior opportunities to object, such an after-the-fact opportunity, standing alone, does not rise to the level of consent. *Cf. Candelario-Santana*, 977 F.3d at 162.[6] Moreover, the *post hoc*

---

[6] Respondent misreads *DiPietro* in contending that the purported opportunity to object after the declaration of mistrial was, without more, sufficient to give rise to consent. Resp.Br.34 n.9. The Court clearly also relied on the opportunity "when

discussion in *DiPietro*, unlike here, specifically related to the "explanation of the reason for a mistrial," 936 F.2d at 11, substantially increasing the likelihood that counsel would have raised any objection they had regarding that issue.

Finally, Respondent's characterization of *DiPietro* is contrary to the string of First Circuit precedents relied on *supra*. If counsel's mere failure to object to a *sua sponte* declaration of mistrial upon which counsel was not asked to comment amounted to consent, then the defendants in *Brady*, *Ramirez*, and *Candelario-Santana* would have been found to have consented to the mistrials, obviating the need for any manifest-necessity analysis. Clearly, that is not the law in this circuit.

### B.    The Jury's Unanimous Conclusion Following Trial that Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution

"*[W]hether an acquittal has occurred for purposes of the Double Jeopardy Clause is a question of federal, not state, law*." Pet.Br.40-41 (quoting *McElrath v. Georgia*, 601 U.S. 87, 96 (2024)). This, in itself, is sufficient to reject Respondent's argument that "[t]he SJC's declaration of what constitutes a valid jury verdict…is definitive and binding" here. Resp.Br.35. The operative question, under federal law, is whether "there has been any ruling that the prosecution's

---

the mistrial was declared," *i.e.*, when it was announced in the presence of the jury, which was insufficient here for reasons set forth *supra*.

proof is insufficient to establish criminal liability for an offense." *McElrath*, 601 U.S. at 96 (citation omitted).  While "operation of state law" may inform whether the jury reached such a conclusion, *id.*, *i.e.*, by defining what the jury was required to find, this Court may not defer to state procedural requirements regarding the form that any such finding must take.

Respondent's argument that form must control over substance in the context of a jury acquittal, though it concededly does not for judicial acquittals, Resp.Br.37 n.11, is inconsistent with *McElrath* (which refused to elevate form over substance in the context of a jury acquittal, 601 U.S. at 96), as well as the Supreme Court's instruction that "[t]he Double Jeopardy clause…prohibits reexamination of a court-decreed acquittal to the same extent it prohibits reexamination of an acquittal by jury verdict." *Smith v. Massachusetts*, 543 U.S. 462, 467 (2005).[7]  Respondent also ignores caselaw finding jury acquittals "***implied*** by a conviction on a lesser included offense…."  Pet.Br.43 (citing cases).

_____

[7] Respondent relies upon *Smith*'s observation, "[w]e think, and petitioner does not dispute, that as a general matter state law may prescribe that a judge's midtrial determination of the sufficiency of the State's proof can be reconsidered."  543 U.S. at 470 (citation omitted).  This language was *dicta* (no such state law existed) on an uncontested point.  Even crediting the *dicta arguendo*, any ability to reconsider a "midtrial" determination regarding the sufficiency of the evidence does not imply that state law may limit the Double Jeopardy implications of a final, unanimous jury conclusion following trial that the state failed to prove its case.

Respondent cites no authority for the proposition that a final and unanimous (but unannounced) finding that a defendant did not commit the offense charged has no constitutional effect.  As Respondent acknowledges, the Supreme Court in *Blueford*, while expressing "no endorsement" of the defendant's "substance-not-form" argument, did not reject such argument because, even considering "the argument on its own terms," the foreperson's mid-deliberation statement was not final.  Resp.Br.38.  Justice Sotomayor, dissenting, described "a verdict in substance" as "a final collective decision…reached after full deliberation, consideration, and compromise among the individual jurors."  566 U.S. at 616 (citation omitted).  The post-trial juror statements relied upon here facially satisfy that description.

In at least two instances, federal courts have given effect to unannounced acquittals.  *See United States v. Dotson*, 817 F.2d 1127, 1129 (5th Cir. 1987); *United States v. Stauffer*, 922 F.2d 508, 511 (9th Cir. 1990).  Respondent dismisses these cases as "inapposite" because the juries did return verdicts.  Resp.Br.37 n.11.  But the verdicts returned were ***for conviction, not acquittal***, on the relevant counts.  The case for crediting an unannounced acquittal is, if anything, stronger where, as here, that acquittal does not contradict other actions by the jury (because the jury's

23

notes were susceptible to a reading in which the deadlock was limited to the lesser-included offenses within Count 2).

### C.    Alternatively, Petitioner Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Read

Respondent's opposition to Petitioner's argument for a post-verdict inquiry is notable for what it does not dispute: (1) that, under the district court's order, and Respondent's legal position, "sworn and credible statements by all 12 jurors attesting to a final, unanimous decision to acquit would not be sufficient to mount a successful Double Jeopardy challenge," Pet.Br.47; (2) that, by contrast, in the context of juror bias or extraneous influence a single credible juror statement would require post-trial inquiry;[8] and (3) that the district court had authority to conduct the requested *voir dire* itself or to require the state trial judge to conduct it. Resp.Br.49 n.17.

---

[8] Respondent contends that *United States v. Tsarnaev*, 96 F.4th 441 (1st Cir. 2024) "is about how the failure of federal venirepersons to disclose information concerning potential biases during jury selection should be handled by a federal judge," not "whether the Constitution requires a posttrial inquiry of a state jury concerning its deliberations." Resp.Br.48 n.16. But Respondent does not even attempt to respond to Petitioner's argument that Fifth Amendment Double Jeopardy rights are no less fundamental and deserving of protection, including via post-trial inquiry where necessary, than the Sixth Amendment right to an unbiased jury.

Respondent also fails to undermine the juror statements reflected in the affidavits. Despite referring to "purported" jurors or juror statements no fewer than 18 times, Respondent cites no information that has come to light in the more than eight months since the filing of Read's motion to dismiss undermining the truth of the juror statements reflected in the affidavits or for that matter suggesting any juror's identity has been wrongfully disclosed or that any juror has been harassed.[9] Despite many opportunities, neither the Commonwealth nor Respondent has challenged the authenticity or accuracy of those statements in any way. These statements by five jurors (four directly and one indirectly) far surpass the burden of production that has been held to require post-verdict inquiry in the context of juror bias and extraneous influence, and there is simply no reason to treat Double Jeopardy protections as deserving of less protection.

Respondent additionally fails to meaningfully address the content of the juror statements. *See, e.g.*, Pet. Br.41-42. As Petitioner argued in her opening brief, the statements are inconsistent with Respondent's speculative suggestion that

---

[9] Petitioner submits that, while a desire to avoid attention may explain why one or two jurors may not have come forward, it cannot credibly explain why, if the widely publicized juror statements were not accurate, the seven other jurors would remain silent and allow the inaccuracy which went to the heart of their lengthy jury service to go uncorrected.

they "do not foreclose the possibility that the supposed unanimity…was based on a preliminary discussion or straw poll."  Resp.Br.39.  Similarly, there is not a scintilla of evidence that any juror(s) changed their minds, such that Respondent's suggestion on that point is "merely hypothetical" in this case.  Resp.Br.37 n.10.

In any event, the very *voir dire* that the Commonwealth and Respondent have consistently opposed would resolve all the speculative doubts set forth in Respondent's brief.  It would also entail the same, if not more, "solemnity" and "[p]ublic affirmation" that Respondent argues is required for jury verdicts. Resp.Br.36-37, 39.

Respondent does not explain how any "juror's nuanced views or concerns," Resp.Br.47, could undermine "an attestation from each juror that the jury voted unanimously [and finally] to acquit petitioner on Counts One and Three."  Add:27; *see also McElrath*, 601 U.S. at 97.  But, even assuming *arguendo* the court conducting *voir dire* found it necessary, Respondent cites nothing that would prohibit inquiry of jurors regarding, *inter alia*, (1) whether their communication to the court describing an impasse on "charges" was intended to communicate a deadlock on all charges, as opposed to only some; and (2) whether the jury had unanimously and finally agreed that Read is not guilty on Count 3 in addition to

Count 1 (as all four jurors who contacted trial counsel directly agreed that it had). Notably, not one of the purported inconsistencies among the juror statements cited by Respondent undermines in any respect the consensus of all five statements that the jury reached a unanimous conclusion Read is not guilty of murder.

Respondent cites no authority barring inquiry regarding the jury's verdict, or any of the foregoing questions, which facially do not implicate the jury's deliberations.[10]  Instead, it contends that "the principles and policy considerations that animate" Fed. R. Evid. 606(b), which rule the district court found and Respondent does not dispute facially does not apply here, Add:26, Resp.Br.42,

---

[10] The cases cited by Respondent on this issue are all readily distinguishable. *See Warger v. Shauers*, 574 U.S. 40, 43 (2014) (affidavit that juror "had spoken during deliberations about 'a motor vehicle collision in which her daughter was at fault for the collision and a man died,' and had 'related that if her daughter had been sued, it would have ruined her life'" (citation omitted)); *Tanner v. United States*, 483 U.S. 107, 113 (1987) (affidavit stating that "several of the jurors consumed alcohol during the lunch breaks at various times throughout the trial, causing them to sleep through the afternoons"); *United States v. Campbell*, 684 F.2d 141, 150 n.18 (D.C. Cir. 1982) (juror statement "I felt that I had swayed eleven people maybe in the wrong direction because they should have been able to deliberate more and more and more,…but they didn't seem to want to do that"). *Dietz v. Bouldin*, 579 U.S. 40, 42 (2016), involved no request for post-trial inquiry, but instead reaffirmed the district court's "power to rescind a jury discharge order and recall a jury for further deliberations after identifying an error in the jury's verdict." *Dietz*'s holding was expressly "limited to civil cases only," and the Court did not address "additional concerns in criminal cases, such as attachment of the double jeopardy bar." *Id.* at 51.

should take precedence over Read's fundamental constitutional rights. Respondent unsurprisingly cites no precedent for giving such weighty effect to "policy considerations" not enacted into law. To the contrary, prior to the enactment of Rule 606(b), the Supreme Court had held "that the rule against jurors' impeaching their verdicts applie[d] only in a proceeding actually impeaching that verdict," which indisputably does not describe this case in which Petitioner is attempting to prove that the jury reached a verdict. *Warger v. Shauers*, 574 U.S. 40, 47 (2014). And this Court has held that, at least in some circumstances, inquiry is required even when (unlike in the present case) it violates Rule 606(b). *See United States v. Villar*, 586 F.3d 76, 87 (1st Cir. 2009); *United States v. Lara-Ramirez*, 519 F.3d 76, 87 (1st Cir. 2008) ("[C]oncern for the sanctity of jury deliberations may not be elevated above the defendant's right to have h[er] fate decided by the first jury empaneled in h[er] case."). Respondent's proffered concerns about juror fear and/or safety could be addressed by proceeding anonymously. It is noteworthy in this regard that to date no juror identity has been disclosed as a result of more than eight months' litigation regarding this issue.

Ultimately, Respondent's argument, while framed as an effort to protect jurors, would, if accepted by the Court, ignore much of the results of the jurors'

service.  The jury in this case sat for 41 trial days, taking time away from their occupations and families in an effort to resolve this matter.  After the court declared a mistrial, at least four of those jurors took it upon themselves to make known that, as a result of their significant efforts, the jury reached a conclusion that Read is not guilty of murder.  The district court order, which prevents any such unannounced acquittal from ever being given effect, undermines the fundamental interest of our criminal justice system in ensuring that decisions reached by a unanimous jury of the defendant's peers are given effect, not ignored.  Read herself, of course, also has a fundamental constitutional interest in ensuring that she is not prosecuted for murder after a jury concluded following trial that she is not guilty of that offense.  Respondent has failed to provide this Court with a single precedent where in the face of proof that a prior jury reached a unanimous verdict in favor of the defendant, the same sovereign has been permitted to re-prosecute the same defendant for the same offense.

## CONCLUSION

For the foregoing reasons and those set forth in Petitioner's opening brief, the district court's denial of Read's petition should be reversed.

Respectfully submitted,
Karen Read
By her Attorneys,

**/s/ Michael Pabian**                                    **/s/ Martin G. Weinberg**
Michael Pabian                                                Martin G. Weinberg
20 Park Plaza, Suite 1000                            20 Park Plaza, Suite 1000
Boston, Massachusetts 02116                     Boston, Massachusetts 02116
(617) 227-3700 (Telephone)                       (617) 227-3700 (Telephone)
(617) 338-9538 (Fax)                                  (617) 338-9538 (Fax)
pabianlaw38@gmail.co                              owlmgw@att.net

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.     This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 6,499 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14-point font.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

Dated:  March 26, 2025

**CERTIFICATE OF SERVICE**

I, Martin G. Weinberg, hereby certify that on this 26th day of March 2025, this Brief was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

<u>**/s/ Martin G. Weinberg**</u>
Martin G. Weinberg

Dated:  March 26, 2025